UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLIED INDUSTRIAL SUPPLY LLC,

    Plaintiff

v.

CHRISTOPHER STONE

    Defendant

                                    /

Case No. 1:22-cv-815
Hon. Paul L. Maloney

**DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Defendant, Christopher Stone, in support of his Motion for Summary Judgment, hereby presents the following Statement of Material Facts:

**I.   LVA'S FOUNDING**

1.    Stone founded Lehigh Valley Abrasives, LLC ("LVA"), a New Jersey limited liability company, in approximately 2006. (Ex. 1 (hereinafter "Stone Dep.") 9:25-10:3).

2.    Stone developed the idea for the business because during his previous employment, he identified a European supplier of a product called a flap disc used for metalworking that he could acquire for one-tenth of the cost of that same product in the United States. (Stone Dep. 18:11-19:7).

3.    That supplier—Sundisc—was the largest manufacture of flap discs in Europe but did not then have a presence in the United States. (Stone Dep. 23:19-24:8).

4.    In 2007, however, that changed when Sundisc founded Sundisc Abrasives USA in Saint Louis, Missouri.

## II. LVA'S OPERATIONS

5.  The philosophy that Stone used to build LVA was to "have a core product line" of complementary products used in similar applications. (Stone Dep. 45:13-21).

6.  To that end, the "core" of LVA's offerings were "abrasives for metalworking; and specifically for cleaning and finishing metal welding and fabrications." (Stone Dep. 46:10-20).

7.  So, for example, although LVA sold abrasives, it did not sell abrasives for all applications; abrasives suitable for metal work are different from other applications because it is being used on "an extremely hard surface so the structure of the grain is a much -- a harder material you want to use for the grain." (Stone Dep. 90:25-91:2).

8.  Having identified the core offerings, Stone went about developing his business.

9.  To develop and grow his business, Stone employed multiple strategies. (Stone Dep. 17:17-23).

10. First, he established an ecommerce website. (Stone Dep. 17:17-23).

11. The original ecommerce company Stone used to host LVA's ecommerce store was called ProStores. (Stone Dep. 28:19-29:7; Declaration of Christopher (hereinafter "Stone Decl.") ¶¶ 3-11, Ex. A).

12. In connection with that ecommerce site, Stone established the email address "info@lehighvalleyabrasives.com" no later than 2007. (See Stone Dep. 86:19-23; Stone Decl. ¶¶ 3-11, Ex. A).

13. Second, he joined a trade association called the National Ornamental Metalworkers, which, as its name implies, is concerned with metalworking. (Stone Dep. 58:12-21).

14. Given LVA's focus on metalworking applications, it made sense that Stone would focus on that trade association because other abrasive applications, such as woodworking, require a different type of abrasive. (Stone Dep. 91:4-6).

15. For that reason, during Stone's operation of LVA he did not receive inquiries from individuals who wished to use LVA's products in woodworking applications. (Stone Dep. 92:7-15).

16. Third, he cold called potential customers. (Stone Dep. 58:12-21).

17. Finally, he used internet advertising, such as Google AdWords, services to promote LVA. (Stone Dep. 103:14-19).

18. In the early years, LVA had fifty to one hundred customers that were a mix of smaller buyers who brought from eBay and larger customers with whom Stone had an existing relationship. (Stone Dep. 26:9-22).

19. As LVA's business grew, it expanded its product offerings into complementary areas, such as cutting wheels. (Stone Dep. 40:19-41:5).

20. One consistent aspect of the business was how its customers placed orders: customers primarily placed orders was through the ecommerce website, over the phone, or through the email account info@lehighvalleyabrasives.com. (Stone Dep. 32:11-16; 35:18-23).

21. Occasionally, a customer would send purchase requests to Stone's personal email address—clslcs2000@hotmail.com ("Hotmail Account")—those requests were rare and typically from close acquaintances, such as Stone's brother-in-law. (Stone Dep. 36:1-37:3).

