# EXHIBIT 1

Transcript of the Testimony of

# Christopher Stone

January 29, 2025

Allied Industrial Supply LLC v. Christopher Stone



**Tip of the Mitt Transcription**
(231) 753-6957
depos@tipofthemitttranscription.com

Christopher Stone - January 29, 2025

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

ALLIED INDUSTRIAL SUPPLY LLC,

                Plaintiff,

v                                  Case No. 1:22-cv-00815

                              HON. PAUL L. MALONEY
CHRISTOPHER STONE, an individual,
        Defendant,
and
CHRISTOPHER STONE,
        Plaintiff,
v
ALLIED INDUSTRIAL SUPPLY LLC,
        Defendant.
_____/

DEPOSITION OF
CHRISTOPHER STONE
Taken by the Plaintiff/Counter-Defendant
Wednesday, January 29, 2025
9:00 a.m.
Via Zoom Videoconference

## Page 2

RECORDED BY:        Stacey Seals, CER 7908
                    Certified Electronic Recorder
                    Tip of the Mitt Transcription
                    Firm Registration Number 8620
                    (231) 753-6957

## Page 3

APPEARANCES

For the Plaintiff/      ANDREW ANTHONY CASCINI, ESQ. (P76640)
Counter-Defendant:      Henn Lesperance
                        32 Market Ave., Suite 400
                        Grand Rapids, Michigan 49503
                        (616) 940-5164
                        aac@hennlesperance.com

For the Defendant/      CHRISTOPHER E. LEVASSEUR, ESQ. (P35981)
Counter-Plaintiff:      Stark Reagan, PC
                        1111 W. Long Lake Road, Suite 202
                        Troy, Michigan 48098
                        (248)641-9955
                        clevasseur@starkregan.com

Also Present:           Robert M. Shindorf

## Page 4

1
2                           TABLE OF CONTENTS
3                                                         PAGE
   EXAMINATIONS
4  Examination by Mr. Cascini                              8
5
6
7  EXHIBITS                    DESCRIPTION
                                                          PAGE
8
9  Deposition Exhibit 1    Asset Purchase Agreement        98
10 Deposition Exhibit 2    Non-Competition and            108
                           Confidentiality Agreement
11
12 Deposition Exhibit 3    Consulting Agreement           112
13 Deposition Exhibit 4    Settlement Agreement           115
14 Deposition Exhibit 5    Emails                         120
15 Deposition Exhibit 6    Emails                         132
16 Deposition Exhibit 7    Emails                         146
17 Deposition Exhibit 8    Email                          148
18 Deposition Exhibit 9    Screenshot of Web Page         156
19 Deposition Exhibit 10   Screenshot of Web Page         158
20 Deposition Exhibit 11   Screenshot of Web Page         161
21 Deposition Exhibit 12   Screenshot of Web Page         163
22 Deposition Exhibit 13   Muth Memorandum                165
23 Deposition Exhibit 14   Copyright Information          169
                           and Emails
24 Deposition Exhibit 15   Requests for Production        171
                           of Documents
25

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

---

Page 5

| 1 | Deposition Exhibit 16 | Photographs | 174 |
| 2 | Deposition Exhibit 17 | Screenshot of Web Page | 179 |

---

Page 6

1    Via Zoom Videoconference
2    Wednesday, January 29, 2025 - 9:07 a.m.
3         MR. CASCINI:  Good morning, Mr. Stone.  My name is
4    Andrew Cascini.  I am the attorney for the Plaintiff in this
5    case, Allied Industrial Supply.  I'm here today to ask you
6    some questions in this deposition.
7         First, we're conducting this over Zoom today, and
8    one of the things that makes this a little tough is that
9    obviously there's a little bit of a delay.  So I'm going to
10   give you some instructions here that generally apply to the
11   duration of the deposition.  The most important thing -- and
12   this will be hard for both of us, I promise you -- we can't
13   cross talk over each other because the Zoom microphone tends
14   to have that sound drop out.  So -- and I'll respect this of
15   you and if I step on your words I'll apologize and back off,
16   I'd appreciate it if you'd do the same.  Please wait until
17   I'm fully completed with a question before you begin to
18   answer it.  I will do the same with your answers as well.
19   Do you understand that?
20        MR. STONE:  Yes.
21        MR. CASCINI:  Perfect.  And you've already
22   anticipated probably what I'm going to do with my second
23   instruction, which is we have a court reporter today,
24   that's what Stacey is here performing for us, she is going
25   to be only recording the audio that she is able to get and

---

Page 7

1    the words that we're able to say.  And that means that
2    whenever I do ask you a question we need to have a complete
3    verbal answer.  You and I will both do it just in our
4    natural lives, but "uh-huh" or "unh-unh" or one of those
5    just acknowledgment noises that we all make in conversation
6    those won't work.  I will need you to answer with full
7    complete words, "yes," "no," or explain subjects fully.  Do
8    you understand that piece?
9         MR. STONE:  Yes.
10        MR. CASCINI:  Do you have any difficulty hearing
11   me today or seeing my face or seeing the face of any of the
12   other participants that have their camera on in today's Zoom
13   dep?
14        MR. STONE:  No.
15        MR. CASCINI:  Do you have any concerns about the
16   deposition being conducted over Zoom in any way?
17        MR. STONE:  No.
18        MR. CASCINI:  Great.  I will be asking you a
19   number of different questions today, one thing I will tell
20   you is that you can always tell me if you don't understand
21   one of my questions.  I'm an attorney and I'm imperfect just
22   like everybody else in a myriad of ways.  Sometimes I don't
23   ask intelligible ones.  So if I ever ask a question and you
24   don't understand it, please tell me and I will assume if you
25   do answer the question that you did understand it.  Do you

---

Page 8

1    understand what I mean by that?
2         MR. STONE:  Yes.
3         THE REPORTER:  Do you solemnly swear or affirm the
4    testimony you're about to give will be the whole truth?
5         MR. STONE:  Yes.
6              CHRISTOPHER STONE
7    having been called by the Plaintiff/Counter-Defendant and sworn:
8              EXAMINATION
9    BY MR. CASCINI:
10   Q   Let's start with some biographical information and some
11       background, Mr. Stone.  First, could you, please, state and
12       spell your name for the court reporter?
13   A   Christopher Stone, C-H-R-I-S-T-O-P-H-E-R, last name Stone,
14       S-T-O-N-E.
15   Q   Mr. Stone, where do you live?
16   A   I live in Glen Gardner, New Jersey.
17   Q   Where around in the state is that?  Is that Northern Jersey,
18       Southern Jersey?
19   A   That's the western part of the state close to the
20       Pennsylvania border, Easton and Bethlehem.
21   Q   And what do you consider your occupation to be?  What do you
22       do for a living?
23   A   I am a small business owner.
24   Q   Okay.  What small businesses do you own?
25   A   US Tool Depot.

2  (Pages 5 to 8)

Christopher Stone - January 29, 2025

Page 9

1  Q   US Tool Depot, is that a New Jersey corporation?
2  A   **It's a New Jersey, yes.**
3  Q   What does US Tool Depot do?
4  A   **US Tool Depot sells machinery.**
5  Q   Does it sell anything else?
6  A   **It sells some accessories or consumables for those machines;**
7     **parts.**
8  Q   We'll come back, I'll have quite a few questions to ask you
9     about US Tool Depot as this goes on today.  But first I want
10    to ask you another question, do you own any other small
11    businesses other than US Tool Depot?
12 A   **No.**
13 Q   Historically have you owned any other small businesses other
14    than US Tool Depot?
15 A   **Well, I owned Lehigh Valley Abrasives.  And prior to that I**
16    **was a partner in a manufacturing company called Kason**
17    **Corporation.**
18 Q   Can you spell Kason for me?
19 A   **Yeah, K-A-S-O-N Corporation.**
20 Q   I will ask you some questions about both of those, so we'll
21    put a pin kind of in that.  I want to talk a little bit
22    about Lehigh Valley first.  First, do you remember when you
23    founded -- well, were you the founder of Lehigh Valley?  I
24    should start there.
25 A   **Yes, I founded Lehigh Valley Abrasives approximately 2006,**

Page 10

1     somewhere around there.
2  Q   And was that also a New Jersey LLC?
3  A   **Yes.**
4  Q   And what did Lehigh Valley Abrasives do?
5  A   **Lehigh Valley Abrasives sold abrasives for metal work.**
6  Q   And then you mentioned that this was a company that you
7     owned in the past tense, and I have a pretty good sense of
8     what the answer is going to be.  But nevertheless, for the
9     record how did you come to dispose of Lehigh -- well, let
10    me -- do you still own Lehigh Valley Abrasives?
11 A   **No, I do not.**
12 Q   How did you come to dispose of Lehigh Valley Abrasives?
13 A   **I sold it in 2014 to Allied Industrial Supply.**
14 Q   Was Lehigh Valley Abrasives sold or disposed of through an
15    asset deal, a membership transaction, or both?
16 A   **It was an asset purchase agreement.**
17 Q   I suspect that you already know that I have it, we'll talk
18    about that in just a minute.  But I do want to make sure
19    that we don't miss any steps along the way.  You also
20    mentioned that you were at one time a member of somebody
21    called Kason Corporation; is that right?
22 A   **Correct.**
23 Q   What is Kason Corporation, what was the nature of the
24    business?
25 A   **It's a multinational manufacturer of vibratory screening**

Page 11

1     **equipment.**
2  Q   And did you say vibratory screening?
3  A   **Correct.**
4  Q   Believe me when I say I will have more questions about that
5     in a moment, but -- and you mentioned that you had a
6     membership interest in that company; is that correct?
7  A   **Correct.**
8  Q   How did you come to acquire your membership interest in
9     Kason?
10 A   **So Kason Corporation was founded by my father in 1967, who**
11    **was an engineer.  And I worked there through high school and**
12    **college and when I graduated college I was offered to buy 3**
13    **percent of the company, which I did.**
14 Q   What did you purchase that 3 percent interest for?  Was it
15    in exchange for some money, for something else?
16 A   **Money, yeah.  And I don't remember the exact amount, but,**
17    **yes, it was money.  But that was like 30 years ago.**
18 Q   Can you ballpark it for me?  Are we talking over or under
19    $500,000?
20 A   **It was under.**
21 Q   Was it over or under 100,000?
22 A   **To the best of my recollection it would be about 100,000.**
23 Q   Fair enough.  And I understand you're giving an
24    approximation of that.  Any time you ever offer me an
25    approximation or a guess of something it's okay to qualify

Page 12

1     it as such and I'll understand that's what your answer says
2     to that.
3         Do you still own a membership interest in Kason
4     Corporation?
5  A   **No.**
6  Q   When did you dispose of your interest in Kason Corporation?
7  A   **In 2004 the company was sold to a private equity group.**
8  Q   Did you receive consideration for your 3 percent membership
9     interest as a part of that transaction?
10 A   **Yes.**
11 Q   What did you received as compensation for that transaction?
12 A   **Again, I don't remember the exact amount, but it was a few**
13    **hundred thousand dollars.**
14 Q   Safe to say it was less than a million dollars?
15 A   **Yes.**
16 Q   Do you happen to remember whether it was greater than or
17    less than $500,000?
18 A   **It might have been in that range.  But keep in mind that**
19    **when I bought in to when we sold was like a 15-year period.**
20 Q   And as part of that transaction did you need to sign a
21    non-compete agreement?  Did you need to sign a consultancy
22    agreement, anything like that?
23 A   **(No verbal response)**
24 Q   Is that a "no"?
25 A   **"No." I'm sorry.  "No."**

Christopher Stone - January 29, 2025

Page 13

1  Q    Okay.  Can you explain to me what vibratory screening
2       equipment is?
3  A    It is a piece of machinery which is designed to separate
4       material based on particle size.  So it is fabricated out of
5       stainless steel and it has a motor in it that spins and
6       offers centrifugal force in order to vibrate the machine and
7       separate the particles.
8  Q    To whom did you -- and this was the sort of product or
9       service that Kason would offer?
10 A    Yeah.  And it was -- yeah; correct.
11 Q    And who were some of Kason's customers?  Who was the
12      recipient of either the products or the services that Kason
13      would sell?
14 A    It was primarily Fortune 500 companies.
15 Q    Can you give me any examples of customers of Kason?
16 A    Exxon, Kraft.
17 Q    Did Kason offer -- well, let me ask you this question very
18      specifically:  Did Kason offer and sell products that
19      performed this service, or were you a servicing company
20      where you would go onsite and perform contracting and get
21      this done?  How would that --
22 A    We manufactured these machines and then we would ship them
23      to the customer.
24 Q    When you had a membership interest in the company, did you
25      also have an employment relationship with the company?

Page 14

1  A    I don't understand what you mean by "employment
2       relationship."
3  Q    Were you an employee of Kason while you had a membership
4       interest?
5  A    Oh, yes; yes, I was.
6  Q    What was your role as an employee of Kason?
7  A    I was vice president of manufacturing, so I oversaw all of
8       the manufacturing operations.
9  Q    Who was responsible at Kason for performing sales of the
10      company's products?
11 A    So we had a vice president of sales and we had several sales
12      engineers.  And then we sold through independent
13      manufacturers' reps around the county and around the world.
14 Q    That was exactly what my next question was going to be.  I
15      asked you the question of who the customers were, you said
16      several Fortune 500 companies and gave me examples.  Where
17      did you ship products when you were at Kason?  You said
18      all --
19 A    All over the world, yes.
20 Q    Now I see here that -- from at least my notes, that we had a
21      disposition of the membership interest in Kason in 2004.
22      Lehigh Valley was not founded until 2006.  Are both of those
23      numbers accurate, first?
24 A    So it might -- when I -- when Kason was sold I did stay on
25      for like six months after with them and then I started

Page 15

1       Lehigh Valley Abrasives.  So the dates might not be exact,
2       but it's like a ballpark around that time frame.
3  Q    And when you say that you stayed on, you remained an
4       employee of Kason even after you disposed of your membership
5       interest?
6  A    Correct; for six months, yes.
7  Q    And did they maintain your employment relationship without
8       asking you to sign either a non-compete or a consultation
9       agreement?
10 A    So as -- as far as I can remember I did not sign a
11      non-compete.  I was running the manufacturing operations,
12      and it's a pretty complex business and I guess there was not
13      a concern.
14 Q    Did you have an employment agreement either before or after
15      you disposed of your membership interest?
16 A    I had an employment agreement with Kason Corporation being
17      the owner of the company, but I don't believe -- and again,
18      this is going back like 25 years -- I don't think there was
19      an employment agreement with the private equity company that
20      purchased us for a non-compete, but I don't recall that 100
21      percent.
22 Q    Ah.  And maybe therein lies the distinction.  After Kason
23      was acquired by the private equity company, was that a asset
24      sale or was that a sale of the stock?
25 A    That was a sale of the stock.

Page 16

1  Q    Ah.  So Kason remained an operating entity even after the
2       private equity group acquired it?
3  A    Correct.
4  Q    That is after all the nature of what private equity
5       companies do usually; correct?
6  A    Correct.
7  Q    So did you maintain your employment agreement with Kason
8       both before and after the transaction, because you did
9       maintain your employment before and after the transaction?
10 A    So honestly I don't recall.  Again, this is 2004 so 20 years
11      ago.  I don't recall what the employment contract was for
12      the six months after the sale of the company.
13 Q    Understood.  Okay.  So around 2004 -- and I understand, by
14      the way, these dates are approximate.  Believe me, I cannot
15      remember specific dates.  If you were to ask me when in 2002
16      I graduated high school I could not tell you.  But at the
17      same time, I could guess.  Around how long after you
18      completely ceased employment and ownership of Kason did you
19      form Lehigh Valley Abrasives?
20 A    It was pretty much right away, like maybe a few months
21      after.
22 Q    Have you ever been an employee of any other company other
23      than Kason, Lehigh Valley or US Tool Depot?
24 A    So I -- when I sold Lehigh Valley Abrasives I worked in
25      nonprofit for four years and I did do some work with the

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 17

1  local YMCA and was an employee of theirs for a little bit.
2  Q   Other than working for the YMCA, what other kinds of
3      nonprofit activities were you involved in generally?
4  A   So I've done mission trips to Honduras and West Virginia.
5      I've been involved in a lot of mission work and I'm on the
6      missions board at my church and so I oversee a lot of the
7      liaison between us and the different charities we support.
8  Q   Okay.  I'm going to ask you some questions next about the
9      foundation of LVA.  And when I'm talking about -- it's
10     obvious to you I am sure, Mr. Stone, for the purposes of the
11     record when I say "LVA" I'm referring to Lehigh Valley
12     Abrasives.
13 A   Okay.
14 Q   You said you founded LVA in approximately 2006; is that
15     accurate?
16 A   Yup; yes.
17 Q   What preparations did you make in getting ready to form
18     Lehigh Valley Abrasives?
19 A   What preparations?  So I created an ecommerce website --
20 Q   Okay.
21 A   -- and I started to bring in products and sell products to
22     customers through our ecommerce website.  And I believe I
23     also sold some on eBay at the time as well.
24 Q   Now, I have a variety of different questions associated with
25     that point.  You said you created an ecommerce website.

Page 18

1  Keeping in mind I'm an attorney, I work in the air
2  conditioning and I do not know a damn thing about how our
3  website came to be, other than knowing what the check is
4  going out for.  How do you come to form a website like that?
5  What's the process?
6  A   I mean, the process is pretty simple for developing an
7      ecommerce website.  There are packages that exist out there,
8      so you choose from one of the preexisting ecommerce packages
9      and then you load in a series of products and descriptions
10     into the site.
11 Q   From where do you get the products and descriptions that you
12     load into the site?  Where do those come from?
13 A   So let me just -- I'll back up a little bit.  So when I was
14     vice president of manufacturing at Kason Corporation we did
15     a lot of manufacturing heavy stainless steel products and we
16     used a lot of abrasives.  And so in that process I got to
17     know a lot of the different abrasive suppliers because we
18     were a big consumer of those items.  And I was able during
19     that time to determine there was a single product called a
20     flap disc that was being sold in the United States for like
21     $10 a disc and I was able to locate a company in Europe that
22     would sell it to us for about $1 a disc and we'd use
23     thousands and thousands of them.  So it was a big savings to
24     us.  So when we -- when I left Kason, when it was sold, my
25     idea was develop a relationship with this company and sell

Page 19

1  the single product, the flap disc, in the United States at a
2  much lower price than my competitors.  And I knew it was a
3  good product because we used it in our plant and I had
4  already compared it to all the other products.  So that
5  was -- the founding of Lehigh Valley was on that single
6  product, the flap disc, in the only years that was the only
7  product that we sold.
8  Q   Okay.  Great answer and lots to unpack there, so I'm going
9      to go in kind of increments.  We're going to go really broad
10     first.  Educate me like I am four years old.  When you say
11     "abrasives" what do you mean?  What are we talking about?
12 A   So there's different types of abrasives, but we operated in
13     the area of coated abrasives.  And so it is basically
14     sandpaper, a flap disc is layered sandpaper on a fiberglass
15     backing which is used to finish metal products.
16 Q   And when you say "finish metal products," what you're
17     talking about is an object of some kind is created out of
18     metal and then the abrasive is applied using this flap disc
19     against the surface.  It polishes it, it makes it smooth?
20     What does it do?  Why are we doing this?
21 A   So there's various different reasons you might want to use
22     one.  So when you -- when you weld you create weld splatter
23     and you create a surface in the weld and so you may want to
24     remove the splater on the surface, so we call that metal
25     cleanup.  What you can -- then you want to also import a

Page 20

1  surface finish for reasons of the way it looks.  And so
2  there are various different reasons you might want to use a
3  flap disc on a metal product.  You might want to clean the
4  weld or you might want to impart a certain finish on the
5  material.
6  Q   Got it.  So other than those two reasons; metal cleanup and
7      putting a finish on the material; is there any other reason
8      that you'd want to use a coated abrasive on a metal
9      product --
10 A   Those are the primary reasons you would use it.
11 Q   Now, you mentioned at first that you had observed that there
12     was a sourcing of flap disc that you could get from -- did
13     you say Europe?
14 A   Correct.
15 Q   And what was that source for flap disc?  We're talking about
16     the one that you noticed that sort of sounds like formed the
17     genesis of LVA's idea?
18 A   Right.  So I developed a relationship with a company called
19     Sundisc Abrasives, which is in Holland.
20 Q   Understood.  And am I understanding correctly that the
21     products when manufactured in the United States I think you
22     said approximately they would cost $10 a part versus --
23 A   Correct.
24 Q   -- getting them from Sundisc could be done at $1 a part?
25 A   Correct.  And so that's the difference also between end user

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 21

1  and wholesale pricing, but, yes.
2  Q  Explain that to me, the difference between end user and
3     wholesale pricing. What does that mean?
4  A  So Sundisc would sell to me for $1 and I would sell to my
5     customers for $2 and competitors in the US were selling it
6     for $10. That's approximations.
7  Q  Did you form the relationship with Sundisc Abrasives by and
8     through your business relationship or employment
9     relationship with Kason?
10 A  So when -- when I worked at Kason Sundisc was a vendor of
11    Kason's, yes.
12 Q  Were you purchasing -- was Kason I should say, purchasing
13    the flap disc product we were just talking about --
14 A  Yes.
15 Q  -- from Sundisc?
16 A  Yes.
17 Q  And how -- without going into -- this is not so important,
18    but without going into too much detail, how was the flap
19    disc being used as part of Kason's manufacturing process?
20    Where did it come into play?
21 A  So there were a few different areas it was used. One area
22    it was used was we had a department called a screen
23    department in which we laid epoxy on a metal surface and it
24    was used to clean some of the excess epoxy. And then it was
25    also used in the welding process to clean weld splatter and

Page 22

1     weld discoloration.
2  Q  Okay. And epoxy, is it a binding material, is it an
3     adhes- --
4  A  It's like a glue; yeah, a resin glue, yes.
5  Q  So when we're talking about performing the function of metal
6     cleanup, we're sometimes cleaning things off metal that
7     aren't metal; in other words, sometimes we're cleaning epoxy
8     off metal?
9  A  Right.
10 Q  Are we ever cleaning anything else off metal with a flap
11    disc?
12 A  So, you know, over the years I've met a lot of different
13    people who do a lot of unusual things so there's a ton of
14    stuff out there. But those are the main uses.
15 Q  Understandable. So you said that you formed LVA in 2006,
16    and was the observation you made about flap disc pricing one
17    of the reasons you generated the idea, hey, maybe LVA would
18    be a good business?
19 A  That's why I started it, yes.
20 Q  Did you derive substantial value from that business
21    relationship with Sundisc at LVA?
22 A  So -- so there are various companies in Europe that make
23    that product at that price. I just happened to hit upon
24    Sundisc. There are other companies in Europe that do the
25    same thing.

Page 23

1  Q  Regardless of whether there are companies that do the same
2     thing or make an identical product or a materially similar
3     product, when LVA was founded did you derive substantial
4     economic value from your business relationship with Sundisc?
5  A  Sundisc was an important vendor, yes.
6  Q  And one of the features -- what were the reasons they were
7     an important vendor? I think you've already given testimony
8     to them, but spell them out for me. What were the reasons
9     they were important?
10 A  So they were important because they could provide us with a
11    product that we could go to market with and be very
12    competitive with. We could offer our customers cost
13    savings.
14 Q  So the price point was one reason; correct?
15 A  Correct.
16 Q  Were there any other reasons that Sundisc's products
17    represented economic value for you as a business owner of
18    LVA?
19 A  So the way -- the way it kind of worked, at least in the
20    early 2000's, is there were lots of very big industrial
21    distributors. So companies like 3M were the market leaders
22    in flap discs; like 3M and Norton. And they controlled the
23    market and they could charge very high prices to their
24    distributors and there was nobody else out there. There are
25    small European companies, such as Sundisc, that are

Page 24

1     independent manufacturers of that product and they are not
2     big enough to have a big presence in the United States, so
3     for them they're able to ship to US customers, like me, at a
4     fair price. And so for Norton and 3M, they're deriving a
5     very large profit from that. They really didn't want to
6     deal with me who was a newcomer to the market, and so that's
7     why it made more sense for me to go to someone like Sundisc
8     that at the time didn't have a presence in the US.
9  Q  Help me understand. So LVA -- let me restate what I think
10    the testimony has been. Please listen very carefully, if
11    I'm wrong at any point this is where I want to be corrected;
12    I want to know. So LVA is formed, you're purchasing these
13    flap discs in the very beginning. I understand that there
14    was an expansion of products later. You're purchasing flap
15    discs from Sundisc, presumably importing them into the
16    United States. Is that piece correct?
17 A  Correct.
18 Q  Okay. And then you're selling them to third parties that
19    will use these abrasive products at some place in their
20    manufacturing process. Is that part correct?
21 A  Correct.
22 Q  And were -- you mentioned 3M. Was 3M, for example -- was
23    that one of LVA's customers?
24 A  No; no, that would be a competitor. They make flap discs.
25 Q  They make flap discs. They're the domestic -- or at

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 25

1    least --
2  A   Correct.
3  Q   -- domestically manufacture them?
4  A   Correct.
5  Q   Okay.  When you started LVA you had -- we already talked
6      about this, we have a vendor source in mind.  I have some
7      more questions about that in a minute.  Did you already have
8      customers or clients that you knew would be interested in
9      purchasing these flap discs from you?
10 A   I did -- well, I didn't have it in writing or anything like
11     that, but I have a feeling.  So when I was an owner in Kason
12     Corporation we were machinery manufacturers, and as vice
13     president of manufacturing I visited a lot of our suppliers
14     all throughout the country.  We couldn't manufacture
15     everything ourselves in house so we had various metal
16     manufacturers throughout the country, and I would visit them
17     and I noticed that they had the same issue that I had, that
18     they were buying, you know, a product for like $10 and I had
19     it in my mind, wow, if I started a company I could sell them
20     something for $2 that will work as well.  So I had a lot of
21     relationships in the manufacturing industry.
22 Q   Understood.  And so we didn't have any contractual
23     relationship, nobody had promised to buy anything from you,
24     but you had ideas of potential sources other future
25     business -- you had ideas of potential sources for future

Page 26

1      customers?
2  A   Correct.
3  Q   Who were in the earliest days -- we're thinking all the way
4      back to the founding of LVA when only flap discs were the
5      product offered, who were some of LVA's earliest customers?
6  A   Boy, I couldn't tell you off the top of my head -- that's 20
7      years ago -- who they were.  That I'm not -- I don't
8      remember.
9  Q   How many customers would you say -- making an approximation
10     in the first year of LVA's business, how many customers were
11     you selling to approximately?
12 A   So -- so let me try and sort of answer it to the best of my
13     ability.  We did have two ways we went to market; one was
14     through eBay.
15 Q   You mentioned that.
16 A   And so there were -- there were lots of small people who
17     would buy, like, ten flap discs off eBay.  And then there
18     were some bigger customers that I had approached and that
19     either I had a relationship where I knew they used a lot of
20     flap discs.  So I would say that maybe -- in the first year
21     maybe 100 customers; 50 to 100 I'd say.
22 Q   Okay.
23         (Off the record interruption)
24 Q   So, Mr. Stone, let me go back just a minute.  You mentioned
25     eBay as one potential source, I know you mentioned that

Page 27

1      earlier as the one form of method for selling these
2      products.  And is that as simple as I understand it to be?
3      I've sold products on eBay before, many others have.  Maybe
4      people that are later than millenials haven't.  But just an
5      issue of did you form an eBay account under LVA's name?
6  A   Yes, I did.
7  Q   And then from there you would post these objects, the flap
8      discs, for bid; is that right?
9  A   Correct.
10 Q   And then customers in small quantities would bid on them and
11     then you would be able to ship them directly to them?
12 A   Correct.
13 Q   Did you maintain a stockpile or warehouse of the product?
14     Where were they?  Was there a room in your house that was
15     full of flap discs --
16 A   So at first -- yes, when I first started the business the
17     flap discs were in the basement of my home.
18 Q   Who would prepare shipping?  Were you the one that was in
19     the basement stuffing envelopes and packages?
20 A   Yup; yes.
21 Q   And forgive me for this tremendously elementary question.
22     We're talking flap discs, how big, how heavy, what am I
23     looking at when I'm looking at a flap disc?
24 A   So ten flap discs would weigh two pounds.
25 Q   Okay.  All right.  So these are thin, like small products?

Page 28

1  A   Correct.
2  Q   Are they round or are they like --
3  A   Yeah, they're round -- yeah, they're round, you know, the
4      size of a hamburger.
5  Q   Again, these are elementary questions.  The name flap disc,
6      what's the -- disc I get, they're round.  What is the flap
7      referring to?  Is that the method by which it performs the
8      abrasive activity?
9  A   (No verbal response)
10 Q   Oh, Chris, I think I lost you.
11         MR. LEVASSEUR:  He's frozen again.
12 BY MR. CASCINI:
13 Q   Chris, I lost you there for a minute but I do think you're
14     back now.  So I'm going to reask that question one more time
15     to you.  I understand why the disc part of the name flap
16     disc is there.  What is the flap, is that the abrasive
17     itself?
18 A   Yes.
19 Q   I understand.  So you mentioned there were some sales that
20     were being performed by eBay.  And then taking a step back
21     to the ecommerce platform, you mentioned that there are
22     packages that exist and then you need to choose from a list
23     of products or descriptions.  Really break this down for me.
24     When you say packages that exist what does that mean?  How
25     do you get a website started, or how did you get your

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 29

1  website started for LVA?

2  A   So there are companies that provide ecommerce software. The
3      company that I originally -- the software company I
4      originally started with was a company called Pro Stores. So
5      I paid them a subscription and they allowed me to put my
6      information in their templates and then publish that to the
7      web.

8  Q   And when you would place the information in the templates,
9      that would actually create a digital webpage that then could
10     be posted on the Internet that others could access?

11  A   Correct.

12  Q   Okay. And did the Pro Stores platform along with that
13     package, was there a way to facilitate transactions? I
14     understand the idea of putting in the product description
15     up on the website, we'll talk about that more in a minute.
16     But how did it come to be that you could actually take an
17     order and generate an invoice? What's that process look
18     like in the first days of LVA?

19  A   So, yeah, so Pro Stores, which is an ecommerce software
20     package, allows the customer to once they view the product
21     to purchase that product. So it provides the transaction to
22     purchase along with providing a description to the customer
23     of what they're buying.

24  Q   And Pro Stores has the architecture to perform that

25     function; in other words, are you the one designing and

Page 30

1  programming the way you -- you put it in a shopping cart or
2  whatever and then you put the transaction through, is that
3  Pro Stores technology and software that's performing that
4  function?

5  A   Correct.

6  Q   And how is Pro Stores making money from you? Do you have a
7  contract, a flat fee? How does that process work?

8  A   Yes, they charge a flat monthly fee.

9  Q   Now, you mentioned -- and we're talking again -- for the
10  time frame here, we're talking the early days of LVA, we're
11  talking about when you're selling flap discs pretty much
12  only. You mentioned that you put your information in their
13  templates and then are able to publish that to the web. How
14  do you generate the information?

15  A   For example -- let's take the flap disc for example. There
16  are certain criteria that go into a flap disc, like the type
17  of sandpaper you use. So the most common sandpaper is a
18  material called zirconia. So in order to put it on the
19  website you would type the description of the product just
20  like you might do if you were selling, you know, a used
21  coffee maker or whatever. You would say, okay, this product
22  is four-and-a-half inch in diameter, it is made of zirconia.
23  And in abrasives we deal with grit or the size of the
24  particle, and so we say 80 grit, so you would write that.
25  And then you would write what it does. Like we discussed

Page 31

1  earlier this product can be used for cleaning weld splatter
2  off of metal surfaces, this product can be used for that.
3  And that's basically it.

4  Q   And when it came for you -- some of that sounded like it was
5  product description or specification; is that accurate to
6  say?

7  A   Yes.

8  Q   Does Sundisc provide you with a description of the product
9  that you can put on the site, or do you need to actually
10  write copy associated with this?

11  A   So I wrote the copy for the flap discs.

12  Q   Got it. Okay. So there are specifications, that's just, A,
13  how big is it, what's the grit, that kind of thing. But
14  there's more to it than that obviously, it's not just a list
15  of random numbers, it's a description of what the product
16  is. So you're writing it and then incorporating in the
17  product specifications as well?

18  A   Correct. So there's -- so, yes, that is what I did for flap
19  discs. And maybe you'll get to this later, but as the
20  company grew we started to sell other people's products and
21  in that -- in that case you would use the description
22  supplied by other people.

23  Q   Okay. So we will get to the very concept next of product
24  diversification, I'll kind of walk you through that story.
25  But just a quick detour here, so we've got the Pro Store

Page 32

1  setup -- we're back in 2006 -- we've got the eBay setup.
2  Are there any other ways that you're receiving orders from
3  customers to purchase flap discs?

4  A   So when I -- again, when I started the company I had that,
5  but then I also -- I called companies I knew in
6  manufacturing in the area. I called them and visited some
7  and asked them to buy products from me. So for those
8  customers, they would -- some of them would email me a
9  purchase order, or call me on the phone and say this is what
10  I want, ship it to me.

11  Q   So we have so far four methods, we've got eBay, we've got
12  the Pro Stores online store, we have email submitted orders,
13  and we have phone call orders. Any other way you ever took
14  an order in the early days of LVA?

15  A   Those would be the main ways that we took orders that I can
16  remember, yes.

17  Q   And during the period of time -- so we're jumping ahead in
18  time, don't let me get that lost here. Between the period
19  when LVA was founded until the moment that you had a
20  disposition of the assets, were there any methods other than
21  those four that we just talked about through which LVA sold
22  products?

23  A   Not that I can think of, no.

24  Q   Or if there were they were occasional and, you know, rare?

25  A   Correct. Those were the main ways, yeah.

8 (Pages 29 to 32)

Christopher Stone - January 29, 2025

Page 33

1  Q  All right. I want to ask you first about taking a phone
2     call when there's an order -- well, actually, no. Let me
3     back all the way up. I know with eBay sales there's
4     obviously documentation that eBay maintains where it
5     demonstrates -- it's like a receipt or an invoice; the
6     product's been bought, the product's been sold, here's when
7     it was posted, here's when it was sold, here's the price,
8     here's the shipping address, here's the buyer, here's the
9     seller. Was that information automatically generated by
10    eBay then and retained as a record from LVA?
11  A  Yes.
12  Q  When you would make a similar sale over Pro Stores, over the
13    website that you made via the Pro Stores platform, was there
14    an invoice that was automatically generated there as well?
15  A  Yes.
16  Q  That was part of the -- is it true that it was part of the
17    service that you were purchasing from Pro Stores --
18  A  Yes.
19  Q  -- the generation of those invoices associated with sales?
20  A  Yes.
21  Q  So when you take a phone call order, how does -- how does
22    paperwork get generated? How is that instantiated and made
23    so you have records of it?
24  **A  So for that case we would use QuickBooks as our source for**
25  **recording the transaction and creating an invoice.**

Page 34

1  Q  And QuickBooks is another form of third party basically
2     business accounting software; correct?
3  **A  Correct.**
4  Q  It has the ability to log product sales, so you can put in
5     the information from a customer and you say it will generate
6     an invoice for you?
7  **A  Correct; yes.**
8  Q  Did you ever use any -- between the time when LVA was formed
9     and between the time when LVA's assets were disposed, did
10    you ever have any other platform, accounting platform, that
11    you used when you took phone orders to record those
12    transactions?
13  **A  No.**
14  Q  QuickBooks all the way down; every single phone order ever
15    went into QuickBooks?
16  **A  Well, let me just clarify that. There were some customers**
17  **who would give us a phone order and ask us to put it in the**
18  **web -- there's two areas where we could record it, in**
19  **QuickBooks or in the website. And they may call and say,**
20  **"I've got an account with you," put it in the website so**
21  **they would get a copy of the invoice from the website. But**
22  **those were the only two areas where we recorded the sale.**
23  Q  So let me see if I understand. You get a phone call order,
24    sometimes they're going to tell you -- sometimes they won't
25    specify, in a circumstance like that would you ordinarily

Page 35

1     put it in QuickBooks?
2  **A  Yes.**
3  Q  Now in circumstances where they did and they said, hey, we
4     already have an account through the Pro Stores page, can you
5     put it into the Pro Stores account, would it be you
6     inputting that information based on the phone call into Pro
7     Stores?
8  **A  So in the early days of the company, yes, I was the only**
9  **employee. But later I had employees, so, no.**
10  Q  And a careful distinction. Would it be you or would it be
11    an LVA employee who would take the phone call and then
12    transmit then put the data into Pro Stores manually?
13  **A  Yes.**
14  Q  Got it. Are there any other ways that documentation would
15    be created or manifested from sales that occurred over the
16    telephone during LVA's entire history with you?
17  **A  No.**
18  Q  You also mentioned that purchase orders could be emailed to
19    you; is that correct?
20  **A  Yes.**
21  Q  Was there a sales@lva.com or something like that? What was
22    the email address used?
23  **A  So it was info@lehighvalleyabrasives.com.**
24  Q  Were any other email addresses used to solicit sales?
25  **A  No other email addresses were used to solicit sales, no.**

Page 36

1  Q  And I apologize, that was a distinguishable question and
2     thank you for listening to it with specificity. Did you
3     ever receive emails through any other source that were --
4     people were ordering products from you?
5  **A  So there was a rare -- it was very rare but it did happen**
6  **upon occasion that -- because I had been in manufacturing my**
7  **whole career and had a long relationship with some of the**
8  **customers that predated Lehigh Valley Abrasives, there was a**
9  **stray, maybe one or two, that would come in to my personal**
10  **email account.**
11  Q  And what is your personal email account?
12  **A  It's clslcs2000@hotmail.com.**
13  Q  And you said that there were approximately -- because -- how
14    did people acquire -- how did potential customers -- strike
15    all that. How did potential customers acquire that email
16    address such that they were sometimes emailing you through
17    it?
18  **A  I could give you an example, and it could be**
19  **(indiscernible). But for example my brother-in-law owns a**
20  **shipyard -- this is a real example, I'm not making it up.**
21  **But he owns a shipyard in Nyack, so we -- obviously we have**
22  **our relationship and when I started this company he sent me**
23  **an email and said, "Chris, can you supply me abrasives?"**
24  **And I'm like, "Yeah." And he'd be like, "Okay, ship me ten**
25  **of these," and that would come through my personal email**

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 37

1    address.
2  Q   Okay.
3  A   But it was very rare that that would happen.
4  Q   Other people that knew you were selling abrasives, would
5      they ever contact you through the personal email they knew?
6  A   So it could -- so like I said, I had some relationships that
7      prespanned/predated Lehigh Valley Abrasives, like I visited
8      a lot of manufacturers around the country and had some
9      personal relationships with them, so that could have
10     happened as well.
11 Q   So we have two email addresses identified right now where at
12     least on one occasion Lehigh Valley received a sales order;
13     one was info@lehighvalleyabrasives.com, one was -- my
14     apologies -- clslsc2000@hotmail.com, or whatever the Hotmail
15     account you just told me was, what ever the LC's and the
16     numbers were in order, when I refer to the Hotmail account
17     that's what I mean.  Any other email addresses through which
18     clients would ever submit orders during the entirety of the
19     time LVA was in operation?
20 A   No.  Not that I ever recall, let me put it that way.
21 Q   So I'm going to ask you questions next about sales that may
22     have been ordered through info@lehighvalleyabrasives.com.
23     So we're specifically referring to that email address with
24     respect to this question.  You talked to me before, I
25     understand how an invoice or a purchase order would get made

Page 38

1      if it made through Pro Stores.  I get it if it came through
2      eBay.  Suppose you get an email into
3      info@lehighvalleyabrasives and, "Hey, Chris, I need 100
4      abrasive produces, these are the dimensions I need," what
5      happens next such that documentation of that sale is
6      created?
7  A   So that order would be entered into QuickBooks.  So
8      QuickBooks has a part of their software where you can enter
9      orders and create an invoice and that's what we happen.
10 Q   Is it safe to say that's similar to sales that you would
11     receive through the phone; that is to say because the answer
12     you gave me for phones as well you would sometimes import
13     them into QuickBooks based on the phone call, you would do
14     that based on the email in certain circumstances?
15 A   Yes.
16 Q   Would you ever -- you mentioned with phone call sales you
17     received that sometimes they would ask you to put it into
18     Pro Stores.  Was there ever a time where you received an
19     email order into info@lehighvalleyabrasives.com and put it
20     into Pro Stores as opposed to QuickBooks?
21 A   So I do not remember that exactly, so I don't want to answer
22     it wrong.  My guess is that that probably happened but I'm
23     not completely sure about that.
24 Q   And just to clarify -- and please tell me if this changes
25     your answer in any way.  When I use the word "you" to

Page 39

1      describe the entry I meant either you or any Lehigh Valley
2      employee.
3  A   Right; yeah.
4  Q   Does that change your answer in any way?
5  A   No.
6  Q   Next I'm going to ask you some questions about the Hotmail
7      email address that you mentioned.  How would a sale or a
8      transaction that came in through the Hotmail account be
9      reported?
10 A   So again --
11 Q   How would the purchase order or invoice be generated?
12 A   Yeah.  So again, that was a rare occasion, but it would have
13     gone into QuickBooks.
14 Q   Same question that I had then for the Pro Stores account.
15     Did you ever receive a email -- and when I say "you" I mean
16     you or any Lehigh Valley employee, ever receive a email
17     order through the Hotmail account and put it into the Pro
18     Stores account?
19 A   Honestly, I can't recall if that ever happened or not.  I'm
20     not sure.
21 Q   If I were to take a look and had unfettered access to the
22     QuickBooks account, would I be able to tell the source
23     through which a sale had been -- strike that.  Would I be
24     able to tell where the sale had come from; that is to say
25     could I tell whether it was an email sale, telephone sale,

Page 40

1      an eBay sale?  Would I be able to tell?
2  A   No.  There's no field that denotes that information.
3  Q   Okay.  Now at any time in your ownership history of LVA --
4      we mentioned phone, email, Pro Stores and then eBay -- any
5      other methods by which sales are ever received, sales orders
6      are ever received from anybody?
7  A   Not that I can remember, no.
8  Q   Okay.  And other than the Pro Stores database and the
9      QuickBooks database, is there any other ways that you stored
10     information about the sales that have been made?
11 A   (No verbal response)
12 Q   And I think the audio cut out.  Chris is that a "no"?
13 A   "No."  Sorry.  "No."
14 Q   All right.  You've already given me some testimony about
15     flap discs being the first abrasive product that was
16     offered.  Is it -- it is true, however, isn't it, that LVA
17     later sold other non flap disc abrasives?
18 A   Yes, that is true.
19 Q   Tell me the process there, how did LVA begin to expand what
20     it offered as products for sale?
21 A   So we began, as we discussed, with flap discs, but
22     customers -- typical customers who would be using a flap
23     disc would often be using related products for similar tasks
24     in metalworking; for example, a flap disc is used to grind
25     or impart a finish on metal.  They have to cut metal and

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 41

1  then they would use a cutting wheel.  So customers would
2  say -- and it kind of made sense to me -- "We're buying a
3  flap disc from you, how about if we buy our cutting wheels
4  from you?"  And so we added cutting wheels to our product
5  line and that's sort of how that progressed.
6  Q   How did you know where -- from where you could source the
7     cutting wheels?
8  A   I'm sorry, excuse me.  Again, I spent most of my career on
9     the shop floor overseeing a pretty big polishing department,
10    so I knew all of the players in the abrasives industry and I
11    was already buying those products in my previous company so
12    that's how I knew which companies to approach.
13 Q   So you'd have customers who started with the flap disc but
14    then based on the fact they needed a flap disc -- they
15    needed something else involved with the manufacturing
16    process, and then that also became something they would ask
17    you about; right?
18 A   Correct.
19 Q   And then that became a product that if you could source it
20    you offered it; is that safe to say?
21 A   Correct; yes.
22 Q   Was there ever a time where there was a customer that came
23    to you and they said, hey, I need X, Y or Z and you had to
24    tell them, oh, I don't know anything about that at all, or I
25    don't know where to source that?

Page 42

1  A   Yes, that -- yeah, for sure.
2  Q   Was there a common type of product that was requested where
3     you had to tell them, no, and turn them down?
4  A   So in the world of abrasives there are thousands and
5     thousands of SKUs, so there are certain areas that I didn't
6     get involved with; for example, like cylindrical grinding
7     wheels, that's something that my -- some of them used, but
8     it's a -- sort of a different animal.  And there are other
9     examples like that that I shied away from.
10 Q   Let me ask you this question first and then I'll follow-up.
11    Why did you shy away from it?
12 A   So it would take a big investment and it wasn't -- it wasn't
13    an area I also had personal experience with, I didn't really
14    understand the product.
15 Q   When you say that it would take a big investment, explain
16    what that means a little bit to me.  Why would that take a
17    big investment --
18 A   So for -- so for example, in the automobile industry they
19    use big cylindrical grinding wheels, and so it would take a
20    big investment as far as investing in, A, buying very
21    expensive wheels, understanding them, and then marketing
22    them to this particular segment of the market.  So as a
23    small business I sort of tried to focus on what I knew best.
24 Q   You mentioned when you started selling flap discs you
25    actually had a basement full of inventory.  During the

Page 43

1  lifetime of LVA did you always maintain an inventory or like
2  a warehouse that was full of all the products you offered?
3  A   We always had a -- I always had inventory, but not all of
4     the products I sold were in that inventory.  Some items I
5     sold we did something called "drop shipping" where we
6     shipped from the manufacturer direct.
7  Q   When approximately did you move on to a drop ship -- or
8     include drop shipping as part of your sales model?
9  A   So that was early on I also did drop shipping as well.
10 Q   Was it -- would you say that at any point in 2006 you were
11    doing drop shipping?
12 A   That's a long time ago, but it could have been.
13 Q   From early in the company's formation -- understanding maybe
14    it's in 2007, maybe it's in 2008, but drop shipping -- is it
15    safe to say that became a method of distribution early in
16    LVA's history?
17 A   Yes.
18 Q   Okay.  And I should -- I know what it is -- or at least I
19    think I know what it is, so maybe you can actually educate
20    me more.  What is drop shipping?
21 A   So drop shipping is when the manufacturer ships the product
22    directly to the customer.  LVA acts as a distributor so drop
23    shipping is when we don't take possession of the inventory,
24    we have it shipped direct from the manufacturer to the end
25    user.

Page 44

1  Q   Okay.  So in light of that answer help me understand.  How
2     would it represent, if you had, a significant investment to
3     begin selling cylindrical grinders?  After all, couldn't you
4     drop ship them?
5  A   So you're -- so -- and I gave you one example, cylindrical
6     grinding wheels, but there's a lot of examples.  But in this
7     particular one you're dealing with -- like when you get
8     involved in the auto industry the volumes are very, very
9     high, they -- sometimes they'll work directly with the
10    manufacturers.  And it would be a large capital outlay as
11    well to pay for the product, have it shipped to the customer
12    and wait to get paid.  But that one example -- don't get me
13    wrong, that's not like a huge thing, there's just tons of
14    things like that.
15 Q   Okay.  And I will ask you some follow-up questions.  It's
16    just I'm trying to get a sense for what were the factors
17    that went into saying I just can't get that type of product
18    for you?  What were the various things that went into it?
19    And you mentioned that, for example, the capital outlay, a
20    big investment, it makes sense to me if you're buying an
21    expensive product it might not be possible for you to buy
22    and then house all those products waiting for a hopeful
23    sale.  With drop shipping though I'm not sure that I
24    understand that that concern is applicable.  So what other
25    concerns would lead you to say I can't sell that?  What are

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 45

1    the other kinds of problems you would have?
2  A   So I would -- I would shy away from selling something that I
3       was not knowledgeable about the product, that would be
4       another area I would shy away from.
5  Q   Any other reasons?
6  A   There are certain markets where customers don't pay well,
7       that might be an area that I would shy away from.
8  Q   Give me a sense of what you mean by -- what does that mean?
9  A   I'll give you an example. There are lots of mom and pop
10      small polishing shops where they buy a product called buffs,
11      but they're very small companies and they don't pay
12      their bills, so I might shy away from a product like that.
13 Q   Any other reasons why you might turn down a product line,
14      even if somebody said, "Hey, I want you to sell this to me"?
15 A   Well, I think in general my marketing philosophy has been to
16      try and have a core product line that the products are
17      associated with each other, they're close to each other in
18      what they do and where they're used, and so that sort of was
19      a guiding principle of mine. Like if someone said, you
20      know, "Hey, do you want to sell batteries," I wasn't going
21      to sell batteries, you know.
22 Q   Within the realm of abrasives though, were there any
23      other -- other than taking a big capital investment, you not
24      having good knowledge of the product, or the sales being
25      directed to poorly paying markets, were there any other

Page 46

1    factors that would lead you to say I can't sell that
2       abrasive product to you?
3  A   Off the top of my head now I can't think of any.
4  Q   You mentioned that -- well, actually I don't want to put
5       words in your mouth. One of the examples you gave me of a
6       type of product that maybe you had solicited but you
7       couldn't deliver was the cylindrical grinding wheel; is that
8       right as an example?
9  A   Yes.
10 Q   Are you telling me that categorically you never sold any
11      cylindrical grinding wheels, or are you telling me there
12      were times where you did it? In other words, was there ever
13      a history where you said, "Actually, I've developed this
14      expertise and now can sell this product?"
15 A   Well, in that -- in the particular example of cylindrical
16      grinding wheels, no, I never sold any. But I think I pretty
17      much stuck to -- I mean, when I think about it I think I
18      pretty much stuck to the core of what I knew, and that was
19      abrasives for metalworking; and specifically for cleaning
20      and finishing metal welding and fabrications.
21 Q   Okay. So now the next thing that I'm going to do is I'm
22      going to ask you what are some other examples of products
23      that during the time where you controlled LVA you had to
24      say, "Ah, we just don't do that"?
25 A   I know there are examples but I'm sort of drawing a blank.

Page 47

1       So -- well, I can tell you that from time to time there were
2       people who we sold abrasives would say, "Hey, could you
3       actually do finished metal products for us, could you do the
4       polishing for us?" And we did not do that, we were not set
5       up for that.
6  Q   So in other words, you weren't going to offer the use of a
7       abrasives as a service, instead you were in the business of
8       selling abrasives?
9  A   Correct.
10 Q   Any other examples of products other than a cylindrical
11      grinding wheel that come to mind right now where you said,
12      "Nope, that's just not our bag"?
13 A   Not right now, no.
14 Q   Okay. So -- all right. We're going to go back in time
15      early in the formation of the company. I'm always going to
16      give you that preface so that we're on the same page about
17      what time frame we're talking about. You start with the
18      flap discs, you gradually extend to other products. Around
19      let's say -- I'm making up a date, let's just say a
20      couple years into the formation of the company how many
21      products approximately were you selling? Let's talk about
22      2010, just give me a sense.
23 A   2010 my best guess would be about 2,000 SKUs; I'd say like
24      1,000 to 2,000 SKUs would be my best guess.
25 Q   And then -- well, what's the largest number of SKUs that

Page 48

1       Lehigh Valley ever had within its offering?
2  A   So I think -- when I sold the company I think it was about
3       3- to 4,000 SKUs.
4  Q   Well, certainly that's a lot of -- and when we talk about
5       SKUs we're talking about each individual product has a
6       little code that's associated with it, the SKU code;
7       correct?
8  A   Correct.
9  Q   You also mentioned that when information was posted on Pro
10      Stores that you'd be given a specification list and then you
11      would generate for copy a description of the product.
12      That's what you did with flap wheels (sic); right?
13 A   Correct.
14 Q   How did you generate all the information and description --
15      how did you ever write copy for 3-, 4,000 SKUs?
16 A   So two things; one is some of it is very repetitive. Like
17      for example we may sell a five inch sandpaper disc, so we
18      have to write a description for a sandpaper disc but it may
19      come in 20 different grids, so you don't have to write a
20      different description for each grid, you only have to write
21      one description but there's 20 different stock in units.
22      That's one example. And then --
23 Q   Actually this is the first time I've ever learned this, just
24      want it noted for the record, SKU stands for stock keeping
25      unit; right?

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 49

1  A  Correct.
2  Q  I have truly learned something new today. I've always
3     wondered, I've just never asked. Okay. So each individual
4     grid would have a different SKU, but you're describing the
5     same kind of thing just in different sizes. So some of them
6     will have -- is it safe to say that some of the descriptions
7     will be generalized; that's to say can you use the copy over
8     and over?
9  A  Correct.
10 Q  Okay. Would you always generate -- would you sit down and
11    write -- write the copy for grit level 20 and then it would
12    copy and paste?
13 A  **So there are certain products where, like the private label**
14    **products like a flap discs that I did write the**
15    **descriptions. But we may sell another product, let's say a**
16    **Sait grinding wheel, so they -- they are a manufacturer in**
17    **the marketplace and they have a product that's well known,**
18    **we might use their copy for that item.**
19 Q  Got it. And what does that process look like? Do they
20    provide -- in those circumstance where you're being provided
21    copy to put on your website, is that copy that they
22    tailormade for that purpose and they just have a -- hey this
23    is a vendor sales capsul, here you go, put it up on your
24    website?
25 A  Many of them do, yes.

Page 50

1  Q  Are there ever any other methods other than copy you write
2     yourself or stuff you got from a manufacturer to be
3     advertised? Are there any other methods by which you are
4     using copy during your time at LVA to put up on the website?
5  A  No.
6  Q  Those are the only two ways?
7  A  Yes.
8  Q  I think I may have already asked you this, so I apologize.
9     Generally just -- I don't have it in my notes. Did you ever
10    use any accounting platforms other than QuickBooks and Pro
11    Stores when you were in control of LVA.
12 A  **So, no, ex- -- let me just preface that with towards the end**
13    **of LVA we were transitioning the ecommerce software from Pro**
14    **Stores to Big Commerce, and I don't recall if that cutoff**
15    **happened before or after the sale. But that was -- that was**
16    **another platform that was transitioned to around the sale of**
17    **the company.**
18 Q  What is Big Commerce?
19 A  **That is another ecommerce software package similar to Pro**
20    **Stores.**
21 Q  Forgive me for the elementary question, what's the point in
22    transitioning from Pro Stores to Big Commerce, what's the
23    advantage gained there?
24 A  **So Pro Stores was being discontinued, it was no longer**
25    **popular and so they were going out of business, so that's**

Page 51

1     **the reason why we had to change.**
2  Q  Now you mentioned that you weren't sure whether this
3     transition started before or during the sale. Do you
4     remember whether it was completed when you retained control
5     of the assets of LVA?
6  A  **So let me rephrase that. I know it started before the sale,**
7     **the transition started before the sale was completed. I**
8     **don't recall if it ended -- the transition was completed**
9     **before or after the sale, that part I'm not sure about.**
10 Q  Understood. Next I'd like to ask you some questions about
11    financials. Keeping in mind I know you don't have tax
12    returns in front of you. But if we were to ballpark in the
13    early days of LVA's histories; we're talking 2006, 2007,
14    2008; approximately what was LVA's total gross annual
15    revenue?
16 A  **So if I had to ballpark it I would say about a million**
17    **dollars.**
18 Q  And how did that change by the time that you sold the
19    company? What was it on an annual revenue basis at the time
20    of the sale?
21 A  **3.5 million.**
22 Q  So safe to say that between the time the company was founded
23    and the time you sold it it had grown at least -- you know,
24    tripled or quadrupled in size; right?
25 A  **Correct.**

Page 52

1  Q  Did you draw a salary from LVA?
2  A  **No.**
3  Q  Did you take distributions or did you receive -- how did you
4     personally in your household make money from LVA, what was
5     the mechanism of that?
6  A  **So, yeah, I basically took a distribution at the end of the**
7     **year; whatever was left over was mine.**
8  Q  Around the time of the sale of LVA, what amount of annual
9     distributions were you taking per year on average? Keeping
10    in mind I understand that's a ballpark.
11 A  **About 400,000.**
12 Q  At first -- well, when LVA was founded did the company have
13    any employees?
14 A  **No.**
15 Q  Were you an employee of LVA or just -- not just an owner.
16    Did you ever receive a W-2 from LVA?
17 A  **No.**
18 Q  Did there come a time where you hired employees at LVA?
19 A  **Yes.**
20 Q  How many employees in total did LVA have, at the time of its
21    sale I'll say?
22 A  **I think it was about 4-, so my two sons worked -- like they**
23    **were in college so they worked for me over breaks and so**
24    **forth.**
25 Q  Where did your sons go to college?

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 53

1  A   One of my sons went to Messiah College, which is outside of
2      Harrisburg, Pennsylvania.  And the other went to a college
3      called TCNJ, which is The College of New Jersey.
4  Q   So you had about four employees at the end; two of them were
5      your sons, two others.  What roles were these employees
6      working in?  What were they doing for you?
7  A   So one of them was doing the accounting and the other
8      employee was doing all the shipping and receiving.
9  Q   And I apologize, I think you gave this description but we
10     have somebody who isn't a son doing accounting, somebody who
11     isn't a son doing shipping and receiving.  What are your
12     sons doing for the company?
13 A   So they were helping adding products to the website.
14 Q   Who would make decisions about the products to be added to
15     the website?
16 A   That would be me.
17 Q   And then you would direct your sons to put the information
18     up onto the website that described the product?
19 A   Correct.
20 Q   Who was actually generated -- when copy would be generated
21     by either you or an LVA employee, was it usually you, always
22     you, usually your sons, always your sons?  What's the
23     division of labor there?
24 A   If it was a manufacturer that was well known in the
25     marketplace and we were using their information then my sons

Page 54

1      would put it on.  If it was something that required our own
2      copy then I would always create our own copy.
3  Q   How did -- let me ask this as a question:  How did LVA
4      maintain a list of all the products that would be offered;
5      in other words, was there a database where all the SKUs were
6      listed, did you assign them product numbers?  How did that
7      process work?
8  A   Yeah, so that would be contained within the -- what was
9      originally the Pro Stores ecommerce site and then
10     transitioned to the Big Commerce site.  That is where the
11     product data would be stored, such as the SKU number,
12     descriptions, et cetera.
13 Q   And with respect to that latter question, did Lehigh Valley
14     ever assign its own product number identifier, were you just
15     using SKUs?  When a product goes up on -- it goes into Pro
16     Stores, what kind of identifying information goes with it?
17     Just the SKU?
18 A   So, yeah, we did generate our own SKUs.  So when a product
19     would go into -- for example, in ecommerce software it would
20     require an SKU and a description of the item.
21 Q   And this is maybe where a gap in my knowledge has shown.
22     SKUs, those are not universal, those are company specific?
23     Are those generated by -- in other words, would LVA be the
24     one to come up with the string of numbers to form the SKU?
25 A   So sometimes yes, sometimes no.  Sometimes we did create our

Page 55

1      own and sometimes we would use those of the manufacturers we
2      represented.
3  Q   Were there any other ways that SKUs were generated other
4      than ones you came up with or ones that were manufacturer
5      provided?
6  A   No.
7  Q   I asked you when you maintained a product listing database
8      and how you did that, you said that that was stored in Pro
9      Commerce (sic) and then later that was navigated over to Big
10     Commerce; is that right?
11 A   Yeah, Pro Stores and then Big Commerce, yes.
12 Q   I'm sorry, and if I said something different -- that was the
13     intent of my question.  So I'll rephrase it just to make
14     sure we're clear.  When you maintained the product -- when
15     LVA maintained the product database that you described, that
16     was either maintained in Pro Stores or later in Big
17     Commerce?
18 A   Yes.
19 Q   Was it ever maintained anywhere else; was there ever an
20     Excel document or anything else that was created about
21     listing all the things that we offered?
22 A   Not that I ever remember.
23 Q   And did the Pro Stores product list, also the Big Commerce
24     product list, did that just include every product you had
25     historically sold, or did that include some things that

Page 56

1      maybe you had offered for sale but nobody ever happened to
2      buy?
3  A   The latter, so it included anything that we either sold or
4      wanted to sell.
5  Q   How often would LVA have a product in its database that it
6      wanted to sell but had been unsuccessful in selling?
7  A   That would be uncommon.  It happened but it wasn't that
8      frequent.
9  Q   Did you ever have any inventory of products that never
10     managed to sell lurking around in a warehouse or a basement,
11     something like that?
12 A   Yes.
13 Q   Was there ever a time during LVA's history that a customer
14     contacted you and said I want to purchase X and you didn't
15     have that product in the database but then went out to go
16     find it on the market and sold it to them?
17 A   So let me sort of make sure I understand what you're saying.
18     Are you saying we didn't currently have it in our catalog,
19     they asked us for it so we added it to our catalog and sold
20     it to them?  I'm sure that happened, yes.
21 Q   So is it safe to say that there are at least two potential
22     sources for the products that are listed in that product
23     list; one you sold it before, you're familiar with it,
24     you've offered it for sale and as a result you know about
25     its existence and you're advertising it for sale; and two,

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 57

1  people are coming to you, they're requesting it, you may not
2  have offered it for sale before but then after that point
3  you did?
4  A  Yes.
5  Q  Is it safe to say that both those methods were included in
6  the product list?
7  A  That existed, yes; both were included in the product list,
8  yes.
9  Q  Were there any other avenues of a product entering its way
10  into the product list?
11  A  You know, so the only other thing I can think of -- I mean,
12  the abrasives industry is one that I had been involved with,
13  so I would read literature on it and I would do research on
14  it and if I came across a product that I thought fit with
15  what we currently offered I would add it to what we sold.
16  Q  So there would be some times where you'd read marketing
17  materials and you'd say, "Hey, we could sell that as well,"
18  and then would add it to the product list?
19  A  Yes.
20  Q  One thing I don't have a very good understanding of, you
21  already gave testimony that there were times where a
22  customer came to you and said can you sell me "X," and you
23  said, "No, I just can't." The reason for that, you gave a
24  couple of different reasons; you gave three in particular.
25  How often did that happen?  Did that happen would you say

Page 58

1  once or twice, did that happen a dozen or so times, hundreds
2  of times, thousands of times?
3  A  Is the question how many times did a customer ask me for
4  something and I said that's not something we offer?
5  Q  Yes.
6  A  I would say maybe like a dozen times a year something like
7  that would happen.
8  Q  Okay.  I believe you gave testimony earlier that in the
9  early days of LVA you had contacts and you formed your first
10  customers from those contacts; right?
11  A  Correct.
12  Q  How did LVA grow its customer base?  What were the methods
13  that it used to market and advertise?
14  A  So I -- one of the methods is I joined a trade association
15  called NOMA, which is National Ornamental Metalworkers, and
16  so I became a member of that group and got to know some of
17  the members in that group.  I -- there are some direct
18  mailing lists that are available on the web, like
19  manufacturer's groups and so forth and I did cold calling
20  and called people.  And the website itself was also a source
21  of (indiscernible) customers.
22  Q  And for that last point I think I know what you mean, people
23  could come across -- well, let me ask you this actually,
24  this is important.  What was the website where I would go to
25  be able to buy a product from LVA?

Page 59

1  A  So it was lehighvalleyabrasives.com.
2  Q  Okay.  Lehighvalleyabrasives.com.  So when you say that the
3  website itself was a source of marketing or advertising,
4  people would stumble across the website and then could buy
5  and sell products from there?
6  A  Correct.
7  Q  Okay.  And how -- Lehigh Valley Abrasives, not exactly
8  something I'm going to accidently enter.  How did people
9  come to find that particular website?  How did you direct
10  people to it?
11  A  So keep in mind in the early 2000's, mid 2000's, the web was
12  not as developed as it is now and we were one of the first
13  companies to start selling flap discs direct to end users on
14  our website.  So because of that, because we were one of the
15  first to market in that method we would show up -- when
16  people typed "flap discs" typically we would show up near
17  the top of that.
18  Q  And explain to me the mechanism -- I think that I know, but
19  I want to make sure that I know.  How did it come to be that
20  if you just typed flap discs into something like Google or
21  Yahoo or -- I'm trying to think of the other ones --
22  Altavista was back around then, how did it come to be that
23  your website would appear?
24  A  So there are two things; one I mentioned but I want to
25  mention again is that in those days there were not a lot of

Page 60

1  people -- there were not a lot of people selling flap discs
2  on the web, so we were one of the only ones, so for that
3  reason it appeared.  Another reason it appears is that I had
4  written articles for some of the major trade magazines and
5  so when you write an article and you're considered
6  knowledgeable in that area Google directs people towards
7  your website because they want to direct people to websites
8  that they feel are valid and are a good source of
9  information.
10  Q  You mentioned that sometimes, especially in the early days,
11  people would search flap discs, not a lot of people sold it
12  so your name would come up; right?
13  A  Correct.
14  Q  Is it safe to say that the exclusivity of Lehigh Valley's
15  position that it derived some value from that?
16  A  I don't understand.  I'm sorry, I didn't understand the
17  question.  Can you say that again?
18  Q  Totally fine.  You mentioned that because there were not a
19  lot of competitors in that space, there were not a lot of
20  products -- or companies selling flap discs your name would
21  be close to the top; right?  Is that accurate?
22  A  Yes.
23  Q  So if some of the value derived by Lehigh Valley, does that
24  come from its not exclusive but rare position in a market,
25  you're selling a product that isn't offered by many other

15 (Pages 57 to 60)

Christopher Stone - January 29, 2025

Page 61

1  people?
2  A   So when -- in the early days there was definitely value
3      there because there were not a lot of competitors, that has
4      changed drastically and now there are lots and lots of
5      competitors selling the same thing.
6  Q   Is it safe to say that there's still value but the value is
7      diminished in comparison with what it was?
8  A   Yeah; severely diminished, yes.
9  Q   You mentioned writing articles for trade magazines and then
10     that would also lead and drive traffic to the website; is
11     that accurate?
12 A   Yes.
13 Q   And is this just as simple as someone reads your article,
14     sees the name, Googles the name and then comes across the
15     website, or is there another method here that it drives
16     business?
17 A   So the way -- the way Google ranks companies when you search
18     for data is they look for companies that are authorities in
19     the subject matter and that they look for original pieces of
20     work and they look for companies that -- they want to direct
21     people to websites that they think they're going to get good
22     information.  And so writing articles for trade magazines
23     includes search engine optimization.
24 Q   So the more original work that LVA would generate the more
25     business it would derive from that; is that accurate?

Page 62

1  A   Yes.
2  Q   And when we're talking about original work we're talking
3      about -- that's the trade articles you write, does that also
4      include product descriptions?
5  A   So not really product descriptions, but I also did a
6      newsletter as well that was technical in nature; it wasn't a
7      sales newsletter, it was a newsletter that provided
8      information to the customer on how to utilize the products
9      to improve productivity, and so that was also an original
10     work that improved the rankings as well.
11 Q   How does a company like Google or a search engine know what
12     it's looking at when determining the original work?  Is it
13     comparing and seeing, hey, does this string of words appear
14     in comparison with other companies, other websites?
15 A   So I -- that's my guess, but I'm not an expert on that.
16     That I don't know, yeah.
17 Q   Understandable.  Okay.  But there's not a -- to your
18     knowledge Google doesn't have a newsletter counter
19     (indiscernible) for biggest amount of newsletters, it's
20     looking at the text, it's reading the material; right?
21 A   Correct.
22 Q   And when you say the originality of that helps to determine
23     it, if you make it it's original to you and as a result it's
24     not going to appear elsewhere; right?  Is that what you're
25     saying?

Page 63

1  A   Correct; yes.
2  Q   And that will increase the availability and visibility of
3      the website on Google; is that correct?
4  A   Correct.
5  Q   How many approximately customers, different distinct
6      customers, were you selling to at the end of your first year
7      of operation?  Keeping in mind I get it, I'm just asking for
8      an approximate value.
9  A   Maybe 50 to 100.
10 Q   By the time that you sold LVA, approximately how many unique
11     customers did LVA -- had LVA historically ever sold to?
12 A   I don't know the exact number, but I would say several
13     thousand.
14 Q   What percentage -- if you can ballpark it for me, and this
15     easier in some industries than others.  What percentage of
16     your sales go to repeat customers; that is to say -- well,
17     actually let me ask the question this way:  I want you to
18     think of over the history of LVA maybe your largest five
19     customers.  Keeping in mind I understand this is an
20     approximation, what percentage of LVA's historical sales did
21     those five customers account for?
22 A   So at LVA no particular customer represented a large amount
23     of sales.  We had lots of customers, high order -- a large
24     number of orders but low order value.  So, you know, in a
25     year we would get a few thousand orders, but each order

Page 64

1      would be like 100, $150.
2  Q   What were some of LVA's biggest customers during the
3      entirety of the time you were there?  Ranking them either in
4      terms of revenue or in terms of number of orders, however
5      you choose.
6  A   I mean, I can't remember them off the top of my head, but
7      there were no customers that -- I can't think of a single
8      customer that represented even five percent of sales.  It
9      was more like lots of small customers.
10 Q   On the Lehigh Valley website we mentioned already there
11     would be newsletters, there would be marketing materials,
12     there would be copy describing products.  Maybe it isn't in
13     the nature of the abrasives business, but are there
14     photographs or pictures of products that they could actually
15     see the item they'd be purchasing?
16 A   Yes, there were pictures of products.
17 Q   Where would you get the photographs of the products to put
18     on the website?
19 A   So we would get those from the manufacturers we represented.
20 Q   Were there any other sources from which they came other than
21     from the manufacturers?  Those photographs I'm talking.
22 A   No.
23 Q   When you would offer a product for sale and you would use a
24     manufacturer photograph, would you need to execute some sort
25     of licensing agreement, anything like that with the company?

16  (Pages 61 to 64)

Christopher Stone - January 29, 2025

Page 65

1  A   Typically when we signed up with a distributor we signed an
2      agreement with them that as a distributor for their products
3      we are able to use their photos.
4  Q   Ah.  So there would be agreements that you would enter into
5      with these manufacturers before you ever bought anything?
6  A   Correct.
7  Q   Was that -- did you always do that, most of the time do that
8      or just sometimes do that?
9  A   So it would be most of the time.  Not every manufacturer
10     required it, but most of them did.
11 Q   Did LVA maintain a database of all those signed and executed
12     licensing agreements?
13 A   Yes.  I don't know that you would call it a database, but
14     for each vendor we represented we would sign an agreement,
15     they would have a copy and I would sign it and at the time I
16     had like a file system so I would put a copy of the
17     agreement in the file of that vendor's name.
18 Q   And where were those files stored and located?  Are we
19     talking other name cloud server or are we talking --
20 A   I'm talking old school here.  I'm talking paper in a manila
21     folder in a folder in a file cabinet.
22 Q   Did you ever convert those paper records into an electronic
23     format?
24 A   No.
25 Q   Where are those records now?

Page 66

1  A   You know, 20 years ago --
2  Q   I'm sorry, Chris, you answered in good faith but you faded
3      out in the beginning and I didn't hear it.  So where are
4      those records now?
5  A   I have no idea.
6  Q   Did you give them to Allied Industrial as part of the
7      transaction?
8  A   I don't think asked for that and I don't think I did,
9      but I'm not 100 percent sure about that.  They weren't of
10     value to Allied.  Allied when they bought the company had a
11     responsibility to reach out to those vendors and sign new
12     agreements, because those agreements were between me and the
13     vendor.  When they purchased me they had a responsibility to
14     reach out to that vendor, make sure they could still sell
15     the product and execute an agreement under the Allied name
16     with that vendor.
17 Q   Did you ever actually sell the name of Lehigh Valley
18     Abrasives; in other words, did the corporate form itself,
19     the LLC itself, did you dispose of that in any way?  I know
20     there was an asset sale.
21 A   Oh.  I -- no, I never even thought about that.
22 Q   You just gave some testimony that Allied Industrial would
23     have the obligation to reach out to each manufacturer and
24     execute a new license in agreement with them.  Is that
25     accurate?

Page 67

1  A   Yes.
2  Q   What was the source of that obligation, from where did that
3      obligation come from?
4  A   Well, that -- what I'm saying is what I think should happen,
5      because -- this is -- I'm not a lawyer, but I executed an
6      agreement with the vendor, they gave me permission, Chris
7      Stone as the owner of Lehigh Valley Abrasives, to sell their
8      product.  When a third party bought me, Allied, they don't
9      have that same agreement to sell that product until they
10     reach out to that vendor and make that agreement.
11 Q   Were the agreements transferred to Allied Industrial as a
12     part of the asset sale?
13 A   No.
14 Q   Was that carved out of any particular asset arrangement or
15     agreement; in other words, was it specified they were coming
16     with it?
17 A   No; no.  It was never discussed, but I'm just talking
18     general principles.  Like if you ask the manufacturer -- if
19     you ask the manufacturer -- if I called the manufacturer and
20     said I'm selling the company to this other company, they
21     would say give me their -- and they did, give me their phone
22     number, I need to -- we need to execute a new agreement with
23     them.
24 Q   And you would be told that by these manufacturers, is that
25     what you're saying, source of the obligation as you

Page 68

1      understood it?
2  A   Correct.
3  Q   Did you ever see a document or read an agreement that said,
4      hey, you've got to -- this is nontransferable, this can't be
5      moved over to a purchaser?
6  A   I never read that that's in the agreement, but my
7      understanding is I am signing that, Christopher Stone as the
8      owner of Lehigh Valley Abrasives, that's my (indiscernible)
9      with them.  When a new third party, a separate entity takes
10     over, I would think -- and again, I'm not -- this is not
11     something I'm saying out of absolute knowledge but I would
12     think they would have a responsibility to reach out to that
13     vendor and sign an agreement under their name and their new
14     company.
15 Q   And currently I believe you said you don't know where these
16     licensing agreements that were maintained in paper copy --
17     where they currently are?
18 A   That's 20 years ago.  I mean, probably in the garbage
19     somewhere; some garbage landfill is my guess.
20 Q   Would you have been the one to dispose of them?
21 A   Honestly I don't know where they are or what happened or --
22     you know, they really are of no value anymore to me because
23     I no longer own Lehigh Valley, and once I sold Lehigh Valley
24     they were not -- I no longer had a relationship with that
25     vendor.

17 (Pages 65 to 68)

Christopher Stone - January 29, 2025

Page 69

1  Q   But I thought you just gave testimony that those licensing
2      agreements were specific to you?
3  **A   Right, as long as I owned Lehigh Valley Abrasives.**
4  Q   Okay.  I understand.  And based on your understanding of
5      that language then your ability to maintain a licensing
6      relationship with them terminated as soon as you sold the
7      assets of Lehigh Valley?
8  **A   Correct.**
9  Q   But they did not transfer over in your understanding, so
10     Allied did not assume them, they just disappeared?
11 **A   Correct. Allied would have to reach out and form a new**
12 **     relationship and sign a new agreement.**
13 Q   So thinking back to one of these licensing agreements -- and
14     it sounds like neither of us have it so we can't reference
15     it, it's not in front of our face here.  Do you know if you
16     were the signatory, if Lehigh Valley was the signatory, or
17     if both of you were the signatory?
18 **A   So again, you're right, we don't have it in front of me, but**
19 **     to the best of my recollection it was both.**
20 Q   Both?
21 **A   All I'm saying is to the best of my recollection there would**
22 **     be a line at the bottom that would say owner's signature and**
23 **     then company name.**
24 Q   Got it.
25 **A   That was typical of the agreement.**

Page 70

1  Q   And you would be executing that as the owner of Lehigh
2      Valley?
3  **A   Correct.**
4  Q   Got it.
5          MR. LEVASSEUR:  We're going on two hours pretty
6      soon, so when you get a good transition why don't we take a
7      five minute break.
8          MR. CASCINI:  Actually you're anticipating well.
9      I've got one more subject in this line to talk about, then
10     we'll transition over to the transaction.  And I think that
11     right before we do the transaction would be the logical
12     break, Chris, if that's okay with you.
13         MR. LEVASSEUR:  Sounds good.
14         MR. CASCINI:  I'm sorry.  I used "Chris," there
15     are two Chrises.  So, Mr. LeVasseur and Mr. Stone, if you
16     guys are okay with it I'd like to proceed for around another
17     15, 20 minutes and then we can take a break at that point.
18     Is that okay with both of you?
19         MR. LEVASSEUR:  That's fine.
20         THE WITNESS:  Yes, that's okay with me.
21         MR. CASCINI:  I appreciate that.  And just one
22     thing for the purposes of the record today.  Chris -- Mr.
23     LeVasseur, this is a conversation you and I have already
24     had.
25 BY MR. CASCINI:

Page 71

1  Q   We will be able to take some breaks, Mr. Stone, but one of
2      the things about fitting it in today I have a hard stop at
3      3:00 so we're going to need to keep breaks fairly short
4      unfortunately.
5  **A   Okay.**
6  Q   I've never otherwise done that in a dep, but I know I'm
7      trying to accommodate your schedule and you're trying to
8      accommodate mine and that's one of the things we talked
9      about here.
10 **A   Okay.**
11 Q   All right.  So we mentioned all the sources where sales
12     invoices are kept.  We've mentioned the source of where all
13     of the listed product are kept by LVA.  Where does LVA
14     maintain a list of all of its historical customers?
15 **A   So that data would be maintained within the ecommerce**
16 **     software and QuickBooks.**
17 Q   And when we say ecommerce software, I think I know what you
18     mean, but for the purpose of clarity we're talking about Pro
19     Stores and then later Big Commerce; right?
20 **A   Correct.**
21 Q   So they have a database that's maintained there and then
22     separately there's a QuickBooks database as well; right?
23 **A   Correct.**
24 Q   You need to put both of those lists together to form a
25     complete picture of all the sales -- of all the customers to

Page 72

1      whom there have historically been sales?
2  **A   Yes.**
3  Q   And is that a case of the products as well, you need to put
4      both those databases together to get a sense of all the
5      products that LVA historically sold?
6  **A   So for the products all of the products would be in the Pro**
7  **     Stores/Big Commerce database.**
8  Q   Okay.  So there was never a sale that was effectuated by
9      phone or email that didn't involve a product that was on the
10     website; is that accurate?
11 **A   To the best of my knowledge I can't remember that ever**
12 **     happening.**
13 Q   Okay.  So -- and I apologize because I asked you a question
14     with a double negative in it and then I think you gave me
15     one.  So to the best of your knowledge there was never an
16     instance where a phone order or an email order was taken,
17     put into QuickBooks, but the order was for a product that
18     wasn't on the website.  Is that an accurate statement?
19 **A   To the best of my knowledge I think that's true, there were**
20 **     many, many more products and sales generated from the**
21 **     website than from QuickBooks.**
22 Q   What's the proportion that you would say of sales that were
23     documented in either the ecommerce platform versus
24     QuickBooks?
25 **A   So I don't have that data but if I just had to guess from**

Tip of the Mitt Transcription
(231) 753-6957

Page 73

1    memory I would say maybe two-thirds ecommerce software and
2    one-third QuickBooks.  That's my best guess.
3  Q   Okay.  And then I'm going to ask you a question that I'm
4    actually a little surprised to see I didn't ask you before.
5    Do you remember when we looked back to the four sources of
6    sales; the email, phone, the ecommerce platform/the online
7    website, or eBay.  Approximately over the lifetime of LVA
8    can you -- keeping in mind approximately -- what are the
9    percentages of the sales across this board?  Can you help me
10   understand the main source of sales?
11 A   So let's -- after a few years I stopped selling on eBay.  So
12   your question is the breakdown between phone, email and
13   directly on the ecommerce site; is that correct?
14 Q   Correct.
15 A   So I would say 60 to 70 percent ecommerce and then 15
16   percent phone and 15 percent email, that would be my best
17   guess.
18 Q   So is it safe to say based on the places where I know those
19   transactions were logged, if you were to take a look back at
20   all the historical records of every single order LVA has
21   ever had, about 60 to 70 percent of them are going to be in
22   the ecommerce platform's database and then -- what would
23   that be? -- 40 to 30 percent are going to be in the
24   QuickBooks database?
25 A   Yeah, I would say 70 percent ecommerce, 30 percent

Page 74

1    QuickBooks, yes; about that, that's the best I can remember.
2  Q   And I do understand that those are approximates.
3  A   Yeah.
4  Q   I get it.  Would LVA ever directly solicit to customers;
5    that is to say was there ever any direct advertising where
6    you took a customer list and you blasted out, hey, we've got
7    a sale on X, Y, Z, or anything of that nature?
8  A   Yes.
9  Q   Tell me about some of the methods of direct solicitation LVA
10   used.
11 A   So LVA -- so when we -- one of the things I had mentioned is
12   the newsletter, so we collected obviously customers -- when
13   they ordered off our website we had their name and email
14   address and we send out a newsletter quarterly to all
15   of those customers saying, hey, look at this great new
16   product that we're now selling or we're offering 10 percent
17   off that kind of thing.  We also would sometimes send emails
18   out to -- for example I mentioned we were members of NOMA,
19   so from that we got an email list of NOMA customers and we
20   would send periodic emails out to them offering our
21   services, that kind of thing.
22 Q   Other than the historical record of the ecommerce sales --
23   actually let me break this down to make sure I understand,
24   because I think I'm missing a piece.  When there's an
25   ecommerce transaction you guys maintained the customer name

Page 75

1    and then the email; right?
2  A   Correct.
3  Q   And then you would use that, the -- that's either the
4    ecommerce platform, so either Big Commerce or Pro Stores,
5    you would use that list sometimes to do direct
6    solicitations, you'd blast out an email?
7  A   Correct.
8  Q   Then there was also third party lists, like the NOMA list,
9    for example, is one that you just gave me?
10 A   Correct.
11 Q   Are there any other email lists that are available to you in
12   your time at LVA?
13 A   So other than NOMA there were other ones.  I'm trying to
14   remember, there was like a -- there was a mailing list that
15   we were a member of a group, it was like the American Iron
16   Workers or something like that, and we would send emails to
17   them.  Those are the two big ones I remember.
18 Q   What other ones do you remember?
19 A   I mean, those are the only two I remember but there might
20   have been more.  I mean, that was a method that we used to
21   try to get sales is to send emails to customers directly
22   linked to our website.
23 Q   Did you have -- other than your own internal ecommerce list,
24   the NOMA list and the American Ironworkers list, how many
25   other lists were ever maintained?  Are we talking one, are

Page 76

1    we talking five, ten, 20?
2  A   I don't remember 100 percent because this is -- again, this
3    is going back, you know, 15, 20 years.  But I would say
4    maybe five; maybe.
5  Q   And with the NOMA custom list, the American Ironworkers
6    list, and based on your recollection those five or so other
7    lists, what information would that include?  Would that
8    include the customer name and an email address?
9  A   Correct.  But just so we're clear, we didn't like have a
10   record of those.  We went on like NOMA's website and NOMA's
11   website would have the name of the company and the email and
12   we'd send them an email.  We didn't like store that anywhere
13   ourselves.  Do you follow what I'm saying?
14 Q   But certainly there was a record of the emails that you sent
15   out; right?
16 A   Yeah; yeah.  I mean, yes, we sent emails to the customers on
17   that list.
18 Q   So there wasn't a list that was maintained of NOMA
19   customers, it was just one that happened to be generated
20   when the emails were actually sent; is that accurate?
21 A   Well, the list is maintained by NOMA, not by us, that's what
22   I was trying to get at.  And the American Ironworkers, the
23   list is maintained on their website, not ours.  We got the
24   information from being a part of those groups.
25 Q   Fair enough.

19 (Pages 73 to 76)

Page 77

1  **A    We went to their address to get the email address.**
2  Q    So that's the source, but there is a list that is maintained
3      eventually by LVA -- right? -- after all you can see who
4      send emails to; right?
5  **A    Right; right. If we saved the email then there would be a**
6      **record of it, yes.**
7  Q    Okay.  So --
8          MR. LEVASSEUR:  For the record I just want to
9      clarify.  Andrew, when you're talking about lists, in my
10      mind -- and I'm sure there may be some confusion with Mr.
11      Stone -- you think of an actual list as opposed to -- if you
12      send an email you've got a record of an email because we can
13      look for the email.  And so to the extent that's what you're
14      referring to as a list that would be what we're talking
15      about here; is that fair to say?
16          MR. CASCINI:  Yes.  And I do -- I want to clarify
17      here.  So actually if it's okay with your, Mr. LeVasseur, I
18      want to back up just a second, so please let me tread on a
19      little bit of ground because I do want to make sure we have
20      a clear record here.
21  BY MR. CASCINI:
22  Q    Mr. Stone, only with respect to the NOMA -- I'm sorry, is it
23      NOMA or NOVA?
24  **A    NOMA, yup.**
25  Q    With respect to the NOMA custom list and the American

Page 78

1      Ironworkers list, those are lists that are maintained on
2      their website, we take that list and we send out
3      communications to that list; is that accurate?
4  **A    We take those emails from their site and we use that email**
5      **address to send a solicitation email to the customer, yes.**
6  Q    And then we retain a record of the emails that we sent;
7      right?
8  **A    If we saved the email, yes.  We didn't save all of our**
9      **emails, but, yes, if it was -- if the email was saved there**
10      **would be a record, if the email wasn't saved there would not**
11      **be a record.  Because there's not really a value of saving**
12      **an email of -- a solicitation email.**
13  Q    Okay.
14  **A    At least in my -- at least as far as I can see.**
15  Q    Okay.  One thing that immediately occurs to me it would stop
16      you from having to go visit the NOMA -- or, yeah, the NOMA
17      website every time, after all you could just pull up the
18      list.  For example, when I email all of my clients I
19      received those emails from them all originally, but I have
20      an email list where I can say "all clients" and boom it auto
21      populates.  Did LVA maintain anything of that nature with
22      respect to the NOMA or the Ironworkers emails?
23  **A    No.  And let me explain a little bit further.  So the way I**
24      **view it is a customer who came and bought something from us**
25      **there is a high likelihood that they are going to buy from**

Page 79

1      **us again.  We have that email address in our email**
2      **software -- in our -- I'm sorry -- ecommerce software we**
3      **have that email address.  There's a high probability of**
4      **success with a customer like that.  When you send out an**
5      **email to a group or something the response rate is terrible,**
6      **it's like 1 percent, so we don't really need a record and**
7      **it's not something we had terribly much success with.**
8  Q    I understand.  I get the position.  And you mentioned that
9      emails would sometimes -- email records would sometimes be
10      saved and sometimes would not be saved; is that accurate?
11  **A    Yes.**
12  Q    What was LVA's email retention policy, at least at the time
13      where you disposed of LVA's assets?
14  **A    So the retention policy was that we kept emails related to**
15      **orders for up to three years.**
16  Q    And then after that time how were those emails
17      automatically -- were they automatically deleted, was there
18      a sorting mechanism?  How did they come to disappear then at
19      that point?
20  **A    There was no automated system, but as you know you get**
21      **charged for email storage.  So, you know, I believe we got a**
22      **notice from Microsoft that we're going to have to pay more**
23      **money unless we reduce our storage.**
24  Q    So when you would begin to run out of storage you would
25      delete emails older than three years?

Page 80

1  **A    If they were -- if they were -- yeah, we would delete emails**
2      **older than three years if we got a message that the mailbox**
3      **was almost full, yes.**
4  Q    That being said, if you received the order via email you've
5      already told me you think it's logged in QuickBooks; right?
6  **A    Yes.**
7  Q    So would that record also be deleted, or would that record
8      remain in the QuickBooks?
9  **A    We never deleted anything from QuickBooks.**
10  Q    Got it.  So the source email may be gone, the record of the
11      sale is maintained in QuickBooks --
12  **A    Correct.**
13  Q    -- safe to say?
14  **A    Yes.**
15  Q    Got it.
16          MR. CASCINI:  I think, Mr. LeVasseur, this might
17      be an opportune time for a break.  Mr. Stone, would that be
18      okay with you for us to take a break for --
19          THE WITNESS:  Yes.
20          MR. CASCINI:  Why don't we -- just for the sake of
21      making this easy, why don't we come back together at 11:30,
22      Mr. LeVasseur.  Is that acceptable to you?
23          MR. LEVASSEUR:  Sure.
24          MR. CASCINI:  Mr. Stone, are you okay with that?
25          THE WITNESS:  Yes.

20  (Pages 77 to 80)

Christopher Stone - January 29, 2025

Page 81

1        (Off the record)
2  BY MR. CASCINI:
3  Q   Mr. Stone, we just took a break for a couple of minutes, but
4      are you still able to see me, to hear me, to understand --
5  A   Yes.
6  Q   Is it still coming across okay?
7  A   Yes.
8  Q   A couple of follow-up questions before I begin to discuss
9      subjects of the transaction.  I just wanted to go back
10     through some things.  The very first thing here is I wanted
11     to talk a little bit more about Sundisc.  And a question
12     that occurred to me, literally as I was getting a glass of
13     water, is when you would purchase items from Sundisc you
14     would turn around and sell those to LVA's customers;
15     correct?
16 A   Yes.
17 Q   Did -- why were LVA's customers not purchasing them directly
18     from Sundisc?
19 A   So Sundisc is in the Netherlands and for a US customer to
20     buy like 100 discs from the Netherlands would be -- that
21     would be cost prohibitive because you would have to
22     transport those goods across the ocean.  So I could buy them
23     in large quantities and transport them and the transport
24     costs are a fraction of what they would be.
25 Q   Does Sundisc, are they -- when they arrive at the consumer

Page 82

1      are they Sundisc branded products or do they white label
2      them for you?  By white labeling what I mean is do they put,
3      you know, your name on them and, you know, say, hey this is
4      an LVA Abrasives product?
5  A   Yes, they're white labeled as you would say.
6  Q   What are the features that make Sundisc so competitive?  Why
7      is there price so much lower?
8  A   So they are the largest independent flap disc manufacturer
9      in Europe and they are very automated, and so they are able
10     to make the product at a competitive price.  When I entered
11     the flap disc market, like I mentioned before, there were
12     only a few players, 3M being one of them, and 3M has a great
13     name so they could just charge a lot for a product and they
14     were making very hefty margins.
15 Q   Now you mentioned that they've performed white labeling, and
16     just to be very clear what I'm referring to with that
17     term -- if I'm using the term of art incorrectly, what I
18     understand white labeling to be is that a product will be
19     given to you from the manufacturer -- and let me back all
20     the way up.  LVA didn't manufacture anything; correct?
21 A   Correct.
22 Q   At no point during its history did it ever actually make a
23     flap disc or abrasive product; right?
24 A   When I owned it we never manufactured it, yes.
25 Q   Fair enough.  Okay.  When you owned it it never manufactured

Page 83

1      anything, it instead purchased products from the
2      manufacturer and then sold them to companies that would need
3      to use that; right?
4  A   Correct.
5  Q   And what I understand the process of white labeling to be is
6      that it doesn't come in a Sundisc box, the product itself
7      isn't stamped with a Sundisc label, that's all LVA labeling
8      and packaging and the like that the customer ends up
9      receiving; right?
10 A   It is their packaging but our name is on the label, yes.
11 Q   Your name is on the label.  How does that -- mechanically
12     speaking how does that occur?  Are they doing that for you
13     and they're putting the label on?  Are you receiving it and
14     putting your own label on?  Tell me how that works, I have
15     never done that.
16 A   So correct, they have automated labeling machines that they
17     put on it our label.  So it would say Lehigh Valley
18     Abrasives and they have automated equipment that would stamp
19     that on the flap disc, automatically put that disc into a
20     box and put our name on the box as well.
21 Q   And I assume before you make your first purchase of these
22     items to be white labeled you need to send them that
23     information; right?  You need to tell them, hey, this is how
24     we want it stamped, this is what we want the box to look
25     like, that kind of thing; is that accurate?

Page 84

1  A   Yes.
2  Q   And with respect to that process how long does that take to
3      set that up, to get that so that it's all working correctly?
4  A   I guess there's no one answer to that because it can depend
5      on several factors.  But if I had to make a guess how long
6      it takes to design the label and get the prototype maybe
7      three months.
8  Q   And is that true in general for white labeling, or is that
9      true only exclusively for Sundisc?
10 A   So that's sort of a ballpark for Sundisc, but it would be
11     different for different manufacturers the amount of time it
12     takes.
13 Q   What's the longest it's ever taken in your experience and
14     what's the shortest?
15 A   I would say the longest is six months and the shortest is
16     like three days.
17 Q   Would three months represent around the average though; is
18     that accurate?
19 A   I think so, yeah.
20 Q   Okay.  One thing I wanted to ask also, when an order is made
21     at LVA using the online website it is kept -- we know this
22     you've -- in the online database; that is to say the Pro
23     Stores account or the Big Commerce account.  You've already
24     testified to that; is that accurate?
25 A   Yes.

21 (Pages 81 to 84)

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 85

1 Q   Is an email generated contemporaneously with the sale being
2     made?  In other words, if you're -- I don't know -- I'm
3     making up a hypothetical here -- out to dinner and you have
4     your phone on you, can you see "ping" there was just a sale
5     of some product that hits an email inbox?
6 A   So if the customers ordered through one of the ecommerce
7     websites, either Pro Stores or Big Commerce, then, yes,
8     those stores in Big Commerce have a function that boost
9     email software.  Most ecommerce packages do that they send
10    you an invoice when you place the order.
11 Q   And is that invoice sent via email?
12 A   So it's sent via -- yeah, it's sent via email from the
13    system, yes.
14 Q   And where would -- what was the email address to which those
15    emails would be sent when Pro Stores was doing it say?
16 A   So when Pro Stores was doing -- for example, when a customer
17    goes to order an item they have to enter their email address
18    along with their shipping address in order -- in addition to
19    what they're going to order, and when they do that that
20    email address is the one that either Pro Stores or Big
21    Commerce sends a copy of the order to.
22 Q   Perfect, but what I'm asking is a slightly different
23    question.  And I apologize, I understand why you gave me
24    that answer.  I don't think it was evasive, I just asked a
25    bad question.  I'm asking something a little bit different

Page 86

1     though.  Do you or LVA as an entity, do you guys get an
2     email receipt of that order at the same time the invoice
3     goes out?
4 A   So you could set the software up to do that.  I don't think
5     that I did set the software up to do that, but that's a
6     function that you can do.
7 Q   And you've never set up that function so --
8 A   I don't -- again, we're going back, you know, ten, 15 years,
9     but I don't think so; I don't think that was set up that
10    way.
11 Q   Next I want to ask you in a little more in depth because we
12    hit on part of it, but never completed the thought.  You
13    mentioned that there was the info@lva email address;
14    correct?  Is that one of them?
15 A   Info@lehighvalleyabrasives.com, yup.
16 Q   Okay.  And when I say "info@lva," that's what I'll be
17    referring to, just that's a mouthful.
18 A   Okay; okay.
19 Q   With respect to that info@lva email account, when was that
20    created?
21 A   That was created around the time that the company started, I
22    think it was around 2006 or so.
23 Q   And were there other email addresses -- using the domain
24    @lehighvalleyabrasives, were there other email addresses
25    that were associated with that?  Like was there a Chris at

Page 87

1     LVA or a --
2 A   So I don't think so, going again, you know, ten, 15 years
3     ago.  But I think info@lehigh -- info@LVA was the only one,
4     the only email address.
5 Q   And how mechanically would you access that?  Did you use
6     Outlook, would it get forwarded to another email account?
7     How would you view what was in the info@LVA email?  If
8     somebody sends an email to info@LVA how would you get it?
9 A   I used Outlook.
10 Q   When you order a -- or I'm sorry, when you receive an order
11    from a customer for an abrasive product, do they tell you
12    what they intend to use that abrasive product for?
13 A   No.
14 Q   So you're not also a consultant too?  You're not working
15    with them through it and they're like, hey, you know, we're
16    going to be using this at this particular juncture in our
17    manufacturing process?
18 A   So let me back up a little bit.  Typically someone just
19    orders it, but from time to time there are individuals and
20    companies who will call and ask for advise on how to use it
21    so that could also have taken place in some occasions.
22 Q   And with respect to -- actually strike that.  What
23    proportion of the time would you receive information about
24    -- what proportion of the time did an order come to you for
25    a specific product versus them describing what their needs

Page 88

1     were where you recommended something?
2 A   I'm going to preface it to say in the early days of the
3     company there was more communication about customers, people
4     would -- it was more common to call someone and talk to them
5     on the phone.  Towards the latter end pretty much everything
6     was done through the website.  But I would say maybe one out
7     of 100 customers  would want advice on how to use the flap
8     disc.
9 Q   One out of 100 you said was approximately the proportion?
10 A   Yes.
11       MR. CASCINI:  I apologize, guys, I'm just getting
12    some documents in order because we're going to take a look
13    at some in just a minute here.  Very good.
14 BY MR. CASCINI:
15 Q   Did Sundisc offer various configurations of the products; in
16    other words, did they have an online catalog or when you
17    ordered the products from Sundisc what kind of information
18    did you need to exchange from them?
19 A   Typically you would need to tell them like what type of
20    material you would want to make the flap disc out of,
21    whether it be -- like I said, zirconia, ceramic, different
22    materials have different properties.  So you would need to
23    tell them that, you would need to tell them the diameter of
24    the disc you want.  Those are the two main pieces of
25    criteria you need at the time of order.

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 89

1  Q    And after that point in time are these -- are these products
2       that they have on hand and it's just them choosing between
3       them, or would they manufacture them differently based on
4       what you said your needs were?
5  A    So they -- I mean, different manufacturers do it different
6       ways, but Sundisc because they're very automated they only
7       manufactured two specific orders. So if I were to send them
8       an order they would make my order.
9  Q    Got it. And when you would send them those specific orders,
10      after a period of time did you need to continue walking them
11      through it or by being a repeat customer of them were you
12      able to tell them, hey, we just need the same thing over
13      again?
14 A    Yeah, the only thing we had to specify in our purchase order
15      was the diameter and the type of sandpaper we wanted to use
16      on the disc.
17 Q    Okay. Between the time when you ordered a product from
18      Sundisc, based on the fact they were a manufacturer, how
19      long would it take you from saying, hey, I need the thing
20      until it arrived on your doorstep, or at the customer's
21      doorstep if they were drop shipping it?
22 A    So typically it would take about two to three months because
23      you're taking it by ship across the ocean.
24 Q    So that amount -- basically from sort of onset to delivery
25      we have the white labeling process that we need to do, then

Page 90

1       we order it and then after that they'll need to ship it, and
2       both the white labeling process is about on average three
3       months and then the shipping and delivery is about three
4       months; is that right?
5  A    So let me clarify that. Let me just say what you call white
6       labeling I call private labeling. Not that you're wrong,
7       but --
8  Q    Let's use your term, we'll call it private labeling.
9  A    Yeah, but the private labeling that's a one time thing and
10      it's the first time you ever place an order, after that
11      subsequent orders you don't have to deal with that. So
12      subsequent orders it's the total of three months.
13 Q    Understood. Got it. Okay. You have already given some
14      testimony about the various uses that abrasives have in
15      metalworking. Are abrasives used in other forms of material
16      surfacing as well?
17 A    So the type of abrasives we sold were used for metalworking.
18      There are other abrasives that are used in different
19      industries, but the abrasives are manufactured in a
20      different way.
21 Q    What is the difference between a metalworking abrasive and
22      an abrasive used for -- I'm trying to think of -- sanding of
23      drywall? I'm making something up here.
24 A    Sure. So abrasives used for metalworking, metal is --
25      especially stainless steel -- an extremely hard surface so

Page 91

1       the structure of the grain is a much -- a harder material
2       you want to use for the grain. And you also want the grain
3       to be closer together because it's a much more difficult
4       grinding application. In abrasives that are used in the
5       woodworking industry are basically the grain is softer and
6       it's spread out more.
7  Q    And you mentioned a distinction between woodworking
8       abrasives and -- the nature of the abrasive is different,
9       you said it's softer and then spread out more. The
10      companies that you -- the companies that manufacture
11      metalworking abrasive products, do they also manufacture
12      woodworking abrasive products or are those different
13      companies that manufacture those?
14 A    Some of them do and some of them don't.
15 Q    Are there any multifunction abrasives, are there abrasives
16      that are designed for multiple different uses on different
17      materials?
18 A    So an abrasive that you would use for metal would not be the
19      same abrasive you would use for wood, it wouldn't work well.
20      And for example in the concrete industry they use like a
21      silicone carbide, a totally different material.
22 Q    You also mentioned I believe that one of the products that
23      LVA also offered in addition to just abrasives are products
24      that were adjacent to it, parts for machines that may use
25      abrasives. Are those ever common to multiple different

Page 92

1       material abrasives; in other words, parts used for a
2       woodworking abrasive sometimes be used for a metalworking
3       abrasive machine?
4  A    (No verbal response)
5  Q    I think I lost the sound there. I'm sorry.
6  A    Oh, I'm sorry. "No."
7  Q    During your time when you were operating LVA, did you ever
8       get a customer asking to order products where he said, "Hey,
9       I intend to use these for woodworking" or "I intend to use
10      these for concrete working" was the other example you gave?
11      Did you ever have customers that asked you about that?
12 A    I did not, no.
13 Q    Okay. You never received any solicitations for either of
14      those sorts of products?
15 A    No.
16 Q    Next I'd like to change pages a little bit. We may end up
17      circling back at various times for different categories, but
18      for right now I'm going to ask you some questions next about
19      the acquisition of LVA and when you ended up selling the
20      assets. Okay?
21 A    Okay.
22 Q    First, approximately when did you dispose of LVA's assets?
23 A    So the company was sold I believe it was October 13th, 2014.
24 Q    And to whom did you sell it?
25 A    To Allied Industrial Supply.

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 93

```
 1  Q   And with whom did you work at Allied Industrial Supply, who
 2      was the other actual person on the other side of the
 3      transaction from you at Allied?
 4  A   Mr. Shindorf.
 5  Q   And that would be Robert Shindorf?
 6  A   Yes.
 7  Q   How did you come to -- what was the genesis if the sale?
 8      How did that start?  Was it something where you were looking
 9      to sell your business, they were looking to acquire you?
10      Tell me the story.
11  A   Yes, so I was looking to sell.  I wanted to spend some time
12      in the mission field doing mission work, take some time off.
13      So I was looking to sell the company and I sold it through a
14      broker and the broker put the company up for sale and
15      interviewed different people and I received different offers
16      and finally we -- we made an agreement, myself and Allied
17      Industrial Supply.
18  Q   What led you to decide, hey, I need a broker, I want to do
19      this?  What was the reason for which you decided to begin --
20  A   Yeah.  So like I said I wanted to spend some time in the
21      mission field and I couldn't.  Basically when I was running
22      the company I had other people but it really couldn't run
23      without me.  And I wanted to be able to take some time off
24      and do some things like I mentioned I went to Honduras for
25      awhile and I did some different things.  And that was the
```

Page 94

```
 1      impotice for the sale of the company.
 2  Q   And when you mentioned mission work I think I know what you
 3      mean, but we're talking a religious mission; correct?
 4  A   Correct.
 5  Q   Okay.  And that was the beginning of the genesis of it, came
 6      from the idea, hey, I'd like to take some time away.  And as
 7      a result is it safe to say that's when you decided, hey, I
 8      should consider selling this?
 9  A   Yes.
10  Q   And you mentioned that you worked with a broker, who was
11      that broker?
12  A   So the name of the company I think was Lehigh Valley
13      Business Brokers.
14  Q   Any business entity relation?  I mean, the names are pretty
15      similar.
16  A   No, there was no relationship.  The gentleman -- he was a
17      nice older gentleman, he actually has passed away since.  I
18      can't even remember his name at the time.  But, yeah, he
19      helped me sell the company.
20  Q   Around how long was it -- well, let me ask you this:  When
21      did you get in contact approximately with the broker.  Do
22      you know when the sale was actually finalized?  Give me a
23      sense of the time frame.
24  A   Okay.  So again, my memory is not as good as it used to be
25      and this was a long time ago, but I think -- I think it
```

Page 95

```
 1      was -- I think we put it up for sale about nine months prior
 2      to actually selling it.
 3  Q   And when you advertised the business for sale how did you
 4      describe it?  Were you responsible for drafting, hey, this
 5      is what we do and who we are?
 6  A   Yeah.  So we listed, you know, speciality industrial
 7      distributor of abrasives for metalworking, and we -- you
 8      know, at the time we were one of the first companies to sell
 9      abrasives through an ecommerce website and so we advertised
10      that.  And at the time there weren't a lot of other people
11      doing that so there was attraction in the marketplace for a
12      company like that.
13  Q   And when you listed the way that it was advertised, did you
14      retain any -- explain to me how a business broker advertises
15      this.  Is there a web posting, is it sent around on
16      newsletters?  How does --
17  A   Yeah, so -- so the primary way is there's like two or three
18      websites listing websites.  One of them is Biz Buy Sell and
19      there's some others, and that was the primary way that the
20      company was marketed to outside people who were interested
21      in buying it.
22  Q   And copy of that posting, was there ever a written product
23      that described your business as specialty metalworking
24      abrasives, was that actually the way that it was categorized
25      at the time of sale?
```

Page 96

```
 1  A   So, again, I don't have it in front of me but basically
 2      that's what I remember is that it was abrasives for
 3      metalworking is what we advertised.
 4  Q   Okay.  And through that process eventually you were placed
 5      in contact with Allied Industrial and Mr. Shindorf; is that
 6      right?
 7  A   Correct.
 8  Q   When do you remember first making contact with Mr. Shindorf,
 9      what's the earliest that you can remember in that respect?
10  A   I don't know the exact time frame, but I know we did speak
11      on the phone several times.  He made an offer and we
12      accepted the offer.  You know, maybe that was like a four or
13      five month time span.
14  Q   Were they the only offer that was ever extended for Lehigh
15      Valley?
16  A   No we had other offers and -- at the time I know I was
17      candid with him, with Mr. Shindorf, that we had other offers
18      and I know that he -- the original offer he made he improved
19      that offer and that's one of the reasons why we sold to him.
20  Q   Okay.  So you solicited multiple different offers, Mr.
21      Shindorf's is one of them -- or I should say Allied's is one
22      of them.  Later there's communication with him, did you tell
23      him, hey, we have other offers that encouraged him to raise
24      his bid, is the sequence of events here?
25  A   That's correct.
```

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 97

1  Q   Did any of the other companies that made offers also
2      increase their offers?
3  A   So what happened is they did but that was after I had
4      already came to an agreement with Mr. Shindorf, so I didn't
5      feel comfortable breaking that agreement.
6  Q   Okay.  Prior to reaching that agreement though, he was the
7      one with the improved or the increased offer out of the
8      bidders?
9  A   Yes.
10 Q   And was his offer at the end of the day, in terms of just
11     the financial component of it, was it the highest bid?
12 A   If I would have received what the offer was, yes.
13 Q   If you would have received what the offer was, is that not
14     a transparent process or are you not aware of what the offer
15     is at the time where you entered into the sale?
16 A   Well, I don't know if we're going to get into it, but Mr.
17     Shindorf defaulted on repayment of the debt to me and I had
18     to take a much lower amount than the offer was that he had
19     in the contract.
20 Q   Well, and with respect to that we will actually talk about
21     that subject, but I'm asking you a slightly different
22     question.  When you initially decided and said I'm going to
23     sell my business and begin executing an agreement with this
24     guy, with Allied Industrial, were they the highest bid out
25     of all the bids that you had?

Page 98

1  A   Yes.
2  Q   Okay.  And there was an agreement that was executed as a
3      part of this transaction, was there not?
4  A   Yes.
5          MR. CASCIINI:  Now comes the fun part, everybody.
6      We're going to try to show documents on the screen.  What
7      I'm going to do -- Stacey and Mr. LeVasseur, please let me
8      know if you have any objection to this process.  I'm going
9      to share it on the screen, denote how I've marked it on my
10     end and then I intend to circulate all the PDFs of those
11     exhibits to Stacey and then to you, Mr. LeVasseur.  Is that
12     an acceptable way of doing this?
13         MR. LEVASSEUR:  Sounds as good as we're going to
14     be able to do by Zoom.
15         THE REPORTER:  That works for me also.
16         MR. CASCINI:  I just wanted to make sure everybody
17     was cool with that process.  So please bear with me one
18     moment.
19     (Deposition Exhibit 1 marked)
20         MR. CASCINI:  All right.  What I've tried to do is
21     share a document that I have marked as Exhibit 1.  This
22     document has the following up at the top just for the
23     purpose of the record, "Case 1:22-cv" and then the page ID
24     number ECF is number 1-2, page ID is 23 and it says "Asset
25     Purchase Agreement" up at the top, this is a ten-page

Page 99

1      document.
2  BY MR. CASCINI:
3  Q   Mr. Stone, are you able to see that document on the screen?
4  A   Yes; yes, I can.
5  Q   I'm going to make it so that we are able to see the entire
6      page at once.  Are you still able to read the text when it's
7      in that format?
8  A   I think so, yeah.  It's small but I think I can make it out.
9  Q   Okay.  Please tell me if at any point in time it becomes
10     challenging or different to see.
11 A   Okay.
12 Q   This document has listed at the top "Asset Purchase
13     Agreement," lists the parties as Allied Industrial Supply
14     and Lehigh Valley Abrasives and Christopher Stone, those are
15     the three parties to this agreement.  Mr. Stone, is this the
16     asset purchase agreement that you executed with Allied to
17     dispose of LVA's assets?
18 A   Yes.
19 Q   And I'm going to briefly go through the various pages, we
20     just want to make sure that everything internal to this
21     document is captured.  The first page we have the headers
22     Asset Purchase Agreement, Background Information, and
23     Agreements.  We have another page that is within the
24     Agreement section.  We have -- for the third page subheads 4
25     through 7.3, subheads 7.4 through 14 on the fourth page.

Page 100

1      More subparts of 14 on 5.  Subhead 15 on the sixth page, and
2      so on; the seventh page, eighth page, ninth page.  On the
3      ninth page here, is that your signature, Mr. Stone, on the
4      bottom where it says Sellers, Christopher Stone, Managing
5      Member and such?
6  A   Yes.
7  Q   Okay.  And then we have Exhibit A here, which is the asset
8      list and asset allocation; is that correct?
9  A   Yes.
10 Q   Okay.  I'm going to go back up to the list of -- to the very
11     first page.  Under the Agreement section where it has the
12     first head which says "Sales and Purchase," then it says --
13     in the very last sentence there is "The assets include,
14     without limitation, the following."  Do you remember reading
15     this section of the Asset Purchase Agreement when you
16     received it?
17 A   Yes, I did read the contract.
18 Q   Perfect.  Now there are several subheads under section 1;
19     equipment, inventory and supplies, contracts, receivables,
20     intangibles, software, miscellaneous items, intellectual
21     property, and past purchase orders.  Do you see where it
22     says all those?
23 A   Yes.
24 Q   Is it your understanding that all the items listed under
25     subhead 1.1, and those subheadings would be a through h, is

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 101

1  it your understanding that's what LVA sold to Allied
2  Industrial?
3  A   Yes, it is my understanding, but some of the -- the way it's
4     worded is very general.  For example, software, I didn't
5     know like Microsoft Office 365, it's just general in terms.
6     But, yes, this is the agreement.
7  Q   More specifically though -- my question is a little more
8     specific than that.  Whether the terms are general or with
9     specificity, you understand these to be the categories of
10    items that are included in the asset sale; correct?
11 A   Yes.
12 Q   Was it your understanding at the time you executed the
13    agreement that those were the assets you wouldn't be giving
14    to LVA -- or to Allied Industrial from LVA?
15 A   Yes.
16 Q   And at the very bottom of Exhibit A you have an asset list
17    and asset allocation.  We have three different categories
18    listed: inventory, equipment, and software and website.  Do
19    you see where it says that?
20 A   Yes.
21 Q   And various values are assigned to each of those items for
22    the purposes of allocating what the value of the business
23    was?
24 A   Yes.
25 Q   Did you receive at any point in time an independent audit or

Page 102

1  valuation of your business prior to selling it to Allied
2  Industrial?
3  A   No.
4  Q   Didn't have any independent audit before you did it?
5  A   No.
6  Q   Do you have any reason to believe the value of those three
7     categories of assets listed on Exhibit A are incorrect in
8     any way at the time you sold it?
9  A   I do not, no.
10 Q   You have no basis to dispute that; you didn't at the time
11    and you don't now; right?
12 A   Correct.
13 Q   Okay.  Now, one of the things you just brought up, which
14    was, hey, in the sale and purchase asset list you mentioned
15    the terms -- I believe this is the term you used, those are
16    very general, and specifically you referred to the software.
17    It lists several forms of what is specified and encompassed
18    within the software in this agreement, doesn't it?
19 A   So the things that it lists are I think what -- so let's see
20    what it says.  I'm trying to read it.  It says, "All
21    information needed to operate the site after closing,
22    database and hosting accounts, Google AdWords accounts and
23    custom programing and" -- yeah, so -- yes, I would agree
24    with what it says there for the software.
25 Q   And I believe there was probably an unintentional omission.

Page 103

1  It says at the beginning, "All passwords and information
2  needed to operate the site after closing"; right?  And the
3  other additional things you listed.
4  A   Yes; yup.
5  Q   I want to talk about the reference here to Google AdWords.
6  Okay.
7  Q   First really, really basic.  What is it?
8  A   So Google -- there's two ways information appears to you
9     when you do a search on Google; one is organic and the other
10    is paid advertising.  So you can pay Google and they will
11    list your items in either their shopping module or as an
12    advertisement, so your products can come up if you pay
13    Google for them to come up (indiscernible).
14 Q   How did LVA utilize Google AdWords before the asset sale?
15 A   So we used Google AdWords and we would advertise on Google
16    some of our products such as flap disc and some of the other
17    abrasives we sold.  So we paid Google so that when someone
18    typed that in that item would be displayed to the end user
19    looking for that item.
20 Q   Is this a way of -- you mentioned earlier that one of the
21    sources of marketing and advertising that was used was
22    business being driven to the website.  Is that one way that
23    business was driven to the website?
24 A   Yes.
25 Q   Now, the Google AdWords accounts is what it says.  How do

Page 104

1  you interface with Google AdWords?  Like what's the process,
2  what do you do, how do get into whatever that account is to
3  use the product?
4  A   So in order to log into Google AdWords you need to have a
5     login and you need to have a password -- and an account with
6     them.  The account being like a credit card so that they can
7     bill you for the use of their services.
8  Q   Okay.  And what was the account that LVA used to access
9     Google AdWords?
10 A   So LVA used -- so in order to log in you need a login and
11    you need a password.  The login for LVA was the -- I believe
12    it was clslcs2000@gmail.com.  I don't recall what the
13    password is.  But what I want to get at is when a new owner
14    takes possession of the company that login can be changed to
15    whatever you want it to me.  It's not tied to a specific
16    email address.
17 Q   So the AdWords account can be accessed through an email
18    address but is it your testimony that it's not tied to that
19    address?
20 A   Correct.
21 Q   How would it be transferred, what would the process to
22    transfer it be?
23 A   So like most software programs you can change your login and
24    password.  So let's say you wanted to change clslcs200@gmail
25    to bob@gmail, you would just go to Google AdWords and you

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 105

1  would say we request a new login name and they would
2  probably ask you for the password, which you would know, and
3  then you could change it to whatever you wanted it to be.
4  Q   Okay.  I'm going to ask you another question about Exhibit 1
5  that I have up on the screen here.  There's a subhead there
6  for intellectual property, that's one of the broad
7  categories of assets that LVA sold to Allied Industrial as
8  part of this transaction; right?
9  A   So that is listed in the agreement, yes, intellectual
10  property.
11  Q   It is listed in the agreement.  Do you have any reason to
12  doubt that was what you actually sold?
13  A   Well, so I think a lot of this doesn't apply to Lehigh
14  Valley Abrasives.  It talks about engineering drawings,
15  process sheets, bills of material, patents, patent
16  applications, copyrights, we didn't have any of that; we
17  didn't have that, so, yeah.
18  Q   So there may be things on this list that LVA didn't have.
19  Do you have any reason to dispute that anything that is
20  listed that LVA did have would be included in the
21  transaction?
22  A   I'm sorry, I don't understand the question.
23  Q   Totally fine.  There's a list of the various things that are
24  examples of intellectual property.
25  A   Yup.

Page 106

1  Q   I asked you if you had any reason to doubt that the sale
2  actually happened here with respect to those things, and you
3  gave me an answer, which was, well, we didn't have some of
4  those things in here.  And I believe that the engineering
5  drawings was an example of that --
6  A   Right.
7  Q   -- does that accurately restate your testimony?
8  A   Yeah, I mean, when I look at this list we didn't have any of
9  those.
10  Q   Well, if we look at the list you did have, for example,
11  customer lists; right?
12  A   Okay.  Let me see where it says that.
13  Q   Are you able to see my mouse cursor?  I'm not sure.
14  A   Yeah.  So I see inventories, discoveries, improvement
15  designs -- oh, okay, you're going way down there.  Let's
16  see.  Yes, we -- yeah, we had -- obviously, yeah, we had
17  customer lists that were contained within the ecommerce
18  software and QuickBooks was customer data.
19  Q   Okay.  And this doesn't specify that it's customer data by
20  any source; right?  This says if there are customer lists
21  maintained that's an asset that's part of the sale; you
22  don't dispute that, right?
23  A   I do not dispute that, no.
24  Q   If you kept it in a giant rolled up scroll it would have
25  been part of the assets, if you kept it in this account it

Page 107

1  would have been part of the assets, if you kept it in
2  QuickBooks it would have been part of the assets; right?
3  A   Yes.
4  Q   And then we also have lists like databases, data, and other
5  industrial property listed here as well; right?
6  A   Right, which I don't -- I mean, we didn't have any
7  industrial property, we didn't have databases -- unless
8  you're saying QuickBooks is a database.  We didn't have
9  process technology.
10  Q   And that's the part of my question actually I think we've
11  illustrated it.  I understand your testimony that there are
12  some things on this list that you did not maintain at Lehigh
13  Valley.  You aren't disputing, however, that if you did
14  maintain something on that list at Lehigh Valley that you
15  sold it to Allied Industrial as a part of this transaction;
16  right?
17  A   Correct.
18  Q   Okay.  That's where I was going with that.  I apologize if
19  my question before was inartful.  We also have a subhead
20  here for past purchase orders.  It says,
21        "The full benefit of any and all purchase orders
22        placed with and accepted by the sellers in the ordinary
23        course of business that has not been completely
24        performed for filled before the closing date."
25  You also understand that to be a part of the assets that

Page 108

1  were sold to Allied Industrial; correct?
2  A   Yes.
3  Q   All right.  Now contemporaneously with this asset purchase
4  agreement, you also executed a non-compete agreement and a
5  consulting agreement with Allied Industrial; right?
6  A   Yes.
7  Q   Hold on for just a moment here, I'm going to pull that up.
8        (Deposition Exhibit 2 marked)
9        MR. CASCINI:  All right.  Mr. Stone, are you able
10  to see a document on your screen, I have marked it as
11  Exhibit 2, Non-Competition and Confidentiality Agreement,
12  it's listed as Exhibit B up at the very top.  Are you able
13  to see that on your screen?
14  A   Yes; yes.
15  Q   And it looks like this is a three page document; the three
16  pages, for the purposes of the record, are given page IDs
17  20, 21 and 22 in the center of the top of the screen.  Do
18  you see where it says that?
19  A   Yes.
20  Q   All right.  And, Mr. Stone, you executed this agreement with
21  Allied Industrial as -- in consideration for the
22  transaction, didn't you?
23  A   Yes.
24  Q   And you understood at the time that you did this that it
25  prohibited you from engaging in certain conduct and certain

27 (Pages 105 to 108)

Christopher Stone - January 29, 2025

Page 109

1 activities; right?
2 A  Yes; within the terms of what is written in the agreement,
3    yes.
4 Q  Perfect.  And in fact, one of the terms of that agreement is
5    that there's a seven-year term; is that correct?
6 A  Yes.
7 Q  It looks like it runs between October 13th, 2014 -- and when
8    I say there's a seven-year term, what I'm saying is there's
9    a seven-year term that applies to the non-competition
10   provision.
11 A  Yup; yes.
12 Q  All right.  You had an opportunity to read this agreement
13   before you engaged in the transaction, didn't you?
14 A  I did, yes.
15 Q  This did not get sprung on you at the last second, it wasn't
16   given to you at the first time closing, nothing like that?
17 A  I honestly don't recall when it was given to me, but I did
18   read it prior to signing it.
19 Q  And then I want to direct you to subparagraph 8 of this
20   document, that is a -- given the heading "Liquidated
21   Damages."  Do you see where it says that?
22 A  Yes.
23 Q  Then it says if the Seller violates any of the covenants --
24   and I apologize, this isn't a direct quote, I'm doing a
25   summary.  If the Seller violates any covenants contained in

Page 110

1 this agreement it will be difficult for the parties to
2 calculate the damages incurred by such breach, therefore in
3 addition to injunctive relief to stop continuing in future
4 violations, the employer shall be entitled to the greater of
5 actual damages or liquidated damages in the amount of
6 $250,000.  Do you see where it says that?
7 A  Yes.
8 Q  Is it your understanding that basically if we assume for the
9    purposes of this that there was a breach, that Allied
10   Industrial would be entitled to $250,000 in liquidated
11   damages.  Is that what you agreed to when you signed this
12   document?
13 A  (Indiscernible)
14      MR. LEVASSEUR:  Wait; wait; wait; wait.  I want to
15   object.  Objection; calls for a legal conclusion.
16      MR. CASCINI:  Fair enough.
17 BY MR. CASCINI:
18 Q  You can go ahead and answer, Mr. Stone.
19 A  So, no, I did not understand that.
20 Q  Okay.  Do you understand that now upon reading the document
21   now that you've had an opportunity to review it again?
22      MR. LEVASSEUR:  Objection; calls for a legal
23   conclusion.
24      MR. CASCINI:  Noted.
25 BY MR. CASCINI:

Page 111

1 Q  You can answer me, Mr. Stone.
2 A  I did not know what liquidation damages were.  I've never
3    been involved in the legal system and I did not understand
4    that.
5 Q  And I get that by the way, I know some of these terms of art
6    can be confusing.  Were you represented by legal counsel
7    during this transaction?
8 A  Yes.
9 Q  And I am not going to ask you any of the details about what
10   you discussed with your legal counsel, and please do not
11   answer any questions related to that and don't interpret my
12   questions to cover that.  That's privileged information and
13   Mr. LeVasseur will jump in if I intrude on it.  But did you
14   have an opportunity to ask your lawyer any question you had
15   about any document that was presented to you?
16 A  I -- I made a mistake and had a very poor attorney for
17   this --
18      MR. LEVASSEUR:  Wait; wait.  Hang on.  Chris, just
19   answer that question, did you have an opportunity, that's
20   "yes" or "no."
21 BY MR. CASCINI:
22 Q  It is and I didn't intend to ask anything beyond that.
23 A  Say the question again.
24 Q  Did you have an opportunity to ask any questions about
25   interpretation --

Page 112

1 A  Yes.
2 Q  -- of these documents to your attorney before you engaged in
3    the transaction?
4 A  Yes.
5 Q  Okay.  All right.  I'm going to show another document here.
6      (Deposition Exhibit 3 marked)
7 Q  I have marked this document as Exhibit 3.  Up at the top,
8    confusingly, it says Exhibit D, but we're marking it as
9    Exhibit 3 for the purposes of this dep, but it says
10   "Consulting Agreement" under it; doesn't it?  Do you see
11   where it says that, Mr. Stone?
12 A  Yes; yes; yup.
13 Q  And this looks like a seven-page document and it looks like
14   it starts with page ID 40 and carries through consecutively
15   until on the last page is page ID 46?
16 A  Yup.
17 Q  And then is that your signature at the bottom, Mr. Stone?
18 A  Yes.
19 Q  By and through this transaction did you also agree to serve
20   in a consulting relationship with Allied Industrial for a
21   period of time after the transaction was finalized?
22 A  Yes.
23 Q  Okay.  It says here, "Consultant shall perform the services,
24   the duties and roles he previously performed as owner of
25   Lehigh Valley Abrasives subject to the review and direction

28  (Pages 109 to 112)

Christopher Stone - January 29, 2025

Page 113

1  of the company for the company." And the company agreed to
2  pay you as consideration for that service; is that right?
3  A  Yes.
4  Q  Did you have an opportunity to review this document prior to
5  entering into the transaction?
6  A  Yes.
7  Q  And did you understand that you would be serving as a
8  consultant for Allied Industrial for a period of some time
9  after the transaction was finalized?
10 A  Yes.
11 Q  One of the pieces here is a clause on the very bottom -- and
12 I apologize for kind of strattling two pages -- well, wait,
13 actually I don't need to make this hard.  I'm showing you a
14 screen that is in between the -- let's see -- second and the
15 third pages of the document.  I'm talking about subhead 4,
16 return of company materials.  It says,
17         "Upon the termination of this agreement, or upon
18     company's earlier request, consultant will immediately
19     deliver to the company and will not keep in consultants
20     possess, recreate, or deliver to anyone else any and
21     all company property."
22 Do you see where it says that?
23 A  Yup.
24 Q  Did you understand by signing this consultation agreement
25 that you had an obligation to hand over any of Lehigh

Page 114

1  Valley's assets that had been sold and company property
2  after the consultation arrangement was over?
3  A  Yes.
4  Q  That also includes, doesn't it, all electronically stored
5  information and passwords to access such property, and any
6  all records maintained and any reproduction of the foregoing
7  items.  Do you see where that's listed in the portion of the
8  paragraph of subsection 4 that's on the top of page 3?
9  A  Yup; yes.
10 Q  And you understood the handover of that electronically
11 stored information and passwords to be a part of your
12 obligation as soon as you stopped being a consultant; right?
13 A  Yes.
14 Q  Now you mentioned in connection with this you there was
15 later a dispute between you and AIS regarding the repayment
16 of the compensation that AIS gave you for the asset
17 purchase; right?
18 A  So it was -- it wasn't a dispute, it was a default on
19 repayment.  So either -- let me explain.  After I sold the
20 company I gave Allied a $500,000 note to pay me back, and it
21 was supposed to be paid back $8,000 a month for three years
22 and then the balance in full.  And after a few months of the
23 sale he just stopped paying me.  Now the contract says that
24 this is -- the asset purchase and the repayment is in
25 default if we don't receive a payment for ten days.  We

Page 115

1  didn't receive a payment for like three or four months and
2  so I had to hire an attorney to get some of the money back
3  but not all of it, and we had to enter into a settlement
4  agreement in order to move forward and get some of the
5  money, but not all of which was owed to me.
6  Q  Well, that's where I'm going next here.
7         (Deposition Exhibit 4 marked)
8  Q  I'm going to show you a document that I've marked as Exhibit
9  4, it says "Settlement Agreement" up at the top of the
10 screen.  It says, "This Settlement Agreement is entered into
11 effective August 5th, 2015 by and between Robert Shindorf,
12 AIS, and Christopher Stone."  Is this the settlement
13 agreement that you were just referring to in your prior
14 testimony?
15 A  Yes.
16 Q  And by executing this agreement did that resolve the dispute
17 that you had and resolve the default that you had just given
18 testimony about?
19 A  So this -- I mean, yes, it resolved it but I was -- I mean,
20 when someone defaults on you and doesn't pay you and you
21 lose hundreds of thousands of dollars it's not really
22 resolved, it's accepted.
23 Q  Fair enough.  And whether or not you were satisfied with the
24 resolution, this brought that matter to a termination;
25 right?  At that point --

Page 116

1  A  Yes.
2  Q  -- the legal dispute was over --
3  A  Yes.
4  Q  -- is that accurate?
5  A  Correct.
6  Q  And here one of the things I want to call your attention to
7  is that in section 2, subsection d, this is on the second
8  page, we have "Shindorf and Allied hereby release, waive,
9  and forever discharge claims."  But there's an exception
10 there listed that the non-compete is not included and would
11 survive this agreement; right?
12 A  Yes.
13 Q  And you understood that at the time when you reached this
14 settlement agreement?
15 A  Yes.
16 Q  So there's no dispute this document did nothing to alter
17 your obligations under the non-compete agreement, did it?
18 A  Correct.
19 Q  So next I'm going to ask you some questions about the
20 transaction has been completed.  I want you to describe --
21 you're serving at that point as a consultant -- right? --
22 we've already seen the agreement in that respect; right?
23 A  Yes.
24 Q  What was your role as a consultant to AIS after the asset
25 sale was completed?

29 (Pages 113 to 116)

Christopher Stone - January 29, 2025

Page 117

1  A   So when I -- after I sold Lehigh Valley Abrasives to Allied
2      Industrial Supply I sold Lehigh Valley Abrasives which was a
3      very niche company in the industrial abrasives market, and
4      Allied did not have experience in the products, the
5      customers in that particular market.  So my role was to help
6      transition the sale of the company so that they could
7      successfully take it over and have success with the company.
8  Q   And day to day what did that look like?  Give me a sense of
9      what kinds of things you were asked to do.
10 A   So typically what I did is part of the agreement was that I
11     would stay on for at least a year, the first three months of
12     which would be at no charge, you know, I was compensated as
13     part of the sale of the company.  And then the next nine
14     months I would stay on for a salary.  So my role was to --
15     what I did on a day-to-day basis is similar to what I did
16     when I owned the company, I received all the customer orders
17     and entered all the customer orders.  But part of what was
18     supposed to happen was I was supposed to train Allied and
19     their employees over the course of the year in the products,
20     suppliers and customers and business.
21 Q   And I noticed that you said "supposed to train."  Did
22     something different happen than that expectation?
23 A   Yeah.  So when we first sold Allied Mr. Shindorf gave the
24     impression that he was going to keep it in New Jersey and
25     keep my employees, but then he quickly changed his mind.  So

Page 118

1      the business was moved to Michigan and he -- he said we're
2      struggling here, and he said can you come out.  And I flew
3      out on a day's notice and tried to train them, but you
4      can't -- like a company that's been around for ten years I
5      couldn't train everybody in three days on what to do.  So
6      the part of the agreement was I would stay on for a year to
7      train them, but shortly after that three month period ended
8      where I wasn't being paid Mr. Shindorf decided he didn't
9      need me anymore and therein lies the problems that they
10     experienced, because they had a company that they didn't
11     know what they were doing with.
12 Q   Okay.  You flew out you said and you engaged in some
13     training after the headquarters was moved to Michigan?
14 A   Yes.
15 Q   Now when Lehigh Valley was operating, where was its physical
16     location?
17 A   Lebanon, New Jersey.
18 Q   And did you guys have a office building or was it operated
19     out of your house?  What are we talking about here?
20 A   So when I sold the company we had a building in Lebanon, New
21     Jersey, it had a small office in the front and about 2,000
22     square feet of warehouse space in the back.
23 Q   Okay.  And Lehigh Valley operated and shipped its products
24     out of that location?
25 A   Yes.

Page 119

1  Q   Okay.  Now with respect to that did Lehigh Valley do
2      business only in America, did they do it across the country,
3      or did they do it across the world?  Where did your
4      customers come from?
5  A   So primarily in the Northeast.  We were in New Jersey so
6      primarily in New Jersey, Pennsylvania, New York.  But we did
7      have some customers outside that area.  But if there was
8      anything outside the United States it was minimal.
9  Q   Is it safe to say that Lehigh -- did Lehigh Valley have a --
10     whether or not you know whether it's every single one, do
11     you estimate -- did Lehigh Valley have a customer at least
12     once from every state in the country?
13 A   I would think so.  I'm not 100 percent sure, but it might
14     be.
15 Q   And I -- the sound did a weird thing.  Did you say "I would
16     think so"?
17 A   Uh-huh; yes; yes.
18 Q   Okay.  Got it.
19 A   I think so, yes.
20 Q   So Lehigh Valley shipped and was headquartered in New
21     Jersey, which did business across the country, at least on
22     occasion; right?
23 A   Correct.
24 Q   And in fact, you may have done business occasionally in
25     other countries as well, but you said you believe that was

Page 120

1      rare?
2  A   Correct.
3  Q   Okay.  Got it.  Did you engage in communication with Mr.
4      Shindorf after the asset sale was completed on a daily
5      basis, hourly basis, weekly basis?  How frequently were you
6      guys talking?
7  A   I believe we exchanged a few emails a day.
8  Q   I'm going to show you a document.
9          MR. CASCIINI:  Sorry, Chris and Stacey, are we on
10     Exhibit 5?  We are; right?
11         THE REPORTER:  We are correct.
12         (Deposition Exhibit 5 marked)
13 BY MR. CASCINI:
14 Q   Did you and Mr. Shindorf -- I'm sorry.  Mr. Stone, did you
15     and Mr. Shindorf ever have communications about gaining
16     access to LVA's accounts?  We're talking email accounts,
17     QuickBooks accounts, those sort of things.
18 A   Did we ever exchange information on that?  Yes.
19 Q   You had conversations where he asked you for access to those
20     various platforms; is that accurate?
21 A   So when -- the -- if you refer back to the Asset Purchase
22     Agreement, it said that the passwords would be exchanged at
23     closing for the ecommerce site and the
24     info@lehighvalleyabrasives. com.  Are you -- where are
25     you -- I'm not sure which ones you're -- what are you

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 121

1    referring to?
2    Q    Well, let's start more generally.  So the two you just
3         listed --
4    A    Yup.
5    Q    -- with respect to -- well, let's actually discuss the
6         various accounts we've talked about so far.  The QuickBooks
7         account --
8    A    Yes; yes.
9    Q    -- did you give Allied Industrial exclusive access to the
10        Lehigh Valley QuickBooks accounts?
11   A    At close -- at closing what I gave Lehigh Valley is the
12        exclusive access to QuickBooks.  When I say "exclusive"
13        access, we used a desktop version of QuickBooks, I sent him
14        the file and he put it on his server and he used the web
15        version of it.  But, yeah, he had exclusive access.  Now he
16        gave me a login and a password because he still wanted me to
17        enter orders in the system.
18   Q    Because at that time you were serving as a consultant;
19        correct?
20   A    Correct; correct.  He got the login for the
21        info@lehighvalleyabrasives.com, and he got the login for the
22        Big Commerce web store.
23   Q    So I just want to make sure that I have a comprehensive
24        here.  He received the login for the info@lehighvalley;
25        correct?

Page 122

1    A    Yup.
2    Q    He received the login info for the Big Commerce store;
3         correct?
4    A    Correct.
5    Q    Did he receive the login information -- I believe you gave
6         testimony earlier that you were making a transition from Pro
7         Stores to Big Commerce.  Did he receive login information
8         for the Pro Stores account as well?
9    A    Yes; he had both.
10   Q    And at that point in time you have the info@lehighvalley,
11        you have Big Commerce, we have Pro Stores, we also have --
12        did you give him the -- and just gave testimony you also
13        gave him exclusive access to the QuickBooks as well; right?
14   A    Yes.
15   Q    At some point in time -- you gave testimony earlier that at
16        least on occasion there were sales that were sent to a
17        hotmail account or a gmail account in your name; is that
18        right?  Was that your earlier testimony?
19             MR. LEVASSEUR:  Objection; mischaracterizes the
20        testimony.  But go ahead.
21   BY MR. CASCINI:
22   Q    And that's exactly what I want to try to clear up here, Mr.
23        Stone.  So with respect to that, did you receive orders on
24        occasion that were directed -- I believe the word you used
25        was "rarely" but I don't have the transcript yet, no one

Page 123

1         does -- to your Hotmail or Gmail account, the cls Hotmail or
2         Gmail account?
3    A    Rarely is correct.
4    Q    And you told Mr. Shindorf that you received orders to that
5         account; correct?
6    A    I don't recall telling him that, no.
7    Q    I'm going to show you a document that I have marked as
8         Exhibit 5.
9    Q    Are you able to see a document on the screen, I've marked it
10        as Exhibit 5, it is a three-page document, and the very top
11        page in page number 1 is says from Chris Stone to Robert
12        Shindorf, subject incoming orders, and then a date of
13        Monday, November 24th, 2024.  Are you able to see that
14        document up at the top?
15   A    Yes.
16   Q    And just for the purposes of the record, it looks like page
17        2 starts with a header "To Robert Shidorf.  Subject Re:
18        Incoming Orders."  Are you able to see that there?  Are you
19        able to see that at the top?
20   A    Yes; yup.
21   Q    And then the third page, not much information here, it's
22        just a signature block for Mr. Shindorf.
23   A    Yup.
24   Q    And it looks like this is one of these email chains where
25        we're reading bottom to top; the topmost email is the most

Page 124

1         recent one -- right? -- if we look at the time and date
2         stamps here?
3    A    Uh-huh; yup.
4    Q    And it says, if we go all the way to the beginning, "Where
5         do the incoming orders (not ecommerce) go?"  This is Robert
6         writing to you.  "info@lehighvalley the fax?  Any other
7         emails?  Sue/pam?"  And you respond, "Occasionally
8         sue@lehighvalleyabrasives.com"; right?
9    A    Okay.  So there was another one.  I didn't remember that
10        but, yes.
11   Q    And you were very careful to tell me that you weren't sure,
12        but there was another one that was
13        sue@lehighvalleyabrasives, does that refresh your
14        recollection in that respect?
15   A    Yes; yup.
16   Q    Did you hand over access at this sue@lehighvalleyabrasives
17        email account after sending him this email?
18   A    Sending him this email?  So Sue -- the best of my
19        recollection is when he took over the sale that this email
20        address was removed.  That's my best -- it was no longer
21        valid is my best recollection.
22   Q    Do you remember when you decided to terminate that email
23        address?
24   A    No, I don't recall that.
25   Q    Then if we go up a little bit, Mr. Shindorf asked you on

31 (Pages 121 to 124)

Christopher Stone - January 29, 2025

Page 125

1 Monday, November 24th, 2014 at 10:35 a.m., "Do any come to
2 your personal Hotmail account?"  Do you see where it says
3 that?
4 A  Yup.
5 Q  And then your response, "Yes, but I have started responding
6 to the emails and asking they send future emails to
7 info@lehighvalleyabrasives.  Let me know if there's a
8 different email you want them to go to."  Is that correct?
9 A  Yes.
10 Q  And then it says here, "When they are emailed to your
11 personal account, forward it.  Does the fax go to info or
12 the personal one?"  And there's some more correspondence
13 that goes from there.  But I'm calling attention to this
14 one.  Mr. Shindorf eventually asked for access to that
15 Hotmail account, didn't he?
16 A  Well, after the closing of the sale of the company, and it
17 wasn't listed in the sale contract.  But, yes, he did
18 request it well after the sale had been completed.
19 Q  Are there other email accounts individually listed in the
20 purchase agreement?
21 A  The info@lehighvalleyabrasives is the only email account
22 that the company had, and I don't know if that was listed or
23 not.  I don't know.
24 Q  All right.  So the document will show whether or not it's
25 listed, if it ain't on there then it ain't listed; right?

Page 126

1 A  Yup; yeah.  If the emails aren't listed then none of them
2 were required at the sale.
3 Q  And then you say at the end, "I do have a lot of personal
4 email, we can address this in the future"; right?
5 A  Correct.
6 Q  But you didn't ever hand over access to the Hotmail account;
7 right?
8 A  So you're missing an email in which I told him -- and I'm
9 pretty sure you have it, but I told him a few months after
10 that that as an act of kindness I would give him access, I'd
11 let him look at the Hotmail account, at which case he
12 changed the password and locked me out of my own personal
13 email account and stole my personal email account.
14 Q  And which personal email account is this, is this the
15 Hotmail or the Gmail?
16 A  He took both.
17 Q  With respect to the changing of the password, are you
18 referring to the Hotmail account, the Gmail account, or
19 both?
20 A  He did both; both.
21 Q  Well, you use the word "stole," and we can talk about legal
22 conclusions in it.  But is it your attestation that he
23 illegally or inappropriately took access of the Gmail
24 account or the Hotmail account or both?
25 A  Both.

Page 127

1 Q  You do not dispute, however, that there were on occasion --
2 in fact, you told him there were orders that had been
3 submitted to that Hotmail account; right?
4 A  Yes, there were -- on a rare occasion there was an order
5 submitted to the Hotmail account, that did not give him
6 permission -- I never gave him permission to steal my email
7 account, my personal email account in which I told him had
8 personal information.  In addition, in his deposition he
9 said he deleted my personal information and other
10 information from my personal Hotmail account.
11 Q  Well, he will be able to testify for himself at his own dep,
12 so I'm just going to --
13 A  He already said that.
14 Q  That's my point, and what I going to do though, Mr.
15 Stone -- I don't want to get into semantics, but I'm going
16 to ask you what your testimony is.
17 A  Okay.
18 Q  At that point in time the allegation that you just made was
19 that you gave him access to them and then he changed the
20 password; is that right?
21 A  Correct.
22 Q  And you believe that that was illegitimate; correct?
23 A  Correct.
24 Q  Why do you believe that that was an illegitimate act when he
25 changed those passwords?

Page 128

1 A  The fact -- first of all, the sales contract said we would
2 exchange passwords at closing.  The Hotmail account and the
3 Gmail account were never accounts that were part of the
4 company or associated with the domain.  There were accounts
5 that were associated with the domain.  And several months
6 after closing -- it wasn't in the contract, he asked me
7 could he have access to look at the Hotmail account in case
8 a rare order came in.  I said I would grant him access.
9 When you grant someone access that doesn't mean they have
10 the right to change the password and steal your personal
11 email addresses, two of them; both of them were stolen.
12 Q  There is no dispute, however, that you, at least on
13 occasion, even if rarely, used both the Hotmail and the
14 Gmail accounts for LVA's business purposes; right?
15      MR. LEVASSEUR:  Objection; mischaracterizes his
16 testimony.  He testified that sometimes an email order would
17 come in, that doesn't mean he used it.
18      THE WITNESS:  Right.
19 BY MR. CASCINI:
20 Q  You never responded to any emails from that source?
21 A  On occasion an email would come in to that account.  I don't
22 (indiscernible) --
23 Q  And I apologize, Mr. Stone.  I'm sorry, I think there's a
24 chance too that I got cut off because my signal dipped.  My
25 question is a little different.  When you would receive

32 (Pages 125 to 128)

## Page 129

1  emails on rare occasion, so anytime more than once, asking
2  for sales to your personal account, did you ever respond to
3  them?
4  A   So if I received an email for an order, most likely I would
5  have entered that order into the system.  But what I wanted
6  to say is when the account was stolen from me by Mr.
7  Shindorf he put messages on there that this account is no
8  longer valid and he said that forward everything to I think
9  it was sales@lehighvalleyabrasives.  And I'm guessing he
10  might have also sent out a mass email to people not to use
11  it anymore, because from the time I got the account back I
12  didn't receive a single order for Lehigh Valley Abrasives.
13  Q   Do you believe it was illegitimate for him to put up a
14  forwarding message --
15  A   Yes.
16  Q   -- considering your (indiscernible) --
17  A   Yes; absolutely.  It wasn't his email, it was my personal
18  email address.
19  Q   But you do not dispute that at least on some occasions there
20  had been orders submitted to it, your customers did not
21  necessarily treat it that way, do they?
22  A   On a rare occasion it did receive an order, yes.  But if you
23  look at my email account, the majority of my personal email
24  account was personal information.
25  Q   And what kind of -- I think I know what you mean, but what

## Page 130

1  kind of personal information is included within the email
2  account?
3  A   So it had medical records, it had all of my working in the
4  church, it had family information.  And when I got the
5  address back a lot of that had been deleted.
6  Q   When you gave access to it had been -- that personal
7  information was in the account, as well as the record of the
8  rare instances when customers had e-mailed you; right?
9  A   Correct.
10  Q   The two were intermingled together; right?
11  A   But when I got the account back a lot of my information --
12  and I don't know about the customers stuff, but a lot of my
13  information was deleted.
14  Q   When did Mr. Shindorf or Allied -- we'll use the terms
15  interchangeably; okay?
16  A   Yup.
17  Q   When did either Mr. Shindorf or Allied have exclusive access
18  to the Hotmail account?  That is to say because you told me
19  he changed the password.
20  A   Yeah.
21  Q   When were you not able to access it but he was?
22  A   So off the top of my head I cannot tell you that, but we can
23  get back to you with -- I do have documentation on that.
24  Q   And I'll understand for the purposes of this it's an
25  estimate, I get it.

## Page 131

1  A   It was in 2015.
2  Q   2015.  Are we talking for a period of a day, a week, a
3  month, a half a year?  How long?
4  A   Again, we can get back to you with that exact information,
5  but I think it was a few months.
6  Q   And after as you allege Mr. Shindorf changed the password to
7  these accounts, do you tell him, "Hey, you can't do that"?
8  Did you ever object to it with him?
9  A   You have to understand, him and I we don't talk to each
10  other.  This is somebody who basically defaulted on paying
11  me for the company that I built from scratch, I'm out
12  several hundred thousand dollars, he defaulted on payment.
13  Maybe we can get into later some of the things he said to my
14  attorney when we were trying to negotiate with him to get
15  repaid from the default.  So him and I do not talk.
16  Q   Well, when you say that you do not talk, I know couoqually
17  you may mean you don't get along, but you do talk; right?  I
18  mean, we just saw emails of you talking and you'd served as
19  a consultant to him for some time; right?
20  A   That was prior -- that was prior to the stealing of my email
21  address.  Since he stole my email addresses we have not
22  spoken.
23  Q   During the period of time when you were having
24  conversations, Mr. Shindorf expressed to you his opinion
25  that, hey, the Hotmail account was -- that's a business

## Page 132

1  asset, he expressed that opinion to you -- right? --
2  regardless of --
3  A   He didn't express that opinion, he expressed that he would
4  like to be able to have access to the account, which I
5  granted him.
6  Q   I'm going to show you a document I have marked -- I
7  remembered this time -- as Exhibit 6.
8      (Deposition Exhibit 6 marked)
9  Q   Please bear with me, sir.  Sorry.  If we could do this in
10  person it would be a lot easier, I know that.
11  A   That's okay.
12  Q   I'm going to show you a document that you have marked as
13  Exhibit 6.  At the top -- just for the purposes of
14  identifying it, it is a five page document.  Do you see, Mr.
15  Stone, where at the top it says "From:  Christ Stone  To:
16  Robert Shindorf" --
17  A   Yup.
18  Q   -- "Subject:  Open Issues"?  We're looking at the same
19  thing?
20  A   Yes.
21  Q   And if we go to the last page here -- boom, boom, boom,
22  boom, boom -- it looks like the very last page is just --
23  it's your signature block; right?
24  A   Yes.
25  Q   And same story, we've got back to front the bottom ones are

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 133

1    sent the most distant in time and then it progresses from
2    there -- right? -- which is the top one is the most recent,
3    the bottom one is the one sent the longest ago; right?
4  **A   Yes.**
5  Q   Okay.  And here we have -- in this email this goes to Robert
6    Shindorf at Alllied of Michigan.com.  Do you understand that
7    to be Mr. Robert Shindorf's email address?
8  **A   Yes.**
9  Q   And then it's communicating to you through the Hotmail
10    account; is that right?
11  **A   Yes.**
12  Q   And you guys are having admittedly pitched and heated
13    conversation between these two email address; right?
14  **A   So I think, yeah, because I think if I saw correctly there's**
15    **also some stuff about the default in that email.**
16  Q   (Indiscernible) look here and says -- taking a paragraph
17    from the middle of that document -- and I'm sorry, are you
18    able to see my highlighting?  I actually don't know if you
19    can.
20  **A   Yes, I see it; yup.**
21  Q   Cool.  It says here,
22        "I've always lived up to my commitments to you,
23    the opposite isn't true.  You promised access to the
24    Hotmail account you use for business and haven't done
25    it.  Same with the cell number.  I consider both of

Page 134

1    those business assets."
2    Mr. Stone, my question is this:  Regardless of whether you
3    agree or disagree with that statement, it is accurate Mr.
4    Shindorf told you that he considered the Hotmail account to
5    be a business asset; right?
6  **A   Six months after the sale closed, and I also -- and I**
7    **also -- he didn't include that as part of the asset purchase**
8    **agreement.  He had a due diligence period where he could**
9    **review all of our records and he never asked for that.  He**
10    **asked for the info@lehighvalleyabrasives, which was the**
11    **email address that the company used; that's what he received**
12    **at closing.  This is six months later.**
13  Q   So my question is a different question though.  Please
14    listen to my question, I just need an answer to this.
15    Regardless of when it happened, if you agree with it, there
16    was a period of time where Mr. Shindorf expressed the
17    opinion to you that the Hotmail account was a business
18    record; right?
19  **A   He expressed that opinion well after closing, yes.**
20  Q   And then if we go up to the top,
21        "From:  Chris Stone, To: Robert Shindorf, Subject:
22    Open issues, Date:  Thursday, March 12th, 2015.
23    Concerning email.  I always told you I would give you
24    access to my Hotmail account once I am no longer
25    working for Lehigh Valley Abrasives.  Monday I will no

Page 135

1    longer be working for Lehigh Valley Abrasives and I
2    will give you access to that account."
3    You sent that email to him on March 12th of 2015, did you
4    not?
5  **A   I did, yes.  So he didn't ask me for access to the Hotmail**
6    **account until several months after closing.  So several**
7    **months after closing he asked me for access to the Hotmail**
8    **account and I said I would give him access to the Hotmail**
9    **account.**
10  Q   But he didn't know that you had used it for business
11    purposes until several months after closing, did he?
12  **A   So first of all --**
13    MR. LEVASSEUR:  Objection; mischaracterizes his
14    testimony again in terms of the using it for business.
15    MR. CASCIINI:  Granted and I'll rephrase.
16  BY MR. CASCINI:
17  Q   Mr. Stone, did Mr. Shindorf ask you about it only after you
18    told him that you used it for business purposes after the
19    transaction?
20  **A   So I wouldn't say having an occasional customer email come**
21    **in is using it for business purposes; I wouldn't**
22    **characterize it that way.**
23  Q   Fair enough.
24  **A   Yeah.  I mean, I've worked in the industry for many, many**
25    **years; I worked at Kason Corporation for 20 years.  I mean,**

Page 136

1    **if someone sent me an email to my personal address, one**
2    **email, I wouldn't characterize that personal address as**
3    **being used for a business purpose.**
4  Q   We're going to go back.  I'm just going to show you Exhibit
5    5 again.  So this is the one we've already seen, I don't
6    want to confuse you in that regard.  This is Exhibit 5 that
7    we already had marked.  It says here on Monday November
8    24th, 2014 Mr. Shindorf asks you, "Do any come into your
9    personal Hotmail account?"  And then you respond -- it looks
10    like pretty promptly, within that half hour the same day,
11    you respond to him, "Yes, but I have started responding to
12    the emails."  Did Mr. Shindorf have any reason to know that
13    occasionally orders came into the Hotmail account prior to
14    you sending that email?
15  **A   Well, first of all it's rare that something came in.  And**
16    **second of all, that's what due diligence is for.  Due**
17    **diligence is for that particular thing, and then you have a**
18    **sales contract and the contract specifies what's included**
19    **and what's not.**
20  Q   And it specifies that one of the things that's included is
21    passwords for all of the company accounts.  The dispute is
22    whether or not it's a company account; right?
23  **A   Yeah, it's clearly not a company account.**
24  Q   I know that is the opinion that you're expressing, and
25    certainly my client has a contrary one.  We're not here to

34  (Pages 133 to 136)

Christopher Stone - January 29, 2025

Page 137

1  argue the facts of the law though.  All I'm asking is it's
2  become a dispute now at this point; right?
3  A   That's a dispute; we disagree, yes.
4  Q   So I believe that you mentioned there was a period of a few
5      months during 2015 where the password had been changed on
6      the Hotmail account; right?
7  A   And the Gmail, yes.
8  Q   At that point in time did you later receive access to one or
9      both of those accounts?  Did you later reassert the control
10     over that account?
11  A   I reasserted control over the Hotmail account, but not the
12     Gmail account.
13  Q   Why is that?
14  A   So the Hotmail account had really all of my personal
15     information, medical records, church information, so forth,
16     that's the one I really needed.  The Gmail account was an
17     infrequently used email account by me.
18  Q   And you do concede the Gmail account was expressly used for
19     business purposes, for the Google AdWords account; right?
20         MR. LEVASSEUR:  Objection; it mischaracterizes his
21     testimony.  It's simply the login ID, that doesn't mean that
22     the email account is actually needed -- you have to get into
23     the Gmail account in order to get into the other system.
24     It's just the login ID, it's just the digits.
25         THE WITNESS:  Right; correct.

Page 138

1         MR. LEVASSEUR:  And that's what he testified to.
2  BY MR. CASCINI:
3  Q   So your testimony -- what information was contained in the
4      Gmail account itself?
5  A   There was personal emails in the Gmail account as well.
6  Q   But you did not attempt to reassert control over the Gmail
7      account; is that correct?
8  A   I think I gave up on that, yeah; yes.
9  Q   What efforts did you make to try to reassert control over
10     the Gmail account?
11  A   So the Gmail account -- to the best of my recollection after
12     my personal emails were stolen from me a few months later I
13     tried to re-change the passwords back, and I was able to
14     change the password back on the Hotmail account and not the
15     Gmail account, but the Hotmail account was the account that
16     really had all of my personal information that I really
17     wanted back.
18  Q   Did you have a conversation at any point in time with Mr.
19     Shindorf where --
20  A   Mr. Shindorf and I have not spoken since the settlement
21     agreement in 2015; we don't talk, there's no conversation.
22     He didn't reach out to me and tell me he was going to steal
23     my email accounts.
24  Q   Whether the conversation occurred before reported history or
25     at any point up to today, did you ever have a conversation

Page 139

1  with Mr. Shindorf where you said I would give you access to
2  the Hotmail account, but first I want my personal data back?
3  Was that ever a subject of discussion?
4  A   I don't recall that -- I don't recall that discussion, no.
5  Q   Okay.  Did you ever offer and say I'll give you the access,
6      I just want my personal data?
7  A   I don't recall us -- we -- I don't recall us ever
8      communicating with each other since the emails were
9      stolen -- since my email addresses were stolen.
10  Q   How could we tell -- we've made some estimates about how
11     many sales came in to the Hotmail account.  I think those
12     have been pretty consistent, you said they've been rare.
13  A   Yup.
14  Q   What records exist that we could look at that would help us
15     determine exactly what that number was?
16  A   So since I took the Hotmail account back there have been no
17     sales that have come in, no emails for --
18  Q   Understood.  My question is a little different though.  What
19     record could we look at, is there a place we could go to
20     look to determine -- you're saying rarely, we want to know
21     how many is rarely; is it five, is it ten, is it 15, is it
22     30, is it 40?  Where could we go to look?
23         MR. LEVASSEUR:  Objection.  He just said there's
24     zero, so how can you look anywhere for zero.  I'm not sure
25     what the question is trying to -- maybe you can restate.

Page 140

1  BY MR. CASCINI:
2  Q   We have already received testimony from you, Ms. Stone,
3      that -- "rarely" was the term you used, you received orders
4      that were sent to your Hotmail account; right?
5  A   So I think the distinction is we're talking about before the
6      sale of the company or after the sale.  What time frame?
7  Q   Fair.  At any point I time there were --
8         MR. LEVASSEUR:  I think out of fairness to the
9      witness you should put a point in time, because when Mr.
10     Shindorf had sole access and control of the Hotmail account
11     then we know the answer is going to be different than before
12     the sale.  So maybe if you put a time frame it will be
13     easier to answer the question.
14  BY MR. CASCINI:
15  Q   Where today does any record exist that we could use to
16     determine how many sales over the history of time were sent
17     to your Hotmail account for Lehigh Valley to fulfill?
18         MR. LEVASSEUR:  I'm just going to object.  With
19     respect to the time that Mr. Shindorf controlled the Hotmail
20     account the answer is obvious.  Your client can give it to
21     you and we've asked you to give that to us and we haven't
22     gotten it, by the way.  But in any event, if you're asking
23     from prior to that then go ahead and answer the question.
24  BY MR. CASCINI:
25  Q   And let me revise that in light of it.  Maybe I have a

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 141

1  fundamental misunderstanding of the facts here. Mr. Stone,
2  who has exclusive control over the Hotmail account today?
3  A  Today I do.
4  Q  Okay. Has that been true -- you know what, I didn't get
5  this piece so maybe therein lies the distinction. You said
6  that he had it for a few months in 2015. Do you remember
7  when it was reacquired by you?
8  A  So off the top of my head, no, but we can get that
9  information to you.
10 Q  Do you remember approximately? And I will take it as an
11 approximate, I understand.
12 A  So, yeah, I think it was the fall. But again -- I just know
13 it was a few months and it was 2015. I don't know the exact
14 dates but it was -- my best recollection is it was the fall.
15 Q  All right. Since the fall of 2015 -- if that's right, and
16 we'll acknowledge it's a date, we're going to guess it's the
17 fall. I know, I'm not holding you to that. But since that
18 time have you maintained exclusive control of the Hotmail
19 account?
20 A  Yes.
21 Q  Okay. So my only question is today if I want to find out --
22 if anybody wants to find out, if an impartial third party
23 wants to find out how many sales historically were ever sent
24 and received by you in that Hotmail account, where could I
25 look?

Page 142

1  A  There's no way I know of that you could find that out.
2  Q  That record would not be retained in the Hotmail account?
3  A  No.
4  Q  Why not?
5  A  Like I said, when I got the Hotmail account back from Mr.
6  Shindorf many of the emails were deleted.
7  Q  You said that many of your personal emails were deleted; is
8  that accurate?
9  A  Yeah, both were deleted. A lot of emails were deleted.
10 Q  Do you know that there were records that existed before Mr.
11 Shindorf had access -- and this is just a "yes" or "no"
12 question, I'm not asking any more than this. Do you know
13 whether there were records of sales that existed before
14 Shindorf had access that had been deleted after Shindorf had
15 access?
16 A  I think so, but I don't -- I don't think I could prove it.
17 It's just a feeling I have.
18 Q  Is it your testimony that there are no emails showing those
19 sales that remain in that account as of today?
20 A  Yes, that's my testimony.
21 Q  Have you checked for them?
22 A  So let me -- let me preface that. To the best of my memory
23 there are not any. What's in there is all of my personal
24 stuff. One time when I looked quickly most of the history
25 had been deleted by Mr. Shindorf, but if that's something

Page 143

1  you want us to check I would like to do that in more detail.
2  Q  And are you aware -- and this is, again, a "yes" or "no"
3  question, you may not be. Are you aware that we requested
4  that information in discovery?
5  A  The information you requested did not exist. I'm not
6  sure --
7  Q  And maybe we're talking passed each other, and if we are I
8  want to make sure we get it square.
9       MR. LEVASSEUR:  Yeah, I want to be real careful we
10 don't -- because we're going to stumble into an area where
11 it's attorney-client privilege. I can tell you that this
12 request was made, that request was investigated, responded
13 to, and the answers that we provided you were accurate at
14 the time, and I'm sure he can double-check again. You know,
15 he can always check twice, but nonetheless that in fact was
16 an exercise that was undertaken, completed, and you got the
17 answers that you got.
18 BY MR. CASCINI:
19 Q  And, Mr. Stone -- and Mr. LeVasseur's point is really good,
20 obviously I'm not telling you anything you don't know,
21 listen to your attorney in that regard. I'm not looking for
22 communications that the two of you had or that you had with
23 your New Jersey counsel. Don't tell me any of that, that's
24 not mine to know.
25       Did you, Mr. Stone, look in the Hotmail account to

Page 144

1  determine whether or not those records are still in there?
2  A  Which records are we referring to now?
3  Q  Records that indicate -- well, I'll broaden it. Any
4  business activity on the part of LVA that might be in that
5  Hotmail account?
6  A  There's no record.
7       MR. LEVASSEUR:  And for sake of clarification
8  here, when we talk about records we're talking about an
9  email account. So you're asking about looking for an email
10 that came in from somebody trying to order something for --
11 it's just an email, it's not a record. And to the extent
12 the email is a record I --
13      MR. CASCINI:  Fair. Sure. And I did use a term
14 of art and so I'll ask the question again. It's a "yes" or
15 "no" question.
16 BY MR. CASCINI:
17 Q  Did you look in the Hotmail account to determine whether you
18 had retained any emails that you'd received from customers
19 seeking sales from LVA?
20 A  There are no emails there of customers seeking sales from
21 LVA.
22 Q  Do you know that because you looked? That's my question.
23 A  Yes.
24 Q  Okay.
25      MR. LEVASSEUR:  Good question and clear answer.

36 (Pages 141 to 144)

Christopher Stone - January 29, 2025

Page 145

1    Thank you.
2  BY MR. CASCINI:
3  Q    Other than -- I am not asking about anything that you've
4       shared with your attorneys.  Does anyone else have access to
5       the Hotmail account other than you?
6  A    **(No verbal response).**
7  Q    Sorry, I lost it.  Is it "no"?
8  A    **"No.  No."**
9  Q    Has that been the case since -- continuously since you
10      reasserted control of that account from Mr. Shindorf in
11      2015 -- probably in 2015, the fall of 2015?
12 A    **Yes, just I am in control of that account.**
13 Q    Did you ever delete any emails containing sales records that
14      had been in the Hotmail account intended for LVA that have
15      ever existed?  Have you ever deleted any?
16 A    **No.**
17 Q    Now, Mr. LeVasseur made a good observation earlier, which
18      was there's a distinction here between the Gmail account
19      being used as the login for AdWords and other things.  Your
20      testimony is that that remains in possession of Mr.
21      Shindorf; correct?
22 A    **Correct.**
23 Q    Okay.  And --
24 A    **Well, I don't have possession of it; I assume he has it,**
25      **yeah.**

Page 146

1  Q    And that's the right question to be asking you, that was
2       actually what I meant.  You don't have possession of that
3       anymore; right?
4  A    **Correct.**
5  Q    Okay.  Got it.
6           MR. CASCINI: Guys, can we take 15 and then I can
7       just go onto the last thing.  I think we've got a couple
8       hours left, but if we could take a 15 minute break, Mr.
9       LeVasseur, I would appreciate it.
10          MR. LEVASSEUR: Sounds good.
11          MR. CASCINI: Mr. Stone, are you okay with that?
12          THE WITNESS: Yes.
13          MR. CASCINI: Excellent.
14          (Off the record)
15          MR. CASCINI: All right.  We're going to go back
16      on the record.
17 BY MR. CASCINI:
18 Q    Mr. Stone, did you use the Hotmail email account when you
19      were registering the domain for Lehigh Valley?
20 A    **Honestly, I don't remember what email I used; it's possible.**
21          **(Deposition Exhibit 7 marked)**
22 Q    I am going to show you a document that we have marked here
23      as Exhibit 7.  Are you able to see an email on the screen
24      here?  And I'll make it bigger.  It looks like it says up at
25      the very top Chris Stone sent November 5th, 2014 to Robert

Page 147

1       Shindorf and the subject is Lehigh Valley Abrasives domain
2       register; is that right?  You see that on the screen?
3  A    **Yes.**
4  Q    And then if we scroll on down, we can see "Domain Name."
5       And this is in an email that we wrote to Mr. Shindorf;
6       right?  All this information comes from there?
7  A    **That's what it looks like, yes.  I don't remember the email,**
8       **but, yes.**
9  Q    Yeah, I'm sure you don't remember sending an email in 2014,
10      I wouldn't.  But what it appears here is this the email that
11      you sent and it says "Domain Name" and then "Domain Name
12      Information" down below; right?
13 A    **Yes.**
14 Q    And then it has a registrant name, you can see that here,
15      registrant street and some of that information, and then
16      registered email.  That clslcs2000@hotmail.com, that's the
17      Hotmail account; right?
18 A    **Correct.**
19 Q    Okay.  I believe you gave some testimony earlier that Mr.
20      Shindorf deleted personal information from your Hotmail
21      account when it was returned to you during the brief period
22      of time -- after the brief period of time when he had access
23      to it; is that correct?
24 A    **That's correct.  That was taken -- I noticed that and it was**
25      **also he gave that in his deposition.**

Page 148

1  Q    You earlier told him that you were going to do that and then
2       give him access to it though; right?
3  A    **I did at one point say I was going to delete the information**
4       **and give him access, yes.**
5  Q    And just to verify here we're talking about the same thing.
6       I'm going to mark a document as Exhibit Number 8.
7           (Deposition Exhibit 8 marked)
8  Q    Mr. Stone, are you able to see the email on the screen?
9  A    **Yes; yup.**
10 Q    Up here at the top it says "Chris Stone," then "Sent:
11      Tuesday, November 25th.  Hotmail email and rebates."  It
12      says,
13          "Robert, concerning the Hotmail email address, I
14      have lots of personal emails in there in which I have
15      confidentiality restrictions, such as nonprofit
16      budgeting, staffing, Church business, executive
17      responsibilities (none of which I'm sure you care about
18      but I did promise this information would not be shared
19      with others."
20      Then it says,
21          "When you let me know you no longer need me on a
22      daily basis, I will clean the email account of all my
23      personal emails and leave all the LVA history there.  I
24      will then give you the password and login and we can
25      both give you access the account."

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 149

1    And then there are some other subjects that are discussed
2    there. "And just to be safe, should something happen to you
3    or me, please send me something in writing on your
4    letterhead signed and dated." That's how it ends; right?
5  A   Yup.
6  Q   So what happened in between this email and when Mr. Shindorf
7    took possession? What changed?
8  A   Something very big changed, and that is that he defaulted on
9    repaying me for the company he purchased. And he -- so he
10   took out a note for $500,000 and he just stopped paying it.
11   And I had to hire an attorney to try and get some of it
12   back. When my attorney reached out to him and his attorney,
13   he told my attorney, "I know people at Chemical Bank, I can
14   put this into default and you'll get nothing." So rather
15   than me taking him to court, I accepted a much lower offer.
16        In addition to that, he had told me he wanted me
17   to stay on for a year and pay me for a year and then he
18   changed his mind in a week, which went against the agreement
19   anyway, he was supposed to give me like one month's notice.
20   There were rebate checks, some of them as large as $50,000,
21   that we had agreed between the two of us, I have it in
22   writing, that he would give to me and he never gave to me.
23   There was just hundreds of thousands of dollars that he owed
24   me that he didn't pay me and I had to -- I had to proceed in
25   a legal manner, which also cost me money. And then

Page 150

1    ultimately I decided I didn't want the headache of going to
2    court so I took much less than what was originally promised
3    to me. That's what changed, that's why I -- while I still
4    gave him access, I didn't feel any need to go above and
5    beyond for him.
6  Q   And with respect to that, it's your position that -- why did
7    you make -- let's take ourselves back to November 25th of
8    2014, why did you make that promise if you didn't think you
9    had any obligation to do it?
10 A   Well, I did, I gave him access. The promise was to give him
11   access. Whether or not my emails were there or not, that
12   didn't affect his access.
13 Q   That's fair, but why did you agree to clean out your
14   personal information and give him access if you didn't feel
15   like it was an obligation you were supposed to do?
16 A   I'm sorry, could you repeat the question?
17 Q   Sure. Why did you -- here what you're doing is, if I'm not
18   mistaken by the document on the screen, "I will clean the
19   email account out of my personal emails and leave the LVA
20   history there." Why did you agree to do that?
21 A   I agreed to do that because I was trying to avoid any
22   further legal entanglements with him. I know that he is
23   someone who is -- has proclivity towards litigation and I
24   was trying to avoid that.
25 Q   And how -- so you didn't believe you had an obligation to do

Page 151

1    it, you offered it, it was designed to be a settlement
2    compromise for some future dispute?
3  A   In my mind, yes.
4  Q   Okay. So you're extending this promise, your testify is you
5    were willing to do it but you weren't obligated in any way
6    to do it; is that right?
7  A   Correct; yes.
8  Q   And then after it changed then you -- after you had -- the
9    settlement agreement was executed you decided you didn't
10   want to do it anymore; right?
11 A   No, nothing changed. The only thing that changed is that
12   he -- I said I will give you access to it, the only thing
13   that changed is he actually stole it from me; he took it and
14   I had no access. The owner, me the owner of my personal
15   email account, he stole and I had no access to my email
16   account. That's the only thing that changed.
17 Q   But respectively something did change, even if it was
18   justified, even if it was, you know, done with all the
19   authority in the world, because you're saying here I'll give
20   you access to it and I'll clean out my stuff, you weren't
21   the one to clean out your personal information; right?
22 A   Well, I didn't clean out my personal information, I did give
23   him access. What I viewed as the critical thing was to give
24   him access. I did not clean out the personal information,
25   but that didn't have a bearing on whether or not he had

Page 152

1    access or not.
2  Q   And he no longer has access today; right?
3  A   Correct.
4  Q   Why?
5  A   So he doesn't have access because after he -- the agreement
6    we have -- and you've shown all these emails, was that I --
7    and I had no obligation to do it, I did it out of -- trying
8    to avoid further litigation and trying to just be a nice
9    person. But I told him I would give him access to the
10   account, my personal email account. When I gave him access
11   to my personal email account he locked me out of my personal
12   email account. Then later I went back and took back sole
13   control of the email account.
14 Q   So the answer to my question is the reason he no longer has
15   access is because you reasserted access to it and you have
16   the password; right?
17 A   Correct.
18 Q   And he does not; right?
19 A   As far as I know he does not.
20 Q   Fair enough. I shouldn't ask you questions about what he
21   knows or doesn't know.
22 A   Yeah.
23 Q   I get it. I understand that. I want to talk about the
24   formation of US Tool Depot. First, I believe you already
25   gave testimony this is a New Jersey LLC; is that right?

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

---

Page 153

1  **A  Yes.**
2  Q  When was US Tool Depot formed?
3  **A  It was formed in 2018; I don't have the exact date, but it**
4  **was formed in 2018.**
5  Q  Okay.  And I understand that there are a great many disputes
6  about a great many things.  There's no dispute that that was
7  during the period of the non-compete that you had signed
8  with them; right?  Whether or not you violated it, it was
9  during that period; correct?
10 **A  Yes; yes.**
11 Q  You formed the company during that time?
12 **A  Yes.**
13 Q  And XP Abrasives, what is XP Abrasives?
14 **A  XP Abrasives is a company that sells abrasives for**
15 **metalworking, similar to what Lehigh Valley Abrasives did.**
16 Q  When did you form XP Abrasives?
17 **A  So I don't have the exact dates in front of me, but it was**
18 **in 2021 that I formed it.  And the first sales of XP**
19 **Abrasives were in December of 2021 after the non-compete**
20 **expired.**
21 Q  Do you dispute that you formed the company during the
22 non-compete period?
23 **A  I think I did.  I don't have the exact date, but I believe**
24 **that to be true.**
25 Q  Did XP Abrasives sell -- well, I have records for it.  Did

---

Page 154

1  XP Abrasives sell flap discs?
2  **A  Yes.**
3  Q  When did you begin selling flap discs from XP Abrasives?
4  **A  December of 2021; two months after the non-compete expired.**
5  Q  And those flap discs that you sold from XP Abrasives, those
6  were private labeled under XP Abrasives?
7  **A  Yes.**
8  Q  You've already given testimony that it takes an average of
9  three months to begin doing private labeling activities with
10 flap discs in particular -- well, let me ask you:  Is this
11 through Sundisc?
12 **A  Yes.**
13 Q  And is it safe to say that you engaged in some of that
14 conduct during the non-competition period?
15 **A  I did order the flap discs from Sundisc, I think it was like**
16 **a month or two before the non-compete expired I ordered the**
17 **flap discs from Sundisc.**
18 Q  And you also exchanged information with them that was
19 necessary and sufficient for them to private label your
20 products during that time; right?
21 **A  Yes.**
22 Q  And you ordered them, did you receive them during the
23 non-competition period?
24 **A  No.**
25 Q  When did you received them -- or did you receive them?  I

---

Page 155

1  should ask that question first.
2  **A  Yeah.  Well, I -- if that's something you want to know I'd**
3  **have to get back to you with the exact date.  I think it was**
4  **after the non-compete but I don't have that exact**
5  **information when they came in.  The only information I'm**
6  **sure of is that we didn't sell any until December, two**
7  **months after the non-compete expired.**
8  Q  Does US Tool Depot have a website?
9  **A  Yes; yup.**
10 Q  When was the website put up?
11 **A  2018.**
12 Q  And did you engage in any solicitation of customers in
13 connection with the opening of that business?  Did you reach
14 out to people and say, hey, US Tool Depot is open for
15 business now?
16 **A  No.**
17 Q  Okay.  How did people come to learn that US Tool Depot had
18 opened?
19 **A  So what has kind of changed in the world of ecommerce over**
20 **time is that the power of the web is a much more important**
21 **driving force.  So in order to make our products known and**
22 **to being trafficked we use Google AdWords for US Tool Depot.**
23 Q  So you said that you were using Google AdWords that time,
24 was that the primary driver at that point in time?
25 **A  Yes.**

---

Page 156

1  Q  And there were products that were being advertised at US
2  Tool Depot.  How many products did US Tool Depot advertise?
3  **A  So when it first started in 2018 maybe 50, now it has**
4  **several thousand.**
5  Q  I don't think that we ever asked this question and I need to
6  know the answer to it.  Did Lehigh Valley -- you've already
7  given some testimony about what products Lehigh Valley
8  offered.  Did Lehigh Valley offer for sale any abrasives
9  that could be used in woodworking?
10 **A  (No verbal response)**
11 Q  I'm sorry, if you gave an answer the sound cut off.
12 **A  "No."**
13 Q  What is a zirconia sanding belt?
14 **A  So a sanding belt is -- almost picture it like a belt you**
15 **would put on your pants, that's the kind of shape, and it**
16 **goes on a machine and it spins around on the machine and**
17 **when pressed against material it would impart a surface**
18 **finish on the material.**
19 Q  I'm going to show you a document here.  Just a moment.
20      (Deposition Exhibit 9 marked)
21 Q  I'm going to show a document that I have marked as Exhibit
22 Number 9.  Can you see this image on your screen, Mr. Stone?
23 **A  Yes.**
24 Q  Well, what website is this?
25 **A  XP Abrasives.**

---

39 (Pages 153 to 156)

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 157

1  Q   And with XP Abrasives here this is a zirconia sanding belt,
2      this is the product we were just giving some testimony
3      about; is that right?
4  A   Yes.
5  Q   Now it looks like that you choose the grid, we had talked
6      about that a little bit here, and then they could order
7      it -- and this is a product that they could order from XP
8      Abrasives?
9  A   Yes.
10 Q   And if we go on to the -- well, let me ask you this:  Is
11     this a product that could be used for woodworking or -- I'm
12     sorry -- for wood finishing, sand finishing, or both?
13 A   **This particular product would be used for metal finishing.**
14 Q   Okay.  So if I go to the second page here where it says
15     available grit, single pace, weight, backing material,
16     waterproof and then application, it says, "Stock removal,
17     profiling, bevel work."  Do you see where it says all those?
18 A   Uh-huh (affirmative).
19 Q   It also says, "Also appropriate for very dense and hard
20     woods," doesn't it?
21 A   **It does say that, yeah.**
22 Q   Is that inconsistent with your previous testimony that this
23     is not an appropriate product for the use of wood?
24 A   **Yes.  I mean, that shouldn't be there; it's not an**
25     **appropriate product for wood, that's correct.**

Page 158

1  Q   So is the advertisement wrong?
2  A   **Yes.**
3  Q   Was this product a 2-by-36 inch premium zirconia sanding
4      belt, was this a product that was offered by LVA when you
5      owned it?
6  A   **I believe it was.  I'm not 100 percent sure but I think so.**
7          **(Deposition Exhibit 10 marked)**
8  Q   I'm going to show you a document that I have marked as
9      Exhibit 10.  Do you recognize -- which website does this
10     document come from?  It's a screenshot of a website, do you
11     recognize the website this record is shown from?
12 A   **Yes, that's XP Abrasives.**
13 Q   Okay.  And this is a 3 inch Quick Change Disc Roloc Zirconia
14     with Grinding Aid Made in the USA; is that right?
15 A   **Yes; yes.**
16 Q   And then it has various grit numbers down below it?
17 A   **Yup.**
18 Q   And is this a metalworking or woodworking product?
19 A   **Metalworking.**
20 Q   Okay.  Is it an exclusively metalworking product?
21 A   **I mean, people can sort of do crazy things, but in general,**
22     **yes, this is a product designed for metalworking.**
23 Q   And is this product -- I see that XP Abrasives sold it.  Did
24     LVA sell it when you were in control of that?
25 A   **I believe that they did.**

Page 159

1  Q   If we go down to the second page we can see "Zirconia Roloc
2      quick-change cloth disc delivers powerful performance."  And
3      I believe it says here, "A semi-open coat diminishes
4      loading, so you can flawlessly deburr and blend soft metals,
5      such as brass, bronze, and carbon steels, as well as
6      delicate wood surfaces."  Is that correct?
7  A   **That's what it says, yes.**
8  Q   Is that statement on your website -- is that incorrect
9      factually?
10 A   **So people wouldn't really use it for wood surfaces but -- in**
11     **general it would not be used for wood surfaces.**
12 Q   This product cannot be used for the type of surface that you
13     have advertised that it can be used for; is that accurate?
14 A   **That's accurate.**
15 Q   Who drafted the copy on this website?
16 A   **Me.**
17 Q   So you drafted it but now you're telling me it's inaccurate,
18     that's not right?
19 A   **So, I mean, when you look at that statement -- and I hadn't**
20     **seen that before -- I would say, yes, that it really**
21     **shouldn't list that it could be used for wood because it's**
22     **not really appropriate for wood.**
23 Q   Okay.  But again, I just want to clarify in case I'm wrong,
24     you were the one who wrote it; right?
25 A   **Yes, I wrote it.**

Page 160

1  Q   Would it surprise you to learn that there are a great many
2      products that are listed on the XP Abrasives site that say
3      that they're appropriate for woodworking?
4  A   **Would that surprise me?  Yes.**
5  Q   And would it surprise you to learn -- I'm asking you a
6      hypothetical here, and one of the reasons I'm asking the
7      hypothetical is I've got a stack full of records.  But would
8      it surprise you to learn that some of the products that had
9      also been sold by LVA are advertised now by XP as being
10     suitable for woodworking?
11 A   **That would not surprise me, no.**
12 Q   Did LVA sell woodworking related abrasives when you were in
13     control of it?
14 A   **No.**
15 Q   So why would it be unsurprising to you?
16 A   **I mean, I'm surprised that that's actually there.  When we**
17     **finish our deposition I'm going to remove it from the XP**
18     **because I don't think it's appropriate.  I try to be as**
19     **accurate as I can, but I would say that's a mistake I made.**
20 Q   If a customer had ordered it with the intent of using it for
21     woodworking in reliance on what's written on that website
22     there, would that be your mistake or their mistake in
23     ordering that product?
24 A   **That would be my mistake.**
25 Q   Did you have any customers that you remember during your

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 161

1    time at LVA that ever returned a product and said, hey,
2    there's a mistake, I ordered this for woodworking but it
3    doesn't work that way?
4  A  I've never -- I do not recall that ever happening, but
5    certainly we've had customers call and say this isn't
6    working as intended and we've taken product back.
7  Q  Are you familiar with the vendor Dynabrade?
8  A  Yes.
9  Q  What do they manufacture?
10  A  Dynabrade manufactures power tools.
11  Q  Okay.  Do they manufacture any abrasive power tools?
12  A  Yeah, they manufacture power tools that you can mount
13    abrasives on.
14  Q  Do they manufacture power tools that can be used with metal,
15    wood, or both?
16  A  So primarily it's metal, they may have wood but I don't
17    know.  Their primary focus is metal.
18       (Deposition Exhibit 11 marked)
19  Q  And I'm going to show you a document that I have labeled as
20    Exhibit 11.  And we'll get to (indiscernible).  Do you
21    recognize the website that this screenshot has been taken
22    from?
23  A  Yes.
24  Q  What website is that?
25  A  XP Abrasives.

Page 162

1  Q  Okay.  And this says it's a Dynabrade 13300 Mini-Dynisher
2    Finishing Tool.  Is that accurate, it says that on here?
3  A  Yes; yup.
4  Q  And you said this is a product that an abrasive can be
5    mounted on; is that right?
6  A  Yup.
7  Q  So could you mount a variety of different abrasives on this
8    product?
9  A  Yes.
10  Q  Do you know whether or not LVA sold this product while you
11    were in control of it?
12  A  I do not, no.
13  Q  You don't know whether or not you could?
14  A  I don't know whether LVA -- I don't recall whether LVA sold
15    that particular product, no.
16  Q  Understandable.  It says down here, "Tool powers optional,
17    finish virtually any shape, contour or material including,"
18    and then there are a list of things that end in "wood";
19    right?
20  A  Yes.  So that's Dynabrade's copy.
21  Q  That's Dynabrade's copy.  Are you advertising their own
22    product incorrectly with respect to the materials this
23    product can be used on?
24  A  Maybe.  That I don't know.  But that's Dynabrade's text.
25  Q  Did LVA sell any Dynabrade products?

Page 163

1  A  I believe LVA -- I believe LVA -- that Dynabrade was a
2    vendor for LVA.
3       (Deposition Exhibit 12 marked)
4  Q  I'm going to show you a document that I have marked as
5    Exhibit 12.  It's a screenshot of a website again.  Do you
6    recognize which website this came from?
7  A  Well, this says "Lehigh Valley Abrasives."
8  Q  Okay.  Do you recognize it?  When I show it to you are you
9    thinking to yourself, yes, that's what our website used to
10    look like back when I controlled Lehigh Valley Abrasives?
11  A  It looks quite different, but it obviously is Lehigh Valley
12    Abrasives.
13  Q  Okay.  And it lists a bunch of different categories down
14    below, doesn't it?
15  A  Yup.
16  Q  Are those all categories of products that Lehigh Valley
17    offered for sale when you were in control of it?
18  A  So I don't know -- what is the date that this particular
19    screenshot is taken from?
20  Q  That's a great question, let me see if I can figure that
21    piece out.  I don't know, so is the answer to your question
22    that you don't know either whether that is an accurate list
23    of products?
24  A  Yeah; exactly.
25  Q  Understandable.  I get that.  When did Mr. Shindorf, as you

Page 164

1    testified, allegedly default on his payment obligations?
2  A  About four or five months after the sale was completed.
3  Q  Okay.  All right.  So you've given some testimony now about
4    the formation of both US Tool Depot and XP Abrasives, when
5    they were formed and the kind of products that they sold;
6    correct?
7  A  Yes.
8  Q  Recently we exchanged information through a mediator, a
9    special master of both product sales and customer sales.  Do
10    you remember participating in that process?
11  A  Yes.
12  Q  Okay.
13       MR. CASCINI:  And, Chris, please jump in if I'm
14    getting close.
15  BY MR. CASCINI:
16  Q  Please do not give any testimony that relates -- I'm not
17    going to be asking you, don't interpret any of my questions
18    to be asking anything that relates to documents or
19    conversations that you exchanged with your attorney.  But my
20    question is when you provided lists to Mr. Muth, what
21    information did you provide him?
22  A  Mr. Muth I provided information from our sales of products
23    for both US Tool Depot and XP Abrasives, and we provided
24    customer names, order dates, and order products -- the
25    products they ordered.

41 (Pages 161 to 164)

Christopher Stone - January 29, 2025

Page 165

1  Q   Did you provide Mr. Muth copies of email addresses and phone
2      numbers for your customer contacts that you had with --
3  A   So I'm not --
4  Q   -- I'm sorry, either XP or with -- strike all that because
5      that was the worst question in the world. I'm sorry. Did
6      you provide Mr. Muth with email addresses and contact
7      numbers for the customers of either US Tool Depot or XP
8      Abrasives?
9          THE WITNESS: Chris -- could you help me with
10     that, Chris? I'm not sure.
11         MR. LEVASSEUR: I can't. So if you don't know the
12     answer then that's your answer.
13 BY MR. CASCINI:
14 A   Yeah, I don't remember the exact details of the
15     spreadsheets.
16         (Deposition Exhibit 13 marked)
17 Q   I'm going to share a document that I have marked as Exhibit
18     Number 13. Mr. Stone, this is a report, it's to me and
19     Chris, it says, "Subject" -- "From Jeff Muth. Summary of
20     customer and product overlap." Do you see where it says
21     that?
22 A   Yes.
23 Q   This is a five-page document. Mr. Stone, have you seen this
24     document before?
25 A   Yes.

Page 166

1  Q   Okay. I won't ask you any circumstances upon which you came
2      to see it, but I want to ask you a question. There is a
3      statement --
4  A   Wait, is this the summary document?
5  Q   It is.
6  A   Okay. Yes.
7  Q   It says at the very bottom here,
8          "Importantly, the data from the two parties had
9      differences in presentation that limited our ability to
10     fully compare them. First, Allied provided email
11     addresses and phone numbers of their customers where
12     Stone did not."
13 All I'm asking, because I don't want to beat a dead horse
14     and I know what your earlier testimony is there, do you have
15     any reason to doubt that that statement from Mr. Muth is
16     inaccurate -- or is -- do you have any reason to doubt that
17     the statement from Mr. Muth that I just read is accurate?
18 A   I have on reason to doubt that, no.
19 Q   But you do admit, however, that you maintained databases
20     with both the phone numbers and email addresses for your
21     customers; right? You've already given --
22 A   Yes; we that, yeah.
23 Q   Did you send out any email solicitations to your former
24     customers of LVA after you started either US Tool Depot or
25     XP Abrasives?

Page 167

1  A   So we sent out email correspondence to potential customers.
2      I don't know whether they were customers -- former customers
3      of Lehigh Valley Abrasives or not.
4  Q   How did you decide -- well, first, when did you send
5      solicitations on behalf via email of --
6  A   So I can't give you exact dates, but it was after the
7      non-compete had expired.
8  Q   And I believe that you gave testimony you don't know whether
9      they were former customers of Allied or Lehigh Valley; is
10     that accurate?
11 A   So let me preface this. There were a few customers that I
12     remembered that I did reach out to directly, but outside of
13     that that was like a handful, the majority of customers we
14     reached out to we purchased a subscription to Hoover's and
15     we got databases through them. We -- again, I joined NOMA,
16     I had databases from them. We got a database from Postcard
17     Mania. So we had email lists -- pretty big email lists.
18 Q   When you sent out those communications, did you send them to
19     any of the former customers of LVA or of Allied?
20 A   So I want to sort of segment that. There were a few emails
21     I sent that I do specifically remember were customers of
22     Lehigh Valley that I sent out to people. Those were sent by
23     me. The majority of the emails we sent we would have no
24     idea of knowing whether they were Lehigh Valley customers or
25     not.

Page 168

1  Q   Okay. You currently conduct business through your Hotmail
2      account, don't you, on behalf of your two entities; XP
3      Abrasives and US Tool Depot?
4  A   I would say in general, no, but there may be a stray email
5      that -- just like I had mentioned before, there may be
6      someone who remembered me from a few years ago and was,
7      like, hey -- and remembered that email address and sent me
8      something. So it's rare, just like it was with Lehigh, but
9      it occurred from time to time.
10 Q   When you say it's rare but it occurs from time to time, does
11     it happen more frequently, less frequently, or about as
12     frequently as it did when you were operating LVA?
13 A   Would you repeat the first part of your question?
14 Q   And let me specify exactly the subject I'm talking about
15     too. Point well met. I'm talking about instances when you
16     have received orders through your Hotmail account.
17 A   Okay. So for US Tool Depot and XP Abrasives I would say it
18     happens about as frequently as it happened with Lehigh
19     Valley.
20 Q   Understood. Mr. Stone, do you remember working on and
21     sending over documents related to a Request for Production
22     of documents that Allied sent you? And this would have
23     been -- and you would have sent them over around August of
24     this past year.
25 A   Are you talking about discovery documents?

42 (Pages 165 to 168)

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 169

1  Q   I am.  So these would have been documents that we had
2       requested, Allied had requested from you, and that you had
3       produced in response to our Request for production of
4       documents?
5  A   I mean, I'm not sure if I remember everything I sent, but I
6       remember you requested documents and we provided them, yes.
7  Q   Well, I'm going to show you a copy of what I have marked as
8       Exhibit 14.
9            (Deposition Exhibit 14 marked)
10 Q   This is a document, it has eight pages in it.  It looks like
11      we've got photograph registration and then it looks like a
12      series of emails, they're from the Hotmail account up at the
13      top.
14 A   Yup.
15 Q   Like I said, there are only eight pages -- five, six, seven,
16      eight.  Do you remember producing these documents so that
17      they could be --
18 A   Yeah.
19 Q   -- given over to Allied Industrial in response to its
20      document requests?
21 A   Yes.
22 Q   And do you remember that one of the things that they asked
23      you for was all sales of US Tool Depot and XP Abrasives to
24      any of Lehigh Valley or Allied's former clients?
25 A   No, I don't remember the specific details of what you asked

Page 170

1       for.
2  Q   Okay.  Well, one -- I guess the most direct way of asking
3       this question is you don't dispute that the documents that
4       you produced to us in August of 2021 -- or I'm sorry --
5       yeah, in August of 2021 -- no.  Scratch that, that's wrong.
6       I'm confused.  We're late in the afternoon.  You don't
7       dispute that the documents that you produced to us this past
8       August did not include a vast majority of the sales that
9       were included in the Muth report; right?
10 A   Okay.  I'm a little bit confused now.  These emails don't
11      include any sales here, but I'm not sure how you're relating
12      that to the report.
13 Q   Well --
14 A   So one is a vendor, like the Beacut they make products for
15      us, it's not a sale.  And the one -- the one -- the other
16      emails that you referring to were to a company that I was
17      trying to get their business but I wasn't successful in
18      receiving their business.  I quoted them but they didn't
19      order from me.
20 Q   Okay.  And that's Larry Nell?
21 A   Yes.
22 Q   So this is my question, and listen, it was unartful so I'll
23      rephrase it.  There are a great many sales that are
24      reflected in the Muth report that we don't have any
25      transaction information for in this production of documents;

Page 171

1       right?
2            MR. LEVASSEUR:  Let me jump in because I think the
3       document, or whatever you're talking about here, was in
4       response to a different request -- or a different issue than
5       the Muth report was addressing.  This is relating to you
6       wanted Hotmail emails exchanged with customers of -- or
7       former customers of Lehigh Valley I think is what I recall.
8            THE WITNESS:  Yes.
9            MR. LEVASSEUR:  It was specifically the Hotmail
10      emails is what you were looking for that -- and that's what
11      this is, which is completely different than what the Muth
12      report information is.  In fact, the Muth report has nothing
13      to do with the Hotmail address issue.
14           (Deposition Exhibit 15 marked)
15 BY MR. CASCINI:
16 Q   I'm going to show you a document that I have marked as
17      Exhibit 15.  Are you able to see this document on your
18      screen, Mr. Stone?  It says, "Defendant Christopher Stone's
19      Response to Plaintiff's First Request for Production of
20      Documents."
21 A   Yes.
22 Q   Okay.  And the date of this -- we're going to skip all the
23      way -- it's a five-page document, the date of this is
24      September of 2024?
25 A   Yes.

Page 172

1  Q   The document that I just showed you, the eight-page
2       document, those were the emails that you produced in
3       connection with answer these Requests for Production of
4       Documents; right?
5  A   So it was produced in relation to your request for
6       discovery.  I don't know -- I know you had more than one
7       request, but it was one of the discovery requests, yes,
8       those were the documents produced.
9  Q   Well, we've asked for a great many things, but one of them
10      is, "Please produce copies of all telephonic, email, text
11      messages."  We're looking at Number 3 here.  This is our
12      question and this is your response:  "All documents
13      concerning communications directed to any former, current,
14      and potential customers, vendors or suppliers of Lehigh
15      Valley, Allied, US Tool Depot from October of 2014 to the
16      present."  It says, "Documents known to be responsive to
17      this request were produced on August 2nd."  And then it is
18      true, is it not, that the Muth report contains information
19      of the sales that we asked for copies of all the electronic
20      correspondence related to with this request; right?
21 A   I'm sorry, I'm tired too so I'm not processing well.  Let me
22      just read it.
23 Q   And that's fair.  Yeah, take your time to read the exhibit.
24      I don't want you answering a question you either don't
25      understand or that isn't related to what we're talking

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

Page 173

1    about.
2        MR. LEVASSEUR:  You know, in fairness to him I
3    signed it, not him.  That isn't how I interpret it.  You and
4    I have a different -- the information that was supplied --
5    that we agreed to supply to Mr. Muth is a completely
6    different nature than what your request is here.  This, as I
7    interpret it, was asking for the communications, not data
8    itself, you know, not the internal company data, which of
9    course we would have objected to and not provided without a
10   court order.  So, yeah, but -- you know, he didn't sign
11   that, I did, and it's not my deposition but I think you and
12   I interpret the Muth thing and that document request to be
13   completely different.
14  Q   Understandable.  Mr. Stone, I understand that you filed a
15      counter-claim in this lawsuit; correct?
16  A   Yes.
17  Q   And the nature of that counter-claim, as I understood it, is
18      that a violation of the Copyright Act regarding photographs;
19      is that correct?
20  A   Yes.
21  Q   Okay.  We saw earlier that there was a production of various
22      copyrighted registration documentation.  When did you
23      register those copyrights for the photographs that you're
24      making your claim over?
25  A   **I believe it was two years ago, approximately two years ago.**

Page 174

1   Q   And the copyrighted material in the photographs -- and here,
2       let's not guess, I can actually show you the photographs
3       that we may be talking about here.
4           (Deposition Exhibit 16 marked)
5   Q   I'm going to show you a document that I have marked as
6       Exhibit Number 16.  These documents here are ones that were
7       used by your attention during Mr. Shindorf's deposition.  We
8       see several photographs on the second page here.  Are these
9       documents that you have copyrighted?
10  A   Yes.
11  Q   Who took these photographs?
12  A   **Sundise Abrasives.**
13  Q   And you hold the copyright to these photographs?
14  A   **Yeah, they sold me the photographs.**
15  Q   Okay.  And with respect to selling you the photographs, is
16      there a license or any other documentation?  How was that
17      sale documented/memorialized?
18  A   **Well, it was documented with a purchase order and we**
19      **submitted that to the US -- United States Copyright Division**
20      **and they issued us the copyright for those photographs.**
21  Q   What about the ones --
22  A   **I'm sorry, I don't know if that is (indiscernible).  It was**
23      **like a car dealer thing, I don't know what that is.**
24  Q   And I was going to ask you about -- this was a document that
25      I think we found a little mysterious before.

Page 175

1   A   **Yeah.**
2   Q   It looks like -- it was in the pile.
3   A   **Okay.**
4   Q   But do you recognize the document that's currently on the
5       screen?
6   A   **No, I don't know what that is.**
7   Q   This is not something that you have any ownership of to the
8       best of your knowledge?
9   A   **No.**
10  Q   Are these photographs -- is this the material that you are
11      placing at issue in your copyright claim?
12  A   **Those are the photographs that were copyrighted, yes.**
13  Q   Are there any other documents of any kind, whether they take
14      any form, that are at issue in your copyright claim beyond
15      these photographs?
16  A   **For copyright, no; our copyright issue is specifically these**
17      **eight photographs.**
18  Q   Understandable.  And then in the very bottom it looks like
19      we have a purchase order, vendor Sundise Abrasives, shipped
20      to US Tool Depot, digital images ownership and then there
21      are eight images.  It looks like -- did you purchase the
22      photographs from Sundise in --
23  A   **Yes.**
24  Q   -- June of 2023?
25  A   **So again it was about two years ago so that could be**

Page 176

1       correct -- yeah; no, yes, that's correct; that's the right
2       date, yes.
3   Q   And this was after this lawsuit was filed; right?
4   A   **Yes.**
5   Q   So within the time that we've been litigating this case --
6       and I know it's been awhile -- you purchased these images
7       from Sundise; right?
8   A   **Yes.**
9   Q   You didn't hold any IP to them prior to that, did you?
10  A   **I did not.**
11  Q   And then after that point in time it was during the scope of
12      the lawsuit that you registered them and now you have a
13      counter-claim based on them; right?
14  A   **Correct.**
15          MR. CASCINI:  Let me take a quick five minutes,
16      Chris and Chris and Stacey, so that I can organize some
17      documents.
18          MR. LEVASSEUR:  Okay.
19          (Off the record)
20  BY MR. CASCINI:
21  Q   Mr. Stone, when you were operating LVA prior to the asset
22      sale, did you ever solicit -- or did you ever receive I
23      should say, orders via fax?
24  A   **I think we might have had a fax machine -- no, I don't think**
25      **we had a fax machine, I think we had a digital fax service.**

Tip of the Mitt Transcription
(231) 753-6957

Page 177

1  Q   And regardless of whether it was digital or a hard machine,
2      did you receive orders through that fax from time to time?
3  A   Yeah; I think it was rare but I think we did get, like a
4      few.
5  Q   And when you get a fax how would you know?  How would it
6      appear?
7  A   So I think it was sent as an email, like by whatever service
8      we used they -- to the best of my memory they converted it
9      to an email and sent it to us.
10 Q   And where was that email sent?
11 A   Boy I don't remember.
12 Q   If we take a look at Exhibit 5, are you able to see Exhibit
13     5 on the screen, the very first page?
14 A   Yes.
15 Q   It says here Mr. Shindorf asked you on Monday, November
16     24th, 2014, "When they're emailed to your personal account,
17     forward it to info.  Does the fax go to info or the personal
18     one?"  It says here, "The fax goes to my personal one";
19     right?  That's what you respond to him?
20 A   Yes.
21 Q   And by "the personal one," are you referring to your Hotmail
22     account?
23 A   I think so; I think that is what I'm referring to.  But that
24     was -- what? -- 11 years ago.  But I think that's correct.
25 Q   Is it safe to say that this email at least, regardless of

Page 178

1      what -- is there any reason to believe you would have
2      misrepresented to Mr. Shindorf where the faxes were being
3      sent?
4  A   No.
5  Q   Also, faxes that were intended for LVA were sent to your
6      Hotmail account; right?
7  A   Yes, but I don't even know if we were getting faxes, maybe
8      we would get them but it was pretty rare.
9  Q   We already learned that XP and US Tool both have websites;
10     right?
11 A   Yes.
12 Q   And we've already learned also that some of the copy that
13     you put on those websites comes from the manufacturers?
14 A   Yes.
15 Q   Others you wrote it personally; right?
16 A   Correct.
17 Q   Did anybody else write copy on either website on your
18     behalf; in other words, do you have an employee that does
19     that or would it all have been either you or manufacturer
20     copy?
21 A   So I did have -- I did have an employee who helped me, I
22     don't think he wrote copy.  I'm going to say it was me; I'm
23     going to say it was me.
24 Q   Okay.  Did you copy over any information from Allied's
25     product descriptions when making product descriptions for US

Page 179

1      Tool Depot or for XP?
2  A   So, no, but keep in mind I created those descriptions for
3      Allied when I created Lehigh Valley Abrasives.  So maybe I
4      used he same information in my head that I had then.
5  Q   But for the copy itself -- and I understand what you're
6      saying, which is obviously you can't sell an idea in its
7      purest form.  The copy itself, that you sold to Allied;
8      right?  There's no dispute about that as part of the asset
9      sale; right?
10 A   The descriptions?
11 Q   Correct.  The copy -- the intellectual --
12 A   Yeah.
13 Q   -- property created where --
14 A   I mean, it's not really intellectual -- it's a description,
15     it's not really intellectual property, but, yes, they
16     purchased the descriptions that I had wrote for the website.
17         (Deposition Exhibit 17 marked)
18 Q   I'm going to show you a document that I have marked as
19     Exhibit 17.  I do like that -- Mr. Stone, that neither one
20     of us has had to get on an airplane for the purposes of
21     today, but in all other ways a Zoom deposition is a pain in
22     the butt.  I know, by the way, that I'm the one that
23     requested it.  But it's just a general complaint out to the
24     universe.
25         MR. LEVASSEUR:  You just don't like New Jersey.

Page 180

1         MR. CASCINI:  Actually that's not true at all.  I
2      remember that -- I went to Columbia Law School, I had a
3      bunch of friends that lived over in New Jersey and the only
4      time I had ever traveled there prior was because -- I'd
5      heard all the jokes and things people would say about it,
6      and I remember always having a good time traveling and
7      visiting folks in New Jersey.  Wouldn't have (indiscernible)
8      voluntarily.
9  BY MR. CASCINI:
10 Q   Okay.  I've marked a document as Exhibit 17 and I'm about to
11     display that on the page here.  All right.  Mr. Stone, this
12     is a screen shot from a website.
13 A   Uh-huh (affirmative).
14 Q   Do you recognize which website this comes from?
15 A   Yes, that's XP Abrasives.
16 Q   Okay.  And then this is Premium Aluminum Oxide Resin Fiber
17     Disc; is that right?
18 A   Yes; that's what it says, yup.
19 Q   All right.  Fantastic.  So if we go down a little bit
20     there's language here that says, "These Lehigh Valley
21     Abrasives branded Aluminum Oxide Resin Fiber discs are
22     manufactured using premium German," blah, blah, blah.  Why
23     does that say "Lehigh Valley Abrasives branded"?
24 A   So again, I wrote the text so that's on me, but obviously I
25     spent ten years -- I created Lehigh Valley and I made a

45 (Pages 177 to 180)

Page 181

1  mistake and put Lehigh Valley instead of XP.
2  Q   Okay. You acknowledge had you wrote this copy?
3  A   Yes.
4  Q   And the testimony that you're giving today is that you just
5      accidentally put the wrong company name in there?
6  A   Yes.
7  Q   Would it be surprising at all if Allied has a product
8      description that's identical to this?
9  A   No. As I said -- I specifically said, yes, that would not
10     surprise me because I wrote both.
11 Q   Okay. And then also if we take a look at the URL for the
12     page we see two reference to LVA; one here (indicating), the
13     other at the end of the URL. Do you see where that is?
14 A   Yes.
15 Q   Why is that here? This is the -- this is the XP Abrasives
16     website.
17 A   Again, that's on me, that's a mistake on my part. I know we
18     asked in our discovery -- I know that you have a claim
19     against us for using some of your data and we asked for
20     which data that is and we never got an answer. But if I
21     made a mistake like in a case like this I would fix it. I'm
22     not sure what date this is or whether it's been fixed or
23     not, but that's on me making a mistake.
24 Q   How many mistakes like this are there on the XP Abrasives
25     website?

Page 182

1  A   That's a good question. I mean, I only see this one. I
2      don't know. Do you know? I don't know.
3  Q   And that's a fine answer if that's the truth, which is you
4      don't know? Is that a "yes" you do not know?
5  A   I don't know; yeah, that's correct, I don't know.
6  Q   Are there any errors like this on the US Tool Depot website
7      that you're aware of?
8  A   Not that I'm aware of, but it's possible.
9  Q   And you didn't copy this information from Allied Industrial,
10     is that your testimony today?
11 A   My testimony is I don't know -- I don't remember. And
12     again, I did some of the posting of the products and some
13     other people did some posting. But I will say either myself
14     or someone from my company did use a description from the
15     Allied website and put it here. I would agree with that.
16 Q   Do you know if you sold this period (sic) during the
17     non-competition period --
18 A   I did not, no; I did not.
19 Q   You don't dispute that you filed for paperwork with US
20     Customs for -- the name is completely eluding me. We just
21     gave tons of testimony about it. That's my fault, not
22     yours. Hold on just a moment. Flap discs. There is no
23     dispute that you filled out customs requests for there to be
24     flap discs imported during the non-competition period;
25     right?

Page 183

1  A   Correct.
2  Q   And at that time you hadn't -- is your testimony that you
3      hasn't completed sales of these products?
4  A   Correct.
5  Q   Had you had any conversation with customers during the
6      non-competition period to tell them, hey, I'll be ready to
7      run up shop as soon as that competition period is over?
8  A   No.
9  Q   Instead though you bought these products and just you kept
10     them on hand because you were getting ready to compete;
11     right?
12 A   Yeah, so I timed it so that they would come in after the
13     non-compete expired and I was able to sell them.
14         MR. CASCINI: All right. Can we just take a quick
15     maybe five minute/ten minute break? I am nearly done, I
16     just want to make sure that I wrap up anything remaining.
17     Chris, is that okay?
18         MR. LEVASSEUR: That's good, yup.
19         (Off the record)
20 BY MR. CASCINI:
21 Q   Mr. Stone, I'm going to ask you a question about the photos
22     that we just looked at that are at issue in your
23     Counter-Claim, those eight photos.
24 A   Yes.
25 Q   Do you know where Allied Industrial got the photos to use on

Page 184

1      their own website? Do you know where Allied received those
2      photos?
3  A   So initially when Allied purchased Lehigh Valley Abrasives
4      those photos were part of the Lehigh Valley Abrasives
5      website, subsequently Allied has created at least two new
6      websites I know of in which they copied those photos into
7      their new websites.
8  Q   And you do agree that when you completed the asset sale of
9      LVS (sic), LVS's intellectual property was sold to Allied;
10     correct?
11 A   When I completed the sale of LVA to Allied -- what was the
12     question again? I'm sorry.
13 Q   LVA's intellectual property was a portion of that sale, was
14     it not? That was (indiscernible) sold?
15 A   Yes. But that was not an LVA asset. Those were photos used
16     from a vendor with the vendor's permission. After I sold
17     Lehigh Valley Abrasives to Mr. Shindorf he had a
18     disagreement with Sundisc, he wasn't paying them and they
19     cut him off so he decided to start his own flap disc
20     business and make his own flap discs and went into
21     competition against Sundisc.
22 Q   Okay.
23 A   So Sundisc definitely did not want him to be using their
24     pictures on his website, they were competitors at that
25     point.

46 (Pages 181 to 184)

Page 185

1  Q   Okay.  Let me ask you a couple of questions related to that
2      then.  So do you know whether or not Sundisc and AIS, Allied
3      Industrial, had any communications asking them to cease and
4      desist using those photos?  Are you aware of whether or not
5      that's true?
6  A   I do not know that; no, I don't know.
7  Q   Were you privy to any conversations between AIS and Sundisc
8      related to anything at any time?
9  A   I don't know any conversation that AIS that with Sundisc,
10     no.  If that was the question.
11 Q   That's exactly the question, right.
12 A   Okay.
13 Q   So the root question that I asked was do you know where
14     Allied Industrial got the photos, and I believe the
15     testimony was that maybe they received some of them from LVS
16     (sic), but do you know where the rest of them came from?
17 A   I believe they were all from LVA.
18         MR. LEVASSEUR:  By the way, you've been saying LVS
19     and I assume you mean LVA.
20         MR. CASCINI:  Yeah.  Man, I think it's getting
21     late for everybody.  I understand.  Sorry, guys.  Yes, I
22     did.
23 BY MR. CASCINI:
24 Q   Mr. Stone, did you have any confusion about which company I
25     was asking you about when I was incorrectly referring to it

Page 186

1      as LVS?
2  A   I understood.
3  Q   Do you know whether -- well, since you acquired the
4      ownership rights, as demonstrated by the documentation, have
5      you sent demand letters demanding that anyone stop using
6      those photos that you now own?
7  A   Yeah, we listed that in our Complaint, that it's a
8      copyright -- that we have them copyrighted and to remove
9      then from his websites.
10 Q   You said you listed it in the Complaint, do you mean in the
11     Counter-Claim?
12 A   Yeah; yeah.
13 Q   Was there ever any communication other than in the
14     Counter-Claim?  Was there a demand letter send, was there
15     any notice sent?
16 A   No; not that I remember, no.
17 Q   Is there any way that prior to filing the Counter-Claim AIS
18     could have known that the ownership of those photos changed
19     hands?
20 A   They would not have known prior to the claim, but since the
21     claim and they know they have not removed the copyrighted
22     images from any of their websites.  And that's -- they've
23     known for like a year and a half.
24 Q   Who performed the web development and graphic design
25     services for XP Abrasives or US Tool Depot or they're

Page 187

1      different people?
2  A   So US Tool Depot there is none, it's just using the
3      templates from ecommerce; I developed it myself.  For XP
4      Abrasives I used a company called Web Adaptive.
5  Q   Where is Web Adaptive located?
6  A   They are located in the Baltimore, Maryland area.
7  Q   Did Web Adaptive write any of the copy or take any of the
8      photographs that are on the XP Abrasives website?
9  A   No.
10 Q   So either you acquired those from the manufacturers we've
11     talked about or you claim to have wrote them yourself; is
12     that right?
13 A   Yes; yes.
14 Q   Do you know what metadata is?  When I refer to a web page's
15     metadata do you know what that is and means?
16 A   Well, it can mean different things to different people, so
17     could you tell me your definition?
18 Q   Metadata as I understand the issue is that is data that is
19     not necessarily visible.  I mean, (indiscernible)
20     manifestation of the page, but it contained within the file
21     itself, it can uniquely identify files.
22 A   Okay.  Yup, I'm following you.
23 Q   Have you ever heard that term prior to me using it today?
24 A   I've heard the term but it can mean different things.  But I
25     understand now how you are defining it so I'm ready.

Page 188

1  Q   Is there any reason that material posted on XP Abrasives or
2      US Tool Depot's website would have metadata that is
3      identical to pages created by Allied Industrial that is
4      present on their website?
5  A   So, yeah, metadata -- there could be a lot of information
6      that is similar; like for example, flap disc four-and-a-half
7      inch, that's going to be within the metadata of both sites.
8      Some common terms are going to be found in both sites and in
9      competitor's sites.
10 Q   Would there be any reason that metadata unique to Allied
11     Industrial would be present on any web page used by US Tool?
12 A   I guess I would have to know what you mean by unique, you
13     know, because that can mean different things.
14 Q   Based on the knowledge you have now, can you think of any
15     rational explanation for that should that be the case?
16 A   So again, if we're talking about industry terms I would
17     expect to find them in both.  I'm not sure what you unique
18     data you're talking about, but if you told me I could tell
19     you.
20 Q   Did you ever direct anybody at Web Adaptive to scrape
21     consumer -- or product information from Allied Industrial's
22     web page to use it on the XP Abrasives web page?
23 A   No.
24 Q   Did you ever perform that function yourself?
25 A   No.

Christopher Stone - January 29, 2025

Page 189

1  Q   Do you know if anyone did in this process?  Are you aware,
2      do you have actual knowledge, that anyone ever has?
3  A   I don't have actual knowledge.  But like I said, I do
4      have -- I did have people help me and it's possible somebody
5      made a mistake, that I can't deny.  But I don't know
6      specifically what you're referring to.
7  Q   Who did you have helping you that you think -- or that may
8      have been responsible for a mistake like that?
9  A   So I had someone helping me called Kevin Daniel (phonetic),
10     he worked for me --
11 Q   I'm very sorry, I didn't let you finish.  That's my mistake.
12 A   He worked for me at US Tool Depot and he helped me with the
13     website and shipping products.
14 Q   Did you ever direct Mr. Daniel to take any information,
15     whether it's IP, copy, photographs or metadata from Allied
16     Industrial when constructing the US Tool Depot website?
17 A   No.
18 Q   Do you have any reason --
19 A   But keep in mind -- keep in mind we represent some of the
20     same products and we both get our pictures from the
21     manufacturer, so we would have some of the same pictures on
22     our websites.
23 Q   And that's consistent with the testimony you've already
24     given, sometimes that information comes from the
25     manufacturer, sometimes it's made by Allied Industrial.  But

Page 190

1      there wouldn't be any reason material made by Allied
2      Industrial would be on your website for US Tool Depot or XP
3      Abrasives; right?
4  A   Any materials such as, like, descriptions?  I'm not sure
5      what we're talking about here.
6  Q   Copy written by somebody at AIS, photographs taken by
7      somebody at AIS, metadata for websites created by somebody
8      at AIS, there would be no legitimate reason those would be
9      present on an XP Abrasives or US Tool Depot website; right?
10 A   So like I said, if something like that happened it would be
11     a mistake, an isolated mistake.  But we didn't do that
12     intentionally, no.
13 Q   You mentioned that you handed over the QuickBooks account to
14     AIS after you sold Lehigh's assets; correct?
15 A   Yes.
16 Q   And I believe that you said that you had a digital copy of
17     that -- there's like a desktop version and a web version;
18     right?
19 A   Correct; yeah.  So I needed the version, and Mr. Shindorf
20     knew this and he recognized it, to file my taxes I needed to
21     be able to have a version of -- I needed to have QuickBooks,
22     a version of the QuickBooks file.
23 Q   Okay.  And -- well, let's start here.  It was LVA's at first
24     when you owned it; right?
25 A   Yes.

Page 191

1  Q   And then you sold it to AIS; right?
2  A   Yes.
3  Q   And you gave them access to it at the time you sold it;
4      right?
5  A   Yeah, I gave them the QuickBooks file that they loaded into
6      their online version of QuickBooks.
7  Q   Did you retain a copy on your end?
8  A   I had a copy of the QuickBooks file that I needed to file my
9      taxes.
10 Q   Do you have it now?
11 A   No.
12 Q   When did you dispose of it and how?
13 A   Boy, again, so, you know, I sold the company 11 years ago, I
14     honestly don't remember that.
15 Q   Did you at any point in time affirmatively make the decision
16     to delete it?
17 A   I don't recall what happened to the QuickBook files from 11
18     years ago, I just don't remember.
19 Q   Is it possible, whether advertently or inadvertently, that
20     you've retained a copy of it?
21 A   Not that I -- I don't have a copy, no; I do not have a copy
22     of that I know of.  I mean, if it's in, like, a trash bin or
23     something somewhere that I don't know.  But I don't have a
24     copy of it.
25        MR. CASCINI:  I don't have anything else for you

Page 192

1      today, Mr. Stone.  Mr. LeVasseur, anything?
2          MR. LEVASSEUR:  No questions.
3          MR. CASCINI:  Mr. Stone, I appreciate your time
4      today.  Thank you for sitting down with us and I appreciate
5      especially that it's been a long day and thank you for
6      looking at documents with us.
7          THE WITNESS:  Thank you.
8          (Deposition concluded at 3:01 p.m.)
9
10         -0-0-0-
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

48  (Pages 189 to 192)

Christopher Stone - January 29, 2025

Page 193

CERTIFICATE

I, Stacey Seals, a Certified Electronic Recorder and
Notary Public within and for the State of Michigan, do
hereby certify:

That this transcript, consisting of 192 pages, is a
complete, true, and correct record of the deposition of
Christopher Stone, given in this case on January 29th, 2025,
and that the deponent was duly sworn to tell the truth.

I further certify that I am not related to any of the
parties to this action by blood or marriage; and that I am
not interested in the outcome of this matter, financial or
otherwise.

IN WITNESS THEREOF, I have hereunto set my hand this
7th day of February, 2025.

Stacey Seals, CER 7908
Notary Public, State of Michigan
County of Emmet
My commission expires: 10/31/2030

49 (Page 193)

Christopher Stone - January 29, 2025

**A**

**a.m** 1:21 6:2
125:1
**aac@hennlesp...**
3:5
**ability** 26:13
34:4 69:5
166:9
**able** 6:25 7:1
18:18,21 24:3
27:11 30:13
39:22,24 40:1
58:25 65:3
71:1 81:4 82:9
89:12 93:23
98:14 99:3,5,6
106:13 108:9
108:12 123:9
123:13,18,19
127:11 130:21
132:4 133:18
138:13 146:23
148:8 171:17
177:12 183:13
190:21
**abrasive** 18:17
19:18 20:8
24:19 28:8,16
38:4 40:15
46:2 82:23
87:11,12 90:21
90:22 91:8,11
91:12,18,19
92:2,3 161:11
162:4
**abrasives** 9:15
9:25 10:4,5,5
10:10,12,14
15:1 16:19,24
17:12,18 18:16
19:11,12,13
20:19 21:7
30:23 36:8,23
37:4,7 40:17
41:10 42:4
45:22 46:19

47:2,7,8 57:12
59:7 64:13
66:18 67:7
68:8 69:3 82:4
83:18 90:14,15
90:17,18,19,24
91:4,8,15,15
91:23,25 92:1
95:7,9,24 96:2
99:14 103:17
105:14 112:25
117:1,2,3
129:12 134:25
135:1 147:1
153:13,13,14
153:14,15,16
153:19,25
154:1,3,5,6
156:8,25 157:1
157:8 158:12
158:23 160:2
160:12 161:13
161:25 162:7
163:7,10,12
164:4,23 165:8
166:25 167:3
168:3,17
169:23 174:12
175:19 179:3
180:15,21,23
181:15,24
184:3,4,17
186:25 187:4,8
188:1,22 190:3
190:9
**absolute** 68:11
**absolutely**
129:17
**acceptable** 80:22
98:12
**accepted** 96:12
107:22 115:22
149:15
**access** 29:10
39:21 87:5
104:8 114:5

120:16,19
121:9,12,13,15
122:13 124:16
125:14 126:6
126:10,23
127:19 128:7,8
128:9 130:6,17
130:21 132:4
133:23 134:24
135:2,5,7,8
137:8 139:1,5
140:10 142:11
142:14,15
145:4 147:22
148:2,4,25
150:4,10,11,12
150:14 151:12
151:14,15,20
151:23,24
152:1,2,5,9,10
152:15,15
191:3
**accessed** 104:17
**accessories** 9:6
**accidentally**
181:5
**accidently** 59:8
**accommodate**
71:7,8
**account** 27:5
34:20 35:4,5
36:10,11 37:15
37:16 39:8,14
39:17,18,22
63:21 84:23,23
86:19 87:6
104:2,5,6,8,17
106:25 121:7
122:8,17,17
123:1,2,5
124:17 125:2
125:11,15,21
126:6,11,13,13
126:14,18,18
126:24,24
127:3,5,7,7,10

128:2,3,7,21
129:2,6,7,11
129:23,24
130:2,7,11,18
131:25 132:4
133:10,24
134:4,17,24
135:2,6,8,9
136:9,13,22,23
137:6,10,11,12
137:14,16,17
137:18,19,22
137:23 138:4,5
138:7,10,11,14
138:15,15,15
139:2,11,16
140:4,10,17,20
141:2,19,24
142:2,5,19
143:25 144:5,9
144:17 145:5
145:10,12,14
145:18 146:18
147:17,21
148:22,25
150:19 151:15
151:16 152:10
152:10,11,12
152:13 168:2
168:16 169:12
177:16,22
178:6 190:13
**accounting** 34:2
34:10 50:10
53:7,10
**accounts** 102:22
102:22 103:25
120:16,16,17
121:6,10
125:19 128:3,4
128:14 131:7
136:21 137:9
138:23
**accurate** 14:23
17:15 31:5
60:21 61:11,25

66:25 72:10,18
76:20 78:3
79:10 83:25
84:18,24 116:4
120:20 134:3
142:8 143:13
159:13,14
160:19 162:2
163:22 166:17
167:10
**accurately** 106:7
**acknowledge**
141:16 181:2
**acknowledgm...**
7:5
**acquire** 11:8
36:14,15 93:9
**acquired** 15:23
16:2 186:3
187:10
**acquisition**
92:19
**act** 126:10
127:24 173:18
**action** 193:14
**activities** 17:3
109:1 154:9
**activity** 28:8
144:4
**acts** 43:22
**actual** 77:11
93:2 110:5
189:2,3
**Adaptive** 187:4
187:5,7 188:20
**add** 57:15,18
**added** 41:4
53:14 56:19
**adding** 53:13
**addition** 85:18
91:23 110:3
127:8 149:16
**additional** 103:3
**address** 33:8
35:22 36:16
37:1,23 39:7

Christopher Stone - January 29, 2025

| | | | | |
|---|---|---|---|---|
| 74:14 76:8 | 103:14,15,25 | 109:2,4,12 | 117:18,23 | 44:1 84:4 |
| 77:1,1 78:5 | 104:1,4,9,17 | 110:1 112:10 | 121:9 130:14 | 85:24 106:3 |
| 79:1,3 85:14 | 104:25 137:19 | 113:17,24 | 130:17 166:10 | 110:18 111:1 |
| 85:17,18,20 | 145:19 155:22 | 115:4,9,10,13 | 167:9,19 | 111:11,19 |
| 86:13 87:4 | 155:23 | 115:16 116:11 | 168:22 169:2 | 134:14 140:11 |
| 104:16,18,19 | **affect** 150:12 | 116:14,17,22 | 169:19 172:15 | 140:13,20,23 |
| 124:20,23 | **affirm** 8:3 | 117:10 118:6 | 179:3,7 181:7 | 144:25 152:14 |
| 126:4 129:18 | **affirmative** | 120:22 125:20 | 182:9,15 | 156:6,11 |
| 130:5 131:21 | 157:18 180:13 | 134:8 138:21 | 183:25 184:1,3 | 163:21 165:12 |
| 133:7,13 | **affirmatively** | 149:18 151:9 | 184:5,9,11 | 165:12 172:3 |
| 134:11 136:1,2 | 191:15 | 152:5 | 185:2,14 188:3 | 181:20 182:3 |
| 148:13 168:7 | **afternoon** 170:6 | **agreements** 65:4 | 188:10,21 | **answered** 66:2 |
| 171:13 | **ago** 11:17 16:11 | 65:12 66:12,12 | 189:15,25 | **answering** |
| **addresses** 35:24 | 26:7 43:12 | 67:11 68:16 | 190:1 | 172:24 |
| 35:25 37:11,17 | 66:1 68:18 | 69:2,13 99:23 | **Allied's** 96:21 | **answers** 6:18 |
| 86:23,24 | 87:3 94:25 | **Ah** 15:22 16:1 | 169:24 178:24 | 143:13,17 |
| 128:11 131:21 | 133:3 168:6 | 46:24 65:4 | **Alllied** 133:6 | **ANTHONY** 3:3 |
| 139:9 165:1,6 | 173:25,25 | **ahead** 32:17 | **allocating** | **anticipated** 6:22 |
| 166:11,20 | 175:25 177:24 | 110:18 122:20 | 101:22 | **anticipating** |
| **addressing** | 191:13,18 | 140:23 | **allocation** 100:8 | 70:8 |
| 171:5 | **agree** 102:23 | **Aid** 158:14 | 101:17 | **anybody** 40:6 |
| **adhes-** 22:3 | 112:19 134:3 | **ain't** 125:25,25 | **allowed** 29:5 | 141:22 178:17 |
| **adjacent** 91:24 | 134:15 150:13 | **air** 18:1 | **allows** 29:20 | 188:20 |
| **admit** 166:19 | 150:20 182:15 | **airplane** 179:20 | **Altavista** 59:22 | **anymore** 68:22 |
| **admittedly** | 184:8 | **AIS** 114:15,16 | **alter** 116:16 | 118:9 129:11 |
| 133:12 | **agreed** 110:11 | 115:12 116:24 | **Aluminum** | 146:3 151:10 |
| **advantage** 50:23 | 113:1 149:21 | 185:2,7,9 | 180:16,21 | **anytime** 129:1 |
| **advertently** | 150:21 173:5 | 186:17 190:6,7 | **America** 119:2 | **anyway** 149:19 |
| 191:19 | **agreement** 4:9 | 190:8,14 191:1 | **American** 75:15 | **apologies** 37:14 |
| **advertise** 58:13 | 4:10,11,12 | **allegation** | 75:24 76:5,22 | **apologize** 6:15 |
| 103:15 156:2 | 10:16 12:21,22 | 127:18 | 77:25 | 36:1 50:8 53:9 |
| **advertised** 50:3 | 15:9,14,16,19 | **allege** 131:6 | **amount** 11:16 | 72:13 85:23 |
| 95:3,9,13 96:3 | 16:7 64:25 | **allegedly** 164:1 | 12:12 52:8 | 88:11 107:18 |
| 156:1 159:13 | 65:2,14,17 | **Allied** 1:3,13 6:5 | 62:19 63:22 | 109:24 113:12 |
| 160:9 | 66:15,24 67:6 | 10:13 66:6,10 | 84:11 89:24 | 128:23 |
| **advertisement** | 67:9,10,15,22 | 66:10,15,22 | 97:18 110:5 | **appear** 59:23 |
| 103:12 158:1 | 68:3,6,13 | 67:8,11 69:10 | **Andrew** 3:3 6:4 | 62:13,24 177:6 |
| **advertises** 95:14 | 69:12,25 93:16 | 69:11 92:25 | 77:9 | **APPEARANC...** |
| **advertising** | 97:4,5,6,23 | 93:1,3,16 96:5 | **animal** 42:8 | 3:1 |
| 56:25 59:3 | 98:2,25 99:13 | 97:24 99:13,16 | **annual** 51:14,19 | **appeared** 60:3 |
| 74:5 103:10,21 | 99:15,16,22,24 | 101:1,14 102:1 | 52:8 | **appears** 60:3 |
| 162:21 | 100:11,15 | 105:7 107:15 | **answer** 6:18 7:3 | 103:8 147:10 |
| **advice** 88:7 | 101:6,13 | 108:1,5,21 | 7:6,25 10:8 | **applicable** 44:24 |
| **advise** 87:20 | 102:18 105:9 | 110:9 112:20 | 12:1 19:8 | **application** 91:4 |
| **AdWords** | 105:11 108:4,4 | 113:8 114:20 | 26:12 38:11,21 | 157:16 |
| 102:22 103:5 | 108:5,11,20 | 116:8 117:1,4 | 38:25 39:4 | **applications** |

Christopher Stone - January 29, 2025

105:16
applied 19:18
applies 109:9
apply 6:10
  105:13
appreciate 6:16
  70:21 146:9
  192:3,4
approach 41:12
approached
  26:18
appropriate
  157:19,23,25
  159:22 160:3
  160:18
approximate
  16:14 63:8
  141:11
approximately
  9:25 17:14
  20:22 26:11
  36:13 43:7
  47:21 51:14
  63:5,10 73:7,8
  88:9 92:22
  94:21 141:10
  173:25
approximates
  74:2
approximation
  11:24,25 26:9
  63:20
approximations
  21:6
architecture
  29:24
area 19:13 21:21
  32:6 42:13
  45:4,7 60:6
  119:7 143:10
  187:6
areas 21:21
  34:18,22 42:5
argue 137:1
arrangement
  67:14 114:2

arrive 81:25
arrived 89:20
art 82:17 111:5
  144:14
article 60:5
  61:13
articles 60:4
  61:9,22 62:3
asked 14:15 32:7
  49:3 50:8 55:7
  56:19 66:8
  72:13 85:24
  92:11 106:1
  117:9 120:19
  124:25 125:14
  128:6 134:9,10
  135:7 140:21
  156:5 169:22
  169:25 172:9
  172:19 177:15
  181:18,19
  185:13
asking 7:18 15:8
  63:7 85:22,25
  92:8 97:21
  125:6 129:1
  137:1 140:22
  142:12 144:9
  145:3 146:1
  160:5,6 164:17
  164:18 166:13
  170:2 173:7
  185:3,25
asks 136:8
asset 4:9 10:15
  10:16 15:23
  66:20 67:12,14
  98:24 99:12,16
  99:22 100:7,8
  100:15 101:10
  101:16,17
  102:14 103:14
  106:21 108:3
  114:16,24
  116:24 120:4
  120:21 132:1

134:5,7 176:21
  179:8 184:8,15
assets 32:20 34:9
  51:5 69:7
  79:13 92:20,22
  99:17 100:13
  101:13 102:7
  105:7 106:25
  107:1,2,25
  114:1 134:1
  190:14
assign 54:6,14
assigned 101:21
associated 17:24
  31:10 33:19
  45:17 48:6
  86:25 128:4,5
association
  58:14
assume 7:24
  69:10 83:21
  110:8 145:24
  185:19
attempt 138:6
attention 116:6
  125:13 174:7
attestation
  126:22
attorney 6:4
  7:21 18:1
  111:16 112:2
  115:2 131:14
  143:21 149:11
  149:12,12,13
  164:19
attorney-client
  143:11
attorneys 145:4
attraction 95:11
audio 6:25 40:12
audit 101:25
  102:4
August 115:11
  168:23 170:4,5
  170:8 172:17
authorities

61:18
authority 151:19
auto 44:8 78:20
automated
  79:20 82:9
  83:16,18 89:6
automatically
  33:9,14 79:17
  79:17 83:19
automobile
  42:18
availability 63:2
available 58:18
  75:11 157:15
Ave 3:4
avenues 57:9
average 52:9
  84:17 90:2
  154:8
avoid 150:21,24
  152:8
aware 97:14
  143:2,3 182:7
  182:8 185:4
  189:1
awhile 93:25
  176:6

**B**

B 108:12
back 6:15 9:8
  15:18 18:13
  26:4,24 28:14
  28:20 32:1
  33:3 47:14
  59:22 69:13
  73:5,19 76:3
  77:18 80:21
  81:9 82:19
  86:8 87:18
  92:17 100:10
  114:20,21
  115:2 118:22
  120:21 129:11
  130:5,11,23
  131:4 132:25

136:4 138:13
  138:14,17
  139:2,16 142:5
  146:15 149:12
  150:7 152:12
  152:12 155:3
  161:6 163:10
background
  8:11 99:22
backing 19:15
  157:15
bad 85:25
bag 47:12
balance 114:22
ballpark 11:18
  15:2 51:12,16
  52:10 63:14
  84:10
Baltimore 187:6
Bank 149:13
base 58:12
based 13:4 35:6
  38:13,14 41:14
  69:4 73:18
  76:6 89:3,18
  176:13 188:14
basement 27:17
  27:19 42:25
  56:10
basic 103:7
basically 19:13
  31:3 34:1 52:6
  89:24 91:5
  93:21 96:1
  110:8 131:10
basis 51:19
  102:10 117:15
  120:5,5,5
  148:22
batteries 45:20
  45:21
Beacut 170:14
bear 98:17 132:9
bearing 151:25
beat 166:13
began 40:21

Christopher Stone - January 29, 2025

**beginning** 24:13
66:3 94:5
103:1 124:4
**behalf** 167:5
168:2 178:18
**believe** 11:4
15:17 16:14
17:22 58:8
68:15 79:21
91:22 92:23
102:6,15,25
104:11 106:4
119:25 120:7
122:5,24
127:22,24
129:13 137:4
147:19 150:25
152:24 153:23
158:6,25 159:3
163:1,1 167:8
173:25 178:1
185:14,17
190:16
**belt** 156:13,14
156:14 157:1
158:4
**benefit** 107:21
**best** 11:22 26:12
42:23 47:23,24
69:19,21 72:11
72:15,19 73:2
73:16 74:1
124:18,20,21
138:11 141:14
142:22 175:8
177:8
**Bethlehem** 8:20
**bevel** 157:17
**beyond** 111:22
150:5 175:14
**bid** 27:8,10
96:24 97:11,24
**bidders** 97:8
**bids** 97:25
**big** 18:18,23
23:20 24:2,2

27:22 31:13
41:9 42:12,15
42:17,19,20
44:20 45:23
50:14,18,22
54:10 55:9,11
55:16,23 71:19
75:4,17 84:23
85:7,8,20
121:22 122:2,7
122:11 149:8
167:17
**bigger** 26:18
146:24
**biggest** 62:19
64:2
**bill** 104:7
**bills** 45:12
105:15
**bin** 191:22
**binding** 22:2
**biographical**
8:10
**bit** 6:9 9:21 17:1
18:13 42:16
77:19 78:23
81:11 85:25
87:18 92:16
124:25 157:6
170:10 180:19
**Biz** 95:18
**blah** 180:22,22
180:22
**blank** 46:25
**blast** 75:6
**blasted** 74:6
**blend** 159:4
**block** 123:22
132:23
**blood** 193:14
**board** 17:6 73:9
**bob@gmail**
104:25
**boom** 78:20
132:21,21,21
132:22,22

**boost** 85:8
**border** 8:20
**bottom** 69:22
100:4 101:16
112:17 113:11
123:25 132:25
133:3 166:7
175:18
**bought** 12:19
33:6 65:5
66:10 67:8
78:24 183:9
**box** 83:6,20,20
83:24
**Boy** 26:6 177:11
191:13
**branded** 82:1
180:21,23
**brass** 159:5
**breach** 110:2,9
**break** 28:23 70:7
70:12,17 74:23
80:17,18 81:3
146:8 183:15
**breakdown**
73:12
**breaking** 97:5
**breaks** 52:23
71:1,3
**brief** 147:21,22
**briefly** 99:19
**bring** 17:21
**broad** 19:9
105:6
**broaden** 144:3
**broker** 93:14,14
93:18 94:10,11
94:21 95:14
**Brokers** 94:13
**bronze** 159:5
**brother-in-law**
36:19
**brought** 102:13
115:24
**budgeting**
148:16

**buffs** 45:10
**building** 118:18
118:20
**built** 131:11
**bunch** 163:13
180:3
**business** 8:23
10:24 15:12
21:8 22:18,20
23:4,17 25:25
26:10 27:16
34:2 42:23
47:7 50:25
61:16,25 64:13
93:9 94:13,14
95:3,14,23
97:23 101:22
102:1 103:22
103:23 107:23
117:20 118:1
119:2,21,24
128:14 131:25
133:24 134:1,5
134:17 135:10
135:14,18,21
136:3 137:19
144:4 148:16
155:13,15
168:1 170:17
170:18 184:20
**businesses** 8:24
9:11,13
**butt** 179:22
**buy** 11:12 25:23
26:17 32:7
41:3 44:21
45:10 56:2
58:25 59:4
78:25 81:20,22
95:18
**buyer** 33:8
**buying** 25:18
29:23 41:2,11
42:20 44:20
95:21

<table>
<tr><td align="center">**C**</td></tr>
</table>

**C-H-R-I-S-T-...**
8:13
**cabinet** 65:21
**calculate** 110:2
**call** 19:24 32:9
32:13 33:2,21
34:19,23 35:6
35:11 38:13,16
65:13 87:20
88:4 90:5,6,8
116:6 161:5
**called** 8:7 9:16
10:21 18:19
20:18 21:22
29:4 30:18
32:5,6 43:5
45:10 53:3
58:15,20 67:19
187:4 189:9
**calling** 58:19
125:13
**calls** 110:15,22
**camera** 7:12
**candid** 96:17
**capital** 44:10,19
45:23
**capsul** 49:23
**captured** 99:21
**car** 174:23
**carbide** 91:21
**carbon** 159:5
**card** 104:6
**care** 148:17
**career** 36:7 41:8
**careful** 35:10
124:11 143:9
**carefully** 24:10
**carries** 112:14
**cart** 30:1
**carved** 67:14
**CASCIINI** 98:5
120:9 135:15
**Cascini** 3:3 4:4
6:3,4,21 7:10
7:15,18 8:9

Christopher Stone - January 29, 2025

28:12 70:8,14
70:21,25 77:16
77:21 80:16,20
80:24 81:2
88:11,14 98:16
98:20 99:2
108:9 110:16
110:17,24,25
111:21 120:13
122:21 128:19
135:16 138:2
140:1,14,24
143:18 144:13
144:16 145:2
146:6,11,13,15
146:17 164:13
164:15 165:13
171:15 176:15
176:20 180:1,9
183:14,20
185:20,23
191:25 192:3
**case** 1:5 6:5
31:21 33:24
72:3 98:23
126:11 128:7
145:9 159:23
176:5 181:21
188:15 193:10
**catalog** 56:18,19
88:16
**categorically**
46:10
**categories** 92:17
101:9,17 102:7
105:7 163:13
163:16
**categorized**
95:24
**cease** 185:3
**ceased** 16:18
**cell** 133:25
**center** 108:17
**centrifugal** 13:6
**CER** 2:1 193:22
**ceramic** 88:21

**certain** 20:4
30:16 38:14
42:5 45:6
49:13 108:25
108:25
**certainly** 48:4
76:14 136:25
161:5
**CERTIFICATE**
193:1
**Certified** 2:1
193:4
**certify** 193:6,13
**cetera** 54:12
**chains** 123:24
**challenging**
99:10
**chance** 128:24
**change** 39:4
51:1,18 92:16
104:23,24
105:3 128:10
138:14 151:17
158:13
**changed** 61:4
104:14 117:25
126:12 127:19
127:25 130:19
131:6 137:5
149:7,8,18
150:3 151:8,11
151:11,13,16
155:19 186:18
**changes** 38:24
**changing** 126:17
**characterize**
135:22 136:2
**charge** 23:23
30:8 82:13
117:12
**charged** 79:21
**charities** 17:7
**check** 18:3 143:1
143:15
**checked** 142:21
**checks** 149:20

**Chemical** 149:13
**choose** 18:8
28:22 64:5
157:5
**choosing** 89:2
**Chris** 28:10,13
36:23 38:3
40:12 66:2
67:6 70:12,14
70:22 86:25
111:18 120:9
123:11 134:21
146:25 148:10
164:13 165:9
165:10,19
176:16,16
183:17
**Chrises** 70:15
**Christ** 132:15
**Christopher** 1:7
1:10,18 3:7 8:6
8:13 68:7
99:14 100:4
115:12 171:18
193:10
**church** 17:6
130:4 137:15
148:16
**circling** 92:17
**circulate** 98:10
**circumstance**
34:25 49:20
**circumstances**
35:3 38:14
166:1
**claim** 173:24
175:11,14
181:18 186:20
186:21 187:11
**claims** 116:9
**clarification**
144:7
**clarify** 34:16
38:24 77:9,16
90:5 159:23
**clarity** 71:18

**clause** 113:11
**clean** 20:3 21:24
21:25 148:22
150:13,18
151:20,21,22
151:24
**cleaning** 22:6,7
22:10 31:1
46:19
**cleanup** 19:25
20:6 22:6
**clear** 55:14 76:9
77:20 82:16
122:22 144:25
**clearly** 136:23
**clevasseur@st...**
3:9
**client** 136:25
140:20
**clients** 25:8
37:18 78:18,20
169:24
**close** 8:19 45:17
60:21 121:11
164:14
**closed** 134:6
**closer** 91:3
**closing** 102:21
103:2 107:24
109:16 120:23
121:11 125:16
128:2,6 134:12
134:19 135:6,7
135:11
**cloth** 159:2
**cloud** 65:19
**cls** 123:1
**clslcs200@gmail**
104:24
**clslcs2000@g...**
104:12
**clslcs2000@ho...**
36:12 147:16
**clslsc2000@ho...**
37:14
**coat** 159:3

**coated** 19:13
20:8
**code** 48:6,6
**coffee** 30:21
**cold** 58:19
**collected** 74:12
**college** 11:12,12
52:23,25 53:1
53:2,3
**Columbia** 180:2
**com** 120:24
**come** 9:8 10:9,12
11:8 18:4,12
21:20 29:16
36:9,25 39:24
47:11 48:19
52:18 54:24
58:23 59:9,19
59:22 60:12,24
67:3 79:18
80:21 83:6
87:24 93:7
103:12,13
118:2 119:4
125:1 128:17
128:21 135:20
136:8 139:17
155:17 158:10
183:12
**comes** 61:14
98:5 147:6
178:13 180:14
189:24
**comfortable**
97:5
**coming** 57:1
67:15 81:6
**Commerce**
50:14,18,22
54:10 55:9,10
55:11,17,23
71:19 72:7
75:4 84:23
85:7,8,21
121:22 122:2,7
122:11

Christopher Stone - January 29, 2025

commission 193:23
commitments 133:22
common 30:17 42:2 88:4 91:25 188:8
communicating 133:9 139:8
communication 88:3 96:22 120:3 186:13
communications 78:3 120:15 143:22 167:18 172:13 173:7 185:3
companies 13:14 14:16 16:5 22:22,24 23:1 23:21,25 29:2 32:5 41:12 45:11 59:13 60:20 61:17,18 61:20 62:14 83:2 87:20 91:10,10,13 95:8 97:1
company 9:16 10:6 11:6,13 12:7 13:19,24 13:25 15:17,19 15:23 16:12,22 18:21,25 20:18 25:19 29:3,3,4 31:20 32:4 35:8 36:22 41:11 47:15,20 48:2 50:17 51:19,22 52:12 53:12 54:22 62:11 64:25 66:10 67:20,20 68:14 69:23 76:11 86:21 88:3 92:23

93:13,14,22 94:1,12,19 95:12,20 104:14 113:1,1 113:1,16,19,21 114:1,20 117:3 117:6,7,13,16 118:4,10,20 125:16,22 128:4 131:11 134:11 136:21 136:22,23 140:6 149:9 153:11,14,21 170:16 173:8 181:5 182:14 185:24 187:4 191:13
company's 14:10 43:13 113:18
compare 166:10
compared 19:4
comparing 62:13
comparison 61:7 62:14
compensated 117:12
compensation 12:11 114:16
compete 183:10
competition 183:7 184:21
competitive 23:12 82:6,10
competitor 24:24
competitor's 188:9
competitors 19:2 21:5 60:19 61:3,5 184:24
complaint 179:23 186:7 186:10

complete 7:2,7 71:25 193:9
completed 6:17 51:4,7,8 86:12 116:20,25 120:4 125:18 143:16 164:2 183:3 184:8,11
completely 16:18 38:23 107:23 171:11 173:5,13 182:20
complex 15:12
component 97:11
comprehensive 121:23
compromise 151:2
concede 137:18
concept 31:23
concern 15:13 44:24
concerning 134:23 148:13 172:13
concerns 7:15 44:25
concluded 192:8
conclusion 110:15,23
conclusions 126:22
concrete 91:20 92:10
conditioning 18:2
conduct 108:25 154:14 168:1
conducted 7:16
conducting 6:7
confidentiality 4:10 108:11 148:15
configurations

88:15
confuse 136:6
confused 170:6 170:10
confusing 111:6
confusingly 112:8
confusion 77:10 185:24
connection 114:14 155:13 172:3
consecutively 112:14
consider 8:21 94:8 133:25
consideration 12:8 108:21 113:2
considered 60:5 134:4
considering 129:16
consistent 139:12 189:23
consisting 193:8
constructing 189:16
consultancy 12:21
consultant 87:14 112:23 113:8 113:18 114:12 116:21,24 121:18 131:19
consultants 113:19
consultation 15:8 113:24 114:2
consulting 4:11 108:5 112:10 112:20
consumables 9:6
consumer 18:18 81:25 188:21

contact 37:5 94:21 96:5,8 165:6
contacted 56:14
contacts 58:9,10 165:2
contained 54:8 106:17 109:25 138:3 187:20
containing 145:13
contains 172:18
contemporane... 85:1 108:3
CONTENTS 4:1
continue 89:10
continuing 110:3
continuously 145:9
contour 162:17
contract 16:11 30:7 97:19 100:17 114:23 125:17 128:1,6 136:18,18
contracting 13:20
contracts 100:19
contractural 25:22
contrary 136:25
control 50:11 51:4 137:9,11 138:6,9 140:10 141:2,18 145:10,12 152:13 158:24 160:13 162:11 163:17
controlled 23:22 46:23 140:19 163:10
conversation 7:5 70:23 133:13 138:18,21,24

Christopher Stone - January 29, 2025

138:25 183:5
185:9
**conversations**
120:19 131:24
164:19 185:7
**convert** 65:22
**converted** 177:8
**cool** 98:17
133:21
**copied** 184:6
**copies** 165:1
172:10,19
**copy** 31:10,11
34:21 48:11,15
49:7,11,12,18
49:21,21 50:1
50:4 53:20
54:2,2 64:12
65:15,16 68:16
85:21 95:22
159:15 162:20
162:21 169:7
178:12,17,20
178:22,24
179:5,7,11
181:2 182:9
187:7 189:15
190:6,16 191:7
191:8,20,21,21
191:24
**copyright** 4:22
173:18 174:13
174:19,20
175:11,14,16
175:16 186:8
**copyrighted**
173:22 174:1,9
175:12 186:8
186:21
**copyrights**
105:16 173:23
**core** 45:16 46:18
**corporate** 66:18
**corporation** 9:1
9:17,19 10:21
10:23 11:10

12:4,6 15:16
18:14 25:12
135:25
**correct** 10:22
11:3,6,7 13:10
15:6 16:3,5,6
20:14,23,25
23:14,15 24:16
24:17,20,21
25:2,4 26:2
27:9,12 28:1
29:11 30:5
31:18 32:25
34:2,3,7 35:19
41:18,21 47:9
48:7,8,13 49:1
49:9 51:25
53:19 58:11
59:6 60:13
62:21 63:1,3,4
65:6 68:2 69:8
69:11 70:3
71:20,23 73:13
73:14 75:2,7
75:10 76:9
80:12 81:15
82:20,21 83:4
83:16 86:14
94:3,4 96:7,25
100:8 101:10
102:12 104:20
107:17 108:1
109:5 116:5,18
119:23 120:2
120:11 121:19
121:20,20,25
122:3,4 123:3
123:5 125:8
126:5 127:21
127:22,23
130:9 137:25
138:7 145:21
145:22 146:4
147:18,23,24
151:7 152:3,17
153:9 157:25

159:6 164:6
173:15,19
176:1,1,14
177:24 178:16
179:11 182:5
183:1,4 184:10
190:14,19
193:9
**corrected** 24:11
**correctly** 20:20
84:3 133:14
**correspondence**
125:12 167:1
172:20
**cost** 20:22 23:12
81:21 149:25
**costs** 81:24
**counsel** 111:6,10
143:23
**counter** 62:18
**counter-claim**
173:15,17
176:13 183:23
186:11,14,17
**Counter-Defe...**
3:3
**Counter-Plain...**
3:7
**countries** 119:25
**country** 25:14
25:16 37:8
119:2,12,21
**county** 14:13
193:23
**couoqually**
131:16
**couple** 47:20
57:24 81:3,8
146:7 185:1
**course** 107:23
117:19 173:9
**court** 1:1 6:23
8:12 149:15
150:2 173:10
**covenants**
109:23,25

**cover** 111:12
**crazy** 158:21
**create** 19:22,23
29:9 38:9 54:2
54:25
**created** 17:19,25
19:17 35:15
38:6 55:20
86:20,21 179:2
179:3,13
180:25 184:5
188:3 190:7
**creating** 33:25
**credit** 104:6
**criteria** 30:16
88:25
**critical** 151:23
**cross** 6:13
**current** 172:13
**currently** 56:18
57:15 68:15,17
168:1 175:4
**cursor** 106:13
**custom** 76:5
77:25 102:23
**customer** 13:23
29:20,22 34:5
41:22 43:22
44:11 56:13
57:22 58:3,12
62:8 63:22
64:8 74:6,25
76:8 78:5,24
79:4 81:19
83:8 85:16
87:11 89:11
92:8 106:11,17
106:18,19,20
117:16,17
119:11 135:20
160:20 164:9
164:24 165:2
165:20
**customer's**
89:20
**customers** 13:11

13:15 14:15
17:22 21:5
23:12 24:3,23
25:8 26:1,5,9
26:10,18,21
27:10 32:3,8
34:16 36:8,14
36:15 40:22,22
41:1,13 45:6
58:10,21 63:5
63:6,11,16,19
63:21,23 64:2
64:7,9 71:14
71:25 74:4,12
74:15,19 75:21
76:16,19 81:14
81:17 85:6
88:3,7 92:11
117:5,20 119:4
119:7 129:20
130:8,12
144:18,20
155:12 160:25
161:5 165:7
166:11,21,24
167:1,2,2,9,11
167:13,19,21
167:24 171:6,7
172:14 183:5
**customs** 182:20
182:23
**cut** 40:12,25
128:24 156:11
184:19
**cutoff** 50:14
**cutting** 41:1,3,4
41:7
**cylindrical** 42:6
42:19 44:3,5
46:7,11,15
47:10

---
**D**
---
**d** 112:8 116:7
**daily** 120:4
148:22

Christopher Stone - January 29, 2025

damages 109:21
110:2,5,5,11
111:2
damn 18:2
Daniel 189:9,14
data 35:12 54:11
61:18 71:15
72:25 106:18
106:19 107:4
139:2,6 166:8
173:7,8 181:19
181:20 187:18
188:18
database 40:8,9
54:5 55:7,15
56:5,15 65:11
65:13 71:21,22
72:7 73:22,24
84:22 102:22
107:8 167:16
databases 72:4
107:4,7 166:19
167:15,16
date 47:19
107:24 123:12
124:1 134:22
141:16 153:3
153:23 155:3
163:18 171:22
171:23 176:2
181:22
dated 149:4
dates 15:1 16:14
16:15 141:14
153:17 164:24
167:6
day 97:10 117:8
117:8 120:7
131:2 136:10
192:5 193:19
day's 118:3
day-to-day
117:15
days 26:3 29:18
30:10 32:14
35:8 51:13

58:9 59:25
60:10 61:2
84:16 88:2
114:25 118:5
dead 166:13
deal 10:15 24:6
30:23 90:11
dealer 174:23
dealing 44:7
debt 97:17
deburr 159:4
December
153:19 154:4
155:6
decide 93:18
167:4
decided 93:19
94:7 97:22
118:8 124:22
150:1 151:9
184:19
decision 191:15
decisions 53:14
default 114:18
114:25 115:17
131:15 133:15
149:14 164:1
defaulted 97:17
131:10,12
149:8
defaults 115:20
Defendant 1:8
1:14 171:18
Defendant/ 3:7
defining 187:25
definitely 61:2
184:23
definition
187:17
delay 6:9
delete 79:25 80:1
145:13 148:3
191:16
deleted 79:17
80:7,9 127:9
130:5,13 142:6

142:7,9,9,14
142:25 145:15
147:20
delicate 159:6
deliver 46:7
113:19,20
delivers 159:2
delivery 89:24
90:3
demand 186:5
186:14
demanding
186:5
demonstrated
186:4
demonstrates
33:5
denote 98:9
denotes 40:2
dense 157:19
deny 189:5
dep 7:13 71:6
112:9 127:11
department
21:22,23 41:9
depend 84:4
deponent 193:11
deposition 1:17
4:9,10,11,12
4:13,14,15,16
4:17,18,19,20
4:21,22,24 5:1
5:2 6:6,11 7:16
98:19 108:8
112:6 115:7
120:12 127:8
132:8 146:21
147:25 148:7
156:20 158:7
160:17 161:18
163:3 165:16
169:9 171:14
173:11 174:4,7
179:17,21
192:8 193:9
Depot 8:25 9:1,3

9:4,9,11,14
16:23 152:24
153:2 155:8,14
155:17,22
156:2,2 164:4
164:23 165:7
166:24 168:3
168:17 169:23
172:15 175:20
179:1 182:6
186:25 187:2
189:12,16
190:2,9
Depot's 188:2
depth 86:11
derive 22:20
23:3 61:25
derived 60:15,23
deriving 24:4
describe 39:1
95:4 116:20
described 53:18
55:15 95:23
describing 49:4
64:12 87:25
description 4:7
29:14,22 30:19
31:5,8,15,21
48:11,14,18,20
48:21 53:9
54:20 179:14
181:8 182:14
descriptions
18:9,11 28:23
49:6,15 54:12
62:4,5 178:25
178:25 179:2
179:10,16
190:4
design 84:6
186:24
designed 13:3
91:16 151:1
158:22
designing 29:25
designs 106:15

desist 185:4
desktop 121:13
190:17
detail 21:18
143:1
details 111:9
165:14 169:25
determine 18:19
62:22 139:15
139:20 140:16
144:1,17
determining
62:12
detour 31:25
develop 18:25
developed 20:18
46:13 59:12
187:3
developing 18:6
development
186:24
diameter 30:22
88:23 89:15
difference 20:25
21:2 90:21
differences
166:9
different 7:19
17:7,24 18:17
19:12,21 20:2
21:21 22:12
42:8 48:19,20
48:21 49:4,5
55:12 57:24
63:5 84:11,11
85:22,25 88:21
88:22 89:5,5
90:18,20 91:8
91:12,16,16,21
91:25 92:17
93:15,15,25
96:20 97:21
99:10 101:17
117:22 125:8
128:25 134:13
139:18 140:11

162:7 163:11 163:13 171:4,4 171:11 173:4,6 173:13 187:1 187:16,16,24 188:13
**differently** 89:3
**difficult** 91:3 110:1
**difficulty** 7:10
**digital** 29:9 175:20 176:25 177:1 190:16
**digits** 137:24
**diligence** 134:8 136:16,17
**dimensions** 38:4
**diminished** 61:7 61:8
**diminishes** 159:3
**dinner** 85:3
**dipped** 128:24
**direct** 43:6,24 53:17 58:17 59:9,13 60:7 61:20 74:5,9 75:5 109:19,24 170:2 188:20 189:14
**directed** 45:25 122:24 172:13
**direction** 112:25
**directly** 27:11 43:22 44:9 73:13 74:4 75:21 81:17 167:12
**directs** 60:6
**disagree** 134:3 137:3
**disagreement** 184:18
**disappear** 79:18
**disappeared** 69:10
**disc** 18:20,21,22 19:1,6,14,18 20:3,12,15 21:13,19 22:11 22:16 27:23 28:5,6,15,16 30:15,16 40:17 40:23,24 41:3 41:13,14 48:17 48:18 82:8,11 82:23 83:19,19 88:8,20,24 89:16 103:16 158:13 159:2 180:17 184:19 188:6
**discharge** 116:9
**discoloration** 22:1
**discontinued** 50:24
**discoveries** 106:14
**discovery** 143:4 168:25 172:6,7 181:18
**discs** 23:22 24:13,15,24,25 25:9 26:4,17 26:20 27:8,15 27:17,22,24 30:11 31:11,19 32:3 40:15,21 42:24 47:18 49:14 59:13,16 59:20 60:1,11 60:20 81:20 154:1,3,5,10 154:15,17 180:21 182:22 182:24 184:20
**discuss** 81:8 121:5
**discussed** 30:25 40:21 67:17 111:10 149:1
**discussion** 139:3 139:4
**display** 180:11
**displayed** 103:18
**dispose** 10:9,12 12:6 66:19 68:20 92:22 99:17 191:12
**disposed** 10:14 15:4,15 34:9 79:13
**disposition** 14:21 32:20
**dispute** 102:10 105:19 106:22 106:23 114:15 114:18 115:16 116:2,16 127:1 128:12 129:19 136:21 137:2,3 151:2 153:6,21 170:3,7 179:8 182:19,23
**disputes** 153:5
**disputing** 107:13
**distant** 133:1
**distinct** 63:5
**distinction** 15:22 35:10 91:7 140:5 141:5 145:18
**distinguishable** 36:1
**distribution** 43:15 52:6
**distributions** 52:3,9
**distributor** 43:22 65:1,2 95:7
**distributors** 23:21,24
**DISTRICT** 1:1 1:2
**diversification** 31:24
**division** 53:23 174:19
**document** 55:20 68:3 98:21,22 99:1,3,12,21 108:10,15 109:20 110:12 110:20 111:15 112:5,7,13 113:4,15 115:8 116:16 120:8 123:7,9,10,14 125:24 132:6 132:12,14 133:17 146:22 148:6 150:18 156:19,21 158:8,10 161:19 163:4 165:17,23,24 166:4 169:10 169:20 171:3 171:16,17,23 172:1,2 173:12 174:5,24 175:4 179:18 180:10
**documentation** 33:4 35:14 38:5 130:23 173:22 174:16 186:4
**documented** 72:23 174:18
**documented/...** 174:17
**documents** 4:24 88:12 98:6 112:2 164:18 168:21,22,25 169:1,4,6,16 170:3,7,25 171:20 172:4,8 172:12,16 174:6,9 175:13 176:17 192:6
**doing** 19:20 43:11 53:6,7,8 53:10,11,12 83:12 85:15,16 93:12 95:11 98:12 109:24 118:11 150:17 154:9
**dollars** 12:13,14 51:17 115:21 131:12 149:23
**domain** 86:23 128:4,5 146:19 147:1,4,11,11
**domestic** 24:25
**domestically** 25:3
**doorstep** 89:20 89:21
**double** 72:14
**double-check** 143:14
**doubt** 105:12 106:1 166:15 166:16,18
**dozen** 58:1,6
**drafted** 159:15 159:17
**drafting** 95:4
**drastically** 61:4
**draw** 52:1
**drawing** 46:25
**drawings** 105:14 106:5
**drive** 61:10
**driven** 103:22,23
**driver** 155:24
**drives** 61:15
**driving** 155:21
**drop** 6:14 43:5,7 43:8,9,11,14 43:20,21,22 44:4,23 89:21
**drywall** 90:23
**due** 134:8 136:16,16

duly 193:11
duration 6:11
duties 112:24
Dynabrade
  161:7,10 162:1
  162:25 163:1
Dynabrade's
  162:20,21,24

**E**

E 3:7
e-mailed 130:8
earlier 27:1 31:1
  58:8 103:20
  113:18 122:6
  122:15,18
  145:17 147:19
  148:1 166:14
  173:21
earliest 26:3,5
  96:9
early 23:20
  30:10 32:14
  35:8 43:9,13
  43:15 47:15
  51:13 58:9
  59:11 60:10
  61:2 88:2
easier 63:15
  132:10 140:13
Easton 8:20
easy 80:21
eBay 17:23
  26:14,17,25
  27:3,5 28:20
  32:1,11 33:3,4
  33:10 38:2
  40:1,4 73:7,11
ECF 98:24
ecommerce
  17:19,22,25
  18:7,8 28:21
  29:2,19 50:13
  50:19 54:9,19
  71:15,17 72:23
  73:1,6,13,15

73:22,25 74:22
74:25 75:4,23
79:2 85:6,9
95:9 106:17
120:23 124:5
155:19 187:3
economic 23:4
  23:17
educate 19:10
  43:19
effective 115:11
effectuated 72:8
efforts 138:9
eight 169:10,15
  169:16 175:17
  175:21 183:23
eight-page 172:1
eighth 100:2
either 13:12 15:8
  15:14 26:19
  39:1 53:21
  55:16 56:3
  64:3 72:23
  75:3,4 85:7,20
  92:13 103:11
  130:17 163:22
  165:4,7 166:24
  172:24 178:17
  178:19 182:13
  187:10
electronic 2:1
  65:22 172:19
  193:4
electronically
  114:4,10
elementary
  27:21 28:5
  50:21
eluding 182:20
email 4:16 32:8
  32:12 35:22,24
  35:25 36:10,11
  36:15,23,25
  37:5,11,17,23
  38:2,14,19
  39:7,15,16,25

40:4 72:9,16
73:6,12,16
74:13,19 75:1
75:6,11 76:8
76:11,12 77:1
77:5,12,12,13
78:4,5,8,9,10
78:12,12,18,20
79:1,1,3,5,9,12
79:21 80:4,10
85:1,5,9,11,12
85:14,17,20
86:2,13,19,23
86:24 87:4,6,7
87:8 104:16,17
120:16 123:24
123:25 124:17
124:17,18,19
124:22 125:8
125:19,21
126:4,8,13,13
126:14 127:6,7
128:11,16,21
129:4,10,17,18
129:23,23
130:1 131:20
131:21 133:5,7
133:13,15
134:11,23
135:3,20 136:1
136:2,14
137:17,22
138:23 139:9
144:9,9,11,12
146:18,20,23
147:5,7,9,10
147:16 148:8
148:11,13,22
149:6 150:19
151:15,15
152:10,11,12
152:13 165:1,6
166:10,20,23
167:1,5,17,17
168:4,7 172:10
177:7,9,10,25

emailed 35:18
  125:10 177:16
emailing 36:16
emails 4:13,14
  4:15,23 36:3
  74:17,20 75:16
  75:21 76:14,16
  76:20 77:4
  78:4,6,9,19,22
  79:9,14,16,25
  80:1 85:15
  120:7 124:7
  125:6,6 126:1
  128:20 129:1
  131:18 136:12
  138:5,12 139:8
  139:17 142:6,7
  142:9,18
  144:18,20
  145:13 148:14
  148:23 150:11
  150:19 152:6
  167:20,23
  169:12 170:10
  170:16 171:6
  171:10 172:2
Emmet 193:23
employee 14:3,6
  15:4 16:22
  17:1 35:9,11
  39:2,16 52:15
  53:8,21 178:18
  178:21
employees 35:9
  52:13,18,20
  53:4,5 117:19
  117:25
employer 110:4
employment
  13:25 14:1
  15:7,14,16,19
  16:7,9,11,18
  21:8
encompassed
  102:17
encouraged

96:23
ended 51:8
  92:19 118:7
ends 83:8 149:4
engage 120:3
  155:12
engaged 109:13
  112:2 118:12
  154:13
engaging 108:25
engine 61:23
  62:11
engineer 11:11
engineering
  105:14 106:4
engineers 14:12
entanglements
  150:22
enter 38:8 59:8
  65:4 85:17
  115:3 121:17
entered 38:7
  82:10 97:15
  115:10 117:17
  129:5
entering 57:9
  113:5
entire 35:16 99:5
entirety 37:18
  64:3
entities 168:2
entitled 110:4,10
entity 16:1 68:9
  86:1 94:14
entry 39:1
envelopes 27:19
epoxy 21:23,24
  22:2,7
equipment 11:1
  13:2 83:18
  100:19 101:18
equity 12:7
  15:19,23 16:2
  16:4
errors 182:6
especially 60:10

90:25 192:5
**ESQ** 3:3,7
**estimate** 119:11
  130:25
**estimates** 139:10
**et** 54:12
**Europe** 18:21
  20:13 22:22,24
  82:9
**European** 23:25
**evasive** 85:24
**event** 140:22
**events** 96:24
**eventually** 77:3
  96:4 125:14
**everybody** 7:22
  98:5,16 118:5
  185:21
**ex-** 50:12
**exact** 11:16
  12:12 15:1
  63:12 96:10
  131:4 141:13
  153:3,17,23
  155:3,4 165:14
  167:6
**exactly** 14:14
  38:21 59:7
  122:22 139:15
  163:24 168:14
  185:11
**Examination** 4:4
  8:8
**EXAMINATI...**
  4:3
**example** 24:22
  30:15,15 36:18
  36:19,20 40:24
  42:6,18 44:5
  44:12,19 45:9
  46:8,15 48:17
  48:22 54:19
  74:18 75:9
  78:18 85:16
  91:20 92:10
  101:4 106:5,10

188:6
**examples** 13:15
  14:16 42:9
  44:6 46:5,22
  46:25 47:10
  105:24
**Excel** 55:20
**Excellent** 146:13
**exception** 116:9
**excess** 21:24
**exchange** 11:15
  88:18 120:18
  128:2
**exchanged** 120:7
  120:22 154:18
  164:8,19 171:6
**exclusive** 60:24
  121:9,12,12,15
  122:13 130:17
  141:2,18
**exclusively** 84:9
  158:20
**exclusivity** 60:14
**excuse** 41:8
**execute** 64:24
  66:15,24 67:22
**executed** 65:11
  67:5 98:2
  99:16 101:12
  108:4,20 151:9
**executing** 70:1
  97:23 115:16
**executive** 148:16
**exercise** 143:16
**exhibit** 4:9,10,11
  4:12,13,14,15
  4:16,17,18,19
  4:20,21,22,24
  5:1,2 98:19,21
  100:7 101:16
  102:7 105:4
  108:8,11,12
  112:6,7,8,9
  115:7,8 120:10
  120:12 123:8
  123:10 132:7,8

132:13 136:4,6
  146:21,23
  148:6,7 156:20
  156:21 158:7,9
  161:18,20
  163:3,5 165:16
  165:17 169:8,9
  171:14,17
  172:23 174:4,6
  177:12,12
  179:17,19
  180:10
**exhibits** 4:7
  98:11
**exist** 18:7 28:22
  28:24 139:14
  140:15 143:5
**existed** 57:7
  142:10,13
  145:15
**existence** 56:25
**expand** 40:19
**expansion** 24:14
**expect** 188:17
**expectation**
  117:22
**expensive** 42:21
  44:21
**experience** 42:13
  84:13 117:4
**experienced**
  118:10
**expert** 62:15
**expertise** 46:14
**expired** 153:20
  154:4,16 155:7
  167:7 183:13
**expires** 193:23
**explain** 7:7 13:1
  21:2 42:15
  59:18 78:23
  95:14 114:19
**explanation**
  188:15
**express** 132:3
**expressed**

131:24 132:1,3
  134:16,19
**expressing**
  136:24
**expressly** 137:18
**extend** 47:18
**extended** 96:14
**extending** 151:4
**extent** 77:13
  144:11
**extremely** 90:25
**Exxon** 13:16

---

**F**

**fabricated** 13:4
**fabrications**
  46:20
**face** 7:11,11
  69:15
**facilitate** 29:13
**fact** 41:14 89:18
  109:4 119:24
  127:2 128:1
  143:15 171:12
**factors** 44:16
  46:1 84:5
**facts** 137:1 141:1
**factually** 159:9
**faded** 66:2
**fair** 11:23 24:4
  76:25 77:15
  82:25 110:16
  115:23 135:23
  140:7 144:13
  150:13 152:20
  172:23
**fairly** 71:3
**fairness** 140:8
  173:2
**faith** 66:2
**fall** 141:12,14,15
  141:17 145:11
**familiar** 56:23
  161:7
**family** 130:4
**Fantastic** 180:19

**far** 15:10 32:11
  42:20 78:14
  121:6 152:19
**father** 11:10
**fault** 182:21
**fax** 124:6 125:11
  176:23,24,25
  176:25 177:2,5
  177:17,18
**faxes** 178:2,5,7
**features** 23:6
  82:6
**February** 193:19
**fee** 30:7,8
**feel** 60:8 97:5
  150:4,14
**feeling** 25:11
  142:17
**feet** 118:22
**Fiber** 180:16,21
**fiberglass** 19:14
**field** 40:2 93:12
  93:21
**figure** 163:20
**file** 65:16,17,21
  121:14 187:20
  190:20,22
  191:5,8,8
**filed** 173:14
  176:3 182:19
**files** 65:18
  187:21 191:17
**filing** 186:17
**filled** 107:24
  182:23
**finalized** 94:22
  112:21 113:9
**finally** 93:16
**financial** 97:11
  193:15
**financials** 51:11
**find** 56:16 59:9
  141:21,22,23
  142:1 188:17
**fine** 60:18 70:19
  105:23 182:3

Christopher Stone - January 29, 2025

**finish** 19:15,16
  20:1,4,7 40:25
  156:18 160:17
  162:17 189:11
**finished** 47:3
**finishing** 46:20
  157:12,12,13
  162:2
**Firm** 2:2
**first** 6:7 8:11 9:9
  9:22,22 14:23
  19:10 20:11
  26:10,20 27:16
  27:16 29:18
  33:1 40:15
  42:10 48:23
  52:12 58:9
  59:12,15 63:6
  81:10 83:21
  90:10 92:22
  95:8 96:8
  99:21 100:11
  100:12 103:7
  109:16 117:11
  117:23 128:1
  135:12 136:15
  139:2 152:24
  153:18 155:1
  156:3 166:10
  167:4 168:13
  171:19 177:13
  190:23
**fit** 57:14
**fitting** 71:2
**five** 48:17 63:18
  63:21 64:8
  70:7 76:1,4,6
  96:13 132:14
  139:21 164:2
  169:15 176:15
  183:15
**five-page** 165:23
  171:23
**fix** 181:21
**fixed** 181:22
**flap** 18:20 19:1,6

19:14,18 20:3
  20:12,15 21:13
  21:18 22:10,16
  23:22 24:13,14
  24:24,25 25:9
  26:4,17,20
  27:7,15,17,22
  27:23,24 28:5
  28:6,15,16
  30:11,15,16
  31:11,18 32:3
  40:15,17,21,22
  40:24 41:3,13
  41:14 42:24
  47:18 48:12
  49:14 59:13,16
  59:20 60:1,11
  60:20 82:8,11
  82:23 83:19
  88:7,20 103:16
  154:1,3,5,10
  154:15,17
  182:22,24
  184:19,20
  188:6
**flat** 30:7,8
**flawlessly** 159:4
**flew** 118:2,12
**floor** 41:9
**focus** 42:23
  161:17
**folder** 65:21,21
**folks** 180:7
**follow** 76:13
**follow-up** 42:10
  44:15 81:8
**following** 98:22
  100:14 187:22
**force** 13:6
  155:21
**foregoing** 114:6
**forever** 116:9
**forgive** 27:21
  50:21
**form** 16:19
  17:17 18:4

21:7 27:1,5
  34:1 54:24
  66:18 69:11
  71:24 153:16
  175:14 179:7
**format** 65:23
  99:7
**formation** 43:13
  47:15,20
  152:24 164:4
**formed** 20:16
  22:15 24:12
  34:8 58:9
  153:2,3,4,11
  153:18,21
  164:5
**former** 166:23
  167:2,9,19
  169:24 171:7
  172:13
**forms** 90:15
  102:17
**forth** 52:24
  58:19 137:15
**Fortune** 13:14
  14:16
**forward** 115:4
  125:11 129:8
  177:17
**forwarded** 87:6
**forwarding**
  129:14
**found** 174:25
  188:8
**foundation** 17:9
**founded** 9:23,25
  11:10 14:22
  17:14 23:3
  32:19 51:22
  52:12
**founder** 9:23
**founding** 19:5
  26:4
**four** 16:25 19:10
  32:11,21 53:4
  73:5 96:12

115:1 164:2
**four-and-a-half**
  30:22 188:6
**fourth** 99:25
**fraction** 81:24
**frame** 15:2
  30:10 47:17
  94:23 96:10
  140:6,12
**frequent** 56:8
**frequently** 120:5
  168:11,11,12
  168:18
**friends** 180:3
**front** 51:12
  69:15,18 96:1
  118:21 132:25
  153:17
**frozen** 28:11
**fulfill** 140:17
**full** 7:6 27:15
  42:25 43:2
  80:3 107:21
  114:22 160:7
**fully** 6:17 7:7
  166:10
**fun** 98:5
**function** 22:5
  29:25 30:4
  85:8 86:6,7
  188:24
**fundamental**
  141:1
**further** 78:23
  150:22 152:8
  193:13
**future** 25:24,25
  110:3 125:6
  126:4 151:2

------

## G

**gained** 50:23
**gaining** 120:15
**gap** 54:21
**garbage** 68:18
  68:19

**Gardner** 8:16
**general** 45:15
  67:18 84:8
  101:4,5,8
  102:16 158:21
  159:11 168:4
  179:23
**generalized** 49:7
**generally** 6:10
  17:3 50:9
  121:2
**generate** 29:17
  30:14 34:5
  48:11,14 49:10
  54:18 61:24
**generated** 22:17
  33:9,14,22
  39:11 53:20,20
  54:23 55:3
  72:20 76:19
  85:1
**generation**
  33:19
**genesis** 20:17
  93:7 94:5
**gentleman** 94:16
  94:17
**German** 180:22
**getting** 17:17
  20:24 81:12
  88:11 164:14
  178:7 183:10
  185:20
**giant** 106:24
**give** 6:10 8:4
  13:15 34:17
  36:18 45:8,9
  47:16,22 66:6
  67:21,21 94:22
  117:8 121:9
  122:12 126:10
  127:5 134:23
  135:2,8 139:1
  139:5 140:20
  140:21 148:2,4
  148:24 149:19

Christopher Stone - January 29, 2025

149:22 150:10
150:14 151:12
151:19,22,23
152:9 164:16
167:6
**given** 23:7 40:14
48:10 82:19
90:13 108:16
109:16,17,20
115:17 154:8
156:7 164:3
166:21 169:19
189:24 193:10
**giving** 11:23
101:13 157:2
181:4
**glass** 81:12
**Glen** 8:16
**glue** 22:4,4
**gmail** 122:17
123:1,2 126:15
126:18,23
128:3,14 137:7
137:12,16,18
137:23 138:4,5
138:6,10,11,15
145:18
**go** 13:20 19:9,9
23:11 24:7
26:24 30:16
47:14 49:23
52:25 54:19
56:15 58:24
63:16 78:16
81:9 99:19
100:10 104:25
110:18 122:20
124:4,5,25
125:8,11
132:21 134:20
136:4 139:19
139:22 140:23
146:7,15 150:4
157:10,14
159:1 177:17
180:19

**goes** 9:9 54:15
54:15,16 85:17
86:3 125:13
133:5 156:16
177:18
**going** 6:9,22,24
10:8 14:14
15:18 17:8
18:4 19:8,9
21:17,18 28:14
34:24 37:21
39:6 45:20
46:21,22 47:6
47:14,15 50:25
59:8 61:21
62:24 70:5
71:3 73:3,21
73:23 76:3
78:25 79:22
85:19 86:8
87:2,16 88:2
88:12 92:18
97:16,22 98:6
98:7,8,13 99:5
99:19 100:10
105:4 106:15
107:18 108:7
111:9 112:5
115:6,8 116:19
117:24 120:8
123:7 127:12
127:14,15
132:6,12 136:4
136:4 138:22
140:11,18
141:16 143:10
146:15,22
148:1,3,6
150:1 156:19
156:21 158:8
160:17 161:19
163:4 164:17
165:17 169:7
171:16,22
174:5,24
178:22,23

179:18 183:21
188:7,8
**good** 6:3 10:7
19:3 22:18
45:24 57:20
60:8 61:21
66:2 70:6,13
88:13 94:24
98:13 143:19
144:25 145:17
146:10 180:6
182:1 183:18
**goods** 81:22
**Google** 59:20
60:6 61:17
62:11,18 63:3
102:22 103:5,8
103:9,10,13,14
103:15,15,17
103:25 104:1,4
104:9,25
137:19 155:22
155:23
**Googles** 61:14
**gotten** 140:22
**gradually** 47:18
**graduated** 11:12
16:16
**grain** 91:1,2,2,5
**Grand** 3:4
**grant** 128:8,9
**granted** 132:5
135:15
**graphic** 186:24
**great** 7:18 19:8
74:15 82:12
153:5,6 160:1
163:20 170:23
172:9
**greater** 12:16
110:4
**grew** 31:20
**grid** 48:20 49:4
157:5
**grids** 48:19
**grind** 40:24

**grinders** 44:3
**grinding** 42:6,19
44:6 46:7,11
46:16 47:11
49:16 91:4
158:14
**grit** 30:23,24
31:13 49:11
157:15 158:16
**gross** 51:14
**ground** 77:19
**group** 12:7 16:2
58:16,17 75:15
79:5
**groups** 58:19
76:24
**grow** 58:12
**grown** 51:23
**guess** 11:25
15:12 16:17
38:22 47:23,24
62:15 68:19
72:25 73:2,17
84:4,5 141:16
170:2 174:2
188:12
**guessing** 129:9
**guiding** 45:19
**guy** 97:24
**guys** 70:16 74:25
86:1 88:11
118:18 120:6
133:12 146:6
185:21

---

**H**

**h** 100:25
**half** 131:3
136:10 186:23
**hamburger** 28:4
**hand** 89:2
113:25 124:16
126:6 183:10
193:10
**handed** 190:13
**handful** 167:13

**handover**
114:10
**hands** 186:19
**Hang** 111:18
**happen** 12:16
36:5 37:3 38:9
57:25,25 58:1
58:7 67:4
117:18,22
149:2 168:11
**happened** 22:23
37:10 38:22
39:19 50:15
56:1,7,20
68:21 76:19
97:3 106:2
134:15 149:6
168:18 190:10
191:17
**happening** 72:12
161:4
**happens** 38:5
168:18
**hard** 6:12 71:2
90:25 113:13
157:19 177:1
**harder** 91:1
**Harrisburg** 53:2
**head** 26:6 46:3
64:6 100:12
130:22 141:8
179:4
**headache** 150:1
**header** 123:17
**headers** 99:21
**heading** 109:20
**headquartered**
119:20
**headquarters**
118:13
**hear** 66:3 81:4
**heard** 180:5
187:23,24
**hearing** 7:10
**heated** 133:12
**heavy** 18:15

Christopher Stone - January 29, 2025

27:22
**hefty** 82:14
**help** 24:9 44:1
  73:9 117:5
  139:14 165:9
  189:4
**helped** 94:19
  178:21 189:12
**helping** 53:13
  189:7,9
**helps** 62:22
**Henn** 3:3
**hereunto** 193:18
**hey** 22:17 35:3
  38:3 41:23
  45:14,20 47:2
  49:22 57:17
  62:13 68:4
  74:6,15 82:3
  83:23 87:15
  89:12,19 92:8
  93:18 94:6,7
  95:4 96:23
  102:14 131:7
  131:25 155:14
  161:1 168:7
  183:6
**high** 11:11 16:16
  23:23 44:9
  63:23 78:25
  79:3
**highest** 97:11,24
**highlighting**
  133:18
**hire** 115:2
  149:11
**hired** 52:18
**historical** 63:20
  71:14 73:20
  74:22
**historically** 9:13
  55:25 63:11
  72:1,5 141:23
**histories** 51:13
**history** 35:16
  40:3 43:16

46:13 56:13
  63:18 82:22
  138:24 140:16
  142:24 148:23
  150:20
**hit** 22:23 86:12
**hits** 85:5
**hold** 108:7
  174:13 176:9
  182:22
**holding** 141:17
**Holland** 20:19
**home** 27:17
**HON** 1:6
**Honduras** 17:4
  93:24
**honestly** 16:10
  39:19 68:21
  109:17 146:20
  191:14
**Hoover's** 167:14
**hopeful** 44:22
**horse** 166:13
**hosting** 102:22
**hotmail** 37:14,16
  39:6,8,17
  122:17 123:1,1
  125:2,15 126:6
  126:11,15,18
  126:24 127:3,5
  127:10 128:2,7
  128:13 130:18
  131:25 133:9
  133:24 134:4
  134:17,24
  135:5,7,8
  136:9,13 137:6
  137:11,14
  138:14,15
  139:2,11,16
  140:4,10,17,19
  141:2,18,24
  142:2,5 143:25
  144:5,17 145:5
  145:14 146:18
  147:17,20

148:11,13
  168:1,16
  169:12 171:6,9
  171:13 177:21
  178:6
**hour** 136:10
**hourly** 120:5
**hours** 70:5 146:8
**house** 25:15
  27:14 44:22
  118:19
**household** 52:4
**huge** 44:13
**hundred** 12:13
  131:12
**hundreds** 58:1
  115:21 149:23
**hypothetical**
  85:3 160:6,7

---

**I**

**ID** 98:23,24
  112:14,15
  137:21,24
**idea** 18:25 20:17
  22:17 29:14
  66:5 94:6
  167:24 179:6
**ideas** 25:24,25
**identical** 23:2
  181:8 188:3
**identified** 37:11
**identifier** 54:14
**identify** 187:21
**identifying**
  54:16 132:14
**IDs** 108:16
**illegally** 126:23
**illegitimate**
  129:13
**illegitimate**
  127:22,24
**illustrated**
  107:11
**image** 156:22
**images** 175:20

175:21 176:6
  186:22
**immediately**
  78:15 113:18
**impart** 20:4
  40:25 156:17
**impartial** 141:22
**imperfect** 7:21
**import** 19:25
  38:12
**important** 6:11
  21:17 23:5,7,9
  23:10 58:24
  155:20
**Importantly**
  166:8
**imported** 182:24
**importing** 24:15
**impotice** 94:1
**impression**
  117:24
**improve** 62:9
**improved** 62:10
  96:18 97:7
**improvement**
  106:14
**inaccurate**
  159:17 166:16
**inadvertently**
  191:19
**inappropriately**
  126:23
**inartful** 107:19
**inbox** 85:5
**inch** 30:22 48:17
  158:3,13 188:7
**include** 43:8
  55:24,25 62:4
  76:7,8 100:13
  134:7 170:8,11
**included** 56:3
  57:5,7 101:10
  105:20 116:10
  130:1 136:18
  136:20 170:9
**includes** 61:23

114:4
**including** 162:17
**incoming** 123:12
  123:18 124:5
**inconsistent**
  157:22
**incorporating**
  31:16
**incorrect** 102:7
  159:8
**incorrectly**
  82:17 162:22
  185:25
**increase** 63:2
  97:2
**increased** 97:7
**increments** 19:9
**incurred** 110:2
**independent**
  14:12 24:1
  82:8 101:25
  102:4
**indicate** 144:3
**indicating**
  181:12
**indiscernible**
  36:19 58:21
  62:19 68:8
  103:13 110:13
  128:22 129:16
  133:16 161:20
  174:22 180:7
  184:14 187:19
**individual** 1:7
  48:5 49:3
**individually**
  125:19
**individuals**
  87:19
**industrial** 1:3,13
  6:5 10:13
  23:20 66:6,22
  67:11 92:25
  93:1,17 95:6
  96:5 97:24
  99:13 101:2,14

Christopher Stone - January 29, 2025

102:2 105:7
107:5,7,15
108:1,5,21
110:10 112:20
113:8 117:2,3
121:9 169:19
182:9 183:25
185:3,14 188:3
188:11 189:16
189:25 190:2
**Industrial's**
188:21
**industries** 63:15
90:19
**industry** 25:21
41:10 42:18
44:8 57:12
91:5,20 135:24
188:16
**info** 122:2
125:11 177:17
177:17
**info@lehigh**
87:3
**info@lehighva...**
121:24 122:10
124:6
**info@lehighva...**
38:3 120:24
125:7,21
134:10
**info@lehighva...**
35:23 37:13,22
38:19 86:15
121:21
**info@lva** 86:13
86:16,19 87:3
87:7,8
**information**
4:22 8:10 29:6
29:8 30:12,14
33:9 34:5 35:6
40:2,10 48:9
48:14 53:17,25
54:16 60:9
61:22 62:8

76:7,24 83:23
87:23 88:17
99:22 102:21
103:1,8 111:12
114:5,11
120:18 122:5,7
123:21 127:8,9
127:10 129:24
130:1,4,7,11
130:13 131:4
137:15,15
138:3,16 141:9
143:4,5 147:6
147:12,15,20
148:3,18
150:14 151:21
151:22,24
154:18 155:5,5
164:8,21,22
170:25 171:12
172:18 173:4
178:24 179:4
182:9 188:5,21
189:14,24
**infrequently**
137:17
**initially** 97:22
184:3
**injunctive** 110:3
**inputting** 35:6
**instance** 72:16
**instances** 130:8
168:15
**instantiated**
33:22
**instruction** 6:23
**instructions**
6:10
**intangibles**
100:20
**intellectual**
100:20 105:6,9
105:24 179:11
179:14,15
184:9,13
**intelligible** 7:23

**intend** 87:12
92:9,9 98:10
111:22
**intended** 145:14
161:6 178:5
**intent** 55:13
160:20
**intentionally**
190:12
**interchangeably**
130:15
**interest** 11:6,8
11:14 12:3,6,9
13:24 14:4,21
15:5,15
**interested** 25:8
95:20 193:15
**interface** 104:1
**intermingled**
130:10
**internal** 75:23
99:20 173:8
**Internet** 29:10
**interpret** 111:11
164:17 173:3,7
173:12
**interpretation**
111:25
**interruption**
26:23
**interviewed**
93:15
**intrude** 111:13
**inventories**
106:14
**inventory** 42:25
43:1,3,4,23
56:9 100:19
101:18
**investigated**
143:12
**investing** 42:20
**investment**
42:12,15,17,20
44:2,20 45:23
**invoice** 29:17

33:5,14,25
34:6,21 37:25
38:9 39:11
85:10,11 86:2
**invoices** 33:19
71:12
**involve** 72:9
**involved** 17:3,5
41:15 42:6
44:8 57:12
111:3
**IP** 176:9 189:15
**Iron** 75:15
**Ironworkers**
75:24 76:5,22
78:1,22
**isolated** 190:11
**issue** 25:17 27:5
171:4,13
175:11,14,16
183:22 187:18
**issued** 174:20
**issues** 132:18
134:22
**item** 49:18 54:20
64:15 85:17
103:18,19
**items** 18:18 43:4
81:13 83:22
100:20,24
101:10,21
103:11 114:7

**J**

**January** 1:20
6:2 193:10
**Jeff** 165:19
**Jersey** 8:16,17
8:18 9:1,2 10:2
53:3 117:24
118:17,21
119:5,6,21
143:23 152:25
179:25 180:3,7
**joined** 58:14
167:15

**jokes** 180:5
**jump** 111:13
164:13 171:2
**jumping** 32:17
**juncture** 87:16
**June** 175:24
**justified** 151:18

**K**

**K-A-S-O-N** 9:19
**Kason** 9:16,18
10:21,23 11:9
11:10 12:3,6
13:9,12,15,17
13:18 14:3,6,9
14:17,21,24
15:4,16,22
16:1,7,18,23
18:14,24 21:9
21:10,12 25:11
135:25
**Kason's** 13:11
21:11,19
**keep** 12:18 59:11
71:3 113:19
117:24,25
179:2 189:19
189:19
**keeping** 18:1
48:24 51:11
52:9 63:7,19
73:8
**kept** 71:12,13
79:14 84:21
106:24,25
107:1 183:9
**Kevin** 189:9
**kind** 9:21 19:9
19:17 23:19
31:13,24 41:2
49:5 54:16
74:17,21 83:25
88:17 113:12
129:25 130:1
155:19 156:15
164:5 175:13

Christopher Stone - January 29, 2025

**kindness** 126:10
**kinds** 17:2 45:1
  117:9
**knew** 19:2 25:8
  26:19 32:5
  37:4,5 41:10
  41:12 42:23
  46:18 190:20
**know** 10:17 18:2
  18:17 22:12
  24:12 25:18
  26:25 28:3
  30:20 32:24
  33:3 41:6,24
  41:25 43:18,19
  45:20,21 46:25
  51:6,11,23
  56:24 57:11
  58:16,22 59:18
  59:19 62:11,16
  63:12,24 65:13
  66:1,19 68:15
  68:21,22 69:15
  71:6,17 73:18
  76:3 79:20,21
  82:3,3 84:21
  85:2 86:8 87:2
  87:15 94:2,22
  95:6,8 96:10
  96:10,12,16,18
  97:16 98:8
  101:5 105:2
  111:2,5 117:12
  118:11 119:10
  125:7,22,23
  129:25 130:12
  131:16 132:10
  133:18 135:10
  136:12,24
  139:20 140:11
  141:4,12,13,17
  142:1,10,12
  143:14,20,24
  144:22 148:21
  149:13 150:22
  151:18 152:19

152:21 155:2
156:6 161:17
162:10,13,14
162:24 163:18
163:21,22
165:11 166:14
167:2,8 172:6
172:6 173:2,8
173:10 174:22
174:23 175:6
176:6 177:5
178:7 179:22
181:17,18
182:2,2,2,4,4,5
182:5,11,16
183:25 184:1,6
185:2,6,6,9,13
185:16 186:3
186:21 187:14
187:15 188:12
188:13 189:1,5
191:13,22,23
**knowing** 18:3
  167:24
**knowledge** 45:24
  54:21 62:18
  68:11 72:11,15
  72:19 175:8
  188:14 189:2,3
**knowledgeable**
  45:3 60:6
**known** 49:17
  53:24 155:21
  172:16 186:18
  186:20,23
**knows** 152:21
**Kraft** 13:16

_____ L _____

**L** 1:6
**label** 49:13 82:1
  83:7,10,11,13
  83:14,17 84:6
  154:19
**labeled** 82:5
  83:22 154:6

161:19
**labeling** 82:2,15
  82:18 83:5,7
  83:16 84:8
  89:25 90:2,6,6
  90:8,9 154:9
**labor** 53:23
**laid** 21:23
**Lake** 3:8
**landfill** 68:19
**language** 69:5
  180:20
**large** 24:5 44:10
  63:22,23 81:23
  149:20
**largest** 47:25
  63:18 82:8
**Larry** 170:20
**late** 170:6
  185:21
**law** 137:1 180:2
**lawsuit** 173:15
  176:3,12
**lawyer** 67:5
  111:14
**layered** 19:14
**LC's** 37:15
**lead** 44:25 46:1
  61:10
**leaders** 23:21
**learn** 155:17
  160:1,5,8
**learned** 48:23
  49:2 178:9,12
**leave** 148:23
  150:19
**Lebanon** 118:17
  118:20
**led** 93:18
**left** 18:24 52:7
  146:8
**legal** 110:15,22
  111:3,6,10
  116:2 126:21
  149:25 150:22
**legitimate** 190:8

**Lehigh** 9:15,22
  9:23,25 10:4,5
  10:9,10,12,14
  14:22 15:1
  16:19,23,24
  17:11,18 19:5
  36:8 37:7,12
  39:1,16 48:1
  54:13 59:7
  60:14,23 64:10
  66:17 67:7
  68:8,23,23
  69:3,7,16 70:1
  83:17 94:12
  96:14 99:14
  105:13 107:12
  107:14 112:25
  113:25 117:1,2
  118:15,23
  119:1,9,9,11
  119:20 121:10
  121:11 129:12
  134:25 135:1
  140:17 146:19
  147:1 153:15
  156:6,7,8
  163:7,10,11,16
  167:3,9,22,24
  168:8,18
  169:24 171:7
  172:14 179:3
  180:20,23,25
  181:1 184:3,4
  184:17
**Lehigh's** 190:14
**lehighvalleyab...**
  86:24
**lehighvalleyab...**
  59:1,2
**Lesperance** 3:3
**let's** 8:10 30:15
  47:19,19,21
  49:15 73:11
  90:8 102:19
  104:24 106:15
  113:14 121:2,5

150:7 174:2
  190:23
**letter** 186:14
**letterhead** 149:4
**letters** 186:5
**LeVasseur** 3:7
  28:11 70:5,13
  70:15,19,23
  77:8,17 80:16
  80:22,23 98:7
  98:11,13
  110:14,22
  111:13,18
  122:19 128:15
  135:13 137:20
  138:1 139:23
  140:8,18 143:9
  144:7,25
  145:17 146:9
  146:10 165:11
  171:2,9 173:2
  176:18 179:25
  183:18 185:18
  192:1,2
**LeVasseur's**
  143:19
**level** 49:11
**liaison** 17:7
**license** 66:24
  174:16
**licensing** 64:25
  65:12 68:16
  69:1,5,13
**lies** 15:22 118:9
  141:5
**lifetime** 43:1
  73:7
**light** 44:1 140:25
**likelihood** 78:25
**limitation**
  100:14
**limited** 166:9
**line** 41:5 45:13
  45:16 69:22
  70:9
**linked** 75:22

Christopher Stone - January 29, 2025

liquidated
109:20 110:5
110:10
liquidation
111:2
list 28:22 31:14
48:10 54:4
55:23,24 56:23
57:6,7,10,18
71:14 74:6,19
75:5,8,14,23
75:24,24 76:5
76:6,17,18,21
76:23 77:2,11
77:14,25 78:1
78:2,3,18,20
100:8,10
101:16 102:14
103:11 105:18
105:23 106:8
106:10 107:12
107:14 159:21
162:18 163:22
listed 54:6 56:22
71:13 95:6,13
99:12 100:24
101:18 102:7
103:3 105:9,11
105:20 107:5
108:12 114:7
116:10 121:3
125:17,19,22
125:25,25
126:1 160:2
186:7,10
listen 24:10
134:14 143:21
170:22
listening 36:2
listing 55:7,21
95:18
lists 58:18 71:24
75:8,11,25
76:7 77:9 78:1
99:13 102:17
102:19 106:11

106:17,20
107:4 163:13
164:20 167:17
167:17
literally 81:12
literature 57:13
litigating 176:5
litigation 150:23
152:8
little 6:8,9 9:21
17:1 18:13
42:16 48:6
73:4 77:19
78:23 81:11
85:25 86:11
87:18 92:16
101:7 124:25
128:25 139:18
157:6 170:10
174:25 180:19
live 8:15,16
lived 133:22
180:3
lives 7:4
living 8:22
LLC 1:3,13 10:2
66:19 152:25
load 18:9,12
loaded 191:5
loading 159:4
local 17:1
locate 18:21
located 65:18
187:5,6
location 118:16
118:24
locked 126:12
152:11
log 34:4 104:4
104:10
logged 73:19
80:5
logical 70:11
login 104:5,10
104:11,14,23
105:1 121:16

121:20,21,24
122:2,5,7
137:21,24
145:19 148:24
long 3:8 16:17
36:7 43:12
69:3 84:2,5
89:19 94:20,25
131:3 192:5
longer 50:24
68:23,24
124:20 129:8
134:24 135:1
148:21 152:2
152:14
longest 84:13,15
133:3
look 29:17 39:21
49:19 61:18,19
61:20 73:19
74:15 77:13
83:24 88:12
106:8,10 117:8
124:1 126:11
128:7 129:23
133:16 139:14
139:19,20,22
139:24 141:25
143:25 144:17
159:19 163:10
177:12 181:11
looked 73:5
142:24 144:22
183:22
looking 27:23,23
62:12,20 93:8
93:9,11,13
103:19 132:18
143:21 144:9
171:10 172:11
192:6
looks 20:1
108:15 109:7
112:13,13
123:16,24
132:22 136:9

146:24 147:7
157:5 163:11
169:10,11
175:2,18,21
lose 115:21
lost 28:10,13
32:18 92:5
145:7
lot 17:5,6 18:15
18:16,17 22:12
22:13 25:13,20
26:19 37:8
44:6 48:4
59:25 60:1,11
60:19,19 61:3
82:13 95:10
105:13 126:3
130:5,11,12
132:10 142:9
188:5
lots 19:8 23:20
26:16 45:9
61:4,4 63:23
64:9 148:14
low 63:24
lower 19:2 82:7
97:18 149:15
lurking 56:10
LVA 17:9,11,14
22:15,17,21
23:3,18 24:9
24:12 25:5
26:4 29:1,18
30:10 32:14,19
32:21 33:10
34:8 35:11
37:19 40:3,16
40:19 43:1,22
46:23 50:4,11
50:13 51:5
52:1,4,8,12,15
52:16,18,20
53:21 54:3,23
55:15 56:5
58:9,12,25
61:24 63:10,11

63:11,18,22
65:11 71:13,13
72:5 73:7,20
74:4,9,11
75:12 77:3
78:21 82:4,20
83:7 84:21
86:1 87:1
91:23 92:7,19
101:1,14,14
103:14 104:8
104:10,11
105:7,18,20
144:4,19,21
145:14 148:23
150:19 158:4
158:24 160:9
160:12 161:1
162:10,14,14
162:25 163:1,1
163:2 166:24
167:19 168:12
176:21 178:5
181:12 184:11
184:15 185:17
185:19
LVA's 20:17
24:23 26:5,10
27:5 34:9
35:16 43:16
51:13,14 56:13
63:20 64:2
79:12,13 81:14
81:17 92:22
99:17 120:16
128:14 184:13
190:23
LVS 184:9
185:15,18
186:1
LVS's 184:9

M

M 3:11
machine 13:6
92:3 156:16,16

Christopher Stone - January 29, 2025

176:24,25
177:1
**machinery** 9:4
13:3 25:12
**machines** 9:6
13:22 83:16
91:24
**magazines** 60:4
61:9,22
**mailbox** 80:2
**mailing** 58:18
75:14
**main** 22:14
32:15,25 73:10
88:24
**maintain** 15:7
16:7,9 27:13
43:1 54:4
65:11 69:5
71:14 78:21
107:12,14
**maintained** 55:7
55:14,15,16,19
68:16 71:15,21
74:25 75:25
76:18,21,23
77:2 78:1
80:11 106:21
114:6 141:18
166:19
**maintains** 33:4
**major** 60:4
**majority** 129:23
167:13,23
170:8
**maker** 30:21
**making** 26:9
30:6 36:20
47:19 80:21
82:14 85:3
90:23 96:8
122:6 173:24
178:25 181:23
**MALONEY** 1:6
**Man** 185:20
**managed** 56:10

**Managing** 100:4
**Mania** 167:17
**manifestation**
187:20
**manifested**
35:15
**manila** 65:20
**manner** 149:25
**manually** 35:12
**manufacture**
25:3,14 82:20
89:3 91:10,11
91:13 161:9,11
161:12,14
**manufactured**
13:22 20:21
82:24,25 89:7
90:19 180:22
**manufacturer**
10:25 43:6,21
43:24 49:16
50:2 53:24
55:4 64:24
65:9 66:23
67:18,19,19
82:8,19 83:2
89:18 178:19
189:21,25
**manufacturer's**
58:19
**manufacturers**
24:1 25:12,16
37:8 44:10
55:1 64:19,21
65:5 67:24
84:11 89:5
178:13 187:10
**manufacturers'**
14:13
**manufactures**
161:10
**manufacturing**
9:16 14:7,8
15:11 18:14,15
21:19 24:20
25:13,21 32:6

36:6 41:15
87:17
**March** 134:22
135:3
**margins** 82:14
**mark** 148:6
**marked** 98:9,19
98:21 108:8,10
112:6,7 115:7
115:8 120:12
123:7,9 132:6
132:8,12 136:7
146:21,22
148:7 156:20
156:21 158:7,8
161:18 163:3,4
165:16,17
169:7,9 171:14
171:16 174:4,5
179:17,18
180:10
**market** 3:4
23:11,21,23
24:6 26:13
42:22 56:16
58:13 59:15
60:24 82:11
117:3,5
**marketed** 95:20
**marketing** 42:21
45:15 57:16
59:3 64:11
103:21
**marketplace**
49:17 53:25
95:11
**markets** 45:6,25
**marking** 112:8
**marriage** 193:14
**Maryland** 187:6
**mass** 129:10
**master** 164:9
**material** 13:4
20:5,7 22:2
30:18 62:20
88:20 90:15

91:1,21 92:1
105:15 156:17
156:18 157:15
162:17 174:1
175:10 188:1
190:1
**materially** 23:2
**materials** 57:17
64:11 88:22
91:17 113:16
162:22 190:4
**matter** 61:19
115:24 193:15
**mean** 8:1 14:1
18:6 19:11
21:3 28:24
37:17 39:15
45:8,8 46:17
57:11 58:22
64:6 68:18
71:18 75:19,20
76:16 82:2
89:5 94:3,14
106:8 107:6
115:19,19
128:9,17
129:25 131:17
131:18 135:24
135:25 137:21
157:24 158:21
159:19 160:16
169:5 179:14
182:1 185:19
186:10 187:16
187:19,24
188:12,13
191:22
**means** 7:1 42:16
187:15
**meant** 39:1
146:2
**mechanically**
83:11 87:5
**mechanism** 52:5
59:18 79:18
**mediator** 164:8

**medical** 130:3
137:15
**member** 10:20
58:16 75:15
100:5
**members** 58:17
74:18
**membership**
10:15 11:6,8
12:3,8 13:24
14:3,21 15:4
15:15
**Memorandum**
4:21
**memory** 73:1
94:24 142:22
177:8
**mention** 59:25
**mentioned** 10:6
10:20 11:5
20:11 24:22
26:15,24,25
28:19,21 30:9
30:12 35:18
38:16 39:7
40:4 42:24
44:19 46:4
48:9 51:2
59:24 60:10,18
61:9 64:10
71:11,12 74:11
74:18 79:8
82:11,15 86:13
91:7,22 93:24
94:2,10 102:14
103:20 114:14
137:4 168:5
190:13
**message** 80:2
129:14
**messages** 129:7
172:11
**Messiah** 53:1
**met** 22:12
168:15
**metadata** 187:14

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

187:15,18
188:2,5,7,10
189:15 190:7
**metal** 10:5 19:15
  19:16,18,24
  20:3,6,8 21:23
  22:5,6,7,8,10
  25:15 31:2
  40:25,25 46:20
  47:3 90:24
  91:18 157:13
  161:14,16,17
**metals** 159:4
**Metalworkers**
  58:15
**metalworking**
  40:24 46:19
  90:15,17,21,24
  91:11 92:2
  95:7,23 96:3
  153:15 158:18
  158:19,20,22
**method** 27:1
  28:7 43:15
  59:15 61:15
  75:20
**methods** 32:11
  32:20 40:5
  50:1,3 57:5
  58:12,14 74:9
**Michigan** 1:2
  3:4,8 118:1,13
  193:5,22
**Michigan.com**
  133:6
**microphone**
  6:13
**Microsoft** 79:22
  101:5
**mid** 59:11
**middle** 133:17
**millenials** 27:4
**million** 12:14
  51:16,21
**mind** 12:18 18:1
  25:6,19 47:11

51:11 52:10
59:11 63:7,19
73:8 77:10
117:25 149:18
151:3 179:2
189:19,19
**mine** 45:19 52:7
  71:8 143:24
**Mini-Dynisher**
  162:1
**minimal** 119:8
**minute** 10:18
  25:7 26:24
  28:13 29:15
  70:7 88:13
  146:8 183:15
**minute/ten**
  183:15
**minutes** 70:17
  81:3 176:15
**miscellaneous**
  100:20
**mischaracteri...**
  122:19 128:15
  135:13 137:20
**misrepresented**
  178:2
**missing** 74:24
  126:8
**mission** 17:4,5
  93:12,12,21
  94:2,3
**missions** 17:6
**mistake** 111:16
  160:19,22,22
  160:24 161:2
  181:1,17,21,23
  189:5,8,11
  190:11,11
**mistaken** 150:18
**mistakes** 181:24
**misunderstan...**
  141:1
**Mitt** 2:2
**model** 43:8
**module** 103:11

**mom** 45:9
**moment** 11:5
  32:19 98:18
  108:7 156:19
  182:22
**Monday** 123:13
  125:1 134:25
  136:7 177:15
**money** 11:15,16
  11:17 30:6
  52:4 79:23
  115:2,5 149:25
**month** 96:13
  114:21 118:7
  131:3 154:16
**month's** 149:19
**monthly** 30:8
**months** 14:25
  15:6 16:12,20
  84:7,15,17
  89:22 90:3,4
  90:12 95:1
  114:22 115:1
  117:11,14
  126:9 128:5
  131:5 134:6,12
  135:6,7,11
  137:5 138:12
  141:6,13 154:4
  154:9 155:7
  164:2
**morning** 6:3
**motor** 13:5
**mount** 161:12
  162:7
**mounted** 162:5
**mouse** 106:13
**mouth** 46:5
**mouthful** 86:17
**move** 43:7 115:4
**moved** 68:5
  118:1,13
**multifunction**
  91:15
**multinational**
  10:25

**multiple** 91:16
  91:25 96:20
**Muth** 4:21
  164:20,22
  165:1,6,19
  166:15,17
  170:9,24 171:5
  171:11,12
  172:18 173:5
  173:12
**myriad** 7:22
**mysterious**
  174:25

**N**

**name** 6:3 8:12
  8:13 27:5 28:5
  28:15 60:12,20
  61:14,14 65:17
  65:19 66:15,17
  68:13 69:23
  74:13,25 76:8
  76:11 82:3,13
  83:10,11,20
  94:12,18 105:1
  122:17 147:4
  147:11,11,14
  181:5 182:20
**names** 94:14
  164:24
**National** 58:15
**natural** 7:4
**nature** 10:23
  16:4 62:6
  64:13 74:7
  78:21 91:8
  173:6,17
**navigated** 55:9
**near** 59:16
**nearly** 183:15
**necessarily**
  129:21 187:19
**necessary**
  154:19
**need** 7:2,6 12:20
  12:21 28:22

31:9 38:3,4
41:23 64:24
67:22,22 71:3
71:24 72:3
79:6 83:2,22
83:23 88:18,19
88:22,23,25
89:10,12,19,25
90:1 93:18
104:4,5,10,11
113:13 118:9
134:14 148:21
150:4 156:5
**needed** 41:14,15
  102:21 103:2
  137:16,22
  190:19,20,21
  191:8
**needs** 87:25 89:4
**negative** 72:14
**negotiate** 131:14
**neither** 69:14
  179:19
**Nell** 170:20
**Netherlands**
  81:19,20
**never** 46:10,16
  49:3 56:9
  66:21 67:17
  68:6 71:6 72:8
  72:15 80:9
  82:24,25 83:15
  86:7,12 92:13
  111:2 127:6
  128:3,20 134:9
  149:22 161:4
  181:20
**nevertheless**
  10:8
**new** 8:16 9:1,2
  10:2 49:2 53:3
  66:11,24 67:22
  68:9,13 69:11
  69:12 74:15
  104:13 105:1
  117:24 118:17

Christopher Stone - January 29, 2025

118:20 119:5,6
119:6,20
143:23 152:25
179:25 180:3,7
184:5,7
**newcomer** 24:6
**newsletter** 62:6
62:7,7,18
74:12,14
**newsletters**
62:19 64:11
95:16
**nice** 94:17 152:8
**niche** 117:3
**nine** 95:1 117:13
**ninth** 100:2,3
**noises** 7:5
**NOMA** 58:15
74:18,19 75:8
75:13,24 76:5
76:18,21 77:22
77:23,24,25
78:16,16,22
167:15
**NOMA's** 76:10
76:10
**non** 40:17
**non-compete**
12:21 15:8,11
15:20 108:4
116:10,17
153:7,19,22
154:4,16 155:4
155:7 167:7
183:13
**non-competiti...**
4:10 108:11
109:9 154:14
154:23 182:17
182:24 183:6
**nonprofit** 16:25
17:3 148:15
**nontransferable**
68:4
**Nope** 47:12
**Northeast** 119:5

**Northern** 8:17
**Norton** 23:22
24:4
**Notary** 193:5,22
**note** 114:20
149:10
**noted** 48:24
110:24
**notes** 14:20 50:9
**notice** 79:22
118:3 149:19
186:15
**noticed** 20:16
25:17 117:21
147:24
**NOVA** 77:23
**November**
123:13 125:1
136:7 146:25
148:11 150:7
177:15
**number** 2:2 7:19
47:25 54:11,14
63:12,24 64:4
67:22 98:24,24
123:11 133:25
139:15 148:6
156:22 165:18
172:11 174:6
**numbers** 14:23
31:15 37:16
54:6,24 158:16
165:2,7 166:11
166:20
**Nyack** 36:21

---

**O**

**object** 19:17
110:15 131:8
140:18
**objected** 173:9
**objection** 98:8
110:15,22
122:19 128:15
135:13 137:20
139:23

**objects** 27:7
**obligated** 151:5
**obligation** 66:23
67:2,3,25
113:25 114:12
150:9,15,25
152:7
**obligations**
116:17 164:1
**observation**
22:16 145:17
**observed** 20:11
**obvious** 17:10
140:20
**obviously** 6:9
31:14 33:4
36:21 74:12
106:16 143:20
163:11 179:6
180:24
**occasion** 36:6
37:12 39:12
119:22 122:16
122:24 127:1,4
128:13,21
129:1,22
**occasional** 32:24
135:20
**occasionally**
119:24 124:7
136:13
**occasions** 87:21
129:19
**occupation** 8:21
**occur** 83:12
**occurred** 35:15
81:12 138:24
168:9
**occurs** 78:15
168:10
**ocean** 81:22
89:23
**October** 92:23
109:7 172:15
**offer** 11:24 13:9
13:17,18 23:12

47:6 58:4
64:23 88:15
96:11,12,14,18
96:19 97:7,10
97:12,13,14,18
139:5 149:15
156:8
**offered** 11:12
26:5 40:16,20
41:20 43:2
54:4 55:21
56:1,24 57:2
57:15 60:25
91:23 151:1
156:8 158:4
163:17
**offering** 48:1
74:16,20
**offers** 13:6 93:15
96:16,17,20,23
97:1,2
**office** 101:5
118:18,21
**oh** 14:5 28:10
41:24 66:21
92:6 106:15
**okay** 8:24 11:25
13:1 16:13
17:8,13,20
19:8 22:2
24:18 25:5
26:22 27:25
29:12 30:21
31:12,23 36:24
37:2 40:3,8
43:18 44:1,15
46:21 47:14
49:3,10 58:8
59:2,7 62:17
69:4 70:12,16
70:18,20 71:5
71:10 72:8,13
73:3 77:7,17
78:13,15 80:18
80:24 81:6
82:25 84:20

86:16,18,18
89:17 90:13
92:13,20,21
94:5,24 96:4
96:20 97:6
98:2 99:9,11
100:7,10
102:13 103:6
104:8 105:4
106:12,15,19
107:18 110:20
112:5,23
118:12,23
119:1,18 120:3
124:9 127:17
130:15 132:11
133:5 139:5
141:4,21
144:24 145:23
146:5,11
147:19 151:4
153:5 155:17
157:14 158:13
158:20 159:23
161:11 162:1
163:8,13 164:3
164:12 166:1,6
168:1,17 170:2
170:10,20
171:22 173:21
174:15 175:3
176:18 178:24
180:10,16
181:2,11
183:17 184:22
185:1,12
187:22 190:23
**old** 19:10 65:20
**older** 79:25 80:2
94:17
**omission** 102:25
**once** 29:20 58:1
68:23 99:6
119:12 129:1
134:24
**one-third** 73:2

ones 7:23 55:4,4
59:21 60:2
75:13,17,18
120:25 132:25
174:6,21
online 32:12
73:6 84:21,22
88:16 191:6
onset 89:24
onsite 13:20
open 132:18
134:22 155:14
opened 155:18
opening 155:13
operate 102:21
103:2
operated 19:12
118:18,23
operating 16:1
92:7 118:15
168:12 176:21
operation 37:19
63:7
operations 14:8
15:11
opinion 131:24
132:1,3 134:17
134:19 136:24
opportune 80:17
opportunity
109:12 110:21
111:14,19,24
113:4
opposed 38:20
77:11
opposite 133:23
optimization
61:23
optional 162:16
order 13:6 29:17
30:18 32:9,14
33:2,21 34:14
34:17,23 37:12
37:16,25 38:7
38:19 39:11,17
63:23,24,25

72:16,16,17
73:20 80:4
84:20 85:10,17
85:18,19,21
86:2 87:10,10
87:24 88:12,25
89:8,8,14 90:1
90:10 92:8
104:4,10 115:4
127:4 128:8,16
129:4,5,12,22
137:23 144:10
154:15 155:21
157:6,7 164:24
164:24 170:19
173:10 174:18
175:19
ordered 37:22
74:13 85:6
88:17 89:17
154:16,22
160:20 161:2
164:25
ordering 36:4
160:23
orders 32:2,12
32:13,15 34:11
35:18 37:18
38:9 40:5
63:24,25 64:4
79:15 87:19
89:7,9 90:11
90:12 100:21
107:20,21
117:16,17
121:17 122:23
123:4,12,18
124:5 127:2
129:20 136:13
140:3 168:16
176:23 177:2
ordinarily 34:25
ordinary 107:22
organic 103:9
organize 176:16
original 61:19

61:24 62:2,9
62:12,23 96:18
originality 62:22
originally 29:3,4
54:9 78:19
150:2
Ornamental
58:15
outcome 193:15
outlay 44:10,19
Outlook 87:6,9
outside 53:1
95:20 119:7,8
167:12
overlap 165:20
oversaw 14:7
oversee 17:6
overseeing 41:9
owed 115:5
149:23
owned 9:13,15
10:7 69:3
82:24,25
117:16 158:5
190:24
owner 8:23
15:17 23:17
25:11 52:15
67:7 68:8 70:1
104:13 112:24
151:14,14
owner's 69:22
ownership 16:18
40:3 175:7,20
186:4,18
owns 36:19,21
Oxide 180:16,21

――――――――――
P
――――――――――
p.m 192:8
P35981 3:7
P76640 3:3
pace 157:15
package 29:13
29:20 50:19
packages 18:7,8

27:19 28:22,24
85:9
packaging 83:8
83:10
page 4:2,7,17,18
4:19,20 5:2
35:4 47:16
98:23,24 99:6
99:21,23,24,25
100:1,2,2,3,3
100:11 108:15
108:16 112:14
112:15,15
114:8 116:8
123:11,11,16
123:21 132:14
132:21,22
157:14 159:1
174:8 177:13
180:11 181:12
187:20 188:11
188:22,22
page's 187:14
pages 92:16
99:19 108:16
113:12,15
169:10,15
188:3 193:8
paid 29:5 44:12
103:10,17
114:21 118:8
pain 179:21
pants 156:15
paper 65:20,22
68:16
paperwork
33:22 182:19
paragraph 114:8
133:16
part 8:19 12:9
12:20 20:22,24
21:19 24:20
28:15 33:16,16
38:8 43:8 51:9
66:6 67:12
76:24 86:12

98:3,5 105:8
106:21,25
107:1,2,10,15
107:25 114:11
117:10,13,17
118:6 128:3
134:7 144:4
168:13 179:8
181:17 184:4
participants
7:12
participating
164:10
particle 13:4
30:24
particles 13:7
particular 42:22
44:7 46:15
57:24 59:9
63:22 67:14
87:16 117:5
136:17 154:10
157:13 162:15
163:18
parties 24:18
99:13,15 110:1
166:8 193:14
partner 9:16
parts 9:7 91:24
92:1
party 34:1 67:8
68:9 75:8
141:22
passed 94:17
143:7
password 104:5
104:11,13,24
105:2 121:16
126:12,17
127:20 128:10
130:19 131:6
137:5 138:14
148:24 152:16
passwords 103:1
114:5,11
120:22 127:25

Christopher Stone - January 29, 2025

128:2 136:21
138:13
paste 49:12
patent 105:15
patents 105:15
PAUL 1:6
pay 44:11 45:6
 45:11 79:22
 103:10,12
 113:2 114:20
 115:20 149:17
 149:24
paying 45:25
 114:23 131:10
 149:10 184:18
payment 114:25
 115:1 131:12
 164:1
PC 3:7
PDFs 98:10
Pennsylvania
 8:20 53:2
 119:6
people 22:13
 26:16 27:4
 31:22 36:4,14
 37:4 47:2 57:1
 58:20,22 59:4
 59:8,10,16
 60:1,1,6,7,11
 60:11 61:1,21
 88:3 93:15,22
 95:10,20
 129:10 149:13
 155:14,17
 158:21 159:10
 167:22 180:5
 182:13 187:1
 187:16 189:4
people's 31:20
percent 11:13,14
 12:8 15:21
 64:8 66:9
 73:15,16,16,21
 73:23,25,25
 74:16 76:2

79:6 119:13
 158:6
percentage
 63:14,15,20
percentages 73:9
Perfect 6:21
 85:22 100:18
 109:4
perform 13:20
 29:24 112:23
 188:24
performance
 159:2
performed 13:19
 28:20 82:15
 107:24 112:24
 186:24
performing 6:24
 14:9 22:5 30:3
performs 28:7
period 12:19
 32:17,18 89:10
 112:21 113:8
 118:7 131:2,23
 134:8,16 137:4
 147:21,22
 153:7,9,22
 154:14,23
 182:16,17,24
 183:6,7
periodic 74:20
permission 67:6
 127:6,6 184:16
person 93:2
 132:10 152:9
personal 36:9,11
 36:25 37:5,9
 42:13 125:2,11
 125:12 126:3
 126:12,13,14
 127:7,8,9,10
 128:10 129:2
 129:17,23,24
 130:1,6 136:1
 136:2,9 137:14
 138:5,12,16

139:2,6 142:7
 142:23 147:20
 148:14,23
 150:14,19
 151:14,21,22
 151:24 152:10
 152:11,11
 177:16,17,18
 177:21
personally 52:4
 178:15
philosophy
 45:15
phone 32:9,13
 33:1,21 34:11
 34:14,17,23
 35:6,11 38:11
 38:13,16 40:4
 67:21 72:9,16
 73:6,12,16
 85:4 88:5
 96:11 165:1
 166:11,20
phones 38:12
phonetic 189:9
photograph
 64:24 169:11
photographs 5:1
 64:14,17,21
 173:18,23
 174:1,2,8,11
 174:13,14,15
 174:20 175:10
 175:12,15,17
 175:22 187:8
 189:15 190:6
photos 65:3
 183:21,23,25
 184:2,4,6,15
 185:4,14 186:6
 186:18
physical 118:15
picture 71:25
 156:14
pictures 64:14
 64:16 184:24

piece 7:8 13:3
 24:16 74:24
 141:5 163:21
pieces 61:19
 88:24 113:11
pile 175:2
pin 9:21
ping 85:4
pitched 133:12
place 24:19 29:8
 85:10 87:21
 90:10 139:19
placed 96:4
 107:22
places 73:18
placing 175:11
Plaintiff 1:4,11
 6:4
Plaintiff's
 171:19
Plaintiff/ 3:3
Plaintiff/Coun...
 1:19 8:7
plant 19:3
platform 28:21
 29:12 33:13
 34:10,10 50:16
 72:23 75:4
platform's 73:22
platform/the
 73:6
platforms 50:10
 120:20
play 21:20
players 41:10
 82:12
please 6:16 7:24
 8:11 24:10
 38:24 77:18
 98:7,17 99:9
 111:10 132:9
 134:13 149:3
 164:13,16
 172:10
point 17:25

23:14 24:11
 43:10 50:21
 57:2 58:22
 70:17 79:19
 82:22 89:1
 99:9 101:25
 115:25 116:21
 122:10,15
 127:14,18
 137:2,8 138:18
 138:25 140:7,9
 143:19 148:3
 155:24 168:15
 176:11 184:25
 191:15
policy 79:12,14
polishes 19:19
polishing 41:9
 45:10 47:4
poor 111:16
poorly 45:25
pop 45:9
popular 50:25
populates 78:21
portion 114:7
 184:13
position 60:15
 60:24 79:8
 150:6
possess 113:20
possession 43:23
 104:14 145:20
 145:24 146:2
 149:7
possible 44:21
 146:20 182:8
 189:4 191:19
post 27:7
Postcard 167:16
posted 29:10
 33:7 48:9
 188:1
posting 95:15,22
 182:12,13
potential 25:24
 25:25 26:25

Christopher Stone - January 29, 2025

36:14,15 56:21
167:1 172:14
**pounds** 27:24
**power** 155:20
161:10,11,12
161:14
**powerful** 159:2
**powers** 162:16
**predated** 36:8
**preexisting** 18:8
**preface** 47:16
50:12 88:2
142:22 167:11
**premium** 158:3
180:16,22
**preparations**
17:17,19
**prepare** 27:18
**presence** 24:2,8
**present** 3:11
172:16 188:4
188:11 190:9
**presentation**
166:9
**presented**
111:15
**president** 14:7
14:11 18:14
25:13
**prespanned/p...**
37:7
**pressed** 156:17
**presumably**
24:15
**pretty** 10:7
15:12 16:20
18:6 30:11
41:9 46:16,18
70:5 88:5
94:14 126:9
136:10 139:12
167:17 178:8
**previous** 41:11
157:22
**previously**
112:24

**price** 19:2 22:23
23:14 24:4
33:7 82:7,10
**prices** 23:23
**pricing** 21:1,3
22:16
**primarily** 13:14
119:5,6 161:16
**primary** 20:10
95:17,19
155:24 161:17
**principle** 45:19
**principles** 67:18
**prior** 9:15 95:1
97:6 102:1
109:18 113:4
115:13 131:20
131:20 136:13
140:23 176:9
176:21 180:4
186:17,20
187:23
**private** 12:7
15:19,23 16:2
16:4 49:13
90:6,8,9 154:6
154:9,19
**privilege** 143:11
**privileged**
111:12
**privy** 185:7
**Pro** 29:4,12,19
29:24 30:3,6
31:25 32:12
33:12,13,17
35:4,5,6,12
38:1,18,20
39:14,17 40:4
40:8 48:9
50:10,13,19,22
50:24 54:9,15
55:8,11,16,23
71:18 72:6
75:4 84:22
85:7,15,16,20
122:6,8,11

**probability** 79:3
**probably** 6:22
38:22 68:18
102:25 105:2
145:11
**problems** 45:1
118:9
**proceed** 70:16
149:24
**process** 18:5,6
18:16 21:19,25
24:20 29:17
30:7 40:19
41:16 49:19
54:7 83:5 84:2
87:17 89:25
90:2 96:4
97:14 98:8,17
104:1,21
105:15 107:9
164:10 189:1
**processing**
172:21
**proclivity**
150:23
**produce** 172:10
**produced** 169:3
170:4,7 172:2
172:5,8,17
**produces** 38:4
**producing**
169:16
**product** 13:8
18:19 19:1,3,6
19:7 20:3,9
21:13 22:23
23:2,3,11 24:1
25:18 26:5
27:13 29:14,20
29:21 30:19,21
31:1,2,5,8,15
31:17,23 34:4
40:15 41:4,19
42:2,14 43:21
44:11,17,21
45:3,10,12,13

45:16,24 46:2
46:6,14 48:5
48:11 49:15,17
53:18 54:6,11
54:14,15,18
55:7,14,15,23
55:24,24 56:5
56:15,22 57:6
57:7,9,10,14
57:18 58:25
60:25 62:4,5
64:23 66:15
67:8,9 71:13
72:9,17 74:16
82:4,10,13,18
82:23 83:6
85:5 87:11,12
87:25 89:17
95:22 104:3
157:2,7,11,13
157:23,25
158:3,4,18,20
158:22,23
159:12 160:23
161:1,6 162:4
162:8,10,15,22
162:23 164:9
165:20 178:25
178:25 181:7
188:21
**product's** 33:6,6
**production** 4:24
168:21 169:3
170:25 171:19
172:3 173:21
**productivity**
62:9
**products** 13:12
13:18 14:10,17
17:21,21 18:9
18:11,15 19:4
19:15,16 20:21
23:16 24:14,19
27:2,3,25
28:23 31:20
32:7,22 36:4

40:20,23 41:11
43:2,4 44:22
45:16 46:22
47:3,10,18,21
49:13,14 53:13
53:14 54:4
56:9,22 59:5
60:20 62:8
64:12,14,16,17
65:2 72:3,5,6,6
72:20 82:1
83:1 88:15,17
89:1 91:11,12
91:22,23 92:8
92:14 103:12
103:16 117:4
117:19 118:23
154:20 155:21
156:1,2,7
160:2,8 162:25
163:16,23
164:5,22,24,25
170:14 182:12
183:3,9 189:13
189:20
**profiling** 157:17
**profit** 24:5
**programing**
102:23
**programming**
30:1
**programs**
104:23
**progressed** 41:5
**progresses** 133:1
**prohibited**
108:25
**prohibitive**
81:21
**promise** 6:12
148:18 150:8
150:10 151:4
**promised** 25:23
133:23 150:2
**promptly** 136:10
**properties** 88:22

Christopher Stone - January 29, 2025

property 100:21
105:6,10,24
107:5,7 113:21
114:1,5 179:13
179:15 184:9
184:13
proportion
72:22 87:23,24
88:9
prototype 84:6
prove 142:16
provide 23:10
29:2 31:8
49:20 164:21
165:1,6
provided 49:20
55:5 62:7
143:13 164:20
164:22,23
166:10 169:6
173:9
provides 29:21
providing 29:22
provision 109:10
Public 193:5,22
publish 29:6
30:13
pull 78:17 108:7
purchase 4:9
10:16 11:14
29:21,22 32:3
32:9 35:18
37:25 39:11
56:14 81:13
83:21 89:14
98:25 99:12,16
99:22 100:12
100:15,21
102:14 107:20
107:21 108:3
114:17,24
120:21 125:20
134:7 174:18
175:19,21
purchased 15:20
66:13 83:1

149:9 167:14
176:6 179:16
184:3
purchaser 68:5
purchasing
21:12,12 24:12
24:14 25:9
33:17 64:15
81:17
purest 179:7
purpose 49:22
71:18 98:23
136:3
purposes 17:10
70:22 101:22
108:16 110:9
112:9 123:16
128:14 130:24
132:13 135:11
135:18,21
137:19 179:20
put 9:21 29:5
30:1,2,12,18
31:9 34:4,17
34:20 35:1,5
35:12 37:20
38:17,19 39:17
46:4 49:21,23
50:4 53:17
54:1 64:17
65:16 71:24
72:3,17 82:2
83:17,19,20
93:14 95:1
121:14 129:7
129:13 140:9
140:12 149:14
155:10 156:15
178:13 181:1,5
182:15
putting 20:7
29:14 83:13,14

_____
Q
_____
quadrupled
51:24

qualify 11:25
quantities 27:10
81:23
quarterly 74:14
question 6:17
7:2,23,25 9:10
13:17 14:14,15
27:21 28:14
36:1 37:24
39:14 42:10
50:21 54:3,13
55:13 58:3
60:17 63:17
72:13 73:3,12
81:11 85:23,25
97:22 101:7
105:4,22
107:10,19
111:14,19,23
128:25 134:2
134:13,13,14
139:18,25
140:13,23
141:21 142:12
143:3 144:14
144:15,22,25
146:1 150:16
152:14 155:1
156:5 163:20
163:21 164:20
165:5 166:2
168:13 170:3
170:22 172:12
172:24 182:1
183:21 184:12
185:10,11,13
questions 6:6
7:19,21 9:8,20
11:4 17:8,24
25:7 28:5
37:21 39:6
44:15 51:10
81:8 92:18
111:11,12,24
116:19 152:20
164:17 185:1

192:2
quick 31:25
158:13 176:15
183:14
quick-change
159:2
QuickBook
191:17
QuickBooks
33:24 34:1,14
34:15,19 35:1
38:7,8,13,20
39:13,22 40:9
50:10 71:16,22
72:17,21,24
73:2,24 74:1
80:5,8,9,11
106:18 107:2,8
120:17 121:6
121:10,12,13
122:13 190:13
190:21,22
191:5,6,8
quickly 117:25
142:24
quite 9:8 163:11
quote 109:24
quoted 170:18

_____
R
_____
raise 96:23
random 31:15
range 12:18
Ranking 64:3
rankings 62:10
ranks 61:17
Rapids 3:4
rare 32:24 36:5
36:5 37:3
39:12 60:24
120:1 127:4
128:8 129:1,22
130:8 136:15
139:12 168:8
168:10 177:3
178:8

rarely 122:25
123:3 128:13
139:20,21
140:3
rate 79:5
rational 188:15
re-change
138:13
reach 66:11,14
66:23 67:10
68:12 69:11
138:22 155:13
167:12
reached 116:13
149:12 167:14
reaching 97:6
reacquired
141:7
read 57:13,16
68:3,6 99:6
100:17 102:20
109:12,18
166:17 172:22
172:23
reading 62:20
100:14 110:20
123:25
reads 61:13
ready 17:17
183:6,10
187:25
Reagan 3:7
real 36:20 143:9
really 19:9 24:5
28:23 42:13
62:5 68:22
78:11 79:6
93:22 103:7,7
115:21 137:14
137:16 138:16
138:16 143:19
159:10,20,22
179:14,15
realm 45:22
reask 28:14
reason 20:7

Christopher Stone - January 29, 2025

23:14 51:1
57:23 60:3,3
93:19 102:6
105:11,19
106:1 136:12
152:14 166:15
166:16,18
178:1 188:1,10
189:18 190:1,8
**reasons** 19:21
20:1,2,6,10
22:17 23:6,8
23:16 45:5,13
57:24 96:19
160:6
**reassert** 137:9
138:6,9
**reasserted**
137:11 145:10
152:15
**rebate** 149:20
**rebates** 148:11
**recall** 15:20
16:10,11 37:20
39:19 50:14
51:8 104:12
109:17 123:6
124:24 139:4,4
139:7,7 161:4
162:14 171:7
191:17
**receipt** 33:5 86:2
**receivables**
100:19
**receive** 12:8 36:3
38:11 39:15,16
52:3,16 87:10
87:23 101:25
114:25 115:1
122:5,7,23
128:25 129:12
129:22 137:8
154:22,25
176:22 177:2
**received** 12:11
37:12 38:17,18

40:5,6 78:19
80:4 92:13
93:15 97:12,13
100:16 117:16
121:24 122:2
123:4 129:4
134:11 140:2,3
141:24 144:18
154:25 168:16
184:1 185:15
**receiving** 32:2
53:8,11 83:9
83:13 170:18
**recipient** 13:12
**recognize** 158:9
158:11 161:21
163:6,8 175:4
180:14
**recognized**
190:20
**recollection**
11:22 69:19,21
76:6 124:14,19
124:21 138:11
141:14
**recommended**
88:1
**record** 10:9
17:11 26:23
33:10 34:11,18
48:24 70:22
74:22 76:10,14
77:6,8,12,20
78:6,10,11
79:6 80:7,7,10
81:1 98:23
108:16 123:16
130:7 134:18
139:19 140:15
142:2 144:6,11
144:12 146:14
146:16 158:11
176:19 183:19
193:9
**recorded** 2:1
34:22

**Recorder** 2:1
193:4
**recording** 6:25
33:25
**records** 33:23
65:22,25 66:4
73:20 79:9
114:6 130:3
134:9 137:15
139:14 142:10
142:13 144:1,2
144:3,8 145:13
153:25 160:7
**recreate** 113:20
**reduce** 79:23
**refer** 37:16
120:21 187:14
**reference** 69:14
103:5 181:12
**referred** 102:16
**referring** 17:11
28:7 37:23
77:14 82:16
86:17 115:13
121:1 126:18
144:2 170:16
177:21,23
185:25 189:6
**reflected** 170:24
**refresh** 124:13
**regard** 136:6
143:21
**regarding**
114:15 173:18
**regardless** 23:1
132:2 134:2,15
177:1,25
**register** 147:2
173:23
**registered**
147:16 176:12
**registering**
146:19
**registrant**
147:14,15
**registration** 2:2

169:11 173:22
**related** 40:23
79:14 111:11
160:12 168:21
172:20,25
185:1,8 193:13
**relates** 164:16
164:18
**relating** 170:11
171:5
**relation** 94:14
172:5
**relationship**
13:25 14:2
15:7 18:25
20:18 21:7,8,9
22:21 23:4
25:23 26:19
36:7,22 68:24
69:6,12 94:16
112:20
**relationships**
25:21 37:6,9
**release** 116:8
**reliance** 160:21
**relief** 110:3
**religious** 94:3
**remain** 80:8
142:19
**remained** 15:3
16:1
**remaining**
183:16
**remains** 145:20
**remember** 9:22
11:16 12:12,16
15:10 16:15
26:8 32:16
38:21 40:7
51:4 55:22
64:6 72:11
73:5 74:1
75:14,17,18,19
76:2 94:18
96:2,8,9
100:14 124:9

124:22 141:6
141:10 146:20
147:7,9 160:25
164:10 165:14
167:21 168:20
169:5,6,16,22
169:25 177:11
180:2,6 182:11
186:16 191:14
191:18
**remembered**
132:7 167:12
168:6,7
**removal** 157:16
**remove** 19:24
160:17 186:8
**removed** 124:20
186:21
**repaid** 131:15
**repaying** 149:9
**repayment**
97:17 114:15
114:19,24
**repeat** 63:16
89:11 150:16
168:13
**repetitive** 48:16
**rephrase** 51:6
55:13 135:15
170:23
**report** 165:18
170:9,12,24
171:5,12,12
172:18
**reported** 39:9
138:24
**reporter** 6:23
8:3,12 98:15
120:11
**represent** 44:2
84:17 189:19
**represented**
23:17 55:2
63:22 64:8,19
65:14 111:6
**reproduction**

Christopher Stone - January 29, 2025

114:6
reps 14:13
request 105:1
  113:18 125:18
  143:12,12
  168:21 169:3
  171:4,19 172:5
  172:7,17,20
  173:6,12
requested 42:2
  143:3,5 169:2
  169:2,6 179:23
requesting 57:1
requests 4:24
  169:20 172:3,7
  182:23
require 54:20
required 54:1
  65:10 126:2
research 57:13
resin 22:4
  180:16,21
resolution
  115:24
resolve 115:16
  115:17
resolved 115:19
  115:22
respect 6:14
  37:24 54:13
  77:22,25 78:22
  84:2 86:19
  87:22 96:9
  97:20 106:2
  116:22 119:1
  121:5 122:23
  124:14 126:17
  140:19 150:6
  162:22 174:15
respectively
  151:17
respond 124:7
  129:2 136:9,11
  177:19
responded
  128:20 143:12

responding
  125:5 136:11
response 12:23
  28:9 40:11
  79:5 92:4
  125:5 145:6
  156:10 169:3
  169:19 171:4
  171:19 172:12
responsibilities
  148:17
responsibility
  66:11,13 68:12
responsible 14:9
  95:4 189:8
responsive
  172:16
rest 185:16
restate 24:9
  106:7 139:25
restrictions
  148:15
result 56:24
  62:23 94:7
retain 78:6
  95:14 191:7
retained 33:10
  51:4 142:2
  144:18 191:20
retention 79:12
  79:14
return 113:16
returned 147:21
  161:1
returns 51:12
revenue 51:15
  51:19 64:4
review 110:21
  112:25 113:4
  134:9
revise 140:25
right 10:21
  16:20 20:18
  22:9 27:8,25
  33:1 37:11
  39:3 40:14

41:17 46:8
47:11,13,14
48:12,25 51:24
55:10 58:10
60:12,21 62:20
62:24 69:3,18
70:11 71:11,19
71:22 75:1
76:15 77:3,4,5
77:5 78:7 80:5
82:23 83:3,9
83:23 90:4
92:18 96:6
98:20 102:11
103:2 105:8
106:6,11,20,22
107:2,5,6,16
108:3,5,9,20
109:1,12 112:5
113:2 114:12
114:17 115:25
116:11,21,22
119:22 120:10
122:13,18
124:1,8 125:24
125:25 126:4,7
127:3,20
128:10,14,18
130:8,10
131:17,19
132:1,23 133:2
133:3,10,13
134:5,18
136:22 137:2,6
137:19,25
140:4 141:15
141:15 146:1,3
146:15 147:2,6
147:12,17
148:2 149:4
151:6,10,21
152:2,16,18,25
153:8 154:20
157:3 158:14
159:18,24
162:5,19 164:3

166:21 170:9
171:1 172:4,20
176:1,3,7,13
177:19 178:6
178:10,15
179:8,9 180:11
180:17,19
182:25 183:11
183:14 185:11
187:12 190:3,9
190:18,24
191:1,4
rights 186:4
Road 3:8
Robert 3:11 93:5
  115:11 123:11
  123:17 124:5
  132:16 133:5,7
  134:21 146:25
  148:13
role 14:6 116:24
  117:5,14
roles 53:5
  112:24
rolled 106:24
Roloc 158:13
  159:1
room 27:14
root 185:13
round 28:2,3,3,6
run 79:24 93:22
  183:7
running 15:11
  93:21
runs 109:7

S

S-T-O-N-E 8:14
safe 12:14 38:10
  41:20 43:15
  49:6 51:22
  56:21 57:5
  60:14 61:6
  73:18 80:13
  94:7 119:9
  149:2 154:13

177:25
Sait 49:16
sake 80:20 144:7
salary 52:1
  117:14
sale 15:24,24,25
  16:12 33:12
  34:22 38:5
  39:7,23,24,25
  39:25 40:1,20
  44:23 50:15,16
  51:3,6,7,9,20
  52:8,21 56:1
  56:24,25 57:2
  64:23 66:20
  67:12 72:8
  74:7 80:11
  85:1,4 93:7,14
  94:1,22 95:1,3
  95:25 97:15
  101:10 102:14
  103:14 106:1
  106:21 114:23
  116:25 117:6
  117:13 120:4
  124:19 125:16
  125:17,18
  126:2 134:6
  140:6,6,12
  156:8 163:17
  164:2 170:15
  174:17 176:22
  179:9 184:8,11
  184:13
sales 14:9,11,11
  28:19 33:3,19
  34:4 35:15,24
  35:25 37:12,21
  38:10,16 40:5
  40:5,10 43:8
  45:24 49:23
  62:7 63:16,20
  63:23 64:8
  71:11,25 72:1
  72:20,22 73:6
  73:9,10 74:22

75:21 100:12
122:16 128:1
129:2 136:18
139:11,17
140:16 141:23
142:13,19
144:19,20
145:13 153:18
164:9,9,22
169:23 170:8
170:11,23
172:19 183:3
**sales@lehighv...**
129:9
**sales@lva.com**
35:21
**sand** 157:12
**sanding** 90:22
156:13,14
157:1 158:3
**sandpaper** 19:14
19:14 30:17,17
48:17,18 89:15
**satisfied** 115:23
**save** 78:8
**saved** 77:5 78:8
78:9,10 79:10
79:10
**saving** 78:11
**savings** 18:23
23:13
**saw** 131:18
133:14 173:21
**saying** 44:17
56:17,18 62:25
67:4,25 68:11
69:21 74:15
76:13 89:19
107:8 109:8
139:20 151:19
179:6 185:18
**says** 12:1 98:24
100:4,12,12,22
101:19 102:20
102:20,24
103:1,25

106:12,20
107:20 108:18
109:21,23
110:6 112:8,9
112:11,23
113:16,22
114:23 115:9
115:10 123:11
124:4 125:2,10
132:15 133:16
133:21 136:7
146:24 147:11
148:10,12,20
157:14,16,17
157:19 159:3,7
162:1,2,16
163:7 165:19
165:20 166:7
171:18 172:16
177:15,18
180:18,20
**schedule** 71:7
**school** 11:11
16:16 65:20
180:2
**scope** 176:11
**scrape** 188:20
**scratch** 131:11
170:5
**screen** 21:22
98:6,9 99:3
105:5 108:10
108:13,17
113:14 115:10
123:9 146:23
147:2 148:8
150:18 156:22
171:18 175:5
177:13 180:12
**screening** 10:25
11:2 13:1
**screenshot** 4:17
4:18,19,20 5:2
158:10 161:21
163:5,19
**scroll** 106:24

147:4
**Seals** 2:1 193:4
193:22
**search** 60:11
61:17,23 62:11
103:9
**second** 6:22
77:18 109:15
113:14 116:7
136:16 157:14
159:1 174:8
**section** 99:24
100:11,15,18
116:7
**see** 14:20 34:23
64:15 68:3
73:4 77:3
78:14 81:4
85:4 99:3,5,10
100:21 101:19
102:19 106:12
106:13,14,16
108:10,13,18
109:21 110:6
112:10 113:14
113:22 114:7
123:9,13,18,19
125:2 132:14
133:18,20
146:23 147:2,4
147:14 148:8
156:22 157:17
158:23 159:1
163:20 165:20
166:2 171:17
174:8 177:12
181:12,13
182:1
**seeing** 7:11,11
62:13
**seeking** 144:19
144:20
**seen** 116:22
136:5 159:20
165:23
**sees** 61:14

**segment** 42:22
167:20
**sell** 9:5 13:13,18
17:21 18:22,25
21:4,4 25:19
31:20 44:25
45:14,20,21
46:1,14 48:17
49:15 56:4,6
56:10 57:17,22
59:5 66:14,17
67:7,9 81:14
92:24 93:9,11
93:13 94:19
95:8,18 97:23
153:25 154:1
155:6 158:24
160:12 162:25
179:6 183:13
**seller** 33:9
109:23,25
**sellers** 100:4
107:22
**selling** 21:5
24:18 26:11
27:1 30:11,20
37:4 42:24
44:3 45:2 47:8
47:21 56:6
59:13 60:1,20
60:25 61:5
63:6 67:20
73:11 74:16
92:19 94:8
95:2 102:1
154:3 174:15
**sells** 9:4,6 153:14
**semantics**
127:15
**semi-open** 159:3
**send** 74:14,17,20
75:16,21 76:12
77:4,12 78:2,5
79:4 83:22
85:9 89:7,9
125:6 149:3

166:23 167:4
167:18 186:14
**sending** 124:17
124:18 136:14
147:9 168:21
**sends** 85:21 87:8
**sense** 10:7 24:7
41:2 44:16,20
45:8 47:22
72:4 94:23
117:8
**sent** 36:22 76:14
76:16,20 78:6
85:11,12,12,15
95:15 121:13
122:16 129:10
133:1,3 135:3
136:1 140:4,16
141:23 146:25
147:11 148:10
167:1,18,21,22
167:22,23
168:7,22,23
169:5 177:7,9
177:10 178:3,5
186:5,15
**sentence** 100:13
**separate** 13:3,7
68:9
**separately** 71:22
**September**
171:24
**sequence** 96:24
**series** 18:9
169:12
**serve** 112:19
**served** 131:18
**server** 65:19
121:14
**service** 13:9,19
33:17 47:7
113:2 176:25
177:7
**services** 13:12
74:21 104:7
112:23 186:25

Christopher Stone - January 29, 2025

servicing 13:19
serving 113:7
  116:21 121:18
set 47:4 84:3
  86:4,5,7,9
  193:18
settlement 4:12
  115:3,9,10,12
  116:14 138:20
  151:1,9
setup 32:1,1
seven 169:15
seven-page
  112:13
seven-year 109:5
  109:8,9
seventh 100:2
severely 61:8
shape 156:15
  162:17
share 98:9,21
  165:17
shared 145:4
  148:18
sheets 105:15
Shidorf 123:17
shied 42:9
Shindorf 3:11
  93:4,5 96:5,8
  96:17 97:4,17
  115:11 116:8
  117:23 118:8
  120:4,14,15
  123:4,12,22
  124:25 125:14
  129:7 130:14
  130:17 131:6
  131:24 132:16
  133:6 134:4,16
  134:21 135:17
  136:8,12
  138:19,20
  139:1 140:10
  140:19 142:6
  142:11,14,14
  142:25 145:10

145:21 147:1,5
  147:20 149:6
  163:25 177:15
  178:2 184:17
  190:19
Shindorf's 96:21
  133:7 174:7
ship 13:22 14:17
  24:3 27:11
  32:10 36:24
  43:7 44:4
  89:23 90:1
shipped 43:6,24
  44:11 118:23
  119:20 175:19
shipping 27:18
  33:8 43:5,8,9
  43:11,14,20,21
  43:23 44:23
  53:8,11 85:18
  89:21 90:3
  189:13
ships 43:21
shipyard 36:20
  36:21
shop 41:9 183:7
shopping 30:1
  103:11
shops 45:10
short 71:3
shortest 84:14
  84:15
shortly 118:7
shot 180:12
show 59:15,16
  98:6 112:5
  115:8 120:8
  123:7 125:24
  132:6,12 136:4
  146:22 156:19
  156:21 158:8
  161:19 163:4,8
  169:7 171:16
  174:2,5 179:18
showed 172:1
showing 113:13

142:18
shown 54:21
  152:6 158:11
shy 42:11 45:2,4
  45:7,12
sic 48:12 55:9
  182:16 184:9
  185:16
side 93:2
sign 12:20,21
  15:8,10 65:14
  65:15 66:11
  68:13 69:12
  173:10
signal 128:24
signatory 69:16
  69:16,17
signature 69:22
  100:3 112:17
  123:22 132:23
signed 65:1,1,11
  110:11 149:4
  153:7 173:3
significant 44:2
signing 68:7
  109:18 113:24
silicone 91:21
similar 23:2
  33:12 38:10
  40:23 50:19
  94:15 117:15
  153:15 188:6
simple 18:6 27:2
  61:13
simply 137:21
single 18:19 19:1
  19:5 34:14
  64:7 73:20
  119:10 129:12
  157:15
sir 132:9
sit 49:10
site 18:10,12
  31:9 54:9,10
  73:13 78:4
  102:21 103:2

120:23 160:2
sites 188:7,8,9
sitting 192:4
six 14:25 15:6
  16:12 84:15
  134:6,12
  169:15
sixth 100:1
size 13:4 28:4
  30:23 51:24
sizes 49:5
skip 171:22
SKU 48:6,24
  49:4 54:11,17
  54:20,24
SKUs 42:5 47:23
  47:24,25 48:3
  48:5,15 54:5
  54:15,18,22
  55:3
slightly 85:22
  97:21
small 8:23,24
  9:10,13 23:25
  26:16 27:10,25
  42:23 45:10,11
  64:9 99:8
  118:21
smooth 19:19
soft 159:4
softer 91:5,9
software 29:2,3
  29:19 30:3
  34:2 38:8
  50:13,19 54:19
  71:16,17 73:1
  79:2,2 85:9
  86:4,5 100:20
  101:4,18
  102:16,18,24
  104:23 106:18
sold 10:5,13,14
  12:7,19 14:12
  14:24 16:24
  17:23 18:20,24
  19:7 27:3

32:21 33:6,7
  40:17 43:4,5
  46:10,16 47:2
  48:2 51:18,23
  55:25 56:3,16
  56:19,23 57:15
  60:11 63:10,11
  68:23 69:6
  72:5 83:2
  90:17 92:23
  93:13 96:19
  101:1 102:8
  103:17 105:7
  105:12 107:15
  108:1 114:1,19
  117:1,2,23
  118:20 154:5
  158:23 160:9
  162:10,14
  164:5 174:14
  179:7 182:16
  184:9,14,16
  190:14 191:1,3
  191:13
sole 140:10
  152:12
solemnly 8:3
solicit 35:24,25
  74:4 176:22
solicitation 74:9
  78:5,12 155:12
solicitations
  75:6 92:13
  166:23 167:5
solicited 46:6
  96:20
somebody 10:20
  45:14 53:10,10
  87:8 131:10
  144:10 189:4
  190:6,7,7
son 53:10,11
sons 52:22,25
  53:1,5,12,17
  53:22,22,25
soon 69:6 70:6

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

| | | | | |
|---|---|---|---|---|
| | Southern 8:18 | spreadsheets | 118:6 149:17 | 173:14 176:21 |
| sorry 12:25 | space 60:19 | 165:15 | stayed 15:3 | 179:19 180:11 |
| 40:13 41:8 | 118:22 | sprung 109:15 | steal 127:6 | 183:21 185:24 |
| 55:12 60:16 | span 96:13 | square 118:22 | 128:10 138:22 | 192:1,3 193:10 |
| 66:2 70:14 | speak 96:10 | 143:8 | stealing 131:20 | Stone's 171:18 |
| 77:22 79:2 | speaking 83:12 | Stacey 2:1 6:24 | steel 13:5 18:15 | stop 71:2 78:15 |
| 87:10 92:5,6 | special 164:9 | 98:7,11 120:9 | 90:25 | 110:3 186:5 |
| 105:22 120:9 | speciality 95:6 | 176:16 193:4 | steels 159:5 | stopped 73:11 |
| 120:14 128:23 | specialty 95:23 | 193:22 | step 6:15 28:20 | 114:12,23 |
| 132:9 133:17 | specific 16:15 | stack 160:7 | steps 10:19 | 149:10 |
| 145:7 150:16 | 54:22 69:2 | staffing 148:16 | stock 15:24,25 | storage 79:21,23 |
| 156:11 157:12 | 87:25 89:7,9 | stainless 13:5 | 48:21,24 | 79:24 |
| 165:4,5 170:4 | 101:8 104:15 | 18:15 90:25 | 157:16 | store 31:25 |
| 172:21 174:22 | 169:25 | stamp 83:18 | stockpile 27:13 | 32:12 76:12 |
| 184:12 185:21 | specifically | stamped 83:7,24 | stole 126:13,21 | 121:22 122:2 |
| 189:11 | 13:18 37:23 | stamps 124:2 | 131:21 151:13 | stored 40:9 |
| sort 13:8 20:16 | 46:19 101:7 | stands 48:24 | 151:15 | 54:11 55:8 |
| 26:12 41:5 | 102:16 167:21 | Stark 3:7 | stolen 128:11 | 65:18 114:4,11 |
| 42:8,23 45:18 | 171:9 175:16 | start 8:10 9:24 | 129:6 138:12 | stores 29:4,12,19 |
| 46:25 56:17 | 181:9 189:6 | 47:17 59:13 | 139:9,9 | 29:24 30:3,6 |
| 64:24 84:10 | specification | 93:8 121:2 | Stone 1:7,10,18 | 32:12 33:12,13 |
| 89:24 120:17 | 31:5 48:10 | 184:19 190:23 | 6:3,20 7:9,14 | 33:17 35:4,5,7 |
| 158:21 167:20 | specifications | started 14:25 | 7:17 8:2,5,6,11 | 35:12 38:1,18 |
| sorting 79:18 | 31:12,17 | 17:21 22:19 | 8:13,13,15 | 38:20 39:14,18 |
| sorts 92:14 | specificity 36:2 | 25:5,19 27:16 | 17:10 26:24 | 40:4,8 48:10 |
| sound 6:14 92:5 | 101:9 | 28:25 29:1,4 | 67:7 68:7 | 50:11,14,20,22 |
| 119:15 156:11 | specified 67:15 | 31:20 32:4 | 70:15 71:1 | 50:24 54:9,16 |
| sounded 31:4 | 102:17 | 36:22 41:13 | 77:11,22 80:17 | 55:11,16,23 |
| sounds 20:16 | specifies 136:18 | 42:24 51:3,6,7 | 80:24 81:3 | 71:19 75:4 |
| 69:14 70:13 | 136:20 | 86:21 125:5 | 99:3,14,15 | 84:23 85:7,8 |
| 98:13 146:10 | specify 34:25 | 136:11 156:3 | 100:3,4 108:9 | 85:15,16,20 |
| source 20:15 | 89:14 106:19 | 166:24 | 108:20 110:18 | 122:7,8,11 |
| 25:6 26:25 | 168:14 | starts 112:14 | 111:1 112:11 | Stores/Big 72:7 |
| 33:24 36:3 | spell 8:12 9:18 | 123:17 | 112:17 115:12 | story 31:24 |
| 39:22 41:6,19 | 23:8 | state 8:11,17,19 | 120:14 122:23 | 93:10 132:25 |
| 41:25 58:20 | spend 93:11,20 | 119:12 193:5 | 123:11 127:15 | strattling 113:12 |
| 59:3 60:8 67:2 | spent 41:8 | 193:22 | 128:23 132:15 | stray 36:9 168:4 |
| 67:25 71:12 | 180:25 | statement 72:18 | 132:15 134:2 | street 147:15 |
| 73:10 77:2 | spins 13:5 | 134:3 159:8,19 | 134:21 135:17 | strike 36:14 |
| 80:10 106:20 | 156:16 | 166:3,15,17 | 140:2 141:1 | 39:23 87:22 |
| 128:20 | splater 19:24 | States 1:1 18:20 | 143:19,25 | 165:4 |
| sources 25:24,25 | splatter 19:22 | 19:1 20:21 | 146:11,18,25 | string 54:24 |
| 56:22 64:20 | 21:25 31:1 | 24:2,16 119:8 | 148:8,10 | 62:13 |
| 71:11 73:5 | spoken 131:22 | 174:19 | 156:22 165:18 | structure 91:1 |
| 103:21 | 138:20 | stay 14:24 | 165:23 166:12 | struggling 118:2 |
| sourcing 20:12 | spread 91:6,9 | 117:11,14 | 168:20 171:18 | stuck 46:17,18 |

Christopher Stone - January 29, 2025

| | | | | |
|---|---|---|---|---|
| **stuff** 22:14 50:2 | **Sue/pam** 124:7 | 56:17,20 59:19 | 42:16,19 43:23 | 94:3 113:15 |
| 130:12 133:15 | sue@lehighval... | 66:9,14 74:23 | 52:3 70:6,17 | 118:19 120:6 |
| 142:24 151:20 | 124:13,16 | 77:10,19 80:23 | 71:1 73:19 | 120:16 131:2 |
| **stuffing** 27:19 | sue@lehighval... | 90:24 98:16 | 78:2,4 80:18 | 131:18 140:5 |
| **stumble** 59:4 | 124:8 | 99:20 106:13 | 84:2 88:12 | 143:7 144:8 |
| 143:10 | **sufficient** 154:19 | 119:13 120:25 | 89:19,22 93:12 | 148:5 168:14 |
| **subhead** 100:1 | **suitable** 160:10 | 121:23 124:11 | 93:23 94:6 | 168:15,25 |
| 100:25 105:5 | **Suite** 3:4,8 | 126:9 139:24 | 97:18 117:7 | 171:3 172:25 |
| 107:19 113:15 | **summary** 109:25 | 143:6,8,14 | 141:10 146:6,8 | 174:3 188:16 |
| **subheadings** | 165:19 166:4 | 144:13 147:9 | 150:7 172:23 | 188:18 190:5 |
| 100:25 | **Sundisc** 20:19 | 148:17 150:17 | 175:13 176:15 | **talks** 105:14 |
| **subheads** 99:24 | 20:24 21:4,7 | 155:6 158:6 | 177:12 181:11 | **tasks** 40:23 |
| 99:25 100:18 | 21:10,15 22:21 | 165:10 169:5 | 183:14 187:7 | **tax** 51:11 |
| **subject** 61:19 | 22:24 23:4,5 | 170:11 181:22 | 189:14 | **taxes** 190:20 |
| 70:9 97:21 | 23:25 24:7,15 | 183:16 188:17 | **taken** 1:19 72:16 | 191:9 |
| 112:25 123:12 | 31:8 81:11,13 | 190:4 | 84:13 87:21 | **TCNJ** 53:3 |
| 123:17 132:18 | 81:18,19,25 | **surface** 19:19,23 | 147:24 161:6 | **technical** 62:6 |
| 134:21 139:3 | 82:1,6 83:6,7 | 19:24 20:1 | 161:21 163:19 | **technology** 30:3 |
| 147:1 165:19 | 84:9,10 88:15 | 21:23 90:25 | 190:6 | 107:9 |
| 168:14 | 88:17 89:6,18 | 156:17 159:12 | **takes** 68:9 84:6 | **telephone** 35:16 |
| **subjects** 7:7 81:9 | 154:11,15,17 | **surfaces** 31:2 | 84:12 104:14 | 39:25 |
| 149:1 | 174:12 175:19 | 159:6,10,11 | 154:8 | **telephonic** |
| **submit** 37:18 | 175:22 176:7 | **surfacing** 90:16 | **talk** 6:13 9:21 | 172:10 |
| **submitted** 32:12 | 184:18,21,23 | **surprise** 160:1,4 | 10:17 29:15 | **tell** 7:19,20,24 |
| 127:3,5 129:20 | 185:2,7,9 | 160:5,8,11 | 47:21 48:4 | 16:16 26:6 |
| 174:19 | **Sundisc's** 23:16 | 181:10 | 70:9 81:11 | 34:24 38:24 |
| **subparagraph** | **supplied** 31:22 | **surprised** 73:4 | 88:4 97:20 | 39:22,24,25 |
| 109:19 | 173:4 | 160:16 | 103:5 126:21 | 40:1,19 41:24 |
| **subparts** 100:1 | **suppliers** 18:17 | **surprising** 181:7 | 131:9,15,16,17 | 42:3 47:1 74:9 |
| **subscription** | 25:13 117:20 | **survive** 116:11 | 138:21 144:8 | 83:14,23 87:11 |
| 29:5 167:14 | 172:14 | **suspect** 10:17 | 152:23 | 88:19,23,23 |
| **subsection** 114:8 | **supplies** 100:19 | **swear** 8:3 | **talked** 25:5 | 89:12 93:10 |
| 116:7 | **supply** 1:3,13 | **sworn** 8:7 | 32:21 37:24 | 96:22 99:9 |
| **subsequent** | 6:5 10:13 | 193:11 | 71:8 121:6 | 124:11 130:22 |
| 90:11,12 | 36:23 92:25 | **system** 65:16 | 157:5 187:11 | 131:7 138:22 |
| **subsequently** | 93:1,17 99:13 | 79:20 85:13 | **talking** 11:18 | 139:10 143:11 |
| 184:5 | 117:2 173:5 | 111:3 121:17 | 17:9 19:11,17 | 143:23 183:6 |
| **substantial** | **support** 17:7 | 129:5 137:23 | 20:15 21:13 | 187:17 188:18 |
| 22:20 23:3 | **Suppose** 38:2 | | 22:5 27:22 | 193:11 |
| **success** 79:4,7 | **supposed** 114:21 | **T** | 30:9,10,11 | **telling** 46:10,11 |
| 117:7 | 117:18,18,21 | **TABLE** 4:1 | 47:17 48:5 | 123:6 143:20 |
| **successful** | 149:19 150:15 | **tailormade** | 51:13 62:2,2 | 159:17 |
| 170:17 | **sure** 10:18 17:10 | 49:22 | 64:21 65:19,19 | **templates** 29:6,8 |
| **successfully** | 38:23 39:20 | **take** 29:16 30:15 | 65:20,20 67:17 | 30:13 187:3 |
| 117:7 | 42:1 44:23 | 33:21 35:11 | 71:18 75:25 | **ten** 26:17 27:24 |
| **Sue** 124:18 | 51:2,9 55:14 | 39:21 42:12,15 | 76:1 77:9,14 | 36:24 76:1 |

Tip of the Mitt Transcription
(231) 753-6957

Christopher Stone - January 29, 2025

86:8 87:2
114:25 118:4
139:21 180:25
**ten-page** 98:25
**tends** 6:13
**tense** 10:7
**term** 82:17,17
90:8 102:15
109:5,8,9
140:3 144:13
187:23,24
**terminate**
124:22
**terminated** 69:6
**termination**
113:17 115:24
**terms** 64:4,4
97:10 101:5,8
102:15 109:2,4
111:5 130:14
135:14 188:8
188:16
**terrible** 79:5
**terribly** 79:7
**testified** 84:24
128:16 138:1
164:1
**testify** 127:11
151:4
**testimony** 8:4
23:7 24:10
40:14 57:21
58:8 66:22
69:1 90:14
104:18 106:7
107:11 115:14
115:18 122:6
122:12,15,18
122:20 127:16
128:16 135:14
137:21 138:3
140:2 142:18
142:20 145:20
147:19 152:25
154:8 156:7
157:2,22 164:3

164:16 166:14
167:8 181:4
182:10,11,21
183:2 185:15
189:23
**text** 62:20 99:6
162:24 172:10
180:24
**thank** 36:2
145:1 192:4,5
192:7
**theirs** 17:1
**THEREOF**
193:18
**they'd** 64:15
**thin** 27:25
**thing** 6:11 7:19
18:2 22:25
23:2 31:13
44:13 46:21
49:5 57:11,20
61:5 70:22
74:17,21 78:15
81:10 83:25
84:20 89:12,14
89:19 90:9
119:15 132:19
136:17 146:7
148:5 151:11
151:12,16,23
173:12 174:23
**things** 6:8 22:6
22:13 44:14,18
48:16 55:21,25
59:24 71:2,8
74:11 81:10
93:24,25
102:13,19
103:3 105:18
105:23 106:2,4
107:12 116:6
117:9 120:17
131:13 136:20
145:19 153:6
158:21 162:18
169:22 172:9

180:5 187:16
187:24 188:13
**think** 15:18
20:21 23:7
24:9 28:10,13
32:23 40:12
43:19 45:15
46:3,16,17,17
48:2,2 50:8
52:22 53:9
57:11 58:22
59:18,21 61:21
63:18 64:7
66:8,8 67:4
68:10,12 70:10
71:17 72:14,19
74:24 77:11
80:5,16 84:19
85:24 86:4,9,9
86:22 87:2,3
90:22 92:5
94:2,12,25,25
95:1 99:8,8
102:19 105:13
107:10 119:13
119:16,19
128:23 129:8
129:25 131:5
133:14,14
138:8 139:11
140:5,8 141:12
142:16,16
146:7 150:8
153:23 154:15
155:3 156:5
158:6 160:18
171:2,7 173:11
174:25 176:24
176:24,25
177:3,3,7,23
177:23,24
178:22 185:20
188:14 189:7
**thinking** 26:3
69:13 163:9
**third** 24:18 34:1

67:8 68:9 75:8
99:24 113:15
123:21 141:22
**thought** 57:14
66:21 69:1
86:12
**thousand** 12:13
63:13,25
131:12 156:4
**thousands** 18:23
18:23 42:4,5
58:2 115:21
149:23
**three** 57:24
79:15,25 80:2
84:7,16,17
89:22 90:2,3
90:12 95:17
99:15 101:17
102:6 108:15
108:15 114:21
115:1 117:11
118:5,7 154:9
**three-page**
123:10
**Thursday**
134:22
**tied** 104:15,18
**time** 10:20 11:24
15:2 16:17
17:23 18:19
24:8 28:14
30:10 32:17,18
34:8,9 37:19
38:18 40:3
41:22 43:12
46:23 47:1,1
47:14,17 48:23
50:4 51:18,19
51:22,23 52:8
52:18,20 56:13
63:10 64:3
65:7,9,15
75:12 78:17
79:12,16 80:17
84:11 86:2,21

87:19,19,23,24
88:25 89:1,10
89:17 90:9,10
92:7 93:11,12
93:20,23 94:6
94:18,23,25
95:8,10,25
96:10,13,16
97:15 99:9
101:12,25
102:8,10
108:24 109:16
112:21 113:8
116:13 121:18
122:10,15
124:1 127:18
129:11 131:19
131:23 132:7
133:1 134:16
137:8 138:18
140:6,7,9,12
140:16,19
141:18 142:24
143:14 147:22
147:22 153:11
154:20 155:20
155:23,24
161:1 168:9,9
168:10,10
172:23 176:5
176:11 177:2,2
180:4,6 183:2
185:8 191:3,15
192:3
**timed** 183:12
**times** 46:12
57:16,21 58:1
58:2,2,3,6
92:17 96:11
**Tip** 2:2
**tired** 172:21
**today** 6:5,7,23
7:11,19 9:9
49:2 70:22
71:2 138:25
140:15 141:2,3

141:21 142:19
152:2 179:21
181:4 182:10
187:23 192:1,4
**today's** 7:12
**told** 37:15 67:24
80:5 123:4
126:8,9 127:2
127:7 130:18
134:4,23
135:18 148:1
149:13,16
152:9 188:18
**ton** 22:13
**tons** 44:13
182:21
**Tool** 8:25 9:1,3,4
9:9,11,14
16:23 152:24
153:2 155:8,14
155:17,22
156:2,2 162:2
162:16 164:4
164:23 165:7
166:24 168:3
168:17 169:23
172:15 175:20
178:9 179:1
182:6 186:25
187:2 188:2,11
189:12,16
190:2,9
**tools** 161:10,11
161:12,14
**top** 26:6 46:3
59:17 60:21
64:6 98:22,25
99:12 108:12
108:17 112:7
114:8 115:9
123:10,14,19
123:25 130:22
132:13,15
133:2 134:20
141:8 146:25
148:10 169:13

**topmost** 123:25
**total** 51:14 52:20
90:12
**totally** 60:18
91:21 105:23
**tough** 6:8
**trade** 58:14 60:4
61:9,22 62:3
**traffic** 61:10
**trafficked**
155:22
**train** 117:18,21
118:3,5,7
**training** 118:13
**transaction**
10:15 12:9,11
12:20 16:8,9
29:21 30:2
33:25 39:8
66:7 70:10,11
74:25 81:9
93:3 98:3
105:8,21
107:15 108:22
109:13 111:7
112:3,19,21
113:5,9 116:20
135:19 170:25
**transactions**
29:13 34:12
73:19
**transcript**
122:25 193:8
**Transcription**
2:2
**transfer** 69:9
104:22
**transferred**
67:11 104:21
**transition** 51:3,7
51:8 70:6,10
117:6 122:6
**transitioned**
50:16 54:10
**transitioning**
50:13,22

**transmit** 35:12
**transparent**
97:14
**transport** 81:22
81:23,23
**trash** 191:22
**traveled** 180:4
**traveling** 180:6
**tread** 77:18
**treat** 129:21
**tremendously**
27:21
**tried** 42:23
98:20 118:3
138:13
**tripled** 51:24
**trips** 17:4
**Troy** 3:8
**true** 33:16 40:16
40:18 72:19
84:8,9 133:23
141:4 153:24
172:18 180:1
185:5 193:9
**truly** 49:2
**truth** 8:4 182:3
193:11
**try** 26:12 45:16
75:21 98:6
122:22 138:9
149:11 160:18
**trying** 44:16
59:21 71:7,7
75:13 76:22
90:22 102:20
131:14 139:25
144:10 150:21
150:24 152:7,8
170:17
**Tuesday** 148:11
**turn** 42:3 45:13
81:14
**twice** 58:1
143:15
**two** 20:6 26:13
27:24 34:18,22

36:9 37:11
48:16 50:6
52:22 53:4,5
56:21,25 59:24
70:5,15 75:17
75:19 88:24
89:7,22 95:17
103:8 113:12
121:2 128:11
130:10 133:13
143:22 149:21
154:4,16 155:6
166:8 168:2
173:25,25
175:25 181:12
184:5
**two-thirds** 73:1
**type** 30:16,19
42:2 44:17
46:6 88:19
89:15 90:17
159:12
**typed** 59:16,20
103:18
**types** 19:12
**typical** 40:22
69:25
**typically** 59:16
65:1 87:18
88:19 89:22
117:10

_____
**U**
**uh-huh** 7:4
119:17 124:3
157:18 180:13
**ultimately** 150:1
**unartful** 170:22
**uncommon** 56:7
**understand** 6:19
7:8,20,24,25
8:1 11:23 12:1
14:1 16:13
24:9,13 27:2
28:15,19 29:14
34:23 37:25

42:14 44:1,24
52:10 56:17
60:16,16 63:19
69:4 73:10
74:2,23 79:8
81:4 82:18
83:5 85:23
101:9 105:22
107:11,25
110:19,20
111:3 113:7,24
130:24 131:9
133:6 141:11
152:23 153:5
172:25 173:14
179:5 185:21
187:18,25
**Understandable**
22:15 62:17
162:16 163:25
173:14 175:18
**understanding**
20:20 42:21
43:13 57:20
68:7 69:4,9
100:24 101:1,3
101:12 110:8
**understood**
16:13 20:20
25:22 51:10
68:1 90:13
108:24 114:10
116:13 139:18
168:20 173:17
186:2
**undertaken**
143:16
**unfettered** 39:21
**unfortunately**
71:4
**unh-unh** 7:4
**unintentional**
102:25
**unique** 63:10
188:10,12,17
**uniquely** 187:21

unit 48:25
United 1:1 18:20
  19:1 20:21
  24:2,16 119:8
  174:19
units 48:21
universal 54:22
universe 179:24
unpack 19:8
unsuccessful
  56:6
unsurprising
  160:15
unusual 22:13
URL 181:11,13
USA 158:14
use 18:22 19:21
  20:2,8,10
  24:19 30:17
  31:21 33:24
  34:8 38:25
  41:1 42:19
  47:6 49:7,18
  50:10 55:1
  64:23 65:3
  75:3,5 78:4
  83:3 87:5,12
  87:20 88:7
  89:15 90:8
  91:2,18,19,20
  91:24 92:9,9
  104:3,7 126:21
  129:10 130:14
  133:24 140:15
  144:13 146:18
  155:22 157:23
  159:10 182:14
  183:25 188:22
user 20:25 21:2
  43:25 103:18
users 59:13
uses 22:14 90:14
  91:16
usually 16:5
  53:21,22
utilize 62:8

103:14

**V**

v 1:5,12
valid 60:8
  124:21 129:8
Valley 9:15,22
  9:23,25 10:4,5
  10:10,12,14
  14:22 15:1
  16:19,23,24
  17:11,18 19:5
  36:8 37:7,12
  39:1,16 48:1
  54:13 59:7
  60:23 64:10
  66:17 67:7
  68:8,23,23
  69:3,7,16 70:2
  83:17 94:12
  96:15 99:14
  105:14 107:13
  107:14 112:25
  117:1,2 118:15
  118:23 119:1,9
  119:11,20
  121:10,11
  129:12 134:25
  135:1 140:17
  146:19 147:1
  153:15 156:6,7
  156:8 163:7,10
  163:11,16
  167:3,9,22,24
  168:19 169:24
  171:7 172:15
  179:3 180:20
  180:23,25
  181:1 184:3,4
  184:17
Valley's 60:14
  114:1
valuation 102:1
value 22:20 23:4
  23:17 60:15,23
  61:2,6,6 63:8

63:24 66:10
  68:22 78:11
  101:22 102:6
values 101:21
variety 17:24
  162:7
various 19:21
  20:2 22:22
  25:15 44:18
  88:15 90:14
  92:17 99:19
  101:21 105:23
  120:20 121:6
  158:16 173:21
vast 170:8
vendor 21:10
  23:5,7 25:6
  49:23 65:14
  66:13,14,16
  67:6,10 68:13
  68:25 161:7
  163:2 170:14
  175:19 184:16
vendor's 65:17
  184:16
vendors 66:11
  172:14
verbal 7:3 12:23
  28:9 40:11
  92:4 145:6
  156:10
verify 148:5
version 121:13
  121:15 190:17
  190:17,19,21
  190:22 191:6
versus 20:22
  72:23 87:25
vibrate 13:6
vibratory 10:25
  11:2 13:1
vice 14:7,11
  18:14 25:12
Videoconferen...
  1:22 6:1
view 29:20 78:24

87:7
viewed 151:23
violated 153:8
violates 109:23
  109:25
violation 173:18
violations 110:4
Virginia 17:4
virtually 162:17
visibility 63:2
visible 187:19
visit 25:16 78:16
visited 25:13
  32:6 37:7
visiting 180:7
volumes 44:8
voluntarily
  180:8

**W**

W 3:8
W-2 52:16
wait 6:16 44:12
  110:14,14,14
  110:14 111:18
  111:18 113:12
  166:4
waiting 44:22
waive 116:8
walk 31:24
walking 89:10
want 9:9,21
  10:18 19:21,23
  19:25 20:2,3,4
  20:8 24:5,11
  24:12 32:10
  33:1 38:21
  45:14,20 46:4
  48:24 56:14
  59:19,24 60:7
  61:20 63:17
  77:8,16,18,19
  83:24,24 86:11
  88:7,20,24
  91:2,2 93:18
  99:20 103:5

104:13,15
  109:19 110:14
  116:6,20
  121:23 122:22
  125:8 127:15
  136:6 139:2,6
  139:20 141:21
  143:1,8,9
  150:1 151:10
  152:23 155:2
  159:23 166:2
  166:13 167:20
  172:24 183:16
  184:23
wanted 56:4,6
  81:9,10 84:20
  89:15 93:11,20
  93:23 98:16
  104:24 105:3
  121:16 129:5
  138:17 149:16
  171:6
wants 141:22,23
warehouse 27:13
  43:2 56:10
  118:22
wasn't 42:12,12
  45:20 56:7
  62:6 72:18
  76:18 78:10
  109:15 114:18
  118:8 125:17
  128:6 129:17
  170:17 184:18
water 81:13
waterproof
  157:16
way 7:16 10:19
  16:14 20:1
  23:19,19 26:3
  29:13 30:1
  32:13 33:3
  34:14 37:20
  38:25 39:4
  57:9 61:17,17
  63:17 66:19

Christopher Stone - January 29, 2025

78:23 82:20
86:10 90:20
95:13,17,19,24
98:12 101:3
102:8 103:20
103:22 106:15
111:5 124:4
129:21 135:22
140:22 142:1
151:5 161:3
170:2 171:23
179:22 185:18
186:17
**ways** 7:22 26:13
32:2,15,25
35:14 40:9
50:6 55:3 89:6
103:8 179:21
**we'll** 9:8,20
10:17 29:15
70:10 90:8
130:14 141:16
161:20
**we're** 6:7 7:1
19:9 20:15
22:5,6,7 26:3
27:22 30:9,10
30:10 32:1,17
37:23 41:2
47:14,16,17
48:5 51:13
55:14 62:2,2
70:5 71:3,18
74:16,16 76:9
77:14 79:22
86:8 87:15
88:12 94:3
97:16 98:6,13
112:8 118:1
120:16 123:25
132:18 136:4
136:25 140:5
141:16 143:7
143:10 144:8
146:15 148:5
170:6 171:22

172:11,25
188:16 190:5
**we've** 31:25 32:1
32:11,11 71:12
74:6 107:10
116:22 121:6
132:25 136:5
139:10 140:21
146:7 161:5,6
169:11 172:9
176:5 178:12
187:10
**web** 4:17,18,19
4:20 5:2 29:7
30:13 34:18
58:18 59:11
60:2 95:15
121:14,22
155:20 186:24
187:4,5,7,14
188:11,20,22
188:22 190:17
**webpage** 29:9
**website** 17:19,22
17:25 18:3,4,7
28:25 29:1,15
30:19 33:13
34:19,20,21
49:21,24 50:4
53:13,15,18
58:20,24 59:3
59:4,9,14,23
60:7 61:10,15
63:3 64:10,18
72:10,18,21
73:7 74:13
75:22 76:10,11
76:23 78:2,17
84:21 88:6
95:9 101:18
103:22,23
155:8,10
156:24 158:9
158:10,11
159:8,15
160:21 161:21

161:24 163:5,6
163:9 178:17
179:16 180:12
180:14 181:16
181:25 182:6
182:15 184:1,5
184:24 187:8
188:2,4 189:13
189:16 190:2,9
**websites** 60:7
61:21 62:14
85:7 95:18,18
178:9,13 184:6
184:7 186:9,22
189:22 190:7
**Wednesday** 1:20
6:2
**week** 131:2
149:18
**weekly** 120:5
**weigh** 27:24
**weight** 157:15
**weird** 119:15
**weld** 19:22,22,23
20:4 21:25
22:1 31:1
**welding** 21:25
46:20
**went** 26:13
34:15 44:17,18
53:1,2 56:15
76:10 77:1
93:24 149:18
152:12 180:2
184:20
**weren't** 47:6
51:2 66:9
95:10 124:11
151:5,20
**West** 17:4
**western** 1:2 8:19
**wheel** 41:1 46:7
47:11 49:16
**wheels** 41:3,4,7
42:7,19,21
44:6 46:11,16

48:12
**white** 82:1,2,5
82:15,18 83:5
83:22 84:8
89:25 90:2,5
**wholesale** 21:1,3
**willing** 151:5
**witness** 70:20
80:19,25
128:18 137:25
140:9 146:12
165:9 171:8
192:7 193:18
**wondered** 49:3
**wood** 91:19
157:12,23,25
159:6,10,11,21
159:22 161:15
161:16 162:18
**woods** 157:20
**woodworking**
91:5,7,12 92:2
92:9 156:9
157:11 158:18
160:3,10,12,21
161:2
**word** 38:25
122:24 126:21
**worded** 101:4
**words** 6:15 7:1,7
22:7 29:25
46:5,12 47:6
54:5,23 62:13
66:18 67:15
85:2 88:16
92:1 178:18
**work** 7:6 10:5
16:25 17:5
18:1 25:20
30:7 44:9 54:7
61:20,24 62:2
62:10,12 91:19
93:1,12 94:2
157:17 161:3
**worked** 11:11
16:24 21:10

23:19 52:22,23
94:10 135:24
135:25 189:10
189:12
**Workers** 75:16
**working** 17:2
53:6 84:3
87:14 92:10
130:3 134:25
135:1 161:6
168:20
**works** 83:14
98:15
**world** 14:13,19
42:4 119:3
151:19 155:19
165:5
**worst** 165:5
**wouldn't** 91:19
101:13 135:20
135:21 136:2
147:10 159:10
180:7 190:1
**wow** 25:19
**wrap** 183:16
**write** 30:24,25
31:10 48:15,18
48:19,20 49:11
49:11,14 50:1
60:5 62:3
178:17 187:7
**writing** 25:10
31:16 61:9,22
124:6 149:3,22
**written** 60:4
95:22 109:2
160:21 190:6
**wrong** 24:11
38:22 44:13
90:6 158:1
159:23 170:5
181:5
**wrote** 31:11
147:5 159:24
159:25 178:15
178:22 179:16

Christopher Stone - January 29, 2025

180:24 181:2
181:10 187:11

**X**

**X** 41:23 56:14
57:22 74:7
**XP** 153:13,13,14
153:16,18,25
154:1,3,5,6
156:25 157:1,7
158:12,23
160:2,9,17
161:25 164:4
164:23 165:4,7
166:25 168:2
168:17 169:23
178:9 179:1
180:15 181:1
181:15,24
186:25 187:3,8
188:1,22 190:2
190:9

**Y**

**Y** 41:23 74:7
**Yahoo** 59:21
**yeah** 9:19 11:16
13:10,10 22:4
28:3,3 29:19
32:25 36:24
39:3,12 42:1
52:6 54:8,18
55:11 61:8
62:16 73:25
74:3 76:16,16
78:16 80:1
84:19 85:12
89:14 90:9
93:20 94:18
95:6,17 99:8
102:23 105:17
106:8,14,16,16
117:23 121:15
126:1 130:20
133:14 135:24
136:23 138:8

141:12 142:9
143:9 145:25
147:9 152:22
155:2 157:21
161:12 163:24
165:14 166:22
169:18 170:5
172:23 173:10
174:14 175:1
176:1 177:3
179:12 182:5
183:12 185:20
186:7,12,12
188:5 190:19
191:5
**year** 26:10,20
52:7,9 58:6
63:6,25 117:11
117:19 118:6
131:3 149:17
149:17 168:24
186:23
**years** 11:17
15:18 16:10,25
19:6,10 22:12
26:7 47:20
66:1 68:18
73:11 76:3
79:15,25 80:2
86:8 87:2
114:21 118:4
135:25,25
168:6 173:25
173:25 175:25
177:24 180:25
191:13,18
**YMCA** 17:1,2
**York** 119:6
**you're** 8:4
**yup** 17:16 27:20
77:24 86:15
103:4 105:25
109:11 112:12
112:16 113:23
114:9 121:4
122:1 123:20

123:23 124:3
124:15 125:4
126:1 130:16
132:17 133:20
139:13 148:9
149:5 155:9
158:17 162:3,6
163:15 169:14
180:18 183:18
187:22

**Z**

**Z** 41:23 74:7
**zero** 139:24,24
**zirconia** 30:18
30:22 88:21
156:13 157:1
158:3,13 159:1
**Zoom** 1:22 6:1,7
6:13 7:12,16
98:14 179:21

**0**

**0-0-0-** 192:10

**1**

**1** 4:9 18:22
20:24 21:4
79:6 98:19,21
100:18 105:4
123:11
**1-2** 98:24
**1,000** 47:24
**1.1** 100:25
**1:22-cv** 98:23
**1:22-cv-00815**
1:5
**10** 4:18 18:21
20:22 21:6
25:18 74:16
158:7,9
**10/31/2030**
193:23
**10:35** 125:1
**100** 15:20 26:21
26:21 38:3
63:9 64:1 66:9

76:2 81:20
88:7,9 119:13
158:6
**100,000** 11:21,22
**108** 4:10
**11** 4:19 161:18
161:20 177:24
191:13,17
**11:30** 80:21
**1111** 3:8
**112** 4:11
**115** 4:12
**12** 4:20 163:3,5
**120** 4:13
**12th** 134:22
135:3
**13** 4:21 165:16
165:18
**132** 4:14
**13300** 162:1
**13th** 92:23 109:7
**14** 4:22 99:25
100:1 169:8,9
**146** 4:15
**148** 4:16
**15** 4:24 70:17
73:15,16 76:3
86:8 87:2
100:1 139:21
146:6,8 171:14
171:17
**15-year** 12:19
**150** 64:1
**156** 4:17
**158** 4:18
**16** 5:1 174:4,6
**161** 4:19
**163** 4:20
**165** 4:21
**169** 4:22
**17** 5:2 179:17,19
180:10
**171** 4:24
**174** 5:1
**179** 5:2
**192** 193:8

**1967** 11:10

**2**

**2** 4:10 21:5
25:20 108:8,11
116:7 123:17
**2-by-36** 158:3
**2,000** 47:23,24
118:21
**20** 16:10 26:6
48:19,21 49:11
66:1 68:18
70:17 76:1,3
108:17 135:25
**2000's** 23:20
59:11,11
**2002** 16:15
**2004** 12:7 14:21
16:10,13
**2006** 9:25 14:22
17:14 22:15
32:1 43:10
51:13 86:22
**2007** 43:14
51:13
**2008** 43:14
51:14
**2010** 47:22,23
**2014** 10:13
92:23 109:7
125:1 136:8
146:25 147:9
150:8 172:15
177:16
**2015** 115:11
131:1,2 134:22
135:3 137:5
138:21 141:6
141:13,15
145:11,11,11
**2018** 153:3,4
155:11 156:3
**202** 3:8
**2021** 153:18,19
154:4 170:4,5
**2023** 175:24

Christopher Stone - January 29, 2025

**2024** 123:13
171:24
**2025** 1:20 6:2
193:10,19
**21** 108:17
**22** 108:17
**23** 98:24
**231** 2:3
**248)641-9955**
3:9
**24th** 123:13
125:1 136:8
177:16
**25** 15:18
**250,000** 110:6,10
**25th** 148:11
150:7
**29** 1:20 6:2
**29th** 193:10
**2nd** 172:17

**3**

**3** 4:11 11:12,14
12:8 112:6,7,9
114:8 158:13
172:11
**3-** 48:3,15
**3.5** 51:21
**3:00** 71:3
**3:01** 192:8
**30** 11:17 73:23
73:25 139:22
**32** 3:4
**365** 101:5
**3M** 23:21,22
24:4,22,22
82:12,12

**4**

**4** 4:12 99:24
113:15 114:8
115:7,9
**4-** 52:22
**4,000** 48:3,15
**40** 73:23 112:14
139:22

**400** 3:4
**400,000** 52:11
**46** 112:15
**48098** 3:8
**49503** 3:4

**5**

**5** 4:13 100:1
120:10,12
123:8,10 136:5
136:6 177:12
177:13
**50** 26:21 63:9
156:3
**50,000** 149:20
**500** 13:14 14:16
**500,000** 11:19
12:17 114:20
149:10
**5th** 115:11
146:25

**6**

**6** 4:14 132:7,8
132:13
**60** 73:15,21
**616** 3:5

**7**

**7** 4:15 146:21,23
**7.3** 99:25
**7.4** 99:25
**70** 73:15,21,25
**753-6957** 2:3
**7908** 2:1 193:22
**7th** 193:19

**8**

**8** 4:4,16 109:19
148:6,7
**8,000** 114:21
**80** 30:24
**8620** 2:2

**9**

**9** 4:17 156:20,22
**9:00** 1:21

**9:07** 6:2
**940-5164** 3:5
**98** 4:9