# EXHIBIT 8

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF MICHIGAN

 3                   SOUTHERN DIVISION

 4                      *  *  *

 5   ALLIED INDUSTRIAL SUPPLY LLC,         COPY

 6              Plaintiff,

 7   V                          Case No. 1:22-cv-815

 8   CHRISTOPHER STONE,

 9              Defendant.

10   _____/

11

12          DEPOSITION OF ROBERT M. SHINDORF

13      taken on December 5, 2024, at 32 Market Avenue SW, Grand

14      Rapids, Michigan, commencing at about 10:30 AM.

15

16      APPEARANCES:

17      On behalf of Plaintiff:
                HENN LESPERANCE
18              BY:  Mr. Andrew A. Cascini - P76640
                     32 Market Avenue SW, Suite 400
19                   Grand Rapids, Michigan 49503

20      On behalf of Defendant:
                STARK REAGAN, PC
21              BY:  Mr. Christopher E. LeVasseur - P35981
                     111 West Long Lake Road, Suite 202
22                   Troy, Michigan 48098

23      REPORTED BY:  MS. MAUREEN JABOUR NURMIKKO, CSR-3078

24

25
```

```
 1                       I N D E X

 2   WITNESS:                                        PAGE

 3   ROBERT M. SHINDORF

 4        Examination by Mr. LeVasseur                  3

 5        Examination by Mr. Cascini                  150

 6        Re-Examination by Mr. LeVasseur             167

 7

 8   EXHIBITS:                                  IDENTIFIED

 9        Exhibit 1   Plaintiff Allied Industrial Supply LLC's    7

10                    Complaint and Jury Demand

11        Exhibit 2   Settlement Agreement             70

12        Exhibit 3   Defendant Christopher Stone's Counterclaim   118

13        Exhibit 4   Lehigh Valley Abrasives documents           118

14        Exhibit 5   Documents                       119

15        Exhibit 6   Plaintiff Allied Industrial Supply LLC's   125

16                    Third Supplemental Response to Defendant's

17                    First Set of Interrogatories to Plaintiff

18        Exhibit 7   Stone - Shindorf email string   135

19        Exhibit 8   Stone - Shindorf email string   136

20        Exhibit 9   Stone - Shindorf email string   140

21        Exhibit 10  Plaintiff Allied Industrial Supply LLC's   142

22                    Second Supplemental Response to Defendant's

23                    First Set of Requests for Production of

24                    Documents to Plaintiff

25
```

Page 3

1  Grand Rapids, Michigan
2  December 5, 2024
3  * * *
4  ROBERT M. SHINDORF
5  the witness herein, being duly sworn, was examined
6  and testified as follows:
7  EXAMINATION
8  BY MR. LEVASSEUR:
9  Q  Can you please state your name for the record?
10 A  Robert Shindorf.
11 Q  Have you ever been deposed before?
12 A  I have, yes.
13 Q  How many times?
14 A  A few.
15 Q  Do you remember, was there any connection with litigation
16    that your company was involved with?
17 A  Yes.  One of the companies, potentially, and I think also a
18    personal, uh, for a home purchase.
19 Q  Do you remember the names, any details about those prior
20    depositions?
21 A  Yes, I can remember details.
22 Q  Okay.  Then share them with me and we'll --
23 A  There was at least one deposition regarding the purchase of
24    the home where there was a dispute about the condition the
25    home was left in after I purchased it.

Page 4

1  Q  Was that -- let me stop you on that one.  Was that a local
2     case, Grand Rapids?
3  A  Yes.
4  Q  Kent County?
5  A  Kent County, yep.
6  Q  Were you a plaintiff or a defendant?
7  A  Plaintiff.
8  Q  Do you remember who you were suing, the name of the
9     defendant?
10 A  Bruce Langlois.
11 Q  What was that?
12 A  Bruce Langlois.
13 Q  And approximately what year was that, very roughly?
14 A  Four to five years ago, ish.
15 Q  That works.  Did that case go to trial or was it settled?
16 A  Did not go to trial.  It was settled.
17 Q  Okay.  There's one.  Do you remember the second one?
18 A  There's a couple of other occasions, but none of them were
19    of any substantial amounts.  I can't recall the specific
20    cases.
21 Q  Were you -- were you a party to the litigation in the prior
22    depositions --
23 A  Yes.
24 Q  -- that you're referring to?
25 A  Yep.

Page 5

1  Q  Were they local?
2  A  Yes, yeah, everything local.
3  Q  Kent County?
4  A  Yeah, yep.
5  Q  Always a circuit court county case?
6  A  I'm not sure the difference sometimes between district and
7     circuit.
8  Q  Depends on --
9  A  Dollar amount, right?
10 Q  The first rule of depositions, as you know, you're not
11    supposed to talk when the other person's talking, and I
12    just broke it, so I apologize for that.
13 A  No worries.
14 Q  The threshold level is 25,000 or above is circuit court;
15    below would be district court.  Do you happen to know based
16    on that if they were circuit court cases?
17 A  Likely circuit.  There's not much sense in litigating,
18    something, you know, below that dollar amount.
19 Q  Okay.  You're obviously here, as you know, for the
20    litigation involving Allied Industrial Supply; is that the
21    name?
22 A  Correct, yep.
23 Q  Okay.  And that is a company that you're a member of?
24 A  No.
25 Q  Okay.  Who are they?  It's an LLC --

Page 6

1  A  Correct.
2  Q  -- so there are members to it, right?
3  A  There is.
4  Q  Okay.  Can you tell me who the members are?
5  A  The member of Allied Industrial Supply, LLC, is a holding
6     company, Stone Fox Ventures, LLC.
7  Q  And are you a member of Stone Fox?
8  A  I am.
9  Q  Are you the sole member?
10 A  I am.
11 Q  And are you employed by Stone Fox?
12 A  Define employed.
13 Q  Do you take a paycheck?
14 A  No.
15 Q  Are you employed by Allied?
16 A  No.
17 Q  Are you employed by anybody?
18 A  No.
19 Q  Any company?
20 A  No.
21 Q  You take no paychecks from any entity?
22 A  No.  I manage investments for a family office, which would
23    be the Stone Fox Ventures entity.
24 Q  Would you consider your day-to-day activities focused on
25    the management of the family office, Stone Fox family

Page 7

1  office, as opposed to Allied's day-to-day activities?

2  A  Yes.

3  Q  Who runs Allied on a day-to-day basis?

4  A  We have a general manager who handles the front end of

5  customer-facing things, Amanda Burns, and then we have an

6  e-commerce and warehouse manager who handles the back end

7  side of things, which would be Ethan Pomfret.

8  Q  Okay.  In terms of this litigation, would I be correct in

9  assuming you're the one who would be most knowledgeable

10  about the allegations that are in the complaint?

11  A  Yes.

12      (Exhibit 1 marked)

13  BY MR. LEVASSEUR:

14  Q  Let me hand you what I'm going to mark as Exhibit 1.

15      I already have the exhibit marked.

16      THE REPORTER:  Very good.

17  BY MR. LEVASSEUR:

18  Q  And I'll ask you to look at Exhibit 1 and tell me if you

19  recognize that.

20  A  It appears to be the complaint.

21  Q  The complaint includes as an exhibit, does it not, the

22  asset purchase agreement that was entered into between

23  Allied and my client, Christopher Stone?

24  A  Do you have a reference page or anything?

25  Q  If you look at page 1 of 25, you're going to see something

Page 8

1  that looks like the asset purchase agreement to me.

2      MR. CASCINI:  Take your time and go through the

3  exhibits.

4      THE WITNESS:  It appears to be the asset purchase

5  agreement.

6  BY MR. LEVASSEUR:

7  Q  Okay.  I want to ask you a little bit about the

8  circumstances of that transaction between Allied and

9  Mr. Stone.  Specifically, do you recall -- it makes

10  reference to there being a closing of the transaction,

11  obviously, and it was October 13 of 2014.  Does that sound

12  familiar?

13  A  That is what is referenced in the document.

14  Q  And was that closing in person or was it by mail?

15  A  I don't recall specifically.

16  Q  Do you recall ever meeting Mr. -- you met Mr. Stone before

17  the closing, obviously, right?

18  A  No, I did not meet him before the closing.

19      One of two things occurred.  Either it was done

20  in counterparts electronically, or right around the time of

21  closing it may have been done in person here.  I think it

22  was actually done in counterparts and he scanned it back

23  because I think I remember receiving like 900 jpeg files,

24  rather than a nicely scanned pdf document that was

25  compiled, and trying to organize it back into a concise

Page 9

1  document.  And there may have been a final kind of scanning

2  when I traveled out there after the closing.  I think

3  that's the way that it occurred.

4  Q  At closing, typically, and I think your asset purchase

5  agreement makes reference, there was supposed to be some

6  deliverables.  Do you recall that?  He was supposed to

7  provide certain things to you in connection with the sale,

8  right?

9  A  Certainly.

10  Q  And do you know whether you got what you were expecting to

11  receive?

12  A  That is a challenging question to answer and probably at

13  the heart of the disagreement.

14  Q  Well, let's get right to it.  What did you not get, if

15  anything, that you thought you should have gotten at the

16  closing?

17  A  Well, certainly and maybe not limited to it but would have

18  been continued and unfettered access to our client lists,

19  email addresses, phone numbers, and other original source

20  materials that were the entirety -- well, not entirety --

21  that were the primary driving value of the acquisition.  If

22  you notice in the asset purchase agreement, there's a

23  significant portion of it that is driven from intangible

24  value rather than physical assets.  So I would say that we

25  received most of the physical assets.  I don't think that

Page 10

1  there was much of a challenge on did we receive the exact

2  dollar amount of inventory or, you know, racking or things

3  like that.  But as an e-commerce business, much of the

4  value is driven from the intellectual property and the

5  processes by which that intellectual property is converted

6  into sales and cash flow.

7  Q  Okay.  So what you did not get, you just indicated, first

8  of all, a client list.  You didn't get a client list from

9  Mr. Stone?

10  A  There was no specific client list provided, meaning no

11  formal database of clients, but they were located

12  throughout multiple email accounts, accounting files, and

13  other sources like that, faxes that came in with client

14  information on it, if that makes sense.

15  Q  It does.  So it isn't that there was a client list that

16  existed that wasn't given to you; it's just that there was

17  no technical client list.

18  A  Yeah, if --

19      MR. CASCINI:  Objection.  That misconstrues the

20  client's prior testimony.

21  BY MR. LEVASSEUR:

22  Q  Let me -- I didn't mean to mischaracterize your testimony

23  so let me clarify.

24      When you say you did not get a client list, I

25  interpreted your answer to be that it was because there

Page 11

```
 1   doesn't -- a client list doesn't exist in the form of, you
 2   know, one list as opposed to there's client information
 3   from various sources.  Is that what you meant to say?
 4  A   Yes.  The -- I think the definition of the word "list"
 5   would be the -- where we crossed paths there, meaning
 6   there's no one specific database that could have easily
 7   been turned over from Mr. Stone to Allied that would be
 8   here is every customer we've ever done business with or
 9   ever had contact with, like many large businesses may have,
10   you know, a sales force-type database.  That did not exist.
11   It was the sources of information, including those email
12   addresses and those accounting files and previous
13   e-commerce entities that, you know, recorded transactions,
14   if that makes sense.
15  Q   It does, yes.  Okay.  So did you get access to the sources
16   of information that would allow you to determine who the
17   clients were?
18  A   Some we had access to permanently; some we had access to
19   temporarily.
20  Q   And the sources that you had access to permanently would
21   be -- can you list them for me?
22  A   Yeah, like the QuickBooks accounting file.
23  Q   Was that -- so access to QuickBooks was turned over at
24   closing?
25  A   Correct.
```

Page 12

```
 1  Q   And the password in order for you to get into the
 2   QuickBooks?
 3  A   Correct.
 4  Q   Because this is an online software --
 5  A   No, not an online.  It's a physical on-premises software,
 6   is what it would be called.  There is QuickBooks online,
 7   but then there's also, you know, a QuickBooks, like,
 8   desktop version.
 9  Q   Okay.  And as part of the sale, you got the desktop version
10   from Mr. Stone?
11  A   We got a copy of the client file of the desktop version.
12  Q   Which enabled you to use the QuickBooks as he was using it
13   with all the information that was in it.
14  A   Correct.
15  Q   Okay.  Then the client information was also in the form
16   of -- that you were provided as opposed to what you were
17   not provided -- in what other fashion, QuickBooks and what
18   else?
19  A   The -- when we purchased the business, you know, we
20   purchased an e-commerce store.  They had been migrating
21   from a platform called ProStores to a platform called
22   BigCommerce.  ProStores was end of life, essentially.  So
23   they shut that one down and then turned on the other one.
24   That was occurring in the background.  And so we didn't get
25   any of the lists from ProStores.  It was turned off almost
```

Page 13

```
 1   at the same time of the acquisition.  Whether it was 30
 2   days before or 30 days after, it was relatively close to
 3   when we closed on this.  That wasn't something that was, to
 4   my knowledge, explicitly disclosed at that time, that that
 5   transition was occurring in there.  So anything from the
 6   previous ProStores databases, the client records from
 7   there, we did not receive that information.
 8  Q   Okay.  But the migration was happening as ordinary --
 9       MR. CASCINI:  Can we go off the record really
10   briefly?
11       (Pause in proceedings)
12       MR. CASCINI:  Thank you.  Appreciate it.
13  BY MR. LEVASSEUR:
14  Q   So the migration from ProStores to BigCommerce; is that
15   what you said?
16  A   BigCommerce, big.  Large, big.
17  Q   Okay.  That was just being done in the ordinary course of
18   the business and it had nothing to do with the sales
19   transaction, I assume?
20  A   Yeah, I mean, it's ordinary course but, obviously, it's
21   also a big task to migrate platforms.  I don't know if
22   you've ever been part of like a -- migrating like an ERP or
23   an accounting software, but it's generally a nightmare.
24  Q   So do you note that there was information that was in
25   ProStores that would have been useful and that you thought
```

Page 14

```
 1   you were buying that you could not get then because of
 2   migration to BigCommerce?
 3  A   Yeah.  There's always information there that's important,
 4   you know, previous sales histories, the -- who bought, what
 5   their email addresses are, what their names are, what their
 6   company address is, what their, you know, phone numbers
 7   are.  All that information is valuable.
 8  Q   Did you raise an objection to that?
 9  A   No, I did not, no.
10  Q   Okay.  So we have QuickBooks.  We've got the ProStores and
11   BigCommerce, and what else of the client information --
12  A   Uh --
13  Q   -- that you obtained?
14  A   Yes, absolutely.  Incoming faxes and incoming purchase
15   orders via email.
16  Q   Okay.  Now let's talk about the client details that you did
17   not get access to at closing, at or near closing.  What was
18   that?
19  A   Well, we just had the discussion of the ProStores, so that
20   would be one of those client details.  At closing, I did
21   not receive access to the emails.  Mr. Stone raised a point
22   that he had, you know, been using the email addresses for
23   both personal and business and that he had personal
24   information in there that he would like to clean out before
25   he allowed me access.  I always try to approach
```

Page 15

1  acquisitions in a partnership approach.  If you can avoid
2  conflict, you may as well avoid conflict.  So I said no
3  problem, please go ahead and do that and give me access
4  when you're, you know, able to clear your personal records
5  from it.  And, you know, he proceeded to forward his
6  email -- his previous emails or change his email address to
7  a new email address and start utilizing that and then
8  provided access to it.  I don't know how long after closing
9  it was, but two to six months after closing, somewhere in
10 that range probably.
11 Q  When he did give you access.
12 A  When he gave access to it, correct.
13 Q  And when we talk about email, we're talking about --
14 there's two accounts that are referenced in the complaint,
15 the Gmail account and the Hotmail account?
16 A  Correct, yep.
17 Q  Do you remember what the actual accounts, what the --
18 A  Yeah, it's like --
19 Q  -- address is?
20 A  -- clslcs2000, something like that?
21 Q  Clslcs2000?  I wrote it down here.
22 A  I think we said the same thing.  I'm not positive.
23 Q  Okay.
24 A  But yes, yep.
25 Q  That @gmail and that @hotmail?

Page 16

1  A  Yeah.  The Gmail one might have been light slightly
2  different, but I think it was actually the -- I think it
3  was the same, yes.
4  Q  Okay.  And your contention in this litigation is that you
5  purchased those actual email accounts and should have been
6  given them to the exclusion of Mr. Stone; is that -- do I
7  understand your claim correctly?
8  A  Correct.
9  Q  Was there a company email account that you did, in fact,
10 get access, control of, at closing?
11 A  No.  He did not have any company accounts on his own, like
12 @lehighvalleyabrasives.com, which is -- that's the
13 e-commerce brand, lehighvalleyabrasives.com.  I may refer
14 to it sometimes as LVA just because it's less than a
15 mouthful.  So he did not have email addresses set up
16 directly at lehighvalleyabrasives.com, so
17 sales@lehighvalleyabrasives or info@lehighvalleyabrasives,
18 like many people do, and that was one of the first
19 activities that we did was to set those accounts up to have
20 a much more professional forward-facing email address.
21 Q  So when he owned the company and was running the company, a
22 customer could go to the lehighvalleyabrasives.com website
23 and then order right from the website?
24 A  They could.
25 Q  And then, alternatively, they could send an email to the

Page 17

1  Hotmail or the Gmail account?
2  A  Correct.
3  Q  And specifically ask Mr. Stone, can you sell me this
4  product?
5  A  Correct, yes.  He would utilize the Hotmail account as well
6  as a personal cell phone as the marketing information in
7  the footer of the email address, as well as on multiple
8  pages in different areas on the website.
9  Q  Okay.  So eventually, you indicate, he did give you access
10 to the Hotmail and the Gmail accounts?
11 A  Correct.
12 Q  So you were able to go into those accounts and extract any
13 customer information that you needed to use to run the
14 business?
15 A  We had access, but extracting the customer information was
16 not necessarily an intention of it.  It was intended to be
17 utilized as a database, as you -- you know, your emails
18 don't expire, right?  You can go back and reference
19 previous purchase history and things like that and look up
20 customer information, and so we utilized it that way for a
21 period of time at the beginning of the acquisition.
22 Q  Because it's just an email to -- it would be just an email
23 to him from the past that you would be looking at to find
24 the customer, right?  Is that what you would be doing with
25 it?

Page 18

1  A  Sometimes it would be questions that a customer might have,
2  or if you need to look up a history of, you know, a
3  customer is having a problem with a product and they don't
4  know -- customers don't always know what they bought.  Like
5  they are looking for one product, and products can be very
6  similar in nature in this industry, so they may be
7  explaining it in a way where you go, all right, you know,
8  let me just find what they actually purchased, and then you
9  can find the email history of, oh, they bought blank and be
10 able to assist them a little bit more.
11     So we utilized the email for general operating of
12 the business.  And then at a certain point we added a --
13 like an out-of-office message, an auto reply, to indicate
14 to people to start sending orders to
15 sales@lehighvalleyabrasives.com and general questions to
16 info@lehighvalleyabrasives.com.  And we left those up for a
17 long time, and our intention was, permanently, for anyone
18 who did email those -- that address, to then forward them
19 over to the proper branded domain name, you know,
20 lehighvalleyabrasives.com.
21 Q  Okay.  Now, the information that you could have -- if
22 you're researching the history of what a particular
23 customer might have ordered or whatever using the email --
24 A  Uh-huh.
25 Q  -- the actual order information and the customer

Page 19

1  information and the product information would all be in the
2  QuickBooks platform, would it not?
3  A   Not necessarily, because there were different avenues that
4  someone could purchase from.  His information architecture
5  was lacking.  So in -- if he entered the order into
6  QuickBooks, sometimes it would be a generic part number and
7  then the description would be what they purchased.  And you
8  can't search based on the description.  You can search
9  based on a part number.  So that complicates some of the
10  previous history as well.
11  Q   Well, the information would have to be in QuickBooks,
12  right, because that's the -- that was what was used for,
13  you know, accounting and tax purposes and so forth, wasn't
14  it?
15      MR. CASCINI:  Objection as to form.
16  BY MR. LEVASSEUR:
17  Q   You can go ahead and answer.
18      MR. CASCINI:  You can go ahead and answer,
19  Robert.
20      THE WITNESS:  I don't know exactly how to answer
21  that question.  Information was in QuickBooks.  Whether the
22  information was easily accessible or -- and it doesn't mean
23  that all information is entered into QuickBooks.  Partial
24  information could be entered, a generic part number could
25  be used, and, you know, they could have shipped something

Page 20

1  from stock.  They could have drop-shipped something from a
2  vendor.  They may not have entered it into QuickBooks.
3  They may have put it into the e-commerce software, because
4  they did not -- every order that came into the e-commerce
5  software is not entered into the QuickBooks file.  Those
6  are completely separate databases.
7  BY MR. LEVASSEUR:
8  Q   Okay.  But every single sale for which a product is
9  delivered and income -- the payment for the product is
10  received would be reflected in something other than just
11  the email, would it not?
12  A   If done the way it should have been done, I would answer
13  affirmative to that.  However, it was not necessarily done
14  that way.  There were many times that customers were
15  entered with maybe a -- you know, a general name.
16  Sometimes it was someone's first name.  Sometimes it was
17  someone's last name.  Sometimes it was company name as,
18  like, the customer reference.  Could be a person's name.
19  Could be -- there were many products and customers in there
20  that had duplicates, many, many duplicates.  So you could
21  enter a customer and use their last name as H -- there's a
22  company called HD Railings, which is a customer -- HDI, HD
23  Railings, HD Railings, Incorporated, or by their name it
24  could be entered sometimes.  There was no consistency in
25  that.  So it's always best to be able to reference

Page 21

1  information in as many different ways as possible, of
2  course.  That way you can, if you're searching for what
3  someone ordered in the past, you have that ability to look
4  it up.
5      And, also, if someone buys a product, the sale
6  may be recorded but the information of what was sold might
7  not be recorded.  So you could say, "I sold you product
8  worth $100," but what that actual product is might -- the
9  description might be deficient to even know what was sold.
10  Q   How many times did the deficiency, a deficiency as you're
11  describing it, get solved through the use of an email as
12  opposed to some other source?
13  A   Initially or -- initially, hundreds and hundreds of times.
14  Q   And if I ask you to provide me examples of those, how would
15  you do that?
16  A   I'd ask for access to the email address that I bought.
17  Q   Okay.  Well, let's start with the Gmail.
18  A   Okay.
19  Q   You were provided access to the Gmail account, right?
20  A   Correct.
21  Q   And you were never -- that access was never taken away,
22  correct?
23  A   Correct.
24  Q   Okay.  So in this lawsuit right now, if I were to ask you,
25  I want you to give me an example -- I want you to give me

Page 22

1  every example, in fact, where you used the Gmail account to
2  solve a question or answer a question that you had that you
3  could not solve in using some other format.
4  A   So the Gmail account was used mostly for Google advertising
5  and the storage of information.  In fact, like one of the
6  things that was stored on there was, like, previous backups
7  of the QuickBooks accounting software.  So it was not
8  utilized for customer-facing interactions.  If it was, it
9  was incredibly minor.
10  Q   Okay.  So you didn't use the Gmail account to solve any of
11  the problems you've been describing this morning, correct?
12      MR. CASCINI:  Objection, vague.  What are the
13  problems we've been talking about today there, Chris?  What
14  are we talking about?
15      MR. LEVASSEUR:  The problems that he has
16  described this morning where he indicated to me that he had
17  to have access to the email accounts because the other
18  databases that he was provided, this other software he was
19  provided, was not adequate to operate the company and that
20  he needed access to the email account in order to operate
21  the company in the fashion that he thought he was entitled
22  to.
23      MR. CASCINI:  Although I retain the objection,
24  you can answer if you know, Robert.
25      THE WITNESS:  Yeah, I'm not a hundred percent

Page 23

```
1   certain of the exact question.  What I can provide you is
2   the use of the Gmail account, which the Gmail account was
3   primarily used for account management across service
4   platforms.  It was not customer facing.  So did we ever
5   have problems in which we needed to go back into the Gmail
6   account?  Certainly.  And for, you know, quite some time,
7   because it was literally linked to Google AdWords, which
8   was a -- a large source of driving revenue for the
9   business.
10  BY MR. LEVASSEUR:
11  Q   And since you did get access to the Gmail account and you
12      still have access to the Gmail account, that isn't an issue
13      in this litigation; would that be fair to say?
14  A   Yeah, that's a challenge.  "Isn't an issue" is -- I'm --
15      the Gmail account we have access to.  I can affirmatively
16      say that.  If the Gmail account is an issue, I mean,
17      there's an issue of him trying to access the QuickBooks
18      file which was stored on the Gmail account, so to say it's
19      not an issue would probably be incorrect.
20  Q   Okay.  Would it be fair to say, then, that the only issue
21      would be that Mr. Stone attempted to access the Gmail
22      account for QuickBooks?
23  A   This is --
24          MR. CASCINI:  Objection as to form.  You mean the
25      only issue involving the Gmail account would be --
```

Page 24

```
1           MR. LEVASSEUR:  Right, yep, as to Gmail, as to
2   Gmail only.
3           THE WITNESS:  At this moment, from my
4   recollection, I believe so.
5   BY MR. LEVASSEUR:
6   Q   Do you know whether Mr. Stone was able to access the
7       QuickBooks information through Gmail as you claim he was
8       attempting to do?
9   A   I'm not sure whether he was successful.
10  Q   Let's say for sake of argument that he was unsuccessful.
11      Would you agree with me, then, that that is not an issue
12      either?
13  A   That what is not an issue, him accessing the QuickBooks?
14  Q   Unsuccessfully attempting to access QuickBooks using the
15      Gmail account did not stop -- did not cause a problem for
16      Allied Industrial; Would that be fair to say?
17  A   No, because that -- if we're talking about accessing
18      QuickBooks at all or accessing QuickBooks via Gmail?
19  Q   Via Gmail.
20  A   If accessing Quickbooks via Gmail -- ask the question one
21      more time for me.  Sorry.
22  Q   You indicated -- I'm trying to focus on -- on dealing with
23      the Gmail account.
24  A   Uh-huh.
25  Q   We already established you got access to the Gmail account;
```

Page 25

```
1   you never lost access to the Gmail account.  So I was
2   asking you, is that even an issue in this litigation, and
3   you indicated yes, because Mr. Stone attempted to get into
4   QuickBooks through the Gmail account.
5   A   I --
6   Q   Do I have it right so far?
7   A   Yes.
8   Q   All right.  And if Mr. Stone was unsuccessful, assuming he
9       even did what you're accusing him of, but if he was
10      unsuccessful, then no harm, no foul.  It's not an issue for
11      the litigation.  Would you agree with me?
12  A   I definitely wouldn't agree no harm, no foul.  I think it
13      shows intent.
14  Q   Intent but no harm, correct?
15  A   I have no idea.  I have inadequate discovery to make that
16      conclusion.
17  Q   Well, how, if at all, was Allied harmed by Mr. Stone
18      attempting -- again, assuming he did --
19  A   Uh-huh.
20  Q   -- attempting to access QuickBooks unsuccessfully through
21      Gmail?
22  A   Since we're making assumptions, I assumed that he had
23      backup files of QuickBooks that he probably provided to his
24      accountant and maybe retained other copies of in which he
25      also accessed information from.  That's my assumption.  So
```

Page 26

```
1   I see intent and I have to make assumptions as well.  I
2   assume he accessed QuickBooks to get customer information
3   from it, just as I am confident that he accessed
4   information from the Hotmail account in order to market to
5   our customer list, because he also emailed us during that
6   time.
7   Q   Let's take it one step at a time.
8   A   Yeah, yeah.  Well, you're making assumptions, so I just
9       figured I'd make assumptions too.
10  Q   Well, okay.  I guess let's clarify about the assumptions.
11      You have no idea whether he accessed QuickBooks using the
12      Gmail account; is that true?
13  A   I know he attempted to.  I have 100 percent confidence that
14      he attempted to access it.  Whether he was successful or
15      not, I don't know.
16  Q   Okay.  If the evidence demonstrates that he was not
17      successful, can you identify any harm suffered by Allied as
18      a result of the unsuccessful attempt that you think he
19      might have tried?
20  A   I have no knowledge of that.  It would be an assumption and
21      I really don't want to make assumptions.
22  Q   Well, as to this, that's not an assumption.  You either
23      have harm -- Allied had harm or it didn't have harm.  Are
24      you aware of any harm suffered by Allied as a result of an
25      unsuccessful attempt by Mr. Stone to access QuickBooks
```

Page 27

```
 1   through Gmail?
 2  A   I am not aware of any harm that Allied suffered via an
 3      unsuccessful attempt to access Gmail, if that's
 4      specifically the question.
 5  Q   That's the question.  So let's talk about Hotmail.  The
 6      Hotmail account, as you -- I think you've indicated you
 7      were provided -- you were also provided access to the
 8      Hotmail account.
 9  A   Temporarily.
10  Q   Eventually.
11  A   Temporarily.
12  Q   Correct.  And you had the ability during that shared access
13      to go into the account and see -- download all the emails
14      if you wanted to do so, gather all the customer information
15      if you wanted to do so, or do whatever you wanted to do,
16      correct?
17  A   I want to back up because you used the word shared there,
18      and the email account was not shared.  We had sole access
19      to it.  After he turned over to us, we changed the
20      passwords and we had sole access to it.  It's only by him
21      utilizing the -- you know, you forget your password and you
22      put your birthdates in and things like that.  He changed
23      the passwords back and locked our access out.  So it was
24      not intended to be shared access.  We had sole access.
25  Q   You intended to have sole access.
```

Page 28

```
 1  A   We did have sole access.
 2  Q   How quickly did you change the password after it was
 3      provided?
 4  A   Immediately.
 5  Q   Same day?
 6  A   Let's define immediately within a week or so.
 7  Q   Okay.  After you obtained access, what did you do with the
 8      Hotmail account?
 9  A   We continued to take orders, incoming orders from it.  You
10      know, transitioning customers is a long process.
11      Customers, some may order weekly; some may order once a
12      year; some may order, you know, infrequently, et cetera.
13      So that email address also was used in many different
14      marketing platforms, so it was on the newsletters, in
15      which, you know, once you publish a pdf out there on the
16      Internet, it stays there forever.  Right?  So there's no
17      way to go back and edit those and say, oh, we don't want it
18      to be this Hotmail account anymore.  We want it to be this
19      new email address.
20          So we continued to take orders from it, and then
21      we started to try and transition people into using our
22      branded email accounts, so sales@lehighvalley,
23      info@lehighvalley, orders@lehighvalley, types of addresses
24      like that, and over a period of time, you know, we kind of
25      continuously ramped up the transition path for people to
```

Page 29

```
 1      use those.  So it went to auto messages that would say,
 2      hey, you know, please use this email address for quicker
 3      response times, and we would still sign in on an everyday
 4      basis, every hour basis.  We were forwarding emails for a
 5      period of time.  He had a lot of junk mail that would go in
 6      there as well.  And then at a certain point we had a
 7      message up that would say this email address was
 8      unmonitored.  Please, you know, utilize sales@lehighvalley
 9      or @lehighvalley, info, you know, for whatever questions
10      they might have or sending purchase orders in.  And while
11      we said it was unmonitored, that was, you know, a customer
12      behavior manipulation to try and get people to use utilize
13      the right sales channel of it, and we would still go in
14      there frequently.
15          For a number of years, that Hotmail account was
16      also linked to different passwords online that we had to
17      sometimes, you know, do a password reset, go in there and
18      get it.  It took a while to get that all transitioned over
19      and being able to use, you know,
20      info@lehighvalleyabrasives.com for all the passwords, so.
21  Q   Okay.  If I wanted you to tell me and provide me examples
22      of an order that came into the company after the
23      transition, after this -- after this -- after the
24      transaction, an order that came into the Hotmail account,
25      would you have the ability to do that?
```

Page 30

```
 1  A   Without access to the Hotmail account, would I be able to
 2      provide you an order that came into the Hotmail account?
 3      Because I don't have access to the Hotmail account which is
 4      where most of that would be stored.
 5  Q   Right.  So as we sit here today --
 6  A   Uh-huh.
 7  Q   -- let's say you made the -- the Hotmail access happened --
 8      do you know when it happened, when you guys --
 9  A   It was -- it was a couple months.  It was, you know, four
10      to five to, I don't know, 90 or 120 days.  It was not
11      immediate, and I was fine with that.  He was still entering
12      the orders himself, and he said he had -- he said something
13      like charity work stuff that he had did in there, and I
14      didn't want to press the issue at the time.  I mean, you
15      know, acquisitions really are a partnership at the
16      beginning of them where you're trying to work through
17      things together.  So he was entering the orders.  We had
18      plenty of other stuff to work on.  It took a little bit of
19      time, but it wasn't a year to get access.
20  Q   Okay.  So you're saying that when he got, during this
21      transition period while he's -- for a period after the
22      transaction he was working for you as a consultant or
23      employee?
24  A   Yeah, I think it was -- I think it was a six-month
25      agreement, but I'm actually not 100 percent positive what
```

Page 31

1  the length of time that we kept him on was.

2  Q   So while -- doesn't matter how long, but while he was still

3      working for you, with you, what you're telling me is that,

4      when an order would come into the Hotmail account --

5  A   Uh-huh.

6  Q   -- his Hotmail account --

7  A   No.  Our Hotmail account.

8  Q   Well, his personal Hotmail account that you think that you

9      bought.

10 A   Well, yeah.  I wouldn't characterize it as his personal

11     one, but the Hotmail account.

12 Q   The Hotmail account.

13 A   Sure.

14 Q   He would -- you've just indicated he would then process the

15     order --

16 A   Yes.

17 Q   -- that came into the Hotmail.

18 A   Generally speaking.  I'm sure there's probably some

19     instances where maybe he forwarded it, forwarded the email

20     to, you know, one of our office staff members, and we may

21     have entered it, maybe there was a pricing discrepancy and

22     he wanted us to make a management decision, since, you

23     know, it was our money at that time rather than his own.  I

24     know there were discussions early on about, hey, do you

25     want to honor this price, you know.  So maybe not every

Page 32

1  order would he enter; many of them, though, in that first

2  initial period.

3  Q   Okay.  Well, when an order did come into the Hotmail and he

4      processed it --

5  A   Yes.

6  Q   -- what did he do?  What do you do to process an order?

7  A   It would probably depend on the type of order.  Some orders

8      were stock-type items.  Some were drop-ship items.  I mean,

9      drop-ship meaning -- are you familiar with the term?

10 Q   I am.

11 A   Okay.  So it would depend on the type of order, the type of

12     product, quantity; all those things would change how he

13     would potentially enter the order.

14 Q   Okay.  But he would enter the order in some fashion in

15     something.  That's what I'm getting at.

16 A   Okay.  You're asking what the something is?

17 Q   I'm being very fundamental.  I'm trying to be very

18     fundamental.

19 A   Yeah, yes.  You would enter it either into QuickBooks or

20     enter it into the BigCommerce store once it was launched.

21 Q   And Quickbooks as we've already indicated and BigCommerce

22     as we have already indicated, those were sites and

23     platforms you had access to at all times after the

24     transaction.

25 A   Yes, yeah.  With QuickBooks being a desktop version, not an

Page 33

1  online version, that information was stored locally in New

2  Jersey until we were able to migrate it into -- onto our

3  server and then provide kind of like a remote desktop

4  solution to the staff that was in New Jersey.

5  Q   Okay.  So after he stops working for the company and you

6      have access to the Hotmail account and an order would come

7      into the Hotmail account, if I were to ask you to provide

8      me every single order that came into the Hotmail account

9      after Mr. Stone was no longer associated with you, would

10     you be able to do that?

11 A   Not without access to the Hotmail account.  Because if we

12     entered -- let's just assume every order was entered into

13     QuickBooks rather than BigCommerce-- we'll make that

14     assumption just for -- so we get a mutual understanding on

15     here.

16         When you enter the order, there is not an

17     indication on the order what the source for the order was.

18     So that source could be a fax, then you enter in the order;

19     the source could be a phone call and you enter in the

20     order; or the source could be an email that just says in

21     the email text itself, I want to buy ten more of the item I

22     bought last time; or it could be I want to buy ten of this

23     part number; or in the case of, you know, smaller or larger

24     companies, maybe a formal pdf purchase order even.  So

25     there were -- there's a multitude of ways that people would

Page 34

1  send information in.  So those would generally be entered

2  into Quickbooks but not indicated in which method that

3  source was from.

4  Q   So you would have -- during the time you had the access to

5      the Hotmail account, you could not tell me one way or

6      another how many orders came into Hotmail as opposed to on

7      the web platform, on the internet site, or any other way.

8          MR. CASCINI:  Objection, misconstrues prior

9      testimony.  My client said that he could if he had access

10     to it.

11         MR. LEVASSEUR:  Okay.

12         MR. CASCINI:  The question was while you had

13     access, right?

14 BY MR. LEVASSEUR:

15 Q   Yeah, while you had access.  I'm asking you now to go back.

16     During the time you had access, you indicated that some

17     orders did come into --

18 A   I misunderstood that as well, then.  While I had access,

19     yes, I would have been able to tell you where the order

20     came from.

21 Q   Okay.  And can you tell me now, looking back, during that

22     short period of time that you did have access and before

23     the access was taken away from you, I want to know exactly

24     how many orders you got through the Hotmail account.  I

25     want to know that right now.  So can you tell me?

Page 35

1 A  No.

2 Q  Is there any ability -- and it's impossible to say now,

3    correct?

4 A  No.  Well, it's only impossible if he destroyed the

5    information that was in the Hotmail account.

6 Q  No, I don't -- that would be me asking Mr. Stone.  I'm

7    asking you.  Do you or Allied -- when I say you, I'm

8    referring to Allied, generally, because obviously I'm not

9    talking about you personally.

10 A  Of course.

11 Q  Does Allied have any records, any way through the

12    information that is available to it today to go back and

13    tell me, we had five Hotmail orders -- or five orders for

14    product that came in through Hotmail in the month of March

15    2015?

16      MR. CASCINI:  Objection.  I believe that's been

17    asked and answered.

18      THE WITNESS:  No, we --

19      MR. CASCINI:  Answer if you know.

20      THE WITNESS:  No, we do not have that ability,

21    because the source of the order that -- let's call it order

22    path.  The order path was not -- is not an indicated field

23    in QuickBooks.  So we do not indicate this came in via

24    Hotmail, this came in via sales@lehighvalleyabrasives.com,

25    this came in via phone.  That is not indicated on the

Page 36

1    orders.

2 BY MR. LEVASSEUR:

3 Q  Okay.  So when we look at your QuickBooks records to see

4    all the orders that came in during the month of March in

5    2015, for example, there's literally no way to tell if all

6    of them came in through Hotmail, if half of them came in

7    through Hotmail, or if none of them came into Hotmail.  Is

8    that fair to say?

9 A  Correct.  And it would even get more ambiguous than that

10    because during the transition when we were trying to

11    migrate people away, they may have submitted a purchase

12    order via Hotmail, received our response that said hey,

13    please send your orders to sales@lehighvalleyabrasives.com,

14    and they may have then submitted that order to

15    sales@lehighvalleyabrasives.com during that customer

16    transition period where we're trying to get -- use that.

17    And the reason for using that

18    sales@lehighvalleyabrasives.com email is, number one, it's

19    able to be shared via Outlook a lot more professionally and

20    then multiple customer service agents can utilize it that

21    way, as long as it's just really hammering the branding.

22    You know, your clslcs2000@hotmail doesn't have any branding

23    associated with it, of course.  The more you can hammer the

24    brand name, the greater the opportunity is.

25 Q  Understood.  Now, from the moment that your access to the

Page 37

1    Hotmail account ended, going forward, can you tell me now

2    or ever whether any orders came in seeking products from

3    Allied to the Hotmail account?

4 A  I don't --

5      MR. CASCINI:  Objection, vague, but is -- are you

6    asking him whether he's able to now or whether he was able

7    to in the past at some point in time?

8 BY MR. LEVASSEUR:

9 Q  Whether you're able to now, tell me how many orders came --

10    went to the Hotmail account after you lost access.

11 A  The very nature of not having access means I can't tell you

12    what went there.

13 Q  So as far as you know, it's possible that no orders went to

14    the Hotmail account after you lost access, as far as you

15    know.

16 A  I have no idea.  I have no idea what occurred with it

17    because I didn't have access to it and it was not monitored

18    daily.

19 Q  Well, from the point you lost access, it wasn't monitored

20    at all by you, by Allied.

21 A  Correct, right.

22 Q  And before that you're indicating it wasn't monitored

23    daily; just somebody would take a look at it to see if

24    there were any orders in there?

25 A  Correct.  And it was also used for access to other online

Page 38

1    services that were linked to that email account.

2 Q  Did you perform a, um, due diligence before you finalized

3    the transaction?

4 A  Define due diligence.

5 Q  Do you know what due diligence is?

6 A  I do.

7 Q  Then I'll go --

8 A  It means something different to everyone else.

9 Q  -- with a general understanding to a businessman of due

10    diligence.

11 A  Yes.

12 Q  Did you perform due diligence?

13 A  Yes.

14 Q  What did you do?

15 A  Accessed the financial information, accounting information,

16    their -- the QuickBooks records were not very complete, so

17    we looked at previous years of tax returns.  He did not

18    provide any customer information during the due diligence

19    period.  He was quite protective of that.  Did not provide

20    any -- maybe some online reports of, like, the sales

21    amounts, but we mostly went off of tax returns and

22    performed more of financial analysis than anything else.

23 Q  What was incomplete about their QuickBooks that he

24    provided?

25 A  So I mentioned earlier that online orders would not be

Page 39

1   entered into QuickBooks.  So in order to file a tax return,
2   it would really be almost calculating two separate
3   accounting records, two separate P&Ls in a way, and then
4   putting them together; whereas each QuickBooks order -- you
5   know, the QuickBooks is primarily an accounting software
6   that can process orders, of course.  The lump sales for the
7   online stores would be put into QuickBooks just as a lump
8   amount.  So we sold $100,000 online this month; it's one
9   $100,000 sale in QuickBooks.  There's no information in
10  QuickBooks of what that sale breakdown actually is.  So we
11  couldn't analyze, well, you sold 900 of Part Number A and
12  600 of Part Number B because part numbers didn't match
13  online and offline, and online orders were not put into the
14  offline system, offline being QuickBooks, with every single
15  transaction occurring in there, meaning every line item on
16  the order.
17  Q    So what you're saying is that there's information that went
18       into QuickBooks regarding sales that were other than online
19       orders?
20  A    Yes, yeah.  The sales that went into QuickBooks were
21       exclusively -- I don't want to say exclusively -- generally
22       not any online orders.
23  Q    And not online orders means what?  Telephone orders?  Fax
24       orders?
25  A    So the stuff that went into QuickBooks was generally a

Page 40

1   sales order from -- excuse me, a purchase order from
2   Hotmail, a fax, a phone order, maybe even a website inquiry
3   that was not an actual online transaction, if you follow
4   what I mean by that.  Someone could have sent, on the
5   contact page, right, you know, say contact us if you have
6   any questions.  Someone may have said I want to buy some of
7   this.  So the source may have been an online lead that was
8   then entered into as an offline purchase.  Sometimes orders
9   would get entered into QuickBooks if it was a nonstock
10  online order, meaning an item that had to drop-ship,
11  because then you had to also issue a purchase order, so you
12  would generate -- you would enter the sales order into
13  QuickBooks to get the purchase order from it to ship it,
14  but then it wouldn't be invoiced.  So the sales information
15  would be in there but there would be no corresponding
16  invoice to that sale.  I'm not sure if you understand what
17  I'm saying there.
18  Q    That makes sense.
19  A    Okay.  I don't know if you have a financial background so
20       you have the understanding of those -- that pathway.
21  Q    For invoicing purposes, QuickBooks will do the invoicing
22       essentially automatically --
23  A    Yeah.  There's --
24  Q    -- once you put the information in?
25  A    Right.  There's sort of a transaction path that can occur

Page 41

1   in, you know, offline or online, right?  You don't --
2   offline QuickBooks would be, you may generate an estimate,
3   so you may put John as the name only, put an estimate in,
4   and if someone -- like a military contract, they require a
5   formal estimate.  You have to send them an estimate.  Even
6   if they order it online, it's part of their process that
7   they need to have -- I need to have an estimate before I'm
8   allowed to buy it, even though you could just buy it and
9   you have all the information.  It's just sometimes people
10  have corporate or government processes they have to follow.
11  Q    That's the government for you.,
12  A    Yeah, right, yeah.  Inefficiency when you could just use a
13       credit card.  So an estimate, when it was converted to a
14       sales, to a sale, could then become a sales order, and then
15       from a sales order it could become an invoice.  So that
16       would be the path, estimate to sales order to invoice.
17       From the sales order it could fork.  Prior to being an
18       invoice, it would be a purchase order to the vendor if it
19       was a non-stock item.  And then once you receive the bill
20       from the vendor, you would know that it's shipped or that
21       it was received by the customer and you would then create
22       the invoice off the sales order but the trigger would be
23       receiving the bill in order to create the invoice.
24            Now, they may have paid online, but because he
25       had to issue a purchase order, he would sometimes enter a

Page 42

1   sales order to drive the purchase order off of it, because
2   you could click a button that would say order this and it
3   would pull up, transfer it to a purchase order, say here's
4   your cost, and then click email and send it off to the --
5   whichever vendor it happened to be in order to make the
6   purchase.
7   Q    Would it be true that, every time a product sold, an
8        invoice is generated one way or the other?
9   A    Yeah, yes, yeah, if it was an online invoice that would be
10       emailed to you or an offline invoice, correct.
11  Q    Well, I mean not -- an invoice from Allied or Lehigh Valley
12       or Allied after the transaction to the end customer,
13       there's an invoice; otherwise, how are you going to get
14       paid, right?
15  A    Well, a credit card transaction, you're paid before your
16       invoice.  You're paid at the sales order standpoint prior
17       to the actual invoice.
18  Q    The invoice reflecting that transaction ultimately exists;
19       is that true?
20  A    Yes.
21  Q    And the invoice necessarily always has the customer name
22       and the customer address.
23  A    Generally.  Maybe not all that information.  It would
24       depend on how the order was entered.
25  Q    And invoices were something that was not within the

1  exclusive domain of the Hotmail account, I would assume.
2  Is that true?
3  A   Correct, yeah.  The invoice would not be generated from
4  Hotmail.  An invoice would be generated from the source of
5  the sale, whether it was an online sale or an offline sale.
6  Q   So if we wanted to look back, starting today, looking back
7  ten years, we could get all the customer information we
8  needed if we just looked at the invoices --
9  A   No.  We --
10  Q   -- for the last ten years.
11  A   No.  We earlier had the conversation that not all the
12  information was accurately entered into the system.  So
13  there's a period of time, obviously, in -- since we've
14  owned the company, I could give you very accurate
15  information on what was sold in the last, let's call it,
16  six years or so, but there -- he had the three sources of
17  transactions, QuickBooks, Industrial Tool Crib, which was
18  built on a platform called 3dcart, which then transitioned
19  to -- I can't -- they rebranded.  I don't remember what the
20  rebranding -- I still call it 3dcart, and then BigCommerce,
21  and obviously prior to that was the ProStores that we
22  discussed as well.
23       So information is only as good as how it was
24  entered.  So our information is pretty clean.  His
25  information was not clean.  There were -- he had codes for

1  products sometimes, to say a flap wheel, which is -- it's a
2  product.  It's an abrasive product.  There's a one inch by
3  one-inch flap wheel.  His code might be FW 1x1x1/4, which
4  is flap wheel 1 by 1 by 1/4, which is the shank size.  That
5  did not indicate actually what was shipped to the customer,
6  because he would use that code to either sell imported
7  product from China, imported product from local vendors, or
8  product that might actually even be a branded product.  As
9  an example, one of the vendors is called Wendt, and he
10  might provide them a Wendt product for the same thing.
11       So we had a hell of a time for years, and still
12  occasionally do; oh, I bought this before, and we look up
13  the transaction and it's one of these generic part numbers
14  rather than a specific part number, and that's always -- we
15  don't know exactly what they got.  Did they get the product
16  from China?  Did they get it from a local vendor?  Did they
17  get it from a brand like Wendt?
18       And so we have to then, you know, try and find,
19  do we have any other information from the sales history?
20  And we've -- we've worked pretty hard to clean all that
21  stuff up over a time period.
22  Q   Okay.  Are you indicating to me that the only way you could
23  solve those dilemmas when they would arise would be to
24  access the Hotmail account?
25  A   If that was the source of the sale, then that would be the

1  source of the solution.
2  Q   But you don't know whether, in fact, the email itself,
3  looking at the email, would provide you any clarity.
4  A   What do you mean?
5  Q   Because you don't -- you're just speculating as to whether
6  an email would provide the clarity that you're referring
7  to?
8  A   No.  If the source of the purchase was from the Hotmail
9  account, there -- there may or may not be additional
10  information.  Oftentimes there could be.  Oh, I, you know,
11  want the Lehigh Valley Abrasive branded product, and that
12  means that was, you know, generally the Chinese import.
13  And they may say that in their email.  Or they might say
14  I'm looking for, you know, this Wendt flap wheel, and that
15  may be indicated in the email.  Or they may just say I'm
16  looking for a flap wheel, and then we would not have
17  conclusive information.
18  Q   You could solve the problem by saying, well -- you could
19  sell them whatever it is you want to sell them, right?
20  A   You could, but there are silent variances in products, and
21  getting people to move product sometimes is not the easiest
22  thing in the word.  People often want, well, I tried nine
23  things before and this is the one that works.
24  Q   Okay.  How many times has this dilemma arisen?
25  A   Dozens.

1  Q   Can you provide me examples?
2  A   Sure.  Give me access to the Hotmail account and I can
3  provide you information.
4  Q   No.  I -- I understood you to be telling me a dilemma has
5  arisen that you could not solve because you don't have
6  access to the Hotmail account.
7  A   Okay.  I don't have a list of those scenarios, but many
8  times has the --
9  Q   Well, the -- go ahead.  Finish.  I'm sorry.
10  A   Many times has the problem occurred where we were not sure
11  what was sold to a customer because of incomplete
12  information, and then we can't continue down that rabbit
13  hole of troubleshooting without access.
14  Q   How many times were you unable to sell a product to the
15  customer because of that dilemma?
16  A   I don't have that information.
17  Q   Is there even one time?
18  A   I don't have that information.
19  Q   Is it possible that was -- that you never had -- never
20  ultimately lost a sale because of this dilemma that you're
21  describing?
22  A   I don't believe that's possible.
23  Q   How many times -- but you cannot tell me, it would be sheer
24  speculation for you to tell me the number of times that
25  there was a problem, that you ultimately lost a sale

Page 47

1  because of this.
2  A  It would be speculation because I don't answer customer
3     calls, generally speaking. I would get involved from a
4     technical perspective, but customer service agents would
5     answer most customer calls.
6  Q  Do you have any records from those customer service
7     representatives indicating we --
8  A  No, we don't --
9  Q  -- sale could not be made because we couldn't access
10    Hotmail account?
11 A  No. We don't have a CRM software, customer relationship
12    management software, that would track that.
13 Q  Going back to your due diligence, you described a little
14    bit what you did and what you got and so forth. Were you
15    satisfied at the end of the due diligence period that you
16    got enough information to move forward with the
17    transaction?
18 A  Ultimately, I did move forward with the transaction and
19    purchased the entity and the assets of the entity, so I
20    guess, yes? Yeah.
21 Q  I may have asked you this, but when was it that you learned
22    that the access to the Hotmail account was taken away from
23    you?
24 A  I don't have the exact date.
25 Q  I think you indicated you got access --

Page 48

1  A  Shortly.
2  Q  -- three to six months after the transaction, so we're
3     talking early 2015, and you had access for a period of
4     time.
5  A  Uh-huh.
6  Q  You never lost access to Gmail. We've established that.
7     You did lose access to Hotmail. Can you give me any
8     indication at all as to when you lost the access?
9  A  Off the top of my memory right now, no, I can't.
10 Q  Was it -- did you have access for weeks?
11 A  Years.
12 Q  For years?
13 A  Years.
14 Q  This happened years after?
15 A  Correct.
16 Q  Would you have any records that would reflect when it is
17    that you lost the access?
18 A  No. That's like trying to prove a negative. I'm not sure
19    the date that we lost access. I'm sure he would because he
20    had to do a password reset.
21 Q  So he would know the date; you would not?
22 A  Correct. And, as I mentioned, we didn't monitor it daily.
23 Q  Right. But how frequently did you monitor it? Weekly?
24    Monthly?
25 A  It was a tool that our customer service team could use

Page 49

1  because we were transitioning everyone off of utilizing
2  that Hotmail account. So like most management team
3  members, you don't necessarily know when a problem occurs
4  right when -- right when it occurs. That connection to the
5  problem is always disconnected when there's a layer in
6  between.
7  Q  Let's talk about the non-compete allegations that are made
8     in your complaint, and specifically, again, referencing
9     Exhibit 1, you can refer to it, but what is your
10    understanding of the non-compete obligations that Mr. Stone
11    was subjected to as a result of the transaction reflected
12    in the asset purchase agreement?
13       MR. CASCINI: Objection. The document speaks for
14    itself in that regard.
15       You can answer the question if you know, Robert.
16 BY MR. LEVASSEUR:
17 Q  I'll -- I can answer for you. If -- my understanding, and
18    you can confirm or deny, is that he was prevented from
19    competing with Allied for a period of seven years after the
20    date of the closing, which would be October 13, 2014. Is
21    that your understanding?
22 A  More or less. I'm sure there's some parsing of that that
23    could potentially occur, but, you know, maybe that could be
24    done in a follow-up question if there is one.
25 Q  Actually, I don't what you mean by parsing it.

Page 50

1  A  Well, competing against Allied, it's not the fact of
2     competing against Allied. It's competing -- if Allied
3     decided to start selling medical equipment, I don't believe
4     that Mr. Stone would have been in competition if he also
5     decided to sell medical equipment because I don't believe
6     that was the spirit of the non-compete. It wasn't that it
7     was -- that he was not allowed to compete against Allied.
8     It was compete in the nature of work that he and Lehigh
9     Valley Abrasives had been doing with the customers and the
10    methods.
11 Q  And, obviously, then, he was not -- you were not expecting
12    him to not earn a living after this transaction.
13 A  Correct, yeah, correct.
14 Q  He could start a business; he could sell whatever he wanted
15    as long it didn't compete with Allied.
16 A  As long as it didn't compete with the products and the
17    customers and services and the nature of the businesses
18    that were acquired.
19 Q  And my understanding from the complaint, obviously, is that
20    you allege that he violated that obligation.
21 A  Obviously. I'm confident he did.
22 Q  Wonderful. Tell me what information you had at the time
23    you filed the complaint that he, in fact, violated that
24    obligation.
25 A  Very certainly. He formed a website called US Tool Depot

Page 51

1  which is in direct competition against Industrial Tool Crib
2  and Lehigh Valley Abrasives by selling metalworking
3  products, abrasive products, tooling and machinery and
4  equipment online, which is the exact nature of the
5  businesses and which were acquired.
6  Q  Let's slow up a bit. Creating the company US Tool Depot in
7     and of itself was not a violation of the non-compete.
8     Would you agree?
9  A  No, I wouldn't agree with that. I believe it says you're
10    not allowed to be a shareholder or a consultant or director
11    of any entity. I think there's language in there like
12    that. I might be confusing it with other non-competes I've
13    read before, but I believe there's language that says can't
14    be a shareholder, can't be a director, can't consult to any
15    competing business.
16 Q  And that would be competing. I mean, the creation -- US
17    Tool Depot, if it sold toothpaste, he could do that, right?
18 A  Sure, yes, yes.
19 Q  Okay.
20 A  I believe that's probably true.
21 Q  Okay. So your problem or your allegation against him is
22    that he sold -- and I want you to go slower. What is it
23    that you claim US Tool Depot sold that it was not allowed
24    to sell under the non-compete agreement?
25 A  I'll try not to make a mistake in this here, but US Tool

Page 52

1  Depot then formed an e-commerce website on the BigCommerce
2  platform and sold machinery, tools, woodworking equipment,
3  metalworking equipment, abrasive products, clamps,
4  measuring tools, all of which are products that Allied or
5  Lehigh Valley Abrasives or Industrial Tool Crib did or
6  could have sold that were in the nature of the acquisition.
7  Q  And when did you learn that this had taken place?
8  A  As soon as he marketed us from his Hotmail account saying
9     you might remember me, I used to own Lehigh Valley
10    Abrasives, and he emailed us.
11 Q  When was that email received?
12 A  It's, I believe, in the exhibits or discovery, but the date
13    on it is -- on the email. I don't recall the exact date.
14 Q  Give me your best recollection.
15 A  I think it was February of '22, I think, maybe '23.
16 Q  And at that time, he was no longer under the restrictions
17    imposed by the non-compete agreement; is that fair to say?
18 A  The email is not the non-compete issue. That would likely
19    the trade secrets issue and the use of our intellectual
20    property that he retained and marketed to. That's a pretty
21    good indicator that he emailed our company, but that drove
22    us to look into his activities, and that's when we
23    discovered he formed these websites, he was marketing to
24    our customers. We got calls from customers that said, hey,
25    I don't know if you know this, but someone is saying that

Page 53

1  they used to work for you and emailed us. So that's --
2  that's the nature of the complaint.
3  Q  But you indicated it was 2022 or 2023. That's after the
4     non-compete period expired, correct?
5  A  Discovering competitive practices after the competitive
6     practices have started does not exclude the activity of the
7     competitive practice, because US Tool Depot was formed
8     during the non-compete period of time, and that is when
9     those competitive practices occurred.
10 Q  Well, that's what we're going to have to find out, isn't
11    it?
12 A  Sure.
13 Q  Certainly, if he -- if he limited his compete -- selling
14    competing products, the list that you provided me, if he
15    did not sell any of those competing products during the
16    seven-year non-compete period, he would not be in
17    violation; is that fair to say?
18    MR. CASCINI: Objection --
19    THE WITNESS: No.
20    MR. CASCINI: -- just to the point, list that you
21    provided, are you referring to his prior testimony about
22    the kinds of things that were sold that he's given in his
23    deposition today?
24    MR. LEVASSEUR: Yes.
25    MR. CASCINI: I retract the objection then.

Page 54

1     THE WITNESS: I would say that's a non-exclusive
2  list just for clarifying. You know, there's hundreds of
3  parts online, of course, that are potentially competitive.
4  So I don't want that to used as a, oh, you didn't say it
5  during this period of time, a gotcha-type thing. There are
6  thousands of SKUs on the websites. So would you repeat
7  your question based on that?
8  BY MR. LEVASSEUR:
9  Q  Would you agree with me that he could sell anything and
10    everything, competing or not, after the non-compete period
11    expired?
12 A  No. Anything and everything is too exhaustive. He
13    certainly couldn't sell products that were driven from the
14    intellectual property and which we purchased. So I would
15    certainly believe that the configurations of our products
16    that we had private labeled that he was purchasing are
17    intellectual property, and if you purchase and sell the
18    product based on that identical configuration under your
19    own brand, you might not be violating the non-compete, but
20    you certainly are utilizing intellectual property and trade
21    secret information, so --
22 Q  That's fair. So limiting the question to the non-compete
23    restrictions, he can sell anything and everything under the
24    sun after the seven years has expired for purposes of the
25    non-compete restriction.

Page 55

1    MR. CASCINI: Objection.
2  BY MR. LEVASSEUR:
3  Q  True?
4    MR. CASCINI: Objection as to form. Are you
5  asking whether he can sell anything and that would not be a
6  contractual violation of the non-compete? Is that you're
7  trying to establish?
8    MR. LEVASSEUR: Essentially, yes.
9    THE WITNESS: I believe --
10    MR. CASCINI: Answer if you know.
11    THE WITNESS: I believe so. That's a -- it's a
12  tricky question. I don't think you mean it to be tricky,
13  but there's a lot of moving pieces to it.
14  BY MR. LEVASSEUR:
15  Q  Well, certainly the non-compete didn't last forever,
16    obviously, right?
17  A  Correct.
18  Q  It was seven years, but if he was a good boy during the
19    seven years, he could do -- when the restrictions were
20    lifted, he could do whatever he wanted.
21    MR. CASCINI: Objection as to form, vague,
22  whatever he wanted.
23  BY MR. LEVASSEUR:
24  Q  Whatever he wanted without --
25    (Multiple speakers)

Page 56

1    MR. CASCINI: -- contractual relations.
2    MR. LEVASSEUR: Sorry.
3  BY MR. LEVASSEUR:
4  Q  Whatever he wanted without violating the non-compete
5    agreement.
6  A  Yeah, because they were obviously continuing obligations of
7    the transaction that occur, so from a non-compete
8    perspective, I believe that's correct, but I would, you
9    know, need to examine each argument here we're having on a
10    case-by-case basis.
11  Q  Okay. And we're going to go into the other aspects that
12    don't relate to the non-compete in a minute --
13  A  Sure.
14  Q  -- but to close out the non-compete part, the seven-year
15    restriction of the non-compete, is it your allegation that
16    he violated that during the seven years?
17  A  Do I believe Mr. Stone violated the non-compete during
18    his -- during the time restriction?
19  Q  Not do you believe; are you alleging that?
20  A  Yes.
21  Q  And what evidence do you have to support your contention
22    that he violated the non-compete during the seven-year
23    period starting October 13, 2014?
24  A  A significant amount of evidence, including the formation
25    of the domain, the launching of the e-commerce site, the

Page 57

1    products listed on the e-commerce site in which he was
2    selling. There's a significant amount of evidence that
3    indicates he violated the non-compete.
4  Q  Okay. The creation of the domain name alone is a
5    violation, in your mind?
6  A  Yes.
7  Q  Why is that?
8  A  US Tool Depot is pretty similar to Industrial Tool Crib in
9    the general nature of the structure of it, and there are
10    restrictions -- again, I believe I could review the
11    non-compete if you'd like -- to say he's not allowed to own
12    or be a part of or consult to any competing business in
13    which, after forming that domain name -- I don't know if he
14    formed the LLC first or the domain name or whatever; sometimes
15    it's a chicken or the egg scenario, you know, form an LLC
16    if the domain name's not available type thing, so he may --
17    I don't know the dates on those off the top of my head, but
18    he formed the domain name, he launched the e-commerce
19    store, and did all of that prior to the expiration of the
20    non-compete.
21  Q  Are you talking about for US Tool Depot --
22  A  Yes.
23  Q  -- or XP Abrasives?
24  A  Uh --
25  Q  You're talking right now just US Tool?

Page 58

1  A  US Tool Depot. I believe XP Abrasives' domain name was
2    purchased prior to the expiration of the non-compete as
3    well.
4  Q  Okay. Let's focus for the time being on US Tool Depot.
5    Let's, for purposes of my question, assume that nothing --
6    he sold nothing through that company. Is it your
7    contention, and it sounds like it is and that's why I'm
8    asking you, that merely creating the -- you know,
9    registering your domain name in and of itself is a
10    violation of the non-compete?
11  A  Yes.
12  Q  And that's because that domain name had "tool" in it and
13    Allied's company that they bought from Mr. Stone also had
14    the word "tool"?
15  A  Yes.
16  Q  So you believe that the asset purchase agreement gave you
17    exclusive control of the word "tool"?
18  A  No.
19  Q  Well, then why couldn't Mr. Stone use -- create a name that
20    includes the word "tool"?
21  A  You know, this is challenging because you're asking me a
22    hypothetical of if he sold nothing, but he did, and he did
23    launch, so I don't -- I can't speak to his intentions, but
24    when you look at US Tool Depot as a name and then you look
25    at the domain name that he launched, it's really

Case 1:22-cv-00815-RLM-SJB    ECF No. 132-8, PageID.1422    Filed 02/14/25    Page 18 of 59

Allied Industrial Supply v. Stone, et al.                                                              Robert Windorf

Page 59

1 challenging for me, at least, to disassociate the two, the
2 actual just general purpose name of US Tool Depot, from the
3 action of launching an e-commerce store that sold tools. I
4 can't disassociate the two so I can't answer that question
5 in an objective form.
6 Q   Okay. Well, I thought it was -- and I am trying to get you
7     to disassociate the two, because I want to know whether --
8     what it is that I'm defending against. And if, in fact,
9     nothing was sold, the creation of a company and the use and
10    the coming up with the name that happens to include "tool"
11    doesn't violate anything of that non-compete agreement --
12 A   It's --
13 Q   -- in my estimation, and if you disagree I want you to tell
14    me why and point out where in the non-compete agreement
15    does it prevent him from creating a company that sells
16    nothing in competition with Allied.
17        MR. CASCINI: I'm going to put the objection on
18 the record that the document speak for itself.
19        But you can answer the question if you know it,
20 Robert.
21        THE WITNESS: You know, I'll refer to the
22 document, if I can.
23 BY MR. LEVASSEUR:
24 Q   Absolutely.
25 A   And see, you know -- asset purchase agreement.

Page 60

1        MR. CASCINI: Do you have an attorney copy of
2 this exhibit, just -- if not, that's okay.
3        MR. LEVASSEUR: I don't.
4        MR. CASCINI: I can pull up a version.
5        MR. LEVASSEUR: I try not to kill too many --
6        MR. CASCINI: I appreciate that, Chris.
7        (Recess taken from 11:49 AM to 11:53 AM)
8 BY MR. LEVASSEUR:
9 Q   Have you had a chance to go through the non-compete
10    agreement?
11 A   Yes.
12 Q   And did you find anything that indicated that Mr. Stone
13    would be prohibited from even creating a company that did
14    not sell any product at all?
15 A   Exhibit B, paragraph 1 of the noncompetition agreement
16 specifically states that:
17        The seller agrees that, for a period of seven
18 years after closing date, neither will directly or
19 indirectly engage or invest in, own, manage, operate,
20 finance, control or participate in the ownership,
21 management, operation, financing, or control of -- lost my
22 spot -- services or advice to any business whose products
23 or activities compete in whole or in part with the business
24 of AIS, et cetera, et cetera, et cetera.
25        So the ownership of the entity is a challenge.

Page 61

1 We would have to depose Mr. Stone to know what the intent
2 of that entity is. You can file an entity with lots of
3 intents and purposes.
4        MR. CASCINI: I also just want to note for the
5 record, there was line in that that was omitted, but he's
6 trying to recite paragraph 1, and it's impossible to -- the
7 point where you mentioned that you lost your place, there
8 was one line --
9        THE WITNESS: Did I skip a line?
10        MR. CASCINI: But it's immaterial.
11        THE WITNESS: Okay.
12 BY MR. LEVASSEUR:
13 Q   Understood. You're relying on that part of it.
14 A   Correct.
15 Q   And you interpret that to say that creation of a company
16    that sells nothing and does nothing is in violation.
17 A   I don't -- I don't think that this is a company that sells
18    nothing and does nothing.
19 Q   That's right, and it isn't.
20 A   Right.
21 Q   But you indicated previously that merely by registering the
22    domain name alone, nothing more, was -- made him in
23    violation of the non-compete agreement.
24 A   I actually believe wholeheartedly that filing a domain name
25    with the word "tool" in it is competition against our

Page 62

1 domain name that has the word "tool" in it. It's a
2 different question than you asked before which was about
3 the entity formation aspect of it because now it's an
4 action and it is a sales channel or an information channel.
5 Q   Understood. I understand your position.
6        Okay. Now, certainly the company didn't just get
7    created and do nothing. It did do something. And the
8    things that it did, to your knowledge and your allegation
9    in the complaint, that is a violation of the non-compete
10    agreement; fair to say?
11 A   Yes.
12 Q   Okay. What products did US Tool Depot sell that you
13    believe to be in competition with AIS, Allied?
14 A   US Tool Depot purchased and sold products -- we'll use
15 categories of products because that's really, you know, a
16 more general way of doing this here.
17 Q   And before you answer, I want to make clear I'm restricting
18    you -- that my question is restricted to the non-compete
19    period and not after.
20 A   Sure.
21 Q   Understood?
22 A   Sure.
23 Q   Okay.
24 A   Yep. Abrasive products were sold, machinery was sold,
25    tools were sold, and I believe during the non-compete

Page 63

1   period Mr. Stone used US Tool Depot to purchase
2   private-label flap discs with our exact same configuration
3   from the vendor in which Lehigh Valley used to purchase
4   them from called Sundisc Abrasives. As the import records
5   indicate, that flap disc came from Sundisc to US Tool
6   Depot.
7 Q   And then resold them?
8 A   What do you mean?
9 Q   Purchased flap discs --
10 A   He purchased inventory for the purpose of selling, yes,
11   correct.
12 Q   Okay. And where did you get that information?
13 A   The public import records that exist. I believe it's
14   either provided in discovery or an exhibit potentially
15   in the complaint somewhere, but --
16 Q   And do you have any records that indicate that he sold
17   those flap discs during the seven-year period?
18 A   No.
19 Q   And your contention is that he can't even buy products?
20 A   The document speaks for itself. No, of course he cannot.
21 Q   Where does it say he cannot purchase?
22 A   Well, he can't -- directly or indirectly engage in, I would
23   certainly argue that investing and purchasing are probably
24   quite similar. Own or manage, manage is certainly, when
25   you're issuing a purchase order, you're definitely managing

Page 64

1   a transaction. Operate, the purchase or sale of products.
2   Control, or we can even go more general, participate in the
3   ownership, management or operation, finance, or control of.
4   He definitely was participating in competitive practices.
5 Q   Explain to me how being a customer purchasing a product
6   competes with Allied.
7 A   It was not a customer purchasing a product.
8 Q   Well, you indicated right now you don't have any evidence
9   that he actually sold the flap disc that you're talking
10   about, so the evidence that you have is that he purchased
11   it.
12 A   Okay.
13 Q   If he purchased it and did not sell it, would you agree
14   with me that's not competition with Allied?
15 A   No, I would not agree with that.
16 Q   How does -- how does -- how is Allied being competed with,
17   being harmed --
18 A   Sure.
19 Q   -- by Mr. Stone's company buying a flap disc?
20 A   Yeah, absolutely. That's easy to indicate. If you have a
21   non-compete agreement -- let's just use January 1st, right,
22   and it expires on December 31st so you can start business
23   on January 1st, if you spend that entire year before
24   prepping, including forming your entity, reaching out to
25   vendors, getting a website built out, getting

Page 65

1   infrastructure in place so that you can launch immediately
2   and start taking sales on January 1st, those are
3   competitive practices prior to that.
4 Q   Got it. But to reiterate, you don't have any evidence that
5   he actually did do any selling before the seven-year
6   period; is that accurate?
7 A   Of what product, the flap discs?
8 Q   The competing products.
9 A   Yes, absolutely.
10 Q   Okay. What evidence do you have that he actually did that?
11 A   The list of products that were sold that -- the short list
12   that we have from the US Tool Depot website indicates a
13   significant amount of competing products.
14 Q   Okay. The evidence you have -- you're relying strictly on
15   what US Tool Depot's website indicates; that's your
16   evidence?
17 A   I am -- no. I am relying on the Excel or CSV, one of the
18   two, but database of products, the product list, that
19   was submitted to us as part of discovery that indicates
20   competitive products, the actual sale of competitive
21   products, not the -- I would agree that a website by its
22   nature is an attempt to sell a product and not an actual
23   sale. Whether it's competitive practice or not, it's not a
24   sale yet until somebody purchases something. It still may
25   be competitive activity. But there are products on that

Page 66

1   export that are absolutely competing products that were
2   sold during the non-compete period.
3 Q   Do you know off the top of your head what those are?
4 A   There is a database, and I've analyzed the database
5   personally. I don't have it memorized, the products, but
6   there are abrasive products. There are machines which are
7   used for grinding or polishing. There are a number of
8   competing products.
9 Q   Okay.
10   MR. CASCINI: Chris, I want to make sure we're
11   talking all about the same thing here.
12   MR. LEVASSEUR: Uh-huh.
13   MR. CASCINI: And just noted for the purposes of
14   the record, this is prior to us engaging in the mutual
15   mediation where the customer lists and product sales have
16   been exchanged. What we are currently in possession of is
17   a redacted document that you sent me back on -- I'm going
18   to be making up a date here -- something like October 8.
19   There was a partial production that was redacted and we've
20   had a discovery dispute over that. I think -- I don't
21   think there's any -- I think this is the document that
22   Mr. Shindorf is referring to. I just want to stipulate
23   for the purposes of the record, this is -- we have not yet
24   received information where the mediator has exchanged data
25   about common sales yet.

Page 67

1      MR. LEVASSEUR: Correct. And I assumed that he
2 was talking about exactly that document that I --
3      MR. CASCINI: Perfect.
4      MR. LEVASSEUR: -- the redacted document, Excel
5 spreadsheet that I provided to you.
6      MR. CASCINI: Wanted to make sure our assumptions
7 aligned. Great.
8 BY MR. LEVASSEUR:
9 Q  **Now, would you agree with me that, whether it's US Tool**
10   **Depot or XP Abrasives, subsequent to -- their activities**
11   **subsequent to October 13, 2021, would not be in violation**
12   **of the non-compete agreement that Mr. Stone signed?**
13 A  It could be related to the non-compete agreement, but I'm
14   not sure if the activity after that period --
15   theoretically, you can have a purchase agreement that
16   was -- I'm sorry -- purchase order that was submitted on,
17   what's the date of expiration here, October 13? It was
18   submitted on October 12th and shipped on October 15th,
19   which still could have indications of the non-compete
20   period there.
21 Q  **Fair enough.**
22 A  Or the customers that may have been generated during that
23   period of time of the non-compete with continued sales
24   afterward, that may be related to it. But the very nature
25   of a non-compete is that it's challenging to determine the

Page 68

1   exact damages and that's why Mr. Stone agreed to liquidated
2   damages.
3 Q  **Right. We're not talking about damages right now, but we**
4   **will.**
5 A  It's important.
6 Q  **Yes, and that's why we're going to do it, but, again, other**
7   **than the nuance that you've just indicated, you do agree**
8   **with me that subsequent to the lifting of the seven-year**
9   **non-compete, he can do whatever he wants in terms of**
10   **selling products through XP Abrasives and US Tool, agreed?**
11 A  As it relates to the non-compete, not as it relates to
12   trade secrets, vendor information, customer information,
13   price lists, et cetera.
14 Q  **Got it. Now, this is not the first litigation between you**
15   **and Mr. Stone, is it?**
16 A  I believe it is the first litigation, but there was a
17   disagreement.
18 Q  **That didn't go to court?**
19 A  Correct.
20 Q  **Okay.**
21 A  I don't even think a complaint was filed or anything like
22   that.
23 Q  **And what was the nature of that disagreement?**
24 A  Mr. Stone's financial illiteracy and how he believed that
25   transactions should or could have occurred.

Page 69

1 Q  **Was it more fundamentally that he didn't believe that you**
2   **were paying the purchase price, the full purchase price for**
3   **his business?**
4 A  No, I don't believe so.
5 Q  **Then the nature of the dispute was what?**
6 A  There was an accounting period from the beginning, so when
7   the transition occurred, he still had his merchant accounts
8   set up, so he was still receiving deposits from sales into
9   his account after the transaction. I was paying some of
10   his previous purchase orders after the transaction. There
11   was a lot of this initial accounting that needed to occur
12   that is always a little bit messy. When you don't purchase
13   the stock, when you purchase, you know, the asset of an
14   entity, there's still money flowing in and money flowing
15   out, and are you paying an old bill or a new bill and when
16   did that bill generate and when was that sales activity,
17   when did the sales activity occur, when did the purchase
18   order occur. So there was initial cleaning up of those
19   things that occurred.
20 Q  **So under the asset purchase agreement, the purchase price**
21   **was indicated at -- to be 1,000 -- not 1,000 -- $1,300,000;**
22   **is that accurate?**
23 A  If that's what the document reflects.
24 Q  **And is it your contention that you paid the full $1,300,000**
25   **to Mr. Stone?**

Page 70

1 A  I believe there was a settlement agreement in which we
2   prepaid some of the seller financing and received a
3   discount in exchange for that prepayment of the seller
4   financing.
5 Q  **So prior to the settlement agreement, you had not paid the**
6   **full purchase price; is that accurate?**
7 A  Made full payment in cash or committed to pay via
8   promissory notes or other -- because I would argue that
9   your promissory note is your payment, because it's
10   collectible.
11 Q  **I agree. And the promissory note was for 500,000, correct?**
12 A  If that's what the document is, yeah.
13 Q  **And did you pay -- did you fully -- prior to the**
14   **settlement, you had not fully satisfied that promissory**
15   **note, correct?**
16 A  We were -- yes, we had satisfied the terms of the
17   promissory note. The settlement agreement granted us a
18   discount off of the remaining balance of the promissory
19   note for prepaying it.
20      (Exhibit 2 marked)
21 BY MR. LEVASSEUR:
22 Q  **Let me hand you -- speaking of that settlement agreement,**
23   **let me hand you what has been marked as Exhibit 2. Can you**
24   **confirm for me that that is the settlement agreement we've**
25   **just been referencing?**

Page 71

1   A   I believe so.

2   Q   And let me direct your attention to paragraph 1D -- or 2D.

3     Do you see that?

4   A   2D. Okay.

5   Q   And would you agree with me that you released any and all

6     claims that you may have against Mr. Stone other than those

7     relating to the non-compete agreement; is that fair to say?

8   A   I think the document speaks for itself, and some of the

9     challenges, of course, are claims known or unknown until

10     the date of this agreement in which there are certainly

11     things that survive the date of this agreement, one of

12     which is reference the non-compete and then, obviously,

13     intellectual property, trade secrets, and other aspects of

14     his are required.

15   Q   Well, those -- nothing but the non-compete agreement was

16     carved out, correct?

17   A   No. It's any claims known or unknown until the date of

18     this agreement, and then at the date of this agreement he

19     had not violated the non-compete, he had not violated

20     intellectual property issues, he had not violated trade

21     secret issues, so there were no claims at that time. That

22     doesn't give him carte blanche, of course, to then violate

23     those things and make the claim that, oh, well, you told me

24     it was fine because you agreed to discharge me from that.

25     So, no, I wouldn't agree with your statement that any and

Page 72

1     all claims he can just do what he wants with.

2   Q   Well --

3   A   Like, for instance, we purchased -- it's our contention I

4     purchased his email address. Subsequent and after this, he

5     then took ownership of that back. That is a violation of

6     the asset agreement. It doesn't mean that he isn't allowed

7     to do it. He did it. Doesn't mean he's allowed to.

8   Q   Well, you knew that he did not give you access to the Gmail

9     or the Hotmail account as of the date of closing, didn't

10     you?

11   A   Yes.

12   Q   So you knew that, and you had -- you could have sued him

13     for that because, allegedly, if it was covered by the asset

14     purchase agreement, he breached the agreement on that date,

15     correct?

16   A   Yeah, but that's a bit frivolous. I mean, like this

17     lawsuit itself has gone on for virtually two years at this

18     point. You don't just jump to suing someone who is in --

19     you know, who's basically acting as your office manager in

20     New Jersey 30, 45 days after because you didn't receive

21     access to an email account.

22   Q   Well, I'm not suggesting that you made a poor business

23     decision by not suing him, but the fact of the matter is

24     you could, according to your theory that you purchased the

25     Hotmail and the Gmail account and he didn't give them to

Page 73

1     you.

2   A   Sure, could have, yeah.

3   Q   Now I want to the spend some time going through the

4     complaint. So --

5   A   Exhibit 1?

6   Q   Yes. That's 1, Exhibit 1. And let me direct your

7     attention to paragraph 24 where you make -- again,

8     referring to the Hotmail account, you make the allegation

9     that the Hotmail account was used primarily to receive

10     incoming purchase orders, requests for quotes, requests for

11     pricing information, and other inquiries directly from

12     end-user customers. How is it you know that allegation to

13     be true?

14   A   How is it that I know that email address was the

15     primary address --

16   Q   Was used primarily for those purposes.

17   A   Because it was the only email address that was used for

18     those purposes.

19   Q   Well, as you indicated previously, Mr. Stone, the Hotmail

20     account was his primary personal account with all his

21     personal information. He used it for medical. He used it

22     for --

23   A   I did not indicate that. I did not say it was his primary

24     personal account.

25   Q   You --

Page 74

1   A   I said he was using it for personal purposes as well.

2   Q   Okay. So how do you know that primary purpose were these

3     listed in paragraph 24?

4   A   It was the sole source for business transactions. And my

5     personal experience with viewing the incoming emails when I

6     did have access to it was that there was relatively no

7     incoming personal information into it.

8   Q   It was the sole source for business transactions.

9   A   It was the sole source for incoming customer inquiries and

10     purchase orders, correct.

11   Q   And there was no --

12   A   Via email, not phone or, you know, online, but via email.

13     It was the sole email --

14   Q   Sole email source.

15   A   Correct.

16   Q   And the Gmail, as you indicated previously, served a

17     different function.

18   A   Yes. Mostly account management and backups, Google Drive

19     type things.

20   Q   Okay. Well, then I would guess, looking at paragraph 25 of

21     the complaint, that you would agree with me that that

22     allegation's not true.

23   A   No. What aspect are you indicating that you think is not

24     true of that? That's -- that's exactly what I just said,

25     is that that Gmail account is used to access online

**Page 75**

```
 1   services and tools, which is Google-owned Webmaster Tools,
 2   if you're familiar with -- are you familiar with e-commerce
 3   at all?
 4   Q    A little bit.
 5   A    So Webmaster Tools is kind of a broad term for some of the
 6        Google services which can crawl your website to give you
 7        better search engine optimization, can link to Google
 8        AdWords, which is an advertising platform, Google Merchant
 9        Center, which is how you can utilize the Google shopping
10        service where it shows the products on the top.  So that
11        was an email address linked with that as well.  It was
12        not -- but it was not used -- I can't say that there was
13        never an incoming email to that from a purchase order, but
14        it was primarily used for services, linking services.
15   Q    Directing your attention to paragraph 26, explain to me
16        what you mean by that the Gmail account was used as a
17        repository for a large cache of customer information?
18   A    Yep.  There was a backup of the QuickBooks file on the
19        Gmail account.
20   Q    So QuickBooks as a secondary backup -- uh, presumably
21        QuickBooks is backed up; it's got its own backup, online
22        backup or --
23   A    No, it doesn't.  It does not have its own.
24   Q    Okay.
25   A    You're responsible for the safety of your data with
```

**Page 76**

```
 1        QuickBooks desktop version.
 2   Q    Okay.  And both before and after the transaction, the Gmail
 3        account was a backup method for the -- for the -- or a
 4        place to back up the QuickBooks information.
 5   A    Correct.  If you're familiar with, like, Google Drive --
 6   Q    I am.
 7   A    -- yeah, that would be a place to store information.
 8   Q    And you had access -- because you maintained access of the
 9        Gail account the entire time, you had access and still have
10        access to all of that customer information, correct?
11   A    Correct.  Well, to the data that was stored there, correct.
12   Q    And then the information, again, still in paragraph 26, it
13        went beyond mere customer lists with related contact
14        information including accounting records and backup files,
15        and is that the same thing you were just referencing?
16   A    Yeah, that we're referencing there.
17   Q    So you have all that, correct?
18   A    Is that -- is the stuff still on there; is that what you're
19        asking?
20   Q    Well, if you -- did you delete it at some point?
21   A    I don't think so.
22   Q    Okay.  Well, if it was there as you allege in paragraph 26
23        at the time you filed the complaint, it's still there; it's
24        still available to you, all of that customer information?
25   A    Right, sure, yes.
```

**Page 77**

```
 1   Q    Paragraph 29 indicates that 70-80 percent of the Lehigh
 2        Valley sales were generated directly through emails to the
 3        Hotmail or the Gmail account.  You indicated now that the
 4        Gmail account really didn't -- didn't -- wasn't used for
 5        sale purposes to the customers, so was that part of the
 6        allegation incorrect?
 7   A    No, no.  I think there's layers to this statement here.  So
 8        there's the date layer, right, as of 2014, between 70 and
 9        80 percent, so there's your volume, of Lehigh Valley's
10        sales were generated directly through emails sent to and
11        from the Hotmail or Gmail accounts, inclusive of both
12        online advertising platforms and emailed purchase orders or
13        inquiries.
14             So online advertising platforms would be Google
15        AdWords, Microsoft Bing advertising is how they define it
16        and which generates quite a bit of the information, and
17        then it's tied to those email addresses, and then there is
18        also the emailed purchased orders or inquiries, so the
19        email is one portion of it, but the inclusive of online
20        advertising platforms and that.  So, comprehensively, those
21        email addresses are associated with the advertising
22        platforms as well as the emailed purchased orders.
23   Q    Is there a way to access the advertising platforms without
24        the email account itself?
25   A    No.
```

**Page 78**

```
 1   Q    You log into it through the email account?
 2   A    That's correct.  Like a Gmail log-in screen, you would go
 3        to the Google AdWords, adwords.google.com, and then sign in
 4        with those email addresses.
 5   Q    And then as you indicated, there was a time factor and it's
 6        as of 2014, so how did you -- how do you know that this was
 7        the case in 2014?
 8   A    It was arranged for a reason, you know, 70 to 80 percent,
 9        because we can't be assured to a 100 percent degree, but
10        almost all transactions as an e-commerce business are done
11        electronically, so the vast majority of those, and I
12        believe he had indicated to us at some point that about
13        80 percent of his transactions were via the online platform
14        or emailed transactions.  Twenty percent would be local
15        companies, previous contacts that would call in, things
16        like that.
17   Q    So the source of information that backs up this allegation
18        is Mr. Stone himself?
19   A    Yes, and transaction records from the time.
20   Q    You have transaction records from 2014 that establish that
21        the 70-80 percent of the orders that came into Lehigh
22        Valley were through the Gmail and the Hotmail account?
23   A    No.  Mr. Stone retains those records.
24   Q    Okay.  In making this allegation, what were you looking at?
25        What information did you have when you made the allegation
```

Page 79

```
 1   when you filed the complaint?
 2 A   As we discussed earlier, we did due diligence and we asked
 3     him what the sources of revenues and incomes were at the
 4     time.
 5 Q   Okay.  So, again, we'll get back to the sole source of this
 6     information is Mr. Stone himself.
 7 A   I wouldn't say the sole source because that's too
 8     conclusive of it.  There's information related to the
 9     platforms that, you know, was a -- that could probably be
10     parsed if there was a complete picture of it to determine
11     exactly, rather than him recalling from his memory or
12     anything like that.
13 Q   Okay.  Well, just to clarify, I had asked you through your
14     counsel to give me the documentation that backs up this
15     allegation, and I have received absolutely nothing.  Is
16     that because you're holding it back or because you don't
17     have anything to back up this allegation and that you're
18     relying instead on Mr. Stone?
19 A   We may be relying on representations from Mr. Stone that he
20     represented during the transaction, as well as my
21     information and belief from the period of time and when the
22     due diligence occurred.
23 Q   Okay.  Just to be clear, your information, do you have
24     information that exits in an email, in a document, in
25     anything other than your memory?
```

Page 80

```
 1 A   I'm not -- I believe that there are emails in the discovery
 2     that you received from Mr. Stone that indicates the sources
 3     of sales, the breakdown of the sales process.
 4 Q   Are you capable of looking through documents that you
 5     provided to me through your counsel and pinpoint exactly
 6     what it is you're talking about?
 7 A   I would be, yeah.
 8 Q   Okay.  So if I asked you through your counsel to do that,
 9     you would be able to do that for me?
10 A   Likely.
11 Q   In 35, you make an allegation that we've been talking about
12     quite a bit this morning about the Hotmail and the Gmail
13     accounts having been purchased by Allied through the asset
14     purchase agreement, and you indicate that it expressly
15     includes the Hotmail and Gmail account.  Could you please
16     point out where -- you made the exhibit to the complaint,
17     where, in fact, in the Exhibit 2 to the complaint that it
18     contains the express reference to the Hotmail and the Gmail
19     account?
20     MR. CASCINI:  For the purpose of clarity, you
21     mean Exhibit 2 to Exhibit 1 introduced here, right?  Sorry.
22     MR. LEVASSEUR:  Right, yeah.
23     MR. CASCINI:  Not the settlement agreement.
24     We're talking about Exhibit 1 Which has a sub-exhibit of
25     its own called Exhibit 2.
```

Page 81

```
 1     MR. LEVASSEUR:  Exactly.  Thank you for that
 2     clarification.
 3     MR. CASCINI:  Solely for my own benefit, Chris.
 4     Just wanted to make sure I was there.
 5     MR. LEVASSEUR:  Actually, for further
 6     clarification, I don't know that it is Exhibit -- it's
 7     Exhibit A and it's out of order, in fact, now that I'm
 8     looking at this, but I think it's Exhibit A to -- Exhibit A
 9     to Exhibit 1 of this Deposition Exhibit 1 is probably the
10     best way to reference it.
11     THE WITNESS:  I may be out of order on this here
12     too.  I've got Exhibit B here.
13     MR. CASCINI:  Page ID should be -- page ID is the
14     page number.
15     THE WITNESS:  Okay, page ID.  And what page ID am
16     I looking for?
17     MR. LEVASSEUR:  It's going to be the one that's 1
18     through 25, because that I know is the asset purchase
19     agreement.  That's the best way for me to -- that's how
20     I've been referencing it.
21     THE WITNESS:  Here we go.
22     MR. CASCINI:  23, right.
23     For the purpose of the record, you were right,
24     Chris.  It's Page ID.23 of ECF No. 1-2, which is -- which
25     belongs to Exhibit 1.
```

Page 82

```
 1     THE WITNESS:  So the purchase agreement speaks
 2     for itself and specifically includes:
 3     "Assets include, without limitation, the
 4     following:"
 5     Under "d" you get Intangibles, which are the
 6     sources of the transactions including phone numbers, all
 7     books and records reasonably necessary to operate the
 8     business.
 9     And "e," it has software, websites, all passwords
10     and information needed to operate the site.
11     In "f," it's any existing computer programs,
12     software programs, software and technical libraries,
13     license agreements, and any other intellectual property.
14     Your license agreement certainly would be your email access
15     agreement in which you agree with Microsoft, you know,
16     Microsoft/Hotmail, and that's it.
17 BY MR. LEVASSEUR:
18 Q   Okay.  So it doesn't expressly reference Hotmail and the
19     Gmail accounts.
20 A   Are you asking is the word Hotmail on this document?
21     Because it is certainly a category of these items
22     purchased.
23 Q   We can agree to disagree on that, but I'm just --
24 A   That's fine.
25 Q   -- for clarification, nowhere on the asset purchase
```

Page 83

1  agreement does it state that Mr. Stone was selling his
2  personal email account csls -- or whatever it is --
3  2000@hotmail.
4  A  That specific email address is not wrote on the asset
5  purchase agreement, but it's my contention and I believe
6  the agreement speaks to the fact that it is certainly one
7  of the business systems, including accounts, et cetera,
8  that I just referenced there that are part of the
9  transaction, and his efforts and email addresses for email
10  transactions -- no -- email correspondence, that is the
11  word I was looking for, indicates that as well.
12  Q  And the same answer would be true -- you're giving me the
13  same answer with respect to the Gmail account.
14  A  Yes.
15  Q  Okay.
16  A  Specifically, also, there is a paragraph 1.2 for assets not
17  included.  Had he wished to retained those, he could have
18  explicitly wrote in 1.2 that he wanted to retain his
19  Hotmail and Gmail accounts.
20  Q  In paragraph 42 you indicate that Allied had changed the
21  passwords to the Hotmail and the Gmail account after
22  Mr. Stone gave you access by giving you the password.
23  A  Correct.
24  Q  Did you tell him in advance that you were going to change
25  the password?

Page 84

1  A  I'm not certain.
2  Q  How did -- do you recall the first time that the two of you
3  had a conversation about the fact that you locked him out
4  of his accounts?
5  A  Locked him out is a mischaracterization.
6  Q  Or prevented him from gaining access by changing the
7  password.
8  A  Again, I don't even believe he was prevented from having
9  access.  I think there was a period of time in which he
10  passed over those accounts and was still doing work for the
11  company.  I think there was a transitional period of time
12  there.
13  Q  That may be true, but I thought you said previously that
14  there was never shared access, that when you -- when you
15  got the accounts, when you got access to the accounts, you
16  essentially immediately changed the passwords.
17     MR. CASCINI:  Objection.  I think that
18  misconstrues the prior testimony regarding how long there
19  was shared access during -- immediately following the
20  transaction.
21     But you can answer the question if you know,
22  Robert.
23     THE WITNESS:  Yeah.  I'll do my best to answer
24  it.  Obviously, it was a number of years ago here, but
25  he -- he transferred -- he gave us a password, and then I

Page 85

1  believe we set the accounts up so that we could obviously
2  have access to it and internal shared access along with
3  forwarding and things like that.  I believe he did have
4  access to the incoming -- if you're familiar enough with
5  Microsoft Outlook, right, you can set up your
6  sales@lehighvalleyabrasives.com, but you can also add IMAP
7  accounts, POP email accounts or IMAP accounts, if you're
8  familiar with those.  I believe he had access via that
9  method of some of the incoming transactions that had
10  occurred at that time.  And we retained control of the
11  accounts, but that didn't mean he didn't have some
12  during that transition period of time.  Once he was no
13  longer consulting to us or anything, he certainly didn't
14  have any access anymore.
15  BY MR. LEVASSEUR:
16  Q  Well, as soon as the password gets -- I know enough about
17  an email account that, once you change the password, unless
18  you're putting the password in, you can't get access.  So
19  when you changed the password, unless you gave him the
20  password, the new one, he wouldn't have access anymore,
21  right?
22  A  Correct.  But I believe he did have access via either us
23  sharing the password or via us programming the Outlook to
24  download those emails for him to have access to.  There was
25  a transitional period of time in there where, you know, he

Page 86

1  was an employee consultant and he retained full access to
2  it, then there was a little bit of shared access, to it was
3  full control.
4  Q  So there -- and then -- unless you gave him the new
5  password, the other scenario you're indicating is that you
6  would have set up a system so that, when emails come into
7  the Hotmail account, they automatically get sent to another
8  account that he has been -- you know, one of his own
9  personal accounts.
10  A  Correct, or the company had access to.  So there was email
11  forwarding that was occuring.  There was -- you know, for a
12  period of time.  There was also, you know, programming the
13  email addresses on computers that were owned by the
14  company.  So those are all things that occurred during that
15  period of time.  The exact date he no longer had access to,
16  I'm not -- I'm not sure of.
17  Q  Looking at paragraph 43, is that what you're referring to
18  in terms of the directing -- no, it isn't; directing the
19  email, having email sent to him at another email address.
20  That isn't what you're referring to in paragraph 43,
21  correct?
22  A  No.  And we didn't send emails to him at another email
23  address, but we did set up an automatic -- you can forward
24  emails automatically, as well as you can set an out of
25  office.  You can do both at the same time.  So we did set

Page 87

1  up email forwarding on the email addresses initially to
2  accounts that he did have access to while he was still a
3  consultant, as well as that out-of-office message to try
4  and start changing customers' behaviors to start using the
5  Lehigh Valley Abrasives branded email domains.
6  Q   And is paragraph 43 also referencing what you previously
7      indicated where you set up a system so that, when a
8      customer sends the email to the Hotmail account, it then
9      gets forwarded to the Lehigh Valley account that you'd set
10     up, email account that you'd set up?
11 A   Yes.
12 Q   Okay.  So you would have the ability to give me every
13     single email that got forwarded from the Hotmail to the
14     Lehigh Valley email beginning with the date that you put
15     this in place through today, correct?
16 A   Possibly.  That would, like, depend on the settings of the
17     email server on whether or not -- sometimes emails expire
18     after a certain period of time.  They may have been deleted
19     by customer service representatives.  They could have been
20     deleted because they were a duplicate.  If the customer
21     also followed the instructions of -- because they would --
22     if a customer sent an email into the Hotmail account, they
23     would receive an auto reply saying, hey, we're not using
24     this email address anymore, please e-mail
25     sales@lehighvalleyabrasives.com, but that email would also

Page 88

1  be forwarded to sales@lehighvalleyabrasives.com.  So it
2  could have been duplicated in there, in which the customer
3  service agent would delete the duplicate email.
4  Q   Have you looked to see whether you have those emails that
5      were originally sent to the Hotmail account and then
6      forwarded to the Lehigh Valley account to see whether you
7      have them?
8  A   I believe we sent a very large database of emails that
9      contained Mr. Stone's email address, so if we retained
10     those, it should be in that email dump.
11 Q   Email dump to who?
12 A   It was part of discovery.
13 Q   I can assure you that the emails that I'm looking for and
14     that I'm talking about right now were not provided.
15 A   Well, then they may not exist in there.
16 Q   I can't answer that; only you can.
17 A   Well, I --
18 Q   Did -- did you look to see whether they exist?
19 A   I believe there were hundreds if not thousands of emails.
20     So did I specifically look for the question you're asking
21     me?  No.  I gathered the information that we had available
22     to provide it for discovery.
23 Q   Well, are you telling me with certainty today that there
24     are no emails still in existence, if there ever were, that
25     show customers sending in an order to the Hotmail, and

Page 89

1  because you don't use the Hotmail, it then gets forwarded
2  to the Lehigh Valley account?
3  A   No, I'm not telling you with certainty that that doesn't
4      exist.  You told me that it didn't exist.
5  Q   No.  I told you you didn't give them to me.  I didn't say
6      that they didn't exist.
7  A   Oh.
8  Q   I asked for them --
9  A   Sure.
10 Q   -- and I did not get them.
11 A   I believe you have -- I believe you have all the emails
12     that exist from our side.  However, the Hotmail side would
13     show forwarding so long as he hasn't deleted emails from
14     there.  I don't know what's occurred with that.
15 Q   Okay.  Through your counsel, I'm going to ask that you
16     verify that that is, in fact, true or not true, and if it's
17     not true to give me the emails themselves because they've
18     been asked for.
19 A   I believe you have all the emails that we have that
20     reference his email address.
21 Q   Okay.  But I -- to be honest, I'm not comfortable that that
22     answer is certain because you're --
23 A   No, it's not certain because I don't have thousands of
24     emails memorized at all.
25           MR. CASCINI:  Are you asking, Chris, for us to

Page 90

1  verify whether or not there are emails that exist that were
2  forwarded between those two accounts that have not been
3  produced?
4           MR. LEVASSEUR:  Yes.  And to the extent emails
5  came into the Hotmail account and didn't get forwarded, I
6  obviously want those too, but it sounds like automatically
7  everything would have been forwarded if you set up the
8  system correctly.
9           THE WITNESS:  No, no, no, no.  There's multiple
10 periods of transition that occurred.  So we forwarded
11 emails.  We had the outgoing email message saying, hey,
12 please start sending your purchase orders, and then at a
13 certain part we stopped forwarding emails and just had that
14 out-of-office message that said, hey, this is not a
15 monitored email account, please make sure you're sending
16 purchase orders to these other email addresses.  So there
17 was a period of time in which we no longer forwarded
18 everything, because -- I don't know if you have a Gmail or
19 a Hotmail account or anything like that, but there's a lot
20 of garbage that those types of accounts often get as well,
21 and forwarding that to a shared box where now every person
22 is the offices is pinged when an email comes in because
23 it's a shared email.  I believe Lehigh Valley Abrasives is
24 a shared email.  That's not a -- it's not conducive to
25 being productive.  So you don't want to get someone's

Page 91

1  macys.com rewards, right?  You know, we try to unsubscribe
2  those things.  But that junk mail would also be part of the
3  forwarding process.  You can't just only exclusively
4  forward purchase orders.
5  BY MR. LEVASSEUR:
6  **Q    Understood.**
7  A    Yep.
8  **Q    You know, it's -- I'm not trying to be tricky here.  I**
9  **clearly want and need to see -- because this is an**
10  **allegation you've made in the lawsuit and it's a serious**
11  **allegation, I want to see just how much harm has been**
12  **caused by the allegation that you're making against my**
13  **client, and the way for me to analyze that is to see**
14  **exactly how many customers really did send orders to the**
15  **Hotmail address.**
16  A    Mr. Stone has access to it.  The whole point --
17  **Q    He doesn't have access to it.**
18  A    He doesn't have access to the Hotmail account?
19  **Q    I'm talking about during the period that you had it in**
20  **control.**
21  A    But we didn't delete things from his sent folder.  Those
22  all would be retained in there.
23  **Q    Understood, understood.**
24  A    So any --
25  **Q    And you also have it because it was forward to Lehigh**

Page 92

1  **valley.**
2  A    We may.  We may.
3  **Q    And, likewise, to the extent -- I understand that generally**
4  **your answer has been that the Gmail account was not used**
5  **and customers didn't send orders to Gmail.  To the extent**
6  **that there are any orders that were sent to Gmail, I want**
7  **to -- I need to see those too.  If there are none, and it**
8  **sounds like your assumption is that there are none, that's**
9  **fine.  I just need to know that.**
10  A    Right.
11  **Q    Paragraph 46 talks about something that we have already**
12  **discussed this morning, and that's the products that you**
13  **claim competed directly with Allied through the US Tool**
14  **Depot site, and I just want to close that out.  The list**
15  **that you gave me is a complete list of competing products.**
16  A    Probably not an all-encompassing complete list, but it's an
17  example of the types of products that are competitive.
18  **Q    If I asked you -- and you don't have to do it right now --**
19  **through counsel, again, to literally create an exact,**
20  **complete, full list of products that are on US Tool Depot**
21  **website during the seven years, not now; I don't know**
22  **whether it may have changed after the seven years is up,**
23  **but during the seven-year period, literally give me a**
24  **complete list of products that you claim compete directly**
25  **with Allied products, could you do that?**

Page 93

1  A    If Mr. Stone gives us a database export of the products
2  that he had on his website as of the last date of the
3  non-compete period, we could easily indicate which of those
4  products is competitive in nature.  Obviously, the nature
5  of a database is that it's a living organism that changes
6  over time.
7  **Q    Paragraph 48, you indicate that Mr. Stone made a mistake by**
8  **submitting password reset requests through the Gmail and**
9  **Hotmail accounts.  What about that was a mistake?**
10  A    A strategic mistake on his part.
11  **Q    In what way?**
12  A    By him trying to access the QuickBooks file that was on the
13  Gmail Google Drive account.  I can't remember his email
14  address off the top of my head, but it was cl.stony67,
15  maybe something similar to that, @gmail.  That email
16  address of his requested access from the Gmail account
17  referenced in here to download the QuickBooks file.
18  **Q    What if he wasn't trying to hide anything?  The mistake is**
19  **you think he was trying to hide that from you?**
20  A    The mistake is that I would not have known the full nature
21  of his deceit had that not occurred.
22  **Q    And the full nature of the deceit that you then learned is**
23  **what?**
24  A    That, coupled with his retention of the Hotmail, coupled
25  with his e-mailing of customers, is clearly indicative of

Page 94

1  him utilizing or trying to utilize intellectual property
2  and trade secrets for his own enrichment.
3  **Q    With reference to your comment there of emailing customers,**
4  **look to paragraph 50 of the complaint.**
5  A    Okay.
6  **Q    You make reference to a March 29, '22, email.  Is that the**
7  **emailing of customers that you're referencing?**
8  A    Not the sole emailing of customers.
9  **Q    What other emailing of customers do you have evidence of?**
10  A    Customers called us and indicated that he emailed them.
11  **Q    What customers?**
12  A    I believe that's either mentioned here in the complaint or,
13  if it's not, we may not have wrote them down because this
14  occurred all quite quickly and we didn't really know the
15  scope of what was occuring.
16  **Q    Okay.  So other than the March 29 email, you don't have any**
17  **documentary evidence of him sending an email to a customer,**
18  **correct?**
19  A    No.  I think there is one or two more that were submitted
20  either to his New Jersey counsel -- because I believe we
21  did get an email forwarded to us from another customer.  It
22  might be the same content, though.  So the -- you know, the
23  copy and paste center section may be the same.
24  **Q    Okay.  So maybe you have one more; maybe this is the only**
25  **one.**

Page 95

1   A   Yeah, there may be -- correct.

2   Q   **And would you agree with me that that solicitation was made**

3     **after the non-compete -- to the extent it was a**

4     **solicitation email for business, it was during the period**

5     **that he was no longer prevented from competing with Allied;**

6     **is that correct?**

7   A   Yes. March 29th, 2022, is a period after the non-compete

8     agreement has expired.

9   Q   **Look forward to paragraph 55 where you claim that Stone**

10     **directly cribbed Allied's intellectual property to create**

11     **xpabrasives.com. What do you mean by the term cribbed?**

12   A   I think that might be a grammatical error on there,

13     probably should have meant scraped, meaning he downloaded

14     all of the pictures and descriptions and pricing and

15     products SKUs from our website to utilize it on his

16     website. I think that's probably a spellcheck correction,

17     scraped to cribbed.

18   Q   **And by scraped, you mean he literally took -- copy and**

19     **paste?**

20   A   Yes, in a way. So scraped is an IT term. It basically

21     means, like, to just download all of the fields of

22     something. It's called scraping. Most web developers are

23     capable of doing it. Sometimes it's used for analyzing

24     competitors like pricing. You may scrape someone's website

25     to see they're selling this product for 5 bucks, I'm

Page 96

1   selling it for 5.50. I'm overpriced.

2       In this scenario here, Mr. Stone actually had the

3     words Lehigh Valley Abrasives plastered all over XP

4     Abrasives' website. He utilized our name on his website

5     with the content, the descriptions of the products, being

6     100 percent verbatim exactly from us, and he actually, we

7     found, did it from other websites too, including Acme Tools

8     and a few others that we've discovered he scraped from

9     there to input into his own website.

10   Q   **If I look at his website today, will I see what you're**

11     **talking about?**

12   A   There is still an example or two on his website that

13     indicates LVA or some of our metadata that he did correct.

14     He tried to remove the words Lehigh Valley Abrasives, and

15     that is removed from all but probably a page or two, but

16     there is still the letters LVA in some areas, as well as

17     the metadata of the pages still has some exact content.

18   Q   **And by that I assume you mean that it's changed from what**

19     **you originally looked at when you filed the complaint.**

20   A   Correct.

21   Q   **Do you have -- did you print a copy of the website that**

22     **contains the scraping that you're making reference to?**

23   A   I believe we actually did download a backup of his website

24     to -- I think it's called an offline copy. I believe an

25     offline copy of his website was made at that time of both

Page 97

1   maybe US Tool Depot and XP Abrasive.

2   Q   **Is there a reason why you didn't provide that to me?**

3   A   I just remembered that that was done. I'm not -- I'm not

4     sure even where it was sourced. We had our web developer

5     create a copy of it. If it's still -- I know they sent a

6     link, I think, like one of those download links. I don't

7     know if that expired. But I think that exists. I think

8     that exists and I can look for that, if we still have that.

9   Q   **Paragraph 56 states that Mr. Stone prevented Allied from**

10     **accessing the Hotmail account and Gmail account by changing**

11     **the passwords to those accounts. That's not true with**

12     **respect to the Gmail account, correct?**

13   A   Correct. I think that is incorrect.

14       That might have been confusing, my answer there.

15       I do -- I believe --

16   Q   **It is confusing, even though I understood what you're**

17     **saying.**

18   A   Yeah. I believe the Gmail account, either password was not

19     changed or it was but we were able to change it back to one

20     of our passwords. We didn't lose complete access to the

21     Gmail account.

22   Q   **Paragraph 62 indicates that Stone acquired your trade**

23     **secrets. What trade secrets are you referring to?**

24   A   Vendor/customer information, product configurations,

25     pricing, both vendor pricing and --

Page 98

1   Q   **Slow down.**

2   A   Sure.

3   Q   **Vendor --**

4   A   Vendor information.

5   Q   **Okay.**

6   A   Customer information, customer purchase history, customer

7     purchasing price, vendor purchasing prices, product

8     configurations, amongst other things.

9   Q   **When did he do that?**

10   A   You would have to ask Mr. Stone.

11   Q   **Well, you say he did it so you must know when he did it.**

12   A   We acquired it when he -- at a minimum when he changed the

13     passwords back.

14   Q   **Well, he didn't change the password back on Gmail, as we**

15     **indicated, so you're indicating that all these things were**

16     **acquired when he resumed control of the Hotmail account.**

17   A   As well as potentially other time periods.

18   Q   **Well, what -- if it was done during other time periods,**

19     **what was done during these other time periods?**

20   A   Sorry. Let me rephrase that. Not necessarily time

21     periods, but other methods. So Hotmail was certainly one

22     method. I do not know if the product configurations were

23     things that he had downloaded previously and retained

24     copies of product configurations, if he got that from

25     Hotmail specifically, but I know that he has identical

Page 99

1   product configurations.
2 Q You're going to have to help me out with this one.
3 A Sure.
4 Q I know what an email account is.
5 A Uh-huh.
6 Q It has emails.
7 A Right.
8 Q How does an email have a product configuration in it that
9   is Allied's product configuration?
10 A Yeah, no problem. So, obviously, we purchased the company,
11   intellectual property of the company, trade secrets of the
12   property, and that would include the product information
13   and configuration of the privately labeled products.
14   Lehigh Valley Abrasives as an -- I told you there were
15   multiple sources on, like, flap wheels. Another product is
16   a flap disc. Flap discs are available in different
17   diameters with different nut counts of flaps on them, with
18   different materials for those flaps. Those were all things
19   that would have been designed and included in the email
20   content of that Hotmail account via the conversations that
21   were had with the vendors. Mr. Customer, you want to buy a
22   flap disc? Yes, I do. Okay, great. How many flaps do you
23   want on it? I want this many flaps on it. Great. How
24   much material, you know, what material do you want? That
25   would all have been, because these were overseas vendors,

Page 100

1   all parts of emails that existed in that Hotmail account.
2 Q Overseas including Sundisc?
3 A Sundisc, yes. Sundisc, Wendt, and some Asian sources as
4   well.
5 Q So prior to the transaction, Mr. Stone didn't make any
6   products at all, right?
7 A No, he made no products, correct.
8 Q So he's just buying product from -- he's just the middleman
9   buying from the manufacturer and selling to the end
10   customer, right?
11 A No. That's an oversimplification. The product was
12   expressly configured. One of the values of Lehigh Valley
13   Abrasives is that Mr. Stone engineered a decently
14   performing product for the price point so that it was very
15   competitive in an online environment at the price. And
16   that's what we purchased. We purchased --
17 Q Isn't it true Mr. Stone didn't engineer anything? He's not
18   an engineer.
19 A Well, you don't have to be an engineer to -- okay, maybe
20   we'll use the word design. He designed the configuration
21   of the product. I believe that his marketing on the page
22   even tells that he's an abrasives expert and he designed
23   the -- and selected the exact configurations of the product
24   and which he's reusing now.
25 Q Does Allied sell any Sundisc products?

Page 101

1 A No.
2 Q Why is that?
3 A Because we formed our own entity called Elite Abrasives to
4   manufacture the product domestically. We did use Sundisc
5   for a long time until we purchased our own machinery.
6 Q Okay. Again going back to 62, you also indicate that he
7   took confidential business information. To the extent that
8   phrase is intended to mean something different than trade
9   secrets, what is it?
10 A Trade secrets and confidential business information.
11 Q All right. In other words, what I'm saying is, the list
12   you gave me as to trade secrets, is that also the same list
13   for confidential information?
14 A I believe there's probably overlap.
15 Q Is there anything distinct under the category of
16   confidential business information that would not be
17   included in the list of trade secrets?
18 A This is probably a Venn diagram of overlap. I believe
19   those are both used to be all encompassing of the
20   information that he retained. Something may not
21   specifically be classified by the UCC definition of trade
22   secrets which may be confidential business information.
23 Q Sixty-four says that he relied in whole or in part on
24   Allied's databases. What databases are you referring to?
25 A Well, an email account is a database of emails.

Page 102

1 Q So you're referring to whatever is in the Hotmail account
2   is the database that we're talking about here.
3 A And the retention that he likely did of our accounting
4   files and spreadsheets that would have existed in the
5   Hotmail account.
6 Q Do you have evidence that there were spreadsheets in the
7   Hotmail account?
8 A I know there were spreadsheets in the Hotmail account, from
9   my own personal -- I don't have evidence because I don't
10   have access to it, but --
11 Q Well, again, going back to my rudimentary knowledge of what
12   an email account is, you're talking about there would be a
13   spreadsheet attached to an email.
14 A Correct.
15 Q And that email, if I'm going to try to find it, would be
16   from who to who?
17 A From any vendor or any customer that shows this our
18   purchase history or this is our product configuration or
19   this is our price list, those would be databases that he
20   would have retained for a competitive advantage.
21 Q And do you have any evidence that he used any of that
22   information that you claim that he has to compete against
23   Allied during the seven-year period?
24 A Yes. The purchase of the flap discs in which he purchased
25   and had delivered, as well as his marketing -- well, you

Page 103

1 said during the non-competition period.
2 **Q   The seven-year non-compete period.**
3 A   He purchased the flap discs beforehand, and they were
4 delivered, I think, shortly after.  I can't remember the
5 dates on the import records, but -- and, yep, I think I
6 answered your question though.
7 **Q   You said about him purchasing a flap disc from a**
8 **manufacturer that I could buy a flap disc from if I felt**
9 **like it.**
10 A   If you wanted to buy tens of thousands of them, you could.
11 **Q   Well, regardless, I could do it, right?**
12 A   Sure, sure.
13 **Q   Nothing -- Allied doesn't have the market on flap discs**
14 **from Sundisc, right?**
15 A   No.
16 **Q   Anybody can buy it.**
17 A   Correct.
18 **Q   And now that Mr. Stone is not prevented from competing with**
19 **Allied, Mr. Stone can do it, right?**
20 A   Certainly, yeah.  He can purchase flap discs from Sundisc
21 Abrasives.
22 **Q   In fact, since you don't purchase flap discs from them, it**
23 **really doesn't affect you in any way, right?**
24 A   The configuration and the price point and marketing aspects
25 of it, that does affect us.

Page 104

1 **Q   Well, the price point is -- Sundisc tells me what they're**
2 **going to sell the flap discs for.**
3 A   They tell you the cost, but they don't tell you what you
4 sell it for.
5 **Q   Okay.  But in terms of the purchasing side, I can do that;**
6 **anybody can do that.  Right?**
7 A   I would guess probably not anyone.  It's volume driven.
8 You can't, you know, just buy ten from them.  You know, if
9 you want to buy thousands, sure, they will sell to anyone.
10 **Q   So then price configuration that you have an objection to**
11 **Mr. -- claiming that Mr. Stone did something using your**
12 **secret information --**
13 A   Product configuration.
14 **Q   I thought you said pricing too.**
15 A   Well, yes, but product -- I said product configuration but
16 also the pricing strategy.
17 **Q   Okay.  So there's a unique configuration of the product**
18 **that Mr. Stone, before he sold the business to you, would**
19 **have configured the product, configured the flap disc --**
20 A   Yes.
21 **Q   -- ordered it from Sundisc, sold it to his customer.**
22 A   Yes.
23 **Q   Okay.  So to the extent that he didn't reuse that same**
24 **configuration when he bought, either during or after the**
25 **non-compete period was up, as long as he didn't use that**

Page 105

1 **same configuration, that he just used -- created a new**
2 **configuration or bought an off-the-shelf flap disc from**
3 **Sundisc, it's not a problem, right?**
4 A   It may not be a problem on the product configuration side
5 of it, but the vendor information and customer information
6 is also a trade secret.  The sourcing of products is a
7 trade secret.
8 **Q   So after the seven-year period was up, you claim that the**
9 **asset purchase agreement prevented Mr. Stone from buying**
10 **from a well-known manufacturer of flap discs because he at**
11 **one time used to buy from them before he sold his company**
12 **to you?**
13 A   They're by far not a well known source of flap discs.
14 **Q   Well, he knew.**
15 A   Right, with confidential business trade secret information.
16 He never marketed that anywhere.  He didn't market it
17 that way because the whole point of having that private label is
18 to appear that you are the manufacturer.  He didn't
19 advertise that these products were sold by Sundisc -- or
20 manufactured by Sundisc.  Excuse me.
21 **Q   Okay.  So your position on that is that even after the**
22 **non-compete period expired, he couldn't use any knowledge**
23 **that he has in his own brain to do anything at all related**
24 **to the business?**
25 A   I think any knowledge that he ever had is probably an

Page 106

1 extreme mischaracterization of it.  He could not use
2 information that was material in the formation -- in the
3 business strategy, which would include vendor and
4 configurations, and maybe it's -- maybe it's vendor plus
5 configurations that's the issue; maybe it's vendor plus
6 configuration plus pricing; maybe it's two of the three.
7 But utilizing the information that he sold to me, the
8 systems he sold to me, the sources he sold for his
9 own unjust enrichment is my problem.
10 **Q   Okay.  So, to simplify, for example, the non-compete period**
11 **just related to competing, but forever he could not buy**
12 **from any vendor that he used to buy from when he ran Lehigh**
13 **Valley Abrasives before selling it to Allied.**
14    MR. CASCINI:  Objection.  That misconstrues the
15 prior testimony.
16    THE WITNESS:  He cannot do it in an unfair way.
17 BY MR. LEVASSEUR:
18 **Q   Okay.  So let's break it down.  You're not claiming that he**
19 **could not buy -- cannot use any of the vendors he used to**
20 **use before he sold the business.**
21 A   No.
22 **Q   Okay.  Your claim is he cannot use any of the vendors in an**
23 **unfair way, and your definition of unfair, then, is what?**
24 A   There's probably lots of components to that.  It may be
25 related to the price level that he receives.  For instance,

Page 107

1 when you build a new relationship with a vendor, they may
2 start you -- because you have low volume, they may give you
3 a 20 percent discount. You get a 20 percent discount
4 because you're not selling stuff yet. Then you build the
5 business up and you start getting a 30 percent or a
6 40 percent. You're gaining the knowledge that there's a
7 larger discount to be had which lets you set your prices
8 very low in order to take advantage of the fact that you
9 could prenegotiate the fact that, hey, I used to sell your
10 stuff, I used to do this much volume of the stuff, and I
11 know that a 40 percent discount exists. So you maybe get
12 unfair treatment from your previous relationship with that
13 vendor to negotiate a better price point because of the
14 knowledge you have that a new person would not be able to
15 have or generate, if that makes sense as an example.
16 Q   Makes sense.
17 A   Yep.
18 Q   But you don't have information that that actually occurred.
19 A   I don't have access to the emails because I have
20 insufficient discovery. I do not have a single email that
21 he ever sent to any vendor prior to the expiration of the
22 non-compete or after. So that was never submitted to us
23 for us to review.
24       But I do know that he wouldn't be able to sell
25 the product at the price point that he's selling it at had

Page 108

1 he not been able to negotiate a bigger discount than a
2 small start-up company would have been able to get. And he
3 was a small start-up company, right? He had no sales prior
4 to -- that's the contention on XP Abrasives, right, is that
5 he didn't sell anything prior to the expiration of the
6 non-compete. So the price level that he is selling the
7 product for on his website, he would not be able to
8 generate that price if he got the standard discount
9 afforded to new vendors.
10 Q   Okay. And you make this assumption merely from the price
11     you see him selling his products alone.
12 A   They would be sold for a loss.
13 Q   And you are concluding that he got a discount and that it's
14     unfair that he would get a discount from a vendor because
15     he would be relying, to get that discount, on the prior
16     relationships he had with those vendors over the years that
17     he's been in business.
18 A   Certainly --
19 Q   Is that --
20 A   -- that's a component of it, yeah. And you can see even
21 from the email text that he's leveraging the relationship
22 of Lehigh Valley Abrasives. When he sent us that email
23 saying you may remember me from Lehigh Valley Abrasives,
24 he's leveraging that to build an unfair competitive
25 advantage on it. In his email marketing, it still says on

Page 109

1 his About Us page on his website that he formed Lehigh
2 Valley Abrasives, so he's leveraging our current brand for
3 his growth strategy.
4 Q   So to the extent he didn't leverage anything in getting the
5     pricing he got from vendors, then there isn't anything
6     wrong on the vendor side; would that be true?
7 A   I think that's pretty broad. I don't know the nature of
8 his communications with his vendors. There are probably
9 many scenarios that would be considered an unfair
10 competitive advantage, but we have not gotten discovery on
11 his.
12 Q   Well, did you send out subpoenas to the vendors that you
13     think are giving him --
14 A   We sent --
15 Q   -- discounts?
16 A   We sent litigation hold notices to vendors.
17 Q   And do you have any information from any of them back to
18     support your theory?
19 A   Well, first, I -- I'm no legal scholar here, but I believe
20 we need to probably exhaust our discovery options first
21 before bringing in a third party. I mean, that may not be
22 true, but --
23 Q   Okay. So on the vendor side, the problem is him getting
24     good discounts that you think he's not entitled to because
25     he's never entitled to get a good discount because he would

Page 110

1 be trading off his relationship that he built up over the
2 years before he sold the business to you. That's part of
3 the claim.
4       MR. CASCINI: Objection. That misconstrues the
5 client's prior testimony.
6       You can answer if you understand the question,
7 Robert.
8       THE WITNESS: I did not say he should never get a
9 good discount. I said that he was lev-- that he got
10 potentially an unfair competitive advantage by utilizing
11 knowledge and information and systems and price lists that
12 he retained control of.
13 BY MR. LEVASSEUR:
14 Q   Okay. Name the vendors that you are claiming this unfair
15     competitive advantage was gained with.
16 A   Sundisc, Metabo, VSM, Wendt. You could literally look at
17 his brand page. Bessey. Almost every vendor on there is a
18 duplicate of the vendors from Lehigh Valley Abrasives.
19 There are almost no new vendors with the exclusion of a few
20 that he brought on in this veiled attempt to try and
21 pretend that US Tool Depot was a non-competing business,
22 because the vendor might not be the same but the product
23 was.
24 Q   But you don't have any evidence of that; it's just a
25     theory, correct?

Page 111

1  A   I'd love to get discovery.

2  Q   **Just closing the door on that.**

3  A   Yep.

4  Q   **Right?  Am I -- is that accurate?**

5  A   I'm not certain if we have summited anything that shows the

6      exact competitive advantage that he has from that.

7  Q   **You --**

8  A   We certainly know that, from -- not from the vendor side of

9      stuff, but from the customer side of stuff we certainly

10     know and have submitted evidence of his using our customer

11     information that he sold to us for his own marketing

12     purposes.

13 Q   **Okay.  And --**

14 A   So vendors, maybe not, no.  Well --

15 Q   **On that end, it's -- even after the seven-year period, your**

16     **contention is that he can't reach out to any of his**

17     **customers that he had before he sold the business to**

18     **Allied --**

19 A   Yes.

20 Q   **-- even after seven years.**

21 A   Absolutely, 100 percent correct.

22 Q   **Understood.**

23 A   Because he wouldn't know who they were had it not been part

24     of the customers that we purchased.

25 Q   **So in that respect, the non-compete was forever, not for**

Page 112

1      **seven years.**

2  A   No, non-compete --

3  Q   **He cannot -- he cannot sell to any customer of Lehigh**

4      **Valley at the time he sold that then becomes an Allied**

5      **customers, he can never sell to those customers again to**

6      **the end of time --**

7  A   No, I don't.

8  Q   **-- not just for seven years?**

9  A   That's not that I'm saying at all.  I'm saying the nature

10     of his action to mass-market to our customer list is the

11     problem.  If an independent customer happened to Google his

12     name and was unhappy with services from us and reached out

13     to him and said, hey, I want to buy from you, that's fine.

14     I don't think that there's an issue with that.  But I do

15     think there's an issue with saying, hey, you used to buy

16     flap discs from me when I was at Lehigh Valley Abrasives

17     and I know you paid $1.99 each; why don't you buy them from

18     me now at XP Abrasive for 1.99 each and do that en mass to

19     our customer list that we purchased that he retained

20     control of in the Hotmail.

21 Q   **Do you have any evidence that you lost any customers as a**

22     **result of these activities?**

23 A   Yes.  HD Railings was submitted -- one of the few emails

24     that was actually submitted was a customer of ours.

25 Q   **And they are no longer a customer?**

Page 113

1  A   I do not believe they're purchasing from us.  I believe

2      they're purchasing from him, as that email indicated.

3  Q   **And do you know why they switched from you to him?**

4  A   No.

5  Q   **Do you have records that would indicate the sales volume**

6      **that you used to sell to that customer?**

7  A   Sure.

8  Q   **Do you have any idea off the top of your head?**

9  A   No.

10         MR. CASCINI:  When we are done with the line of

11     questioning, Chris, can we take five?

12         MR. LEVASSEUR:  Yes.

13         (Recess taken from 1:12 PM to 1:26 PM)

14 BY MR. LEVASSEUR:

15 Q   **Paragraph 66, you allege that Stone has and will cause**

16     **damages.  Have you calculated what those damages are?**

17 A   No.

18 Q   **Have you come to -- do you have any idea what it is the**

19     **damages would be based on?**

20 A   Well, certainly there's the liquidated damages portion, and

21     then in addition to that there would be some of the sales

22     that he's probably generated via the trade secrets and

23     confidential information marketing to our customers, and

24     then, obviously, there's, in addition to that, the

25     intellectual property usage.

Page 114

1  Q   **Do you have any information as to any particular sale that**

2      **was completed as a result of using Allied's intellectual**

3      **property or confidential information?**

4  A   No.  Mr. Stone retains that information.

5  Q   **In Count II in paragraph 68, you make reference to**

6      **copyrighted information that Allied is the owner of.  Do**

7      **you actually have a physical copyright to indicate what is**

8      **protected?**

9  A   I would think you're speaking of like a perfected copyright

10     on -- is that -- where you submit an actual copyright for a

11     body of work, whether it be a book or an article or a

12     photograph?

13 Q   **Yes.**

14 A   No.  We did not file actual copyright.  It's not ^^pens,

15     but that process.

16 Q   **So, currently, no copyright actually exists with respect to**

17     **any Allied information.**

18 A   It's my understanding that there's formal and then there's,

19     like, common law copyright, which means we are the original

20     source of the information and we retain ownership rights to

21     its use.

22 Q   **Are you referring there to information that was created**

23     **after the sale of the company or are you talking about**

24     **information that Mr. Stone created?**

25 A   Both.

**Page 115**

1  Q   What -- in terms of information created after, what

2      copyrighted information has Mr. Stone taken from you?

3  A   Photographs.  Photographs.  And basically everything that

4      we referenced earlier, the photographs, the website

5      information, the product names, the product descriptions,

6      the content of his website and marketing.  Not all content,

7      of course, but --

8  Q   In paragraph 74, you're indicating that the harm that he's

9      causing by infringing on the copyrights causing irreparable

10     harm to Allied.  What is that harm that you're referencing

11     to paragraph 74?

12 A   Well, some of that harm would be the way that search

13     engines utilize information for search engine ranking.

14     Search engines, like Google is an example of a search

15     engine, value original content, and if that content is

16     duplicated in other areas, the value of that content is

17     reduced, and that's challenging to measure how much value

18     you've lost in the use of that.

19 Q   And here we're talking about the photos that you claim

20     Mr. Stone took from your website and put it on his own

21     website?

22 A   Photos, descriptions, product titles, configuration of the

23     taxonomical structure, correct.

24 Q   Paragraph 80, we've talked about this a bit, but, again,

25     you've indicated that Mr. Stone diverted customers from

**Page 116**

1      Allied to his own company.  Have you compiled a list of

2      those customers that he has diverted?

3  A   No, we've not compiled a list of those customers.

4  Q   Do you know which customers have been lost to his company?

5  A   No.  We don't have adequate discovery to be able to

6      determine what customer -- what people he has sold to that

7      would be from our customer list.

8  Q   So you think this has happened but you don't actually have

9      any information to back it up right now.

10 A   No.  We know that Mr. Stone has diverted customers.

11     Whether they purchased and the volumes in which they've

12     purchased, we don't have that information.  Mr. Stone

13     retains it.

14 Q   Okay.  As to the customers that you do know have been lost

15     to Mr. Stone, who are they?

16 A   Well, I know HD Railings, and that's the extent of what I

17     know he has marketed because that's the extent of his

18     discovery to us.

19 Q   Got it.

20         Again, in paragraph 91, you make references to

21     damages caused by Mr. Stone's activities which you alleged

22     through Count IV, the misappropriation of trade secrets,

23     and, once again, would I be -- would the answer be the

24     same, that you don't actually have any calculation of

25     damages, you don't have a number, you don't have anything

**Page 117**

1      to quantify that?

2  A   Well, since most of Mr. Stone's business has been derived

3      from the use of confidential information and trade secrets,

4      it would not be a stretch to say that the enterprise value

5      of his business is based on the trade secret information

6      and confidential information of ours, but we don't have a

7      calculation because we don't have adequate discovery.

8  Q   And using your own records, you don't have any basis for

9      presenting -- for making a calculation.

10 A   Right.  I guess I don't know.  I don't remember that.

11 Q   I know that we've lost this customer and a million dollars

12     in sales because of what Mr. Stone did to us; you don't

13     have anything like that?

14 A   It would probably be irresponsible to try and attribute a

15     loss of a customer without having both sides of that story.

16     Because there's loss of customers and then there's loss of

17     new customers.  We may not get a customer because of his

18     use of our information on his website, et cetera, because

19     of our diminished SEO value.

20 Q   Paragraph 96 talks about Mr. Stone using Allied's property

21     for purposes of selling products, and the property that

22     we're referencing there would I be accurate in saying is

23     the trade secret information that you indicated previously

24     you believe he took?

25 A   The trade secret information as well as the copyright

**Page 118**

1      information, our content that he took, the photos that he

2      took, the customer lists that he retained control of, the

3      vendor information, the product configuration, et cetera.

4  Q   Okay.  You're aware there's a counterclaim in this case,

5      right?

6  A   I am.

7         (Exhibit 3 marked)

8  BY MR. LEVASSEUR:

9  Q   And in that counterclaim, which I'm going to mark as

10     Exhibit 3, Mr. Stone has asserted that you're violating

11     copyright that he holds --

12 A   Yep.

13 Q   -- with respect to pictures that you have on your website.

14 A   Sure.

15 Q   And are those the same pictures that you're saying that he

16     can't use?

17 A   No.

18 Q   Which pictures -- do you have any understanding of which

19     pictures on your website Mr. Stone is suing you about?

20 A   I do.  I believe there's like three to five, something like

21     that.  There's pictures of the flap disc manufacturing

22     process.

23 Q   Did I mark that as 3?

24 A   Yes.

25         (Exhibit 4 marked)

Case 1:22-cv-00815-RLM-SJB    ECF No. 32-4, PageID.1437    Filed 02/14/25    Page 33 of 59

Allied Industrial Supply, Inc. v. Stone, et al.    Lindorf

BY MR. LEVASSEUR:

1  Q  I'm going to hand you what's been marked as Exhibit 4.
   Tell me if you recognize that.

4  A  No, I don't.

5  Q  Well, thumb through it a bit because there's more pages.
   Have you ever seen that before?

7  A  I'm not sure what it is. The formatting is pretty
   terrible, so I don't -- I mean, it appears to be content
   from our website but I'm not sure what the source of it is.
   It's -- it's strange, the way this is formatted.

11 Q  And let me hand you something else and see if you recognize
   this. Exhibit 5.

13        (Exhibit 5 marked)

14        THE WITNESS: No, this -- never seen "Put the
   system into dealer mode." I don't think this is related to
   us. I -- there's actually a couple pages in here; I don't
   think this first page has anything to do with us, but these
   are the images.

19 BY MR. LEVASSEUR:

20 Q  Third page -- or the second page?

21 A  For me it's the second page, these images here, but I don't
   know what this dealer mode stuff is.

23 Q  Okay.

24 A  I don't think it's related at all.

25 Q  Then referencing the second page of Exhibit 5 --

1  A  Says Images U1 --

2  Q  -- you said you recognize that. What is that?

3  A  The one that says Images U1, U2, U3 --

4  Q  Right.

5  A  -- at the top of it?

6  Q  Yes.

7  A  Those are images of the flap disc manufacturing process.

8  Q  And can those be found on an Allied website?

9  A  I believe so.

10 Q  Do you have ownership of those images?

11 A  Yes. Mr. Stone sold them to us.

12 Q  Do you know who took those photos?

13 A  I know who didn't take those photos. Mr. Stone didn't take
   those photos because these are photos from Sundisc in the
   Netherlands. Mr. Stone does not manufacture flap discs nor
   own any equipment to manufacture the flap discs.

17        There's one other source that it could be, which
   would be from the flap disc manufacturer, which would be
   called Helmut Weiss and which we own their machines.
   That's what we purchased. So I recognize the machinery,
   but I know that either he didn't take the photos or if he
   did he sold those photos as an asset to us in this asset
   purchase, because he's the one who put them on our website.
   Where else did we get them from?

25 Q  Well, I think it's accurate to say that they were on Lehigh

1     Valley's website before the sale.

2  A  Right, agree.

3  Q  And then --

4  A  And then we bought Lehigh Valley and retained the ownership
   of everything on it.

6  Q  And then you, after the sale, took them from Lehigh
   Valley's website and put them on Allied's website.

8  A  Allied doesn't have a website. It's
   lehighvalleyabrasives.com.

10 Q  Because it's --

11 A  It's still Lehigh Valley, yes.

12 Q  If, in fact, Mr. Stone didn't own the rights to those
   photographs at the time he sold the company to you, then
   that would not have been part of the sale, right?

15 A  That's probably a legal conclusion that I can't quite draw
   for you.

17 Q  Well, speaking as a layman, would you agree that he
   couldn't sell to you what he doesn't own?

19 A  Sure, yeah, you can't sell what you don't own.

20 Q  Okay. And if he now owns those images because he bought
   them from Sundisc or somebody else, then he would have the
   right and not you to have those images on his website.
   Would you agree with me?

24 A  No, probably not. I think that if you purchase something,
   you purchase all of it, and at a minimum you purchase a

1     license to use it. So I don't know who took the photos or
   the source of the photos, but I think that -- it's a really
   hard leap for me to get to the he owns them and now we
   can't use them when he sold them to us, or maybe he
   misrepresented his ability to sell them to us. That's a
   possibility.

7  Q  Did you see anywhere in the asset purchase agreement where
   he indicates that he owns the rights to those photographs
   and he is selling them to Allied?

10 A  I bet we could reference back to the fact that he's selling
   the software and its content. If you'd like to go back to
   the asset purchase agreement, which would say, asset
   purchase agreement, page 1, paragraph 1, Intangibles: The
   name Lehigh Valley Abrasives, telephone numbers, all books,
   records; (e), Software: Sellers' websites, all passwords
   and information needed to operate the websites, the
   databases and hosting accounts, the Google AdWords account,
   customized programming language used for search engine
   optimization. Miscellaneous Items: Software programs,
   software and technical libraries, license agreements, other
   intellectual property. Certainly within these categories
   does the ownership of the content of the websites fall.
   Even it specifically says Intellectual Property, registered
   and unregistered trademark, registered and unregistered
   trade names, formulae and secret and confidential

Page 123

1 processes. It's quite indicative that if he forgot to
2 copyright it, he still sold it to us.
3 Q   Well, he didn't forget to copyright it. He didn't have a
4   copyright because he didn't own it.
5 A   So he purchased it -- he purchased it recently?
6 Q   In fact, he did.
7 A   Okay.
8 Q   I can even show you a copy.
9 A   Did we receive that in discovery, his purchase, not his --
10 Q   Well, it's registered because he purchased it from Sandisc.
11 A   Sundisc?
12 Q   Sundisc.
13 A   Okay. He purchased the photographs from Sundisc.
14 Q   Okay.
15 A   Okay. Great.
16 Q   After the sale.
17 A   Okay.
18 Q   So would you agree with me that Allied does not have any
19   right to those photographs?
20 A   No, I wouldn't agree with that.
21 Q   And that's on the basis that you believe the asset purchase
22   agreement sold you the photo, the images that were owned by
23   Sundisc?
24 A   At a minimum --
25 Q   Sundisc?

Page 124

1 A   Sundisc, Sun, yep.
2       At a minimum, Mr. Stone represented to us that he
3   had a right to sell the assets, and he put them on the
4   website himself or directed them to be put on the website.
5 Q   Well, correct, when he was running the business and he had
6   permission to use those photographs from Sundisc, then he
7   put them on the website.
8 A   Okay.
9 Q   But he didn't own them. He just had permission.
10 A   Allegedly. I'm not sure.
11 Q   Did Allied get permission from Sundisc after the sale?
12 A   No. Why would we? Mr. Stone represented that we had --
13   what he was selling to us was for our full use as well as
14   transferring the license --
15 Q   Would you agree with me that the asset purchase agreement
16   does not specifically reference the photographs on the
17   website that he never owned at the time of the sale?
18 A   No. I would say that the registered and unregistered
19   copyrights, as well as -- I believe it specifically says
20   the use license in here.
21 Q   He didn't have a use license.
22 A   Well, he certainly had a use license.
23 Q   He had permission from the vendor to use the photographs.
24 A   He had license from the vendor to use the photographs,
25   right.

Page 125

1 Q   I don't know if it was a license. He had permission.
2 A   Oh, yeah. Maybe a verbal license, then, rather than an
3   explicit written license to use.
4 Q   In any event, the owner of the images did not ever provide
5   Allied authority to use them on your website. Would I be
6   accurate in saying that?
7 A   I would not know that because I don't know the source.
8   Maybe it was Sundisc. All I know is what I purchased and
9   that was part of what I purchased.
10 Q   I'm going to hand you the most resent discovery responses
11   that were provided by Allied in connection with this matter
12   and that's Exhibit 6.
13     (Exhibit 6 marked)
14     MR. LEVASSEUR: Is it 5?
15     MR. CASCINI: Oh, we're on 6. My fault.
16 BY MR. LEVASSEUR:
17 Q   I'm going to ask you about some of the answers, so
18   directing your attention to Number 9 where it asks the date
19   that you ceased enjoying unrestricted access, use of, and
20   enjoyment of the Gmail and Hotmail accounts. This is kind
21   of a refresher because I've asked you this date previously.
22 A   What page are we on?
23 Q   It would be on page 6 and then the answer is on 7.
24 A   Okay.
25 Q   And that indicates -- first of all, as we clarified today,

Page 126

1   it's just the Hotmail account, not the Gmail account that
2   access was lost, correct?
3 A   Yes. That unrestricted access would have been lost, yes.
4 Q   And on page 7, we've got a date here, that November 6,
5   2015. Do you agree that's the date that the Hotmail
6   account password was changed or is that --
7 A   Approximately.
8 Q   And then Paragraph Number 10 talks about Stone working
9   behind the scenes to compete with Allied, and the
10   supplemental response makes reference to defendant's
11   conduct including interacting with plaintiff's customers in
12   an attempt to take, redirect, reprice, interrupt, or
13   discontinue any facet of the business relationship. We
14   made reference to the March -- I think it's March 29 email
15   that you obtained in terms of Mr. Stone reaching out to a
16   customer.
17 A   Uh-huh.
18 Q   Is that -- other than that, is there -- are there any
19   documents that would support the answer to Interrogatory
20   Number 10?
21 A   Okay. So your -- your question is -- and I just wanted to
22   read this because I know it refers back to this -- the
23   evidence that we have that relates to his use of
24   confidential information and trade secrets?
25 Q   Correct.

Page 127

1 A   Okay. Well, I think that the document speaks for itself
2 here, the interrogatories, but we also submitted, I
3 believe, information from the Internet archives that showed
4 the use of, you know, with US Tool Depot, XP Abrasives
5 potentially in there, as well as the discovery which we've
6 not received that would indicate more.
7 **Q   So you have a physical document that relates to the**
8 **Internet archives that you're referencing?**
9 A   It's a website that's accessible from where.
10 **Q   Did you ever print it out or -- I don't know what website**
11 **it is, I don't know what you're referring to, so -- and I**
12 **haven't been provided with it, so --**
13 A   Yeah.
14 **Q   Did you -- are you relying on that --**
15 A   I think it's --
16 **Q   -- as evidence of some of the claims you've made against**
17 **Mr. Stone?**
18 A   Yes, absolutely.
19 **Q   Well, you didn't provide it.**
20 A   It may be also referred to as Wayback Machine. I'm not
21 sure if you -- if that was referenced anywhere in there,
22 but it's a service, it's like a nonprofit company, that
23 scrapes the web and takes a picture of the web in time,
24 essentially, and there's snippets on there of his websites
25 from before that, I guess, retain the history of the sites.

Page 128

1 It's not an everyday thing, but --
2 **Q   Okay. So you looked at this Wayback Machine but you didn't**
3 **capture any evidence for use in this litigation?**
4 A   I know that it's been exchanged with at least New Jersey
5 counsel, and I'm not certain if it's been provided as an
6 exhibit or part of discovery or an attachment, but I know
7 New Jersey counsel has that information. It was provided
8 to them, at least initially in the beginning.
9 **Q   Turn to page 8. At the very top you see the reference to**
10 **Defendant's conduct in maintaining control of customer**
11 **lists. I just want to verify again that your testimony**
12 **today is clarified that there is and never was a customer**
13 **list, correct?**
14 A   A list of -- is there a defined list of information? I
15 think the word customer list is used a generality to say
16 customer information. It may not necessarily be in a form
17 of an all-encompassing list with every customer's
18 information on it.
19 **Q   Interrogatory 11 asks for evidence supporting the claim**
20 **that forming US Tool Depot violated a contractual**
21 **obligation that he owed to Allied, and then the answer is**
22 **fairly generic and just directs defendant to business**
23 **records, correspondence, and documents produced in this**
24 **case. Do you have any ability to narrow that down to a**
25 **particular document that supports the allegations?**

Page 129

1 A   That he violated his contractual obligation to not compete?
2 I mean, the nature of the entity and its activities.
3 **Q   So it's the non-compete agreement that you're relying upon**
4 **to support that allegation.**
5 A   And his contractual obligation there, yes.
6 It does say any duty, so I want to make sure that
7 we're clear that he has more than just the duty of his
8 non-compete. He also has the duty for the trade secrets
9 and confidential business information. So any duty is the
10 challenge there.
11 US Tool Depot, LLC, also, rather than
12 ustooldepot.com. But US Tool Depot, LLC, is the entity
13 that imported the flap discs from Sundisc. So XP Abrasives
14 did not import that product. US Tool Depo did, per the
15 import records.
16 **Q   On paragraph -- Interrogatory 15, you were asked to**
17 **quantify the damages resulting from the allegations of**
18 **paragraph 55 of the complaint. I think we've gone over**
19 **this already, but I just want to verify again because the**
20 **answer provides no number, no quantification of any kind,**
21 **and you, I believe, made it clear today that you have not**
22 **and -- have not quantified any damages that Allied has**
23 **suffered as a result of anything that Mr. Stone has done as**
24 **we sit here today, as of -- from the beginning of time**
25 **until today; is that fair?**

Page 130

1 A   I wouldn't say any damages, because we certainly have
2 quantified the liquidated damages.
3 **Q   You mentioned liquidated damages, but not actual calculated**
4 **damages.**
5 A   Correct. We have not calculated actual damages.
6 **Q   And jumping ahead to Interrogatory 19, the answer would be**
7 **the same with respect to the quantification of damages?**
8 A   I'd have to review paragraph 65 of the complaint.
9 You know, I mean, the nature of that is we don't
10 yet have discovery in order to start quantifying that.
11 **Q   Well, you certainly have Allied's information, but Allied**
12 **does not have -- can't point to anything that it has**
13 **suffered in the way of financial losses as a result of**
14 **Mr. Stone's conduct. Would that be accurate?**
15 A   No, that would not be accurate.
16 **Q   Well, then why haven't you quantified the damages when you**
17 **were asked to do so?**
18 A   Well, the very nature of a non-compete is that sometimes
19 it's challenging to calculate the damages, which is why
20 Mr. Stone agreed to liquidate the damages of $250,000.
21 **Q   Again -- yes.**
22 A   The nature --
23 **Q   I'm not referring to liquidated damages. I'm talking about**
24 **actual damages. You have not -- you do not know of any**
25 **actual damages that Allied has suffered as a result of his**

Page 131

1  conduct, and so you're relying on the liquidated damages
2  provision.  Is that accurate?
3  A   No.  We're not solely relying on the liquidated damages.
4      We anticipate the release of discovery to help us calculate
5      what our actual damages are.
6  Q   Well, we're almost at the end of discovery.
7  A   Yeah, I know, unfortunately.
8  Q   And you, even at this late date and this case has been
9      pending for who knows how long and you cannot point to a
10     single loss that Allied has suffered as a result of
11     something that Christopher Stone has done.
12         MR. CASCINI:  I'm going to put an objection on
13     the record.  We asked for the production of those documents
14     months and months ago.  We have an ongoing dispute about it
15     and we're going to settle it in front of a mediator as --
16     along with, you know, reviewing any objections therein.
17     The reason that we can't do that at this late date is not
18     attributable to some failure on our part to go forward to
19     try to find them.
20  BY MR. LEVASSEUR:
21  Q   And that is not what I meant to imply, but I would --
22         MR. CASCINI:  Fair enough.
23  BY MR. LEVASSEUR:
24  Q   -- just indicate that what I'm getting at is that Allied
25     itself has nothing that it could point to or use to

Page 132

1  calculate losses that the company has suffered because of
2  conduct by Mr. Stone.
3  A   We could go through our records and find people that we no
4      longer do business with and attribute that to Mr. Stone,
5      but that would probably be unfair and you would question
6      that activity as well.  But we don't intend to say that the
7      loss -- that every loss of every customer is a result of
8      his actions.  So that would not be a fair way of doing it.
9      We would like to see who he's selling to, do they match up
10     with our records, and then there's the intangible aspect,
11     the loss of search engine optimization values, the loss of
12     new customers through unfair competitive advantages.
13  Q   And nothing Mr. Stone can give you can quantify damages
14     on -- as to those issues, so have you --
15  A   Yes, they absolutely can.  What he can give us can help us
16     know what customers of ours he's selling.  That would
17     absolutely help quantify.
18  Q   Well, that you already indicated, but -- the intangibles
19     you just referenced.
20  A   That's why you agree to liquidated damages is because of
21     the very nature -- in fact, I believe it says specifically
22     that the very nature of some of these disputes are that
23     it's challenging to calculate.
24  Q   Okay.  So --
25  A   So we put a reasonable -- I think it was 15 percent.  We

Page 133

1  put a reasonable 15 percent amount of the transaction sale
2  as liquidated damages.  It's not exorbitant.
3  Q   Jumping back to Interrogatory 16, this is something we also
4      covered already, I think, and you'll see that the answer to
5      identify the trade secrets you allege you converted, you
6      gave me a list previously.  Is that list that you gave me
7      during this deposition when we talked about trade secrets,
8      is that the list that you would rely upon in responding to
9      Interrogatory 16?
10  A   Generally speaking, it's an example of the list of
11     information, but I'm not sure what he has retained and has
12     used because I don't have access to the assets we
13     purchased.
14         MR. CASCINI:  Also, I'm just going to object for
15     record, the document speak for itself.  We answer in the
16     first supplemental response what -- in addition to the
17     answer, then, what other trade secrets were converted
18     therein.  So I suppose the objection is asked and answered
19     and the document speaks for itself.  I suppose those are
20     the two.
21         But you can answer any more to the extent that
22     you know.
23         MR. LEVASSEUR:  Well, it's not asked and answered
24     in the sense that I'm asking him to clarify that the list
25     that he gave me during this deposition is the list -- are

Page 134

1  the trade secrets that are referenced in Interrogatory 16.
2  I was just asking for a confirmation.
3         THE WITNESS:  I think the challenge with, you
4      know, Question 16 is identify each trade secret, and we
5      can't identify each trade secret by the nature of the fact
6      that he is the one that studded the relation of those trade
7      secrets.  He retains it.  So our list is an example but not
8      exclusive.
9  BY MR. LEVASSEUR:
10  Q   Okay.  And to the extent that the list isn't complete, it's
11     because you're suggesting that maybe there's more trade
12     secrets he has that you don't even know he has.
13  A   Correct.
14  Q   Got it.
15         In 20, we asked for a copy -- registration of any
16     copyright, and I believe we didn't get one, and I think you
17     cleared that up in the deposition.  I just want to verify
18     that it's because there is no registered copyright owned by
19     Allied; is that fair to say?
20  A   Correct, registered, but that does not mean that there are
21     not common-law copyright.
22  Q   Twenty-three is another quantification of damages question,
23     and the answer I presume would be the same as to why you
24     have not provided any quantification of damages related to
25     the allegations of paragraph 81 of the complaint?

Page 135

1  A  Would you like me to review paragraph 81?

2  Q  Sure. I'm sure you don't remember, because I don't.

3  A  No, I do not.

4         81 is related to the breach of contract, and I

5  believe the breach of contract is related to the

6  non-compete agreement, and so at a minimum that is our

7  liquidated damages.

8  Q  You're not -- and you have no evidence other than -- you're

9  relying on the liquidated damages provision for the damages

10  you're seeking there.

11  A  Not solely, no.

12  Q  Okay. But other than liquidated damages, you cannot give

13  me any information, you cannot give me a number, you cannot

14  support a number, nothing like that today?

15  A  Not yet.

16  Q  Now I think we're on 7.

17  A  Oh, Exhibit 7?

18  Q  Yes.

19  A  This is 6, yep.

20         (Exhibit 7 marked)

21  BY MR. LEVASSEUR:

22  Q  And I'll hand you Exhibit 7, which is an email exchange

23  between you and Mr. Stone from November 24, 2014. If you

24  could take a minute to read that, and then I've got a

25  couple questions for you.

Page 136

1  A  Okay.

2  Q  So in November of 2014, would you agree with me that you

3  were referring to the Hotmail account as Mr. Stone's

4  personal account?

5  A  Yes.

6  Q  Would you agree with me that in November of 2014 you did

7  not make any allegation to Mr. Stone, at least not on this

8  day, that you had purchased that account and that he should

9  turn it over to you?

10  A  Can you ask that one more time, because I --

11  Q  You were not asking him anywhere in this email exchange --

12  you were not taking the position anywhere in this email

13  exchange that Allied owned that account.

14  A  No, I did not take that position. It's assumed.

15  Q  On the bottom of the first page, you indicate:

16         "When they are emailed to your personal account,

17  forward it to info."

18         Can you describe what that means?

19  A  Yes. So I'm using the word personal here to define the

20  difference between a Hotmail or Gmail type account versus a

21  corporate or Lehigh Valley Abrasives. So when I say

22  forward it to info, I mean info@lehighvalleyabrasives.com,

23  which we established at around this time.

24         (Exhibit 8 marked)

25

Page 137

1  BY MR. LEVASSEUR:

2  Q  I'll give you a minute to read Exhibit 8. When you're

3  done, let me know.

4  A  Okay.

5  Q  Do you agree with me that Mr. Stone was indicating his

6  willingness to provide you shared access to his personal

7  Hotmail account but not turn over control of the account to

8  Allied?

9  A  You want to reference exactly what --

10  Q  On the second page:

11         "I will give you the password and login and we

12  can both access to the account."

13  A  I think the document says what it says.

14  Q  So you agree that at that time that was the understanding,

15  that --

16  A  No.

17  Q  -- he wasn't going to give it to you; he was going to let

18  you have access.

19  A  I believe that's what he said about shared email access,

20  but that does not mean that is what my understanding is.

21  We purchased the business systems and sources of

22  information.

23  Q  Would you agree with me that you never sent him an email

24  declaring that "I own the Hotmail account, give it to me,

25  it's mine," nothing to that effect?

Page 138

1  A  I don't think so, actually. I believe there's an email

2  exchange that he specifically turned over access to us.

3  Q  Well, he didn't give you access, shared access.

4  A  I don't have shared access now, so he must not have honored

5  that.

6  Q  He gave you shared -- at one point you had access to the

7  account, correct?

8  A  So it's -- yes, I had access to the account.

9  Q  Okay. Shared access.

10  A  No. I had sole access.

11  Q  Because you changed the password.

12  A  Because we set up the business system, yes, and he did not

13  use it for personal. He created a new -- I believe there's

14  a new -- there's an email chain that says he's created a

15  new email address for personal use somewhere. In fact, I

16  think that's the -- not in here.

17  Q  Well, I've gone through all the emails and all the

18  documents that you have produced, and I can't find a single

19  email where you make any statement indicating that you

20  purchased the account when you bought the company under the

21  asset purchase agreement. Would I be missing it or are you

22  aware of such an email?

23  A  You know, I don't know that every single item has to be

24  stated when it's already stated in the purchase agreement,

25  so I don't know that it needs to be explicitly stated.

Page 139

1　There's also -- I understand that I didn't say, no, it's
2　not your personal email address in here, because you don't
3　have to argue about everything.  If he's turning it over,
4　he's turning it over.  You don't have to make -- there's no
5　forward knowledge he would then later on violate his
6　responsibilities that I had to put a stake in the ground at
7　that moment and say, no, it's not yours and it's not shared
8　access, it's mine.  So I didn't do that at that time
9　because it's implied in the purchase agreement that I own
10　the assets of the company.
11　Q　Okay.  It's implied as you've described but it is not
12　stated that he sold you his personal -- using your words --
13　his personal Hotmail account.  There's nothing in the asset
14　purchase agreement where it states that his personal
15　Hotmail account is sold to Allied, correct?
16　A　I believe that's a mischaracterization of how I'm using the
17　word personal.  I'm using it in this scenario to identify
18　the difference between a Lehigh Valley Abrasives-branded
19　email account or the clslcs email.  I'm defining one as
20　personal; one is -- I didn't use the word business on the
21　other one, but I'm just defining it so that we know which
22　email address we're referring to in this email exchange.
23　Q　And he used it as a personal email account, didn't he?
24　A　He also used it as the sole business address to
25　communicate.  There was no other email address he used to

Page 140

1　communicate with customers besides that email address.
2　Q　But you would agree with me that that was his personal
3　email account for personal matters such as, as he
4　referenced in the -- or in the email exchange we just went
5　through, church information --
6　A　Yeah.  He used it for that purpose as well, but not -- I
7　don't know that that is his sole email address, because I
8　know he had other email addresses also.
9　　　　　(Exhibit 9 marked)
10　BY MR. LEVASSEUR:
11　Q　I'm handing you what's been marked as Exhibit 9.  Do you
12　recall receiving -- do you recall this email exchange?
13　A　Yes.
14　Q　And would you agree with me that Mr. Stone was telling you,
15　as late as March 12, 2015, that he, quote/unquote:
16　　　　　I always told you I would give you access to my
17　Hotmail account.
18　　　　　Access, not --
19　A　What's the question?
20　Q　Would you agree with me that he was telling you that late
21　that he was only going to give you access; he's not turning
22　over ownership of the account to you when he never sold it
23　to you.
24　A　No.
25　　　　　MR. CASCINI:  Objection.  The document speaks for

Page 141

1　itself.
2　　　　　THE WITNESS:  No, I don't agree with that.  I
3　think, just because he says something, does not mean that
4　that is accurate.  He may be changing his intention,
5　because lots of -- he may have not realized --
6　BY MR. LEVASSEUR:
7　Q　Would you agree with me that you did not respond to that
8　email with any statement to the effect of I own it, I
9　bought it when I bought the company, it's in the asset
10　purchase agreement, it's mine, nothing to that effect?  You
11　did not respond to that email with any such statement?
12　A　I have no idea if I responded to that email.  This could
13　be, you know, the middle of the chain.  It doesn't
14　necessarily mean it was the most recent responded-to item.
15　Q　Well, I'll represent to you that the emails that you
16　provided to me, which that's -- I did not edit that email;
17　that's the way you gave it to me -- you did not give me any
18　response from you indicating that you were advising him
19　that you already owned the Hotmail account or anything --
20　any words to that effect.  Do you have any reason to
21　believe that I am missing something?
22　A　I have no idea.  I mean, I think that the documents are
23　probably fairly comprehensive.  I have no idea whether
24　you're missing anything if it exists.
25　Q　You're not aware of an email to that effect.

Page 142

1　A　There are thousands of emails.  I'm not aware of every
2　email.
3　Q　And you're not aware of a single email that reflects what
4　I'm asking you about.
5　A　If you can -- no, I'm not aware of -- I'm not -- I think I
6　answered the question.  No, I'm not aware of a single email
7　that explicitly states that, which is what I believe you're
8　asking.
9　　　　　(Exhibit 10 marked)
10　BY MR. LEVASSEUR:
11　Q　I'm now handing you what's been marked as Exhibit
12　Number 10, which is the response to the most recent
13　document request that your counsel has provided to me.
14　A　One moment, please.
15　　　　　I'd like to amend my previous statement that I'm
16　not aware of an email that says that.  This specific email
17　chain here says, "I consider both of those business assets"
18　about the email and phone numbers.
19　　　　　MR. CASCINI:  I'm going to indicate my client is
20　indicating Exhibit 9, page 3 of that document.  The
21　document has been marked Exhibit 9 for purposes of this
22　deposition.
23　　　　　THE WITNESS:  The bottom underline there.  I
24　think you missed something, just to go back to that
25　question too.

BY MR. LEVASSEUR:

Q   And you indicate:

"You promised access to the Hotmail account that you use for business, and you haven't done that."

A   "I consider them" -- "I consider both of those business assets."

Q   Turning to Exhibit 10, I have some questions that we probably are not going to want to do the way we would have to do it, um, turning to -- go to request Number 5. I have a briefcase here that's probably filled with three feet of paper --

A   "Produce all documents supporting your allegation in paragraph 19 --"

Q   "-- that Lehigh Valley marketed and distributed woodworking machinery on or before the sale of Lehigh Valley's assets to Allied."

I will state for the record that the documents that have been produced -- and the response is, you're referring to documents that were produced previously in discovery. I have all those documents with me, and I will give you the chance, if you wish to take it, to go through them, but I'll reflect or I'll state for the record that I've gone through them and there isn't a single document that provides any evidence of that specific allegation in paragraph 19. So I'm asking you, would you like to look

for them or would you agree with me that you did not produce any such documents?

A   So is this an interrogatory? Excuse me for not knowing.

Q   It's a document request.

A   Okay. So it states:

"Produce all documents supporting your allegation in paragraph 19."

So I'll pause there. And paragraph 19 says:

"Lehigh Valley marketed and distributed a variety of products, primarily including abrasives, power tools, stationary metal and woodworking machinery, and tools, fixtures, and equipment."

So that's what paragraph 19 says. Here you're asking for Lehigh Valley marketed and distributed woodworking machinery, and that's exclusively what you're looking for in this request for documentation?

Q   You can read it any way you want, but we can read it more broadly to be the exact allegation in paragraph 19.

A   Because that's inclusive of abrasives, power tools, other equipment that -- I want to know are you talking --

Q   The broader version --

A   The broad --

Q   -- doesn't matter for purposes of this question.

A   Okay.

Q   Let's go with the broader --

A   Okay.

Q   -- allegation in paragraph 19.

No documents were produced despite the fact than you're relying on the documents that were produced in the, you know, in the initial round of discovery production. So there isn't anything that relates to paragraph 19. Would it be fair to say that, since you didn't give it to me, nothing exists, there is nothing?

A   No. I'm not sure what you have in your possession that you think that -- I mean, his entire catalog of products is -- falls into this category.

Q   I know, but you're supposed to give that to me and you didn't is what I'm telling you.

A   Okay.

Q   So would you agree with me you did not provide any documents that support the allegations of paragraph 19?

A   There were hundreds of documents submitted. I can't --

Q   I know.

A   Yeah, I can't --

Q   Might be thousands.

A   Yeah, I know. I can't -- I can't tell you exactly every single item that you have in your possession.

Q   Well --

A   I can review them if you'd like me to see whether or not there are documents supporting the allegation.

Q   Here's what I propose that we do, we not go through thousands of pages right now today, and that you go through the document production that was provided to me, I think it was back in June, and if I'm missing the document that -- the document or documents that support paragraph 19, pull them out, identify them, and your counsel can provide them to me that way. Do you understand what I'm saying?

A   I understand the statement you're making. I'm not sure how I'm supposed to react to that in a deposition.

MR. CASCINI: All we're saying is that what we're looking for a reassurance that you have all the documents that are within your custody or control that are responsive to Question Number --

MR. LEVASSEUR: -- 5.

MR. CASCINI: -- 5 in your RPDs? You're asking for confirmation of that?

MR. LEVASSEUR: Correct.

MR. CASCINI: Okay.

MR. LEVASSEUR: And I'm going to say the same thing with respect to every one of these, because it's the same thing. I don't have any documents that support the Request Number 6 --

THE WITNESS: There's a quite comprehensive list of document exports that were provided to Attorney Muth -- Muth? Is that how you say his name?

Page 147

MR. LEVASSEUR: Yes.

THE WITNESS: -- which would certainly be inclusive of the products that were distributed.

BY MR. LEVASSEUR:

Q  My point being that the answer says that I've already got it and it's in this document dump, for lack of a better term, but I'm telling you there is nothing.

A  Yeah, I would be highly skeptical that you have no information that says that we marketed and distributed all these products.

Q  Okay. So can we agree for the sake of saving everyone's time that you and your counsel will work together to go through this document request, and every time it says that it was given to me in that June 6 document production, that instead of generically referring to all 60,000 pages or whatever it is, that you pull out, with respect to every single one of these requests, the actual specific document and identify it in some fashion by date or whatever?

A  I know there's also at least one specific email where I asked Chris what the categories of products that were sold were, which is where the complaint is defined from. There is an email chain that says what do you sell, and he says abrasives, power tools, et cetera.

Q  That's fine. If that's -- if that is --

A  I know that is in there as well.

Page 148

Q  If that's the documentation that you have that you are producing to me that was responsive to that request, that's what I want. I'm asking that you guys do the work and tell me what it is, which document, and not just say look in this pile of stuff and find it.

A  Okay.

Q  Is that fair?

MR. CASCINI: And, Mr. LeVasseur, all I want to do is I just want to say that we've got a federal rule at some point to it. Certainly if there is a legal dispute that we have later, that's something that we can work out outside of the confines of the deposition, but my client doesn't know what discovery obligations are. You can always -- and I think that we would both agree we've been very responsive with each other in dealing with these issues. To the extent you need any additional identification, that's something we can talk about after the deposition. Now, if you're asking my client if he has anything additionally beyond what's already been provided, that is something that he can answer.

BY MR. LEVASSEUR:

Q  We'll, I will ask that question. Is there anything you have in addition to the documents that have already been provided back in June of last year that support any of the allegations in the complaint that were identified in

Page 149

Exhibit Number 10?

A  I objectively don't know, because I don't know what all you have in your possession for those documents. If --

Q  And that's fair enough.

A  -- I have something or find something, you certainly welcome to it. I feel very strongly about our case and I don't feel that there's anything to hide at all. Now, whether I've provided it all to you or not, that, I don't know. The word "all" is such a largely defined word, right?

Q  Right. And that's fair enough, and I'm just stating that I just want -- it's your allegations, and if there's something, a document that supports any of the allegations that are in each of these requests in Exhibit Number 10, I just want to know specifically what it is.

A  And here would be a challenge with produce all documents supporting your allegation that we distributed these items. That would be every single invoice the company had ever generated. That is a document that supports our allegation that we sell abrasives, power tools, et cetera. And every online transaction as well.

MR. CASCINI: Very briefly, Chris, can we just go off the record for a moment?

MR. LEVASSEUR: Yes.

(Discussion held off the record)

Page 150

MR. LEVASSEUR: No further questions.

(Discussion held off the record)

EXAMINATION

BY MR. CASCINI:

Q  Robert, I believe you gave some testimony earlier about whether there was a discreet client list in the Hotmail account when you had access to it. Do you remember when you gave that testimony?

A  Yes.

Q  I believe that the testimony was you weren't aware of any client list, any single file, but that client information could be assembled from that Hotmail account; is that accurate?

A  Yes.

Q  Do you know whether Mr. Stone maintained a copy of some sort of discreet or unified client list?

A  No.

Q  You don't know. So he may have, he may not have; it may exist, it may not exist. Is that safe to say?

A  Correct.

Q  And, in fact, you asked him if such a client list existed via email on March 12 of 2015, didn't you?

A  Yes.

Q  That is, you can find than on Exhibit 9 that's been introduced in this deposition on the third page. The

Page 151

1  subject of the email is Open Issues. It's quite lengthy.
2  That's an email you sent to him at the Hotmail account,
3  right?
4  A   Correct.
5  Q   Okay. It says in here, when you're saying -- you said,
6  about halfway down the page -- this is, again, Exhibit 9 on
7  the third page:
8         "If you'd like to pursue a judge, go for it.
9  Here's a result of what it's going to be."
10        And then it says judge, attorney.
11        Is that a hypothetical conversation? Are you the
12  author of the entirety of this email?
13 A   Yes.
14 Q   When you say judge and attorney, are you quoting anybody
15 there?
16 A   No. That's a hypothetical example. He was claiming
17 monetary damages for that accounting issue that I was
18 mentioning early on in the deposition where he's claiming I
19 owe him money and not telling me how much I owe him. And
20 I'm telling him, yeah, we're going through the accounting.
21 Q   So when you write here:
22        "I've always lived to up to my commitments to
23 you. The opposite isn't true. You promised access to the
24 Hotmail account that you used for business, and haven't
25 done it. The same with the cell number. I consider both

Page 152

1  of those business assets."
2         That's -- you are writing those words.
3  A   I am.
4  Q   Correct?
5  A   Correct.
6  Q   You mentioned earlier that at one point in time -- strike
7  that.
8         You mentioned earlier that the Hotmail account
9  had numerous email forwarding set up over time, right? You
10 said there were a couple of transition periods; is that
11 correct?
12 A   Yes.
13 Q   And you mentioned at one point that there was a message
14 saying that the email address is no longer monitored
15 directing customers to send an email to Lehigh Valley
16 branded email addresses; is that correct?
17 A   Yes.
18 Q   When you said that that was something -- I believe the
19 quote that I have written down here is it's a tactic of
20 sales manipulation.
21        Was it truly unmonitored at any time when you had
22 access to it?
23 A   No.
24 Q   So what does the term sales manipulation mean, then, in
25 this context?

Page 153

1  A   I think I said, like, customer behavior manipulation. I
2  want them to use the new account. So telling someone we're
3  not going to get your order if you send it here is a way of
4  making them take action, because it's challenging to
5  monitor multiple sources of emails and enter them, and
6  especially when it's not controlled by a domain and a
7  service like a Microsoft Exchange that can parse its way
8  out to Outlook easier.
9  Q   I understand. So it was said as a means of driving more
10 business to the official Lehigh Valley accounts, but you
11 were still monitoring the Hotmail account at that time.
12 A   Correct. Not everyone does what you ask of them.
13 Q   You mentioned that there was a transition period wherein,
14 after the sale was completed, where he told you you needed
15 shared access, he still had personal information in the
16 Hotmail account, correct?
17 A   Correct.
18 Q   And I believe that we saw emails that -- from that time
19 that documented those kinds of exchanges, right?
20 A   Correct.
21 Q   You also mentioned that you saw evidence he was processing
22 orders during the period of time he was acting as a
23 consultant for Lehigh Valley, emails that were coming into
24 the Hotmail account; is that right?
25 A   Correct.

Page 154

1  Q   Do you know if every time he received an email he either,
2  one, entered it into QuickBooks or the BigCommerce site or,
3  two, forwarded those emails to your official sales account?
4  Do you know if every time he did that he did one of those
5  two things?
6  A   No, I don't know with specify that he did.
7  Q   It's possible he did; it's possible he didn't?
8  A   Correct.
9  Q   We had a lot of testimony about invoicing and the process
10 by which invoices are generated. Were the invoices
11 generated by the Hotmail account?
12 A   No. I mean, email accounts don't generate anything.
13 They're just used to transfer information.
14 Q   And I promise it wasn't a trick question. There's nothing
15 special about -- I don't have a Hotmail account. There's
16 nothing special about a Hotmail account by which an invoice
17 can be generated through that information, right?
18 A   Not unless you had a Word document or an Excel document. I
19 mean, Hotmail is a Microsoft product, so you could have a
20 Word document or you could have an Excel document that
21 you'd use for invoicing stored on like your -- I think
22 Microsoft calls it OneDrive now. I don't know what they
23 called it at the time, but -- you could, but that's -- I
24 don't think that was the general business practice.
25 Q   Okay. Did Allied Industrial -- did you or did your company

Page 155

1  ever generate invoices using some native feature of
2  Hotmail?
3  A  No.
4  Q  Okay. And I believe you gave testimony that invoices were
5  generated for the sales that were made at least after you
6  acquired the company; is that correct?
7  A  Yes, within a period of time. There may have been -- there
8  was a lot of disorganization that took a long time to clean
9  up, a long time. I think I even indicated that here in
10  Exhibit 9 in that email exchange.
11 Q  Okay. After some transition period of time, though, is it
12  safe to say that every sale made was going to generate an
13  invoice?
14 A  Yes.
15 Q  Would those invoices reflect the source of the sale? And
16  by the term source of the sale, what I mean is, will it
17  show whether it was received by email, fax, phone, somebody
18  coming into the office, a personal connection; will it show
19  what the source of the sale was?
20 A  No.
21 Q  Mr. Shindorf, are you a lawyer?
22 A  No.
23 Q  I can ask you what the layperson's definition is of a trade
24  secret, but do you know how the term trade secret is
25  defined under the Defend Trade Secrets Act with

Page 156

1  specificity?
2  A  No.
3  Q  Do you know how the term trade secret is defined by the
4  Michigan Uniform Trade Secrets Act with specificity?
5  A  No.
6  Q  Based on your lay understand of the term trade secret, can
7  customers lists sometimes potentially be a trade secret?
8  A  Absolutely.
9  Q  Can vendor information sometimes potentially be a trade
10  secret?
11 A  Absolutely.
12 Q  Can sales and pricing information sometimes be considered a
13  trade secret?
14 A  Absolutely.
15 Q  You were asked a lot of questions about flap discs that
16  were imported by US Tool Depot prior to the expiration of
17  the non-compete. Do you remember giving testimony about
18  that?
19 A  Yes.
20 Q  In your view, under the terms of the non-compete, under
21  your lay understanding of the terms of the non-compete that
22  we've gone over many times, is making an effort to invest
23  in inventory that may later be sold, is that competitive
24  activity?
25 A  Yes. And even further back than that, the act of

Page 157

1  negotiating the price, designing the artwork, you know,
2  specifying the configuration, it all occurs prior to even
3  purchasing or shipping or the manufacturing of that
4  product. It would all be a violation of the non-compete
5  agreement.
6  Q  And that's based on your lay understanding of what you
7  interpret the non-compete you signed with Stone meant?
8  A  Absolutely, and my virtual expert-level knowledge at this
9  point of the manufacturing process and the cycle and period
10  of time it takes between wanting to buy something,
11  designing it, purchasing it, it being manufactured, then it
12  being shipped over on a boat for multiple weeks is a long
13  period of time.
14 Q  Okay. And when you reference the long period of time, are
15  you saying that if you knew that the import record
16  indicates that they were made during the non-compete
17  period, those steps were likely taken far in advance of
18  that?
19 A  Yeah. You can't buy a product that you want a special
20  label put on if you don't have the label to put on the
21  product --
22 Q  Okay.
23 A  -- which would have occurred beforehand.
24 Q  Approximately, using Allied Industrial's business
25  practices, how long would you have to perform that process

Page 158

1  before you would be ready to import a product?
2  A  Six to 12 months.
3  Q  All right. I know that there's a dispute -- there may be a
4  dispute of fact about this in the case, but I believe your
5  testimony was you purchased the Hotmail and the Gmail
6  accounts, as those terms have been defined in this case,
7  when you purchased Lehigh Valley's assets in October of
8  2014, right?
9  A  Correct.
10 Q  And I also believe you gave testimony you didn't get access
11  to them, unilateral access to them, right away, that you
12  spent some time because he said he had personal emails in
13  the Hotmail account, right?
14 A  Correct.
15 Q  And I believe that you said that you didn't file a lawsuit
16  right away at that point in time, right?
17 A  Correct.
18 Q  I believe you gave testimony that you could have but you
19  decided, hey, I'm not going to file a lawsuit over that
20  particular issue right now?
21 A  It's best to try to work with someone if you can, and if
22  he's doing his part of entering the orders and passing
23  along the information and responding to things, then that's
24  probably good enough so long as we get our asset in the
25  end.

Page 159

1 Q Okay. And that three-month period -- I think you gave
2 testimony that that that personal-use period where there
3 was mutual sharing, I believe you said that was about three
4 months long?
5 A I think it's longer than that, now, looking at Exhibit 9
6 here again in which Mr. Stone indicates:
7 "Monday I will no longer be working for Lehigh
8 Valley Abrasives and I will give you access to that
9 account."
10 And the date on that email was March 12, 2015.
11 Q Okay.
12 A So his --
13 Q So that's about five months after the acquisition.
14 A October, November, December, plus -- yeah, so five to six
15 months almost.
16 Q The three month that you testified to earlier, was that an
17 estimate?
18 A Yes.
19 Q You executed the settlement agreement that is Exhibit 2 on
20 what date?
21 A The effective date is August 5. The execution date does
22 not necessarily -- is not indicated necessarily here in
23 case it was plus or minus, but on or around August 5th.
24 Q Okay. The three-month period where you may have shared
25 access and you decided not to pursue a lawsuit, that

Page 160

1 occurred prior to this date, August 5, correct?
2 A Correct.
3 Q Did he change his password, thus denying you access, before
4 or after that August 5 date? In other words, when were you
5 cut out of the Hotmail account completely?
6 A After August of 2015.
7 Q We spent quite a while on the subject of a period of time
8 wherein emails were forwarded from the Hotmail account to
9 the Allied account. Do you remember giving testimony about
10 that?
11 A Yes.
12 Q That was during a period of time where you were trying to
13 make sure, hey, there's not stuff going into the Hotmail
14 account, sales information that we're missing. Is that
15 safe to say?
16 A Correct.
17 Q So it's going from the Hotmail account to the Allied side,
18 right?
19 A Correct.
20 Q Emails originated from a third-party, comes into the
21 Hotmail account, and then the auto email sent from the
22 Hotmail to the Lehigh Valley account, right -- or the
23 Allied account, right?
24 A Yes. Maybe to be more specific on it, a customer or vendor
25 or potential customer could have emailed the Hotmail

Page 161

1 account, and at that point in time that email would
2 auto-forward to sales@lehighvalleyabrasives.com, and they
3 would also receive an auto reply saying, hey, please start
4 using sales@lehighvalleyabrasives.com. So there were sort
5 of two activities that occurred for a period of time, and
6 then we reduced it to one activity, which was them
7 receiving the email saying we're not monitoring this
8 anymore, please send them to sales, because as the number
9 of orders trickled down, we're forwarding junk mail, so it
10 made sense to eliminate that. And there was -- there were
11 still things going into the Hotmail account at that time.
12 Q Is it safe to say, despite the fact that there's an auto
13 reply sent, that there's going to be a record on the
14 Hotmail side of the forwarded message being sent and a
15 record, at least at some time, on the Allied side of the
16 message being received?
17 A There should be on forwarding. I don't know that auto
18 replies are always kept in, like, the sent folder, but I
19 think -- but I believe forwards should have that
20 information.
21 Q And with these questions, I'm only asking you about the
22 forwarded emails.
23 During the period of time when you had access to
24 the Hotmail account, did you ever delete any emails from
25 the Hotmail account inbox or sent folders?

Page 162

1 A Definitely.
2 Q And what kinds of content would you delete during that
3 time?
4 A Irrelevant content that wasn't related to the business,
5 whether it was a junk mail, you know, a solicitation from
6 Amazon.com or, you know, some other online retailer,
7 general garbage, you know, that everyone gets about Viagra
8 pills for sale or, you know, all that crap junk that goes
9 to those.
10 Q Did Stone ever complain, hey, you're deleting emails from
11 my account?
12 A Never.
13 Q Did you ever delete from the sent email box of the Hotmail
14 account records of the forwarded emails to Allied?
15 A I don't believe so.
16 Q And Stone controls that Hotmail account now, right?
17 A Yes.
18 Q We've had lots of testimony about that, and I think that --
19 I think the opposing party admits that he controls it now,
20 right?
21 A I wouldn't want to confirm that the opposing party agrees
22 with that, but --
23 Q Fair enough. And, actually, let me rephrase that question.
24 I believe that -- your understanding is Stone
25 controls that email address now.

Page 163

1  A   Yes.

2  Q   Okay.

3  A   I do want to put a caveat on there that, when you say you,

4     meaning I'm answering for me as an individual, but there is

5     always the chance that there's one of --

6  Q   And you've got my next --

7  A   -- 15 different people who also had access to those things.

8  Q   And that's exactly where I was going next. Did you ever

9     order anyone to delete any of the sent forwarded emails

10    from Hotmail to Allied on the Hotmail side?

11 A   No. We have a policy where we try not to delete

12    information unless your mail file is getting too big

13    because that information -- we live in the information age,

14    and information is value and money.

15 Q   Okay. So Stone controls the Hotmail account now, right?

16 A   Yes.

17 Q   Would it then be safe to say either Stone currently has

18    records of those forwarded emails in his Hotmail account,

19    or he was the one who deleted them?

20 A   Yes.

21        MR. LEVASSEUR: Objection, calls for speculation.

22 BY MR. CASCINI:

23 Q   Can you think of any other means by which documents

24    wouldn't be in there?

25 A   No.

Page 164

1        Well, there would -- there might be another

2     method, potentially. If Stone is using a third-party

3     mailing system, like a Klaviyo or Constant Contact or

4     Mailchimp, you can export all of your records, basically

5     the sent-to people, and create a database of who I sent

6     emails to and then put that into, like, a Constant Contact

7     or a Klaviyo or a Mailchimp, then those emails would then

8     be sent from that service rather than from Hotmail. I

9     think the email that we received to our Allied or Lehigh

10    address came from his xpabrasives.com account, not from the

11    Hotmail account. And so he would have exported that list

12    of customer information from Hotmail, because we never

13    interacted with XP Abrasives and didn't know it existed

14    until he sent us that email. So the only way that would be

15    in the database would be exporting the customers from

16    Hotmail and importing them into another marketing service

17    like Constant Contact or Mail Chimp.

18 Q   Okay. I'm just asking, however, about the forwarded emails

19    that went from the Hotmail account to the Allied account

20    during the transition period you gave testimony about

21    before. Do you have any reason to believe that, after

22    Mr. Stone acquired unilateral access to the Hotmail

23    account, that he did any of those things you've just

24    described? Do you know whether or not he did?

25 A   I'm reasonably certain he did, but I don't know with

Page 165

1     certainty that he -- that that's how our company email

2     address got into his marketing. The only source for it

3     would have been the Hotmail account.

4  Q   You gave some testimony about Sundisc and products

5     manufactured by Sundisc. Tell me more about the

6     background. What is Sundisc?

7  A   Sundisc is an abrasives manufacturer, and they are almost

8     exclusively a private-label company.

9  Q   Okay.

10 A   And what I mean by that is they make products for other

11    people to put their name on for resale. So they're a

12    behind-the-scenes supplier of product. And they actually

13    make product for some major international companies like

14    DeWalt, I think is one of their customers, which is a

15    pretty big contract to then -- it may not be DeWalt

16    anymore, but they make -- for large organizations, they're

17    the behind-the-scenes private-label manufacturer.

18 Q   Did you ever purchase products from Sundisc for

19    private-label use after you acquired the -- after you

20    acquired Lehigh Valley's assets in October of 2014?

21 A   Yes.

22 Q   And how long did you purchase from Sundisc for? How long

23    did they remain a vendor?

24 A   Multiple years.

25 Q   You said at some point they transitioned away from being a

Page 166

1     vendor, but they were a vendor during the non-competition

2     period here?

3  A   Absolutely.

4  Q   Why did you negotiate a liquidated damages clause into --

5        Well, actually, let me step back.

6        Do you remember how the liquidated damages clause

7     was inserted into the non-compete? Who proposed it; do you

8     remember?

9  A   Yeah. It was a mutually agreed upon clause of the

10    non-compete. When you're dealing with intangibles, it's

11    hard to prove exact figures on things, and it is a

12    relatively standard clause in which he agreed to, I agreed

13    to, his attorney vetted, my attorney vetted, and we both

14    came to the conclusion that $250,000 was a reasonable and

15    fair amount as a liquidated damage should he violate the

16    non-compete.

17 Q   And that was -- your intent in negotiating it was you

18    thought there may be a chance it would be difficult to

19    calculate damages if he were to violate the non-compete; is

20    that right?

21 A   Absolutely.

22        MR. CASCINI: Mr. Shindorf, I have nothing

23    further for you.

24

25

Page 167

RE-EXAMINATION

BY MR. LEVASSEUR:

Q   Two questions.  Number one, can you explain to me how Allied would be harmed by Mr. Stone purchasing product from a vendor that Allied no longer uses?

A   Absolutely.  It's Allied, via Lehigh Valley Abrasives, had a distinct product line with a specific configuration that he copied.  And though the source, the vendor, is not the same anymore, the configuration and price point of the product is.

Q   So it's the configuration and the price point, not the vendor itself, that you have an issue with.

A   I have an issue with all of it.

Q   Well, let's talk about the vendor identity itself.  If Allied doesn't use a vendor anymore, how does it hurt you if somebody else uses that vendor?

A   Because it's more competition.  When you don't know -- when -- it's not market knowledge that Sundisc exists.  They are a behind-the-scenes supplier.  You could find them on the Internet, but not without market knowledge, and that is an issue.

Q   Well, Sundisc's existence is not a secret, is it?

A   Define secret.

Q   It's not something hidden from the general public.

A   Absolutely.  It is hidden who the manufacturer is of the

Page 168

product when you put your label on it.  That is the definition of private label.

Q   Well, in Mr. Stone's case, having worked in this industry his entire life --

A   That's not true.  He did not work in this industry his entire life.

Q   Well, a big part of his life, for at least 20-plus years.

A   No, no.  Mr. Stone owned Lehigh Valley Abrasives for a period of -- five to seven years?

Q   Okay.  That's fine.  Your position is that the existence of the vendor is a secret that even though Mr. Stone already knew, learned, through the course of him conducting business through a company he created, that that became a secret, a trade secret that Allied owned and Mr. Stone could never use again, just the existence itself of that vendor.  Is that your testimony?

        MR. CASCINI:  Object, asked and answered.

        But you can answer if you know, Robert.

BY MR. LEVASSEUR:

Q   Yes or no?

A   Vendor source a trade secret, in my opinion.  It's not a legal conclusion, but vendor sources are important.

Q   Okay.  And how did Allied -- how was Allied hurt by Mr. Stone knowing that Sundisc exists?

A   If Coca-Cola's formula was released, Coca-Cola would be

Page 169

harmed by it.

Q   It's not apples and oranges.

A   It is.  It's the configuration of our product and where we get the ability get that product configured that way.

Q   Well, the apple to apple would be he knows that Coca-Cola exists and he knows that Sundisc exists.  How does his knowledge that Coca-Cola exists harm Allied?

A   It is not well known where the source of private-labeled information -- private-labeled abrasives come from.  It's not well known.  And that's information he purchased.  We purchased an easier sourcing method than figuring it out on our own.  Figuring it out on your own takes time and money.

Q   Okay.  Well --

A   He jumped-skipped -- he jumped that by using our information.

Q   Well --

A   Sorry.  I didn't mean to talk over you.

Q   He didn't use your information to learn that.  He learned that long before Allied purchased his company.

A   And he sold the information to me.

Q   Okay.  So your contention is that he sold information that was publicly available should he care to relearn it, but he didn't have to relearn it because he already knew it, meaning the existence of a company that -- in Holland or the Netherlands.  Is that what your position is, that he

Page 170

could never, ever use that company again to do anything because he used to do business with them and then you bought his company.

A   I think a company like Sundisc is a lot different than a general market brand.  Like another brand that exists is called Metabo that he sells currently and we sell.  The existence of the brand Metabo is not a secret.  The fact that Metabo sources some of their product from Sundisc also and from Bullard Abrasives and a number of other sources actually is important information that is not market knowledge.

        The source of the private labeling is important because it's a barrier of entry for new companies, and a barrier of entry absolutely helps someone grow or not grow, being able to jump those barriers.

Q   Is Allied located in Grand Rapids?

A   Yeah.

Q   Do you have any other locations?

A   No.  Like physical, like where we warehouse our goods?

Q   Where is the company?

A   We're an Internet-based entity, so we service people in Michigan, Indiana, Ohio, Canada.

Q   I didn't ask you where you service; I asked where you're located.

A   Our warehouse is in Grand Rapids.

Page 171

| | |
|---|---|
| 1 | **Q  Do you have offices?** |
| 2 | A   Yes, in Grand Rapids. |
| 3 | **Q  Do you have any other location other than the Grand Rapids** |
| 4 | **location?** |
| 5 | A   Where we have people or product? |
| 6 | **Q  Where you have an office.** |
| 7 | A   No.  We have no other office than Grand Rapids. |
| 8 | MR. LEVASSEUR:  No further questions. |
| 9 | MR. CASCINI:  Nothing for me either. |
| 10 | (Proceedings concluded at about 3:09 PM) |
| 11 | (Signature of witness waived) |

Page 172

| | |
|---|---|
| 1 | * * * |
| 2 | CERTIFICATE OF REPORTER |
| 3 | |
| 4 | STATE OF MICHIGAN          ) |
| 5 | COUNTY OF KENT              ) SS |
| 6 | |
| 7 | |
| 8 | I, Maureen Jabour Nurmikko, Notary Public in and |
| 9 | for the County of Kent, State of Michigan, do certify that |
| 10 | this transcript, consisting of 172 pages, is a complete, |
| 11 | true, and correct transcript of the testimony of ROBERT M. |
| 12 | SHINDORF taken in this case on December 5, 2024. |
| 13 | IN WITNESS WHEREOF, I have hereunto set my hand |
| 14 | this 17th day of December, 2024. |

**COPY**

_____

MAUREEN JABOUR NURMIKKO, CSR-3078
Notary Public in and for the County of Kent,
State of Michigan.

My Commission expires 8-2-30.

### WORD INDEX

**< $ >**
**$1,300,000** 69:21, 24
**$1.99** 112:17
**$100** 21:8
**$100,000** 39:8, 9
**$250,000** 130:20 166:14

**< 1 >**
**1** 2:9 7:12, 14, 18, 25
44:4 49:9 60:15 61:6
73:5, 6 80:21, 24 81:9,
17, 25 122:13
**1,000** 69:21
**1.2** 83:16, 18
**1.99** 112:18
**1/4** 44:4
**1:12** 113:13
**1:22-cv-815** 1:7
**1:26** 113:13
**10** 2:21 126:8, 20 142:9,
12 143:7 149:1, 14
**10:30** 1:14
**100** 26:13 30:25 78:9
96:6 111:21
**11** 128:19
**11:49** 60:7
**11:53** 60:7
**111** 1:21
**118** 2:12, 13
**119** 2:14
**12** 140:15 150:22 158:2
159:10
**1-2** 81:24
**120** 30:10
**125** 2:15
**12th** 67:18
**13** 8:11 49:20 56:23
67:11, 17
**135** 2:18
**136** 2:19
**140** 2:20
**142** 2:21
**15** 129:16 132:25 133:1
163:7
**150** 2:5
**15th** 67:18
**16** 133:3, 9 134:1, 4
**167** 2:6
**172** 172:10
**17th** 172:14
**19** 130:6 143:13, 25
144:7, 8, 13, 18 145:2, 6,
16 146:5
**1D** 71:2
**1st** 64:21, 23 65:2
**1x1x1/4** 44:3

**< 2 >**
**2** 2:11 70:20, 23 80:17,
21, 25 159:19
**20** 107:3 134:15
**2000@hotmail** 83:3
**2014** 8:11 49:20 56:23
77:8 78:6, 7, 20 135:23
136:2, 6 158:8 165:20
**2015** 35:15 36:5 48:3
126:5 140:15 150:22
159:10 160:6
**202** 1:21
**2021** 66:11
**2022** 53:3 95:7
**2023** 53:3

**2024** 1:13 3:2 172:12,
14
**20-plus** 168:7
**22** 52:15 94:6
**23** 52:15 81:22
**24** 73:7 74:3 135:23
**25** 7:25 74:20 81:18
**25,000** 5:14
**26** 75:15 76:12, 22
**29** 77:1 94:6, 16 126:14
**29th** 95:7
**2D** 71:2, 4

**< 3 >**
**3** 2:4, 12 118:7, 10, 23
142:20
**3:09** 171:10
**30** 13:1, 2 72:20 107:5
**31st** 64:22
**32** 1:13, 18
**35** 80:11
**3dcart** 43:18, 20

**< 4 >**
**4** 2:13 118:25 119:2
**40** 107:6, 11
**400** 1:18
**42** 83:20
**43** 86:17, 20 87:6
**45** 72:20
**46** 92:11
**48** 93:7
**48098** 1:22
**49503** 1:19

**< 5 >**
**5** 1:13 2:14 3:2 95:25
119:12, 13, 25 125:14
143:9 146:14, 15 159:21
160:1, 4 172:12
**5.50** 96:1
**50** 94:4
**500,000** 70:11
**55** 95:9 129:18
**56** 97:9
**5th** 159:23

**< 6 >**
**6** 2:15 125:12, 13, 15, 23
126:4 135:19 146:22
147:14
**60,000** 147:15
**600** 39:12
**62** 97:22 101:6
**65** 130:8
**66** 113:15
**68** 114:5

**< 7 >**
**7** 2:9, 18 125:23 126:4
135:16, 17, 20, 22
**70** 2:11 77:8 78:8
**70-80** 77:1 78:21
**74** 115:8, 11

**< 8 >**
**8** 2:19 66:18 128:9
136:24 137:2
**80** 77:9 78:8, 13 115:24
**81** 134:25 135:1, 4
**8-2-30** 172:23

**< 9 >**

**9** 2:20 125:18 140:9, 11
142:20, 21 150:24 151:6
155:10 159:5
**90** 30:10
**900** 8:23 39:11
**91** 116:20
**96** 117:20

**< A >**
**ability** 21:3 27:12
29:25 35:2, 20 87:12
122:5 128:24 169:4
**able** 15:4 17:12 18:10
20:25 24:6 29:19 30:1
33:2, 10 34:19 36:19
37:6, 9 80:9 97:19
107:14, 24 108:1, 2, 7
116:5 170:15
**abrasive** 44:2 45:11
51:3 52:3 62:24 66:6
97:1 112:18
**Abrasives** 2:13 50:9
51:2 52:5, 10 57:23
58:1 63:4 67:10 68:10
87:5 90:23 96:3, 4, 14
99:14 100:13, 22 101:3
103:21 106:13 108:4, 22,
23 109:2 110:18 112:16
122:14 127:4 129:13
136:21 144:10, 19
147:23 149:20 159:8
164:13 165:7 167:6
168:8 169:9 171:3
**Abrasives-branded**
139:18
**absolutely** 14:14 59:24
64:20 65:9 66:1 79:15
111:21 127:18 132:15,
17 156:8, 11, 14 157:8
166:3, 21 167:6, 25
170:14
**access** 9:18 11:15, 18, 20,
23 14:17, 21, 25 15:3, 8,
11, 12 16:10 17:9, 15
21:16, 19, 21 22:17, 20
23:11, 12, 15, 17, 21 24:6,
14, 25 25:1, 20 26:14, 25
27:3, 7, 12, 18, 20, 23, 24,
25 28:1, 7 30:1, 3, 7, 19
32:23 33:6, 11 34:4, 9,
13, 15, 16, 18, 22, 23
36:25 37:10, 11, 14, 17,
19, 25 44:24 46:2, 6, 13
47:9, 22, 25 48:3, 6, 7, 8,
10, 17, 19 72:8, 21 74:6,
25 76:8, 9, 10 77:23
82:14 83:22 84:6, 9, 14,
15, 19 85:2, 4, 8, 11, 14,
18, 20, 22, 24 86:1, 2, 10,
15 87:2 91:16, 17, 18
93:12, 16 97:20 102:10
107:19 125:19 126:1, 3
133:12 137:6, 12, 18, 19
138:2, 3, 4, 6, 8, 9, 10
139:8 140:16, 18, 21
143:3 150:7 151:23
152:22 153:15 158:10,
11 159:8, 25 160:3
161:23 163:7 164:22
**accessed** 25:25 26:2, 3,
11 38:15
**accessible** 19:22 127:9
**accessing** 24:13, 17, 18,
20 97:10

**account** 15:15 16:9
17:1, 5 21:19 22:1, 4, 10,
20 23:2, 3, 6, 11, 12, 15,
16, 18, 22, 25 24:15, 23,
25 25:1, 4 26:4, 12 27:6,
8, 13, 18 28:8, 18 29:15,
24 30:1, 2, 3 31:4, 6, 7, 8,
11, 12 33:6, 7, 8, 11 34:5,
24 35:5 37:1, 3, 10, 14
38:1 43:1 44:24 45:9
46:2, 6 47:10, 22 49:2
52:8 69:9 72:9, 21, 25
73:8, 9, 20, 24 74:18, 25
75:16, 19 76:3, 9 77:3, 4,
24 78:1, 22 80:15, 19
83:2, 13, 21 85:17 86:7,
8 87:8, 9, 10, 22 88:5, 6
89:2 90:5, 15, 19 91:18
92:4 93:13, 16 97:10, 12,
18, 21 98:16 99:4, 20
100:1 101:25 102:1, 5, 7,
8, 12 122:17 126:1, 6
136:3, 4, 8, 13, 16, 20
137:7, 12, 24 138:7, 8, 20
139:13, 15, 19, 23 140:3,
17, 22 141:19 143:3
150:7, 12 151:2, 24
152:8 153:2, 11, 16, 24
154:3, 11, 15, 16 158:13
159:9 160:5, 8, 9, 14, 17,
21, 22, 23 161:1, 11, 24,
25 162:11, 14, 16 163:15,
18 164:10, 11, 19, 23
165:3
**accountant** 25:24
**accounting** 10:12 11:12,
22 13:23 19:13 22:7
38:15 39:3, 5 69:6, 11
76:14 102:3 151:17, 20
**accounts** 10:12 15:14,
17 16:5, 11, 19 17:10, 12
22:17 28:22 69:7 77:11
80:13 82:19 83:7, 19
84:4, 10, 15 85:1, 7, 11
86:9 87:2 90:2, 20 93:9
97:11 122:17 125:20
153:10 154:12 158:6
**accurate** 43:14 65:6
69:22 70:6 111:4
117:22 120:25 125:6
130:14, 15 131:2 141:4
150:13
**accurately** 43:12
**accusing** 25:9
**Acme** 96:7
**acquired** 50:18 51:5
97:22 98:12, 16 155:6
164:22 165:19, 20
**acquisition** 9:21 13:1
17:21 52:6 159:13
**acquisitions** 15:1 30:15
**Act** 155:25 156:4, 25
**acting** 72:19 153:22
**action** 59:3 62:4 112:10
153:4
**actions** 132:8
**activities** 6:24 7:1
16:19 52:22 60:23
67:10 112:22 116:21
129:2 161:5
**activity** 53:6 65:25
67:14 69:16, 17 132:6
156:24 161:6
**actual** 15:17 16:5 18:25
21:8 40:3 42:17 59:2

**65:20, 22 114:10, 14
130:3, 5, 24, 25 131:5
147:17
**add** 85:6
**added** 18:12
**addition** 113:21, 24
133:16 148:23
**additional** 45:9 148:16
**additionally** 148:19
**address** 14:6 15:6, 7, 19
16:20 17:7 18:18 21:16
28:13, 19 29:2, 7 42:22
72:4 73:14, 15, 17 75:11
83:4 86:19, 23 87:24
88:9 89:20 91:15 93:14,
16 138:15 139:2, 22, 24,
25 140:1, 7 152:14
162:25 164:10 165:2
**addresses** 9:19 11:12
14:5, 22 16:15 18:20
28:23 77:17, 21 78:4
83:9 86:13 87:1 90:16
140:8 152:16
**adequate** 22:19 116:5
117:7
**admits** 162:19
**advance** 83:24 157:17
**advantage** 102:20 107:8
108:25 109:10 110:10,
15 111:6
**advantages** 132:12
**advertise** 105:19
**advertising** 22:4 75:8
77:12, 14, 15, 20, 21, 23
**advice** 60:22
**advising** 141:18
**AdWords** 23:7 75:8
77:15 78:3 122:17
**adwords.google.com** 78:3
**affect** 103:23, 25
**affirmative** 20:13
**affirmatively** 23:15
**afforded** 108:9
**afterward** 67:24
**age** 163:13
**agent** 88:3
**ago** 4:14 84:24 131:14
**agree** 24:11 25:11, 12
51:8, 9 54:9 64:13, 15
65:21 67:9 68:7 70:11
71:5, 25 74:21 82:15, 23
95:2 121:2, 17, 23
123:18, 20 124:15 126:5
132:20 136:2, 6 137:5,
14, 23 140:2, 14, 20
141:2, 7 144:1 145:15
147:11 148:14
**agreed** 68:1, 10 71:24
130:20 166:9, 12
**Agreement** 2:11 7:22
8:1, 5 9:5, 22, 30 30:25
49:12 51:24 52:17 56:5
56:18 59:11, 14, 25
60:10, 15 61:23 62:10
64:21 67:12, 13, 15
69:20 70:1, 5, 17, 22, 24
71:7, 10, 11, 15, 18 72:6,
14 80:14, 23 81:19 82:1,
14, 15 83:1, 5, 6 95:8
105:9 122:7, 12, 13
123:6 129:3, 24 139:9,
14 141:10 157:5 159:19

Allied Industries Supply v. Quast, LLC    Case 1:23-cv-00815-RLM-SJB    ECF No. 32-24    PageID.1452    Filed 02/14/25    Page 48    Kostner Lindorf

of 59

agreements 82:13 122:20
agrees 60:17 162:21
ahead 15:3 19:17, 18
46:9 130:6
AIS 60:24 62:13
aligned 67:7
allegation 51:21 56:15
62:8 73:8, 12 77:6
78:17, 24, 25 79:15, 17
80:11 91:10, 11, 12
129:4 136:7 143:12, 24
144:6, 18 145:2, 25
149:17, 19
allegations 7:10 49:7
128:25 129:17 134:25
145:16 148:25 149:12,
13
allegation's 74:22
allege 50:20 76:22
113:15 133:5
alleged 116:21
allegedly 72:13 124:10
alleging 56:19
all-encompassing 92:16
128:17
ALLIED 1:5 2:9, 15, 21
5:20 6:5, 15 7:3, 23 8:8
11:7 24:16 25:17 26:17,
23, 24 27:2 35:7, 8, 11
37:3, 20 42:11, 12 49:19
50:1, 2, 7, 15 52:4 59:16
62:13 64:6, 14, 16 80:13
83:20 92:13, 25 95:5
97:9 100:25 102:23
103:13, 19 106:13
111:18 112:4 114:6, 17
115:10 116:1 120:8
121:8 122:9 123:18
124:11 125:5, 11 126:9
128:21 129:22 130:11,
25 131:10, 24 134:19
136:13 137:8 139:15
143:16 154:25 157:24
160:9, 17, 23 161:15
162:14 163:10 164:9, 19
167:4, 5, 6, 15 168:14, 23
169:7, 19 170:16
Allied's 7:1 58:13
95:10 99:9 101:24
114:2 117:20 121:7
130:11
allow 11:16
allowed 14:25 41:8
50:7 51:10, 23 57:11
72:6, 7
alternatively 16:25
Amanda 7:5
Amazon.com 162:6
ambiguous 36:9
amend 142:15
amount 5:9, 18 10:2
39:8 56:24 57:2 65:13
133:1 166:15
amounts 4:19 38:21
analysis 38:22
analyze 39:11 91:13
analyzed 66:4
analyzing 95:23
Andrew 1:18
answer 9:12 10:25
19:17, 18, 20 20:12 22:2,
24 35:19 47:2, 5 49:15,
17 55:10 59:4, 19 62:17
83:12, 13 84:21, 23
88:16 89:22 92:4 97:14

110:6 116:23 125:23
126:19 128:21 129:20
130:6 133:4, 15, 17, 21
134:23 147:5 148:20
168:18
answered 35:17 103:6
133:18, 23 142:6 168:17
answering 163:4
answers 125:17
anticipate 131:4
anybody 6:17 103:16
104:6 151:14
anymore 28:18 85:14,
20 87:24 161:8 165:16
167:9, 15
apologize 5:12
appear 105:18
APPEARANCES 1:16
appears 7:20 8:4 119:8
apple 169:5
apples 169:2
Appreciate 13:12 60:6
approach 14:25 15:1
126:7 157:24
architecture 19:4
archives 127:3, 8
areas 17:8 96:16 115:16
argue 63:23 70:8 139:3
argument 24:10 56:9
arisen 45:24 46:5
arranged 78:8
article 114:11
artwork 157:1
Asian 100:3
asked 35:17 47:21 62:2
79:2, 13 80:8 89:8, 18
92:18 125:21 129:16
130:17 131:13 133:18,
23 134:15 147:20
150:21 156:15 168:17
170:23
asking 25:2 32:16
34:15 35:6, 7 37:6 55:5
58:8, 21 76:19 82:20
88:20 89:25 133:24
134:2 136:11 142:4, 8
143:25 144:14 146:15
148:3, 18 161:21 164:18
asks 125:18 128:19
aspect 62:3 74:23
132:10
aspects 56:11 71:13
103:24
assembled 150:12
asserted 118:10
asset 7:22 8:1, 4 9:4, 22
49:12 58:16 59:25
69:13, 20 72:6, 13 80:13
81:18 82:25 83:4 105:9
120:22 122:7, 12 123:21
124:15 138:21 139:13
141:9 158:24
assets 9:24, 25 47:19
82:3 83:16 124:3
133:12 139:10 142:17
143:6, 15 152:1 158:7
165:20
assist 18:10
associated 33:9 36:23
77:21
assume 33:2 36:2
33:12 43:1 58:5 96:18
assumed 25:22 67:1

136:14
assuming 7:9 25:8, 18
assumption 25:25 26:20,
22 33:14 92:8 108:10
assumptions 25:22 26:1,
8, 9, 10, 21 67:6
assure 88:13
assured 78:9
attached 102:13
attachment 128:6
attempt 26:18, 25 27:3
65:22 110:20 126:12
attempted 23:21 25:3
26:13, 14
attempting 24:8, 14
25:18, 20
attention 71:2 73:7
75:15 125:18
attorney 60:1 146:24
151:10, 14 166:13
attributable 131:18
attribute 117:14 132:4
August 159:21, 23 160:1,
4, 6
author 151:12
authority 125:5
auto 18:13 29:1 87:23
160:21 161:3, 12, 17
auto-forward 161:2
automatic 86:23
automatically 40:22
86:7, 24 90:6
available 35:12 57:16
76:24 88:21 99:16
169:22
Avenue 1:13, 18
avenues 19:3
avoid 15:1, 2

< B >
back 7:6 8:22, 25 17:18
23:5 27:17, 23 28:17
34:15, 21 35:12 43:6
47:13 66:17 72:5 76:4
79:5, 16, 17 97:19 98:13,
14 101:6 102:11 109:17
116:9 122:10, 11 126:22
133:3 142:24 146:4
148:24 156:25 166:5
backed 75:21
background 12:24 40:19
165:6
backs 78:17 79:14
backup 25:23 75:18, 20,
21, 22 76:3, 14 96:23
backups 22:6 74:18
balance 70:18
barrier 170:13, 14
barriers 170:15
based 5:15 19:8, 9 54:7,
18 113:19 117:5 156:6
157:6
basically 72:19 95:20
115:3 164:4
basis 7:3 29:4 56:10
117:8 123:21
beginning 17:21 30:16
69:6 87:14 128:8
129:24
behalf 1:17, 20
behavior 29:12 153:1
behaviors 87:4

behind-the-scenes 165:12,
17 167:19
belief 79:21
believe 24:4 35:16
46:22 50:3, 5 51:9, 13,
20 52:12 54:15 55:9, 11
56:8, 17, 19 57:10 58:1,
16 61:24 62:13, 25
63:13 68:16 69:1, 4
70:1 71:1 78:12 80:1
83:5 84:8 85:1, 3, 8, 22
88:8, 19 89:11, 19 90:23
94:12, 20 96:23, 24
97:15, 18 100:21 101:14,
18 109:19 113:1 117:24
118:20 120:9 123:21
124:19 127:3 129:12
132:21 134:16 135:5
137:19 138:1, 13 139:16
141:21 142:7 150:5, 10
152:18 153:18 155:4
158:4, 10, 15, 18 159:3
161:19 162:15, 24
164:21
believed 68:24
belongs 81:25
benefit 81:3
Bessey 110:17
best 20:25 52:14 81:10,
19 84:23 158:21
bet 122:10
better 75:7 107:13
147:6
beyond 76:13 148:19
big 13:16, 21 163:12
165:15 168:7
BigCommerce 12:22
13:14, 16 14:2, 11 32:20,
21 33:13 43:20 52:1
154:2
bigger 108:1
bill 41:19, 23 69:15, 16
Bing 77:15
birthdates 27:22
bit 8:7 18:10 30:18
47:14 51:6 69:12 72:16
75:4 77:16 80:12 86:2
115:24 119:5
blanche 71:22
blank 18:9
boat 157:12
body 114:11
book 114:11
books 82:7 122:14
bottom 136:15 142:23
bought 14:4 18:4, 9
21:16 31:9 33:22 44:12
58:13 104:24 105:2
121:4, 20 138:20 141:9
170:3
box 90:21 162:13
boy 55:18
brain 105:23
brand 16:13 36:24
44:17 54:19 109:2
110:17 170:5, 7
branded 18:19 28:22
44:8 45:11 87:5 152:16
branding 36:21, 22
breach 135:4, 5
breached 72:14
break 106:18
breakdown 39:10 80:3
briefcase 143:10

briefly 13:10 149:22
bringing 109:21
broad 75:5 109:7
144:22
broader 144:21, 25
broadly 144:18
broke 5:17
brought 110:20
Bruce 4:10, 11
bucks 95:25
build 107:1, 4 108:24
built 43:18 64:25 110:1
Bullard 170:9
Burns 7:5
business 10:3 11:8
12:19 13:18 14:23
17:14 18:12 23:9 50:14
51:15 57:12 60:22, 23
64:22 69:3 72:22 74:4,
8 78:10 82:8 83:7 95:4
101:7, 10, 16, 22 104:18
105:15, 24 106:3, 20
107:5 108:17 110:2, 21
111:17 117:2, 5 124:5
126:13 128:22 129:9
132:4 137:21 138:12
139:20, 24 142:17 143:4,
5 151:24 152:1 153:10
154:24 157:24 162:4
168:13 170:2
businesses 11:9 50:17
51:5
businessman 38:9
button 42:3
buy 33:21, 22 40:6 41:8
63:19 99:21 103:8, 10,
16 104:8, 9 105:11
106:11, 12, 19 112:13, 15,
17 157:10, 19
buying 14:1 64:19
100:8, 9 109:6
buys 21:5

< C >
cache 75:17
calculate 130:19 131:4
132:1, 23 166:19
calculated 113:16 130:3,
5
calculating 39:2
calculation 116:24 117:7,
9
call 33:19 35:21 43:15,
20 78:15
called 12:6, 21 20:22
43:18 44:9 50:25 63:4
80:25 94:10 95:22
96:24 101:3 120:19
154:23 170:6
calls 47:3, 5 52:24
154:22 163:21
Canada 170:22
capable 80:4 95:23
capture 128:3
card 41:13 42:15
care 169:22
carte 71:22
carved 71:16
Cascini 1:18 2:5 8:2
10:19 13:9, 12 19:15, 18
22:12, 23 23:24 34:8, 12
35:16, 19 37:5 49:13
53:18, 20, 25 55:1, 4, 10,
21 56:1 59:17 60:1, 4, 6
61:4, 10 66:10, 13 67:3,

6  80:20, 23  81:3, 13, 22
84:17  89:25  106:14
110:4  113:10  125:15
131:12, 22  133:14
140:25  142:19  146:10,
15, 18  148:8  149:22
150:4  163:22  166:22
168:17  171:9

**Case**  1:7  4:2, 15  5:5
33:23  78:7  118:4
128:24  131:8  149:6
158:4, 6  159:23  168:3
172:12
case-by-case  56:10
cases  4:20  5:16
cash  10:6  70:7
catalog  145:10
categories  62:15  122:21
147:20
category  82:21  101:15
145:11
cause  24:15  113:15
caused  91:12  116:21
causing  115:9
caveat  163:3
ceased  125:19
cell  17:6  151:25
**Center**  75:9  94:23
certain  9:7  18:12  23:1
29:6  84:1  87:18  89:22,
23  90:13  111:5  128:5
164:25
**Certainly**  9:17  23:6
50:25  53:13  54:13, 15,
20  55:15  62:6  63:23, 24
71:10  82:14, 21  83:6
85:13  98:21  103:20
108:18  111:8, 9  113:20
122:21  124:22  130:1, 11
147:2  148:10  149:5
certainty  88:23  89:3
165:1
**CERTIFICATE**  172:2
certify  172:1
cetera  28:12  60:24
68:13  83:7  117:18
118:3  147:23  149:20
chain  138:14  141:13
142:17  147:22
challenge  10:1  23:14
60:25  129:10  134:3
149:16
challenges  71:9
challenging  9:12  58:21
59:1  67:25  115:17
130:19  132:23  153:4
chance  60:9  143:21
163:5  166:18
change  15:6  28:2  32:12
83:24  85:17  97:19
98:14  160:3
changed  27:19, 22  83:20
84:16  85:19  92:22
96:18  97:19  98:12
126:6  138:11
changes  93:5
changing  84:6  87:4
97:10  141:4
channel  29:13  62:4
characterize  31:10
charity  30:13
chicken  57:15
**Chimp**  164:17
**China**  44:7, 16
**Chinese**  45:12

**Chris**  22:13  60:6  66:10
81:3, 24  89:25  113:11
147:20  149:22
**CHRISTOPHER**  1:8, 21
2:12  7:23  131:11
church  140:5
circuit  5:5, 7, 14, 16, 17
cl.stony67  93:14
claim  16:7  24:7  51:23
71:23  92:13, 24  95:9
102:22  105:8  106:22
110:3  115:19  128:19
claiming  104:11  106:18
110:14  151:16, 18
claims  71:6, 9, 17, 21
72:1  127:16
clamps  52:3
clarification  81:2, 6
82:25
clarified  125:25  128:12
clarify  10:23  26:10
79:13  133:24
clarifying  54:2
clarity  45:3, 6  80:20
classified  101:21
clause  166:4, 6, 9, 12
clean  14:24  43:24, 25
44:20  155:8
cleaning  69:18
clear  15:4  62:17  79:23
129:7, 21
cleared  134:17
clearly  91:9  93:25
click  42:2, 4
client  7:23  9:18  10:8,
10, 13, 15, 17, 24  11:1, 2
12:11, 15  13:6  14:11, 16,
20  34:9  91:13  142:19
148:12, 18  150:6, 11, 16,
21
clients  10:11  11:17
client's  10:20  11:5
close  13:2  56:14  92:14
closed  13:3
closing  8:10, 14, 17, 18,
21  9:2, 4, 16  11:24
14:17, 20  15:8, 9  16:10
49:20  60:18  72:9  111:2
clslcs  139:19
clslcs2000  15:20, 21
clslcs2000@hotmail  36:22
**Coca-Cola**  168:25  169:5,
7
**Coca-Cola's**  168:25
code  44:3, 6
codes  43:25
collectible  70:10
come  31:4  32:3  33:6
34:17  86:6  113:18
169:9
comes  90:22  160:20
comfortable  89:21
coming  59:10  153:23
155:18
commencing  1:14
comment  94:3
**Commission**  172:23
commitments  151:22
committed  70:7
common  66:25  114:19
common-law  114:22
communicate  139:25
140:1
communications  109:8

companies  3:17  33:24
78:15  165:13  170:13
company  3:16  5:23  6:6,
19  14:6  16:9, 11, 21
20:17, 22  22:19, 21
29:22  33:5  43:14  51:6
52:21  58:6, 13  59:9, 15
60:13  61:15, 17  62:6
64:19  84:11  86:10, 14
99:10, 11  105:11  108:2,
3  114:23  116:1, 4
121:13  127:22  132:1
138:20  139:10  141:9
149:18  154:25  155:6
165:1, 8  168:13  169:19,
24  170:1, 3, 4, 20
compete  50:7, 8, 15, 16
53:13  60:23  92:24
102:22  126:9  129:1
competed  64:16  92:13
competes  64:6
competing  49:19  50:1, 2
51:15, 16  53:14, 15
54:10  57:12  65:8, 13
66:1, 8  92:15  95:5
103:18  106:11
competition  50:4  51:1
59:16  61:25  62:13
64:14  167:17
competitive  53:5, 7, 9
54:3  64:4  65:3, 20, 23,
25  92:17  93:4  100:15
102:20  108:24  109:10
110:10, 15  111:6  132:12
156:23
competitors  95:24
compiled  8:25  116:1, 3
complain  162:10
**Complaint**  2:10  7:10, 20,
21  15:14  49:8  50:19, 23
53:2  62:9  63:15  68:21
73:4  74:21  76:23  79:1
80:16, 17  94:4, 12  96:19
129:18  130:8  134:25
147:21  148:25
complete  38:16  79:10
92:15, 16, 20, 24  97:20
134:10  172:10
completed  114:2  153:14
completely  20:6  160:5
complicates  19:9
component  108:20
components  106:24
comprehensive  141:23
146:23
comprehensively  77:20
computer  82:11
computers  86:13
concise  8:25
concluded  171:10
concluding  108:13
conclusion  25:16  121:15
166:14  168:22
conclusive  45:17  79:8
condition  3:24
conducive  90:24
conduct  126:11  128:10
130:14  131:1  132:2
conducting  168:12
confidence  26:13
confident  26:3  50:21
confidential  101:7, 10, 13,
16, 22  105:15  113:23
114:3  117:3, 6  122:25
126:21  129:9

configuration  54:18
63:2  99:8, 9, 13  100:20
102:18  103:24  104:10,
13, 15, 17, 24  105:1, 2, 4
106:6  115:22  118:3
157:2  167:7, 9, 11  169:3
configurations  97:24
97:24  98:8, 22, 24  99:1
100:23  106:4, 5
configured  100:12
104:19  169:4
confines  148:12
confirm  49:18  70:24
162:21
confirmation  134:2
146:16
conflict  15:2
confusing  51:12  97:14,
16
connection  3:15  9:7
49:4  125:11  155:18
consider  6:24  142:17
143:5  151:25
considered  109:9  156:12
consistency  20:24
consisting  172:10
**Constant**  164:3, 6, 17
consult  51:14  57:12
consultant  30:22  51:10
86:1  87:3  153:23
consulting  85:13
contact  11:9  40:5  76:13
164:3, 6, 17
contacts  78:15
contained  88:9
contains  80:18  96:22
content  94:22  96:5, 17
99:20  115:6, 15, 16
118:1  119:8  122:11, 22
162:2, 4
contention  16:4  56:21
58:7  63:19  69:24  72:3
83:5  108:4  111:16
169:21
context  152:25
continue  46:12
continued  9:18  28:9, 20
67:23
continuing  56:6
continuously  28:25
contract  41:4  135:4, 5
165:15
contractual  55:6  56:1
128:20  129:1, 5
control  16:10  58:17
60:20, 21  64:2, 3  85:10
86:3  91:20  98:16
110:12  112:20  118:2
128:10  137:7  146:12
controlled  153:6
controls  162:16, 19, 25
163:15
conversation  43:11  84:3
151:11
conversations  99:20
converted  10:5  41:13
133:5, 17
copied  167:8
copies  25:24  98:24
copy  12:11  60:1  94:23
95:18  96:21, 24, 25  97:5
123:8  134:15  150:15
copyright  114:7, 9, 10, 14,
16, 19  117:25  118:11

123:2, 3, 4  134:16, 18, 21
copyrighted  114:6  115:2
copyrights  115:9  124:19
corporate  41:10  136:21
**Correct**  5:22  6:1  7:8
11:25  12:3, 14  15:12, 16
16:8  17:2, 5, 11  21:20,
22, 23  22:11  25:14
27:12, 16  35:3  36:9
37:21, 25  42:10  43:3
48:15, 22  50:13  53:4
55:17  56:8  61:14  63:11
67:1  68:19  70:11, 15
71:16  72:15  74:10, 15
76:5, 10, 11, 17  78:2
83:23  85:22  86:10, 21
87:15  94:18  95:1, 6
96:13, 20  97:12, 13
100:7  102:14  103:17
110:25  111:21  115:23
124:5  126:2, 25  128:13
130:5  134:13, 20  138:7
139:15  146:17  150:20
151:4  152:4, 5, 11, 16
153:12, 16, 17, 20, 25
154:8  155:6  158:9, 14,
17  160:1, 2, 16, 19
172:11
correction  95:16
correctly  16:7  90:8
correspondence  83:10
128:23
corresponding  40:15
cost  42:4  104:3
counsel  79:14  80:5, 8
89:15  92:19  94:20
128:5, 7  142:13  146:6
147:12
**Count**  114:5  116:22
**Counterclaim**  2:12
118:4, 9
counterparts  8:20, 22
counts  99:17
**County**  4:4, 5  5:3, 5
172:5, 9, 21
couple  4:18  30:9
119:16  135:25  152:10
coupled  93:24
course  13:17, 20  21:2
35:10  36:23  39:6  54:3
63:20  71:9, 22  115:7
168:12
**COURT**  1:1  5:5, 14, 15,
16  68:18
covered  72:13  133:4
crap  162:8
crawl  75:6
create  41:21, 23  58:19
92:19  95:10  97:5  164:5
created  62:7  105:1
114:22, 24  115:1  138:13,
14  168:13
**Creating**  51:6  58:8
59:15  60:13
creation  51:16  57:4
59:9  61:15
credit  41:13  42:15
**Crib**  43:17  51:1  52:5
57:8
cribbed  95:10, 11, 17
**CRM**  47:11
crossed  11:5
csls  83:2
**CSR-3078**  1:23  172:21

**CSV** 65:17
**current** 109:2
**currently** 66:16 114:16 163:17 170:6
**custody** 146:12
**customer** 11:8 16:22 17:13, 15, 20, 24 18:1, 3, 23, 25 20:18, 21, 22 23:4 26:2, 5 27:14 29:11 36:15, 20 38:18 41:21 42:12, 21, 22 43:7 44:5 46:11, 15 47:2, 4, 5, 6, 11 48:25 64:5, 7 66:15 68:12 74:9 75:17 76:10, 13, 24 87:8, 19, 20, 22 88:2 94:17, 21 98:6 99:21 100:10 102:17 104:21 105:5 111:9, 10 112:3, 10, 11, 19, 24, 25 113:6 116:6, 7 117:11, 15, 17 118:2 126:16 128:10, 12, 15, 16 132:7 153:1 160:24, 25 164:1
**customer-facing** 7:5 22:8
**customers** 18:4 20:14, 19 28:10, 11 50:9, 17 52:24 67:22 73:12 77:5 87:4 88:25 91:14 92:5 93:25 94:3, 7, 8, 9, 10, 11 111:17, 24 112:5, 21 113:23 115:25 116:2, 3, 4, 10, 14 117:16, 17 126:11 132:12, 16 140:1 152:15 156:7 164:15 165:14
**customer's** 128:17
**customized** 122:18
**cut** 160:5
**cycle** 157:9

**< D >**
**daily** 37:18, 23 48:22
**damage** 166:15
**damages** 68:1, 2, 3 113:16, 19, 20 116:21, 25 129:17, 22 130:1, 2, 3, 4, 5, 7, 16, 19, 20, 23, 24, 25 131:1, 3, 5 132:13, 20 133:2 134:22, 24 135:7, 9, 12 151:17 166:4, 6, 19
**data** 66:24 75:25 76:11
**database** 10:11 11:6, 10 17:17 65:18 66:4 88:8 93:1, 5 101:25 102:2 164:5, 15
**databases** 13:6 20:6 22:18 101:24 102:19 122:17
**date** 47:24 48:19, 21 49:20 52:12, 13 60:18 66:18 67:17 71:10, 11, 17, 18 72:9, 14 77:8 86:15 87:14 93:2 125:18, 21 126:4, 5 131:8, 17 147:18 159:10, 20, 21 160:1, 4
**dates** 57:17 103:5
**day** 28:5 136:8 172:14
**days** 13:2 30:10 72:20
**day-to-day** 6:24 7:1, 3
**dealer** 119:15, 22
**dealing** 24:22 148:15 166:10
**deceit** 93:21, 22

**December** 1:13 3:2 64:22 159:14 172:12, 14
**decently** 100:13
**decided** 50:3, 5 158:19 159:25
**decision** 31:22 72:23
**declaring** 137:24
**Defend** 155:25
**Defendant** 1:9, 20 2:12 4:6, 9 128:22
**Defendant's** 2:16, 22 126:10 128:10
**defending** 59:8
**deficiency** 21:10
**deficient** 21:9
**Define** 6:12 28:6 38:4 77:15 136:19 167:23
**defined** 128:14 147:21 149:9 155:25 156:3 158:6
**defining** 139:19, 21
**definitely** 25:12 63:25 64:4 162:1
**definition** 11:4 101:21 106:23 155:23 168:2
**degree** 78:9
**delete** 76:20 88:3 91:21 161:24 162:2, 13 163:9, 11
**deleted** 87:18, 20 89:13 163:19
**deleting** 162:10
**deliverables** 9:6
**delivered** 20:9 102:25 103:4
**Demand** 2:10
**demonstrates** 26:16
**deny** 49:18
**denying** 160:3
**depend** 32:7, 11 42:24 87:16
**Depends** 5:8
**Depo** 129:14
**depose** 61:1
**deposed** 3:11
**DEPOSITION** 1:12 3:23 53:23 81:9 133:7, 25 134:17 142:22 146:9 148:12, 18 150:25 151:18
**depositions** 3:20 4:22 5:10
**deposits** 69:8
**Depot** 50:25 51:6, 17, 23 52:1 53:7 57:8, 21 58:1, 4, 24 59:2 62:12, 14 63:1, 6 65:12 67:10 92:14, 20 97:1 110:21 127:4 128:20 129:11, 12 156:16
**Depot's** 65:15
**derived** 117:2
**describe** 136:18
**described** 22:16 47:13 139:11 164:24
**describing** 21:11 22:11 46:21
**description** 19:7, 8 21:9
**descriptions** 95:14 96:5 115:5, 22
**design** 100:20
**designed** 99:19 100:20, 22
**designing** 157:1, 11

**desktop** 12:8, 9, 11 32:25 33:3 76:1
**despite** 145:3 161:12
**destroyed** 35:4
**details** 3:19, 21 14:16, 20 79:10 116:6
**developer** 97:4
**developers** 95:22
**DeWalt** 165:14, 15
**diagram** 101:18
**diameters** 99:17
**difference** 5:6 136:20 139:18
**different** 16:2 17:8 19:3 21:1 28:13 29:16 38:8 62:2 74:7 99:16, 17, 18 101:8 163:7 170:4
**difficult** 166:18
**dilemma** 45:24 46:4, 15, 20
**dilemmas** 44:23
**diligence** 38:2, 4, 5, 10, 12, 18 47:13, 15 79:2, 22
**diminished** 117:19
**direct** 51:1 71:2 73:6
**directed** 124:4
**Directing** 75:15 86:18 125:18 152:15
**directly** 16:16 60:18 63:22 73:11 77:2, 10 92:13, 24 95:10
**director** 51:10, 14
**directs** 128:22
**disagree** 59:13 82:23
**disagreement** 9:13 68:17, 23
**disassociate** 59:1, 4, 7
**disc** 63:5 64:9, 19 99:16, 22 103:7, 8 104:19 105:2 118:21 120:7, 18
**discharge** 71:24
**disclosed** 13:4
**disconnected** 49:5
**discontinue** 126:13
**discount** 70:3, 18 107:3, 7, 11 108:1, 8, 13, 14, 15 109:25 110:9
**discounts** 109:15, 24
**discovered** 52:23 96:8
**Discovering** 53:5
**discovery** 25:15 52:12 63:14 65:19 66:20 80:1 88:12, 22 107:20 109:10, 20 111:1 116:5, 18 117:7 123:9 125:10 127:5 128:6 130:10 131:4, 6 143:20 145:5 148:13
**discreet** 150:6, 16
**discrepancy** 31:21
**discs** 63:2, 9, 17 65:7 99:16 102:24 103:3, 13, 20, 22 104:2 105:19, 13 112:16 120:15, 16 129:13 156:15
**discussed** 43:22 79:2 92:12
**discussion** 14:19 149:25 150:2
**discussions** 31:24
**disorganization** 155:8

**dispute** 3:24 66:20 69:5 131:14 148:10 158:3, 4
**disputes** 132:22
**distinct** 101:15 167:7
**distributed** 143:14 144:9, 14 147:3, 9 149:17
**DISTRICT** 1:1, 2 5:6, 15
**diverted** 115:25 116:2, 10
**DIVISION** 1:3
**document** 8:13, 24 9:1 49:13 59:18, 22 63:20 66:17, 21 67:2, 4 69:23 70:12 71:8 79:24 82:20 127:1, 7 128:25 133:15, 19 137:13 140:25 142:13, 20, 21 143:23 144:4 146:3, 4, 5, 24 147:6, 13, 14, 17 148:4 149:13, 19 154:18, 20
**documentary** 94:17
**documentation** 79:14 144:16 148:1
**documented** 153:19
**documents** 2:13, 14, 24 80:4 126:19 128:23 131:13 138:18 141:22 143:12, 17, 19, 20 144:2, 6 145:3, 4, 16, 17, 25 146:5, 11, 21 148:23 149:3, 16 163:23
**doing** 17:24 50:9 62:16 84:10 95:23 132:8 158:22
**Dollar** 5:9, 18 10:2
**dollars** 117:11
**domain** 18:19 43:1 56:25 57:4, 13, 14, 16, 18 58:1, 9, 12, 25 61:22, 24 62:1 153:6
**domains** 87:5
**domestically** 101:4
**door** 111:2
**download** 27:13 85:24 93:17 95:21 96:23 97:6
**downloaded** 95:13 98:23
**Dozens** 45:25
**draw** 121:15
**drive** 42:1 74:18 76:5 93:13
**driven** 9:23 10:4 54:13 104:7
**driving** 9:21 23:8 153:9
**drop-ship** 32:8, 9 40:10
**drop-shipped** 20:1
**drove** 52:21
**due** 38:2, 4, 5, 9, 12, 18 47:13, 15 79:2, 22
**duly** 3:5
**dump** 88:10, 11 147:6
**duplicate** 87:20 88:3 110:18
**duplicated** 88:2 115:16
**duplicates** 20:20
**duty** 129:6, 7, 8, 9

**< E >**
**earlier** 38:25 43:11 79:2 115:4 150:5 152:6, 8 159:16
**early** 31:24 48:3 151:18
**earn** 50:12
**easier** 153:8 169:11

**easiest** 45:21
**easily** 11:6 19:22 93:3
**easy** 64:20
**ECF** 81:24
**e-commerce** 7:6 10:3 11:13 12:20 16:13 20:3, 4 52:1 56:25 57:1, 18 59:3 75:2 78:10
**edit** 28:17 141:16
**effect** 137:25 141:8, 10, 20, 25
**effective** 159:21
**effort** 156:22
**efforts** 83:9
**egg** 57:15
**Either** 8:19 24:12 26:22 32:19 44:6 63:14 85:22 94:12, 20 97:18 104:24 120:21 154:1 163:17 171:9
**electronically** 8:20 78:11
**eliminate** 161:10
**Elite** 101:3
**email** 2:18, 19, 20 9:19 10:12 11:11 14:5, 15, 22 15:6, 7, 13 16:5, 9, 15, 20, 25 17:7, 22 18:9, 11, 18, 23 20:11 21:11, 16 22:17, 20 27:18 28:13, 19, 22 29:2, 7 31:19 33:20, 21 36:18 38:1 42:4 45:2, 3, 6, 13, 15 52:11, 13, 18 72:4, 21 73:14, 17 74:12, 13, 14 75:11, 13 77:17, 19, 21, 24 78:1, 4 79:24 82:14 83:2, 4, 9, 10 85:7, 17 86:10, 13, 19, 22 87:1, 5, 8, 10, 13, 14, 17, 22, 24, 25 88:3, 9, 10, 11 89:20 90:11, 15, 16, 22, 23, 24 93:13, 15 94:6, 16, 17, 21 95:4 99:4, 8, 19 101:25 102:12, 13, 15 107:20 108:21, 22, 25 113:2 126:14 135:22 136:11, 12 137:19, 23 138:1, 14, 15, 19, 22 139:2, 19, 22, 23, 25 140:1, 3, 4, 7, 8, 12 141:8, 11, 12, 16, 25 142:2, 3, 6, 16, 18 147:19, 22 150:22 151:1, 2, 12 152:9, 14, 15, 16 154:1, 12 155:10, 17 159:10 160:21 161:1, 7 162:13, 25 164:9, 14 165:1
**e-mail** 87:24
**emailed** 26:5 42:10 52:10, 21 53:1 77:12, 18, 22 78:14 94:10 136:16 160:25
**emailing** 94:3, 7, 8, 9
**e-mailing** 93:25
**emails** 14:21 15:6 17:17 27:13 29:4 74:5 77:2, 10 80:1 85:24 86:6, 22, 24 87:17 88:4, 8, 13, 19, 24 89:11, 13, 17, 19, 24 90:1, 4, 11, 13 99:6 100:1 101:25 107:19 112:23 138:17 141:15 142:1 153:5, 8, 23 154:3 158:12 160:8, 20 161:22, 24 162:10, 14

163:9, *18*  164:6, 7, *18*
**employed**  6:*11*, 12, 15, 17
**employee**  30:*23*  86:*1*
**en**  112:*18*
**enabled**  12:*12*
**encompassing**  101:*19*
**ended**  37:*1*
**end-user**  73:*12*
**engage**  60:*19*  63:22
**engaging**  66:*14*
**engine**  75:7  115:*13*, 15
122:*18*  132:*11*
**engineer**  100:*17*, 18, *19*
**engineered**  100:*13*
**engines**  115:*13*, 14
**enjoying**  125:*19*
**enjoyment**  125:20
**enrichment**  94:2  106:9
**enter**  20:*21*  32:*1*, 13, 14,
19, 20  33:16, 18, 19
40:*12*  41:25  153:5
**entered**  7:22  19:5, *23*,
24  20:2, 5, 15, 24  31:21
33:*12*  34:*1*  39:*1*  40:8, 9
42:24  43:*12*, 24  154:2
**entering**  30:*11*, 17
158:22
**enterprise**  117:4
**entire**  64:*23*  76:9
145:*10*  168:4, 6
**entirety**  9:20  151:*12*
**entities**  11:*13*
**entitled**  22:21  109:24, 25
**entity**  6:21, 23  47:*19*
51:*11*  60:25  61:2  62:3
64:24  69:*14*  101:3
129:2, 12  170:21
**entry**  170:*13*, 14
**environment**  100:*15*
**equipment**  50:3, 5  51:4
52:2, 3  120:16  144:*12*,
20
**ERP**  13:22
**error**  95:*12*
**especially**  153:6
**essentially**  12:22  40:22
55:8  84:*16*  127:24
**establish**  55:7  78:20
**established**  24:25  48:6
136:*23*
**estimate**  41:2, 3, 5, 7, 13,
16  159:*17*
**estimation**  59:*13*
**et**  28:*12*  60:24  68:*13*
83:7  117:*18*  118:*3*
147:*23*  149:20
**Ethan**  7:7
**event**  125:4
**eventually**  17:9  27:*10*
**everyday**  29:*3*  128:*1*
**everyone's**  147:*11*
**evidence**  26:*16*  56:*21*, 24
57:2  64:8, *10*  65:4, *10*,
14, *16*  94:9, *17*  102:6, 9,
*21*  110:24  111:*10*
112:*21*  126:*23*  127:*16*
128:*3*, *19*  135:8  143:*24*
153:*21*
**exact**  10:*1*  23:*1*  47:24
51:*4*  52:*13*  63:2  68:*1*
86:*15*  92:*19*  96:*17*
100:*23*  111:6  144:*18*
166:*11*
**exactly**  19:20  34:*23*
44:*15*  67:2  74:24  79:*11*

80:5  81:*1*  91:*14*  96:6
137:9  145:*21*  163:8
**Examination**  2:4, 5  3:7
150:*3*
**examine**  56:9
**examined**  3:5
**example**  21:25  22:*1*
36:5  44:9  92:*17*  96:*12*
106:*10*  107:*15*  115:*14*
133:*10*  134:7  151:*16*
**examples**  21:*14*  29:21
46:*1*
**Excel**  65:*17*  67:4
154:*18*, 20
**exchange**  70:*3*  135:22
136:*11*, *13*  138:2  139:22
140:4, *12*  153:7  155:*10*
**exchanged**  66:*16*, 24
128:4
**exchanges**  153:*19*
**exclude**  53:6
**exclusion**  16:6  110:*19*
**exclusive**  43:*1*  58:*17*
134:8
**exclusively**  39:21  91:*3*
144:*15*  165:8
**excuse**  40:*1*  105:20
144:*3*
**executed**  159:*19*
**execution**  159:*21*
**exhaust**  109:20
**exhaustive**  54:*12*
**Exhibit**  2:9, *11*, 12, 13, 14,
15, 18, 19, 20, 21  7:*12*, 14,
15, 18, 21  49:9  66:2, 15
63:*14*  70:20, 23  73:5, 6
80:*16*, 17, 21, 24, 25  81:6,
7, 8, 9, 12, 25  118:7, 10,
25  119:2, *12*, 13, 25
125:*12*, 13  128:6  135:*17*,
20, 22  136:24  137:2
140:9, *11*  142:9, *11*, 20,
21  143:7  149:*1*, 14
150:24  151:6  155:*10*
159:5, *19*
**EXHIBITS**  2:8  8:3
52:*12*
**exist**  11:*1*, 10  63:*13*
88:*15*, 18  89:4, 6, 12
90:*1*  150:19
**existed**  10:*16*  100:*1*
102:4  150:*21*  164:*13*
**existence**  88:24  167:22
168:*10*, 15  169:24  170:7
**existing**  82:*11*
**exists**  42:*18*  97:7, 8
107:*11*  114:*16*  141:24
145:8  167:*18*  168:24
169:6, 7  170:5
**exits**  79:24
**exorbitant**  133:2
**expecting**  9:*10*  50:*11*
**experience**  74:5
**expert**  100:22
**expert-level**  157:8
**expiration**  57:*19*  58:2
67:*17*  107:21  108:5
156:*16*
**expire**  17:*18*  87:*17*
**expired**  53:4  54:*11*, 24
95:8  97:7  105:22
**expires**  64:22  172:*23*
**Explain**  64:5  75:*15*
167:*3*

**explaining**  18:7
**explicit**  125:*3*
**explicitly**  1:*4*, 3  83:*18*
138:25  142:7
**export**  66:*1*  93:*1*  164:4
**exported**  164:*11*
**exporting**  164:*15*
**exports**  146:24
**express**  80:*18*
**expressly**  80:*14*  82:*18*
100:*12*
**extent**  90:4  92:3, 5  95:3
101:7  104:23  109:4
116:*16*, 17  133:21
134:*10*  148:16
**extract**  17:*12*
**extracting**  17:*15*
**extreme**  106:*1*

**< F >**
**facet**  126:*13*
**facing**  23:4
**fact**  16:9  22:*1*, 5  45:2
50:*1*, 23  59:8  72:23
80:*17*  81:7  83:6  84:*3*
89:*16*  103:22  107:8, 9
121:*12*  122:*10*  123:6
132:*21*  134:5  138:*15*
145:*3*  150:*21*  158:4
161:*12*  170:7
**factor**  78:5
**failure**  131:*18*
**fair**  23:*13*, 20  24:*16*
36:8  52:*17*  53:*17*  54:22
62:*10*  67:21  71:7
129:25  131:22  132:8
134:*19*  145:7  148:7
149:4, *11*  162:*23*  166:*15*
**fairly**  128:22  141:*23*
**fall**  122:22
**falls**  145:*11*
**familiar**  8:*12*  32:9  75:2
76:5  85:4, 8
**family**  6:22, 25
**far**  25:6  37:*13*, 14
105:*13*  157:*17*
**fashion**  12:*17*  22:21
32:*14*  147:*18*
**fault**  125:*15*
**fax**  33:*18*  39:*23*  40:2
155:*17*
**faxes**  10:*13*  14:*14*
**feature**  155:*1*
**February**  52:*15*
**federal**  148:9
**feel**  149:6, 7
**feet**  143:*10*
**felt**  103:8
**field**  35:22
**fields**  95:*21*
**figured**  26:9
**figures**  166:*11*
**figuring**  169:*11*, 12
**file**  11:22  12:*11*  25:5
23:*18*  39:*1*  61:2  75:*18*
93:*12*, 17  114:*14*  150:*11*
158:*15*, *19*  163:*12*
**filed**  50:*23*  68:21  76:23
79:*1*  96:*19*
**files**  8:*23*  10:*12*  11:*12*
25:*23*  76:*14*  102:4
**filing**  61:24
**filled**  143:*10*
**final**  9:*1*

**finalized**  38:2
**finance**  60:20  64:3
**financial**  38:*15*, 22
40:*19*  68:24  130:*13*
**financing**  60:*21*  70:2, 4
**find**  17:23  18:8, 9
44:*18*  53:*10*  60:*12*
102:*15*  131:*19*  132:*3*
138:*18*  148:5  149:5
150:24  167:*19*
**fine**  30:*11*  71:24  82:24
92:9  112:*13*  147:24
168:*10*
**Finish**  46:9
**First**  2:*17*, *23*  5:*10*  10:7
16:*18*  20:16  32:*1*  57:*14*
68:*14*, *16*  84:2  109:*19*,
20  119:*17*  125:25
133:*16*  136:*15*
**five**  4:*14*  30:*10*  35:*13*
113:*11*  118:20  159:*13*,
*14*  168:9
**fixtures**  144:*12*
**flap**  44:*1*, 3, 4  45:*14*, 16
63:2, 5, 9, 17  64:9, *19*
65:7  99:*15*, 16, 22
102:24  103:*3*, 7, 8, 13, 20,
22  104:2, *19*  105:2, 10,
13  112:*16*  118:22  120:7,
15, 16, 18  129:*13*  156:*15*
**flaps**  99:*17*, *18*, 22, 23
**flow**  10:6
**flowing**  69:*14*
**focus**  24:22  58:4
**focused**  6:24
**folder**  91:21  161:*18*
**folders**  161:25
**follow**  40:3  41:*10*
**followed**  87:21
**following**  82:4  84:*19*
**follows**  3:6
**follow-up**  49:24
**footer**  17:7
**force-type**  11:*10*
**forever**  28:*16*  55:*15*
106:*11*  111:25
**forget**  27:21  123:*3*
**forgot**  123:*1*
**fork**  41:*17*
**form**  11:*1*  12:*15*  19:*15*
23:*24*  55:*4*, 21  57:*15*
59:5  128:*16*
**formal**  10:*11*  33:24
41:5  114:*18*
**format**  22:*3*
**formation**  56:24  62:*3*
106:2
**formatted**  119:*10*
**formatting**  119:7
**formed**  50:25  52:*1*, 23
53:7  57:*14*, *18*  101:*3*
109:*1*
**forming**  57:*13*  64:24
128:20
**formula**  168:25
**formulae**  122:25
**forth**  19:*13*  47:*14*
**forward**  15:5  18:*18*
37:*1*  47:*16*, 18  86:23
91:4, 25  95:9  131:*18*
136:*17*, 22  139:5
**forwarded**  31:*19*  87:9,
13  88:*1*, 6  89:*1*  90:2, 5,
7, 10, 17  94:21  154:*3*

160:8  161:*14*, 22  162:*14*
163:9, *18*  164:*18*
**forward-facing**  16:20
**forwarding**  29:4  85:*3*
86:*11*  87:*1*  89:*13*  90:*13*,
21  91:*3*  152:9  161:9, *17*
**forwards**  161:*19*
**foul**  25:*10*, *12*
**found**  96:7  120:8
**Four**  4:*14*  30:9
**Fox**  6:6, 7, *11*, 23, 25
**frequently**  29:*14*  48:*23*
**frivolous**  72:16
**front**  7:4  131:*15*
**full**  69:2, 24  70:6, 7
86:*1*, 3  92:20  93:20, 22
124:*13*
**fully**  70:*13*, 14
**function**  74:*17*
**fundamental**  32:*17*, 18
**fundamentally**  69:*1*
**further**  81:5  150:*1*
156:25  166:*23*  171:8
**FW**  44:*3*

**< G >**
**Gail**  76:9
**gained**  110:*15*
**gaining**  84:6  107:6
**garbage**  90:20  162:7
**gather**  27:*14*
**gathered**  88:21
**general**  7:4  18:*11*, 15
20:*15*  38:9  57:9  59:2
62:*16*  64:2  154:24
162:7  167:24  170:5
**generality**  128:*15*
**generally**  13:23  31:*18*
34:*1*  35:8  39:21, 25
42:*23*  45:*12*  47:*3*  92:*3*
133:*10*
**generate**  40:*12*  41:2
69:*16*  107:*15*  108:8
154:*12*  155:*1*, *12*
**generated**  42:8  43:*3*, 4
67:22  77:2, 10  113:22
149:*19*  154:*10*, 11, 17
155:5
**generates**  77:*16*
**generic**  19:6, 24  44:*13*
128:22
**generically**  147:*15*
**getting**  32:*15*  45:21
64:25  107:5  109:4, 23
131:24  163:*12*
**give**  15:*3*, 11  17:9
21:25  43:*14*  46:2  48:7
52:*14*  71:22  72:8, 25
75:6  79:*14*  87:*12*  89:5,
17  92:23  107:2  132:*13*,
15  135:*12*, 13  137:2, 11,
17, 24  138:3  140:*16*, 21
141:*17*  143:21  145:7, 12
159:8
**given**  10:16  16:6  53:22
147:*14*
**gives**  93:*1*
**giving**  83:*12*, 22  109:*13*
156:*17*  160:9
**Gmail**  15:*15*, 25  16:*1*
17:*1*, 10  21:*17*, 19  22:*1*,
4, 10  23:2, 5, 11, 12, 15,
16, 18, 21, 25  24:*1*, 2, 7,
15, 18, 19, 20, 23, 25  25:*1*,
4, 21  26:*12*  27:*1*, 3  48:6

*72:8, 25  74:16, 25  75:16,*
*19  76:2  77:3, 4, 11  78:2,*
*22  80:12, 15, 18  82:19*
*83:13, 19, 21  90:18  92:4,*
*5, 6  93:8, 13, 15, 16*
*97:10, 12, 18, 21  98:14*
*125:20  126:1  136:20*
*158:5*

**go** *4:15, 16  8:2  13:9*
*15:3  16:22  17:12, 18*
*18:7  19:17, 18  23:5*
*27:13  28:17  29:5, 13, 17*
*34:15  35:12  38:7  46:9*
*51:22  56:11  60:9  64:2*
*68:18  78:2  81:21*
*122:11  131:18  132:3*
*142:24  143:9, 21  144:25*
*146:1, 2  147:12  149:22*
*151:8*

**goes** *162:8*

**going** *7:14, 25  37:1*
*42:13  47:13  53:10*
*56:11  59:17  66:17  68:6*
*73:3  81:17  83:24  89:15*
*99:2  101:6  102:11, 15*
*104:2  118:9  119:2*
*125:10, 17  131:12, 15*
*133:14  137:17  140:21*
*142:19  143:8  146:19*
*151:9, 20  153:3  155:12*
*158:19  160:13, 17*
*161:11, 13  163:8*

**good** *7:16  43:23  52:21*
*55:18  109:24, 25  110:9*
*158:24*

**goods** *170:19*

**Google** *22:4  23:7  74:18*
*75:6, 7, 8, 9  76:5  77:14*
*78:3  93:13  112:11*
*115:14  122:17*

**Google-owned** *75:1*

**gotcha-type** *54:25*

**gotten** *9:15  109:10*

**government** *41:10, 11*

**grammatical** *95:12*

**Grand** *1:13, 19  3:1  4:2*
*170:16, 25  171:2, 3, 7*

**granted** *70:7*

**Great** *67:7  99:22, 23*
*123:15*

**greater** *36:24*

**grinding** *66:7*

**ground** *139:6*

**grow** *170:14*

**growth** *109:3*

**guess** *26:10  47:20*
*74:20  104:7  117:10*
*127:25*

**guys** *30:8  148:3*


**< H >**

**half** *36:6*

**halfway** *151:6*

**hammer** *36:23*

**hammering** *36:21*

**hand** *7:14  70:22, 23*
*119:2, 11  125:10  135:22*
*172:13*

**handing** *140:11  142:11*

**handles** *7:4, 6*

**happen** *5:15*

**happened** *30:7, 8  42:5*
*48:14  112:11  116:8*

**happening** *13:8*

**happens** *59:10*

**hard** *44:20  122:3*
*166:11*

**harm** *25:10, 12, 14*
*26:17, 23, 24  27:2  91:11*
*115:8, 10, 12  169:7*

**harmed** *25:17  64:17*
*167:4  169:1*

**HD** *20:22, 23  112:23*
*116:16*

**HDI** *20:22*

**head** *57:17  66:3  93:14*
*113:8*

**heart** *9:13*

**held** *149:25  150:2*

**hell** *44:11*

**Helmut** *120:19*

**help** *99:2  131:4  132:15,*
*17*

**helps** *170:14*

**HENN** *1:17*

**hereunto** *172:13*

**hey** *29:2  31:24  36:12*
*52:24  87:23  90:11, 14*
*107:9  112:13, 15  158:19*
*160:13  161:3  162:10*

**hidden** *167:24, 25*

**hide** *93:18, 19  149:7*

**highly** *147:8*

**histories** *14:4*

**history** *17:19  18:2, 9, 22*
*19:10  44:19  98:6*
*102:18  127:25*

**hold** *109:16*

**holding** *6:5  79:16*

**holds** *118:11*

**hole** *46:13*

**Holland** *169:24*

**home** *3:18, 24, 25*

**honest** *89:21*

**honor** *31:25*

**honored** *138:4*

**hosting** *122:17*

**Hotmail** *15:15, 25  17:1,*
*5, 10  26:4  27:5, 6, 8*
*28:8, 18  29:15, 24  30:1,*
*2, 3, 7  31:4, 6, 7, 8, 11, 12,*
*17  32:3  33:6, 7, 8, 11*
*34:5, 6, 24  35:5, 13, 14,*
*24  36:6, 7, 12  37:1, 3, 10,*
*14  40:2  43:1, 4  44:24*
*45:8  46:2, 6  47:10, 22*
*48:7  49:2  52:8  72:9, 25*
*73:8, 9, 19  77:3, 11*
*78:22  80:12, 15, 18*
*82:18, 20  83:19, 21  86:7*
*87:8, 13, 22  88:5, 25*
*89:1, 12  90:5, 19  91:15,*
*18  93:9, 24  97:10  98:16,*
*21, 25  99:20  100:1*
*102:1, 5, 7, 8  112:20*
*125:20  126:1, 5  136:3,*
*20  137:7, 24  139:13, 15*
*140:17  141:19  143:3*
*150:6, 12  151:2, 24*
*152:8  153:11, 16, 24*
*154:11, 15, 16, 19  155:2*
*158:5, 13  160:5, 8, 13, 17,*
*21, 22, 25  161:11, 14, 24,*
*25  162:13, 16  163:10, 15,*
*18  164:8, 11, 12, 16, 19,*
*22  165:3*

**hour** *29:4*

**hundred** *122:25*

**hundreds** *21:13  54:2*

*88:19  145:17*

**hurt** *167:15  168:23*

**hypothetical** *58:22*
*151:11, 16*


**< I >**

**ID** *81:13, 15*

**ID.23** *81:24*

**idea** *25:15  26:11  37:16*
*113:8, 18  141:12, 22, 23*

**identical** *54:18  98:25*

**identification** *148:17*

**IDENTIFIED** *2:8*
*148:25*

**identify** *26:17  133:5*
*134:4, 5  139:17  146:6*
*147:18*

**identity** *167:14*

**II** *114:5*

**illiteracy** *68:24*

**images** *119:18, 21  120:1,*
*3, 7, 10  121:20, 22*
*123:22  125:4*

**IMAP** *85:6, 7*

**immaterial** *61:10*

**immediate** *30:11*

**Immediately** *28:4, 6*
*65:1  84:16, 19*

**implied** *139:9, 11*

**imply** *131:21*

**import** *45:12  63:4, 13*
*103:5  129:14, 15  157:15*
*158:1*

**important** *14:3  68:5*
*168:22  170:10, 12*

**imported** *44:6, 7  129:13*
*156:16*

**importing** *164:16*

**imposed** *52:17*

**impossible** *35:2, 4  61:6*

**inadequate** *25:15*

**inbox** *161:25*

**inch** *44:2*

**include** *59:10  82:3*
*99:12  106:3*

**included** *83:17  99:19*
*101:17*

**includes** *7:21  58:20*
*80:15  82:2*

**including** *11:11  56:24*
*64:24  76:14  82:6  83:7*
*96:7  100:2  126:11*
*144:10*

**inclusive** *77:11, 19*
*144:19  147:3*

**income** *20:9*

**incomes** *79:3*

**Incoming** *14:14  28:9*
*73:10  74:5, 7, 9  75:13*
*85:4, 9*

**incomplete** *38:23  46:11*

**Incorporated** *20:23*

**incorrect** *23:19  77:6*
*97:13*

**incredibly** *22:9*

**independent** *112:11*

**Indiana** *170:22*

**indicate** *17:9  18:13*
*35:23  44:5  63:5, 16*
*64:20  73:23  80:14*
*83:20  93:3, 7  101:6*
*113:5  114:7  127:6*
*131:24  136:15  142:19*
*143:2*

**indicated** *10:7  22:16*
*24:22  25:3  27:6  31:14*
*32:21, 22  34:2, 16  35:22,*
*25  45:15  47:25  53:3*
*60:12  61:21  64:8  68:7*
*69:22  73:19  74:16  77:3*
*78:5, 12  87:7  94:10*
*98:15  113:2  115:25*
*117:23  132:18  155:9*
*159:22*

**indicates** *57:3  65:12, 15,*
*19  77:1  80:2  83:11*
*96:13  97:22  122:8*
*125:25  157:16  159:6*

**indicating** *37:22  44:22*
*47:7  74:23  86:5  98:15*
*115:8  137:5  138:19*
*141:18  142:20*

**indication** *33:17  48:8*

**indications** *67:19*

**indicative** *93:25  123:1*

**indicator** *52:21*

**indirectly** *60:19  63:22*

**individual** *163:4*

**INDUSTRIAL** *1:5  2:9,*
*15, 21  5:20  6:5  24:16*
*43:17  51:1  52:5  57:8*
*154:25*

**Industrial's** *157:24*

**industry** *18:6  168:3, 5*

**Inefficiency** *41:12*

**info** *29:9  136:17, 22*

**info@lehighvalley** *28:23*

**info@lehighvalleyabrasive
s** *16:17*

**info@lehighvalleyabrasive
s.com** *18:16  29:20*
*136:22*

**information** *10:14  11:2,*
*11, 16  12:13, 15  13:7, 24*
*14:3, 7, 11, 24  17:6, 13,*
*15, 20  18:21, 25  19:1, 4,*
*11, 21, 22, 23, 24  21:1, 6*
*22:5  24:7  25:25  26:2, 4*
*27:14  33:1  34:1  35:5,*
*12  38:15, 18  39:9, 17*
*40:14, 24  41:9  42:23*
*43:7, 12, 15, 23, 24, 25*
*44:19  45:10, 17  46:3, 12,*
*16, 18  47:16  50:22*
*54:21  62:4  63:12  66:24*
*68:12  73:11, 21  74:7*
*75:17  76:4, 7, 10, 12, 14,*
*24  77:16  78:17, 25  79:6,*
*8, 21, 23, 24  82:10  88:21*
*97:24  98:4, 6  99:12*
*101:7, 10, 13, 16, 20, 22*
*102:22  104:12  105:5, 15*
*106:2, 7  107:18  109:17*
*110:11  111:11  113:23*
*114:1, 3, 4, 6, 17, 20, 22,*
*115:1, 2, 5, 13  116:9,*
*12  117:3, 5, 6, 18, 23, 25*
*118:1, 3  122:16  126:24*
*127:3  128:7, 14, 16, 18*
*129:9  130:11  133:11*
*135:13  137:22  140:5*
*147:9  150:11  153:15*
*154:13, 17  156:9, 12*
*158:23  160:14  161:20*
*163:12, 13, 14  164:12*
*169:9, 10, 15, 18, 20, 21*
*170:10*

**infrastructure** *65:1*

**infrequently** *28:12*

**infringing** *115:9*

**initial** *32:2  69:11, 18*
*145:5*

**Initially** *21:13  87:1*
*128:8*

**input** *96:9*

**inquiries** *73:11  74:9*
*77:13, 18*

**inquiry** *40:2*

**inserted** *166:7*

**instance** *72:3  106:25*

**instances** *31:19*

**instructions** *87:21*

**insufficient** *107:20*

**intangible** *9:23  132:10*

**Intangibles** *82:5  122:13*
*132:18  166:10*

**intellectual** *10:4, 5*
*52:19  54:14, 17, 20*
*71:13, 20  82:13  94:1*
*95:10  99:11  113:25*
*114:2  122:21, 23*

**intend** *132:6*

**intended** *17:16  27:24,*
*25  101:8*

**intent** *25:13, 14  26:1*
*61:1  166:17*

**intention** *17:16  18:17*
*141:4*

**intentions** *58:23*

**intents** *61:3*

**interacted** *164:13*

**interacting** *126:11*

**interactions** *22:8*

**internal** *85:2*

**international** *165:13*

**Internet** *28:16  34:7*
*127:3, 8  167:20*

**Internet-based** *170:21*

**interpret** *61:15  157:7*

**interpreted** *10:25*

**Interrogatories** *2:17*
*127:2*

**Interrogatory** *126:19*
*128:19  129:16  130:6*
*133:3, 9  134:1  144:3*

**interrupt** *126:12*

**introduced** *80:21  150:25*

**inventory** *10:2  63:10*
*156:23*

**invest** *60:19  156:22*

**investing** *63:23*

**investments** *6:22*

**invoice** *40:16  41:15, 16,*
*18, 22, 23  42:8, 9, 10, 11,*
*13, 16, 17, 18, 21  43:3, 4*
*149:18  154:16  155:13*

**invoiced** *40:14*

**invoices** *42:25  43:8*
*154:10  155:1, 4, 15*

**invoicing** *40:21  154:9, 21*

**involved** *3:16  47:3*

**involving** *5:20  23:25*

**Irrelevant** *162:4*

**irreparable** *115:9*

**irresponsible** *117:14*

**ish** *4:14*

**issue** *23:12, 14, 16, 17, 19,*
*20, 25  24:11, 13  25:2, 10*
*30:14  40:11  41:25*
*52:18, 19  106:5  112:14,*
*15  151:17  158:20*
*167:12, 13, 21*

issues 71:20, 21 132:14
148:16 151:1
issuing 63:25
item 33:21 39:15 40:10
41:19 138:23 141:14
145:22
items 32:8 82:21
122:19 149:17
its 65:21 75:21, 23
80:25 114:21 122:11
129:2 153:7
IV 116:22

< J >
JABOUR 1:23 172:8, 21
January 64:21, 23 65:2
Jersey 33:2, 4 72:20
94:20 128:4, 7
John 41:3
jpeg 8:23
judge 151:8, 10, 14
jump 72:18 170:15
jumped 169:14
jumped-skipped 169:14
jumping 130:6 133:3
June 146:4 147:14
148:24
junk 29:5 91:2 161:9
162:5, 8
Jury 2:10

< K >
Kent 4:4, 5 5:3 172:5, 9,
21
kept 31:1 161:18
kill 60:5
kind 9:1 28:24 33:3
75:5 125:20 129:20
kinds 53:22 153:19
162:2
Klaviyo 164:3, 7
knew 72:8, 12 105:14
157:15 168:12 169:23
know 5:10, 15, 18, 19
9:10 10:2 11:2, 10, 13
12:7, 19 13:21 14:4, 6,
22 15:4, 5, 8 17:17 18:2,
4, 7, 19 19:13, 20, 25
20:15 21:9 22:24 23:6
24:6 26:13, 15 27:21
28:10, 12, 15, 24 29:2, 8,
9, 11, 17, 19 30:8, 9, 10,
15 31:20, 23, 24, 25
33:23 34:23, 25 35:19
36:22 37:13, 15 38:5
39:5 40:5, 19 41:1, 20
44:15, 18 45:2, 10, 12, 14
48:21 49:3, 15, 23 52:25
54:2 55:10 56:9 57:13,
15, 17 58:8, 21 59:7, 19,
21, 25 61:1 62:15 66:3
69:13 72:19 73:12, 14
74:2, 12 78:6, 8 79:9
81:6, 18 82:15 84:21
85:16, 25 86:8, 11, 12
89:14 90:18 91:1, 8
92:9, 21 94:14, 22 97:5,
7 98:11, 22, 25 99:4, 24
102:8 104:8 107:11, 24
109:7 111:8, 10, 23
112:17 113:3 116:4, 10,
14, 16, 17 117:10, 11
119:22 120:12, 13, 21
122:1 125:1, 7, 8 126:22
127:4, 10, 11 128:4, 6

130:9, 24 131:7, 16
132:16 133:22 134:4, 12
137:3 138:23, 25 139:21
140:7, 8 141:13 144:20
145:5, 12, 18, 21 147:19,
25 148:13 149:2, 9, 15
150:15, 18 154:1, 4, 6, 22
155:24 156:3 157:1
158:3 161:17 162:5, 6, 7,
8 164:13, 24, 25 167:17
168:18
knowing 144:3 168:24
knowledge 13:4 26:20
62:8 102:11 105:22, 25
107:6, 14 110:11 139:5
157:8 167:18, 20 169:7
170:11
knowledgeable 7:9
known 71:9, 17 93:20
105:13 169:8, 10
knows 131:9 169:5, 6

< L >
label 105:17 157:20
168:1, 2
labeled 54:16 99:13
labeling 170:12
lack 147:6
lacking 19:5
Lake 1:21
Langlois 4:10, 12
language 51:11, 13
122:18
large 11:9 13:16 23:8
75:17 88:8 165:16
largely 149:9
late 131:8, 17 140:15, 20
launch 58:23 65:1
launched 32:20 57:18
58:25
launching 56:25 59:3
law 114:19
lawsuit 21:24 72:17
91:10 158:15, 19 159:25
lawyer 155:21
lay 156:6, 21 157:6
layer 49:5 77:8
layers 77:7
layman 121:17
layperson's 155:23
lead 40:7
leap 122:3
learn 52:7 169:18
learned 47:21 93:22
168:12 169:18
left 3:25 18:16
legal 109:19 121:15
148:10 168:22
Lehigh 2:13 42:11
45:11 50:8 51:2 52:5, 9
63:3 77:1, 9 78:21 87:5,
9, 14 88:6 89:2 90:23
91:25 96:3, 14 99:14
100:12 106:12 108:22,
23 109:1 110:18 112:3,
16 120:25 121:4, 6, 11
122:14 136:21 139:18
143:14, 15 144:9, 14
152:15 153:10, 23 158:7
159:7 160:22 164:9
165:20 167:6 168:8
lehighvalley 29:9
lehighvalleyabrasives.com

16:12, 13, 16, 22 121:9
length 31:1
lengthy 151:1
LESPERANCE 1:17
lets 107:7
letters 96:16
lev 110:9
LeVasseur 1:21 2:4, 6
3:8 7:13, 17 8:6 10:21
13:13 19:16 20:7 22:15
23:10 24:1, 5 34:11, 14
36:2 37:8 49:16 53:24
54:8 55:2, 8, 14, 23 56:2,
3 59:23 60:3, 5, 8 61:12
66:12 67:1, 4, 8 70:21
80:22 81:1, 5, 17 82:17
85:15 90:4 91:5 106:17
110:13 113:12, 14 118:8
119:1, 19 125:14, 16
131:20, 23 133:23 134:9
135:21 137:1 140:10
141:6 142:10 143:1
146:14, 17, 19 147:1, 4
148:8, 21 149:24 150:1
163:21 167:2 168:19
171:8
level 5:14 106:25 108:6
leverage 109:4
leveraging 108:21, 24
109:2
libraries 82:12 122:20
license 82:13, 14 122:1,
20 124:14, 20, 21, 22, 24
125:1, 2, 3
life 12:22 168:4, 6, 7
lifted 55:20
lifting 68:8
light 16:1
likewise 92:3
limitation 82:3
limited 9:17 53:13
limiting 54:22
line 39:15 61:5, 8, 9
113:10 167:7
link 75:7 97:6
linked 23:7 29:16 38:1
75:11
linking 75:14
links 97:6
liquidate 130:20
liquidated 68:1 113:20
130:2, 3, 23 131:1, 3
132:20 133:2 135:7, 9,
12 166:4, 6, 15
list 10:8, 10, 15, 17, 24
11:1, 2, 4, 21 26:5 46:7
53:14, 20 54:2 65:11, 18
92:14, 15, 16, 20, 24
101:11, 12, 17 102:19
112:10, 19 116:1, 3, 7
128:13, 14, 15, 17 133:6,
8, 10, 24, 25 134:7, 10
146:23 150:6, 11, 16, 21
164:11
listed 57:1 74:3
lists 9:18 12:25 66:15
68:13 76:13 110:11
118:2 128:11 156:7
literally 23:7 36:5
92:19, 23 95:18 110:16
litigating 5:17
litigation 3:15 4:21
5:20 7:8 16:4 23:13
25:2, 11 68:14, 16
109:16 128:3

little 8:7 18:10 30:18
47:13 69:12 75:4 86:2
live 163:13
lived 151:22
living 50:12 93:5
LLC 1:5 5:25 6:5, 6
57:14, 15 129:11, 12
LLC's 2:9, 15, 21
local 4:1 5:1, 2 44:7, 16
78:14
locally 33:1
located 10:11 170:16, 24
location 171:3, 4
locations 170:18
locked 27:23 84:3, 5
log 78:1
login 137:11
log-in 78:2
Long 1:21 15:8 18:17
28:10 31:2 36:21 50:15,
16 84:18 89:13 101:5
104:25 131:9 155:8, 9
157:12, 14, 25 158:24
159:4 165:22 169:19
longer 33:9 52:16
85:13 86:15 90:17 95:5
112:25 132:4 152:14
159:5, 7 167:5
look 7:18, 25 17:19
18:2 21:3 36:3 37:23
43:6 44:12 52:22 58:24
88:18, 20 94:4 95:9
96:10 97:8 110:16
143:25 148:4
looked 38:17 43:8 88:4
96:19 128:2
looking 17:23 18:5
34:21 43:6 45:3, 14, 16
74:20 78:24 80:4 81:8,
16 83:11 86:17 88:13
144:16 146:11 159:5
looks 8:1
lose 48:7 97:20
loss 108:12 117:15, 16
131:10 132:7, 11
losses 130:13 132:1
lost 25:1 37:10, 14, 19
46:20, 25 48:6, 8, 17, 19
60:21 61:7 112:21
115:18 116:4, 14 117:11
126:2, 3
lot 29:5 36:19 55:13
69:11 90:19 154:9
155:8 156:15 170:4
lots 61:2 106:24 141:5
162:18
love 111:1
low 107:2, 8
lump 39:6, 7
LVA 16:14 96:13, 16

< M >
Machine 127:20 128:2
machinery 51:3 52:2
62:24 101:5 120:20
143:15 144:11, 15
machines 66:6 120:19
macys.com 91:1
mail 8:14 29:5 91:2
161:9 162:5 163:12
164:17
Mailchimp 164:4, 7
mailing 164:3
maintained 76:8 150:15

maintaining 128:10
major 165:13
majority 78:11
making 25:22 26:8
66:18 78:24 91:12
96:22 117:9 146:8
153:4 156:22
manage 6:22 60:19
63:24
management 6:25 23:3
31:22 47:12 49:2 60:21
64:3 74:18
manager 7:4, 6 72:19
managing 63:25
manipulation 29:12
152:20, 24 153:1
manufacture 101:4
120:15, 16
manufactured 105:20
157:11 165:5
manufacturer 100:9
103:8 105:10, 18 120:18
165:7, 17 167:25
manufacturing 118:21
120:7 157:3, 9
March 35:14 36:4 94:6,
16 95:7 126:14 140:15
150:22 159:10
mark 7:14 118:9, 23
marked 7:12, 15 70:20,
23 118:7, 25 119:2, 13
125:13 135:20 136:24
140:9, 11 142:9, 11, 21
Market 1:13, 18 26:4
103:13 105:16 167:18,
20 170:5, 10
marketed 52:8, 20
105:16 116:17 143:14
144:9, 14 147:9
marketing 17:6 28:14
52:23 100:21 102:25
103:24 108:25 111:11
113:23 115:6 164:16
165:2
mass 112:18
mass-market 112:10
match 39:12 132:9
material 99:24 106:2
materials 9:20 99:18
matter 31:2 72:23
125:11 144:23
matters 140:3
MAUREEN 1:23 172:8,
21
mean 10:22 13:20
19:22 23:16, 24 30:14
32:8 40:4 42:11 45:4
49:25 51:16 55:12 63:8
72:6, 7, 16 75:16 80:21
85:11 95:11, 18 96:18
101:8 109:21 119:8
129:2 130:9 134:20
136:22 137:20 141:3, 14,
22 145:10 152:24
154:12, 19 155:16
165:10 169:17
meaning 10:10 11:5
32:9 39:15 40:10 95:13
163:4 169:24
means 37:11 38:8
39:23 45:12 95:21
114:19 136:18 153:9
163:23
meant 11:3 95:13

131:*21* 157:*7*
**measure** 115:*17*
**measuring** 52:*4*
**mediation** 66:*15*
**mediator** 66:*24* 131:*15*
**medical** 50:*3, 5* 73:*21*
**meet** 8:*18*
**meeting** 8:*16*
**member** 5:*23* 6:*5, 7, 9*
**members** 6:*2, 4* 31:*20*
49:*3*
**memorized** 66:*5* 89:*24*
**memory** 48:*9* 79:*11, 25*
**mentioned** 38:*25* 48:*22*
61:*7* 94:*12* 130:*3* 152:*6,*
*8, 13* 153:*13, 21*
**mentioning** 151:*18*
**merchant** 69:*7* 75:*8*
**mere** 76:*13*
**merely** 58:*8* 61:*21*
108:*10*
**message** 18:*13* 29:*7*
87:*3* 90:*11, 14* 152:*13*
161:*14, 16*
**messages** 29:*1*
**messy** 69:*12*
**met** 8:*16*
**Metabo** 110:*16* 170:*6, 7,*
*8*
**metadata** 96:*13, 17*
**metal** 144:*11*
**metalworking** 51:*2* 52:*3*
**method** 34:*2* 76:*3* 85:*9*
98:*22* 164:*2* 169:*11*
**methods** 50:*10* 98:*21*
**MICHIGAN** 1:*2, 14, 19,*
*22* 3:*1* 156:*4* 170:*22*
172:*4, 9, 22*
**Microsoft** 77:*15* 82:*15*
85:*5* 153:*7* 154:*19, 22*
**Microsoft/Hotmail** 82:*16*
**middle** 141:*13*
**middleman** 100:*8*
**migrate** 13:*21* 33:*2*
36:*11*
**migrating** 12:*20* 13:*22*
**migration** 13:*8, 14* 14:*2*
**military** 41:*4*
**million** 117:*11*
**mind** 57:*5*
**mine** 137:*25* 139:*8*
141:*10*
**minimum** 98:*12* 121:*25*
123:*24* 124:*2* 135:*6*
**minor** 22:*9*
**minus** 159:*23*
**minute** 56:*12* 135:*24*
137:*2*
**misappropriation** 116:*22*
**Miscellaneous** 122:*19*
**mischaracterization** 84:*5*
106:*1* 139:*16*
**mischaracterize** 10:*22*
**misconstrues** 10:*19* 34:*8*
84:*18* 106:*14* 110:*4*
**misrepresented** 122:*5*
**missed** 142:*24*
**missing** 138:*21* 141:*21,*
*24* 146:*4* 160:*14*
**mistake** 51:*25* 93:*7, 9,*
*10, 18, 20*
**misunderstood** 34:*18*
**mode** 119:*15, 22*
**moment** 24:*3* 36:*25*

139:*7* 142:*14* 149:*23*
**Monday** 159:*7*
**monetary** 151:*17*
**money** 31:*23* 69:*14*
151:*19* 163:*14* 169:*12*
**monitor** 48:*22, 23* 153:*5*
**monitored** 37:*17, 19, 22*
90:*15* 152:*14*
**monitoring** 153:*11* 161:*7*
**month** 35:*14* 36:*4* 39:*8*
159:*16*
**Monthly** 48:*24*
**months** 15:*9* 30:*9* 48:*2*
131:*14* 158:*2* 159:*4, 13,*
*15*
**morning** 22:*11, 16* 80:*12*
92:*12*
**mouthful** 16:*15*
**move** 45:*21* 47:*16, 18*
**moving** 55:*13*
**multiple** 10:*12* 17:*7*
36:*20* 55:*25* 90:*9* 99:*15*
153:*5* 157:*12* 165:*24*
**multitude** 33:*25*
**Muth** 146:*24, 25*
**mutual** 33:*14* 66:*14*
159:*3*
**mutually** 166:*9*

**< N >**
**name** 3:*9* 4:*8* 5:*21*
18:*19* 20:*15, 16, 17, 18,*
*21, 23* 36:*24* 41:*3* 42:*21*
57:*4, 13, 14, 18* 58:*1, 9,*
*12, 19, 24, 25* 59:*2, 10*
61:*22, 24* 62:*1* 96:*4*
110:*14* 112:*12* 122:*14*
146:*25* 165:*11*
**names** 3:*19* 14:*5* 115:*5*
122:*25*
**name's** 57:*16*
**narrow** 128:*24*
**native** 155:*1*
**nature** 18:*6* 37:*11* 50:*8,*
*17* 51:*4* 52:*6* 53:*2* 57:*9*
65:*22* 67:*24* 68:*23* 69:*5*
93:*4, 20, 22* 109:*7* 112:*9*
129:*2* 130:*9, 18, 22*
132:*21, 22* 134:*5*
**near** 14:*17*
**necessarily** 17:*16* 19:*3*
20:*13* 42:*21* 49:*3* 98:*20*
128:*16* 141:*14* 159:*22*
**necessary** 82:*7*
**need** 18:*2* 41:*7* 56:*9*
91:*9* 92:*7, 9* 109:*20*
148:*16*
**needed** 17:*13* 22:*20*
23:*5* 43:*8* 69:*11* 82:*10*
**needs** 138:*25*
**negative** 48:*18*
**negotiate** 107:*13* 108:*1*
166:*4*
**negotiating** 157:*1* 166:*17*
**neither** 60:*18*
**Netherlands** 120:*15*
169:*25*
**never** 21:*21* 25:*1* 46:*19*
48:*6* 75:*13* 84:*14*
105:*16* 107:*22* 109:*25*
110:*8* 112:*5* 119:*14*
124:*17* 128:*12* 137:*23*
140:*22* 162:*12* 164:*12*
168:*15* 170:*1*

**new** 15:*7* 28:*19* 33:*1, 4*
69:*15* 72:*20* 85:*20* 86:*4*
94:*20* 105:*1* 107:*1, 14*
108:*9* 110:*19* 117:*17*
128:*4, 7* 132:*12* 138:*13,*
*14, 15* 153:*2* 170:*13*
**newsletters** 28:*14*
**nicely** 8:*24*
**nightmare** 13:*21*
**nine** 45:*22*
**non-compete** 49:*7, 10*
50:*6* 51:*7, 24* 52:*17, 18*
53:*4, 8, 16* 54:*10, 19, 22,*
*25* 55:*6, 15* 56:*4, 7, 12,*
*14, 15, 17, 22* 57:*3, 11, 20*
58:*2, 10* 59:*11, 14* 60:*9*
61:*23* 62:*9, 18, 25* 64:*21*
66:*2* 67:*12, 13, 19, 23, 25*
68:*9, 11* 71:*7, 12, 15, 19*
93:*3* 95:*3, 7* 103:*2*
104:*25* 105:*22* 106:*10*
107:*22* 108:*6* 111:*25*
112:*2* 129:*3, 8* 130:*18*
135:*6* 156:*17, 20, 21*
157:*4, 7, 16* 166:*7, 10, 16,*
*19*
**non-competes** 51:*12*
**non-competing** 110:*21*
**noncompetition** 60:*15*
**non-competition** 103:*1*
166:*1*
**non-exclusive** 54:*1*
**nonprofit** 127:*22*
**nonstock** 40:*9*
**non-stock** 41:*19*
**Notary** 172:*8, 21*
**note** 13:*24* 61:*4* 70:*9,*
*11, 15, 17, 19*
**noted** 66:*13*
**notes** 70:*8*
**notice** 9:*22*
**notices** 109:*16*
**November** 126:*4* 135:*23*
136:*2, 6* 159:*14*
**nuance** 68:*7*
**number** 19:*6, 9, 24*
29:*15* 33:*23* 36:*18*
39:*11, 12* 44:*14* 46:*24*
66:*7* 81:*14* 84:*24*
116:*25* 125:*18* 126:*8, 20*
129:*20* 135:*13, 14*
142:*12* 143:*9* 146:*13, 22*
149:*1, 14* 151:*25* 161:*8*
167:*3* 170:*9*
**numbers** 9:*19* 14:*6*
39:*12* 44:*13* 82:*6*
122:*14* 142:*18*
**numerous** 152:*9*
**nut** 99:*17*

**< O >**
**object** 133:*14* 168:*17*
**Objection** 10:*19* 14:*8*
19:*15* 22:*12, 23* 23:*24*
34:*8* 35:*16* 37:*5* 49:*13*
53:*18, 25* 55:*1, 4, 21*
59:*17* 84:*17* 104:*10*
106:*14* 110:*4* 131:*12*
133:*18* 140:*25* 163:*21*
**objections** 131:*16*
**objective** 59:*5*
**objectively** 149:*2*
**obligation** 50:*20, 24*
128:*21* 129:*1, 5*

**obligations** 49:*10* 56:*6*
148:*13*
**obtained** 14:*13* 28:*7*
126:*15*
**obviously** 5:*19* 8:*11, 17*
13:*20* 35:*8* 43:*13, 21*
50:*11, 19, 21* 55:*16* 56:*6*
71:*12* 84:*24* 85:*1* 90:*6*
93:*4* 99:*10* 113:*24*
**occasionally** 44:*12*
**occasions** 4:*18*
**occur** 40:*25* 49:*23* 56:*7*
69:*11, 17, 18*
**occuring** 86:*11* 94:*15*
**occurred** 8:*19* 9:*3*
37:*16* 46:*10* 53:*9* 68:*25*
69:*7, 19* 79:*22* 85:*10*
86:*14* 89:*14* 90:*10*
93:*21* 94:*14* 107:*18*
157:*23* 160:*1* 161:*5*
**occurring** 12:*24* 13:*5*
39:*15*
**occurs** 49:*3, 4* 157:*22*
**October** 8:*11* 49:*20*
56:*23* 66:*18* 67:*11, 17,*
*18* 158:*7* 159:*14* 165:*20*
**office** 6:*22, 25* 7:*1*
31:*20* 72:*19* 86:*25*
155:*18* 171:*6, 7*
**offices** 90:*22* 171:*1*
**official** 153:*10* 154:*3*
**offline** 39:*13, 14* 40:*8*
41:*1, 2* 42:*10* 43:*5*
96:*24, 25*
**off-the-shelf** 105:*2*
**Oftentimes** 45:*10*
**oh** 18:*9* 28:*17* 44:*12*
45:*10* 54:*4* 71:*23* 89:*7*
125:*2, 15* 135:*17*
**Ohio** 170:*22*
**Okay** 3:*22* 4:*17* 5:*19,*
*23, 25* 6:*4* 7:*8* 8:*7* 10:*7*
11:*15* 12:*9, 15* 13:*8, 17*
14:*10, 16* 15:*23* 16:*4*
17:*9* 18:*21* 20:*8* 21:*17,*
*18, 24* 22:*10* 23:*20*
26:*10, 16* 28:*7* 29:*21*
30:*20* 32:*3, 11, 14, 16*
33:*5* 34:*11, 21* 36:*3*
40:*19* 44:*22* 45:*24* 46:*7*
51:*19, 21* 56:*11* 57:*4*
58:*4* 59:*6* 60:*2* 61:*11*
62:*6, 12, 23* 63:*12* 64:*12*
65:*10, 14* 66:*9* 68:*20*
71:*4* 74:*2, 20* 75:*24*
76:*2, 22* 78:*24* 79:*5, 13,*
*23* 80:*8* 81:*15* 82:*18*
83:*15* 87:*12* 89:*15, 21*
94:*5, 16, 24* 98:*5* 99:*22*
100:*19* 101:*6* 104:*5, 17,*
*23* 105:*21* 106:*10, 18, 22*
108:*10* 109:*23* 110:*14*
111:*13* 116:*14* 118:*4*
119:*23* 121:*20* 123:*7, 13,*
*14, 15, 17* 124:*8* 125:*24*
126:*21* 127:*1* 128:*2*
132:*24* 134:*10* 135:*12*
136:*1* 137:*4* 138:*9*
139:*11* 144:*5, 24* 145:*1,*
*14* 146:*18* 147:*11* 148:*6*
151:*5* 154:*25* 155:*4, 11*
157:*14, 22* 159:*1, 11, 24*
163:*2, 15* 164:*18* 165:*9*
168:*10, 23* 169:*13, 21*

**old** 69:*15*
**omitted** 61:*5*
**once** 28:*11, 15* 32:*20*
40:*24* 41:*19* 85:*12, 17*
116:*23*
**OneDrive** 154:*22*
**one-inch** 44:*3*
**ongoing** 131:*14*
**online** 12:*4, 5, 6* 29:*16*
33:*1* 37:*25* 38:*20, 25*
39:*7, 8, 13, 18, 22, 23*
40:*3, 7, 10* 41:*1, 6, 24*
42:*9* 43:*5* 51:*4* 54:*3*
74:*12, 25* 75:*21* 77:*12,*
*14, 19* 78:*13* 100:*15*
149:*21* 162:*6*
**on-premises** 12:*5*
**Open** 151:*1*
**operate** 22:*19, 20* 60:*19*
64:*1* 82:*10* 122:*16*
**operating** 18:*11*
**operation** 60:*21* 64:*3*
**opinion** 168:*21*
**opportunity** 36:*24*
**opposed** 7:*1* 11:*2* 12:*16*
21:*12* 34:*6*
**opposing** 162:*19, 21*
**opposite** 151:*23*
**optimization** 75:*7*
122:*19* 132:*11*
**options** 109:*20*
**oranges** 169:*2*
**order** 12:*1* 16:*23* 18:*25*
19:*5* 20:*4* 22:*20* 26:*4*
28:*11, 12* 29:*22, 24* 30:*2*
31:*4, 15* 32:*1, 3, 6, 7, 11,*
*13, 14* 33:*6, 8, 12, 16, 17,*
*18, 20, 24* 34:*19* 35:*21,*
*22* 36:*12, 14* 39:*1, 4, 16*
40:*1, 2, 10, 11, 12, 13*
41:*6, 14, 15, 16, 17, 18, 22,*
*23, 25* 42:*1, 2, 3, 5, 16, 24*
63:*25* 67:*16* 69:*18*
75:*13* 81:*7, 11* 88:*25*
107:*8* 130:*10* 153:*3*
163:*9*
**ordered** 18:*23* 21:*3*
104:*21*
**orders** 14:*15* 18:*14*
28:*9, 20* 29:*10* 30:*12, 17*
32:*7* 34:*6, 17, 24* 35:*13*
36:*1, 4, 13* 37:*2, 9, 13, 24*
38:*25* 39:*6, 13, 19, 22, 23,*
*24* 40:*8* 69:*10* 73:*10*
74:*10* 77:*12, 18, 22*
78:*21* 90:*12, 16* 91:*4, 14*
92:*5, 6* 153:*22* 158:*22*
161:*9*
**orders@lehighvalley**
28:*23*
**ordinary** 13:*8, 17, 20*
**organism** 93:*5*
**organizations** 165:*16*
**organize** 8:*25*
**original** 9:*19* 114:*19*
115:*15*
**originally** 88:*5* 96:*19*
**originated** 160:*20*
**outgoing** 90:*11*
**Outlook** 36:*19* 85:*5, 23*
153:*8*
**out-of-office** 18:*13* 87:*3*
90:*14*
**outside** 148:*12*

overlap 101:*14, 18*
overpriced 96:*1*
overseas 99:*25* 100:*2*
oversimplification 100:*11*
owe 151:*19*
owed 128:*21*
owned 16:*2* 43:*14*
   86:*13* 123:*22* 124:*17*
   134:*18* 136:*13* 141:*19*
   168:*8, 14*
owner 114:*6* 125:*4*
ownership 60:*20, 25*
   64:*3* 72:*5* 114:*20*
   120:*10* 121:*4* 122:*22*
   140:*22*
owns 121:*20* 122:*3, 8*

**< P >**
P&Ls 39:*3*
P35981 1:*21*
P76640 1:*18*
PAGE 2:*2* 7:*24, 25*
   40:*5* 81:*13, 14, 15, 24*
   96:*15* 100:*21* 109:*1*
   110:*17* 119:*17, 20, 21, 25*
   122:*13* 125:*22, 23* 126:*4*
   128:*9* 136:*15* 137:*10*
   142:*20* 150:*25* 151:*6, 7*
pages 17:*8* 96:*17* 119:*5,*
   *16* 146:*2* 147:*15* 172:*10*
paid 41:*24* 42:*14, 15, 16*
   69:*24* 70:*5* 112:*17*
paper 143:*11*
paragraph 60:*15* 61:*6*
   71:*2* 73:*7* 74:*3, 20*
   75:*15* 76:*12, 22* 77:*1*
   83:*16, 20* 86:*17, 20* 87:*6*
   92:*11* 93:*7* 94:*4* 95:*9*
   97:*9, 22* 113:*15* 114:*5*
   115:*8, 11, 24* 116:*20*
   117:*20* 122:*13* 126:*8*
   129:*16, 18* 130:*8* 134:*25*
   135:*1* 143:*13, 25* 144:*7,*
   *8, 13, 18* 145:*2, 6, 16*
   146:*5*
parse 153:*7*
parsed 79:*10*
parsing 49:*22, 25*
part 12:*9* 13:*22* 19:*6, 9,*
   *24* 33:*23* 39:*11, 12* 41:*6*
   44:*13, 14* 56:*14* 57:*12*
   60:*23* 61:*13* 65:*19* 77:*5*
   83:*8* 88:*12* 90:*13* 91:*2*
   93:*10* 101:*23* 110:*2*
   111:*23* 121:*14* 125:*9*
   128:*6* 131:*18* 158:*22*
   168:*7*
Partial 19:*23* 66:*19*
participate 60:*20* 64:*2*
participating 64:*4*
particular 18:*22* 114:*1*
   128:*25* 158:*20*
partnership 15:*1* 30:*15*
parts 54:*3* 100:*1*
party 4:*21* 109:*21*
   162:*19, 21*
passed 84:*10*
passing 158:*22*
password 12:*1* 27:*21*
   28:*2* 29:*17* 48:*20* 83:*22,*
   *25* 84:*7, 25* 85:*16, 17, 18,*
   *19, 20, 23* 86:*5* 93:*8*
   97:*18* 98:*14* 126:*6*
   137:*11* 138:*11* 160:*3*

passwords 27:*20, 23*
   29:*16, 20* 82:*9* 83:*21*
   84:*16* 97:*11, 20* 98:*13*
   122:*15*
paste 94:*23* 95:*19*
path 28:*25* 35:*22* 40:*25*
   41:*16*
paths 11:*5*
pathway 40:*20*
Pause 13:*11* 144:*8*
pay 70:*7, 13*
paycheck 6:*13*
paychecks 6:*15*
paying 69:*2, 9, 15*
payment 20:*9* 70:*7, 9*
PC 1:*20*
pdf 8:*24* 28:*15* 33:*24*
pending 131:*9*
pens 114:*14*
people 16:*18* 18:*14*
   28:*21, 25* 29:*12* 33:*25*
   36:*11* 41:*9* 45:*21, 22*
   116:*6* 132:*3* 163:*7*
   164:*5* 165:*11* 170:*21*
   171:*5*
percent 22:*25* 26:*13*
   30:*25* 77:*1, 9* 78:*8, 9, 13,*
   *14, 21* 96:*6* 107:*3, 5, 6,*
   *11* 111:*21* 132:*25* 133:*1*
Perfect 67:*3*
perfected 114:*9*
perform 38:*2, 12* 157:*25*
performed 38:*22*
performing 100:*14*
period 17:*21* 28:*24*
   29:*5* 30:*21* 32:*2* 34:*22*
   36:*16* 38:*19* 43:*13*
   44:*21* 47:*15* 48:*3* 49:*19*
   53:*4, 8, 16* 54:*5, 10*
   56:*23* 60:*17* 62:*19* 63:*1,*
   *17* 65:*6* 66:*2* 67:*14, 20,*
   *23* 69:*9* 79:*21* 84:*9, 11*
   85:*12, 25* 86:*12, 15*
   87:*18* 90:*17* 91:*19*
   92:*23* 93:*3* 95:*4, 7*
   102:*23* 103:*1, 2* 104:*25*
   105:*8, 22* 106:*10* 111:*15*
   153:*13, 22* 155:*7, 11*
   157:*9, 13, 14, 17* 159:*1, 2,*
   *24* 160:*7, 12* 161:*5, 23*
   164:*20* 166:*2* 168:*9*
periods 90:*10* 98:*17, 18,*
   *19, 21* 152:*10*
permanently 11:*18, 20*
   18:*17*
permission 9:*4, 9, 11,*
   *23* 125:*1*
person 8:*14, 21* 90:*21*
   107:*14*
personal 3:*18* 14:*23*
   15:*4* 17:*6* 31:*8, 10*
   73:*20, 21, 24* 74:*1, 5, 7*
   83:*2* 86:*9* 102:*9* 136:*4,*
   *16, 19* 137:*6* 138:*13, 15*
   139:*2, 12, 13, 14, 17, 20,*
   *23* 140:*2, 3* 153:*15*
   155:*18* 158:*12*
personally 35:*9* 66:*5*
personal-use 159:*2*
person's 5:*11* 20:*18*
perspective 47:*4* 56:*8*
phone 9:*19* 14:*6* 17:*6*
   33:*19* 35:*25* 40:*7* 74:*12*
   82:*6* 142:*18* 155:*17*

photo 123:*22*
photograph 114:*12*
Photographs 115:*3, 4*
   121:*13* 122:*8* 123:*13, 19*
   124:*6, 16, 23, 24*
photos 115:*19, 22* 118:*1*
   120:*12, 13, 14, 21, 22*
   122:*1, 2*
phrase 101:*8*
physical 9:*24, 25* 12:*5*
   114:*7* 127:*7* 170:*19*
picture 79:*10* 127:*23*
pictures 95:*14* 118:*13,*
   *15, 18, 19, 21*
pieces 55:*13*
pile 148:*5*
pills 162:*8*
pinged 90:*22*
pinpoint 80:*5*
place 52:*7* 61:*7* 65:*1*
   76:*4, 7* 87:*15*
Plaintiff 1:*6, 17* 2:*9, 15,*
   *17, 21, 24* 4:*6, 7*
plaintiff's 126:*11*
plastered 96:*3*
platform 12:*21* 19:*2*
   34:*7* 43:*18* 52:*2* 75:*8*
   78:*13*
platforms 13:*21* 23:*4*
   28:*14* 32:*23* 77:*12, 14,*
   *20, 22, 23* 79:*9*
please 3:*9* 15:*3* 29:*2, 8*
   36:*13* 80:*15* 87:*24*
   90:*12, 15* 142:*14* 161:*3,*
   *8*
plenty 30:*18*
plus 106:*4, 5, 6* 159:*14,*
   *23*
PM 113:*13* 171:*10*
point 14:*21* 18:*12* 29:*6*
   37:*7, 19* 53:*20* 59:*14*
   61:*7* 72:*18* 76:*20* 78:*12*
   80:*16* 91:*16* 100:*14*
   103:*24* 104:*1* 105:*17*
   107:*13, 25* 130:*12* 131:*9,*
   *25* 138:*6* 147:*5* 148:*10*
   152:*6, 13* 157:*9* 158:*16*
   161:*1* 165:*25* 167:*9, 11*
policy 163:*11*
polishing 66:*7*
Pomfret 7:*7*
poor 72:*22*
POP 85:*7*
portion 9:*23* 77:*19*
   113:*20*
position 62:*5* 105:*21*
   136:*12, 14* 168:*10*
   169:*25*
positive 15:*22* 30:*25*
possession 66:*16* 145:*9,*
   *22* 149:*3*
possibility 122:*6*
possible 21:*1* 37:*13*
   46:*19, 22* 154:*7*
Possibly 87:*16*
potential 160:*25*
potentially 3:*17* 32:*13*
   49:*23* 54:*3* 63:*14* 98:*17*
   110:*10* 127:*5* 156:*7, 9*
   164:*2*
power 144:*10, 19* 147:*23*
   149:*20*
practice 53:*7* 65:*23*
   154:*24*

practices 53:*5, 6, 9* 64:*4*
   65:*3* 157:*25*
prenegotiate 107:*9*
prepaid 70:*2*
prepaying 70:*19*
prepayment 70:*3*
prepping 64:*24*
presenting 117:*9*
press 30:*14*
presumably 75:*20*
presume 134:*23*
pretend 110:*21*
pretty 43:*24* 44:*20*
   52:*20* 57:*8* 109:*7* 119:*7*
   165:*15*
prevent 59:*15*
prevented 49:*18* 84:*6, 8*
   95:*5* 97:*9* 103:*18* 105:*9*
previous 11:*12* 13:*6*
   14:*4* 15:*16* 17:*19* 19:*10*
   22:*6* 38:*17* 69:*10* 78:*15*
   107:*12* 142:*15*
previously 61:*21* 73:*19*
   74:*16* 84:*13* 87:*6* 98:*23*
   117:*23* 125:*21* 133:*6*
   143:*19*
price 31:*25* 68:*13* 69:*2,*
   *20* 70:*6* 98:*7* 100:*14, 15*
   102:*19* 103:*24* 104:*1, 10*
   106:*25* 107:*13, 25* 108:*6,*
   *8, 10* 110:*11* 157:*1*
   167:*9, 11*
prices 98:*7* 107:*7*
pricing 31:*21* 73:*11*
   95:*14, 24* 97:*25* 104:*14,*
   *16* 106:*6* 109:*5* 156:*12*
primarily 23:*3* 39:*5*
   73:*9, 16* 75:*14* 144:*10*
primary 9:*21* 73:*15, 20,*
   *23* 74:*2*
print 96:*21* 127:*10*
prior 3:*19* 4:*21* 10:*20*
   34:*8* 41:*17* 42:*16* 43:*21*
   53:*21* 57:*19* 58:*2* 65:*3*
   66:*14* 70:*5, 13* 84:*18*
   100:*5* 106:*15* 107:*21*
   108:*3, 5, 15* 110:*5*
   156:*16* 157:*2* 160:*1*
private 54:*16* 105:*17*
   168:*2* 170:*12*
private-label 63:*2* 165:*8,*
   *17, 19*
private-labeled 169:*8, 9*
privately 99:*13*
probably 9:*12* 15:*10*
   23:*19* 25:*23* 31:*18* 32:*7*
   51:*20* 63:*23* 79:*9* 81:*9*
   92:*16* 95:*13, 16* 96:*15*
   101:*14, 18* 104:*7* 105:*25*
   106:*24* 109:*8, 20* 113:*22*
   117:*14* 121:*15, 24* 132:*5*
   141:*23* 143:*8, 10* 158:*24*
problem 15:*3* 18:*3*
   24:*15* 45:*18* 46:*10, 25*
   49:*3, 5* 51:*21* 99:*10*
   105:*3, 4* 106:*9* 109:*23*
   112:*11*
problems 22:*11, 13, 15*
   23:*5*
proceeded 15:*5*
proceedings 13:*11*
   171:*10*
process 28:*10* 31:*14*
   32:*6* 39:*6* 41:*6* 80:*3*

91:*3* 114:*15* 118:*22*
   120:*7* 154:*9* 157:*9, 25*
processed 32:*4*
processes 10:*5* 41:*10*
   123:*1*
processing 153:*22*
Produce 143:*12* 144:*2, 6*
   149:*16*
produced 90:*3* 128:*23*
   138:*18* 143:*18, 19* 145:*3,*
   *4*
producing 148:*2*
product 17:*4* 18:*3, 5*
   19:*1* 20:*9, 9* 21:*5, 7, 8*
   32:*12* 35:*14* 42:*7* 44:*2,*
   *7, 8, 10, 15* 45:*11, 21*
   46:*14* 54:*18* 60:*14* 64:*5,*
   *7* 65:*7, 18, 22* 66:*15*
   95:*25* 97:*24* 98:*7, 22, 24*
   99:*1, 8, 9, 12, 15* 100:*8,*
   *11, 14, 21, 23* 101:*4*
   102:*18* 104:*13, 15, 17, 19*
   105:*4* 107:*25* 108:*7*
   110:*22* 115:*5, 22* 118:*3*
   129:*14* 154:*19* 157:*4, 19,*
   *21* 158:*1* 165:*12, 13*
   167:*4, 7, 10* 168:*1* 169:*3,*
   *4* 170:*8* 171:*5*
Production 2:*23* 66:*19*
   131:*13* 145:*5* 146:*3*
   147:*14*
productive 90:*25*
products 18:*5* 20:*19*
   37:*2* 44:*1* 45:*20* 50:*16*
   51:*3* 52:*3, 4* 53:*14, 15*
   54:*13, 15* 57:*11* 60:*22*
   62:*12, 14, 15, 24* 63:*19*
   64:*1* 65:*8, 11, 13, 18, 20,*
   *21, 25* 66:*1, 5, 6, 8* 68:*10*
   75:*10* 92:*12, 15, 17, 20,*
   *24, 25* 93:*1, 4* 95:*15*
   96:*5* 99:*13* 100:*6, 7, 25*
   105:*6, 19* 108:*11* 117:*21*
   144:*10* 145:*10* 147:*3, 10,*
   *20* 165:*4, 10, 18*
professional 16:*20*
professionally 36:*19*
programming 85:*23*
   86:*12* 122:*18*
programs 82:*11, 12*
   122:*19*
prohibited 60:*13*
promise 154:*14*
promised 143:*3* 151:*23*
promissory 70:*8, 9, 11,*
   *14, 17, 18*
proper 18:*19*
property 10:*4, 5* 52:*20*
   54:*14, 17, 20* 71:*13, 20*
   82:*13* 94:*1* 95:*10* 99:*11,*
   *12* 113:*25* 114:*3* 117:*20,*
   *21* 122:*21, 23*
propose 146:*1*
proposed 166:*7*
ProStores 12:*21, 22, 25*
   13:*6, 14, 25* 14:*10, 19*
   43:*21*
protected 114:*8*
protective 38:*19*
prove 48:*18* 166:*11*
provide 9:*7* 21:*14* 23:*1*
   29:*21* 30:*2* 33:*3, 7*
   38:*18, 19* 44:*10* 45:*3, 6*
   46:*1, 3* 88:*22* 97:*2*

125:4 127:19 137:6
145:15 146:6
provided 10:10 12:16,
17 15:8 21:19 22:18, 19
25:23 27:7 28:3 38:24
53:14, 21 63:14 67:5
80:5 88:14 125:11
127:12 128:5, 7 134:24
141:16 142:13 146:3, 24
148:19, 24 149:8
provides 129:20 143:24
provision 131:2 135:9
public 63:13 167:24
172:8, 21
publicly 169:22
publish 28:15
pull 42:3 60:4 146:5
147:16
purchase 3:18, 23 7:22
8:1, 4 9:4, 22 14:14
17:19 19:4 29:10 33:24
36:11 40:1, 8, 11, 13
41:18, 25 42:1, 3, 6 45:8
49:12 54:17 58:16
59:25 63:1, 3, 21, 25
64:1 67:15, 16 69:2, 10,
12, 13, 17, 20 70:6 72:14
73:10 74:10 75:13
77:12 80:14 81:18 82:1,
25 83:5 90:12, 16 91:4
98:6 102:18, 24 103:20,
22 105:9 120:23 121:24,
25 122:7, 12, 13 123:9,
21 124:15 138:21, 24
139:9, 14 141:10 165:18,
22
purchased 3:25 12:19,
20 16:5 18:8 19:7
47:19 54:14 58:2 62:14
63:9, 10 64:10, 13 72:3,
4, 24 77:18, 22 80:13
82:22 99:10 100:16
101:5 102:24 103:3
111:24 112:19 116:11,
12 120:20 123:5, 10, 13
125:8, 9 133:13 136:8
137:21 138:20 158:5, 7
169:10, 11, 19
purchases 65:24
purchasing 54:16 63:23
64:5, 7 98:7 103:7
104:5 113:1, 2 157:3, 11
167:4
purpose 59:2 63:10
74:2 80:20 81:23 140:6
purposes 19:13 40:21
54:24 58:5 61:3 66:13,
23 73:16, 18 74:1 77:5
111:12 117:21 142:21
144:23
pursue 151:8 159:25
put 20:3 27:22 39:7, 13
40:24 41:3 59:17 87:14
115:20 119:14 120:23
121:7 124:3, 4, 7 131:12
132:25 133:1 139:6
157:20 163:3 164:6
165:11 168:1
putting 39:4 85:18

< Q >

quantification 129:20
130:7 134:22, 24
quantified 129:22 130:2,
16

quantify 117:1 129:17
132:13, 17
quantifying 130:10
quantity 32:12
question 9:12 19:21
22:2 23:1 24:20 27:4, 5
34:12 49:15, 24 54:7, 22
55:12 58:5 59:4, 19
62:2, 18 84:21 88:20
103:6 110:6 126:21
132:5 134:4, 22 140:19
142:6, 25 144:23 146:13
148:22 154:14 162:23
questioning 113:11
questions 18:1, 15 29:9
40:6 135:25 143:7
150:1 156:15 161:21
167:3 171:8
QuickBooks 11:22, 23
12:2, 6, 7, 12, 17 14:10
19:2, 6, 11, 21, 23 20:2, 5
22:7 23:17, 22 24:7, 13,
22 149:23, 25 150:2
157:15 161:13, 15
recorded 11:13 21:6, 7
records 13:6 15:4
35:11 36:3 38:16 39:3
47:6 48:16 63:4, 13, 16
76:14 78:19, 20, 23 82:7
103:5 113:5 117:8
122:15 128:23 129:15
132:3, 10 162:14 163:18
164:4
redacted 66:17, 19 67:4
redirect 126:12
reduced 115:17 161:6
Re-Examination 2:6
167:1
refer 16:13 49:9 59:21
reference 7:24 8:10 9:5
17:18 20:18, 25 71:12
80:18 81:10 82:18
89:20 94:3, 6 96:22
114:5 122:10 124:16
126:10, 14 128:9 137:9
157:14
referenced 8:13 15:14
83:8 93:17 115:4
127:21 132:19 134:1
140:4
references 116:20
referencing 49:8 70:25
76:15, 16 81:20 87:6
94:7 115:10 117:22
119:25 127:8
referred 127:20
referring 4:24 35:8
45:6 53:21 66:22 73:8
86:17, 20 97:23 101:24
102:1 114:22 127:11
130:23 136:3 139:22
143:19 147:15
refers 126:22
reflect 48:16 143:22
155:15
reflected 20:10 49:11
reflecting 42:18
reflects 69:23 142:3
refresher 125:21
regard 49:14
regarding 3:23 39:18
84:18
regardless 103:11

recall 4:19 8:9, 15, 16
9:6 52:13 84:2 140:12
recalling 79:11
receive 9:11 10:1 13:7
14:21 41:19 72:20 73:9
87:23 123:9 161:3
received 9:25 20:10
36:12 41:21 52:11
66:24 70:2 79:15 80:2
127:6 154:1 155:17
161:16 164:9
receives 106:25
receiving 8:23 41:23
69:8 140:12 161:7
Recess 60:7 113:13
recite 61:6
recognize 7:19 119:3, 11
120:2, 20
recollection 24:4 52:14
record 3:9 13:9 59:18
61:5 66:14, 23 81:23
131:13 133:15 143:17,
22 149:23, 25 150:2
157:15 161:13, 15
recorded 11:13 21:6, 7
records 13:6 15:4
35:11 36:3 38:16 39:3
47:6 48:16 63:4, 13, 16
76:14 78:19, 20, 23 82:7
103:5 113:5 117:8
122:15 128:23 129:15
132:3, 10 162:14 163:18
164:4
redacted 66:17, 19 67:4
redirect 126:12
reduced 115:17 161:6
Re-Examination 2:6
167:1
refer 16:13 49:9 59:21
reference 7:24 8:10 9:5
17:18 20:18, 25 71:12
80:18 81:10 82:18
89:20 94:3, 6 96:22
114:5 122:10 124:16
126:10, 14 128:9 137:9
157:14
referenced 8:13 15:14
83:8 93:17 115:4
127:21 132:19 134:1
140:4
references 116:20
referencing 49:8 70:25
76:15, 16 81:20 87:6
94:7 115:10 117:22
119:25 127:8
referred 127:20
referring 4:24 35:8
45:6 53:21 66:22 73:8
86:17, 20 97:23 101:24
102:1 114:22 127:11
130:23 136:3 139:22
143:19 147:15
refers 126:22
reflect 48:16 143:22
155:15
reflected 20:10 49:11
reflecting 42:18
reflects 69:23 142:3
refresher 125:21
regard 49:14
regarding 3:23 39:18
84:18
regardless 103:11

registered 122:23, 24
123:10 124:18 134:18,
20
registering 58:9 61:21
registration 134:15
reiterate 65:4
relate 56:12
related 67:13, 24 76:13
79:8 105:23 106:11, 25
119:15, 24 134:24 135:4,
5 162:4
relates 68:11 126:23
127:7 145:6
relating 71:7
relation 134:6
relations 56:1
relationship 47:11 107:1,
12 108:21 110:1 126:13
relationships 108:16
relatively 13:2 74:6
166:12
relearn 169:22, 23
release 131:4
released 71:5 168:25
relied 101:23
rely 133:8
relying 61:13 65:14, 17
79:18, 19 108:15 127:14
129:3 131:1, 3 135:9
145:4
remain 165:23
remaining 70:18
remember 3:15, 19, 21
4:8, 17 8:23 15:17
43:19 52:9 93:13 103:4
108:23 117:10 135:2
150:7 156:17 160:9
166:6, 8
remembered 97:3
remote 33:3
remove 96:14
removed 96:15
repeat 54:6
rephrase 98:20 162:23
replies 161:18
reply 18:13 87:23
161:3, 13
REPORTED 1:23
REPORTER 7:16 172:2
reports 38:20
repository 75:17
represent 141:15
representations 79:19
representatives 47:7
87:19
represented 79:20 124:2,
12
reprice 126:12
request 142:13 143:9
144:4, 16 146:22 147:13
148:2
requested 93:16
Requests 2:23 73:10
93:8 147:17 149:14
require 41:4
required 71:14
resale 165:11
researching 18:22
resent 125:10
reset 29:17 48:20 93:8
resold 63:7
respect 83:13 97:12
111:25 114:16 118:13
130:7 146:20 147:16

respond 141:7, 11
responded 141:12
responded-to 141:14
responding 133:8 158:23
Response 2:16, 22 29:3
36:12 126:10 133:16
141:18 142:12 143:18
responses 125:10
responsibilities 139:6
responsible 75:25
responsive 146:12 148:2,
15
restricted 62:18
restricting 62:17
restriction 54:25 56:15,
18
restrictions 52:16 54:23
55:19 57:10
result 26:18, 24 49:11
112:22 114:2 129:23
130:13, 25 131:10 132:7
151:9
resulting 129:17
resumed 98:16
retailer 162:6
retain 22:23 83:18
114:20 127:25
retained 25:24 52:20
83:17 85:10 86:1 88:9
91:22 98:23 101:20
102:20 110:12 112:19
118:2 121:4 133:11
retains 78:23 114:4
116:13 134:7
retention 93:24 102:3
retract 53:25
return 38:17, 21
returns 38:17, 21
reuse 104:23
reusing 100:24
revenue 23:8
revenues 79:3
review 57:10 107:23
130:8 135:1 145:24
reviewing 131:16
rewards 91:1
right 5:9 6:2 8:17, 20
9:8, 14 16:23 17:18, 24
18:7 19:12 21:19, 24
24:1 25:6, 8 28:16
29:13 30:5 34:13, 25
37:21 40:5, 25 41:1, 12
42:14 45:19 48:9, 23
49:4 51:17 55:16 57:25
61:19, 20 64:8, 21 68:3
76:25 77:8 80:21, 22
81:22, 23 85:5, 21 88:14
91:1 92:10, 18 99:7
100:6, 10 101:11 103:11,
14, 19, 23 104:6 105:3,
15 108:3, 4 111:4 116:9
117:10 118:5 120:4
121:2, 14, 22 123:19
124:3, 25 146:2 149:10,
11 151:3 152:9 153:19,
24 154:17 158:3, 8, 11,
13, 16, 20 160:18, 22, 23
162:16, 20 163:15
166:20
rights 114:20 121:12
122:8
Road 1:21
ROBERT 1:12 2:3 3:4,
10 19:19 22:24 49:15

59:20   84:22   110:7
150:5   168:18   172:11
roughly   4:13
round   145:5
RPDs   146:15
rudimentary   102:11
rule   5:10   148:9
run   17:13
running   16:21   124:5
runs   7:3

< S >
safe   150:19   155:12
160:15   161:12   163:17
safety   75:17
sake   24:10   147:11
sale   9:7   12:9   20:8   21:5
39:9, 10   40:16   41:14
43:5   44:25   46:20, 25
47:9   64:1   65:20, 23, 24
77:5   114:1, 23   121:1, 6,
14   123:16   124:11, 17
133:1   143:15   153:14
155:12, 15, 16, 19   162:8
sales   10:6   11:10   13:18
14:4   29:13   38:20   39:6,
18, 20   40:1, 12, 14   41:14,
15, 16, 17, 22   42:1, 16
44:19   62:4   65:2   66:15,
25   67:23   69:8, 16, 17
77:2, 10   80:3   108:3
113:5, 21   117:12   152:20,
24   154:3   155:5   156:12
160:14   161:8
sales@lehighvalley   28:22
29:8
sales@lehighvalleyabrasiv
es   16:17
sales@lehighvalleyabrasiv
es.com   18:15   35:24
36:13, 15, 18   85:6   87:25
88:1   161:2, 4
Sandisc   123:10
satisfied   47:15   70:14, 16
saving   147:11
saw   153:18, 21
saying   30:20   39:17
40:17   45:18   52:8, 25
87:23   90:11   97:17
101:11   108:23   112:9, 15
117:22   118:15   125:6
146:7, 10   151:5   152:14
157:15   161:3, 7
says   33:20   51:9, 13
101:23   108:25   120:1, 3
122:23   124:19   132:21
137:13   138:14   141:3
142:16, 17   144:8, 13
147:5, 9, 13, 22   151:5, 10
scanned   8:22, 24
scanning   9:1
scenario   57:15   86:5
96:2   139:17
scenarios   46:7   109:9
scenes   126:9
scholar   109:19
scope   94:15
scrape   95:24
scraped   95:13, 17, 18, 20
96:8
scrapes   127:23
scraping   95:22   96:22
screen   78:2

search   19:8   75:7
115:12, 13, 14   122:18
132:11
searching   21:2
Second   2:22   4:17
119:20, 21, 25   137:10
secondary   75:20
secret   54:21   71:21
104:12   105:6, 7, 15
117:5, 23, 25   122:25
134:4, 5   155:24   156:3, 6,
7, 10, 13   167:22, 23
168:11, 14, 21   170:7
secrets   52:19   68:12
71:13   94:2   97:23   99:11
101:9, 10, 12, 17, 22
113:22   116:22   117:3
126:24   129:8   133:5, 7,
17   134:1, 7, 12   155:25
156:4
section   94:23
see   7:25   26:1   27:13
36:3   37:23   59:25   71:3
88:4, 6, 18   91:9, 11, 13
92:7   95:25   96:10
108:11, 20   119:11   122:7
128:9   132:9   133:4
145:24
seeking   37:2   135:10
seen   119:6, 14
selected   100:23
sell   17:3   44:6   45:19
46:14   50:5, 14   51:24
53:15   54:9, 13, 17, 23
55:5   60:14   62:12   64:13
65:22   100:25   104:2, 4, 9
107:9, 24   108:5   112:3, 5
113:6   121:18, 19   122:5
124:3   147:22   149:20
170:6
seller   60:17   70:2, 3
Sellers   122:15
selling   50:3   51:2   53:13
57:2   63:10   65:5   68:10
83:1   95:25   96:1   100:9
106:13   107:4, 25   108:6,
11   117:21   122:9, 10
124:13   132:9, 16
sells   59:15   61:16, 17
170:6
send   16:25   34:1   36:13
41:5   42:4   86:22   91:14
92:5   109:12   152:15
153:3   161:8
sending   18:14   29:10
88:25   90:12, 15   94:17
sends   87:8
sense   5:17   10:14   11:14
40:18   107:15, 16   133:24
161:10
sent   40:4   66:17   77:10
86:7, 19   87:22   88:5, 8
91:21   92:6   97:5   107:21
108:22   109:14, 16
137:23   151:2   160:21
161:13, 14, 18, 25   162:13
163:9   164:5, 8, 14
sent-to   154:5
SEO   117:19
separate   20:6   39:2, 3
serious   91:10
served   74:16
server   33:3   87:17
service   23:3   36:20   47:4,
6   48:25   75:10   87:19

88:3   127:22   153:7
164:8, 16   170:21, 23
services   38:1   50:17
60:22   75:1, 6, 14   112:12
129:5   137:23   161:19
69:8   85:1, 5   86:6, 23, 24,
25   87:7, 9, 10   90:7
107:7   138:12   152:9
172:13
settings   87:16
settle   131:15
settled   4:15, 16
Settlement   2:11   70:1, 5,
14, 17, 22, 24   80:23
159:19
seven   49:19   54:24
55:18, 19   56:16   60:17
92:21, 22   111:20   112:1,
8   168:9
seven-year   53:16   56:14,
22   63:17   65:5   68:8
92:23   102:23   103:2
105:8   111:15
shank   44:4
share   3:22
shared   27:12, 17, 18, 24
36:19   84:14, 19   85:2
86:2   90:21, 23, 24   137:6,
19   138:3, 4, 6, 9   139:7
153:15   159:24
shareholder   51:10, 14
sharing   85:23   159:3
sheer   46:23
Shindorf   66:22
SHINDORF   1:12   2:3,
18, 19, 20   3:4, 10   155:21
166:22   172:12
ship   46:13
shipped   19:25   41:20
44:5   67:18   157:12
shipping   157:3
shopping   75:9
short   34:22   65:11
Shortly   48:1   103:4
show   88:25   89:13
123:8   155:17, 18
showed   127:3
shows   25:13   75:10
102:17   111:5
shut   12:23
side   7:7   89:12   104:5
105:4   109:6, 23   111:8, 9
160:17   161:14, 15
163:10
sides   117:15
sign   29:3   78:3
Signature   171:11
signed   67:12   157:7
significant   9:23   56:24
57:2   65:13
silent   45:20
similar   18:6   57:8   63:24
93:15
simplify   106:10
single   20:8   33:8   39:14
87:13   107:20   131:10
138:18, 23   142:3, 6
143:23   145:22   147:17
149:18   150:11
sit   30:5   129:24
site   34:7   56:25   57:1
82:10   92:14   154:2
sites   32:22   127:25
six   15:9   43:16   48:2

158:2   159:14
six-month   30:24
Sixty-four   101:23
size   44:4
skeptical   147:8
skip   61:9
SKUs   54:6   95:15
slightly   16:1
slow   51:6   98:1
slower   51:22
small   108:2, 3
smaller   33:23
snippets   127:24
software   12:4, 5   13:23
20:3, 5   22:7, 18   39:5
47:11, 12   82:9, 12
122:11, 15, 19, 20
sold   21:6, 7, 9   39:8, 11
42:7   43:15   46:11   51:17,
22, 23   52:2, 6   53:22
58:6, 22   59:3, 9   62:14,
24, 25   63:16   64:9   65:11
66:2   104:18, 21   105:11,
19   106:7, 8, 20   108:12
110:2   111:11, 17   112:4
116:6   120:11, 22   121:13
122:4   123:2, 22   139:12,
15   140:22   147:20
156:23   169:20, 21
sole   6:9   27:18, 20, 24, 25
28:1   74:4, 8, 9, 13, 14
79:5, 7   94:8   138:10
139:24   140:7
Solely   81:3   131:3
135:11
solicitation   95:2, 4   162:5
solution   33:4   45:1
solve   22:2, 3, 10   44:23
45:18   46:5
solved   21:11
somebody   37:23   65:24
121:21   155:17   167:16
someone's   20:16, 17
90:25   95:24
soon   52:8   85:16
Sorry   24:21   46:9   56:2
67:16   80:21   98:20
169:17
sort   40:25   150:16   161:4
sound   8:11
sounds   58:7   90:6   92:8
source   9:19   21:12   23:8
33:17, 18, 19, 20   34:3
35:21   40:7   43:4   44:25
45:1, 8   74:4, 8, 9, 14
78:17   79:5, 7   105:13
114:20   119:9   120:17
122:2   125:7   155:15, 16,
19   165:2   167:8   169:8
170:12
sourced   97:4
sources   10:13   11:3, 11,
15, 20   43:16   79:3   80:2
82:6   99:15   100:3   106:8
137:21   153:5   168:21, 22
170:8, 9
sourcing   105:6   169:11
SOUTHERN   1:3
speak   58:23   59:18
133:15
speakers   55:25
speaking   31:18   47:3
70:22   114:9   121:17
133:10

speaks   49:13   63:20
71:8   82:1   83:6   127:1
133:19   140:25
special   154:15, 16   157:19
specific   4:19   10:10   11:6
44:14   83:4   142:16
143:24   147:17, 19
160:24   167:7
Specifically   8:9, 15   17:3
27:4   49:8   60:16   82:2
83:16   88:20   98:25
101:21   122:23   124:16,
19   132:21   138:2   149:15
specificity   156:1, 4
specify   154:6
specifying   157:2
speculating   45:5
speculation   46:24   47:2
163:21
spellcheck   95:16
spend   64:23   73:3
spent   158:12   160:7
spirit   50:6
spot   60:20
spreadsheet   67:5   102:13
spreadsheets   102:4, 6, 8
SS   172:4
staff   31:20   33:4
stake   139:6
standard   108:8   166:12
standpoint   42:16
STARK   1:20
start   15:7   18:14   21:17
50:3, 14   64:22   65:2
87:4   90:12   107:2, 5
130:10   161:3
started   28:21   53:6
starting   43:6   56:23
start-up   108:2, 3
state   3:9   83:1   143:17,
22   172:4, 9, 22
stated   138:24, 25   139:12
statement   71:25   77:7
138:19   141:8, 11   142:15
146:8
STATES   1:1   60:16
97:9   139:14   142:7
144:5
stating   149:11
stationary   144:11
stays   28:16
step   26:7   166:5
steps   157:17
stipulate   66:22
stock   20:1   69:13
stock-type   32:8
STONE   1:8   2:18, 19, 20
6:6, 7, 11, 23, 25   7:23
8:9, 16   10:9   11:7   12:10
14:21   16:6   17:3   23:21
24:6   25:3, 8, 17   26:25
33:9   35:6   49:10   50:4
56:17   58:13, 19   60:12
61:1   63:1   67:12   68:1,
15   69:25   71:6   73:19
78:18, 23   79:6, 18, 19
80:2   83:1, 22   91:16
93:1, 7   95:9   96:2   97:9,
22   98:10   100:5, 13, 17
103:18, 19   104:11, 18
105:9   113:15   114:4, 24
115:2, 20, 25   116:10, 12,
15   117:12, 20   118:10, 19
120:11, 13, 15   121:12
124:2, 12   126:8, 15

127:17 129:23 130:20
131:11 132:2, 4, 13
135:23 136:7 137:5
140:14 150:15 157:7
159:6 162:10, 16, 24
163:15, 17 164:2, 22
167:4 168:8, 11, 14, 24
**Stone's** 2:12 64:19
68:24 88:9 116:21
117:2 130:14 136:3
168:3
**stop** 4:1 24:15
**stopped** 90:13
**stops** 33:5
**storage** 22:7
**store** 12:20 32:20 57:19
59:3 76:7
**stored** 22:6 23:18 30:4
33:1 76:11 154:21
**stores** 39:7
**story** 117:15
**strange** 119:10
**strategic** 93:10
**strategy** 104:16 106:3
109:3
**stretch** 117:4
**strictly** 65:14
**strike** 152:6
**string** 2:18, 19, 20
**strongly** 149:6
**structure** 57:9 115:23
**studded** 134:6
**stuff** 30:13, 18 39:25
44:21 76:18 107:4, 10
111:9 119:22 148:5
160:13
**sub-exhibit** 80:24
**subject** 151:1 160:7
**subjected** 49:11
**submit** 114:10
**submitted** 36:11, 14
65:19 67:16, 18 94:19
107:22 111:10 112:23,
24 127:2 145:17
**submitting** 93:8
**subpoenas** 109:12
**subsequent** 67:10, 11
68:8 72:4
**substantial** 4:19
**successful** 24:9 26:14, 17
**sued** 72:12
**suffered** 26:17, 24 27:2
129:23 130:13, 25
131:10 132:1
**suggesting** 72:22 134:11
**suing** 4:8 72:18, 23
118:19
**Suite** 1:18, 21
**summited** 111:5
**sun** 54:24 124:1
**Sundisc** 63:4, 5 100:2, 3,
25 101:4 103:14, 20
104:1, 21 105:3, 19, 20
110:16 120:14 121:21
123:11, 12, 13, 23, 25
124:1, 6, 11 125:8
129:13 165:4, 5, 6, 7, 18,
22 167:18 168:24 169:6
170:4, 8
**Sundisc's** 167:22
**Supplemental** 2:16, 22
126:10 133:16
**supplier** 165:12 167:19
**SUPPLY** 1:5 2:9, 15, 21
5:20 6:5

**support** 56:21 109:18
126:19 129:4 135:14
145:16 146:5, 21 148:24
**supporting** 128:19
143:12 144:6 145:25
149:17
**supports** 128:25 149:13,
19
**suppose** 133:18, 19
**supposed** 5:11 9:5, 6
145:12 146:9
**sure** 5:6 24:9 31:13, 18
40:16 46:2, 10 48:18, 19
49:22 51:18 53:12
56:13 62:20, 22 64:18
66:10 67:6, 14 73:2
76:25 81:4 86:16 89:9
90:15 97:4 98:2 99:3
103:12 104:9 113:7
118:14 119:7, 9 121:19
124:10 127:21 129:6
133:11 135:2 145:9
146:8 160:13
**survive** 71:11
**SW** 1:13, 18
**switched** 113:3
**sworn** 3:5
**system** 39:14 43:12
86:6 87:7 90:8 119:15
138:12 164:3
**systems** 83:7 106:8
110:11 137:21

**< T >**

**tactic** 152:19
**take** 6:13, 21 8:2 26:7
28:9, 20 37:23 107:8
113:11 120:13, 21
126:12 135:24 136:14
143:21 153:4
**taken** 1:13 21:21 34:23
47:22 52:7 60:7 113:13
115:2 157:17 172:12
**takes** 127:23 157:10
169:12
**talk** 5:11 14:16 15:13
27:5 49:7 148:17
167:14 169:17
**talked** 115:24 133:7
**talking** 5:11 15:13
22:13, 14 24:17 35:9
48:3 57:21, 25 64:9
66:11 67:2 68:3 80:6,
11, 24 88:14 91:19
96:11 102:2, 12 114:23
115:19 130:23 144:20
**talks** 92:11 117:20
126:8
**task** 13:21
**tax** 19:13 38:17, 21 39:1
**taxonomical** 115:23
**team** 48:25 49:2
**technical** 10:17 47:4
82:12 122:20
**Telephone** 39:23 122:14
**tell** 6:4 7:18 29:21
34:5, 19, 21, 25 35:13
36:5 37:1, 9, 11 46:23,
24 50:22 59:13 83:24
104:3 119:3 145:21
148:3 165:5
**telling** 31:3 46:4 88:23
89:3 140:14, 20 145:13
147:7 151:19, 20 153:2
**tells** 100:22 104:1

**temporarily** 11:19 27:9,
11
**ten** 33:21, 22 43:7, 10
104:8
**tens** 103:10
**term** 32:9 75:5 95:11,
20 147:7 152:24 155:16,
24 156:3, 6
**terms** 7:8 68:9 70:16
86:18 104:5 115:1
126:15 156:20, 21 158:6
**terrible** 119:8
**testified** 3:6 159:16
**testimony** 10:20, 22 34:9
53:21 84:18 106:15
110:5 128:11 150:5, 8,
10 154:9 155:4 156:17
158:5, 10, 18 159:2
160:9 162:18 164:20
165:4 168:16 172:11
**text** 33:21 108:21
**Thank** 13:12 81:1
**theoretically** 67:15
**theory** 72:24 109:18
110:25
**thing** 15:22 44:10
45:22 54:5 57:16 66:11
76:15 128:1 146:20, 21
**things** 7:5, 7 8:19 9:7
10:2 17:19 22:6 27:22
30:17 32:12 45:23
53:22 62:8 69:19 71:11,
23 74:19 78:15 85:3
86:14 91:2, 21 98:8, 15,
23 99:18 154:5 158:23
161:11 163:7 164:23
166:11
**think** 3:17 8:21, 23 9:2,
4, 25 11:4 15:22 16:2
25:12 26:18 27:6 30:24
31:8 47:25 51:11 52:15
55:12 61:17 66:20, 21
68:21 71:8 74:23 76:21
77:7 81:8 84:9, 11, 17
93:19 94:19 95:12, 16
96:24 97:6, 7, 13 104:3,
5 105:25 109:7, 13, 24
112:14, 15 114:9 116:8
119:15, 17, 24 120:25
121:24 122:2 126:14
127:1, 15 128:15 129:18
132:25 133:4 134:3, 16
135:16 137:13 138:1, 16
141:3, 22 142:5, 24
145:10 146:3 148:14
153:1 154:21, 24 155:9
159:1, 5 161:19 162:18,
19 163:23 164:9 165:14
170:4
**Third** 2:16 109:21
119:20 150:25 151:7
**third-party** 160:20 164:2
**thought** 9:15 13:25
22:21 59:6 84:13
104:14 166:18
**thousands** 54:6 88:19
89:23 103:10 104:9
142:1 145:20 146:2
**three** 43:16 48:2 106:6
118:20 143:10 159:3, 16
**three-month** 159:1, 24
**threshold** 5:14
**thumb** 119:5
**tied** 77:17

**time** 8:2, 20 13:1, 4
17:21 18:17 23:6 24:21
26:6, 7 28:24 29:5
30:14, 19 31:1, 23 33:22
34:4, 16, 22 37:7 42:7
43:13 44:11, 21 46:17
48:4 50:22 52:16 53:8
54:5 56:18 58:4 67:23
71:21 73:3 76:9, 23
78:5, 19 79:4, 21 84:2, 9,
11 85:10, 12, 25 86:12,
15, 25 87:18 90:17 93:6
96:25 98:17, 18, 19, 20
101:5 105:11 112:4, 6
121:13 124:17 127:23
129:24 136:10, 23
137:14 139:8 147:12, 13
152:6, 9, 21 153:11, 18,
22 154:1, 4, 23 155:7, 8,
9, 11 157:10, 13, 14
158:12, 16 160:7, 12
161:1, 5, 11, 15, 23 162:3
169:12
**times** 3:13 20:14 21:10,
13 29:3 32:23 45:24
46:8, 10, 14, 23, 24
156:22
**titles** 115:22
**today** 12:13 30:5 35:12
43:6 53:23 87:15 88:23
96:10 125:25 128:12
129:21, 24, 25 135:14
146:2
**told** 71:23 89:4, 5
99:14 140:16 153:14
**Tool** 43:17 48:25 50:25
51:1, 6, 17, 23, 25 52:5
53:7 57:8, 21, 25 58:1, 4,
12, 14, 17, 20, 24 59:2, 10
61:25 62:1, 12, 14 63:1,
5 65:12, 15 67:9 68:10
92:13, 20 97:1 110:21
127:4 128:20 129:11, 22,
14 156:16
**tooling** 51:3
**tools** 52:2, 4 59:3 62:25
75:1, 5 96:7 144:10, 11,
19 147:23 149:20
**toothpaste** 51:17
**top** 48:9 57:17 66:3
75:10 93:14 113:8
120:5 128:9
**track** 47:12
**trade** 52:19 54:20
68:12 71:13, 20 94:2
97:22, 23 99:11 101:8,
10, 12, 17, 21 105:6, 7, 15
113:22 116:22 117:3, 5,
23, 25 122:25 126:24
129:8 133:5, 7, 17 134:1,
4, 5, 6, 11 155:23, 24, 25
156:3, 4, 6, 7, 9, 13
168:14, 21
**trademark** 122:24
**trading** 110:1
**transaction** 8:8, 10
13:19 29:24 30:22
32:24 38:3 39:15 40:3,
25 42:12, 15, 18 44:13
47:17, 18 48:2 49:1
50:12 56:7 64:1 69:9,
10 76:2 78:19, 20 79:20
83:9 84:20 100:5 133:1
149:21

**transactions** 11:13
43:17 68:25 74:4, 8
78:10, 13, 14 82:6 83:10
85:9
**transcript** 172:10, 11
**transfer** 42:3 154:13
**transferred** 84:25
**transferring** 124:14
**transition** 13:5 28:21, 25
29:23 30:21 36:10, 16
69:7 85:12 90:10
152:10 153:13 155:11
164:20
**transitional** 84:11 85:25
**transitioned** 29:18 43:18
165:25
**transitioning** 28:10 49:1
**traveled** 9:2
**treatment** 107:12
**trial** 4:15, 16
**trick** 154:14
**trickled** 161:9
**tricky** 51:12 91:8
**tried** 26:19 45:22 96:14
**trigger** 41:22
**troubleshooting** 46:13
**Troy** 1:22
**true** 26:12 42:7, 19
43:2 51:20 55:3 73:13
74:22, 24 83:12 84:13
89:16, 17 97:11 100:17
109:6, 22 151:23 168:5
172:11
**truly** 152:21
**try** 14:25 28:21 29:12
44:18 51:25 60:5 87:3
91:1 102:15 110:20
117:14 131:19 158:21
163:11
**trying** 8:25 23:17 24:22
30:16 32:17 36:10, 16
48:18 55:7 59:6 61:6
91:8 93:12, 18, 19 94:1
160:12
**Turn** 128:9 136:9 137:7
**turned** 11:7, 23 12:23,
25 27:19 138:2
**turning** 139:3, 4 140:21
143:7, 9
**Twenty** 78:14
**Twenty-three** 134:22
**two** 8:19 15:9, 14 39:2,
3 59:1, 4, 7 65:18 72:17
84:2 90:2 94:9 96:12,
15 106:6 133:20 154:3,
5 161:5 167:3
**type** 32:7, 11 57:16
74:19 136:20
**types** 28:23 90:20 92:17
**typically** 9:4

**< U >**

**U1** 120:1, 3
**U2** 120:3
**U3** 120:3
**UCC** 101:21
**uh** 3:18 14:12 57:24
75:20
**Uh-huh** 18:24 24:24
25:19 30:6 31:5 48:5
66:12 99:5 126:17
**ultimately** 42:18 46:20,
25 47:18
**um** 38:2 143:9

**unable** 46:14
**underline** 142:23
**understand** 16:7 40:16
62:5 92:3 110:6 139:1
146:7, 8 153:9 156:6
**understanding** 33:14
38:9 40:20 49:10, 17, 21
50:19 114:18 118:18
137:14, 20 156:21 157:6
162:24
**Understood** 36:25 46:4
61:13 62:5, 21 91:6, 23
97:16 111:22
**unfair** 106:16, 23 107:12
108:14, 24 109:9 110:10,
14 132:5, 12
**unfettered** 9:18
**unfortunately** 131:7
**unhappy** 112:12
**unified** 150:16
**Uniform** 156:4
**unilateral** 158:11 164:22
**unique** 104:17
**UNITED** 1:1
**unjust** 106:9
**unknown** 71:9, 17
**unmonitored** 29:8, 11
152:21
**unregistered** 122:24
124:18
**unrestricted** 125:19
126:3
**unsubscribe** 91:1
**unsuccessful** 24:10 25:8,
10 26:18, 25 27:3
**Unsuccessfully** 24:14
25:20
**usage** 113:25
**use** 12:12 17:13 20:21
21:11 22:10 23:2 29:1,
2, 12, 19 36:16 41:12
44:6 48:25 52:19 58:19
59:9 62:14 64:21 89:1
100:20 101:4 104:25
105:22 106:1, 19, 20, 22
114:21 115:18 117:3, 18
118:16 122:1, 4 124:6,
13, 20, 21, 22, 23, 24
125:3, 5, 19 126:23
127:4 128:3 131:25
138:13, 15 139:20 143:4
153:2 154:21 165:19
167:15 168:15 169:18
170:1
**useful** 13:25
**uses** 167:5, 16
**ustooldepot.com** 129:12
**utilize** 17:5 29:8, 12
36:20 75:9 94:1 95:15
115:13
**utilized** 17:17, 20 18:11
22:8 96:4
**utilizing** 15:7 27:21
49:1 54:20 94:1 106:7
110:10

**< V >**
**vague** 22:12 37:5 55:21
**Valley** 2:13 42:11
45:11 50:9 51:2 52:5, 9
63:3 77:2 78:22 87:5, 9,
14 88:6 89:2 90:23
92:1 96:3, 14 99:14
100:12 106:13 108:22,
23 109:2 110:18 112:4,

16 121:4, 11 122:14
136:21 139:18 143:14
144:9, 14 152:15 153:10,
23 159:8 160:22 167:6
168:8
**Valley's** 77:9 121:1, 7
143:15 158:7 165:20
**valuable** 14:7
**value** 9:21, 24 10:4
115:15, 16, 17 117:4, 19
163:14
**values** 100:12 132:11
**variances** 45:20
**variety** 144:9
**various** 11:3
**vast** 78:11
**veiled** 110:20
**vendor** 20:2 41:18, 20
42:5 44:16 63:3 68:12
97:25 98:3, 4, 7 102:17
105:5 106:3, 4, 5, 12
107:1, 13, 21 108:14
109:6, 23 110:17, 22
111:8 118:3 124:23, 24
156:9 160:24 165:23
166:1 167:5, 8, 12, 14, 15,
16 168:11, 16, 21, 22
**Vendor/customer** 97:24
**vendors** 44:7, 9 64:25
99:21, 25 106:19, 22
108:9, 16 109:5, 8, 12, 16
110:14, 18, 19 111:14
**Venn** 101:18
**Ventures** 6:6, 23
**verbal** 125:2
**verbatim** 96:6
**verify** 89:16 90:1
128:11 129:19 134:17
**version** 12:8, 9, 11 32:25
33:1 60:4 76:1 144:21
**versus** 136:20
**vetted** 166:13
**Viagra** 162:7
**view** 156:20
**viewing** 74:5
**violate** 59:11 71:22
139:5 166:15, 19
**violated** 50:20, 23 56:16,
17, 22 57:3 71:19, 20
128:20 129:1
**violating** 54:19 56:4
118:10
**violation** 51:7 53:17
55:6 57:5 58:10 61:16,
23 62:9 67:11 72:5
157:4
**virtual** 157:8
**virtually** 72:17
**volume** 77:9 104:7
107:2, 10 113:5
**volumes** 116:11
**VSM** 110:16

**< W >**
**waived** 171:11
**want** 8:7 21:25 26:21
27:17 28:17, 18 30:14
31:25 33:21, 22 34:23,
25 39:21 40:6 45:11, 19,
22 51:22 54:4 59:7, 13
61:4 62:17 66:10, 22
73:3 90:6, 25 91:9, 11
92:6, 14 99:21, 23, 24
104:9 112:13 128:11
129:6, 19 134:17 137:9

143:8 144:17, 20 148:3,
8, 9 149:12, 15 153:2
157:19 162:21 163:3
**wanted** 27:14, 15 29:21
31:22 43:6 50:14 55:20,
22, 24 56:4 67:6 81:4
83:18 103:10 126:21
**wanting** 157:10
**wants** 68:9 72:1
**warehouse** 7:6 170:19,
25
**way** 9:3 17:20 18:7
20:12, 14 21:2 28:17
34:5, 7 35:11 36:5, 21
39:3 42:8 44:22 62:16
77:23 81:10, 19 91:13
93:11 95:20 103:23
105:17 106:16, 23
115:12 119:10 130:13
132:8 141:17 143:8
144:17 146:7 153:3, 7
164:14 169:4
**Wayback** 127:20 128:2
**ways** 21:1 33:25
**web** 34:7 95:22 97:4
127:23
**Webmaster** 75:1, 5
**website** 16:22, 23 17:8
40:2 50:25 52:1 64:25
65:12, 15, 21 75:6 92:21
93:2 95:15, 16, 24 96:4,
9, 10, 12, 21, 23, 25 108:7
109:1 115:4, 6, 20, 21
117:18 118:13, 19 119:9
120:8, 23 121:1, 7, 8, 22
124:4, 7, 17 125:5 127:9,
10
**websites** 52:23 54:6
82:9 96:7 122:15, 16, 22
127:24
**week** 28:6
**weekly** 48:11 48:23
**weeks** 48:10 157:12
**Weiss** 120:19
**welcome** 149:6
**Well** 9:14, 17, 20 14:19
15:2 17:5, 7 19:10, 11
21:17 25:17 26:1, 8, 10,
22 29:6 31:8, 10 32:3
34:18 35:4 37:19 39:11
42:11, 15 43:22 45:18,
22 46:9 50:1 53:10
55:15 58:3, 19 59:6
63:22 64:8 71:15, 23
72:2, 8, 22 73:19 74:1,
20 75:11 76:11, 20, 22
77:22 79:13, 20 83:11
85:16 86:24 87:3 88:15,
17, 23 90:20 96:16
98:11, 14, 17, 18 100:4,
19 101:25 102:11, 25
103:11 104:1, 15 105:13,
14 109:12, 19 111:14
113:20 115:12 116:16
117:2, 25 119:5 120:25
121:17 123:3, 10 124:5,
13, 19, 22 127:1, 5, 19
130:11, 16, 18 131:6
132:6, 18 133:23 138:3,
17 140:6 141:15 145:23
147:25 149:21 164:1
166:5 167:14, 22 168:3,
7 169:5, 8, 10, 13, 16
**well-known** 105:10

**Wendt** 44:9, 10, 17
45:14 100:3 110:16
**went** 29:1 37:10, 12, 13
38:21 39:17, 20, 25
76:13 140:4 164:19
**we're** 15:13 24:17
25:22 36:16 48:2 53:10
56:9, 11 66:10 68:3, 6
76:16 80:24 87:23
102:2 115:19 117:22
125:15 129:7 131:3, 6,
15 135:16 139:22
146:10 151:20 153:2
160:14 161:7, 9 170:21
**West** 1:21
**WESTERN** 1:2
**we've** 11:8 14:10 22:13
32:21 43:13 44:20 48:6
66:19 70:24 80:11 96:8
115:24 116:3 117:11
126:4 127:5 129:18
148:9, 14 156:22 162:18
**wheel** 44:1, 3, 4 45:14, 16
**wheels** 99:15
**WHEREOF** 172:13
**whichever** 42:5
**wholeheartedly** 61:24
**willingness** 137:6
**wish** 143:21
**wished** 83:17
**WITNESS** 2:2 3:5 8:4
19:20 22:25 24:3 35:18,
20 53:19 54:1 55:9, 11
59:21 61:9, 11 81:11, 15,
21 82:1 84:23 90:9
106:16 110:8 119:14
134:3 141:2 142:23
146:23 147:2 171:11
172:13
**Wonderful** 50:22
**woodworking** 52:2
143:14 144:11, 15
**word** 11:4 27:17 45:22
58:14, 17, 20 61:25 62:1
82:20 83:11 100:20
128:15 136:19 139:17,
20 149:9 154:18, 20
**words** 96:3, 14 101:11
139:12 141:20 152:2
160:4
**work** 30:13, 16, 18 50:8
53:1 84:10 114:11
147:12 148:3, 11 158:21
168:5
**worked** 44:20 168:3
**working** 30:22 31:3
33:5 126:8 159:7
**works** 4:15 45:23
**worries** 5:13
**worth** 21:8
**write** 151:21
**writing** 152:2
**written** 125:3 152:19
**wrong** 109:5
**wrote** 15:21 83:4, 18
94:13

**< X >**
**XP** 57:23 58:1 67:10
68:10 96:3 97:1 108:4
112:18 127:4 129:13
164:13
**xpabrasives.com** 95:11
164:10

**< Y >**
**yeah** 5:2, 4 10:18 11:22
13:20 14:3 15:18 16:1
22:25 23:14 26:8 30:24
31:10 32:19, 25 34:15
39:20 40:23 41:12 42:9
43:3 47:20 50:13 56:6
64:20 70:12 72:16 73:2
76:7, 16 80:7, 16, 22
84:23 95:1 97:18 99:10
103:20 108:20 121:19
125:2 127:13 131:7
140:6 145:19, 21 147:8
151:20 157:19 159:14
166:9 170:17
**year** 4:13 28:12 30:19
64:23 148:24
**years** 4:14 29:15 38:17
43:7, 10, 16 44:11 48:11,
12, 13, 14 49:19 54:24
55:18, 19 56:16 60:18
72:17 84:24 92:21, 22
108:16 110:2 111:20
112:1, 8 165:24 168:7, 9
**yep** 4:5, 25 5:4, 22
15:16, 24 24:1 62:24
75:18 91:7 103:5
107:17 111:3 118:12
124:1 135:19