# EXHIBIT B

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "**Agreement**") is made on October 13, 2014 (the "**Effective Date**") between Allied Industrial Supply, LLC ("**AIS**"), a Michigan limited liability company with an address of 3890 Buchanan Avenue SW, Grand Rapids, MI 49548 ("**Buyer**"); Lehigh Valley Abrasives, LLC, a New Jersey limited liability company with an address of 24 Cokesbury Road, Suite 2 Lebanon, NJ 08833 ( "**LVA**"); and Christopher Stone with an address of 24 Cokesbury Road, Suite 2 Lebanon, NJ 08833 (collectively "**Sellers**").

## BACKGROUND INFORMATION

LVA (hereinafter also referred to as the "**Business**") is engaged in the wholesale and distribution business of industrial supplies and abrasives at 24 Cokesbury Lane, Lebanon, NJ 08833 (the "**Premises**"). On August 22, 2014, the parties signed a letter of intent regarding the purchase of the Assets of the Business.

This Agreement contains the understanding between the Buyer and the Sellers with respect to the sale and purchase of the Assets. The closing date shall be on or before October 31, 2014 ("**Closing Date**" or "**Closing**")

## AGREEMENTS

1. <u>Sale and Purchase</u>. Sellers agrees to sell to Buyer and Buyer agrees to purchase from Sellers the Assets described in below. At the Closing, Sellers shall sell and deliver to Buyer all of the assets, rights, and interests of every conceivable kind or character whatsoever, whether tangible or intangible of the Business, that on the Closing Date are owned by Sellers or in which Sellers has an interest of any kind and are used in the Business listed, but not limited to, those items listed on attached Exhibit A (the "**Assets**"). The Assets include, without limitation, the following:

   a. *Equipment*. All machinery, equipment, fixtures, leasehold improvements and other tangible property used by the Sellers in the operation of the Business.

   b. *Inventory and Supplies*. All of Sellers' inventory and supplies used in the operation of the Businesses and on hand at the time of Closing (the "**Inventory**").

   c. *Contracts/Receivables*. All assignable contracts between Sellers and their customers and all receivables. Seller shall maintain the receivables as of the date of Closing related to orders that have been placed, filled and invoiced as of the Closing Date. All remaining receivables shall be assigned to Buyer.

   d. *Intangibles*. The name "Lehigh Valley Abrasives, LLC" and the d/b/a Industrial Tool Crib, the telephone numbers for the Business (the "**Numbers**"), all good will associated with the Business (the "**Goodwill**"), and all books and records reasonably necessary for Buyer to operate the Business after Closing (the "**Records**").

1

    e.   *Software.* Sellers' website(s) (the "**Site**") all passwords and information needed to operate the Site after Closing. Sellers' databases and hosting accounts, Google AdWords accounts and customized programming language and code used for search engine optimization and displaying of a graphical interface for operation of the Site.

    f.   *Miscellaneous Items*.   Any existing computer programs, software programs, software and technical libraries, license agreements, and all other intellectual and/or proprietary information and property and applications for or licenses of, used in connection with the Business,

    g.   *Intellectual Property*.   All Sellers' right, title, benefit, and interest in and to all intellectual property and intellectual property rights owned by or licensed by the Sellers, including, but not limited to, all inventions, discoveries, improvements, designs, prototypes, trade secrets, manufacturing and engineering drawings, process sheets, specifications, bills of material, patents, patent applications, registered and unregistered copyrights and copyright rights in both published and unpublished works, registered and unregistered trademarks, registered and unregistered trade names, formulae and secret and confidential processes, know-how, technology, customer lists, computer software, databases, data, process technology, and other industrial property (whether patentable or unpatentable), all rights to sue for the infringement of any of the foregoing, all renewals and extensions of any of the foregoing, and all goodwill of Sellers relating to any of the foregoing (the "**Intellectual Property**").

    h.   *Past Purchase Orders*.   The full benefit of (a) any and all purchase orders placed with and accepted by Sellers in the ordinary course of business on or before the Closing Date that have not been completely performed or filled before the Closing Date, covering the purchase from Seller of products to be supplied by Sellers, or covering the rendition by Seller of services, and including all deposits, progress payments, and credits.

1.2 <u>Assets not Included in Sale:</u>   All cash, cash equivalents, and amounts held on deposit in all savings, checking, money market, investment, and other similar accounts.  Seller shall maintain all cash on hand as of the date of closing.

2. <u>Assumed Liabilities</u>.  Buyer shall not assume any liabilities of Sellers and Sellers shall indemnify Buyer against any and all claims arising out of or relating to Sellers' liabilities.

3. <u>Purchase Price</u>. The purchase price shall be One Million, Three Hundred Thousand Dollars and No Cents ($1,300,000.00) (the "**Purchase Price**").  The Purchase Price shall be paid as follows: Eight Hundred Thousand Dollars and No Cents ($800,000.00) to be paid at Closing by Buyer via wire transfer or certified funds with payment at Closing of Five Hundred Thousand Dollars and No Cents ($500,000.00) in the form of the Promissory Note to Christopher Stone from Buyer attached as Exhibit C.

4. <u>Payment of Purchase Price</u>.  Buyer shall pay the Purchase Price via wire transfer into an account at Sellers' direction. The obligation of Sellers to transfer possession and/or control of the Sellers' assets shall occur immediately upon transfer and receipt of the initial $800,000.00 and the executed Promissory Note attached as Exhibit C of this Agreement.

