UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

———————————

ALLIED INDUSTRIAL SUPPLY LLC,

    Plaintiff,

v

CHRISTOPHER STONE, an individual,

    Defendants.

and

CHRISTOPHER STONE,

    Counter-Plaintiff,

v

ALLIED INDUSTRIAL SUPPLY LLC

    Counter-Defendant.

Case No:  1:22-cv-00815
Hon. Paul L. Maloney

| | |
|---|---|
| Andrew A. Cascini (P76640)<br>Clayton J. Prickett (P86745)<br>HENN LESPERANCE PLC<br>Attorneys for Plaintiff/Counter-Defendant<br>32 Market Ave., SW, Suite 400<br>Grand Rapids, MI  49503<br>(616) 551-1611<br>aac@hennlesperance.com<br>cjp@hennlesperance.com | Christopher E. LeVasseur (P35981)<br>STARK REAGAN, PC<br>Attorney for Defendant/Counter-<br>  Plaintiff<br>1111 W. Long Lake Road, Suite 202<br>Troy, MI 48098<br>(248) 641 9955<br>clevasseur@starkreagan.com |

**<ins>PLAINTIFF ALLIED INDUSTRIAL SUPPLY'S RESPONSE TO DEFENDANT<br>CHRISTOPHER STONE'S MOTION FOR SUMMARY JUDGMENT</ins>**

HENN LESPERANCE PLC

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... 2

TABLE OF AUTHORITIES ........................................................................................... 4

CONCISE STATEMENT OF ISSUES PRESENTED.................................................. 6

    I.   Defendant Stone is not entitled to summary judgment over Count III of Plaintiff Allied Industrial Supply's Complaint.. ..................................................................... 6

    II.  Defendant Stone is not entitled to summary judgment with respect to the liquidated damages provision of the non-compete agreement he executed with Allied Industrial Supply. ..................................................................................................... 6

    III. Defendant Stone has not established an entitlement to summary judgment over Plaintiff Allied Industrial Supply's trade secret claims because he cannot prove as a matter of law that they were filed after the applicable statutes of limitation expired. ............................ 6

    IV. Defendant Stone's Brief in Support of his Motion for Summary Judgment fails to comport with the applicable court rules in several respects, and these failures pose prejudice to Allied Industrial Supply in defending against Stone's summary judgment motion ................................................................................................................... 6

INTRODUCTION ........................................................................................................... 7

STATEMENT OF FACTS .............................................................................................. 8

    I.   Stone creates Lehigh Valley Abrasives and grows the company to over $1,000,000 in annual revenue. ..................................................................................................... 8

    II.  Allied, enticed primarily by the value of LVA's intangible assets, purchases all of those assets. ............................................................................................................ 9

    III. Some time after Stone sold LVA's assets to Allied, conflicts emerge between Stone and Allied............................................................................................................ 10

    IV. Stone forms two ventures that compete with Allied, violating the non-compete agreement Stone executed with Allied as a condition of Allied's purchase of LVA's assets. ........................................................................................................................ 11

    V.  Stone inadvertently sends a customer solicitation email to Allied on behalf of the businesses he formed to compete with Allied.................................................... 13

STANDARD OF DECISION ....................................................................................... 13

LEGAL ARGUMENT................................................................................................... 14

    I.   The record is replete with facts demonstrating that Stone violated enforceable non-compete agreements he executed with Allied, and thus Stone is not entitled to summary judgment over Allied's breach of contract claims. ...................................... 14

    II.  Stone is not entitled to judgment as a matter of law concerning the liquidated damages provision in his non-compete agreement with Allied. .................................. 28

HENN LESPERANCE PLC

III. None of Allied's claims are barred by the applicable statutes of limitation. .................. 30

IV. Stone's Rule 56 Motion features significant and material procedural defects, which prejudiced Allied and which disrupt any entitlement to summary judgment Stone might otherwise have earned. ...................................................................................................... 32

REQUEST FOR RELIEF .......................................................................................................... 33

CERTIFICATE OF COMPLIANCE .......................................................................................... 35

CERTIFICATE OF SERVICE ................................................................................................... 36

HENN LESPERANCE PLC

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*ACS Consultant Co. v. Williams*,
    No. 06–11301, 2006 WL 897559, at *7 (E.D. Mich. Apr. 6, 2006) ........................................ 17

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 251–52 (1986) ........................................................................................ 13

*Baker Hughes, Inc. v. S & S Chem., LLC*,
    63 F. Supp. 3d 762, 769 (W.D. Mich. 2014) ...................................................... 31

*Bar's Prods. Inc. v. Bars Prods. Int'l Inc.*,
    662 F. App'x 400, 410 (6th Cir. 2016) ...................................................... 17, 18

*Basicomputer Corp. v. Scott*,
    973 F.2d 507, 512 (6th Cir. 1992) ........................................................... 29

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) ....................................................................................................... 29

*Curran v. Williams*,
    352 Mich. 278, 286–287, 89 N.W.2d 602 (1958)). ................................................. 28

*DAR & Assocs., Inc. v. Uniforce Servs., Inc.*,
    37 F. Supp. 2d 192, 203 (E.D.N.Y. 1999) ..................................................... 29, 30

*Evans v. Pearson Enterprises, Inc.*,
    434 F.3d 839, 850–51 (6th Cir.2006). ....................................................... 31

*In re Spradlin*,
    284 B.R. 830, 836 (E.D. Mich. 2002) ...................................................... 17

*Int'l Marine, L.L.C. v. Delta Towing, L.L.C.*,
    704 F.3d 350, 355 (5th Cir. 2013) ............................................................ 29

*Loucks v. Fieldstone Mortg. Co.*,
    No. 1:07-CV-492, 2007 WL 2814866, at *1 (W.D. Mich. Sept. 25, 2007) ......................... 15

*Moore v. St. Clair Cnty.*,
    120 Mich. App. 335, 340, 328 N.W.2d 47, 49 (1982) ....................................... 28

*Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*,
    276 F.3d 845, 848 (6th Cir.2002) ........................................................... 14

HENN LESPERANCE PLC

*Owens v. Hatler*,
    373 Mich. 289, 129 N.W.2d 404, 406 (1964) ................................................ 18

*Quantum Sail Design Grp., LLC v. Jannie Reuvers Sails, Ltd.*, 2015 WL 10963983, at *1 (W.D.
    Mich. Apr. 16, 2015) ........................................................................................ 32

*Quest Car Care Prods, Inc.*,
    708 F. Supp.3d at 13 ........................................................................................ 18

*Quest Car Care Prods., Inc. v. Titus*
    708 F. Supp. 3d 1338, 1344 (W.D. Mich. 2023) (Maloney, J.) ...................... 17

*Apex Tool Grp., LLC v. Wessels*,
    119 F. Supp. 3d 599, 607 (E.D. Mich. 2015) ................................................ 16

*W. Insulation, L.P. v. Moore*,
    No. CIV.A. 305CV602-JRS, 2006 WL 208590, at *6 (E.D. Va. Jan. 25, 2006) .................... 16

*Woodward v. Cadillac Overall Supply Co.*,
    396 Mich. 379, 391–92, 240 N.W.2d 710, 715 (1976) .................................. 16