22. In any event, whenever a customer placed an order over the phone or through email, those orders were entered into QuickBooks; so, throughout Stone's ownership of LVA, all its sales were recorded in its ecommerce store or its QuickBooks database and nowhere else. (Stone Dep. 40:8-13; Exs. 2-3).

23. Throughout Stone's ownership of LVA, its historical customer list was maintained in its ecommerce program, QuickBooks, or ConstantContact and nowhere else. (Stone Dep. 71:13-72:2; Ex. 4).

24. Throughout Stone's ownership of LVA, the list of products sold was maintained in its ecommerce site and nowhere else. (Stone Dep. 72:3-7).

25. After running LVA for years and growing it into a multimillion-dollar enterprise, Stone decided to sell the business because he wanted to take time off to do religious mission work. (Stone Dep. 93:18-94:4).

### III. STONE AND THE PLAINTIFF NEGOTIATE THE SALE OF LVA

26. Stone and the Plaintiff began negotiating the sale of LVA in June 2014. (Ex. 5).

27. At the time of the sale, LVA had "several thousand" customers. (Stone Dep. 63:10-13).

28. Its gross sales were around $3.5 million per year. (Stone Dep. 51:18-21).

29. The net profit from LVA's operation was around $400,000 per year. (Stone Dep. 52:8-11).

30. To generate that sales volume, the LVA had to make thousands of sales per year because the average sale was between $100 to $150, and no client accounted for even 5% of total sales. (Stone Dep. 63:14-64:9).

31. The Plaintiff was primarily interested in LVA because the Plaintiff was "in it's [sic] infancy" and was "not in 'operations' yet…." (Ex. 5).

32. The Plaintiff recognized that LVA was a "niche based business…" that would allow it to jumpstart its own operations. (*Id.*).

33. After the parties agreed upon terms, they executed a series of documents to effectuate the transaction. As relevant to this litigation, the parties executed an asset purchase agreement,

which included a consulting agreement and a non-compete agreement. (Stone Decl. ¶ 12, Ex. B (hereinafter "APA")).

### a. The APA

34. The APA effectuated the sale of LVA's assets that were used in the business of LVA. (APA ¶ 1).

35. The purchase price was $1.3 million, to be paid 1) by $800,000 in cash at closing and 2) by delivery of at $500,000 promissory note. (APA ¶ 3).

36. The APA was to be interpreted "in accordance with the laws of the State of New Jersey and shall be subject to the sole jurisdiction of the State of New Jersey or the federal courts with jurisdiction in the same." (APA ¶ 27).

#### i. Asset List and Allocation

37. Exhibit A to the APA was the Asset List and Asset Allocation. (APA Ex. A).

38. That exhibit allocated the purchase price as follows: $145,000 to inventory, $5,000 to equipment, and $1,150,000 to software and LVA's website. (APA Ex. A).

#### ii. The Non-Compete Agreement

39. The Defendant agreed to sign a non-compete agreement ("Non-Compete Agreement") that was attached to the APA as Exhibit B. (APA ¶ 14(l)).

40. In the relevant portion of the Non-Compete Agreement, the Defendant agreed that for a period of seven years from the October 13, 2014, he would neither:

> directly or indirectly engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend credit to, or render services or advice to, any business *whose products or activities compete* in whole or in part with the business of AIS *within 40 miles of wherever AIS conducts business, has conducted business in the last 12 months*, and of AIS's operations, or attempt to interfere with the business of AIS, either directly or indirectly, in any manner, including, but not limited to: (a) interacting with the AIS's customers in an attempt to take, redirect, re-price, interrupt or discontinue any facet of the business relationship; (b) interacting with

>AIS 's employees or representatives in an attempt to induce them to leave employment with AIS; or (c) interacting with any other person or entity so as to divulge information about AIS's business.
>(APA Ex. B, ¶ 1 (emphasis added)).

41. The Non-Compete Agreement is governed by the laws of the State of Michigan. (APA Ex. B, ¶ 6).

42. The Non-Compete Agreement included a liquidated damages provision that provided the Plaintiff with "the greater of actual damages or liquidated damages in the amount of $250,000.00." (APA Ex. B, ¶ 8).