5. <u>Earn Out</u>. In addition to the Purchase Price, Buyer shall pay to Seller on January 31st, 2016, $50,000.00 (the "**Earn Out**") conditioned upon AIS's 2015 revenues derived from the purchase of the Assets of LVA maintaining or beating the combined 2014 revenues of LVA and AIS's revenues derived from the purchase of the Assets of LVA. Buyer shall pay to Sellers the Earn Out for the first full year after execution of the Agreement only.

6. <u>Buyer's Documentation/Authority</u>.  Buyer has full authority and power to execute this Agreement and all related documents. Buyer shall provide at Closing executed Resolutions signed by the Managing Member or other principal of Buyer having full authority to bind the Company in entering into this Agreement, to Close on the purchase of assets, incur the debt to Seller and to execute the Promissory Note made part of this Agreement.

7. <u>Closing</u>.

 7.1  Closing shall take on or about October 13, 2014 at the office of Seller, or by mail.

 7.2  <u>The Seller's Closing Deliveries</u>.   At Closing, the Seller shall deliver to the Buyer the following (collectively, the "**Seller's Documents**"):

   (a) A General Bill of Sale duly executed by the Seller, conveying to the Buyer good and valid title to the Assets, which title shall be free and clear of all liens, claims, charges, mortgages and encumbrances attached as Exhibit E;

   (b) Certified copies of any required resolutions, duly adopted by the Seller or by the Members of any LLC authorizing, approving and ratifying, as the case may be, the Sale and the execution and delivery of this Agreement, the Seller's Documents and any other document to be executed by the Seller in connection with the Sale;

   (c) The Seller's Certificate or Certification;

   (d) Such other instruments and documents that the Buyer and the Buyer's counsel reasonably deem necessary to affect the Sale.

 7.3  Seller shall be responsible for all debts, liabilities, or claims existing or arising out of matters or events existing or that occurred prior to the time of Closing.  Buyer shall be responsible for all debts, liabilities, or claims arising out of matters or events that occur after the time of Closing. Distribution of proceeds for the within Sale shall be made in the following order of priority at Closing and/or at the Closing of the Property:

   (a) Payment of any taxes and/or of any escrow amount required by the New Jersey Division of Taxation, Bulk Sales Unit for tax liabilities.

(b)    Payment to any creditors and lien holders of Seller including any Landlord lien or claim.

(c)    Amounts due on any equipment leases or licenses if same are being transferred to Buyer.

(d)    Sales proceeds to Seller.

7.4    <u>Further Assurances and Covenants</u>.    At any time from and after Closing, upon the reasonable request of either Party, the other Party will do, execute, acknowledge and deliver, or cause to be delivered, all such further acts and other documents as may be required to carry out provisions of this Agreement.

8.    <u>Delivery Free of Encumbrances</u>.  Sellers shall deliver good title to the Assets free from all mortgages, liens, claims, demands, charges, options, equity interests, leases, tenancies, easements, pledges, security interests, and other encumbrances (the "**Encumbrances**").

9.    <u>Risk of Loss</u>.  Risk of loss to any of the Assets shall remain with Sellers until Closing.  In the event of any material loss or destruction of or damage to the Assets by reason of fire or other casualty prior to Closing, Buyer shall the option to either cancel this Agreement without further obligation or to negotiate a prorate reduction of the Purchase Price.  In the event of a non-material loss, destruction or damage, the Purchase Price shall be reduced on a prorated basis, and Buyer shall be obligated to close the purchase.

10. <u>Taxes</u>.  Sellers shall pay all taxes associated with the Assets prior to the Closing Date.

11. <u>Expenses and Prorations</u>.  The parties agree to pay their own legal, accounting and other expenses incurred in connection with the preparation, execution and effectuation of this Agreement.

12. <u>Brokers, Commissions and Fees</u>.  Each of the parties represents and warrants that none of them is obligated to pay a brokerage fee or commission with respect to the purchase and sale of the Assets.  Each party shall indemnify and hold each other party harmless against and with respect to any and all liability or expense which may be incurred by the other party as a result of claims asserted by any broker or other person claiming brokerage commissions or finder's fees in connection with the execution of this Agreement and the consummation of the transactions contemplated by this Agreement.

13. <u>Financing</u>.  Closing is contingent upon Buyer's ability to obtain a loan to finance $800,000.00 of the Purchase Price.

14. <u>Representations and Warranties of Sellers</u>.  As a material inducement to Buyer to enter into this Agreement and for Buyer to purchase the Assets, Sellers make the following representations, warranties and agreements to Buyer:

a.    *Liabilities*.  Sellers will have no debts or liabilities for which Buyer would have responsibility after Closing, whether related to tax or non-tax matters, due or not

yet due, liquidated or unliquidated, fixed or contingent, or otherwise, except as disclosed to Buyer in writing in this Agreement.

b. _Employment Agreements_.     Sellers have no written contracts with Sellers' employees, all of which employees are "at will" employees. Buyer shall provide to Sellers a list of those employees that Buyer does not want to retain in the Business. Sellers shall, prior to closing, terminate the employment of such employees without liability to Buyer.

c. _Good Standing_. Sellers are in good standing with all governmental agencies and the like, and through which Sellers are permitted to conduct the Business.

d. _Conduct of Business_. Between the date of signing of this Agreement and the date of Closing, Sellers shall operate and maintain the Business in the usual course, shall take no action out of the ordinary and shall refrain from disposing of any of the Assets other than inventory and supplies in the normal course, shall not create any lien, and shall not enter any contract or make any unusual payments or distributions relative to the Business, other than such actions as may be taken in the normal and usual course of business. Sellers shall be entitled to all profits arising out of the operation of the business up to the date of Closing. Either before or after Closing, Sellers shall be entitled to sue in Sellers' own name for purposes of collection any accounts receivables. Any profits and accounts receivable generated by Business operations following Closing shall be the sole property of Buyer.