*Wysong Corp. v. M.I. Indus.*,
    412 F. Supp. 2d 612, 622 (E.D. Mich. 2005) ................................................ 14

HENN LESPERANCE PLC

## CONCISE STATEMENT OF ISSUES PRESENTED

I.    **Defendant Stone is not entitled to summary judgment over Count III of Plaintiff Allied Industrial Supply's Complaint.  Stone cannot demonstrate that the non-compete agreement he executed with Allied Industrial is unenforceable as a matter of law.  Further, the record is full of evidence which creates material disputes of fact about whether or not Stone violated the non-compete agreement by selling similar products to Allied's customers during the non-compete agreement's term.**

II.   **Defendant Stone is not entitled to summary judgment with respect to the liquidated damages provision of the non-compete agreement he executed with Allied Industrial Supply.**

III.  **Defendant Stone has not established an entitlement to summary judgment over Plaintiff Allied Industrial Supply's trade secret claims because he cannot prove as a matter of law that they were filed after the applicable statutes of limitation expired.**

IV.   **Defendant Stone's Brief in Support of his Motion for Summary Judgment fails to comport with the applicable court rules in several respects, and these failures pose prejudice to Allied Industrial Supply in defending against Stone's summary judgment motion.**

HENN LESPERANCE PLC

# INTRODUCTION

In 2014, Defendant Christopher Stone, a New Jersey businessman, decided to sell his abrasives supply company. He found a buyer in Plaintiff Allied Industrial Supply ("Allied"), who paid Stone $1.3 million for the tangible and intangible assets of Stone's company, Lehigh Valley Abrasives, LLC ("LVA").  Contemporaneously with the sale of LVA's assets to Allied, Stone executed a non-compete agreement with Allied, in which he agreed he would not compete with Allied for seven years after the finalization of the sale.

Allied Industry Supply brought this lawsuit against Stone when it learned Stone had retained customer lists that Stone had built for LVA's use – information which constituted intangible assets and trade secrets Allied purchased from Stone in the 2014 transaction.  But Stone didn't just retain those lists – in fact, shortly after his non-compete agreement with Allied expired, Allied learned for the first time that Stone had formed competitive companies during the non-compete period and used Allied's customer lists to solicit LVA's former customers for his new business.  Allied Industrial brought trade secret conversion claims against Stone, but also brought a breach of contract claim against Stone alleging a violation of the non-compete.

After fighting tooth and nail to prevent disclosure of lists of products Stone's new companies sold during and after the non-compete period and to prevent disclosure of the lists of customers to whom Stone made those sales, Allied and Stone engaged a mediator to act as a special master and compare the list of products and customers to whom both Allied and Stone made sales during the non-compete agreement's term.  That comparison revealed that Stone's new companies sold products competitive to products sold by Allied during the non-compete period, and further revealed that Stone's new companies and Allied shared many common customers.

But the Parties do not need the Court to resolve all that now – this is not trial.  Instead, the Motion presently before the Court is Stone's request for this Court to award him with summary

judgment, thus dismissing all of Allied's claims against him as a matter of law.  But contrary to Stone's argument, the record is full of facts which – at the very least – create material disputes of fact with respect to Allied Industrial Supply's claims against Stone.  This means that summary judgment is inappropriate on this record, and accordingly this Court should deny Stone's pending motion and allow Allied Industrial's case against Stone to proceed.

## STATEMENT OF FACTS

### I.    Stone creates Lehigh Valley Abrasives and grows the company to over $1,000,000 in annual revenue.

Defendant Christopher Stone ("Stone") formed a company called Lehigh Valley Abrasives, LLC ("LVA") around 2006. LVA was based in New Jersey, and the company sold abrasive products throughout the United States. LVA did not manufacture the products it sold. Instead, LVA would purchase products from manufacturing companies and distribute them to customers via its e-commerce platform and direct to consumer.  (See Deposition of Christopher Stone, previously attached as Exhibit 1 to Stone's Brief in Support of Motion for Summary Judgment, PageID.890, pp. 31-32) (hereinafter "Stone Dep."). LVA maintained inventory in its New Jersey warehouse and would ship most products direct to consumer. (Stone Dep., PageID.893, p.43).  For some products, LVA would "drop ship[]" the products, meaning it would order the product from the manufacturer and the manufacturer would ship to the final consumer.

In LVA's early days, the company's annual revenue was approximately $1 million. (Stone Dep., PageID.985, p.51). LVA continued to expand its operations and, by 2014, LVA generated approximately $3.5 million annually. (*Id*.). Stone also grew his customer base far beyond the greater New Jersey area. By 2014, LVA had customers from every state in the country. (Stone Dep, PageID.912, p.119).

After successfully growing the company and cultivating significant goodwill, Stone decided to sell his company. Stone's motivation for selling LVA was that the company was

structured in a way that it "couldn't run without [him]," and he allegedly wanted to make more time to engage in religious-based mission work. (Stone Dep. PageID.906, p. 93). To sell LVA, Stone engaged a third-party broker who, in turn, connected prospective purchasers to Stone. (PageID.906, p.95).

II.    **Allied, enticed primarily by the value of LVA's intangible assets, purchases all of those assets.**

Allied Industrial Supply LLC ("Allied") is a Grand-Rapids based company wholly owned by parent company Stone Fox Ventures, LLC. Stone Fox Ventures, which also owns and operates multiple subsidiary companies that manufacture abrasives and abrasive related products, is wholly owned by CEO Robert Shindorf. In 2014, Shindorf, acting on behalf of Allied, opened negotiations with Stone with the intent of purchasing LVA, its assets, or both.  By October 13, 2014, Stone and Allied reached an agreement in principle by which Allied agreed to purchase LVA's assets for $1.3 million. (Asset Purchase Agreement, previously attached as Exhibit 2 to the Complaint, PageID.24) (hereinafter "APA").

As part of the sale, Allied purchased from LVA "all of the assets, rights, and interests of every conceivable kind or character whatsoever, whether tangible or intangible . . . that are owned by Seller or in which Seller has any interest of any kind." (APA, PageID.23). The APA expressly included in the list of assets to be purchased, among other things, 1) all "assignable contracts"; 2) "customers and all receivables"; 3) the name "Lehigh Valley Abrasives, LLC . . . and all good will associated with the business"; 4) past purchase orders; and 5) customer lists.  (APA, PageID.23-24). As Shindorf later testified, Allied's primary motivation for purchasing LVA was to acquire its intangible assets – specifically, LVA's intellectual property and goodwill. (Deposition of Robert Shindorf, attached as Ex. 8 to Stone's Brief, PageID.997, p. 9) ("Shindorf Dep.").

As a condition of the sale, Stone agreed to continue working for Allied after the acquisition is complete as an independent contractor. (APA, PageID.40). Despite Shindorf's years of

experience managing companies working in the abrasive sales industry, Stone believed that Allied "lacked experience in the products," didn't know "the customers in that particular market," and that Allied "didn't know what they were doing with" LVA. (Stone Dep., PageID.912, p. 117-118). Stone anticipated that he would continue working from LVA's New Jersey office and continue performing day-to-day operations in the same way he did prior to the sale. (*Id*.). About a month after the sale, however, Allied moved LVA's operations to Grand Rapids, Michigan. (*Id.*). Allied and Stone's consulting relationship terminated soon after.