### iii. The Promissory Note

43. As set forth above, the Plaintiff agreed to pay $500,000 of the purchase price by delivery of a promissory note ("Promissory Note") attached to the APA as Exhibit C. (APA ¶ 4).

44. The Promissory Note bore interest at a rate of 3.75%. (APA Ex. C, ¶ 1).

45. It obligated the Plaintiff to pay monthly installments of $8,000 and a ballon payment at the end of thirty-six months. (APA Ex. C, ¶ 2).

### iv. The Consulting Agreement

46. The Defendant agreed to enter into the consulting agreement ("Consulting Agreement") that was attached to the APA as Exhibit C. (APA ¶ 18).

47. The Consulting Agreement was to last for one year, subject to the Plaintiff's ability to terminate it upon thirty days' notice. (APA Ex. C ¶¶ 6(a)-(b)).

48. The Closing took place on October 13, 2014. (APA ¶ 7).

### IV. POST-CLOSING OPERATION

49. The post-closing relationship between the parties was somewhat unusual because it required that Stone to continue to "perform the services the duties and roles he previously performed as owner" of LVA. (APA, p. 18).

50. It was also complicated because LVA was in the middle of transitioning its ecommerce store from ProStores, which was going out of business, to Big Commerce. (Stone Dep. 50:8-51:1).

51. Despite that complication, Stone ensured that the Plaintiff had access to the ProStores account, and the operational history located therein. (Stone Decl. 13, Ex. C).

52. The transition from ProStores to Big Commerce concluded around January 19, 2015. (Ex. 6).

53. But issues began to arise over some of the Plaintiff's obligations. Chief among them, the Plaintiff's avoiding Stone's requests to resolve the split between the parties of the 2014 manufacture rebates. (Stone Decl. ¶ 14, Ex. D).

54. Then the Plaintiff defaulted on payment of the sums owed under the Promissory Note, LVA's lease, and certain reimbursements. As a result, the tensions came to a head in March 2015. (Ex. 7).

55. In a heated email exchange, the parties pointed fingers at one another over the perceived failures of the other. (Ex. 7).

56. That exchange effectively marked the end of the parties' productive working relationship.

57. Ultimately, the disputes resulted in the execution of a settlement agreement that preserved only Stone's obligations under the Non-Compete Agreement. (Stone Dep. 97:13-19; Ex. 4).

58. The parties then went their separate ways.

V. **Stone's Subsequent business**

59. Stone formed a business called US Tool Depot in New Jersey in 2018. (Stone Dep. 152:23-153:4).

60. He did not solicit customers in connection with the operation of that business; he simply created a website and ran ads with AdWords. (Stone Dep. 155:8-22).

61. Stone employed the same strategy to build that business as he did LVA: start with core products and build out a portfolio around that offering. To avoid violating his Non-Compete Agreement, he centered that business around woodworking tools.

62. That made sense because during his time with LVA, he did not receive inquiries from individuals who wished to use LVA's products in woodworking applications. (Stone Dep. 92:7-15).

63. Stone formed a business called XP Abrasives in 2021, which competes with the Plaintiff, but that business did not begin competing against the Plaintiff until December 2021, two months after the expiration of the Non-Compete Agreement. (Stone Dep. 153:16-154:4).

64. In preparation for xpabrasives' competition, Stone ordered competing products before the expiration of the Non-Compete Agreement. (Stone Dep. 182:19-183:1).

65. In March 2022, five months after the expiration of the non-compete agreement, Stone attempted to solicit a customer he knew from LVA but instead sent the solicitation to the Plaintiff. (Stone Decl. ¶ 15, Ex. E).

66. That solicitation is the genesis of this lawsuit.

VI. **FACTS RELEVANT TO THE SPECIFIC ALLEGATIONS**

67. The Plaintiff's complaint focuses broadly on three fact patterns. The first is the Plaintiff's contentions concerning Stone's purported access to the Gmail Account and Hotmail Account, as defined in the Complaint. The second concerns Stone's purported breaches of the Non-Compete Agreement. The third concerns Stone's purported violation of the Copyright act. As set forth below, the discovery supports none of those claims.

      a. **Access to the Hotmail Account**

68. The Plaintiff testified that it was initially using the Hotmail Account on an "everyday basis, every hour basis…" (Ex. 8 (Hereinafter "Shindorf Dep.") 28:7-29:14).