e. _Taxes_.     All individual income, corporate income, sales, withholding, unemployment and other taxes incurred by Sellers have and shall be paid by Sellers and all tax returns required to be made by Sellers shall be filed properly by law. Furthermore, Sellers agree to indemnify, defend, and hold harmless, Buyers against any liability incurred, or charged made, against Buyers as it relates to tax liabilities incurred during Seller's ownership of the Assets.

f. _Laws_. Sellers have complied with all applicable ordinances, rules, regulations and laws.

g. _Litigation and Claims_.   There are no lawsuits or claims of any nature pending or threatened against Sellers arising out of the operation of the Business. Sellers shall indemnify, defend and hold harmless the Buyer from and against any such lawsuits or claims.

h. _No Violation or Consent_.   The execution of this Agreement and its performance hereunder do not violate any law or any other obligation of Sellers, and no material consent or approval is required.

i. _Financial Statements_.   The financial statements delivered to Buyers prior to the date of this Agreement fairly present the financial position of Seller as of the date of said financial statements.

j.  *Title to Purchased Assets*.  Sellers have, and at the Closing, Buyer will receive, good and marketable title to all of the Assets, free and clear of all security interests, mortgages, liens, pledges, charges or encumbrances of any nature.

k.  *Sellers' Other Assets*.

(a) All of the Assets are in good operating condition, subject only to ordinary wear and tear, and fit for their intended purpose.

(b) All of the Purchased Assets are owned by Sellers and Sellers are not leasing nor holding on consignment, any Inventory, equipment, furniture, fixtures or other personal property.

(c) All items which comprise Inventory; (1) have been purchased for sale or use by Sellers in the ordinary course of business; and (2) are new, useable in the ordinary course, non-defective, in "first" quality condition and free of all damages and defects

l.  *Restrictive Covenants*.  Christopher Stone agrees to sign the non-competition agreement attached as Exhibit B.

m.  *Contracts*.  Sellers are not obligated under any contract or agreement (written or otherwise) which may not be terminated by Sellers without liability to Sellers or Buyers upon 30 days' or less notice of a desire to terminate.

n.  *Assigned Contracts*.  With respect to any assigned contracts:  Neither Sellers nor, to Sellers' best knowledge, the third parties to such assigned contracts are in default nor has such default been asserted by any party, and there has not occurred any event which, with the passage of time or giving of notice (or both), would constitute such default.  Furthermore, Sellers have satisfied all of their obligations to the extent that such obligations can be determined as of the date of this Agreement and Sellers will satisfy all remaining obligations prior to the Closing Date.

o.  *Intellectual Property*.  Sellers have not interfered with, infringed upon, misappropriated, or violated any material intellectual property right of third parties in any material respect, and Sellers have not received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that Sellers must license or refrain from using any intellectual property rights of any third party).

15. Representations and Warranties of Buyer.  Buyer represents and warrants to Seller as of the date hereof as follows:

(a)  The Buyer has full power and authority to execute, deliver and perform this Agreement to purchase the Assets.

(b)     No contract, mortgage, indenture, promissory note or other similar agreement to which the Buyer is a party or by which it is bound will be violated by the consummation of this Agreement.

(c)     The Buyer has the finances or will have same at Closing necessary to complete this transaction.

(d)     Buyer represents that it is entering into this Agreement and shall consummate the sale based only upon its own investigation(s) and business acumen

16. Liabilities and Indemnification.  Sellers and Buyer agree that Buyer is neither assuming nor agreeing to pay any liabilities of or claims against Sellers by executing this Agreement, other than those liabilities expressly assumed by the terms of this Agreement.

17. Remedies.  The rights and remedies of the parties to this Agreement, whether provided by law or this Agreement, shall be cumulative.  The exercise by any party of any one or more remedies shall not preclude the exercise by them, at the same or different time, of any other remedy for the same default or breach by the other party.  Without limiting the above, either Sellers or Buyer may terminate this Agreement (a) in the event the other party fails to comply with the provisions of this Agreement, and fails to correct such default within ten (10) calendar days' notice of such default; or (b) in the event the other party voluntarily or otherwise enters into any proceeding (including bankruptcy or insolvency proceedings) or makes an arrangement or other composition with its creditors or takes or suffers any similar action or actions in consequence of debt..

18. Consulting Agreement.  Christopher Stone agrees to sign and be bound by the consulting agreement attached as Exhibit D.

19. Compliance with Bulk Sale Regulations.   The parties agree to submission of all required Bulk Sale Notices to the New Jersey Division of Taxation and agree not to Close until an Escrow or Payment Letter is received from the Division of Taxation and to Close subject to any escrows or other requirements set forth by the Division of Taxation.

20. Waiver.  Any party may waive any term, condition or requirement of this Agreement which is intended for their benefit.  Any waiver of any term, condition or requirement of this Agreement shall not operate as a waiver of any other breach of such term, condition or requirement.  No failure to enforce any provisions of this Agreement shall operate as a waiver of any such provisions or any other provision of this Agreement.

21. Notices.  All notices, demands and other communications given under this Agreement shall be in writing and shall either be hand delivered or sent by Certified Mail and email to the respective addresses of the parties.

22. Modification.  No modification of this Agreement shall be effective unless in writing and signed by the party to be bound.

23. <u>Non-Assignability</u>.  Neither this Agreement nor any rights or obligations under it may be assigned, transferred or conveyed by any party without the written consent of the other parties.

24. <u>Entire Agreement</u>.  This Agreement, and its attachments, contain the entire agreement and understanding between the parties.

25. <u>Binding Effect</u>.  This Agreement shall be binding upon and shall inure to the benefit of the Sellers and Buyers, and their heirs, personal representatives, successors and assigns.