### III.    Some time after Stone sold LVA's assets to Allied, conflicts emerge between Stone and Allied.

Unfortunately, Stone parted ways with Allied without resolving an important conflict which had emerged after LVA sold its assets to Allied.  Specifically, Stone and Shindorf disputed who had a legal entitlement to access and use an email address (henceforth called the "Hotmail Account"), which Stone claimed then (and continues to assert now) was his own personal email account, containing only personal information such as "working in the church" and "family information." (Stone Dep., PageID.915, p.130). But Shindorf disagreed, and the facts support his interpretation.  Among other admissions, Stone conceded during his deposition that he engaged in business correspondence with customers through the Hotmail Account, accepted purchase orders from LVA customers through it on at least a "rare[]" basis, and redirected LVA's fax number to send an electronic copy of the faxed documents to it. (Stone Dep., PageID.891, p.36; PageID.1060).  Stone assured Shindorf shortly after Allied's acquisition of LVA's assets that any new emails Stone received through the Hotmail account that were related to LVA's business would be forwarded to Allied's business email account, and even later agreed to remove all personal information from the Hotmail Account before handing it over to Allied for its use. (PageID.1061; PageID.1065; Stone Dep., PageID.914, p. 125).

Stone didn't make good on those promises.  Although Shindorf could access the Hotmail Account during a period of time after LVA sold its assets to Allied, Stone later reasserted control of the Hotmail Account and changed its password such that neither Shindorf nor any other Allied employee could access the information within it.  (Stone Dep., PageID.918, p.141).

**IV.    Stone forms two ventures that compete with Allied, violating the non-compete agreement Stone executed with Allied as a condition of Allied's purchase of LVA's assets.**

Another condition of Allied's purchase of LVA was that Stone agreed to a seven-year, non-compete agreement under which he was barred from competing, directly or indirectly, with Allied. (APA, PageID.28; Non-Competition and Confidentiality Agreement, PageID.33 (hereinafter "Agreement"). The non-compete included an anti-solicitation provision under which Stone cannot interact with Allied customers in an attempt to take, redirect, re-price, interrupt, or discontinue any facet of the business relationship. (*Id.*). The Agreement was effective for seven years and terminated on October 14, 2021. The Agreement's restrictions were commensurate with the 7-figure premium that Allied paid for LVA's goodwill and other intangible assets. It also recognizes that Stone, admittedly, was the face of LVA before the sale and had spent years cultivating a customer base that now belonged to Allied after the sale. Further, the Agreement was consistent with Stone's intent to take time off work for mission work, which was the motivating factor behind his decision to sell LVA.

Stone's retirement was short-lived, and he resumed working a few years after Allied purchased LVA.[1] Unbeknownst to Allied at the time, Stone started directly competing with Allied in 2018.  In that year, Stone founded US Tool Depot, LLC ("US Tool"), which Stone now alleges

---

[1] Stone claims in his Motion, for the first time, that he consulted with a lawyer to identify the limitations of his non-compete agreement. This is unusual because it never came up during his deposition, and Stone's counsel (rightly) interjected in the deposition to avoid disclosure of privileged communications with his attorneys. Stone heeded that advice. (Stone Dep., PageID.910, p. 111). It is disingenuous, at best, for Stone to disclose that he retained legal counsel as to the limitations of his non-compete. However, the Court need not consider Stone's statement because it is unverified, nor was it disclosed in discovery.

11

was established to sell "woodworking tools," although (as will be discussed below) US Tool's product catalogue could hardly be characterized in such a limited way. (PageID.1286-1287, ¶¶59, 61). As discussed more fully in the Legal Argument, below, these products competed with Allied's business in violation of the non-compete.

Not only did Stone begin to sell competing products during the restrictive period, he sold those products directly to Allied's current customers and LVA's former customers. As part of this litigation, the parties each produced their sales data and customer lists to Special Master Jeff Muth. Mr. Muth reviewed both Allied and US Tool Depot's respective sales records and prepared a comprehensive analysis comparing the customer and product overlap (hereinafter "Muth Report"). Mr. Muth concluded, in part, that "between Allied and US Tool, [the Special Master] found 150 customer names that do overlap." (Muth Report Summary, attached as **Exhibit 1** hereto, p.4**).**

A few years later, Stone formed another company, XP Abrasives, also during the restrictive period. Stone readily admits that XP Abrasives sold products that compete with Allied. (Stone's Brief, PageID.877). According to Mr. Muth's analysis, XP Abrasives made at least one sale of a competing product on April 22, 2021—six months before the non-compete expired. (*See id*.; "XP Abrasive-Allied Overlap Chart," p.6, attached as **Exhibit 2** hereto).[2] In addition to selling at least one competing product during the non-compete period, Stone also created XP Abrasive's website, ordered products that compete with Allied, and exchanged information with Sundisk (a major vendor of LVA that later became a vendor of Allied) so XP Abrasives could "private label" Stone's competing products (Stone's Brief, PageID.877; Stone Dep., 154:18-21).

---

[2] **Exhibit 2** contains the underlying source data from Mr. Muth's comparison between Allied and XP Abrasives overlapping sales history; **Exhibit 4** contains the same data except it compares Allied and US Tool Depot's respective sales.

HENN LESPERANCE PLC

**V.    Stone inadvertently sends a customer solicitation email to Allied on behalf of the businesses he formed to compete with Allied.**

For a while, Stone's competitive activities didn't raise suspicion with Allied. But on March 29, 2022, Stone inadvertently sent an email soliciting business on behalf of his new companies to Allied – an email that came from the Hotmail Account. **(**Solicitation Email from C. Stone, attached as **Exhibit 3** hereto). The email appeared to be a mass-mailing with prospective customers as the intended recipient, and in the email Stone expressly wrote to inform potential customers that he had started venture which was competitive with Allied. (*Id.*). Importantly, the email that Stone sent in 2022 restarted an email chain from January 31, 2014. (*Id*).

Stone had tipped his hand.  At this time, and for the first time, Allied became aware that Stone retained old LVA customer lists and historical sales information despite his earlier representations to Shindorf that he had used his Hotmail Account was used only for personal reasons. Within a few months of Stone's inadvertent solicitation email, Allied filed this lawsuit. Through discovery, Allied has been able to fully uncover the extent to which Stone violated his restrictive covenants during the non-compete period, misappropriated trade secrets belonging to Allied, and converted intangible assets.

**STANDARD OF DECISION**

A motion for summary judgment under Rule 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal,*

HENN LESPERANCE PLC

13

*Inc.*, 276 F.3d 845, 848 (6ᵗʰ Cir.2002). As is relevant here, "the moving party must reasonably identify those portions of the record upon which it relies. Simply attaching voluminous exhibits and stating that the necessary information may be found somewhere in the documents will not suffice." *Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 622 (E.D. Mich. 2005).

**LEGAL ARGUMENT**

I.    **The record is replete with facts demonstrating that Stone violated enforceable non-compete agreements he executed with Allied, and thus Stone is not entitled to summary judgment over Allied's breach of contract claims.**

Stone argues that he is entitled to judgment as a matter of law over Allied's breach of contract claims.  More specifically, in Count III of its Complaint, Allied alleged that Stone repeatedly and persistently breached the covenants not to compete with Allied's business for seven years after LVA sold its assets to Allied.  By moving this Court for summary judgment on Count III, Stone argues that the record unambiguously proves that there is no dispute of material fact which could support Allied's claims that Stone violated his competitive activity covenants during the non-compete agreement's term.