69. The Plaintiff's own testimony was that he did not intend to use the Hotmail Account to extract data. Instead, he testified that he intended to—and did—use it as "database" of customer information. (Shindorf Dep. 17:9-21).

70. Contemporaneously with Stone's sale of LVA's assets to the Plaintiff, the Plaintiff's principal acknowledged that the Hotmail Account was Stone's "personal Hotmail account." (Stone Dep. 124:25-125:3; *see also* Exs. 9 (referring to the Hotmail Account as Stone's email address); 10 (same)).

71. Despite the Plaintiff's knowledge that Stone occasionally used his personal Hotmail Account to transact business on LVA's behalf, he did not demand full control of the account. Instead, he merely requested joint access, which Stone accommodated. (Stone Dep. 125:5-18).

72. The articulated purpose of the Plaintiff requesting access to Stone's personal email address was to "enter orders' and "get the history of orders." (Ex. 11).

73. While Stone was willing to accommodate the Plaintiff's request, such access was unnecessary because "all the orders in the Hotmail account ha[d] already been entered in [Q]uick[B]ooks." (Ex. 12).

74. To ensure there would be no issues going forward, Stone began responding to orders that came into the Hotmail Account with an instruction to direct further orders to the info@lehighvalleyabrasives.com. (Ex. 11).

75. Additionally, Stone changed the email address to which faxed orders would be forwarded to infor@lehighvalleyabrasives.com going forward. (Ex. 11). That change was made no later than December 9, 2014. (Ex. 13).

76. The furthest Stone went was to offer that they could "both access . . . the account" after he had cleaned out his personal information. (Ex. 14). The Plaintiff did not push back against that resolution. (Ex. 14).

77. Even as tensions between the parties were rising, the Plaintiff was still only seeking "access" to the account or suggesting that its use for business purposes "need[ed] to change," but was not asserting ownership of the account. (Exs. 15-16).

78. Whatever the Plaintiff's belief about the ownership of the Hotmail Account, it is undisputed that Stone agreed to, at most, share access to that account. (Stoen Dep. 148:10-149:4).

79. Whatever the Plaintiff's belief about the ownership of the Hotmail Account, it is undisputed that the disagreement between the access to the Hotmail Account has existed since 2015. (Stone Dep. 136:24-137:3; Shindorf Dep. 125:17- 126:7 (admitting that he lost access to the Hotmail Account in around November 6, 2015).

80. For the first time in the heated exchange that marked the end of the parties' productive relationship, the Plaintiff stated that he considered the Hotmail Account a business asset. (Ex. 7).

81. But even in that heated moment, the Plaintiff persisted in merely requested "access" to the Hotmail Account, not ownership of it. (Ex. 7).

82. On March 16, 2015, Stone shared his Hotmail Account login in credentials so that the parties would have joint access to it. (Ex. 17).

83. While the Plaintiff's principal had access to the Hotmail Account, he deleted information from it. (Stone Dep. 129:25-130:10).

84. Remarkably, even during the Plaintiff's period of control over the Hotmail Account, it was still referring to it as Stone's "personal address." (Ex. 18).

85. No later than February 2016, the Plaintiff knew that it no longer had access to the Hotmail Account because it submitted a password reset request, which failed. (Ex. 19).

    b. **Access to the Gmail Account**

86. The Plaintiff admits that its access to the Gmail account was never taken away. (Shindorf Dep. 21:17-23).

87. The only "issue" the Plaintiff identified related to the Gmail Account is that Stone "attempted to access the QuickBooks file which was stored on the Gmail account…." (Shindorf Dep. 23:11-19).

88. The only evidence the Plaintiff has produced concerning the attempted access is an automatically generated email stating that Stone was "requesting access" to the file. (Ex. 20).