26. <u>Interpretation</u>.  Buyers and Sellers have jointly drafted this Agreement.  Therefore, the rule of construction of this Agreement against the party drafting it shall not apply.

27. <u>Law</u>.  This Agreement is to be construed and interpreted in accordance with the laws of the State of New Jersey and shall be subject to the sole jurisdiction of the State of New Jersey or the federal courts with jurisdiction in the same.

28. <u>Stuart Law, PLC</u>.  Buyer and Sellers recognize that Stuart Law, PLC is representing Buyer in the purchase of the Assets.  Sellers have hired independent legal counsel to represent Sellers in the transactions contemplated by this Agreement.

29. <u>Mediation</u>.  Buyer and Sellers agree to first mediate any dispute they may have against each other, of any nature whatsoever. The mediation shall occur within 60 days of notice of the dispute and the mediator shall be picked by mutual consent of the parties.   The parties shall use the first recommendation of the Michigan Bar Association referral services if the parties fail to agree on a mediator.

30. <u>Attorney Fees</u>.  In the event of a dispute arising out of this Agreement, the prevailing party will be entitled to actual attorney fees and costs.

31. <u>Counterparts</u>.  This Agreement may be signed in counterparts.  Each counterpart shall constitute the same Agreement.

32. <u>Time</u>.  Time is of the essence under this Agreement.

The parties have signed this Asset Purchase Agreement as of the date set forth at the beginning of this document.

**BUYER:**

Robert M. Shindorf, Managing Member
Allied Industrial Supply, LLC

**SELLERS:**
Lehigh Valley Abrasives, LLC

Christopher Stone, Managing Member

Christopher Stone, Individually

**EXHIBIT A**

**ASSET LIST and ASSET ALLOCATION**

1. Inventory – $145,000.00

2. Equipment - $5,000.00

3. Software & Website - $1,150,000.00

**EXHIBIT B**

**NON-COMPETITION AND CONFIDENTIALITY AGREEMENT**

THIS NON-COMPETITION AGREEMENT (the "**Agreement**") is made as of October 13, 2014, between Allied Industrial Supply, LLC ("**AIS**"), a Michigan limited liability company with an address of 3890 Buchanan Avenue SW, Grand Rapids, MI 49548 ("**Buyer**"); Lehigh Valley Abrasives, LLC, a New Jersey limited liability company with an address of 24 Cokesbury Road, Suite 2 Lebanon, NJ 08833 ( "**LVA**"); and Christopher Stone with an address of 24 Cokesbury Road, Suite 2 Lebanon, NJ 08833 (collectively "**Seller**").

Seller has entered into a Membership Purchase Agreement and Asset Purchase Agreement (collectively "**Purchase Agreement**"), dated as of the same date of this Agreement by and among Allied Industrial Supply, LLC   "**Buyer**") and Seller. Pursuant to the Purchase Agreement and Letter of Intent, Buyer are purchasing the membership interest and assets of Seller. The Asset Purchase Agreement requires that Seller execute and deliver this Agreement. Seller will benefit from the sale of the membership interest and assets.

Accordingly, the parties agree as follows:

1. <u>Non-Competition</u>.  Seller agrees that for a period of seven (7) years after the Closing Date neither will directly or indirectly engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend credit to, or render services or advice to, any business whose products or activities compete in whole or in part with the business of AIS within 40 miles of wherever AIS conducts business, has conducted business in the last 12 months, and  of AIS's operations, or attempt to interfere with the business of AIS, either directly or indirectly, in any manner, including, but not limited to: (a) interacting with the AIS's customers in an attempt to take, redirect, re-price, interrupt or discontinue any facet of the business relationship; (b) interacting with AIS's employees or representatives in an attempt to induce them to leave employment with AIS; or (c) interacting with any other person or entity so as to divulge information about AIS's business.

2. <u>Reasonable</u>. Seller agrees that the non-compete restrictions are reasonable and necessary for the reasonable protection of the business and interests of AIS and that any violation of these restrictions will cause substantial and irreparable injury to AIS, and as a consequence thereof, the Selling Party agrees that AIS is entitled, in addition to any other remedies, to preliminary and permanent injunctive relief to secure specific performance and to prevent a breach or contemplated breach of this Agreement. AIS reserves all remedies available at law or in equity.

3. <u>Severability</u>.  In the event any provisions shall be held to be invalid or unenforceable, the same shall not affect the validity or enforceability of any other provisions, and in the event that such claim of invalidity or unenforceability of any provision shall be predicated upon the length of the term of any covenant therein or the area covered thereby or the type of activity restrained, such provision shall not thereby be deemed invalid or unenforceable

but shall be deemed modified to the maximum area and the maximum term of duration and the type of activity as any court of competent jurisdiction shall deem reasonable, valid and enforceable.

4. <u>Successors and Assigns</u>.  This Agreement will inure to the benefit of, and will be binding upon, the parties to this Agreement and their respective successors, assigns, heirs, and legal representatives, including any entity with which Buyer may merge or consolidate or to which all or substantially all of its assets may be transferred. The duties and covenants of Seller under this Agreement, being personal, may not be delegated or assigned by Seller.

5. <u>Waiver</u>.  Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

6. <u>Governing Law</u>.  This Agreement will be governed by the laws of the State of Michigan, without regard to conflicts of laws principles.

7. <u>Jurisdiction; Service of Process</u>.   Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Michigan, County of Kent, or, if it has or can acquire jurisdiction, in the United States District Court for the Western District of Michigan, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world by registered or certified mail.