The record doesn't support Stone's argument, but instead proves the opposite.  It shows that Stone (i) formed two companies during the seven-year non-compete period that would eventually compete with Allied; (ii) used both of those companies to enter scores of transactions with Allied's customers during the non-compete period; and (iii) used both of those companies to sell products during the non-compete period which were competitive with products sold by Allied. It also shows that Stone geared up during the non-compete's term to freely and openly compete with Allied the moment that the non-compete agreement's term expired, continuing to use the customer contacts, preferences, and order history that Allied purchased from LVA as a part of the asset deal.  Because a reasonable finder of fact could determine that Stone's sales activity during

Hᴇɴɴ Lᴇsᴘᴇʀᴀɴᴄᴇ ᴘʟᴄ

14

the non-compete period violated its terms, Stone is not entitled to summary judgment and this Court should dismiss his Rule 56 Motion over Count III of Allied's Complaint.

### 1.    The Agreement is enforceable.

#### a.    Stone failed to develop any purported challenge to the Agreement's enforceability.

Stone urges the Court to "scrutinize[]" the enforceability of the non-compete agreement Stone executed with Allied as a condition of Allied's purchase of LVA's assets. (Brief, PageID.874). But he fails to develop any factual or legal basis to challenge the Agreement's enforceability. "It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving a court to put flesh on its bones." *Loucks v. Fieldstone Mortg.* Co., No. 1:07-CV-492, 2007 WL 2814866, at *1 (W.D. Mich. Sept. 25, 2007) (citations, alterations, and internal quotation marks omitted). (Maloney, J). Stone's "failure to develop a legal argument in support of his position is a sufficient basis to deny his motion." See *id.*  Nor can this Court determine the enforceability as a matter of law based on Stone's bald assertion that the "relevant facts are undisputed" (Brief, PageID.874) without first demonstrating what those relevant facts are. See *Loucks*, 2007 WL 2814866 at *1 (explaining that the movant has "the initial burden of informing the court of the basis for his motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.") (citation omitted).  For these reasons alone, the Court should reject Stone's perfunctory challenge to avoid enforcement of the restrictive covenants to which he voluntarily agreed and for which he received substantial monetary consideration.

#### b.    The restrictive covenants are reasonable and necessary to protect Allied's legitimate business interests.

But Allied need not rest on Stone's perfunctory gesture implying that the Agreement is unenforceable. Indeed, if the Court nonetheless considers Stone's perfunctory challenge to the Agreement's enforceability, the record demonstrates a conclusion contrary to the one Stone would

ask this Court to reach.  Indeed, it is clear that the Agreement is reasonable and necessary to protect Allied's legitimate business interests.[3]

Under Michigan law, non-compete and non-solicitation agreements are "enforceable if they (1) are reasonably drawn as to duration, geographical scope, and line of business; and (2) protect the legitimate business interest of the party seeking enforcement." See *Apex Tool Grp., LLC v. Wessels*, 119 F. Supp. 3d 599, 607 (E.D. Mich. 2015) (applying Michigan law) (citation omitted). With respect to the first prong of that analysis, under well-settled Michigan law, the "reasonableness of a covenant not to compete incident to the sale of a business" —like the Agreement at issue in this case— "has been generally scrutinized less rigorously than the reasonableness of such a covenant when incident to an employment contract." *Woodward v. Cadillac Overall Supply Co.*, 396 Mich. 379, 391–92, 240 N.W.2d 710, 715 (1976). The justification for more leniency is that parties to a non-compete agreement in connection with the sale of a business have "substantially equal bargaining power of freely contracting parties." *Id.*

The restrictive covenant at issue here is reasonable, particularly in the context of a business-sale restrictive covenant:

Duration. A seven-year non-compete agreement is reasonable. One out-of-jurisdiction case, *Western Insulation, LP v. Moore*, is persuasive because of its factual similarity to the present case. There, the plaintiff purchased a company from the defendant, and during negotiations the parties agreed to a seven-year non-compete agreement following the sale. *W. Insulation, L.P. v. Moore*, No. CIV.A. 305CV602-JRS, 2006 WL 208590, at *6 (E.D. Va. Jan. 25, 2006) (applying Virginia law). The defendant tried to avoid enforcement of the non-compete, arguing that the seven-year duration was unreasonable as a matter of law. *Id.* The court rejected that argument and enforced the agreement. Like Michigan, Virginia law is highly deferential to restrictive covenants

HENN LESPERANCE PLC

---

[3] The parties agree that Michigan law governs the non-compete agreement. (Brief, PageID.874).

formed as part of a business sale. See *id*. Because the non-compete was formed following the sale of the business, the court found that "the protection [plaintiff] stood to gain by negotiating for a seven-year non-compete period was an integral factor in [plaintiff's] decision to purchase [defendant's company] for $42 million. [Plaintiff] should be entitled to a benefit for which it gave substantial monetary consideration." *Id.*; see also *In re Spradlin*, 284 B.R. 830, 836 (E.D. Mich. 2002) (finding that a 5-year non-compete agreement was reasonable in connection with a business sale) (applying Michigan law).

Here, the seven-year duration of the noncompete is reasonable and necessary to protect Allied from Stone unfairly competing against Allied, as well as to protect Allied's purchase of LVA's customer base and goodwill.

Geographic area. A restrictive covenant is reasonable if it is limited to the geographic area where the enforcing party conducts business.[4] *In Quest Car Care Prods., Inc. v. Titus*, for example, the Court upheld, for purposes of a preliminary injunction, a restrictive covenant in an employment contract that spanned 49 states, in part because the "[p]laintiff conducts business in forty-nine states." 708 F. Supp. 3d 1338, 1344 (W.D. Mich. 2023) (Maloney, J.). Moreover, the agreement's geographic restriction "would protect prospective business interests as well as those that are ongoing." *Id*. See also *Bar's Prods. Inc. v. Bars Prods. Int'l Inc.*, 662 F. App'x 400, 410 (6th Cir. 2016) (upholding restraint that extended to foreign countries, in part because "a restraint in the business-sale context may be 'as broad as the business covered by the agreement[.]'") (citation omitted) (applying Michigan law);  *ACS Consultant Co. v. Williams*, No. 06–11301, 2006 WL 897559, at *7 (E.D. Mich. Apr. 6, 2006) (upholding agreement prohibiting competition in all 50 states because plaintiff serviced all 50 states).

---

[4] The parties dispute the geographic area covered by the non-compete. As discussed in the following Section, Allied interprets the Agreement to cover each state in which Allied conducted business.

Here, Stone testified that prior to the sale of LVA, he had customers in each state across the country. (Stone Dep., PageID.912, p. 119:9-14). Thus, preventing Stone from engaging in competitive activity within 40 miles of each location where Allied (and LVA) conducted business is reasonable under Michigan law.