89. The Plaintiff admitted that whether Stone accessed the file is a matter of pure speculation. (Shindorf Dep. 26:10-15).

90. And even if Stone did attempt to access the QuickBooks file, the Plaintiff admits he has "no idea" whether that action caused it harm. (Shindorf Dep. 25:8-16; 27:2-4 ("I am not aware of any harm that Allied suffered via an unsuccessful attempt to access Gmail….")).

91. Although the AdWords account was tied to a specific Gmail account at the time of the closing, changing the account to which it was tied was a simple process. (Stone Dep. 104:17-105:3).

92. In fact, the Plaintiff was able to add its email address to the AdWords account without Stone's involvement. (Stone Decl. ¶ 16, F).

    c. **Violation of the Non-Compete Agreement**

93. The Plaintiff alleges that Stone violated the Non-Compete Agreement by founding US Tool and XP Abrasives. (Ex. 21 (hereinafter "Rogs"), ¶ 21).

94. As set forth above, in the Non-Compete Agreement, Stone promised not to:

> directly or indirectly engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend credit to, or render services or advice to, any business whose products or activities *compete* in whole or in part with the business of AIS *within 40 miles of wherever AIS conducts business, has conducted business in the last 12 months*, and of AIS's operations, or attempt to interfere with the business of AIS, either directly or indirectly, in any manner, including, but not limited to: (a) interacting with the AIS's customers in an attempt to take, redirect, re-price, interrupt or discontinue any facet of the business relationship; (b) interacting with AIS's employees or representatives in an attempt to induce them to leave employment with AIS; or (c) interacting with any other person or entity so as to divulge information about AIS's business.

95. The Plaintiff has not provided evidence to substantiate that Stone competed with its business operations by selling competing products. (Rogs ¶ 12).

96. The Plaintiff has not provided evidence of where it operated, except to say that its offices were in Grand Rapids, Michigan, and it "serviced people in Michigan, Indiana, Ohio, and Canada." (Shindorf Dep. 170:16-171:7).

97. No portion of a radius of forty miles from Grand Rapids, Michigan extends beyond Michigan's borders. (Stone Decl. ¶ 17, Ex. G).

98. But Plaintiff has produced no evidence showing that any of the items sold on US Tool or XP Abrasives *before the expiration of the Non-Compete Agreement* competed with LVA. (Stone Decl. ¶ 18).

99. In any event, the Plaintiff recognizes that the broad category of "abrasives" is insufficient to identify the "niche" LVA operated in because "[a]brasives has subsegments that are so unrelated…." (Ex. 22).

   d. **Violation of the Copyright Act**

100. The Plaintiff admitted that it has not registered any of the works for which it is seeking damages. (Shindorf Dep. 134:15-21; Rogs. ¶ 20).

101.  In any event, the works related to the products on the ecommerce store were merely descriptive; they included the size of the discs, the composition of the abrasive surface, and a description of suitable applications. (Stone Dep. 30:10-31:3).

102.  And although LVA sold thousands of SKUs during its operation, many of the descriptions were similar, differing only in grit or disc size. (Stone Dep. 48:9-22).

103.  Additionally, LVA would simply copy the manufacturer's description of many products. (Stone Dep. 49:10-18).

104.  The Plaintiff has not proven which descriptions were original work or simply copied from the manufacturer.

105.  The operative Complaint and Answer are attached hereto as Exhibits 23 (hereinafter "Compl.") and 24 (hereinafter "Answer").

**STARK REAGAN, P.C.**

 /s/ *Christopher E. LeVasseur*
Christopher E. LeVasseur (P35981)
*Attorney for Defendant Christopher Stone*
1111 W. Long Lake Rd., Ste. 202
Troy, Michigan 48098
(248) 641-9955
clevasseur@starkreagan.com

Dated: February 14, 2025

CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2025, I filed the foregoing document with the Clerk of the Court and sent notification of such filing to all parties of record via this court's CM/ECF e-filing system.

/s/ Megan Kienle