8. <u>Liquidated Damages</u>.  The parties acknowledge that if the Seller violates any covenants contained in this Agreement it will be difficult for the parties to calculate the damages incurred by such breach.  Therefore, in additional to injunctive relief to stop continuing future violations of this Agreement, the Employer shall be entitled to the greater of actual damages or liquidated damages in the amount of $250,000.00.

9. <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts by fax, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

10. <u>Notices</u>.  All notices, consents, waivers, and other communications under this Agreement will be deemed to have been duly given when given at:

a.      If to the Buyer, to:
        Robert M. Shindorf
        3890 Buchanan Ave SW
        Grand Rapids, MI 49548

b.      If to Seller, to the address for notice on the signature page to this Agreement or, if
        no such address is provided, to the last address of Seller provided by Seller to the
        Company.

11. <u>Entire Agreement</u>.  This Agreement, and the agreements referenced in this Agreement,
    contain the entire agreement between the parties with respect to the subject matter of this
    Agreement and supersede all prior written and oral agreements and understandings
    between the parties with respect to the subject matter of this Agreement. The restrictive
    covenants contained in this Agreement compliment, and shall not supersede or otherwise
    modify, any other restrictive covenants contained in the agreements referenced herein or
    therein. This Agreement may not be amended except by a written agreement executed by
    the party to be charged with the amendment.

        The parties have executed and delivered this Non-Competition Agreement as of the
date written in the first paragraph above.

**ALLIED INDUSTRIAL SUPPLY, LLC.**

_____

Robert M. Shindorf, Managing Member


**SELLER**

Lehigh Valley Abrasives, LLC

_____

Christopher Stone, Managing Member

_____

Christopher Stone, Individually

Address for Notice:

_104  Hoffman  Lane_____

_Glen  Gardner  NJ  08826_____


Exhibit B-3

## EXHIBIT C

### PROMISSORY NOTE

$500,000.00                                                     October 13, 2014

THE INDEBTEDNESS EVIDENCED BY THIS INSTRUMENT IS SUBORDINATED IN RIGHT OF PAYMENT TO THE SUPERIOR INDEBTEDNESS (AS DEFINED IN THE SUBORDINATION AGREEMENTS HEREINAFTER REFERRED TO) PURSUANT TO, AND TO THE EXTENT PROVIDED IN, THE SUBORDINATION AGREEMENT DATED AS OF OCTOBER _____, 2014 BY AND AMONG THE PAYEE AND THE DEBTOR IN FAVOR OF CHEMICAL BANK (the "**SUBORDINATION AGREEMENT**") AS SUCH SUBORDINATION AGREEMENTS MAY BE AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME. PAYMENTS MAY BE MADE UNDER THIS INSTRUMENT ONLY TO THE EXTENT EXPRESSLY PERMITTED UNDER SUCH SUBORDINATION AGREEMENTS. THIS LEGEND SHALL BE PLACED ON ANY NOTE OR OTHER INSTRUMENT GIVEN AT ANY TIME IN SUBSTITUTION FOR OR REPLACEMENT HEREOF.

FOR VALUE RECEIVED, Allied Industrial Supply, LLC, a Michigan limited liability company of 3890 Buchanan Ave SW, Grand Rapids, MI 49548 (the "**Debtor**"), hereby promises to pay to the order of Christopher Stone, a New Jersey Individual, (the "**Payee**"), at _104 Hoffman Lane Glen Gardner NJ 0882_, or at such other place as the holder ("**Holder**") of this note ("**Note**") may designate in writing, the principal sum of Five Hundred Thousand Dollars ($500,000.00), together with interest, in accordance with the terms of this Note.

1. <u>Interest Rate</u>.  Except as otherwise provided herein, interest shall accrue on all amounts due under this Note at a rate equal to three point seventy-five percent (3.75%).  Interest shall be computed on the basis of a 365-day year for the actual number of days outstanding. As used in this Note, the term "**Prime Rate**" shall mean the prime rate of interest per annum as published from time to time in The Wall Street Journal.

2. <u>Payment</u>.  Debtor shall make monthly payments of Eight Thousand and 00/100 Cents ($8,000.00), with the first such payment due on the first of the month, immediately following the first full month the Closing Date of the Purchase Agreement, including interest and a like amount on the same day of each month thereafter for a period of thirty-six (36) months.  At the conclusion of 36 months, the full remaining balance shall be come due and payable upon written demand.

3. <u>Prepayment</u>.  Debtor may prepay the outstanding principal due hereunder, in whole or in part, at any time without premium or penalty.

4. <u>Event of Default; Acceleration</u>.  Any of the following shall constitute an "**Event of Default**" under this Note:

(a) Failure of Debtor to make any payment required by this Note within ten (10) days of written notice to Debtor;

Exhibit C-1

(b) Any other default or breach by Debtor under this Note or any default or breach by Debtor under any other agreement between Debtor and Payee.

(c) Any default or breach by Debtor in the payment of any indebtedness owing to any other person, as and when due and payable, whether by acceleration or otherwise, whether or not such third person declares a default or breach or proceeds to enforce any of its rights with respect to such a default or breach;

(d) The dissolution of Debtor; the sale, transfer or disposition by Debtor of all or substantially all of its assets (either in one transaction or through a series of transactions); or any merger, consolidation, reorganization, sale or other transfer of stock or other event that results in more than fifty percent (50%) of the equity ownership of Debtor being owned by a person who is not currently an equity owner of Debtor; and

(e) Commencement by Debtor of any bankruptcy, reorganization, receivership or insolvency proceedings; commencement against Debtor of any bankruptcy, reorganization, receivership or insolvency proceedings that is not discharged in full within thirty (30) days; any assignment by Debtor for the benefit or its creditors; or Debtor becoming insolvent.