Line of business. A restrictive covenant is reasonable if it is limited to the plaintiff's "same or similar business activities." See *Quest Car Care Prods, Inc.*, 708 F. Supp.3d at 1344. Here, the Agreement generally prohibits Stone from competing "in whole or in part with the business of AIS within 40 miles of wherever AIS conducts business, has conducted business in the last 12 months, and of AIS's operations." Thus, the Agreement only restricted Stone's ability to compete with Allied; Stone was free to engage in any other trade that does not compete with Allied.

Legitimate business interest of party seeking enforcement. "In the business sale context, 'the restraint may be as broad as the business covered by the agreement and of sufficient scope to prevent competition therewith.'" *Bar's Prods. Inc. v. Bars Prods. Int'l Inc.*, 662 F. App'x 400, 410 (6th Cir. 2016) (quoting *Owens v. Hatler*, 373 Mich. 289, 129 N.W.2d 404, 406 (1964)) (applying Michigan law). Here, the restrictive covenant at issue stems from Allied's purchase of all LVA's tangible and intangible assets. This included customer lists, customers, and accounts receivable, among other things. Given the substantial consideration paid by Allied to purchase LVA and the value of LVA's goodwill across the county, Allied would never have agreed to purchase LVA for a premium if Stone would be allowed to immediately start competing for the same business. Allied needed a sufficient time to operate and establish its own goodwill with Stone's former client base, and the parties agreed a non-compete of seven years (as a condition of the sale) would accomplish that goal.

HENN LESPERANCE PLC

18

2.     **The record proves that Stone engaged in competitive activity during the restrictive period.**

Stone's Motion characterizes the non-compete agreement as containing two separate components: the first prohibits competition and the second prohibits interference with Allied's business. For ease of reference, Allied will utilize the same framework, although the provision should be read as a whole when construing the language. This Section discusses the prohibition on competitive activity, and the second component is addressed separately below.

Stone misconstrues his obligations to refrain from competitive activity during the restricted period, warping the non-compete agreement's terms to unrecognizably limit the scope of the conduct it prohibited.  The non-compete portion of the Agreement provides as follows:

> "Seller agrees that for a period of seven (7) years after the Closing Date, neither will directly or indirectly engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend credit to, or render services or advice to any business whose products or activities compete in whole or in part with the business of AIS within 40 miles of wherever AIS conducts business, has conducted business in the last 12 months, and of AIS's operations . . ."

(Agreement, PageID.33).

Despite the comprehensive nature of the Agreement's non-compete component, Stone tries to diminish the obligations to which he voluntarily agreed and argues the non-compete restricts only the following conduct:

> "The competition restriction: 1) applied only to businesses that compete[] with the Plaintiff's business; 2) and extend only forty miles from the Plaintiff's place of business."

(Brief, PageID.875). Stone then tries, unsuccessfully, to demonstrate an absence of material fact as to whether Stone complied with his own tortured interpretation of the non-compete component. Stone's interpretation is belied by the Agreement's plain language and the circumstances surrounding contract formation.

19

First. The non-compete agreement prevents Stone from directly or indirectly being involved in a business that competes, in whole or in part, with Allied's business or its operations. Critically, this Agreement was entered into ***contemporaneously*** with Allied's purchase of LVA's tangible and intangible assets. When the non-compete agreement was signed, Allied had purchased "all of the assets, rights, and interests of every conceivable kind and character whatsoever" from LVA, which expressly included 1) all "assignable contracts"; 2) "customers and all receivables"; 3) the name "Lehigh Valley Abrasives, LLC . . . and all good will associated with the business"; 4) past purchase orders; and 5) customer lists.  (APA, PageID.23-24).

Thus, "within 40 miles of wherever AIS conducts business" must be construed to encompass all locations where Allied ***and*** LVA conduct business, or had conducted business in the 12 months prior to the sale. (Agreement, PageID.33). Restricting the scope of the non-compete to only those locations (and customers) where ***Allied*** conducted business ***prior*** to its acquisition of LVA contradicts the sole reason Allied wanted the non-compete in the first place: to prevent Stone from simply continuing to sell competing products in the same locations or to the same customers. Otherwise, Stone could have simply retained the $1.3 million sale price for LVA while forming a new entity and duplicating LVA's business model precisely with respect to the same customers and the same products, which would in turn substantially dilute the interest Allied held in obtaining LVA's assets.

Second. Stone's attempt to restrict the geographic area of the non-compete to within 40 miles of Allied's Grand Rapids office has no support in the text of the Agreement. The non-compete prohibits competition "within 40 miles of ***wherever AIS conducts business***" or "***has conducted business*** in the last 12 months." (Agreement, PageID.33) (emphasis added). Stone's argument that the quoted language doesn't mean what it says in the Agreement is unfounded. There is no support for his argument that the non-compete is limited to "only forty miles from the

***Plaintiff's place of business***." (Brief, PageID.875) (emphasis added). Stone's interpretation does further violence to the agreement's plain language because it would render meaningless the language "…has conducted business within the last 12 months." (Agreement, PageID.33).

<u>Third</u>. To the extent the Court finds an ambiguity exists in the non-compete component, the extrinsic evidence in the record cuts against Stone's narrow interpretation.  Stone originally agreed to work for Allied as a salaried consultant following the sale. According to Stone, "Allied did not have experience in the products" (i.e., industrial abrasives formerly sold by LVA), nor did Allied know "the customers in that particular market." (Stone Dep., PageID.912, 117:1-7). Stone further explained that his consulting services were needed to train Allied's employees because they did not know anything about "the products, suppliers and customers and business" conducted by LVA prior to the company sale (*Id*. at 117:10-20). To be sure, Allied and Shindorf dispute that characterization of Shindorf's experience with the products and services Allied would go on to market.  But accepting Stone's position at face value *arguendo,* a restrictive covenant applicable to only to Allied's pre-acquisition business operations or pre-acquisition place of business would functionally impose no restriction on Stone. Stone could continue selling competing products in the same locations where LVA previously did business because Allied – Stone claims – did not "conduct business[]"in the abrasives market. (*Id*; Agreement, PageID.33) This interpretation cannot stand. It would undermine a universally accepted business practice (i.e., preventing the owner of an acquired company not to compete with the buyer following the sale) and frustrate the parties' original intent.

Moreover, when the non-compete was signed, Stone believed that Allied was going to continue utilizing the former headquarters of LVA in New Jersey. (Stone Dep., PageID.912, 117:23-118:5). Stone was caught off guard when Allied "quickly changed its mind" and moved the business to Michigan not long after the sale (i.e. February of 2015). (Stone Dep. PageID.912,

117:23-118:5). Stone's testimony makes clear that, as of the time he signed the non-compete agreement, he believed that Allied would keep LVA's place of business in New Jersey. This cuts against Stone's "place of business" argument because there is no evidence to suggest the parties contemplated a geographic restriction within 40 miles of Grand Rapids.

In sum, the non-compete component prevents Stone from engaging, directly or indirectly, in the competitive conduct defined in the Agreement. The geographic area covered by the Agreement is within 40 miles of any location where Allied conducts business or had conducted business in the 12-months prior to executing the non-compete. LVA's customers and business operations that Allied purchased from LVA are included when defining the area where Allied conducts business, as is the location where all of Allied's eventual customers received the products Allied sold to them. It is undisputed that LVA had customers in "each state across the country" prior to the sale, as did Allied during the term of the non-compete agreement. (Stone Dep., PageID.912, 119:9-14). And, as shown below, Stone sold competing products to those same customers during the restrictive period. Summary judgment is not appropriate.