Debtor shall promptly notify Holder in writing upon the occurrence of any Event of Default, and upon the occurrence of an Event of Default, Holder may, without notice or demand, declare the entire principal balance of this Note, together with all accrued interest and any other amounts owed hereunder, immediately due and payable, and Holder shall also have any other rights and remedies provided by applicable law.

6. <u>Notices and Payments</u>.  All notices and demands required or permitted by this Note shall be in writing.  All notices, demands and payments required or permitted by this Note shall be deemed properly made (a) upon personal delivery to the relevant address set forth on the first page of this Note or such other relevant address as may be specified in writing by the relevant party, or (b) upon deposit in the United States mail, registered or certified mail, or with a recognized overnight courier, postage prepaid, addressed to the relevant address set forth on the first page of this Note or such other relevant address as may be specified in writing by the relevant party.  Proof of sending any notice, demand or payment shall be the responsibility of the sender.

7. <u>General Provisions</u>.  Any failure by Holder to exercise any right under this Note, including the right to accelerate Debtor's obligations upon the occurrence of an Event of Default, shall not constitute a waiver of the right to exercise such right.  No waiver or release shall be binding against Holder unless given in writing by such Holder.  Debtor shall have no right to offset any claims or other rights it may have against Payee or any related party against amounts due under this Note.  In addition to all indebtedness and accrued interest, Debtor agrees to pay all costs, including, without limitation, attorneys' fees, of collection and enforcement of this Note and any other related documents, including, without limitation, the Security Agreement and the Mortgage.  Such amounts shall be due promptly upon Debtor's receipt of notice that such costs have been incurred.

Exhibit C-2

Payee, and each subsequent Holder, shall have the right to assign all or any part of this Note, or to transfer rights of participation in this Note.  In the event this Note is pledged or assigned to any party, such party shall not be subject to (and Debtor hereby waives as against any such party) any defenses, counterclaims or other objections of Debtor that are personal to Payee or any prior holder.

At no time shall the interest rate on this Note exceed the highest interest rate permitted by law; to the extent amounts received by Holder are attributable to an interest rate in excess of that permitted by law, such amounts shall be deemed permitted prepayments of principal last coming due, without premium or penalty.

This instrument is subject to the terms of standby and Subordination Agreements in favor of Chemical Bank, to which reference is hereby made, restricting the rights of the maker, drawer or any guarantor, and of any holder, with respect to payments on account of the principal and interest hereof and subordinating the indebtedness evidenced hereby to the interest of Chemical Bank.

The terms and conditions of this Note shall be governed, construed, interpreted and enforced in accordance with the domestic laws of the State of New Jersey, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New Jersey.  Any and all actions concerning any dispute arising hereunder shall be filed and maintained in the state or federal courts of New Jersey. The parties specifically consent and submit to the exclusive jurisdiction and venue of such state or federal court, and irrevocably waive any objections either may have based on improper venue or forum non conveniens to the conducting of any proceeding in any such court.

ALLIED INDUSTRIAL SUPPLY, LLC.

By: _____

Robert M. Shindorf, Managing Member

Exhibit C-3

## PERSONAL GUARANTY

Each of the following agrees to be jointly and severally liable to Lender for any amount due under the terms of this note. Each of the following agrees to be personally obligated on the note as this is a guaranty of payment and agrees that he is legally responsible for payment of the note upon Christopher Stones exhaustion of collection efforts against Allied Industrial Supply, LLC and 14 days written notice. Guarantors will be able to assert any and all defenses of its principle in any such action. Any legal action may be taken against guarantor only after legal action has been completed against the principal on the note.

Dated:  10|15|2014                      /s/

Robert Shindorf

Exhibit C-4

**EXHIBIT D**

**CONSULTING AGREEMENT**

THIS CONSULTING AGREEMENT ("**Agreement**") is made and entered into as of October 13, 2014 (the "**Effective Date**") by and between Allied Industrial Supply, LLC, a Michigan Limited Liability Company (the "**Company**"), and Christopher Stone ("**Consultant**") (each herein referred to individually as a "**Party**," or collectively as the "**Parties**").

The Company desires to retain Consultant as an independent contractor to perform consulting services for the Company, and Consultant is willing to perform such services, on the terms described below. In consideration of the mutual promises contained herein, the Parties agree as follows:

1. <u>Services and Compensation</u>. This Agreement is made in connection with, as part of and an Exhibit to, an Asset Purchase Agreement executed simultaneously herewith  and should be interpreted and construed in that context. Consultant shall perform the services the duties and roles he previously performed as owner of Lehigh Valley Abrasives, LLC subject to the review and direction of Company (the "**Services**") for the Company (or its designee), and the Company agrees to pay Consultant the compensation of $2,000.00 for each week after the first three months of this Agreement. Consultant acknowledges that this Agreement is in connection with an asset purchase agreement and thus the first three months of consulting shall be without direct compensation.