### 3.   Stone's operation of US Tool Depot, LLC and sale of competing products during the restrictive period constituted a breach.

It is undisputed that Stone formed US Tool Depot during the restrictive period. It is further undisputed that US Tool Depot sold products during the restrictive period to Allied's current customers. Special Master Jeff Muth reviewed both Allied and US Tool Depot's respective sales records and prepared a comprehensive analysis comparing the customer and product overlap. Mr. Muth concluded, in part, that "between Allied and US Tool, [the Special Master] found 150 customer names that do overlap." (Muth Report Summary, **Exhibit 1**, p.4)**.** The significant customer overlap and similarity in products creates, at a minimum, a dispute of fact as to Stone's

breach of the non-compete.  This is sufficient to defeat Stone's argument that he is entitled to summary judgment over Count III of Allied's Complaint.

But there's more.  Mr. Muth's analysis further revealed that US Tool Depot (i.e., Stone) sold products to customers that LVA serviced before the sale to Allied. For example, Ridco Casting Company was a customer of LVA prior to Allied's acquisition. LVA sold products to Ridco in Pawtucket, Road Island on November 5, 2013. ("US Tool Depot-Allied Overlap Chart," p.11, attached as **Exhibit 4** hereto). On February 10, 2018, during the restrictive period, US Tool Depot sold products to Ridco in Pawtucket, Rhode Island. (*Id.*). Stone's actions – selling products to a former LVA customer, at the customer's same location, during the non-competition's term – further precludes summary judgment.

But it's not just that the Muth Report shows that Stone operated US Tool Depot during the non-compete period, that Stone sold products from US Tool Depot during the non-compete period, or even that Stone sold products to LVA (and later Allied's) customers during the non-compete period.  Indeed, Stone's Motion does not even mention the Muth Report or its detailed findings regarding the products that US Tool Depot sold during those periods. Stone cannot demonstrate an absence of a factual dispute by simply ignoring adverse facts.

And the details about the products that US Tool Depot sold are extremely adverse to Stone's case, which is why he doesn't want the Court to consider them when evaluating his demand for summary judgment.  Indeed, in addition to the significant customer overlap, the record contains a genuine dispute of material fact as to whether US Tool Depot's products sold during the non-compete were competitive, directly or indirectly, with products offered for sale by Allied. According to Stone, US Tool Depot sold woodworking abrasives, while Allied (formerly LVA) sold metalworking abrasives. (See Stone Dep., PageID.922, 160:12-14). Stone argues that all of US Tool Depot's sales during the non-compete period were sales of woodworking abrasives, and

further argues that metalworking abrasives are entirely distinct sectors of the abrasives market without any correspondingly overlapping use. As a threshold issue, this creates a material dispute that a jury should decide as a trier of fact. But more directly, Stone's position now is contradicted by his own sworn testimony

During his deposition, Stone was asked about several products that were offered for sale when he owned LVA. One product was known as a "zirconia sanding belt." (Stone Dep., PageID.922, p. 157). Stone admits that the zirconia sanding belt was offered for sale by LVA when Stone owned the company, and that the particular product "would be used for metal finishing" and not woodworking. (Stone Dep., PageID.922, 158:3-6; 157:10-13). Despite this unequivocal testimony that the zirconia sanding belt is not intended for wood products, Stone admits that he advertises *that same product as being* "appropriate for very dense and hard woods" on his new company's website. (Stone Dep., PageID.922, p.157). When confronted with the contradictory statements, Stone claims he made a "mistake" when drafting the product description for his new company's website. (Stone Dep., PageID.922, 157:19-158: 2).

It might have been a mistake – that seems like a dispute of fact fit for a jury to evaluate. But it wasn't an isolated mistake, either.  Stone was asked about another product known as a "3-inch Quick Change Disc Roloc Zirconia with Grinding Aid." (Stone Dep. PageID.922, 158:13-15). Again, Stone testified that (1) the product was a metalworking product, not a woodworking product; and (2) LVA used to sell that same product as a metalworking abrasive before Stone sold LVA. (Stone Dep., PageID.922, 158:18-25). Yet, Stone admits his new company advertises that the *same product* can be used for metalworking as well as on "delicate wood surfaces." (Stone Dep., PageID.922, 159:1-12). Stone again tries to discount the advertisements he wrote as innocent mistakes when drafting product descriptions. (Stone Dep., PageID.922, 159:12-16).

In sum, the Muth Report demonstrates competitive activity during the restrictive period. Stone concedes that he "formed a business called US Tool Depot," which sold "woodworking tools." (PageID.1286-1287, ¶¶59, 61). Product advertisements from LVA and Stone's new company's advertising materials demonstrate that woodworking and metalworking tools are ***not*** mutually exclusive sectors of the abrasive market; the products have overlapping uses. Viewing the facts and inferences in the light most favorable to Allied, as the Court must, the record demonstrates a genuine dispute of fact as to whether woodworking products compete, "directly or indirectly," with Allied's business operations "in whole or in part." (Agreement, PageID.33).

### 4. Stone's operation of XP Abrasives and sale of competing products during the restrictive period constituted a breach.

Stone admits that his other website, XP Abrasives "competed with LVA" (Brief, PageID.866; see also PageID.877). While Stone claims he did not compete with Allied until after the non-compete period expired, the record demonstrates otherwise.

<u>First</u>. The Muth Report shows that XP Abrasives sold competing products to a customer named Elmer Murphy from Milton, Florida. ("XP Abrasive-Allied Overlap Chart," **Exhibit 2**, p.6). Stone made this sale on ***"4/22/2021"***—6 months ***before*** the non-compete agreement expired in October 2021. (*Id*., emphasis added; Agreement, PageID.33). Stone's concessions that XP Abrasives sold products that directly compete with Allied, combined with a documented sale during the non-competition period, creates a genuine dispute of fact precluding summary judgment.

<u>Second</u>. A genuine dispute of fact exists as to whether Stone's formation of XP Abrasives and business activity during the non-compete period was an additional breach. In addition to selling competing products in April 2021, Stone engaged in the following conduct ***during*** the non-compete period: Stone formed XP Abrasives to sell products that would directly compete with

Allied (Brief, PageID.877); Stone created XP Abrasive's website (PageID.877); Stone ordered products that compete with Allied (PageID.877); Stone exchanged information with Sundisk (an LVA, and later Allied, vendor) so Sundisk could "private label" the products Stone intended to sell that were competitive with products offered by Allied (Stone Dep., PageID.921, 154:18-21); and Stone does "not have an exact information" as to when he received those products (Stone Dep., PageID.921, 154:24-155:7).[5] Stone claims that he was simply "preparing to compete" in taking these steps, and argues that such preparations are not violations of the non-compete even if they were unambiguously executed during the non-compete agreement's term. (Brief, PageID.877). Stone supports his legal position with one case from the Court of International Trade construing a federal statute's use of the word "compete." (*Id*.).