2. <u>Confidentiality</u>.

   a. *<u>Definition of Confidential Information.</u>* "**Confidential Information**" means any non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, its affiliates or subsidiaries, or to the Company's, its affiliates' or subsidiaries' technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's, its affiliates' or subsidiaries' products or services and markets therefore, customer lists and customers (including, but not limited to, customers of the Company on whom Consultant called or with whom Consultant became acquainted during the term of this Agreement), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or by drawings or inspection of premises, parts, equipment, or other property of Company, its affiliates or subsidiaries. Notwithstanding the foregoing, Confidential Information shall not include any such information which Consultant can establish (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; or (iii) is in the rightful possession of

Consultant, without confidentiality obligations, at the time of disclosure as shown by Consultant's then-contemporaneous written records.

b. _Nonuse and Nondisclosure._    During and after the term of this Agreement, Consultant will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information, and Consultant will not (i) use the Confidential Information for any purpose whatsoever other than as necessary for the performance of the Services on behalf of the Company, or (ii) disclose the Confidential Information to any third party without the prior written consent of an authorized representative of Company. Consultant may disclose Confidential Information to the extent compelled by applicable law; provided however, prior to such disclosure, Consultant shall provide prior written notice to Company and seek a protective order or such similar confidential protection as may be available under applicable law. Consultant agrees that no ownership of Confidential Information is conveyed to the Consultant. Without limiting the foregoing, Consultant shall not use or disclose any Company property, intellectual property rights, trade secrets or other proprietary know-how of the Company to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party. Without the Company's prior written approval, Consultant shall not directly or indirectly disclose to anyone the existence of this Agreement or the fact that Consultant has this arrangement with the Company. Consultant agrees that Consultant's obligations under this Section 2, Paragraph **B** shall continue after the termination of this Agreement.

3. Conflicting Obligations.

   a. Consultant represents and warrants that Consultant has no agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, Consultant's obligations to the Company under this Agreement, and/or Consultant's ability to perform the Services. Consultant will not enter into any such conflicting agreement during the term of this Agreement.

   b. In light of the unique and specialized nature of Consultant's services, Consultant shall have the right to subcontract the performance of any Services only with the prior written permission of the Company. In the event the Company authorizes Consultant to subcontract the performance of any Services, Consultant shall require all Consultant's employees, contractors, or other third-parties performing Services under this Agreement to execute a customary Confidential Information and Assignment Agreement in form and substance acceptable to the Company, in its sole and absolute discretion.  Consultant's violation will be considered a material breach under Section 6, Paragraph B.

4. Return of Company Materials.    Upon the termination of this Agreement, or upon Company's earlier request, Consultant will immediately deliver to the Company, and will not keep in Consultant's possession, recreate, or deliver to anyone else, any and all

Company property, including, but not limited to, Confidential Information, tangible embodiments of the Inventions, all devices and equipment belonging to the Company, all electronically-stored information and passwords to access such property, any and all records maintained, and any reproductions of any of the foregoing items that Consultant may have in Consultant's possession or control.

5.  <u>Reports.</u> Consultant agrees that Consultant will periodically keep the Company advised as to Consultant's progress in performing the Services under this Agreement. Consultant further agrees that Consultant will, as requested by the Company, prepare written reports with respect to such progress. The Company and Consultant agree that the reasonable time expended in preparing such written reports will be considered time devoted to the performance of the Services.

6.  <u>Term and Termination.</u>

    a.  *Term*.  The term of this Agreement will begin on the Effective Date of this Agreement and will continue until the earlier of (i) of one year from the effective date or (ii) termination as provided in Section 6, Paragraph **B**.

    b.  *Termination*.  The Company may terminate this Agreement upon giving Consultant 30 days written notice of such termination pursuant to Section 11, Paragraph F of this Agreement. The Company may terminate this Agreement immediately and without prior notice if Consultant refuses to or is unable to perform the Services or is in breach of any material provision of this Agreement.

    c.  *Survival*.  Upon any termination, all rights and duties of the Company and Consultant toward each other shall cease except:

        i.  The Company will pay, within thirty (30) days after the effective date of termination, all amounts owing to Consultant for Services completed and accepted by the Company prior to the termination date and related reimbursable expenses, if any, submitted in accordance with the Company's policies and in accordance with the provisions of Section 1 of this Agreement; and

        ii.  Section 2 (Confidentiality), Section 3, Paragraph B (Conflicting Obligations), Section 4 (Return of Company Materials), Section 6, Paragraphs A and B (Term and Termination), Section 7, Paragraph B (Independent Contractor; Benefits), Section 8 (Indemnification), Section 9 (Limitation of Liability), Section 10 (Arbitration and Equitable Relief), and Section 11 (Miscellaneous) will survive termination or expiration of this Agreement in accordance with their terms.

        iii.  No termination of this Agreement either by its terms or otherwise shall relieve Company and Buyer under the Asset Purchase Agreement of its debt and obligations under the Promissory Note also executed simultaneously herewith and made part of the Asset Purchase Agreement.

7. Independent Contractor; Benefits.

    a. *Independent Contractor*. It is the express intention of the Company and Consultant that Consultant perform the Services as an independent contractor to the Company. Nothing in this Agreement shall in any way be construed to constitute Consultant as an agent, employee or representative of the Company. Without limiting the generality of the foregoing, Consultant is not authorized to bind the Company to any liability or obligation or to represent that Consultant has any such authority. Consultant agrees to furnish (or reimburse the Company for) all tools and materials necessary to accomplish this Agreement and shall incur all expenses associated with performance. Consultant acknowledges and agrees that Consultant is obligated to report as income all compensation received by Consultant pursuant to this Agreement. Consultant agrees to and acknowledges the obligation to pay all self-employment and other taxes on such income.

    b. *Benefits*. The Company and Consultant agree that Consultant will receive no Company-sponsored benefits from the Company where benefits include, but are not limited to, paid vacation, sick leave, medical insurance and 401k participation. If Consultant is reclassified by a state or federal agency or court as the Company's employee, Consultant will become a reclassified employee and will receive no benefits from the Company, except those mandated by state or federal law, even if by the terms of the Company's benefit plans or programs of the Company in effect at the time of such reclassification, Consultant would otherwise be eligible for such benefits.