While the verbiage Congress uses in federal statutes is frequently debated,[6] Stone's argument misses the mark. The relevant inquiry in this case is the meaning of "products or activities" and "compete." (Agreement, PageID.33). Recall that the non-compete agreement provided that during its term, Stone could not "directly or indirectly engage in, invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with . . . any business whose ***products or activities compete***, in whole or in part, with" Allied. (Agreement, PageID.33, emphasis added). The plain language distinguishes between "products" on the one hand, and "activities" on the other. To compete means to "strive consciously or unconsciously for an objective (such as position, profit, or a prize)."[7] See also: *Competition,* Black's Law Dictionary

HENN LESPERANCE PLC

---

[5] Even though he did not have the exact date, he "think[s]" the products were received "after the non-compete" expired.
[6] See *Carr v. United States*, 560 U.S. 438, (2010).
[7] Merriam Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/compete (last visited March 20, 2025).

(11th Ed. 2019) ("The struggle for commercial advantage; the effort or action of two or more commercial interests to obtain the same business from third parties.").

When Stone sold a "product" to Elmer Murphy on April 22, 2021, that sale was competitive activity because XP Abrasives unjustly derived revenue from the sale that Allied otherwise could have obtained. Even under Stone's present-tense argument, that sale violated the noncompete.

When Stone founded XP Abrasives, created a website, ordered "products" from overseas, and created private labels during the non-competition period, he did not undertake those "activities" for personal or philanthropic reasons. (See Agreement, PageID.33). Stone was "striving for an objective"; he was seeking a "commercial advantage" during the non-compete period, which is barred by the Agreement's plain language. And, to the extent there exists an ambiguity as to the meaning of "products or activities" and "compete," then that is a question of fact for the jury.

### 5.   Both US Tool Depot and XP Abrasives interfered with Allied's business during the non-compete period.

The second component of the non-compete agreement prohibits Stone from interfering with Allied's customers, which include LVA's customers and goodwill following the sale. During the non-compete period, Stone may not:

> "…attempt to interfere with the business of AIS, either directly or indirectly, in any manner, including but not limited to: (a) interacting with the AIS's customers in an attempt to take, redirect, re-price, interrupt or discontinue any facet of the business relationship; (b) interacting with AIS's employees or representatives in an attempt to induce them to leave employment with AIS; or (c) interacting with any other person or entity so as to divulge information about AIS's business."

(Agreement, PageID.33). Stone, however, again tries to remove express obligations from the non-interference component. He argues the non-interference portion prohibits only the following conduct:

> "The interference restriction prohibited Stone from: 1) inducing the Plaintiff's employees to leave; or 2) divulging the Plaintiff's business information."

(Brief, PageID.875). Tellingly, Stone omits from his analysis the portion that bars him from "attempt[ing] to interfere with the business of AIS" by "interacting with the AIS's customers" among other things.  (Agreement, PageID.33). The part that Stone omits from his Brief is the same provision he violated.

Stone argues in conclusory fashion that Allied has no evidence that Stone attempted to interfere with Allied's business or that he interacted with AIS's customers in an attempt to re-direct business that otherwise could have gone to Allied. Not so. As described above, the Muth Report demonstrates that ***each*** of Stone's businesses formed during the non-compete agreement sold products to Allied's customers. And there is a factual dispute as to whether the products Stone sold to Allied's customers competed with Allied's business. Thus, a factual dispute exists as to whether Stone interfered, or attempted to interfere, with Allied's customers by Stone selling products to Allied's customers. Because there is a fact dispute as to whether Stone sold products to Allied's customers that Allied otherwise could have sold, Stone is not entitled to judgment as a matter of law that he did not interfere, or attempt to interfere, with Allied's customers.

## II.    <u>Stone is not entitled to judgment as a matter of law concerning the liquidated damages provision in his non-compete agreement with Allied.</u>

Next, Stone argues that the liquidated damages provision in the non-compete agreement is unenforceable because it allegedly operates as a penalty. It does not.

Parties to a contract may agree in advance as to the amount of damages that will be incurred in the event of a breach, particularly when those damages are "uncertain and difficult to ascertain at the time the contract is entered into." *Moore v. St. Clair Cnty.*, 120 Mich. App. 335, 340, 328 N.W.2d 47, 49 (1982) (citing *Curran v. Williams,* 352 Mich. 278, 286–287, 89 N.W.2d 602 (1958)). Michigan courts "recognize that ***the parties, particularly at the time of execution of the***

Henn Lesperance plc

**instrument, are in as good a position as anyone to arrive at a fair amount of damages for a subsequent breach**." *Id*. (quoting *Curran*, 352 Mich at 282) (emphasis added). Moreover, the fact that a party seeking to invalidate a liquidated damages provision "can conjure a hypothetical breach . . . that would produce minuscule actual damages does not undermine the validity of the clause." *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 203 (E.D.N.Y. 1999).

While Stone believes that calculating damages stemming from a breach of a non-compete would be "a simple matter" (PageID.878), courts in this Circuit hold otherwise. "The likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (applying Michigan law); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer.") (citation omitted; applying Ohio law). Accord: *Int'l Marine, L.L.C. v. Delta Towing, L.L.C.*, 704 F.3d 350, 355 (5th Cir. 2013) (explaining that damages from breach of non-compete agreement are "difficult to calculate" and such agreements "often include a liquidated damages provision to avoid the difficulty of calculating damages.") (citation omitted).

Here, Stone cannot claim the liquidated damages provision is unfair. As shown in the cases cited above, courts routinely find that liquidated damage provisions are appropriate and enforceable in the context of non-compete agreements because of the difficulty calculating such damages. Moreover, at the time of execution, the Stone "acknowledge[d] that if the Seller violates any covenants contained in this Agreement, it will be difficult for the parties to calculate damages incurred by such breach." (Agreement, PageID.34). When the parties executed the non-compete

agreement, each were represented by separate counsel. (Stone Dep. PageID.910, pp. 109-110). Stone had the opportunity to ask his attorney questions about the meaning of all documents that were presented to him in connection with the sale. (Stone Dep., PageID.910, pp. 110-111). Stone further explained that he read the non-compete, including the liquidated damages provision, before signing it. (Stone Dep., PageID.910, p.109).

These facts demonstrate that, at the time of formation, the parties understood and agreed to the amount of damages in advance, and they were in the best position to estimate their damages at the time of contracting in light of the scope and duration of the restrictive covenant. The $250,000 stipulated damages in a small fraction of LVA's $3.5 million annual revenue at the time of sale. (Brief, PageID.879). Thus, the $250,000 is a reasonable estimate of damages when compared to one year's revenue, and even more reasonable when compared to the revenue that LVA (under Allied's ownership) was expected to generate by the end of the 7-year non-compete period—approximately $24.5 million.

Stone cannot avoid enforcement of a valid liquidated damages provisions after he breached the Agreement. Nor can Stone's hypothetical sale of one flap disc (PageID.878) undermine the validity of stipulated damages clause. *DAR & Assocs., Inc.*, 37 F. Supp. 2d at 203. (E.D.N.Y. 1999). What's more, the Muth Report demonstrates that there were over 150 overlapping customers that Stone serviced during the non-compete period and hundreds of transactions. Thus, Stone's example of a $20 flap disc is both legally irrelevant and factually wrong.