8. Indemnification. Consultant agrees to indemnify and hold harmless the Company and its affiliates and their directors, officers and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (i) any negligent, reckless or intentionally wrongful act of Consultant or Consultant's assistants, employees, contractors or agents, (ii) a determination by a court or agency that the Consultant is not an independent contractor, (iii) any breach by the Consultant or Consultant's assistants, employees, contractors or agents of any of the covenants contained in this Agreement and corresponding Confidential Information and Invention Assignment Agreement, (iv) any failure of Consultant to perform the Services in accordance with all applicable laws, rules and regulations, or (v) any violation or claimed violation of a third party's rights resulting in whole or in part from the Company's use of the Inventions or other deliverables of Consultant under this Agreement.

9. Limitation of Liability. IN NO EVENT SHALL COMPANY BE LIABLE TO CONSULTANT OR TO ANY OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER COMPANY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE

OF ANY LIMITED REMEDY. IN NO EVENT SHALL COMPANY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY COMPANY TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR INVENTION GIVING RISE TO SUCH LIABILITY.

10. <u>Arbitration and Equitable Relief.</u>

    a. *Remedy.* Except as provided by this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between Consultant and the Company. Accordingly, except as provided for by this Agreement, neither Consultant nor the Company will be permitted to pursue court action regarding claims that are subject to arbitration.

    b. *Availability of Injunctive Relief.* The Parties agree that any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, or confidential information. In the event either party seeks injunctive relief, the prevailing party shall be entitled to recover reasonable costs and attorneys' fees.

11. <u>Miscellaneous</u>

    a. *Governing Law; Consent to Personal Jurisdiction.* This Agreement shall be governed by the laws of the State of New Jersey without regard to the conflicts of law provisions of any jurisdiction. To the extent that any lawsuit is permitted under this Agreement, the Parties hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in New Jersey.

    b. *Assignability.* This Agreement will be binding upon Consultant's heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Except as may otherwise be provided in this Agreement, Consultant may not sell, assign or delegate any rights or obligations under this Agreement. Notwithstanding anything to the contrary herein, Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

    c. *Entire Agreement.* This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants that he/she is not relying on any statement or representation not contained in this Agreement. To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in

this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule.

d. _Headings_. Headings used in this Agreement are for reference only and shall not be considered when interpreting this Agreement.

e. _Severability_. If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

f. _Modification, Waiver_. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the Parties. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

g. _Notices_.   Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally or by commercial messenger or courier service, (ii) when sent by confirmed facsimile, (iii) if mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's address written below or at such other address as the Party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this Section 11, Paragraph G; or (iv) by e-mail if delivery is confirmed by the email service provider, if by email, delivery shall be deemed effective within 24 hours of the time emailed as determined by the email service provider.

    i. If to the Company, to:
       Robert M. Shindorf
       3890 Buchanan Ave SW
       Grand Rapids, MI 49548

    ii. If to Consultant, to the address for notice on the signature page to this Agreement or, if no such address is provided, to the last address of Consultant provided by Consultant to the Company.

h. _Attorney's Fees_. In any court action at law or equity that is brought by one of the Parties to this Agreement to enforce or interpret the provisions of this Agreement, the prevailing Party will be entitled to reasonable attorneys' fees, in addition to any other relief to which that Party may be entitled.

i. Other Agreements. Nothing in this Agreement shall be construed to limit any of Company's rights under any other agreement, including and not limited to, an asset purchase agreement and membership purchase agreement that Company has with Consultant.

j. <u>Signatures</u>.  This Agreement may be signed in two counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

IN WITNESS WHEREOF, the Parties hereto have executed this Consulting Agreement as of the date first written above.

**CONSULTANT**

By: _____

Name: Christopher Stone

Title: Individually

Address for Notice:

_104 Hoffman Lane_____

_Glen Gardner NJ 08826_____

**Allied Industrial Supply, LLC**

By: _____

Name: Robert M. Shindorf

Title: Managing Member

Exhibit D-7

## EXHIBIT E

## BILL OF SALE AND ASSIGNMENT

In consideration for payment of  One Million Three Hundred Thousand Dollars and No Cents ($1,300,000.00 USD), the receipt of which is hereby acknowledged as the purchase price described in an  Asset Purchase Agreement dated October    2014, between the parties Allied Industrial Supply, LLC ("**AIS**"), a Michigan limited liability company with an address of 3890 Buchanan Avenue SW, Grand Rapids, MI 49548 ("**Buyer**"); Lehigh Valley Abrasives, LLC, a New Jersey limited liability company with an address of 24 Cokesbury Road, Suite 2 Lebanon, NJ 08833 ( "**LVA**"); and Christopher Stone with an address of 24 Cokesbury Road, Suite 2 Lebanon, NJ 08833  (collectively "**Seller**") the following  described  personal  property ("**Personal Property**"):

a.    All machinery, equipment, fixtures, leasehold improvements and other tangible property described on attached Exhibit A ("**Equipment**"), used by one or more of the Sellers in the operation of business normally conducted by Lehigh Valley Abrasives, LLC.

b.    All of Sellers inventory used by one or more of the Sellers in the operation of business normally conducted by Lehigh Valley Abrasives, LLC.

c.    All assignable contracts between one or more of Sellers and sellers' contracts.

d.    Any and all other items listed in the Asset Purchase Agreement between the parties.

This Bill of Sale is being given pursuant to the terms of an Asset Purchase Agreement between Sellers and Buyer for the sale and purchase of real and personal property.

This Bill of Sale has been signed on October 13, 2014

**BUYER:**

Robert M. Shindorf, Managing Member
Allied Industrial Supply, LLC

**SELLERS:**

Lehigh Valley Abrasives, LLC

Christopher Stone, Managing Member

Christopher Stone, Individually

Exhibit E-1