For these reasons, the Court should deny summary judgment on Stone's affirmative defense that the liquidated damages provision is unenforceable.

**III.   None of Allied's claims are barred by the applicable statutes of limitation.**

Stone requests summary judgment on Counts I, IV, V, and VI of the complaint. These claims are based on Stone's theft of trade secrets under applicable state and federal statues, as well

as common law conversion. Importantly, Stone does not seek summary judgment on the merits of the underlying claims; his requested relief is based ***solely*** on the statute of limitations. Allied, therefore, addresses only the grounds on which Stone requests relief.

Allied's trade secret and conversion claims are not barred by the statute of limitations because Stone's concealment of his misconduct tolled the statute of limitation. The statute of limitations on these claims is tolled if the plaintiff shows that the defendant engaged in "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Baker Hughes, Inc. v. S & S Chem., LLC*, 63 F. Supp. 3d 762, 769 (W.D. Mich. 2014) (citing *Evans v. Pearson Enterprises, Inc.,* 434 F.3d 839, 850–51 (6th Cir.2006)).

Here, at a minimum, there is a dispute of fact as to whether Stone concealed his misappropriation of Allied's trade secrets and theft of intangible property. At the time Allied purchased LVA, Allied believed that the Hotmail Account contained sensitive business information, including customer lists. Initially, Stone advised Allied's principal that the account was a personal one, but that Stone would forward any business-related email to Allied's business address. (Stone Dep., PageID.914, p. 129). Throughout the entirety of Stone and Allied's dispute over the Hotmail Account, Stone maintained that only personal information was stored on the account, and he only had a stray business-related email. While Allied's principal wanted access to the account to ensure all business-related emails were being forwarded to the company's address, Stone took back exclusive control of the account in 2015. (See Stone Dep., PageID.920, pp. 151-152). Given Stone's consistent representations to Allied that he did not maintain customer lists or account histories in the personal email, Allied did not know or have reason to know that Stone retained trade secrets in his personal account in 2015.

31

Fast forward to March 29, 2022. Stone inadvertently sent a solicitation email to Allied from the Hotmail Account. **(Exhibit 3,** Solicitation Email from C. Stone**).** The intended recipient was a prospective customer, and Stone was writing to inform the customer that Stone had started a competing venture. (*Id.*). Importantly, the email that Stone sent in 2022 restarted an email chain from January 31, 2014. (*Id*). At this time, and for the first time, Allied became aware that Stone retained customer lists and historical information despite his prior (and current) representations that the Hotmail Account was used only for personal reasons. Within mere a few months of Stone's inadvertent solicitation email, Allied filed this lawsuit.

These facts demonstrate that (1) Stone took active steps to conceal trade secrets that existed in his Hotmail Account in the form of customer lists and historical data; (2) Allied did not discover that Stone maintained a repository of trade secrets in the Hotmail Account until April 2022 when Stone inadvertently sent the solicitation email; and (3) within months of discovering Stone possessed trade secrets, Allied filed this lawsuit. These facts permit the tolling of the statute of limitations for purposes of Counts I, IV, V, and VI of the Complaint.

IV. **Stone's Rule 56 Motion features significant and material procedural defects, which prejudiced Allied and which disrupt any entitlement to summary judgment Stone might otherwise have earned.**

Although the record proves that disputes of material fact exist with respect to Counts I, III, IV, and V of Allied's Complaint such that the Defendant is not entitled to summary judgment under Fed. R. Civ. P. 56, Stone's Rule 56 Motion should be denied upon procedural grounds as well. A party's failure to comply with local administrative rules is grounds for denial of the motion. See *Quantum Sail Design Grp., LLC v. Jannie Reuvers Sails, Ltd.*, 2015 WL 10963983, at \*1 (W.D. Mich. Apr. 16, 2015) (denying discovery motion without prejudice where moving party failed to follow local rules).

Under Local Rule 7.1(b), "all affidavits or other documents relied upon to establish such facts shall accompany the motion." Exhibits must be marked with a number or letter. 7.1(b); LCivR 5.3; LCivR 5.7(d)(vii)(B). Citations to previously filed materials must be referenced by their PageID. Absent leave of court, a party cannot file more than 200 pages in support of a motion. LCivR 7.1(b).

Stone's Brief in Support of his Rule 56 Motion is peculiar because, despite attaching more than 400 pages of exhibits, his brief doesn't actually directly cite any of those pages. Instead, Stone relies heavily on a "Statement of Material Facts" – a document filed separately from his Brief in Support of his Motion – which is then repeatedly referenced in the Brief itself. *Cf.* LCivR 7.1(b) (stating that supporting documents "shall accompany the motion."). The Statement of Material Facts is neither required nor permitted by the Federal Rules of Civil Procedure, Local Rules for the Western District of Michigan, or Judge Maloney's "Information and Guidelines" (last updated 3/1/2021). What's more the Statement of Material facts doesn't contain excerpts of evidence in the record. Instead, this Statement includes a duplicate 400 pages of exhibits as an attachment and references those.

This isn't purely a stylistic gripe. In moving this Court under Rule 56, Stone is asking Allied to defend against his argument that the record is devoid of any material facts in dispute. To determine what facts are actually in the record, Stone's Brief in Support of his Rule 56 Motion cites to the Statement of Material Facts, which in turn cites to the voluminous stack of exhibits. The practical impact is that a reader must follow a citation (to the Statement of Material Facts) to a citation (to the exhibits) to find support from the record for the assertions at issue in the Brief itself. This is materially prejudicial to the non-moving party at Summary Judgment because Allied

HENN LESPERANCE PLC

33

must follow a *matryoshka* doll of citations to test Stone's assertions that the record has established his entitlement to judgment as a matter of law. [8]

## **REQUEST FOR RELIEF**

For the reasons explained above in detail and based on the foregoing facts of record and authorities cited herein, Plaintiff Allied Industrial Supply LLC respectfully requests that this Honorable Court DENY Defendant's Motion for Summary Judgment.


Dated: March 21, 2025

*/s/ Andrew A. Cascini*
Andrew A. Cascini (P76640)
Clayton J. Prickett (P86745)
Henn Lesperance PLC
32 Market Ave SW, Ste. 400
Grand Rapids, MI 49503
(616) 551-1611
aac@hennlesperance.com
cjp@hennlesperance.com

HENN LESPERANCE PLC

---

[8] As just one example, Stone's Brief (PageID.874) cites "SOMF ¶41." in apparent reference to a contract term. Paragraph 41 of the purported "SOMF" cites to an unmarked "APA" with a nested reference to Exhibit B of the "APA." PageID.1285.

## **CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of W.D. Mich. LCivR 7.2(b)(i) because this brief contains 9,027 words, excluding the parts of the brief exempted by W.D. Mich. LCivR 7.3(b)(i).

2.      This brief has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2402).

Dated: March 21, 2025

_____/s/ Andrew A. Cascini_____
Andrew A. Cascini (P76640)
HENN LESPERANCE PLC
32 Market Ave. SW, Ste. 400
Grand Rapids, MI 49503
(616) 551-1611

HENN LESPERANCE PLC

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 21, 2025 I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of the filing to all counsel of record.

*/s/ Ashleigh Cieslinski*
Ashleigh Cieslinski,
Legal Assistant

Henn Lesperance plc